UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

WONDER WILLIAMS,

                                        Plaintiff,
                                                                9:16-CV-1211
v.                                                              (GTS/TWD)

MRS. NOVAK, as representative of the estate of
Novak, et al.,

                        Defendants.
_____

APPEARANCES:                                    OF COUNSEL:

WONDER WILLIAMS
10-A-0102
Plaintiff, pro se
Mid-State Correctional Facility
P.O. Box 2500
Marcy, NY 13403

BARBARA D. UNDERWOOD                            AIMEE M. PAQUETTE, ESQ.
Attorney General of the State of New York       Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT-RECOMMENDATION**</u>

## I.    INTRODUCTION

Plaintiff Wonder Williams commenced this *pro se* civil rights action pursuant to 42

U.S.C. § 1983 on October 6, 2016.  (Dkt. No. 1.)  Plaintiff has alleged the following violations of

his First and Eighth Amendment rights while he was incarcerated at Auburn Correctional Facility

("Auburn"): (1) acts of retaliation by Defendant Auburn Corrections Officer ("C.O.")

Christopher Novak ("Novak") and Auburn Sergeant Patrick Donnelly ("Donnelly")[1] against Plaintiff for filing grievances and making verbal and written complaints, in violation of Plaintiff's First Amendment rights; and (2) Eighth Amendment conditions of confinement claims against Novak and Donnelly for moving him to, and forcing him to remain in, allegedly uninhabitable cell I-3, and against Novak for denying Plaintiff's request for cleaning materials despite the deplorable conditions; (3) supervisory liability claims against Auburn Superintendent Harold Graham ("Graham"), Auburn Captain Brian Chuttey ("Chuttey"), Auburn First Deputy Superintendent Grafton Robinson ("Robinson"), Department of Corrections and Community Supervision ("DOCCS") Commissioner Anthony Annucci ("Annucci"), Auburn Lieutenant Timothy Quinn ("Quinn"), and Auburn Captain Edward Fagan ("Fagan") for failure to correct their subordinates Novak and Donnelly's retaliatory conduct against Plaintiff and failure to remedy Plaintiff's allegedly deplorable conditions of confinement in cell I-3, despite receiving notice thereof, in violation of Plaintiff's First and Eighth Amendment rights; and (4) a supervisory liability claim against Donnelly, as Novak's supervisor, for knowing of Novak's retaliatory harassment and threats against Plaintiff and failing to take action to correct the situation.  Defendants have been sued solely in their individual capacities.  (Dkt. No. 1.)

Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 39.)  Plaintiff has responded in opposition to the motion, and Defendants have replied.  (Dkt. Nos. 61 and 69.)  Plaintiff has moved for the imposition of spoliation sanctions against Defendants pursuant to Rule 37 of the Federal Rules of Civil

---

[1]  Novak is now deceased and Mrs. Novak, in her capacity as representative of her late husband's estate (referred to herein as "Novak"), has been substituted as a Defendant.  (Dkt. No. 67.)

Procedure relating to the tape over of videotapes Plaintiff had requested be preserved for litigation following the incidents out of which his claims arise. (Dkt. No. 62.) Defendants have opposed the motion. (Dkt. No. 68.)

For reasons explained below, the Court recommends that Defendants' summary judgment motion be granted in part and denied in part, and that Plaintiff's motion for spoliation sanctions be denied without prejudice to renewal at trial.

## II.    FACTUAL BACKGROUND

### A.    October 15, 2013, Incident with Novak

Plaintiff was placed in administrative segregation in the Special Housing Unit ("SHU") at Auburn on or about March 15, 2010. (Dkt. No. 39-10 at 11.[2]) Plaintiff was still in administrative segregation in SHU on October 15, 2013, when a nurse approached his cell for sick call. (Dkt. Nos. 61-3 at ¶ 4[3]; 61-4 at 2.) Plaintiff asked the nurse for pain medication in a low tone to maintain confidentiality. *Id*. According to Plaintiff, Novak did not like that he and the nurse were speaking in low tones and later returned to Plaintiff's cell to question him about what he and the nurse had discussed. (Dkt. Nos. 61-3 at ¶ 5; 61-4 at 2.) Plaintiff told Novak that his confidential medical information was none of his business. *Id*. Novak became angry and told Plaintiff if he wanted to know something, Plaintiff had better tell him. *Id*.

Plaintiff wrote a grievance (AUB-63882-13) regarding the incident on October 15, 2013. (Dkt. No. 61-4 at 2-3.) The grievance was filed on November 5, 2013, and on December 4,

_____

[2] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

[3] Paragraph numbers are used where documents identified by CM/ECF docket number contain consecutively numbered paragraphs.

2013, the Superintendent denied Plaintiff's request for relief finding that a thorough investigation revealed no support for his allegations of misconduct by Novak. *Id.* at 6. The Inmate Grievance Program ("IGP") Central Office Review Committee ("CORC") likewise found insufficient evidence to substantiate malfeasance. *Id*. at 8.

The grievance record included a memorandum from Novak to Lieutenant Vasile ("Vasile"), dated November 7, 2013, stating that Novak had spoken to Plaintiff regarding his inappropriate behavior towards the nurse on October 15, 2013, but at no time had he harassed Plaintiff and did not recall using foul language. (Dkt. No. 61-4 at 5.) RN Hoover, the nurse involved in the October 15, 2013, incident, submitted a November 21, 2013, statement to Vasile disclosing that Plaintiff had spoken loudly at her to "be quiet and use a lower tone of voice," when she was doing sick call with Novak on October 15, 2013. *Id.* at 7.

### B.    Move to Cell I-3

Plaintiff claims that later in the day on October 15, 2013, Novak and Donnelly came to his cell and ordered him to pack up to be moved to SHU cell I-3. (Dkt. No. 61-3 at ¶ 10.) Plaintiff did not want to move to the cell but was ordered to do so by both Novak and Donnelly, whom Plaintiff claims were responsible for escorting him to the cell, moving him in, and leaving him there. *Id.* at ¶¶ 10, 21.

According to Plaintiff, the cell had not been cleaned or sanitized before he moved in and was in an unsanitary, hazardous state unfit for human habitation. *Id*. at ¶¶ 10-11. Plaintiff described the cell as barren with a cold cracked concrete floor and a broken sink with used toothpaste, dried human spit, hair, blood, and other unsanitary substances on it. *Id*. at ¶ 12. Plaintiff claims the toilet, which was not functioning properly, was repulsive and unsanitary with

dried spit, feces (inside and smeared on the bowl), and urine splashed up on the walls, giving off a sickening and noxious odor, which left Plaintiff nauseous and dizzy and gave him headaches and watery eyes. (Dkt. No. 61-3 at ¶¶ 13-14.) Plaintiff claims Novak denied his request for cleaning supplies, and that he never received cleaning supplies during his stay in cell I-3. (Dkt. No. 39-2 at 27-28.)

Plaintiff has described the mattress as badly damaged, torn and shredding, very flat, stained with dried ejaculate and blood, and smelling of feces and urine. (Dkt. No. 61-3 at ¶ 16.) The pillow was ripped, soiled, and dirty and stained with food, dirt, ejaculate, and urine. *Id.* at ¶ 17. Plaintiff also noticed while in the cell that it had an insect and vermin problem. *Id.* at ¶ 19. Plaintiff claims cell I-3 contained no clean drinking water, and although he was given water with chow, no one came around with buckets of water, and he experienced painful headaches and dehydration. (Dkt. Nos. 1 at ¶ 17; 39-2 at 28, 68.) In his affidavit in opposition to Defendants' motion, Plaintiff goes further suggesting he was only given four or five ounces of water once or twice every two days or so, and that as a result he suffered painful headaches, lethargy, and constipation. (Dkt. No. 61-3 at ¶¶ 68-70.) Plaintiff states in his affidavit, that he complained of stomach pains, an upset stomach, constipation, and cracked lips due to dehydration. *Id.* at ¶¶ 72-74.

According to Plaintiff, on October 17, 2013, he stopped Robinson and spoke with him about the inhumane living conditions in cell I-3. *Id.* at ¶ 11. Plaintiff complained to Robinson about the cell's deplorable state, not being given cleaning supplies, and Robinson's subordinates Novak and Donnelly's retaliation against him. *Id.* Plaintiff asked Robinson to have him moved and to preserve the SHU video for October 15 and 17, 2013, for future court proceedings. *Id.*

Plaintiff claims Robinson showed disinterest and told Plaintiff he would see about it.  *Id*. at  ¶ 12; *see also* Dkt. No. 39-2 at 30.  Robinson did not have Plaintiff moved from the cell after being shown the conditions.  (Dkt. No. 61-3 at ¶ 12.)  Plaintiff remained in cell I-3 for thirty-four days until his transfer to another cell on November 17, 2013.  (Dkt. No. 39-12 at ¶ 8.)

> ### C.    Grievances Regarding Cell I-3 Conditions
>
> #### 1.    October 18, 2013, Grievance (AUB-63832-13)

Plaintiff submitted a grievance, dated October 18, 2013, and filed on October 23, 2013, regarding the condition of the mattress in cell I-3.  (Dkt. No. 39-3 at 4.)  Plaintiff described the mattress as flat and tearing.  *Id*.  Plaintiff claimed the mattress aggravated his back pain, was difficult to sleep on, and needed to be replaced with a brand new mattress.  *Id.*  According to Plaintiff, the area supervisor had been made aware of the mattress issue on the previous three days, and Plaintiff had yet to receive a new mattress.  *Id*.

The Inmate Grievance Resolution Committee ("IGRC") found, based upon the investigation done on the grievance, that Plaintiff's mattress was not flat and was the same as most mattresses.  *Id*. at 7.  The decision also noted that the facility tries to swap out the oldest mattresses with the newest.  Robinson, acting for the Superintendent agreed with the findings of the IGRC.  *Id*. at 5; Dkt. No. 39-18 at ¶ 6.  On appeal to CORC, Plaintiff argued that staff never investigated his complaints about the mattress or interviewed him and had never seen the mattress.  (Dkt. No. 39-3 at 5.)  CORC noted the investigative finding that the mattress had been inspected and found in serviceable condition.  *Id*. at 1.  According to Plaintiff, at no point did grievance investigators come to his cell to inspect the mattress or interview him regarding the grievance, and throughout the grievance process no one identified the SHU staff personnel who

6

said the mattress was not flat.  (Dkt. No. 61-3 at ¶ 39.)

        2.    <u>October 19, 2013, and November 15, 2013, Consolidated Grievances</u>
<u>(AUB-63881-13)</u>

Plaintiff submitted an October 19, 2013, grievance, which was filed on November 5, 2013, and a November 15, 2013, grievance complaining about the conditions in cell I-3 and claiming he was placed in the inadequate cell by Novak and Donnelly in retaliation for writing letters and grievances.  (Dkt. No. 61-4 at 12-14.)  In his declaration, Donnelly states that Plaintiff was not transferred to cell I-3 due to retaliation and, in fact, Donnelly was unaware of any grievances Plaintiff had filed against him or any other officer at the time of the move.  (Dkt. No. 39-12 at ¶ 7.)

The conditions complained of in the grievances were essentially the same as those listed above but also included a clogged vent and the absence of a mirror.  (Dkt. No. 61-4 at 12.)  Plaintiff complained in the October 19, 2013, grievance that he had requested cleaning supplies and hot water from Novak, and Novak had responded "[d]eal with it, I'm not giving you shit . . . [n]ot my problem, maybe you'll learn your lesson about writing people up."  *Id*.  According to Plaintiff, Novak laughed and walked away.  *Id*.  Plaintiff claimed that as of the date of the grievance, he had not received any cleaning supplies, and the sink had not been fixed.  *Id*.  Plaintiff testified at his deposition that he never received cleaning supplies during the time he was in cell I-3, and the plumbing was never repaired.  (Dkt. No. 39-2 at 27-28.)

On November 10, 2013, Vasile interviewed Plaintiff regarding the October 19, 2013, grievance.  (Dkt. Nos. 61-3 at ¶ 49; 61-4 at 16.)  In a November 12, 2013, written report to Chuttey, Vasile indicated he had interviewed Plaintiff regarding the grievance, and Plaintiff

reiterated the complaints in the grievance and told Vasile he had received cleaning materials and cleaned up cell I-3.  (Dkt. No. 61-4 at 16.)  According to Plaintiff, when Vasile came to the cell to interview him, Plaintiff informed him of the gross conditions in the cell and showed him the plumbing that was out of order.  (Dkt. No. 61-3 at ¶ 49.)  Contrary to Vasile's report to Chuttey, Plaintiff claims he told Vasile he had not received cleaning materials and had been unable to adequately clean the cell, although he had tried to do so with his t-shirt and sock.  *Id*.  Plaintiff requested that Vasile pull the surveillance videos and review them for use as evidence in his grievance and to preserve them as evidence for any intended litigation.  *Id*.

As a part of the October 19, 2013, grievance investigation, Novak submitted a November 7, 2013, written statement that the cell Plaintiff moved into on October 15, 2013, had been cleaned out before Plaintiff moved in and the toilet, sink, and light were fully operational.  (Dkt. No. 61-4 at 17.)  In a November 9, 2013, statement in the grievance record, Donnelly stated that cells are cleaned after they are vacated according to SHU cleaning procedures, Plaintiff never complained to him about a dirty cell or broken sink, and as of November 9, 2013, the sink in cell I-3 worked properly.  *Id*. at 21.  In his declaration, Donnelly states that he recalls Plaintiff complaining about his sink not working properly subsequent to November 9, 2013, and Plaintiff was moved to a new cell shortly thereafter.  (Dkt. No. 39-12 at ¶ 11.)  Donnelly also denied having told Plaintiff "if you stop writing people and things up maybe I'll eventually have you moved to a better cell" as Plaintiff claimed in his grievance.  *Id*.

The Superintendent denied Plaintiff's consolidated grievances, stating that a thorough investigation had been conducted, and there was no evidence to support Plaintiff's allegations of staff misconduct.  *Id*. at 15.  CORC wrote in part in its decision on Plaintiff's appeal:

> CORC notes that this matter has been properly investigated by the
> facility administration. Sergeant D . . . and Officer N . . . deny
> making unprofessional comments, and state that grievant's cell was
> fully operational and cleaned before he moved into it. Further,
> Sergeant D . . . states that the grievant did not stop him at any time
> to address concerns regarding the condition of his cell. It is also
> noted that the mattress was not flat, they are replaced as new ones
> become available, and that the grievant was moved to a different
> cell on 11/17/13.

(Dkt. No. 39-4 at 1.) CORC noted in its decision on the consolidated grievances that Plaintiff

had made a request to Vasile during the investigation that he be allowed to use the SHU

surveillance camera as a witness, and wrote "[w]ith respect to grievant's appeal, CORC upholds

the discretion of the facility administration to review videotapes when deemed necessary based

on security concerns, unusual interests, etc." *Id*. at 18.

Plaintiff claims that neither Vasile nor any other investigator investigated his November

15, 2013, grievance, and that no follow up investigations or reports were done on the appeal of

the grievance to CORC. (Dkt. No. 61-3 at ¶ 60.)

### D.    October 19, 2013, Written Complaints to DOCCS Officials Regarding Cell Conditions and Verbal and Written Follow Up By Plaintiff

On October 19, 2013, Plaintiff sent written complaints regarding conditions in cell I-3 to

Defendants Annucci, Graham, Robinson, Chuttey, and Quinn. (Dkt. No. 1-3 at 3-19.)

1.    <u>Annucci</u>

In an October 19, 2003, letter to Annucci, Plaintiff complained of being kept in a gross

and inhumane isolation cell as a result of his write ups on facility staff. The specific complaints

regarding the cell conditions and mattress are essentially the same as those described above. *Id.*

at 3. Plaintiff also complained he was denied cleaning supplies and was told by staff to "deal

with it," and that they might move him to a functioning cell if he stopped writing complaints. (Dkt. No. 1-3 at 3.)  Plaintiff requested that Annucci move him to a more acceptable cell and discipline his subordinates.  *Id*.  The letter does not name either Novak or Donnelly.  *Id*.  At his deposition, Plaintiff testified he did not know if he received responses to his written complaints from Annucci.  (Dkt. No. 39-2 at 58.)

2.    <u>Graham</u>

Plaintiff wrote to Graham on October 19, 2013, to complain about being ordered by Novak and Donnelly to move into an out-of-order cell that was "terrible and completely inhumane, indecent, and unacceptable."  (Dkt. No. 1-3 at 9.)  The letter describes generally the same complaints about cell conditions and denial of cleaning supplies as described above.  *Id*. Plaintiff also complains in the letter about being unable to adequately hydrate himself due to the broken sink.  *Id*.  Plaintiff informed Graham that Novak and Donnelly were aware of the terrible condition of the cell when they moved him in and despite Plaintiff's verbal complaints had done nothing to fix the conditions or move him to another cell.  *Id*.  He also informed Graham that Novak had told him placement in the cell was intentional because of Plaintiff's write-ups on staff, and that Donnelly, acting in concert, had told Plaintiff if he stopped writing grievances he would be moved out eventually.  *Id*.

Plaintiff told Graham he had seen Graham making rounds in SHU on October 17, 2013, and complained that Graham had ignored him when Plaintiff called out to him.  *Id*.  Plaintiff noted in the letter that he had spoken to Robinson that day, but that Robinson had done nothing. *Id*.  Plaintiff asked Graham to move him out of the cell and discipline the officers.  *Id*.

Plaintiff wrote to Graham again on November 4, 2013, reminding him, *inter alia*, of the

10

problems with the cell.   (Dkt. No. 1-3 at 21.)  According to Plaintiff, on November 5, 2013, he

saw Graham on SHU rounds and stopped Graham at his cell, and told Graham about Novak and

Donnelly's retaliatory conduct and the cruel punishment of being confined in cell I-3.  (Dkt. No.

61-3 at ¶ 89.)  Plaintiff claims to have shown Graham the deplorable conditions in his cell,

including the major problems and the leaks.  *Id*.  Graham showed no concern and walked away

and did not order Plaintiff moved from cell I-3.  *Id*.  Plaintiff sent another letter to Graham

regarding the condition of the cell on November 6, 2013, and again asked for Graham's

assistance.  (Dkt. Nos 1-3 at 23; 61-3 at ¶ 90.)

Plaintiff testified at his depositions that he did not recall if he received responses from

Graham to his written complaints.  (Dkt. No. 39-2 at 57.)

3.    Robinson

In an October 19, 2013,  letter to Robinson, Plaintiff reminded him of their October 17,

2013, conversation regarding the condition of his cell in which Robinson had told Plaintiff he

would see about it, and that Robinson had not come back and Plaintiff had not been moved.

(Dkt. No. 1-3 at 13.)  Plaintiff told Robinson he was on notice of the conditions and in his

position had the authority to move Plaintiff to a better cell immediately.  *Id*.  Plaintiff again asked

Robinson to order that he be removed from the cell and placed in another one and to place

Plaintiff's letter in the appropriate files.  *Id*.  Plaintiff wrote to Robinson again on November 3,

2013, complaining, *inter alia*, about still being confined in the gross conditions of cell I-3.  (Dkt.

Nos. 1-3 at 19; 61-3 at ¶ 35.)

4.    Chuttey

On October 19, 2013, Plaintiff sent a written complaint to Chuttey as a member of the

executive team and a captain supervising SHU. (Dkt. No. 1-3 at 6.) Plaintiff articulated

generally the same complaints about the condition of the cell, and headaches and lack of

hydration, and complained that Novak and Donnelly were fully aware that placing him in that

cell was wrong and a violation of his rights. *Id*. Plaintiff asked Chuttey to immediately order

that he be placed in another cell and have his sink repaired. *Id*. Plaintiff testified at his

deposition that he did not recall if he received responses from Chuttey to any written complaints.

(Dkt. No. 39-2 at 60.)

5.    Quinn

Plaintiff's final letter of October 19, 2013, was to Quinn. Plaintiff reiterated his

complaints about the cell and lack of cleaning supplies, and told Quinn he had been placed in the

cell by Donnelly and Novak in retaliation for making meritable complaints about Quinn's

subordinate staff in SHU. (Dkt. No. 1-3 at 16.) Plaintiff asked Quinn to investigate and correct

the wrongs committed by his staff. *Id*. Plaintiff testified at his deposition that he did not recall if

he received responses from Quinn to any written complaints. (Dkt. No. 39-2 at 59.)

**E.    November 2 and 3, 2013, Incidents with Novak**

1.    Incidents as Described by Plaintiff

Plaintiff claims that on November 2, 2013, Novak approached his cell and began to

harass him about filing grievances and complaining to Novak's superiors. (Dkt. No. 61-3 at ¶

76.) According to Plaintiff, Novak said "Williams, you're a real piece of shit, you know that.

Because you've been complaining on me, first chance that comes around I'm gonna make

something bad happen to you, this is my world, nobody can help you in here" and "I'm gonna

jam you up really nice for those complaints on me." *Id*. Novak then walked away, and Plaintiff

wrote a grievance regarding the alleged retaliatory threat the same day.  (Dkt. No. 61-3 at ¶ 76.)

Plaintiff claims Novak engaged in more retaliation over his grievances and complaints against Novak and others the next day, November 3, 2013.  *Id*. at ¶ 79.  Novak approached Plaintiff's cell and destroyed the cell's wall radio and jacks preventing Plaintiff from passing the time listening to programs or music on the SHU headphones.  *Id.*  Afterwards Novak told Plaintiff  "you don't deserve no fucking headphones for all these complaints you wrote . . . ." and to "sit in there and be miserable asshole."  *Id*.  Novak followed up with  "[i]f you write this up on me, I'll break your fucking neck, got that?"  *Id*.  According to Plaintiff, Novak continued "If you're smart we won't be hearing anymore complaints from you . . . .  those grievances won't get you no where, nothing is gonna change, forget all that bullshit about how you prisoners got rights . . . You're in the wrong place for that and as far as I am concerned, you don't have any . . . ."  *Id*. Plaintiff wrote a grievance the same day.  *Id.* at ¶ 80.

2.    Plaintiff's Grievances

Plaintiff's November 2 and 3, 2013, grievances were consolidated under the grievance number AUB-63978-13.  (Dkt. Nos. 61-3 at ¶ 61; 61-4 at 59, 67.)  The contents of the November 2 and 3, 2013, grievances is essentially the same as Plaintiff's description of the harassment by Novak on the dates set forth.  (Dkt. Nos. 61-3 at ¶¶ 76, 79;  61-4 at 59, 67.)  Novak submitted a statement to Donnelly denying he harassed and threatened Plaintiff and denying he made the statements attributed to him by Plaintiff.  (Dkt. No. 61-4 at 62.)  Donnelly submitted a statement concluding that the matter consisted of an inmate's word versus an employee's word, and that the allegations could not be substantiated by fact.  *Id*. at 63.  Therefore, Donnelly found no evidence to support the grievance.  *Id*.  The combined grievances were denied by the Superintendent based

upon a lack of evidence supporting Plaintiff's allegations of staff misconduct.  (Dkt. No. 61-4 at

64.)  On his appeal, Plaintiff requested the SHU area cameras as his witness to the actions on

which his grievances were based, and indicated he had informed Lieutenant Blowers of the

witness.  *Id*.  CORC upheld the Superintendent's determination.  *Id*. at 65.

### 3.    Written Complaints

In his November 3, 2013, written complaint to Robinson, Plaintiff complained of being

harassed by Novak on November 2, 2013, and asked that the surveillance video and audio

recordings from 9:00am to 11:00am be preserved for presentation as evidence in a court of law.

(Dkt. No. 61-4 at 69.)

In his November 4, 2013, written complaint to Graham, Plaintiff complained that on

November 2 and 3, 2013, Novak had wrongfully harassed, threatened, and retaliated against him

for writing and pursuing grievances.  *Id*. at 71.  Plaintiff told Graham that Novak constantly

caused him problems, and he had written and spoken to supervisors regarding staff violations

against him but it had just kept getting worse, and he asked Graham to investigate.  *Id.*  In his

November 6, 2013, written complaint to Graham, Plaintiff reminded Graham of the November 4,

2013, written complaint he had sent him and wrote "This has not been my first letter to you, you

said that you've received my prior letter(s) in your mailbox.  So when are you gonna take any

action to help me or do something."  *Id*. at 75.

Plaintiff also made a written complaint to Chuttey on November 4, 2013, letting him

know that his subordinates continued to wrongfully and unlawfully retaliate, harass, and threaten

Plaintiff due to his grievances and complaints.  *Id*. at 73.  Plaintiff described his November 2 and

3, 2013, encounters with Novak and told Chuttey that Novak tried to intimidate him to stop him

from writing grievances.  (Dkt. No. 61-4 at 73.)  Plaintiff asked Chuttey to step up and handle the matter.  *Id*.

### F.    December 9, 2013, Incident with Novak

Plaintiff claims Novak approached his cell on December 9, 2013, and stated "[y]ou still bitching and complaining to people about me.  I'm gonna make your life a living hell."  Novak then threatened to move Plaintiff into another "fucked up dirty infested cell" even worse than the last if he attempted to write any more grievances.  (Dkt. No. 61-3 at ¶ 96.)  According to Plaintiff, Novak's actions were in retaliation for grievances he had written against Novak dated October 15 and 19, and November 2, 3, and 15, 2013, and written complaints he had sent to Novak's superiors.  *Id*.  Plaintiff claims to have notified the area supervisor about Novak's threats and reprisals, and that no action was taken.  *Id*. at ¶ 98.

Plaintiff wrote a grievance (AUB-64154-13) on December 9, 2013, complaining of the retaliatory encounter with Novak that day and stating that the area supervisor had been made aware of the incident.  (Dkt. No. 61-4 at 77.)  The grievance also mentioned in passing harassment by Novak on November 15 and 27, 2013, which Plaintiff had attempted resolve informally.  *Id*.  Plaintiff complained about the grievance system and its so-called "investigations."  *Id*.  He requested that Novak be properly disciplined, supervised, and ordered to stop taking adverse actions against him.  *Id*

The grievance was denied by the Superintendent based upon Novak's denial and the lack of evidence supporting Plaintiff's claim.  *Id*. at 81, 82, 84.  In his appeal statement, Plaintiff indicated that he had advised staff that the SHU cameras were his evidence and witness.  *Id*. at 81.  CORC also denied the grievance.  *Id*. at 78.

**G.    December 21 and 22, 2013, Incidents**

    1.    December 21, 2013, as Described by Plaintiff

Plaintiff claims that on December 21, 2013, Novak committed acts of retaliation against him for his October 15 and 19, 2013, grievances and his complaint letters to superiors regarding Novak's actions. (Dkt. No. 61-3 at ¶ 100.)  According to Plaintiff, Novak approached his cell and told him to pack up because he was going to be moved to another "fucked up" and "out of service cell" because he had filed grievance AUB-63978-13 (the November 2 and 3, 2013, incidents) against Novak and had not dropped the complaints. *Id.*  Novak told Plaintiff that his complaints did "not mean shit" to anybody, and Plaintiff was in a no-win situation because it was his word against Novak's. *Id.*

Novak and Donnelly came back minutes later. *Id.* at ¶ 101.  Donnelly had grievance AUB-63978-13 and asked Plaintiff if he had anything to add or wanted to drop the complaint against Novak. *Id.*  Plaintiff told Donnelly he wanted the SHU video camera recordings to be used as evidence in support of his complaint and for future litigation, and Donnelly said "that ain't gonna happen." *Id.*

    2.    December 22, 2013, Incident as Described by Plaintiff

Plaintiff claims Novak came to his cell again the next day, threw some plastic bags into the slot and told Plaintiff to pack up because he was being moved to another out-of-service and "fucked-up cell." (Dkt. No. 61-3 at ¶ 104.)  When Plaintiff asked why, Novak told him he had given Plaintiff fair warning about writing grievances and making verbal and written complaints. *Id.*  Novak allegedly told Plaintiff he was going to break his arms and kick all his teeth out as

16

soon as he had the opportunity and threatened Plaintiff's life. (Dkt. No. 61-3 at ¶ 104.) Novak told Plaintiff to be packed when he came back. *Id*. When Donnelly came by later, Plaintiff asked him if he had ordered Novak to move Plaintiff to another cell and Donnelly said he had not ordered any move. (Dkt. No. 1 at ¶ 56.)

Plaintiff has submitted a declaration from inmate Ronald Mask, dated December 23, 2013, stating that Novak told Plaintiff to pack up and threatened bodily harm to Plaintiff due to grievances against Novak and complaints against another corrections officer. (Dkt. No. 61-4 at 108-09.) Mask also heard Novak threaten to kick Plaintiff's teeth out. *Id*. Plaintiff was not moved to another cell on December 22, 2013. (Dkt. No. 39-2 at 50.)

### 3.    Consolidated Grievances (AUB-64191-14)

Plaintiff filed grievances regarding the December 21 and 22, 2013, incidents, and the grievances were again consolidated. (Dkt. No. 61-4 at 86, 96.) The grievances essentially followed the averments in Plaintiff's affidavit in opposition. (Dkt. No. 61-3 at 100, 104.) Novak denied threatening and harassing Plaintiff on December 21 and 22, 2013, and telling him he had to pack his cell to move. (Dkt. No. 64-1 at 93.) Donnelly denied that Plaintiff asked for the video footage for December 21 and 22, 2013, and claimed Plaintiff never told him about anything Novak had done. *Id*. at 92.

The Superintendent denied the consolidated grievances based on Novak and Donnelly's denials and found no evidence to support Plaintiff's grievance. *Id*. at 87. CORC upheld the Superintendent's determination and upheld "the discretion of the facility administration to review videotapes when deemed necessary based on security concerns, unusual incidents, etc." *Id*. at 89.

4.     Written and Verbal Complaints

Plaintiff sent a written complaint, dated December 22, 2013, to Chuttey, complaining of Novak's behavior and Donnelly not only failing to stop it but seemingly encouraging it. (Dkt. No. 61-4 at 98.) Plaintiff chided Chuttey for his lack of concern with correcting the problems and violations of his staff and with failing to respond to Plaintiff's written complaints. *Id.* Plaintiff placed Chuttey on notice to preserve SHU-I-tank's video and audio recording, cameras CS-85 and CS-84, for 7:30am through 9:30am on December 21, 2013, and from 7:30am to 3:00pm on December 22, 2013, for evidence in intended litigation regarding the incidents with Novak and Donnelly. *Id.*

On December 26, 2013, Plaintiff stopped Graham while he was on his SHU rounds and spoke to him about the December 21, 2013, incident with Novak and a host of other incidents with Novak and Donnelly. (Dkt. No. 61-3 at ¶ 108.) Plaintiff informed Graham he wanted SHU security camera recordings for I-tank on those dates properly preserved for evidence in intended litigation regarding the incidents with Novak and Donnelly. *Id.*

On December 28, 2013, Plaintiff sent written notices to Graham, Robinson, and Quinn to preserve the SHU surveillance recordings for 7:30am through 9:30am on December 21, 2013, and from 7:30am to 3:00pm on December 22, 2013, for evidence in intended litigation regarding the incidents with Novak and Donnelly. (Dkt. No. 61-4 at 100-105.)

**H.     January 25, 2014, Incident with Donnelly**

1.     January 25, 2014, Incident as Described by Plaintiff

According to Plaintiff, on January 25, 2014, Donnelly approached him during TV

18

recreation time, snatched the TV power cord out of the socket and, referring to grievance AUB-64191-4 which Plaintiff had filed against Novak and Donnelly, said "[i]s there gonna be anymore of these[?]" (Dkt. No. 61-3 at ¶ 111.) Donnelly then threatened that if Plaintiff wrote any more grievances, there would be no more TV time. Donnelly proceeded to order an officer to handcuff Plaintiff and return him to his SHU cell, which meant Plaintiff's TV time was terminated approximately an hour early. (Dkt. No. 61-3 at ¶ 111.) Plaintiff claims the entire episode was recorded in video and audio on SHU surveillance equipment. *Id*.

2.    January 30, 2014, Grievance (AUB-642-64289-14)

On January 30, 2014, Plaintiff wrote a grievance against Donnelly regarding the January 25, 2014, television incident. (Dkt. No. 61-4 at 114-15.) Plaintiff explained in the grievance that he had been taken out of his cell for a couple of hours of TV and to eat his commissary, which was allowed while he was in administrative segregation in SHU. *Id*. at 114. Plaintiff then described the incident as set forth above. *Id.* at 114; Dkt. No. 61-3 at ¶ 111. Plaintiff identified the SHU surveillance cameras and audio in the TV room as witnesses to the incident with Donnelly. *Id*. (Dkt. No. 61-4 at 114.)

During investigation of the grievance, Donnelly denied threatening Plaintiff. (Dkt. No. 61-4 at 118.) Donnelly acknowledged unplugging the television but claimed to have done so when the two hours of administrative segregation television was done. *Id*.; Dkt. No. 39-12 at ¶ 14. Donnelly also acknowledged asking Plaintiff about grievance AUB-64191-14 at the end of television time. (Dkt. No. 61-4 at 118.) The Superintendent denied the grievance based on lack of evidence to support staff misconduct. *Id*. at 116. The Superintendent noted that the unit video was reviewed and did not substantiate Plaintiff's claim of retaliation. *Id*. at 116-17.

On his appeal to CORC, Plaintiff requested that a copy of the reviewed surveillance video be preserved for CORC review and asked to purchase a copy of the video. *Id*. CORC upheld the Superintendent's determination and advised Plaintiff he could initiate a Freedom of Information Act Request for consideration to obtain the videotape he was requesting in accordance with facility procedures. *Id*. at 111.

3.    Written and Verbal Complaints

On January 25, 2014, Plaintiff wrote to Robinson complaining about the encounter with Donnelly in the television room and asking Robinson to conduct an investigation of his own regarding the continuous harassment and threats by his staff. (Dkt. No. 61-4 at 121.) Plaintiff also asked that the SHU surveillance video be retained for future litigation. *Id*.

Plaintiff made a written complaint to Graham on January 27, 2014, complaining of Donnelly's actions in the television room on January 25, 2014, and further complaining that the harassment and retaliation had been allowed to go on for too long without Annucci, Graham, Robinson, or Chuttey putting an end to it, or even taking it seriously. *Id*. at 126. Plaintiff asked why Graham had not done anything. *Id*. Plaintiff attached a notice to safely preserve the SHU surveillance video and audio from specific cameras and microphones from approximately 10:30am to 10:50am on January 25, 2014. *Id*. at 124-25.

On January 28, 2014, Plaintiff wrote letters to Annucci and Fagan complaining of continued inaction by them with regard to repeated mistreatment, threats, and punishment sustained in retaliation for filing meritorious grievances expressing his concerns, despite being all too aware of the continued adverse actions taken against him. *Id*. at 122-23. Plaintiff also informed them of the incident with Donnelly on January 25, 2014, and requested that video and

audio recordings be safely preserved for litigation.  *Id.*

## III.  APPLICABLE LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).  A plaintiff's verified complaint is to

be treated as an affidavit.[4]  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could **reasonably** find for the plaintiff." (emphasis in original).  "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Id*. (citation and internal quotation marks omitted).  "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation."  *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted).  "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations.  "*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997)  (citation omitted).  "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Where a party is proceeding *pro se*, the court is obliged to "read [the pro se party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest."  *Burgos v. Hopkins*, 14 F.3d 787, 790

---

[4]  The Court finds that Plaintiff's complaint is properly verified.  (Dkt. No. 1 at 26.)

(2d Cir. 1994).  However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[5] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

Defendants have argued that the New York State Dead Man's Statute, N.Y. C.P.L.R. § 4519 applies with respect to decedent Novak, and that Rule 56(e) "requires exclusion of evidence on summary judgment motions which the dead man's statute would exclude at trial."  (Dkt. No. 39-21 at 9-10.)  The Court finds the Dead Man's Statute inapplicable in this civil rights action.

Federal Rule of Evidence 601, which generally determines the admissibility of evidence in federal court, provides that "in a civil case, state law governs the witness's competency regarding a claim or defense ***for which state law supplies the rule of decision***."  F.R.E. 601. (emphasis supplied).  State dead man's statutes have been found inapplicable in federal civil rights actions in which federal, not state law, supplies the rule of decision.  *See, e.g., Savarese v. Aggriss*, 883 F.2d 1194, 1200 n. 10 (3rd Cir. 1989) (finding the Pennsylvania dead man's act would not apply to a federal civil rights action); *Longoria v. Wilson*, 730 F.2d 330, 304 (5th Cir. 1984) (finding no error by district court in refusing to apply state dead man's statute to a federal question based civil rights action under § 1983); *see also Dilegge v. Gleason*, 131 F. Supp. 2d 520, 525 (S.D.N.Y. 2001) (under F.R.E. 601, the dead man's statute applies only where state law provides the rule of decision and is inapplicable in a Title VII discrimination action); *L.H. Pittson Area Sch. Dist.,* 130 F. Supp. 3d 918, 932 n.18 (M.D. Pa. 2015) (dead man's statute only

---

[5]  Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

applies in federal cases where state substantive law applies, not to any claim under federal law); *Estate of Sharkey v. Pine Tree Distributors, Inc.*, 174 F. Supp. 2d 380, 384 (D. Md. 2001) (holding state Dead Man's Statute inapplicable in federal question case).

## IV.    LEGAL STANDARDS FOR  PLAINTIFF'S CLAIMS

### A.    Eighth Amendment Conditions of Confinement

Plaintiff has alleged Eighth Amendment conditions of confinement claims against Defendants Novak and Donnelly with regard to his placement in cell I-3 from October 15, 2013, through November 17, 2013.  (Dkt. No. 1 at 24-25.)  The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.  The prohibition extends to prison conditions.  *Horne v. Coughlin*, 155 F.3d 26, 31 (2d Cir. 1998).  "The Constitution does not mandate comfortable prisons . . . but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations and internal quotation marks omitted).  "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient" to support a claim for unconstitutional conditions of confinement.  *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999).

To state a claim under the Eighth Amendment based upon conditions of confinement, an inmate must satisfy both an objective and a subjective element.  *Farmer*, 511 U.S. at 834, 837. To satisfy the objective element, a plaintiff must establish that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of a "life[ ] necessit[y]" or a "substantial risk of harm."  *Id*. at 834.  To satisfy the subjective element, a

24

plaintiff must establish that the "defendant official acted with a sufficiently culpable state of mind . . ., such as deliberate indifference to inmate health or safety." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citations and internal quotation marks omitted).

To establish the objective element, an inmate must show "that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id*. Health includes the risk of serious damage to "physical and mental soundness." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (quoting *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972)). Prison officials violate the Eighth Amendment when they "deprive an inmate of his 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions." *Walker,* 717 F.3d at 125(quoting *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (per curiam)). There is no "static test" for determining whether a deprivation is serious enough to violate an inmate's Eighth Amendment rights. *Id.* (citing *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)). "The conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar,* 683 F.3d at 57 (citation and internal quotation marks omitted)*.*

When the challenged prison conditions include exposure to unsanitary conditions, the Second Circuit has been unwilling "to set a minimum duration and minimum severity of an exposure for it to reach the level of a constitutional violation." *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015). There is no "bright-line durational requirement for a viable unsanitary conditions claim. Nor is there some minimal level of grotesquerie required . . . ." *Id*. Courts must "evaluate the product of these two components [on a case-by-case basis and] whether exposure to human waste is cruel and unusual depends on both the duration and severity of exposure." *Id*. "The severity of an exposure may be less quantifiable than its duration, but its

25

qualitative offence to a prisoner's dignity should be given due consideration." *Id*.

"Even if no single condition of confinement would be unconstitutional in itself, exposure to the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment." *Rhodes v. Chapman*, 452 U.S. 337, 363 (1981) (internal quotation marks and citation omitted). "Conditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Walker*, 717 F.3d at 125 (quoting *Seiter*, 501 U.S. at 304). Sanitary living conditions have been found by the Second Circuit to constitute a "basic human need." *Id*.

To constitute deliberate indifference under the subjective element, "[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety." *Jabbar*, 683 F.3d at 57; *see also Trammel v. Keane*, 338 F.3d 155, 162-63 (2d Cir. 2003) (the state of mind for the subjective element in cases involving prison conditions is "deliberate indifference to inmate health or safety."). "The official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence is not enough. *Id.* at 835.

### B.    First Amendment Retaliation

Plaintiff has asserted First Amendment retaliation claims against Defendants Novak and Donnelly. (Dkt. No. 1 at 24.) To prevail on a First Amendment retaliation claim, an inmate must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014)

(quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)); *see also Gill v. Pidlypchak*, 389

F.3d 379, 380 (2d Cir. 2004) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001),

*overruled on other grounds*, *Swierkiewicz v. Sorema*, 534 U.S. 506, 508 (2002)).  "Adverse

action" for purposes of a retaliation claim has been defined objectively as "retaliatory conduct that

would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional

rights."  *Pidlypchak*, 389 F.3d at 381.  Otherwise, the retaliatory act is simply *de minimis* and

outside the scope of constitutional protection.  *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353,

366 (S.D.N.Y. 2011) (citing *Dawes*, 239 F.3d at 492-93).  The adverse action inquiry is a

contextual one.  *Mateo v. Fischer*, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010) *(*citing  *Davis v.

Goord*, 320 F.3d 346, 353 (2d Cir. 2003)).  "Prisoners may be required to tolerate more than

public employees, who may be required to tolerate more than average citizens, before a

[retaliatory] action taken against them is considered adverse."  *Dawes*, 239 F.3d at 493 (quoting

*Thaddeus X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (en banc)).

An inmate bears the burden of showing that "the protected conduct was a substantial or

motivating factor" in the defendants' decision to take action against the plaintiff.  *Graham v.

Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).  In evaluating whether a causal connection exists

between the plaintiff's protected activity and a prison official's actions, "a number of factors may

be considered, including: (i) the temporal proximity between the protected activity and the alleged

retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the

matter; and (iv) statements by the defendant concerning his motivation.  *Baskerville v. Blot*, 224

F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 873).  "The causal connection

must be sufficient to support an inference that the protected conduct played a substantial part in

the adverse action." *Id.*  A showing of temporal proximity, without more, has generally been

found insufficient to survive summary judgment.  *See Roseboro,* 791 F. Supp. 2d at 370 (citations

omitted).

Because of the relative ease with which claims of retaliation can be incanted, courts have

scrutinized retaliation claims with particular care.  *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d

Cir. 1983), *overruled on other grounds*, *Swierkiewicz,* 534 U.S. at 506.  As the Second Circuit has

noted,

> [t]his is true for several reasons.  First, claims of retaliation are
> difficult to dispose of on the pleadings because they involve
> questions of intent and are therefore easily fabricated.  Second,
> prisoners' claims of retaliation pose a substantial risk of
> unwarranted judicial intrusion into matters of general prison
> administration.  This is so because virtually any adverse action
> taken against a prisoner by a prison official--even those otherwise
> not rising to the level of a constitutional violation--can be
> characterized as a constitutionally proscribed retaliatory act.

*Dawes,* 239 F.3d at 491.  Accordingly, claims of retaliation must be supported by specific facts;

conclusory statements are not sufficient.  *Flaherty*, 713 F.2d at 13; *see also Houston v. Goord*,

No. 9:03-CV-1412 (GTS/DEP), 2009 WL 890658, at *11 (N.D.N.Y. Mar. 31, 2009) ("Analysis of

retaliation claims . . . requires thoughtful consideration of the evidence presented concerning the

protected activity in which the inmate Plaintiff has engaged and the adverse action taken against

him or her, as well as the evidence tending to link the two.  When such claims, which ordinarily

are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by

evidence establishing the requisite nexus between any protected activity and the adverse action

complained of, the entry of summary judgment dismissing plaintiff's retaliation claims is

warranted.").

Even if a plaintiff makes the appropriate showing of retaliation, a defendant may avoid

liability if he demonstrates that he would have taken the adverse action even in the absence of the

protected conduct.  *See Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (defendant may be

entitled to summary judgment upon showing that the alleged retaliatory action would have taken

even without the improper motivation).

### C.    Supervisory Liability

Plaintiff has asserted supervisory liability claims against Defendants Annucci, Graham,

Robinson, Chuttey, Quinn, Fagan, and Donnelly with respect to the conditions of confinement and

retaliation claims asserted against Novak and Donnelly.  (Dkt. No. 1 at 24-25.)  The law is clear

that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to

an award of damages under § 1983."  *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977).

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each

Government-official defendant, through the official's own individual actions, has violated the

Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). ("Government officials may not be

held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat

superior*.").  "Holding a position in a hierarchical chain of command, without more, is insufficient

to support a showing of personal involvement."  *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT),

2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also

Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (a "mere 'linkage in the prison chain of

command' is insufficient to implicate a state commissioner of corrections . . . in a § 1983 claim")

(citing *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)).  Therefore, "a plaintiff must . . .

allege a tangible connection between the acts of a defendant and the injuries suffered."  *Bass v.

*Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[6]

"Fundamentally, for a supervisor to be liable under Section 1983, there must 'of course' have 'been an underlying constitutional deprivation' by a subordinate, *Blyden,* 186 F.3d at 265, and a 'causal link' between the supervisor's conduct and the violation of the plaintiff's civil rights." *Nicholson v. Fischer*, No. 13-CV-6072-FPG-MWP, 2018 WL 2009432, at *5 (W.D.N.Y. April 28, 2018) (citing *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002)).

## V.    ANALYSIS OF CONDITIONS OF CONFINEMENT CLAIM AGAINST NOVAK AND DONNELLY

Plaintiff has alleged Eighth Amendment conditions of confinement claims against Novak and Donnelly based upon their actions in moving him to cell I-3 on October 15, 2013, denial of Plaintiff's request for cleaning supplies, and their alleged failure to move him to another cell, despite the unsanitary and uninhabitable condition of cell I-3, and to have the allegedly broken sink repaired. (Dkt. No. 61-3 at ¶¶ 10-19, 68-74.) Plaintiff has claimed, upon information and

---

[6] The Second Circuit has thus far not determined whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

belief based on his own personal experience, that the officer in charge of SHU, in this case Donnelly, has the authority to arrange to have an inmate relocated to another cell. (Dkt. No. 61-3 at 30.) Other than Donnelly's statement that the move was not made in retaliation for grievances by Plaintiff, there appears to be no record evidence as to who, if not Donnelly, made the decision to move Plaintiff to cell I-3 and why Plaintiff was moved. (Dkt. No. 39-12 at ¶ 7.)

A.    **Objective Element**

As explained above, an Eighth Amendment conditions of confinement claim has both objective and subjective elements. With regard to the objective element, Plaintiff claims, *inter alia*, that the cell had a broken sink with used toothpaste, dried human spit, hair, blood, and other unsanitary substances on it; an improperly functioning toilet with repulsive and unsanitary dried spit and feces inside and smeared on the bowl and urine splashed up on the wall; feces crusted on the floors, walls, ceiling, ceiling light, and wall desk; excess dust that could not go out clogged vents; a puddle of water from a leaking toilet; flying insects and vermin, including spiders and spider webs and roaches; and a torn, damaged, dirty mattress and pillow stained with dried ejaculate and blood, and smelling like urine and feces. (Dkt. No. 1 at ¶¶ 8-16.) According to Plaintiff, the broken plumbing, sink, and toilet gave off a noxious odor that made him sick to his stomach and caused him to vomit and experience dizziness, nausea, burning and watery eyes, and painful headaches. *Id*. at ¶ 16. Plaintiff also claims there was no drinking water and he was given an inadequate amount of water each day which led to dehydration and constipation. *Id.* at ¶¶ 17; Dkt. No. 63-1 at ¶¶ 68-70, 72-74. Plaintiff contends Novak refused to give him any cleaning supplies leaving him with only a sock and a t-shirt with which to try to clean. (Dkt. No. 1 at ¶¶ 21, and 27.)

There is significant conflict in the record evidence regarding the condition of cell I-3 while Plaintiff was being housed there from October 15, 2013, through November 17, 2013.  (Dkt. Nos. 1 at ¶ 10; 39-12 at ¶ 8.)  Donnelly has stated in his declaration that cells are cleaned out in accordance with SHU cleaning procedures after they are vacated, and the filthy conditions Plaintiff described in his grievances with regard to cell I-3 are simply not true.  (Dkt. No. 39-12 at ¶ 10.)  Donnelly also claims that Plaintiff never stopped him to complain about the conditions in his cell until November 9, 2013, when he complained that his sink, which Donnelly claims had theretofore been working properly, was not working.[7]  *Id.* at ¶¶ 9-11.  Novak submitted a statement in response to Plaintiff's grievance regarding the conditions of cell I-3 claiming that the cell had been cleaned out before Plaintiff moved in and the toilet, sink, and light were fully operational, and that Plaintiff never complained to him about the condition of the cell.  (Dkt. No. 61-4 at 4.)

Defendants submitted records of cell repairs and repair requests for cell I-3 from October 2013, to December 2013, which show no repair orders during Plaintiff's occupancy in the cell. (Dkt. No. 39-5.)  Plaintiff claims that during the duration of his stay in cell I-3, he requested SHU staff to submit a work maintenance order for repair of the sink, toilet, and plumbing both verbally and in writing.  (Dkt. No. 61-3 at ¶¶ 55-56.)  According to Plaintiff, he had no control over if and when maintenance work orders were submitted by SHU staff, and that inmates had no ability to submit work orders themselves.  *Id.* at ¶¶ 57-58.  The Court has found no visual or documentary evidence, *i.e.*, video, photographs, or inspection reports, in the summary judgment record

---

[7]  The Court notes that Plaintiff complained of the sink in his October 19, 2013, grievance.  (Dkt. No. 39-4 at 5.)  Cell repair records show repair for "sink running" in cell I-3 requested on November 20, 2103.  (Dkt. No. 39-5 at 1.)

documenting the condition of the cell when Plaintiff was moved in, or at any time during the thirty-four days he was confined there, that would resolve the factual conflict on summary judgment.

As discussed above, where challenged prison conditions include exposure to unsanitary conditions, the court must consider both the duration and severity of the conditions on a case-by-case basis. *Willey*, 801 F.3d at 68. The Court finds that evidence presented by Plaintiff regarding the unsanitary conditions and broken sink in cell I-3, the thirty-four day duration and the medical problems suffered by him as a result, if believed, could lead a reasonable jury to conclude that the cumulative effect of the conditions to which Plaintiff claims to have been exposed to deprived him of safe and sanitary living conditions and an adequate supply of potable water, both basic human needs, and also constituted a significant offence to Plaintiff's dignity. *See id*. (confinement in an unsanitary cell exposed to human waste supports an unconstitutional conditions of confinement claim depending on both the duration and severity of the exposure ); *Wright v. McMann*, 387 F.2d 519, 522 (2d Cir. 1967) (holding prisoner in a cell that was "fetid and reeking from the stench of the bodily waste of previous occupants which . . . covered the floor, sink, and toilet," would violate the Eighth Amendment); *Garraway v. Griffin*, 707 F. App'x 16, 18 (2d Cir. 2017) (claim that plaintiff was knowingly placed in a cell with a feces-soiled mattress and defendants refused to replace it despite his documented complaints sufficient to raise an issue of fact on conditions of confinement claim); *Young v. Quinlan*, 960 F.2d 351, 365 (3d Cir. 1992) (noting that the denial of "basic sanitation . . . is cruel and unusual because, in the worst case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose), *superseded by statute on other grounds as stated in Ghana v. Holland,* 226

F.3d 175, 184 (3d Cir. 1992); *Benitez v. Mailloux*, No. 9:05-1160 (NAM/RFT), 2009 WL 1953752, at *2 (N.D.N.Y. July 2, 2009) (factfinder may properly consider that SHU was grossly unsanitary, with fecal matter and dead insects on the floor and walls, that plaintiff was deprived of cleaning materials for some period of time thereafter, as well as allegations of lack of running water and bitter cold for a longer time in evaluating Plaintiff's conditions of confinement claim).

It is well established that "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment," *Rule v. Brine, Inc*., 85 F.3d 1002, 1011 (2d Cir. 1996). The Court finds that an assessment of credibility is clearly required with regard to the objective element of Plaintiff's conditions of confinement claims.

### B.    Subjective Element

The Court finds that there is also a substantial issue of material fact on the question of whether Novak and Donnelly acted with deliberate indifference to Plaintiff's health and safety, given the parties' contrasting evidence regarding Novak and Donnelly's knowledge of the conditions and allegedly intentional conduct in placing and keeping Plaintiff in an unsanitary cell with a broken sink for thirty-four days, without any real ability on Plaintiff's part to remedy the conditions. *Walker,* 717 F.3d at 125. Plaintiff claims that Novak and Donnelly moved him to cell I-3, and neither Defendant has denied having a role in the decision to move Plaintiff, identified the person or persons who made the decision, or provided any insight as to the reason for the move. (Dkt. No. 61-3 at ¶ 11.) According to Plaintiff, when Novak denied him cleaning materials, Novak said "Deal with it. I'm not giving you shit," and in response to Plaintiff's complaint about the plumbing problems and lack of clean water, Novak said "not my problem" and smile and

34

laughed at Plaintiff as he walked away.  (Dkt. No. 61-3 at ¶ 26.)

As with the objective element, the Court finds that a reasonable jury could, if Plaintiff's claims were believed, conclude that Novak and Donnelly had acted with deliberate indifference to Plaintiff's health and safety by intentionally moving Plaintiff into a cell with allegedly unsanitary conditions of confinement and a broken sink and refusing his requests to be moved and for cleaning materials, thereby satisfying the subjective element of Plaintiff's claim.  Therefore, the Court recommends that Novak and Donnelly be denied summary judgment on Plaintiff's Eighth Amendment conditions of confinement claim.

## VI.    ANALYSIS OF RETALIATION CLAIMS AGAINST NOVAK AND DONNELLY

### A.    Placement and Retention in Cell I-3 and Denial of Cleaning Products Against Novak and Donnelly

Plaintiff claims that Novak and Donnelly ordered him to pack his belongings and then moved him to cell I-3, which was not fit for human occupation, on October 15, 2013, in retaliation for writing grievances and complaint letters.  (Dkt. Nos. 1 at ¶ 29; 61-3 at ¶¶ 10-11, 21; 61-4 at 12-4.)  Donnelly has denied that Plaintiff was transferred to cell I-3 for writing grievances and does not recall whether on that date he was aware of any grievances Plaintiff had filed against him or any other officer.  (Dkt. No. 39-12 at ¶ 7.)

The law is clear that "[t]he filing of grievances is a constitutionally protected activity" for purposes of a retaliation claim.  *Davis,* 320 F.3d at 352-53.  Plaintiff, however, has failed to identify any grievances or complaints he made against either Novak or Donnelly, or for that matter anyone else, prior to October 15, 2013, when he was moved to cell I-3.

In his October 19, 2013, and November 15, 2013, consolidated grievances, Plaintiff included statements allegedly made to him by Novak and Donnelly suggesting the move to cell I-3

35

had been made because of Plaintiff's grievances.  (Dkt. No. 61-4 at 12-14.)  When questioned at

his deposition, however, Plaintiff testified he did not know exactly why Novak was retaliating

against him but thought it might have to do with the incident with the nurse a short time earlier

that day.  (Dkt. No. 39-2 at 20-21.)

Plaintiff did write a grievance dated October 15, 2013, against Novak with respect to

Novak's alleged harassment regarding Plaintiff's conversation with RN Hudson at sick call that

day, but that grievance was not filed until November 5, 2013, long after the move.  (Dkt. No. 61-4

at 2-3.)  Moreover, according to Plaintiff, he was told to pack his belongings to move to a new cell

several minutes after Plaintiff had refused to disclose the nature of his conversation with the

nurse, which would not have left Plaintiff time to write the grievance before the move.  (Dkt. No.

1 at ¶ 7.)  A grievance filed after the allegedly retaliatory action, cannot not be a substantial factor

in the alleged retaliation.  *See Diaz v. Fischer*, No. 08-CV-1208 (LEK/DRH), 2010 WL 1132772,

at *9 (N.D.N.Y. Feb. 23, 2010).  Furthermore, even assuming for purposes of this motion that

Novak and Donnelly were involved in the decision to move Plaintiff to cell I-3, Plaintiff's failure

to specify what grievances or written complaints he had made and the causal connection, if any,

between the identified grievances or complaints, and Novak and Donnelly's alleged adverse

action, is fatal to Plaintiff's cell I-3 retaliation claim.  *See, e.g., Houston*, 2009 WL 890658, at *11

(entry of summary judgment dismissing a retaliation claim is warranted where the claim is alleged

in only conclusory fashion not supported by evidence "establishing the requisite nexus between

any protected activity and the adverse action complained of"); *Diaz*, 2010 WL 1132772, at *9

(conclusory and general conclusions that plaintiff was retaliated against because of his reputation

for filing grievances in the past is insufficient to maintain plaintiff's retaliation claim); *Ochoa v.*

*DeSimone*, No. 9:06-CV-119 (DNH/RFT), 2008 WL 4517806, at *5 (N.D.N.Y. Sept. 30, 2008) (failure to specify what grievances he filed and against whom fatal to plaintiff's retaliation claim).

Therefore, the Court recommends that summary judgment be granted in Novak and Donnelly's favor on Plaintiff's cell I-3 retaliation claim.

### B.    Remaining Retaliation Claims Against Novak

#### 1.    Description of Claims

Plaintiff has alleged a number of harassing and threatening actions by Novak, which Novak told him were taken because of grievances and complaints Plaintiff had written. Plaintiff claims that on November 2, 2013, Novak harassed and threatened him by calling Plaintiff "a real piece of shit," and telling Plaintiff that he was going to "make something bad" happen to him, and "jam" him up for filing complaints. (Dkt. No. 61-3 at ¶ 76.) Plaintiff further claims that on November 3, 2013, Novak pulled the radio jack for Plaintiff's cell out of the wall, told Plaintiff he did not deserve headphones and to "sit in there and be miserable asshole," and told him "[i]f you write [destruction of the cell's wall radio and jacks] up on me, I'll break your fucking neck, got that?" *Id*. at ¶ 79. The record of repairs to cell I-3 submitted by Defendants show that the wall jacks were out and a request for repair was submitted on November 20, 2013, after Plaintiff had been moved from cell I-3. (Dkt. No. 39-5 at 2.)

According to Plaintiff, on December 9, 2013, Novak threatened to make his life a living hell and to move him into another "fucked up dirty infested cell" if he wrote any more grievances. *Id*. at ¶ 96. On December 21, 2013, Novak allegedly told Plaintiff to pack up to move to a "fucked up" and "out of service cell" for being hardheaded and continuing to file grievances. (Dkt. No. 1 at ¶ 51.) On December 22, 2013, Novak allegedly again told Plaintiff to pack up to

move to another out-of-service and "fucked-up cell," threatened to break his arms and kick all his

teeth out as soon as he had the opportunity, and threatened Plaintiff's life.  *Id*. at ¶ 104.

        2.    <u>Protected Conduct</u>

As noted above, the filing of a grievance constitutes protected First Amendment conduct

on a retaliation claim.  *Davis,* 320 F.3d at 352-53.  Inmate's written and verbal complaints to

corrections officers and prison officials have also been found to constitute activity protected by

the First Amendment.  *See e.g., Monko v. Cusak*, No. 9:11-CV-1218 (GTS/TWD), 2013 WL

5441724, *10 (N.D.N.Y. Sept. 27, 2013); *Decayette v. Goord,* No. 9:06-CV-783, 2009 WL

1606753, at *9 (N.D.N.Y. June 8, 2009); *Brewer v. Kamas*, 533 F. Supp. 2d 318, 329 (W.D.N.Y.

2008); *Smith v. Woods*, No. 9:03-CV-480, 2006 WL 1133247, at *10 (N.D.N.Y. April 24, 2006),

*aff'd*, 219 F. App'x 110 (2d Cir. 2007).  Therefore, the record evidence establishes that Plaintiff's

remaining retaliation claim against Novak satisfies the first element of a retaliation claim.

        3.    <u>Adverse Action</u>

        a.    <u>Legal Standard</u>

"It is well-settled that 'verbal harassment, or even threats, are generally held not to rise to

the level of adverse action that will support a First Amendment retaliation claim.'" *Thomas v.

Pingotti*, No. 9:17-CV-0300 (GTS/DEP), 9:17-CV-0377 (GTS/ATB), 2017 WL 3913018, at *4

(N.D.N.Y. Sept. 6, 2017) (quoting *Rosales v. Kikendall*, 677 F. Supp. 2d 643, 648 (W.D.N.Y.

2010)); *see also Reed v. Doe No. 1*, No. 9:11-CV-0250 TJM), 2013 WL 5441503, at *6

(N.D.N.Y. Sept. 27, 2013) ("it is well-established, however, that verbal harassment and

derogatory comments by prison workers aimed at an inmate, however unprofessional, do not rise

to a level of constitutional significance, and therefore cannot constitute adverse action sufficient to

support a retaliation cause of action."); *Grays v. Elmira Correctional* Facility, No. 1:13-CV-00532 EAW, 2017 WL 2779751, at *3 (W.D.N.Y. June 26, 2017) ("broad illusions to possible future injury, are insufficient to state a First Amendment claim for retaliation); *Kemp v. LeClaire*, No. 03-0844, 2007 WL 776416, at *15 (W.D.N.Y. Mar. 12, 2007) (statements like "your day is coming," "you'll be sent to your mother in a black box," and you'll get your black ass kicked" not adverse actions); *Bartley v. Collins*, No. 95 Civ. 10161, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) ("[V]erbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action.").

    "[S]ome verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action." *Mateo,* 682 F. Supp. 2d at 434; *Barrington v. New York*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011) (holding that verbal threats may constitute adverse action for purpose of a First Amendment retaliation if the threat is sufficiently specific). Whether threats constitute adverse action in a particular case is dependent upon the specificity of the threat and the context in which it was made. *See Sharpe v. Taylor*, No. 9:05-CV-1003 (GTS/GHL), 2009 WL 1743987, at *9 (N.D.N.Y. Mar. 26, 2009); *Hofelich v. Ercole*, No. 06 Civ. 13697 (PKC), 2010 WL 1459740, at *2 (S.D.N.Y. Apr. 8, 2010) ("whether [verbal threats] constitute adverse action seems to depend on their specificity and the context in which they are uttered"); *Lunney v. Brureton*, No. 04 Civ. 2438 (LAK)(GWG), 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007) (collecting cases); *Hepworth v. Suffolk Cty.*, No. 02-CV-6473, 2006 WL 2844408, at *8-9 (E.D.N.Y. Sept. 29, 2006) (numerous verbal threats that inmate "would receive another beating or be killed" was enough evidence that a "reasonable jury could find that the officers unconstitutionally retaliated against" inmate); *see also Kerman v. City of New York*, 261 F.3d 229,

242 (2d Cir. 2001) (officer's statement to plaintiff that he "would teach [plaintiff] a lesson and give him something to sue for" stated a retaliation claim); *Quezada v. Roy*, No. 14-CV-4056, 2015 WL 5970355, at *23 (S.D.N.Y. Oct. 13, 2015) ("threat to kill someone for filing a grievance is sufficiently serious that it might well deter a person of ordinary firmness from exercising his First Amendment rights").

In *Ford v. Palmer*, 539 F. App'x 5 (2d Cir. 2013), the Second Circuit found that threats need not always be definite and specific to constitute adverse action and determined that a retaliation claim based on a corrections officer's threat to poison plaintiff by putting some kind of substance in his hot water in retaliation for filing grievances should not have been dismissed *sua sponte* as a matter of law. *Id*. at 7. The Court reasoned that in the context presented "the vague nature of the alleged threat    *i.e.*, not telling Ford when or how Officer Law planned to poison him    could have enhanced its effectiveness as a threat and increased the likelihood that a person of ordinary firmness would be deterred from filing."

A pattern of harassment and vague threats may be considered collectively in determining whether there has been adverse action for purposes of a First Amendment retaliation claim. *See Morgan v. Luft,* No. 9:15-CV-0024 (GTS/DJS), 2017 WL 9511158, at *5 (N.D.N.Y. June 22, 2017) (a persistent pattern of threats over a period of time makes the threats more credible and could allow a reasonable factfinder to conclude that the threats were sufficient to deter a person of ordinary firmness from filing further grievances); *Tirado v. Shutt*, No. 13 Civ. 2848 (LTS) (AJP), 2015 WL 774982, at *12 (S.D.N.Y. Feb. 23, 2015) (a pattern of harassment and vague threats can potentially constitute adverse action); *Dabney v. Maddock*, No. 10-CV-519, 2011 WL 7479164, at *4 (N.D.N.Y. Nov. 29, 2011) (isolated instances that alone do not rise to the level of adverse

actions, may "collectively . . . suffice to constitute adverse actions").

b.    Analysis of Novak's Alleged Adverse Action

Even if true, calling Plaintiff "a real piece of shit" on November 2, 2103, and any other verbally harassing comments Novak is claimed to have made were by themselves *de minimis* and do not constitute adverse action for purposes of a retaliation claim.  *See Reed*, 2013 WL 5441503, at *6 (verbal harassment does not constitute adverse action for purposes of a retaliation claim). The Court also finds that Novak's alleged threats to "make something bad" happen to Plaintiff and "jam" him up (Dkt. No. 61-3 at ¶ 76), and to make his life a living hell, *id*. at ¶ 96, if he continued to write grievances and complaints, even when considered together, are too vague to constitute adverse action for purposes of a retaliation claim.  *See, e.g., Kemp*, 2007 WL 776416, at *15; *Sharpe v. Taylor*, No. 05-CV-1003, 2009 WL 1743987, at *9 (N.D.N.Y. June 18, 2009) ("vague intimations of some unspecified harm generally will not rise to the level of adverse action for purposes of a retaliation claim").

Given the context in which Novak's alleged threats to Plaintiff on December 9, 21 and 22, 2013, that Plaintiff was being moved into  a "fucked up" and "out of service cell" for continuing to write grievances and complaints, the Court finds those statements standing alone also fail to constitute adverse action for purposes of a retaliation claim, largely because no move occurred on any of those days, and a few hours after Novak's alleged threat on December 22, 2013, Donnelly told Plaintiff no move was planned.   (Dkt. Nos. 1 at ¶ 56; 61-3 at ¶¶ 100-04.)

However, the Court reaches a different conclusion with regard to the issue of adverse action when it considers collectively the harassing and vaguely threatening comments attributed to Novak by Plaintiff; Novak's conduct in pulling Plaintiff's radio jack out of the wall; and Novak's

specific threats to Plaintiff on November 3, 2013, that if he did not stop writing grievances and complaints he would "break Plaintiff's fucking neck," and on December 22, 2013, that he was going to break his arms and kick all his teeth out as soon as he had the opportunity, and kill Plaintiff.  (Dkt. No. 61-3 at ¶¶ 79,104.)  *See Lunney*, 2007 WL 1544629, at *23 (threat to break plaintiff's "fuckin' neck" if he did not stop writing grievances sufficient to support retaliation claim); *Quezada*, 2015 WL 5970355, at *23 (threat to kill plaintiff found to support retaliation claim).

The Court finds that a reasonable fact finder, considering collectively the alleged pattern of harassment and threats by Novak, could conclude they were sufficient to deter a person of ordinary firmness from filing further grievances.  *See Morgan,* 2017 WL 9511158, at *5 (a persistent pattern of threats over a period of time makes the threats more credible and could allow a reasonable fact finder to conclude that the threats were sufficient to deter a person of ordinary firmness from filing further grievances); *Tirado,* 2015 WL 774982, at *12 (a pattern of harassment and vague threats can potentially constitute adverse action); *Dabney v. Maddock*, No. 10-CV-519, 2011 WL 7479164, at *4 (N.D.N.Y. Nov. 29, 2011) (isolated instances that alone do not rise to the level of adverse actions, may "collectively . . . suffice to constitute adverse actions").

    4.    <u>Causal Connection between the Protected Conduct and Adverse Action</u>

    a.    <u>Temporal Relationship</u>

The alleged harassing and threatening statements by Novak and his pulling Plaintiff's radio jack out of the wall occurred during the period from November 2, 2013, through December 22, 2013.  (Dkt. No. 61-3 at ¶¶ 76, 79, 96, 100, 104.)  The first grievance filed by Plaintiff against

Novak identified in the record relates to the incident on October 15, 2013, was written on October 15, 2013, and was filed in the grievance office on November 5, 2013, subsequent to the November 2 and 3, 2013, instances of retaliation alleged against Novak by Plaintiff.  (Dkt. 61-4 at 2-3, 6.)  Therefore, Novak cannot be found to have retaliated against Plaintiff for his October 15, 2013, grievance on November 2 and 3, 2013.

Plaintiff's October 19, 2013, grievance regarding the conditions in cell I-3, Novak's alleged refusal to give Plaintiff cleaning supplies, and Novak's alleged response, "[n]ot my problem, maybe now you'll learn your lesson about writing people up," when Plaintiff told him the sink was broken, was also filed in the grievance office on November 5, 2013, subsequent to the alleged retaliation on November 2 and 3, 2013.  *Id*. at 61-4 at 12, 15.  The November 15, 2013, grievance with which it was consolidated, also post-dated the November 2 and 3, 2013, incidents of alleged retaliation by Novak.

However, Plaintiff's October 19, 2013, written complaints to Annucci, Graham, Robinson, Chuttey, and Quinn regarding the conditions of cell I-3, and Novak and Donnelly's alleged retaliatory conduct in placing Plaintiff in cell I-3, which were also protected conduct, preceded the incidents of November 2 and 3, 2013.  (Dkt. No. 1-3 at 3-19.)  Moreover, the alleged retaliation by Novak on December 9, 21, and 22, 2013, came after the filing of Plaintiff's grievances regarding Novak's alleged retaliation on November 2 and 3, 2013, on November 25, 2013.  (Dkt. No. 61-4 at 59, 64, 67.)   In addition, Plaintiff's grievance regarding Novak's alleged retaliation on December 9, 2013, was filed on December 20, 2013, a day before the December 21, 2013, and two days before the December 22, 2013, incidents of alleged retaliation.  *Id*. at 64.

b.    Alleged Statements by Novak Concerning Motivation

Plaintiff claims that on November 2, 2013, Novak told Plaintiff that "[b]ecause you've been complaining on me, first chance that comes around I'm gonna make something bad happen to you, this is my world, nobody can help you in here" and "I'm gonna jam you up really nice for those complaints on me."  (Dkt. No. 61-3 at ¶ 76.)  Plaintiff also claims that on November 3, 2013, when Novak destroyed the cell's wall radio Nowak told him he didn't deserve "no fucking headphones for all these complaints you wrote."  *Id*. at ¶ 79.  According to Plaintiff on December 9, 2013, Novak told him "[y]ou still bitching and complaining to people about me, I'm gonna make your life a living hell."  *Id*. at ¶ 96.  On December 21, 2013, Novak allegedly told Plaintiff he was going to be moved to another "fucked up" cell because he had filed grievance AUB-63978-13 against Novak regarding the November 2 and 3, 2013, incidents.  *Id*. at ¶ 100.

The Court finds that the temporal relationship between Plaintiff's specifically identified grievances and written complaints and the alleged instances of retaliation, along with the evidence submitted by Plaintiff showing that Novak himself causally connected the harassment and threats to Plaintiff's grievances and written complaints against him, are sufficient to create a genuine issue of fact on the issue of causation with regard to Plaintiff's November 2 and 3, 2013, and December 9, 22, and 23, 2013, retaliation claims against Novak.  *See Morgan v. Luft*, No. 9:15-CV-0024 (GTS/DJS), 2017 WL 4326082, at *6 (N.D.N.Y. June 22, 2017) (finding a substantial issue of fact on causation where plaintiff claimed defendant explicitly connected his threats to a grievance written by plaintiff) (quoting *Colon*, 58 F.3d at 873).

Based upon the foregoing, the Court recommends that Novak be denied summary

judgment on Plaintiff's November 2 and 3 and December 9, 21, and 22, 2013, First Amendment retaliation claims.

C.    **Remaining Retaliation Claims Against Donnelly**

Plaintiff claims that on January 25, 2015, Donnelly pulled the television power cord out of the socket during Plaintiff's television time, asked if Plaintiff was going to file any more grievances, and had him taken back to his cell early with a threat to take away his television privileges if there were more grievances. (Dkt. No. 1 at ¶¶ 68-69.) The Court finds that no reasonable jury could conclude that the alleged retaliatory actions "would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 381. The acts were *de minimis* and outside the scope of constitutional protection. *Roseboro,*791 F. Supp. 2d at 366.

Plaintiff has also asserted a general supervisory liability claim against Donnelly based upon his alleged knowledge of Novak's retaliatory harassment and threats and failure as Novak's supervisor to take action to correct Novak's behavior. (Dkt. No. 1 at ¶ 40.) More specifically, Plaintiff claims that on November 3, 2013, when he complained to Donnelly about Novak's harassing and threatening conduct concerning moving him again a short time earlier, Donnelly "in a deliberately indifferent manner, simply shrugged his shoulders and giggled like a little school girl about what he heard, and walked away." *Id*. at ¶ 56. Donnelly denies it occurred and claims that Plaintiff never complained to him about Novak. (Dkt. No. 39-12 at ¶ 7.)

The Court finds that even if Donnelly had responded in that manner, the Court has already determined that Novak's action in telling Plaintiff he was going to move to another "fucked up" cell on November 3, 2013, was not in and of itself sufficient to constitute adverse action for

purposes of a retaliation claim.  Absent an underlying constitutional deprivation by a subordinate, there can be no supervisory liability.  *Blyden*, 186 F.3d at 265.

Based on the foregoing, the Court recommends that Defendant Donnelly be granted summary judgment on Plaintiff's remaining retaliation and supervisory liability claims.

## VII.    ANALYSIS OF SUPERVISORY LIABILITY CLAIMS AGAINST ANNUCCI, GRAHAM, ROBINSON, CHUTTEY, QUINN, AND FAGAN

"Fundamentally, for a supervisor to be liable under Section 1983, there must of course have been an underlying constitutional deprivation by a subordinate . . ., and a causal link between the supervisor's conduct and the violation of the plaintiff's civil rights."  *Nicholson v. Fischer*, No. 13-CV-6072-FPG-MWP, 2018 WL 2009432, at *5 (W.D.N.Y. April 30, 2018) (quoting *Blyden*, 186 F.3d at 265 and *Poe,* 282 F.3d at 140) (internal quotations marks omitted).  Plaintiff's supervisory liability claims in this case are based upon the Defendant supervisory officials' allege failure to correct the wrongs regarding the condition of cell I-3 and retaliation by Novak and Donnelly, despite having been placed on notice.  (Dkt. No. 39-2 at 56-62.)  *See Colon*, 58 F.3d at 873.  Plaintiff relies largely on grievances filed by him, written complaints he sent to the supervisory official Defendants, and verbal complaints made to them in support of his supervisory liability claims.

### A.    Annucci

Plaintiff wrote to Annucci on October 19, 2013, complaining of the conditions in cell I-3 and complaining of un-named staff telling him he might be moved out if he stopped writing complaints.  ((Dkt. No. 1-3 at 3.)  Plaintiff also wrote to Annucci on January 28, 2014, complaining of his failure to take action with regard to repeated mistreatment and punishment in

retaliation for filing grievances despite being aware of the continued adverse action against him and informing Annucci of the allegedly retaliatory act by Donnelly on January 25, 2014. (Dkt. No. 61-4 at 122-23.) There is no acknowledgment or response from Annucci to either letter in the summary judgment record, and Plaintiff testified at his deposition he did not know if Annucci responded to the October 19, 2013, letter. (Dkt. No. 39-2 at 58.) There is also no evidence in the record that Annucci took any action in response to Plaintiff letters.

Writing letters and grievances to a supervisory official in insufficient to establish notice of a constitutional violation and personal involvement. *See Flynn v. Ward*, No. 9:15-CV-1028 (TJM/CFH), 2018 WL 3195095, at *13 (N.D.N.Y. June 7, 2018) (citing *Smart v. Goord*, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) ("Commissioner . . . cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] . . . ."); *Thompson v. Pallito*, 949 F. Supp. 2d 558, 575-76 (D.Vt. 2013) (if merely writing an unanswered letter to a prison official were sufficient to establish personal involvement, it would "contravene the black-letter principle that § 1983 does not allow for respondeat superior liability.")

Therefore, the Court recommends that Annucci be granted summary judgment.

**B.    Graham**

On October 19, 2013, Plaintiff wrote to Graham complaining of the inhumane conditions in cell I-3; Novak and Donnelly's role in placing Plaintiff in the cell and ignoring his complaints about the conditions and his requests to be moved; Novak and Donnelly working in concert to force Plaintiff to stop writing grievances; and Robinson's failure to respond to Plaintiff's request to take remedial action and have Plaintiff moved to another cell. (Dkt. No. 1-3 at 9-10.) On November 4, 2013, Plaintiff wrote to Graham reminding him of the problems with the cell and

complaining about the November 2 and 3, 2013, incidents with Novak. *Id*. at 21.

Plaintiff claims to have stopped Graham in SHU on November 5, 2013, told him about the retaliatory conduct by Novak and Graham, and shown him the inhumane conditions in cell I-3. (Dkt. No. 61-3 at ¶ 89.) On November 6, 2013, Plaintiff wrote to Graham again and reminded him of their discussion the day before and writing "[y]ou are well aware that this cell is not up to minimum standards and is indecent. You've seen it with your own eyes while speaking to me its horrible state of condition You told me that you would 'take care of the matter.'" *Id*. at 23. (unaltered text).

Plaintiff wrote to Graham on December 26, 2013, to complain about the December 21, 2013, incident with Novak, and on December 28, 2013, wrote complaining about wrongdoing by Novak and Donnelly on December 21 and 22, 2013. (Dkt. Nos. 61-3 at ¶ 108; 61-4 at 102.) On January 27, 2014, Plaintiff wrote to Graham to complain about the television incident with Donnelly on January 25, 2014. (Dkt. No. 61-4 at 102.) At his deposition, Plaintiff was unable to recall if he received responses to his written complaints to Graham, and there is no evidence in the summary judgment record showing that Graham responded to Plaintiff's written complaints. (Dkt. No. 39-2 at 57.)

Plaintiff's written complaints to Graham regarding the conditions in cell I-3 and alleged acts of retaliation by Novak and Donnelly, absent a response, investigation, or action by Graham, are insufficient to show personal involvement for purposes of supervisory liability. *See Flynn*, 2018 WL 3195095, at *13; *Smart*, 441 F. Supp. 2d at 643; *Thompson*, 949 F. Supp. 2d at 575-76. Therefore, the Court finds that Plaintiff's complaints to Graham regarding Novak and Donnelly's alleged retaliation, without response or action from Graham, are not enough to raise an issue of

fact on personal involvement with regard to Plaintiff's retaliation claims, and that Graham is entitled to summary judgment with regard to the retaliation claims. However, according to Plaintiff, Graham personally observed the conditions in the cell, and after seeing the inhumane conditions in the cell on October 17, 2013, Graham did nothing. Graham has not submitted a declaration in support of his motion. Therefore the Court that there is an issue of fact as to whether Graham was personally involved in the conditions of confinement violation of Plaintiff's Eighth Amendment rights under the fourth *Colon* criteria precluding summary judgment.

In his capacity as Superintendent at Auburn, Graham issued decisions on Plaintiff's grievances AUB-63978-13 (November 2 and 3, 2013, incidents with Novak); AUB-64154-13 (December 9, 2013, incident with Novak); AUB-64191-14 (December 21 and 22, 2013, incidents with Novak and Donnelly); and AUB-642-64289-14 (January 25, 2014, incident with Donnelly).[8] (Dkt. No. 61-4 at 64, 81, 87, 116-17.) As a general rule, the review denial or affirmance of a grievance insufficient to establish personal involvement by a supervisory official. *Perilla v. Fischer*, No. 13-CV-398M, 2013 WL 5798557, at *7 (W.D.N.Y. Oct. 28, 2013) (citing *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). There is no indication Graham did anything more than rely upon the investigation conducted by subordinate officers in summarily denying Plaintiff's grievances. Therefore, the Court finds that Graham was not personally involved by virtue of his decisions on Plaintiff's three retaliation grievances against Novak.

Based upon the foregoing, the Court recommends that Graham be granted summary

---

[8] Because the Court has determined that the television incident with Donnelly on January 25, 2013, did not involve adverse action for purposes of a retaliation claim, there can be no supervisory liability against Graham or any of the other Defendants with respect to the related retaliation claim. *See Blyden*, 186 F.3d at 265.

judgment except as to Plaintiff's supervisory liability claim regarding the conditions of confinement claim with respect to which the Court recommends denial of the motion.

### C.    Robinson

Plaintiff claims that on October 17, 2013, he stopped Robinson in SHU, told him about the deplorable state of cell I-3, not being given cleaning supplies, and Novak and Donnelly's retaliation against him.[9]  (Dkt. Nos. 39-2 at 30, 62; 61-3 at ¶ 11.)  According to Plaintiff, Robinson showed disinterest but told Plaintiff he would see about it.  (Dkt. Nos. 39-2 at 30; 61-3 at ¶ 12.)  Robinson did not have Plaintiff moved after the conversation.  *Id.*  Plaintiff wrote to Robinson on October 19, 2013, complaining about the cell and reminding Robinson about their conversation on October 17, 2013, when Robinson had told Plaintiff he would see about it but did not come back or have Plaintiff moved.  (Dkt. No. 1-3 at 13.)  Plaintiff wrote to Robinson again on November 3, 2013, complaining about retaliatory conduct by Novak on November 2 and 3, 2013.  (Dkt. Nos. 1-3 at 19; 61-3 at ¶ 35.)  Plaintiff also wrote to Robinson on January 25, 2013, complaining of the television incident of that date with Donnelly and other harassment and threats

---

[9]  In his complaint and in his October 19, 2013, letters to both Robinson and Graham Plaintiff referenced verbally complaining to Robinson about the inhumane conditions in cell I-3 with no reference to having shown Robinson the conditions in the cell.  (Dkt. Nos. 1 at ¶ 31; 1  3 at 9, 13.)  At his deposition, Plaintiff testified he believed Robinson had seen the cell but offered no details.  (Dkt. No. 61-1 at 62.)  It was not until his declaration in opposition to Defendants' motion for summary judgment that Plaintiff specifically claimed to have also shown Robinson the conditions in the cell on October 17, 2013.  (Dkt. No. 61-3 at ¶ 41).While it is not within the district court's purview to weigh the credibility of the parties at the summary judgment stage, where Plaintiff relies exclusively on his own testimony, and where as here, the testimony is contradictory and incomplete it is appropriate for the court to make some assessment of the Plaintiff's account.  *Jeffreys*, 426 F.3 at 554.  The Court does not find Plaintiff's claim that he showed Robinson the inside of his cell in opposition to Defendants' motion sufficient to avoid summary judgment.

by staff.  (Dkt. No. 61-4 at 121.)

In his declaration in support of his motion for summary judgment, Robinson has stated he does not recall Plaintiff complaining to him verbally or in writing about the conditions of his cell or actions of Novak.  (Dkt. No. 39-18 at ¶ 4.)  The Court finds nothing in the record showing that Robinson responded to, investigated, or took other action with regard to Plaintiff's written or verbal complaints about the alleged condition of his cell and alleged retaliation by Novak and Donnelly, or that he had personal knowledge beyond Plaintiff's written and verbal complaints.  Therefore, the Court recommends summary judgment in Robinson's favor.  *See Burns v. Fischer,* No. 13-CV-0486 (LEK/CFH), 2014 WL 1413387, at *7 (N.D.N.Y. Feb. 3, 2014); *Alvarado v. Westchester Cty.*, 22 F. Supp. 3d 208, 215 (S.D.N.Y. 2014) ("[B]ecause Section 1983 liability cannot be predicated on a theory of *respondeat superior*, . . . a defendant's mere receipt of a letter or grievance, without personally investigating or acting thereon, is insufficient to establish [personal involvement]." (internal quotation marks and citations omitted)).

### D.    Chuttey

On October 19, 2013, Plaintiff wrote to Chuttey complaining about the cell I-3 conditions, lack of potable water, and lack of cleaning supplies.  (Dkt. No. 1-3 at 16.)  Plaintiff also complained that Novak and Donnelly were fully aware of the cell conditions when they moved him there.  *Id*.  He asked Chuttey to order that Plaintiff be placed in another cell and have the sink repaired.  Plaintiff wrote to Chuttey again on November 4, 2013, to complain about harassment, threats, and retaliation by Novak, inform Chuttey of the encounters with Novak on November 2 and 3, 2013, and to ask Chuttey to intervene.  (Dkt. No. 61-4 at 73.)  Plaintiff claims that on November 18, 2013, he stopped Chuttey in the hall and asked if he had received Plaintiff's

51

November 4, 2013, complaint letter, with Chuttey responding that he had received and read the letter. (Dkt. No. 1 at ¶ 47.) In a December 22, 2013, written complaint to Chuttey, Plaintiff again complained of Novak's behavior and of Donnelly seemingly encouraging it and chided Chuttey for his failure to intervene and correct the problem. (Dkt. No. 61-4 at 98.)

Plaintiff testified at his deposition that he could not recall if he received any response to his letters from Chuttey. (Dkt. No. 39-2 at 60.) There are no responses from Chuttey, nor is there any evidence in the record showing that Chuttey took any action with respect to any of Plaintiff's complaints. Moreover, even if Chuttey did acknowledge receipt of Plaintiff's November 4, 2013, letter, "a defendant's mere 'receipt' of a letter . . . without personally investigating or acting [thereon] is insufficient to establish personal responsibility." *Burns,* 2014 WL 1413387, at * 7. Therefore, the Court recommends that Chuttey be granted summary judgment.

### E.    Quinn

Plaintiff wrote to Quinn about the cell I-3 conditions and lack of cleaning supplies on October 19, 2013, and asked Quinn to investigate and correct the wrongs being done Plaintiff. (Dkt. No. 1-3 at 16.) Plaintiff wrote to Quinn again on December 28, 2013, informing him of Novak and Donnelly's threats and intimidation on December 21 and 22, 2013, in violation of his rights, complaining about the ineffectiveness of the inmate grievance program, noting that Quinn had not responded to Plaintiff's prior letters informing him of staff misconduct, and asking that Quinn perform his duty to correct the situation. (Dkt. No. 61-4 at 100-01.)

Plaintiff testified at his deposition that he did not recall if he received a response from Quinn to any of his written complaints (Dkt. No. 39-2 at 59), and there are no responses from Quinn in the summary judgment record. There is also no evidence that Quinn took any action

with respect to Plaintiff's complaints.  Therefore, the Court recommends that Quinn be granted summary judgment.  *See Flynn*, 2018 WL 3195095, at *13.

### F.    Fagan

Plaintiff wrote to Fagan on January 28, 2014, informing him of the incident with Donnelly on January 25, 2014, and complaining of his continued inaction with regard to Plaintiff's repeated retaliatory mistreatment, despite being aware of the continued adverse actions taken against him. (Dkt. No. 61-4 at 122-23.)  Plaintiff testified at his deposition that he did not recall if he spoke directly to Fagan about his complaints or if Fagan responded to his letter.  (Dkt. No. 39-2 at 61.) There is no written response from Fagan, nor is there evidence of any action by Fagan in response to Plaintiff's letter in the summary judgment record.  Therefore, the Court recommends that Fagan be granted summary judgment.

### VIII.  QUALIFIED IMMUNITY

Defendants have collectively included a request for qualified immunity in which they recite boilerplate law on entitlement to qualified immunity and state as conclusion, without analysis of the manner in which the Defendants have satisfied the criteria for qualified immunity in this case, that "[f]or all of the reasons already outlined above, it is clear that Defendants acted reasonably under the circumstances and are entitled to summary judgment on the grounds of qualified immunity."  (Dkt. No. 39-21 39.)

Under a qualified immunity defense, "[a] governmental official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate clearly established rights or if it would have been objectively reasonable for the official to believe his conduct did not violate plaintiff's rights."  *Reuland v. Hynes*, 460 F.3d 409, 419 (2d Cir. 2006)

(quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003)). A defendant's motion for summary judgment on the basis of qualified immunity must fail where a factual question exists on the issue of intent or motive. *Johnson v. Ganim*, 342 F.3d 105, 117 (2d Cir. 2003).

The Court has determined that Plaintiff has raised an issue of fact with regard to his conditions of confinement claim against Novak and Donnelly. The courts have long recognized that depriving an inmate of "basic human needs," which has been found to include "safe and sanitary living conditions" violates his rights under the Eighth Amendment. *Phelps,* 308 F.3d at 185); *see also Farmer*, 511 U.S. at 837. In *Garraway*, 707 F. App'x at 18, the Second Circuit concluded that "[the constitutional magnitude" of failing to respond to an inmate's complaints of unsafe and unsanitary conditions, "if proved, was clearly established by [the date of plaintiff's claims] so as to defeat defendant's claim of qualified immunity." Likewise, an inmate's right to be free from retaliation for the exercise of a First Amendment right was clearly established at the time of the alleged retaliation against Plaintiff in this case. *See Pidlypchak*, 389 F.3d at 380. Moreover, Defendants' argument for qualified immunity is devoid of any evidence showing that it was objectively reasonable for them to believe their alleged conduct did not violate plaintiff's constitutional rights in this case with respect to the claims on which the Court has recommended denial of summary judgment. *Id*. at 39.

Based on the foregoing, the Court recommends that Defendants all be denied summary judgment on qualified immunity grounds without prejudice.

## IX.    CONCLUSION

In sum, the Court recommends that Defendants' motion for summary judgment (Dkt. No. 39) be granted in part as follows: (1) judgment in Novak's favor on Plaintiff's First Amendment

retaliation claim related to cell I-3; (2) judgment in Donnelly's favor on all of Plaintiff's First Amendment retaliation and supervisory liability claims; (3) judgment in Robinson, Chuttey, Quinn, and Fagan's favor on Plaintiff's supervisory liability claims; and (4) judgment in Graham's favor on all of Plaintiff's supervisory liability claims related to Plaintiff's First Amendment retaliation claims against Novak and Donnelly.  The Court further recommends that Defendants' motion for summary judgment be denied in part as follows: (1) denial as to Plaintiff's Eighth Amendment conditions of confinement claim against Novak and Donnelly; (2) denial as to Plaintiff's First Amendment retaliation claims against Novak, with the exception of the retaliation claim related to cell I-3; and (3) denial as to Plaintiff's supervisory liability claim against Graham on Plaintiff's Eighth Amendment conditions of confinement claim.  In addition, the Court recommends denial of Defendants' motion for summary judgment on qualified immunity grounds without prejudice.

If the District Court accepts this Report-Recommendation, the following § 1983 claims will remain for trial: (1) Plaintiff's Eighth Amendment conditions of confinement claims against Novak and Donnelly related to cell I-3; (2)  Plaintiff's First Amendment retaliation claims against Novak, with the exception of the retaliation claim related to cell I-3; (3) Plaintiff's supervisory liability claim against Graham on Plaintiff's Eighth Amendment conditions of confinement claim; and (4) to the extent allowed by the District Court, Defendants' claim of entitlement to qualified immunity.

## X.    PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE

Plaintiff has moved pursuant to Rule 37 of the Federal Rules of Civil Procedure for the imposition of sanctions against Defendants for spoliation of evidence, namely, tape over of SHU

I-tank surveillance audio and video recordings for the locations and time periods of the incidents relevant to Plaintiff's claims, despite Plaintiff's timely notice to Defendants to preserve the tapes for expected litigation. (Dkt. No. 62-1.)  In their opposition, Defendants challenge the adequacy and timing of Plaintiff's notices to preserve the tapes. (Dkt. No. 68 at 7-9.)  Defendants also point out Plaintiff's failure to show exactly what he believes the tapes would show, although Defendants themselves offer no evidence that the videos would not be probative on Plaintiff claims. *Id*. at 6.  In addition, Defendants argue Plaintiff has failed to produce evidence that Defendants destroyed the videos with the requisite culpable state of mind. *Id*. at 9.  Aside from alluding generally to the videos being recorded over, neither party provides evidence regarding what constitutes "the Department of Correction and Community Supervision's good faith operation of it's video system," relied upon by Defendants or the timing and circumstances of any relevant tape over vis-a-vis the notices to preserve provided by Plaintiff. *Id*.

        The Court has concluded that there is insufficient information in the parties' motion papers on which to rule on the issue of spoliation.  The Court has also concluded, however, that for purposes of its recommendation on Defendants' motion for summary judgment it is not necessary to do so.  The Court's recommendation that Novak and Donnelly be granted summary judgment on Plaintiff's retaliation claim relating to his placement in cell I-3 is based upon a legal determination regarding the absence of evidence showing protected First Amendment conduct. The Court has denied summary judgment with regard to Plaintiff's remaining retaliation claims and his Eighth Amendment conditions of confinement claim against Novak and Donnelly based on the evidence in the summary judgment record.  The Court has recommended that Donnelly be granted summary judgment on the retaliation claim involving the television based upon a legal

56

determination that the incident, as described by Plaintiff himself, did not constitute adverse action.

Because the motion papers provide inadequate information on which to properly determine Plaintiff's motion for spoliation sanctions, and the Court finds it unnecessary to do so for purposes of this Report-Recommendation, the Court denies Plaintiff's motion without prejudice to reconsideration or renewal including, if necessary, a hearing in the District Court in connection with any trial held in the matter.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 39) be **GRANTED** in part and **DENIED** in part; and it further

**RECOMMENDED** that summary judgment be **GRANTED** to Defendant Novak on Plaintiff's First Amendment retaliation claims related to his being moved to and kept in cell I-3, and **GRANTED** to Donnelly on all of Plaintiff's retaliation and supervisory liability claims; and it is further

**RECOMMENDED** that summary judgment be **DENIED** to both Novak and Donnelly on Plaintiff's Eighth Amendment conditions of confinement claim with regard to cell I-3, and **DENIED** to Novak on all of Plaintiff's First Amendment retaliation claims with the exception of the claim related to his being moved to and kept in cell I-3; and it is further

**RECOMMENDED** that summary judgment be **GRANTED** to Defendants Robinson, Chuttey, Quinn, and Fagan on Plaintiff's supervisory liability claims; and it is further

**RECOMMENDED** that summary judgment be **GRANTED** to Defendant Graham on Plaintiff's supervisory liability claim related to his First Amendment retaliation claims, and that it be **DENIED** on Plaintiff's supervisory liability claim related to his Eighth Amendment conditions

of confinement claim; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment on qualified

immunity grounds be denied as to all Defendants without prejudice to reconsideration at trial; and

it is hereby

**ORDERED** that Plaintiffs motion for sanctions against Defendants for spoliation of

evidence (Dkt. No. 62) be denied without prejudice to a request for reconsideration or renewal at

trial; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-

Recommendation, along with copies of the unpublished decisions cited herein in accordance with

the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.[10]  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.

Dated: August 9, 2018
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[10]  If you are proceeding pro se and are served with this Order and Report-
Recommendation by mail, three additional days will be added to the fourteen-day period,
meaning that you have seventeen days from the date the Order and Report-Recommendation was
mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed
period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the
end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

KeyCite Yellow Flag - Negative Treatment

Distinguished by Salvatierra v. Connolly, S.D.N.Y., February 29, 2012

2006 WL 1289256
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Mark BARTLEY, Plaintiff,
v.
Todd COLLINS; Christopher Pecore;
and Timothy Bates, Defendants.

No. 95 Civ. 10161(RJH).
|
May 10, 2006.

**Attorneys and Law Firms**

Mark Bartley, Stormville, NY, pro se.

Reid Anthony Muoio, Hughes Hubbard & Reed LLP,
New York, NY, for Plaintiff.

Bruce A. Brown, Assistant Attorney General, New York,
NY, for Defendants.

*MEMORANDUM OPINION AND ORDER*

RICHARD J. HOLWELL, District Judge.

**\*1** Plaintiff Mark Bartley ("Bartley") brought claims
pursuant to 42 U.S.C. § 1983 in his third amended
complaint against several defendants employed by
the New York State Department of Corrections
("DOCS"), alleging violations of his First and Fourteenth
Amendment rights not to be retaliated against for the
exercise of his right of access to the courts. Defendants
now move for summary judgment on all claims. For the
reasons set forth below, the Court grants defendants'
motion.

**BACKGROUND**

Unless otherwise indicated, the following facts are
undisputed.[1] Plaintiff Bartley was at all relevant times
a DOCS inmate at Green Haven Correctional Facility
("Green Haven") in New York. (Defs.' 56.1 ¶ 3.)

Defendants Todd Collins ("Collins"), Timothy Bates
("Bates"), and Christopher Pecore ("Pecore") were at all
relevant times correctional officers at Green Haven. (Id.
¶¶ 8-10.)

At about 2:45 a.m. on April 16, 1995, Scott Turrisi, a
mentally ill inmate at Green Haven, set a fire in his cell in
an apparent suicide attempt. (Defs.' 56.1 ¶ 12.) Bartley and
several other inmates were injured, one of whom died three
days later. (Id. at ¶¶ 12, 15; Pl.'s 56.1 ¶¶ 12, 15.) Shortly
after the fire, Bartley, together with another inmate, Felix
Diaz ("Diaz"), began to prepare lawsuits against DOCS
employees for their alleged failure to properly care for
inmates in the events leading up to and after the fire.
(Defs.' 56.1 ¶ 42.)

Bartley, who was known as a jailhouse lawyer, asserts that
prior to the fire, he had a "relatively clean" disciplinary
record. (Pl.'s 56.1 ¶ 60; Bartley Dep. at 99-100.) On the
morning of April 16, 1995, the day of the fire, Bartley and
Diaz circulated a petition among inmates at the prison
clinic in preparation for a lawsuit. (Defs.' 56.1 ¶¶ 42-43.) In
his complaint, Bartley alleged that following that action,
he was retaliated against by defendants. (Third Am.
Compl. ¶¶ 41-49.)

*A. Alleged Retaliation by Collins*

Bartley testified that in the days following the fire, Collins
made false charges against him on two occasions for minor
infractions. (Bartley Dep. at 98-99.) Those misbehavior
reports resulted in Bartley being put in "keeplock"
confinement,[2] thereby denying him access to the law
library for approximately ten days. (Id.; Schulman Decl.
Ex. M at 247.) Bartley asserts that this was done to prevent
him from seeking legal redress for injuries resulting from
the prison fire. (Bartley Dep. at 100.)

Prior to April 18, Collins had counseled Bartley for not
locking up properly, but had not, to his recollection,
written a misbehavior report against him. (Defs.' 56.1
¶ 45.) On April 18, Collins wrote a misbehavior report
against Bartley for allegedly ignoring repeated orders to
lock in for a count. (Defs.' 56.1 ¶ 46; Pl.'s 56.1 ¶ 46.)
Collins claims that when ordered to return to his cell,
Bartley stopped at two cells to talk to people, thereby
delaying the count. (Defs.' 56.1 ¶ 47.) Bartley maintains
that the charges were false and that any delay was the
result of Bartley being in a wheelchair (Schulman Decl.

Ex. Q at 5). Collins put Bartley on keeplock status pending a disciplinary hearing on the charges. (Defs.' 56.1 ¶ 47.) After an April 20 hearing that Bartley did not attend, Bartley was found guilty of two of three charges against him and was given a fifteen-day loss of package, commissary, and phone privileges. (Defs.' 56.1 ¶ 46.)

**\*2** On April 19, after Bartley was informed that he was on keeplock, he and Collins had a heated exchange. According to Collins, plaintiff called him a "cocksucker" and a "punk faggot bitch" and threatened to "kick Collins' ass and make problems for him." (Schulman Decl. Ex. Q at 2.) Collins wrote another misbehavior report, and at an April 24th hearing, Bartley admitted to using a hostile tone and calling Collins names, including "cocksucker." *(Id.* at 5.) However, Bartley denied making any threats and alleged that Collins told him he had a "big mouth" because Bartley had told Diaz to bring a lawsuit about the fire. *(Id.* at 6.) Ultimately, Bartley plead guilty to harassment, was found guilty of creating a disturbance, and was declared not guilty of charges of threats and violent conduct. *(Id.* at 3, 8; Schulman Decl. Ex. M at 247.) For the two infractions, Bartley was given 10 days of keeplock. (Schulman Decl. Ex. Q at 8; Schulman Decl. Ex. M at 247.)

In his complaint, Bartley alleges that, in addition to having him placed in keeplock, Collins threatened him by saying that Bartley "better drop" his lawsuit. (Third Am. Compl. ¶ 48.) However, Bartley offers no evidence to support the allegation of a threat except for testimony that "all of these defendants ... [were] bothering me, saying little snide remarks, saying we going to get you, you better drop the suit, and all this other stuff," and that "they told me you better drop the lawsuit, Bartley," where Collins apparently was among the "they" to whom Bartley was referring. (Bartley Dep. at 104-07.)

### B. *Alleged Retaliation by Bates*
In his complaint, Bartley alleges that in the days following the fire, Bates filed false charges of littering and other minor infractions against him to "punish and deter" him from filing a lawsuit. (Third Am. Compl. ¶ 46.) On April 19, Bates wrote a misbehavior report against Bartley for littering and for obstructing the view inside his cell with a sheet. (Defs.' 56.1 ¶ 57.) Bartley denies the charges but did not attend the resultant disciplinary hearing, where he was found guilty of three of the four charges against him and given a thirty-day loss of privileges. *(Id.;* Pl.'s 56.1 ¶ 57.)

### C. *Alleged Retaliation by Pecore*
Also in his complaint, Bartley alleges that Pecore retaliated against him by telling him, after Bartley and Diaz began preparing lawsuits, "Pataki will have to foot the bill anyway, so he doesn't care what I do" and "you better drop the lawsuit Bartley." (Third Am. Compl. ¶ 47.) Bartley further alleges that Pecore threatened him with serious bodily harm, including death, if Bartley did not discontinue the lawsuit. *(Id.)* However, Bartley provides no evidence of the time, date, place, circumstances, or words employed in the alleged threats of physical violence, save for testimony that "two of the defendants in the present action," who Bartley does not identify, "approached me, accosted me and threatened me physically and verbally of what they would do." (Bartley Dep. at 104.) Pecore affirmatively denies having had any discussions with Bartley after the fire. (Defs.' 56.1 ¶ 53; Pl.'s 56.1 ¶ 53.)

## DISCUSSION

### A. *The Summary Judgment Standard*
**\*3** Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may also be granted when the opposing party fails to establish an element essential to that party's case and on which that party would bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 321 (1986); *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 61 (2d Cir.1998) (summary judgment is "mandated" when "the evidence is insufficient to support the non-moving party's case")

In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all reasonable inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). But an alleged factual dispute between the parties will not by itself defeat a motion for summary judgment because "the requirement is that there be no *genuine* issue of *material*

fact." *Anderson,* 477 U.S. at 247-48 (emphasis in original). "A fact issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Mitchell v. Shane,* 350 F.3d 39, 47 (2d Cir.2003) (quoting *Anderson,* 477 U.S. at 248). "A fact is 'material' if it might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson,* 477 U.S. at 248).

Moreover, to survive summary judgment, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial. *Anderson,* 477 U .S. at 256-57; *Gross v. Nat'l Broad. Co., Inc.,* 232 F.Supp.2d 58, 67 (S.D.N.Y.2002). Where, as here, a plaintiff's case depends in part on his own statements and observations, such statements must " 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.' " *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) (quoting *Fed.R.Civ.P. 56(e)*).

Thus, hearsay statements that would be inadmissible at trial, conclusory assertions, and mere denials contained in those affidavits are insufficient to create a genuine issue of material fact. *Id.* (internal citations omitted); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 114, 123-24 (2d Cir.2001); *Quinn v. Syracuse Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). Neither will "unsubstantiated speculation" suffice. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (citation omitted). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P. 56(e)*. With these principles in mind, the Court turns to the merits of the defendants' motion.

## B. *Bartley's Retaliation Claims*

**\*4** Prisoners have a constitutional right to petition the government, and it is a violation of *§ 1983* for prison officials to retaliate against prisoners for the exercise of that right. *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (prisoner stated a valid claim under *§ 1983* by alleging that a prison official filed false disciplinary charges against him in retaliation for his exercise of a constitutional right to file a grievance); *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("[F]iling of a grievance and attempt to find inmates to represent the grievants ... is constitutionally protected."); *Colon v.*

*Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)) ("[P]risoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right."); *Ciaprazi v. Goord,* No. Civ. 9:02CV00915, 2005 WL 3531464, at \*7 (N.D.N.Y. Dec. 22, 2005) ("[P]laintiff, who has lodged formal complaints of prison conditions and treatment of inmates, has engaged in protected activity.").

However, courts are to "approach prisoner claims of retaliation with skepticism and particular care" because such claims are easily fabricated and may cause unwarranted judicial interference with prison administration. *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official ... can be characterized as a constitutionally proscribed retaliatory act."); *see also Gill v. Pidlypchack,* 389 F.3d 379, 385 (2d Cir.2004) (Scullin, C.J ., concurring).

In order to sustain a First Amendment retaliation claim, "a prisoner must demonstrate the following: '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Gill,* 389 F.3d at 380 (quoting *Dawes,* 239 F.3d at 492). If each of the three elements of a *prima facie* case of retaliation is established, the burden shifts to the defendants "to show that the plaintiff would have received the same punishment even absent the retaliatory motivation," in which case the plaintiff's claim must fail. *Gayle,* 313 F.3d at 682 (2d Cir.2002); *Freeman v. Goord,* 2005 WL 3333465, at \*4 (S.D.N.Y. Dec. 10, 2005) ("Even if an inmate plaintiff meets his burden under this three-pronged test, defendants are entitled to summary judgment ... if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone," as courts "employ a presumption that a prison official's acts to maintain order are done for a proper purpose.") (citations and quotations omitted).

### 1. *Constitutionally Protected Conduct*

**\*5** Plaintiff asserts that he was retaliated against for engaging in the constitutionally protected activity of

Case 9:16-cv-01211-GTS-TWD    Document 72    Filed 08/09/18    Page 62 of 338
Bartley v. Collins, Not Reported in F.Supp.2d (2006)
2006 WL 1289256

circulating a petition in preparation for legal proceedings. Defendants counter that under the Second Circuit's decision in *Duamutef v. O'Keefe,* 98 F.3d 22, 24 (2d Cir.1996), circulating a petition is not protected conduct.

The circulation of a petition by a prisoner is generally protected by the First Amendment. *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976), *cert. denied,* 431 U.S. 967 (1977). However, that right "must be weighed against legitimate safety interests of the prison." *Duamutef,* 98 F.3d at 24 (reiterating the multi-factor test to determine the validity of a regulation that impinges on inmates' constitutional rights as set forth in *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987).). The *Duamutef* court held that where there was an official grievance procedure available to prisoners and a plaintiff did not claim that his petition contained requests that could not be addressed through that procedure, it was "permissible for prison officials to bar the circulation of petitions." *Id.* at 24 (citing *Nickens v. White,* 622 F.2d 967, 971 (8th Cir.1980), *cert. denied,* 449 U.S. 1018 (1980); *Edwards v. White,* 501 F.Supp. 8, 11-13 (M.D.Pa.1979), *af'd,* 633 F.2d 209, 212 (3d Cir.1980). The *Nickens* court ruled similarly, relying on the affidavit of a prison superintendent who explained that petitions were banned for security concerns and that alternative means were available for communicating grievances. 622 F.2d at 970.

Courts have noted that even though *Duamutef* held that petitions *could* be banned, the ruling did not forbid petitions. *Farid v. Goord,* 200 F.Supp.2d 220, 236 (W.D.N.Y.2002). Where the defendant asserted that the plaintiff "does not have a right to circulate a petition" but did not reference a rule or regulation that prohibited petitioning, the *Farid* court held that the plaintiff, in circulating a petition, had engaged in protected conduct. *Id.* Defendants here similarly do not identify a prison regulation prohibiting petitioning by prisoners that justifies a limitation of plaintiff's First Amendment rights. In the absence of penitentiary rules proscribing petitioning, plaintiff's activity was constitutionally protected and as such, plaintiff satisfies the first element of his prima facie case of retaliation with respect to all three defendants.

*2. Adverse Action*

Plaintiff alleges that all three defendants took adverse action against him: Collins by verbally pressuring him to

not bring legal action and filing misbehavior reports that put him in keeplock and caused him to lose privileges, Bates by filing false charges that cost him privileges, and Pecore by threatening him with physical violence. Defendants maintain that plaintiff's claims are conclusory and do not rise to the level of severity required for the actions to be characterized as adverse.

**\*6** In evaluating what constitutes adverse action, a court should be mindful that " 'Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse.' " *Dawes,* 239 F.3d at 493 (quoting *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999) (en banc) (per curiam)).

In the prison context, adverse action is defined objectively as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill,* 389 F.3d at 381, 383 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). A subjective definition is not adopted because "it would be unfair in the extreme to rule that plaintiff's bringing of the subsequent claim in itself defeated his claim of retaliation." *Id.* If the retaliatory conduct would not deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights, it " 'is simply *de minimis* and therefore outside the ambit of constitutional protection.' " *Davis,* 320 F.3d at 353 (quoting *Dawes,* 239 F.3d at 493).

With respect to his claims that Collins and Pecore issued verbal threats against him, plaintiff does not survive summary judgment. His deposition testimony that multiple defendants threatened him and encouraged him to abandon his lawsuit is conclusory because it is insufficiently specific with regard to the identification of any one defendant, and does not adequately provide the time, date, place, or circumstances of the alleged remarks. *See, e.g., Gaines v. Artus,* No. 9:04-CV-76, 2006 WL 721618, at \*5 (N.D.N.Y. Mar. 20, 2006) (prisoner's § 1983 claim for denial of proper medical care dismissed on summary judgment in part because "[d]uring plaintiff's deposition, he ... could never be specific regarding the individuals allegedly responsible for this substandard care" and therefore "makes only conclusory claims"); *Jasmin v. New York State Dept. of Labor,* No. 98 Civ. 7569, 2000 WL 194774, at \*2 (S.D .N.Y. Feb. 17,

2000) (plaintiff's "conclusory deposition testimony that
co-worker 'has constantly been harassing me until last
week' is utterly insufficient to create an issue of fact for the
jury"); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d
Cir.1995) (plaintiff "cannot defeat [a summary judgment]
motion by relying on the allegations in his pleading, ... or
on conclusory statements") (citations omitted).

Even if plaintiff's deposition testimony were deemed
sufficiently specific, verbal threats such as "we going to get
you, you better drop the suit," [3] do not rise to the level of
adverse action. *See Dawes,* 239 F.3d at 493 (2d. Cir.2001)
("Not every unnecessary statement of a prison guard
regarding an inmate's exercise of free speech violates the
First Amendment"); *Alicea v. Howell,* 387 F.Supp.2d 227,
237 (W.D.N.Y.2005) ("[Defendant's] alleged statements
to plaintiff about there being 'no secrets in prison' and
that plaintiff would 'have to pay the consequences' for
filing a grievance against [defendant] do not give rise to a
First Amendment retaliation claim."); *Williams v. Muller,*
No. 98 Civ. 5204, 2001 WL 936297, at *4 (S.D.N.Y. Aug.
17, 2001) (defendant's "alleged spreading of rumors [that]
plaintiff claims ... were intended to incite the inmates to
harm plaintiff ... do not give rise to a retaliation claim");
*Cruz v. Hillman,* No. 01 Civ. 4169, 2002 WL 31045864, at
*7 (S.D.N.Y. May 16, 2002) (allegation that corrections
counselor expressed his dislike for inmates who file civil
lawsuits, and later came to plaintiff's cell and said 'Green
Haven is an open battlefield, so be careful' insufficient to
state a retaliation claim).

**\*7** Plaintiff's complaint, although more particular than
his testimony with regard to what each defendant allegedly
said, does not defeat defendants' motion for summary
judgment. Not only does the complaint, like plaintiff's
testimony, inadequately plead the time, date, place, or
circumstances of the alleged remarks, but because it is
unverified, it cannot be relied on as evidence in opposing
a summary judgment motion. *Trinidad v. New York City
Dept. of Correction,* ---F.Supp.2d ----, 2006 WL 704163,
at *6 (S.D.N.Y. Mar. 21, 2006) (Unsworn materials are
"an insufficient basis for opposing a motion for summary
judgment"); *Dukes v. City of New York,* 879 F.Supp.
335, 343 (S.D.N.Y.1995) ("Unsworn statements are not
admissible to controvert a summary judgment motion.");
*Kelly v. United States,* 924 F.2d 355, 357 (1st Cir.1991)
(to survive summary judgment, "the nonmovant may not
rest upon mere allegations in, say, an unverified complaint
or lawyer's brief, but must produce evidence which would

be admissible at trial to make out the requisite issue
of material fact") (citing Fed.R.Civ.P. 56(e)); *Solo Serve
Corp. v. Westowne Assoc.,* 929 F.2d 160, 165 (5th Cir.1991)
("Given that [defendant] has filed a properly supported
motion for summary judgment, [plaintiff] cannot rely on
the facts in its unverified complaint, but must point to
evidence in the record sufficient to establish the alleged
facts to avoid summary judgment.")

Bates' misbehavior report against plaintiff and Collins's
first report, which both resulted in plaintiff's temporary
loss of various privileges such as permission to visit the
commissary, likewise do not constitute adverse action
because they were *de minimis:* they do not constitute
penalties that would deter a similarly situated prisoner
of ordinary firmness from exercising his constitutional
rights. *Compare Pledger v. Hudson,* No. 99 Civ. 2167, 2005
WL 736228, at *5 (S.D.N.Y. Mar. 31, 2005) (correction
officer's issuance of an unfavorable evaluation of prisoner
and threat to place him in a Special Housing Unit did
not meet the standard of adverse action), *with Gill,* 389
F.3d at 384 (plaintiff's allegation that defendants filed
false misbehavior reports against him, resulting in his
being sentenced to three weeks of keeplock, constituted
a claim of adverse action), *and Wheeler v. Beard,* No.
Civ. A.03-4826, 2005 WL 1840159, at *3 (E.D.Pa. Aug.
3, 2005) (prisoner plaintiffs alleged adverse action in
retaliation claim by claiming that defendants, among
other things, denying medical treatment and prison-issued
undergarments, destroying legal mail and other legal
materials, planting contraband in cell to serve as basis for
bogus misconduct report, and caused one plaintiff to lose
his job).

However, Collins's second misbehavior report against
plaintiff did constitute adverse action because it caused
plaintiff to be placed in keeplock confinement for ten
days. *Auleta v. LaFrance,* 233 F.Supp.2d 396, 402
(N.D.N.Y.2002) ( "Plaintiff's claim that he was placed
in keeplock for 7 1/2 days is properly construed as
alleging an adverse action"); *Lashley v. Wakefield,* 367
F.Supp.2d 461, 467 (W.D.N.Y.2005) (noting holdings in
other cases that nine days' keeplock confinement does not
necessarily as a matter of law constitute *de minimis* alleged
retaliation).

*3. Causal Connection*
 **\*8** Plaintiff alleges that the actions taken by defendants
were in retaliation against his engagement in the protected

Case 9:16-cv-01211-GTS-TWD    Document 72    Filed 08/09/18    Page 64 of 338
Bartley v. Collins, Not Reported in F.Supp.2d (2006)

2006 WL 1289256

conduct of circulating a petition, while defendants assert that the events were unrelated. To show a causal connection between his protected act and the adverse action, a plaintiff must make more than merely conclusory allegations. *See Dawes,* 239 F.3d at 491 ("bald allegations of retaliation" will not suffice; the causal connection must be "sufficient to support the inference that the speech played a substantial part in the adverse action"). Evidence of improper motive may be circumstantial and can include "(1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the plaintiff's prior good disciplinary record; (3) the plaintiff's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline." *Chavis v. Kienert,* No. 9:03-CV-0039, 2005 WL 2452150, at *16 (N .D.N.Y. Sept. 30, 2005) (citing *Colon,* 58 F.3d at 872-73).

In *Gayle,* the Second Circuit overruled a district court's grant of summary judgment for defendants in a case in which the plaintiff proffered sufficient evidence to "create a genuine issue of material fact as to whether retaliation was a substantial factor in the DOCS officials' decision to charge and punish" him. 313 F.3d at 683. The *Gayle* court came to its conclusion based on circumstances involving, *inter alia,* the prisoner's receipt of a misbehavior report shortly after filing a grievance; the report's relationship to a discussion the prisoner and a guard held regarding the grievance, the fact that the prisoner and a guard offered conflicting testimony at a disciplinary hearing regarding what prompted the report; a guard's lack of credibility when testifying at the hearing, and the fact that the hearing (at which the prisoner was found guilty of violating a rule) was administratively reversed. *Id.* at 683-84.

Plaintiff's allegation of a causal connection between his protected act and Collins' second misbehavior report is sufficient, although weaker than that in *Gayle.* The report, which caused plaintiff to be placed in keeplock, came just three days after the date of the prison fire and plaintiff's circulation of a petition, a temporal proximity that may suggest causality. *Colon,* 58 F.3d at 872 ("[T]emporal proximity between an inmate's lawsuit and disciplinary action may serve as circumstantial evidence of retaliation.") (citations omitted). Plaintiff's assertion that he had a relatively clean disciplinary record prior to the fire also suggests the possibility of improper motive. *Id.* ("[E]vidence of prior good behavior also may be circumstantial evidence of retaliation.") (citation

omitted). However, at the disciplinary hearing regarding the second report, plaintiff was not only found guilty of two of the charges against him but also pled guilty to one of them. In *Pledger,* the court granted a defendant's motion for summary judgment where a plaintiff did not deny the factual foundation of the criticisms made in an allegedly retaliatory negative evaluation by a prison official. 2005 WL 736228, at *4. Here, plaintiff's acknowledgement of the factual basis of one of the charges made in Collins's second report weakens his claim that the report was retaliatory, but plaintiff did contest the other three charges in the report and was found not guilty of two of them. On balance, the Court concludes that a material issue of fact has been created on the issue of causation.

### 4. Defendants' Justifications for Their Actions

 *9 Defendants claim that even if plaintiff satisfies the three elements of a prima facie case of retaliation, as plaintiff does with respect to Collins's second misbehavior report, their actions were not unlawful because they would have engaged in them even absent the plaintiff's protected conduct.

Summary judgment should be granted for the defendants if they can show that there is no genuine issue that they would have taken the same action-here, writing a misbehavior report that caused plaintiff to be put in keeplock for ten days-even without retaliatory motivation. *See, e.g., Gayle,* 313 F.3d at 682; *Graham,* 89 F.3d at 79. In making this determination, the court should employ a " 'presumption that a prison official's acts to maintain order are done for a proper purpose.' " *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998) (quoting *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995), *cert. denied,* 525 U.S. 907 (1998)). "The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff 'committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.' " *Gayle,* 313 F.3d at 682 (quoting *Hynes,* 143 F.3d at 657).

Collins wrote his second misbehavior report against plaintiff after plaintiff called him various epithets, which plaintiff later admitted to at a disciplinary hearing. Although Bartley was found not guilty of charges of threats and violent conduct, those charges stemmed from the same behavior for which Bartley was found guilty on two other charges. Between the presumption that Collins acted with a proper purpose and the fact that plaintiff acknowledged engaging in the conduct underlying the

charges, Collins satisfies his burden of showing that he would have written the report even if plaintiff had not earlier circulated a petition.

C. *Qualified Immunity*
Because the claims against defendants are otherwise dismissed, the Court need not address defendants' assertion of qualified immunity.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1289256

Footnotes

1    The facts as herein recited are drawn from defendants' Rule 56.1 Statement ("Defs.' 56.1 ¶ ___"), plaintiff's response to defendants' Rule 56.1 Statement ("Pl.'s 56.1 ¶ ___"), Bartley's deposition ("Bartley Dep."), and records of disciplinary hearings stemming from Todd Collins's April 19, 1995 misbehavior report against Bartley ("Schulman Decl. Ex. M" and "Schulman Decl. Ex. Q").

2    When under keeplock confinement, an inmate is confined to his cell for 23 hours a day and loses various privileges. 7 N.Y. Comp.Codes R. & Regs. tit. 7, §§ 301.1-301.6.

3    Because plaintiff did not testify to it in his deposition, the Court excludes from consideration the allegation made only in plaintiff's unverified complaint that Pecore "on at least one occasion, threatened to kill [Bartley] if he did not discontinue this lawsuit." (Third Am. Cmpl. ¶¶ 47.) *See* discussion *infra*.

**End of Document**                                   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-01211-GTS-TWD    Document 72    Filed 08/09/18    Page 66 of 338
Benitez v. Mailloux, Not Reported in F.Supp.2d (2009)
2009 WL 1953752

2009 WL 1953752
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Henry BENITEZ, Plaintiff,

v.

B. MAILLOUX, W. Brown, Cook, S. Walsh, D.
Lawrence, J. Chesbrough, N. Race, N. Smith, E.
Weissman, C. Richards, L. Wright, Smithers, T.
Debyah, P. Sawyer, D. Quinn, N. Bezio, M. Yaddow,
D. LaClair, R. Woods, R. Wright, P. Perry, G.
LaFrance, E. Liberty, B. Kourofsky, D. King, K.
Vann, T. Zerniak, G. Canning, R. Keith, J. Martin,
A. Boucaud, M. Tirone, S. Salls, D. Uhler, R. Bishop,
D. Clancy, L. Peary, C. Gregory, E. Amberman,
Kaufman, W. Crozier, K. Bellamy, T. Eagen,
V. LaPage, P. Burgess, G. Bedard, S. Garrison,
C. Rowe, M. Lambert, K. Caron, J. Boulrice, J.
Oropallo, M. McDonald, M. Church, B. Meacham, J.
Keating, B. Grant, R. Richards, J. Price, J. McGaw,
W. Trombley, C. Champagne, John Does 1–3,
P. Gilmore, R. DaFoe, R. Lilledahl, D. Riley, R.
Legacy, G. Soucia, J. Anctil, D. Selsky, J. Bennett,
J. Botta, W. Welch, and A. Laclair, Defendants.

No. 9:05–CV–1160 (NAM/RFT).
|
July 2, 2009.

West KeySummary

1    **Federal Civil Procedure**
        👉 **Civil Rights Cases in General**
        A genuine issue of material fact as
        to whether a prisoner was subjected
        to inhumane conditions of confinement
        precluded summary judgment in favor of
        the prison officials in a § 1983 proceeding.
        The prisoner alleged that he was subjected
        to unsanitary conditions because the cell he
        was placed in was covered with fecal matter
        and dead insects on the floor and walls, and
        that for some period of time thereafter, he
        was deprived of cleaning supplies, preventing

him from cleaning the cell, and that he was
deprived of toilet paper during the same
time period. 42 U.S.C.A. § 1983 U.S.C.A.
Const.Amend. 6.

Cases that cite this headnote

**Attorneys and Law Firms**

Henry Benitez, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General, State of New
York, Gerald J. Rock, Esq., Assistant Attorney General,
Albany, NY, for the Defendants.

**MEMORANDUM–DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

**INTRODUCTION**

**\*1**  In this *pro se* action, plaintiff, an inmate in the custody
of New York State Department of Correctional Services,
seeks money damages under 42 U.S.C. § 1983 for a number
of alleged deprivations occurring between July 10, 2004
and the commencement of the action on September 14,
2005. Defendants move for summary judgment (Dkt. No.
144), and United States Magistrate Judge Randolph F.
Treece issued a Report and Recommendation (Dkt. No.
174) recommending that the motion be granted in part
and denied in part. The Report and Recommendation also
contained an Order to Show Cause directing plaintiff to
show cause why causes of action should not be dismissed
against certain defendants who have not been served. For
the reasons set forth below, the Court adopts the Report
and Recommendation in part and rejects it in part, grants
summary judgment in part and denies it in part, and
dismisses the claims against the defendants who have not
been served.

**SUMMARY JUDGMENT**

Defendants move (Dkt. No. 144) for summary judgment
dismissing this *pro se* prisoner section 1983 complaint.
Upon referral pursuant to 28 U.S.C. § 636(b)(1)
(B) and Local Rule 72.3(c), United States Magistrate

Judge Randolph F. Treece issued a Report and Recommendation (Dkt. No. 174) dated March 25, 2009, recommending that the action be dismissed as against certain defendants. Plaintiff has submitted an objection (Dkt. No. 178). Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court reviews *de novo* those parts of a report and recommendation to which a party specifically objects. Where only general objections are filed, the Court reviews for clear error. *See Brown v. Peters,* 1997 WL 599355,*2– 3 (N.D.N.Y.), *aff'd without op.,* 175 F.3d 1007 (2d Cir.1999). Failure to object to any portion of a report and recommendation waives further judicial review of the matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993). Accordingly, the Court conducts *de novo* review of the issues raised by plaintiff.

Upon *de novo* review, the Court agrees with and adopts most of the excellent and thorough Report and Recommendation of Magistrate Judge Treece. However, in his objection to the Report and Recommendation, plaintiff explains certain aspects of his case and evidence; partly for this reason, and due to plaintiff's *pro se* status, the Court does not adopt the recommendation to grant summary judgment in defendants' favor with respect to two issues. Regarding the first issue, the Court denies summary judgment dismissing the excessive force claim against C. Champagne stemming from the alleged beating of plaintiff on July 20, 2004. In view of plaintiff's *pro se* status, the Court finds that plaintiff's objection, in which he explains his deposition testimony and refers to the allegation in the complaint that Champagne struck him with his baton during the beating, is sufficient to withstand summary judgment. Thus, the Court denies summary judgment in Champagne's favor regarding this claim. The Court otherwise adopts Magistrate Judge Treece's Report and Recommendation on this issue, including the recommendation to deny summary judgment dismissing the conspiracy claim related to the alleged beating.

 *2 The second issue concerns plaintiff's Eighth Amendment claim regarding the conditions in his cell in the Special Housing Unit ("SHU") from July 19, 2004, until the filing of the complaint on September 14, 2005. Although this is a close question, the Court finds sufficient evidence in the complaint, deposition, opposition to summary judgment, and other papers to raise an issue of fact barring dismissal of the Eighth Amendment claim regarding the alleged cold temperature and lack of sink and toilet running water in plaintiff's SHU cell from July 19, 2004 to September 14, 2005, as well as other alleged deprivations for a much shorter period. Regarding the cold, plaintiff avers that a wide crevice in the cell wall adjacent to his outside exercise pen door was not repaired for a year and a half, permitting cold drafts, snow, and insects to enter and causing him to suffer from "bitter" cold in the winter, and that the exterior wall to which his bed was attached was so cold that he had to sleep on the floor. According to Superintendent R. Woods' response to plaintiff's grievance regarding the crevice, a work order to close the crevice was submitted on or before February 2, 2005. Plaintiff, however, claims the work was not done for over a year. Woods' affidavit does not establish whether or when anyone actually performed the repair work that was ordered. Further, the fact that the temperature in plaintiff's cell was checked once and found to be acceptable is not enough to warrant summary judgment on this issue. Deprivation of the basic human need of warmth can constitute an Eighth Amendment violation. *See, e.g., Benitez v. Straley,* 2006 WL 5400078, * 13 (S.D.N.Y. Feb.16, 2006); *Moore v. Gardner,* 199 F.Supp.2d 17, 36–38 (W.D.N.Y. Mar.12, 2002).* Regarding unsanitary conditions, plaintiff avers that his cell lacked sink and toilet running water from July 19, 2004 to September 14, 2005. Woods' affidavit does not completely remove any question of fact regarding this allegation. In addition, plaintiff claims that when he was placed in the SHU cell on July 19, 2004, it was grossly unsanitary, with fecal matter and dead insects on the floor and walls, and that for some period of time thereafter, [1] he was deprived of cleaning supplies, preventing him from cleaning the cell, and that he was deprived of toilet paper during the same time period. The factfinder may properly consider these alleged conditions, although occurring only during a limited period, as well as the allegations of lack of running water and bitter cold for a longer period, in evaluating plaintiff's Eighth Amendment claim based on inhumane conditions of confinement. *See generally Gaston v. Coughlin,* 249 F.3d 156, 164–65 (2d Cir.2001) *and cases cited therein; Wright v. McMann,* 387 F.2d 519, 526 (2d Cir.1967); *compare Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir.2003). Plaintiff has adequately alleged liability on the part of Woods, who visited him in his cell on a number of occasions and was aware of his complaints of the cold, as well as B. Mailloux, T. Debyah, Grant, R. Richards, Smithers, N. Bezio, D. Quinn, J. Price, J. McGaw, Brown, Keating, and Burgess. Plaintiff may also proceed on his claims that defendants Mailloux, Smithers, and Woods conspired to subject him to these conditions;

the conclusory conspiracy claim as to Sawyer is dismissed. As against the other defendants named in this cause of action, the record lacks a sufficient basis upon which a rational jury could find personal involvement, supervisory responsibility, and/or deliberate indifference.

**\*3** Plaintiff also asserts an Eighth Amendment conditions-of-confinement claim alleging he was denied outdoor recreation. The Court agrees with Magistrate Judge Treece that—particularly when viewed in light of plaintiff's deposition testimony—this claim, as well as the claim of conspiracy to deny outdoor exercise, lacks sufficient factual basis to withstand summary judgment. The Court agrees that plaintiff may proceed on his Eighth Amendment claim of deprivation of food on numerous occasions from July 10, 2004 to September 14, 2005. Further, the Court adopts Magistrate Judge Treece's discussion and recommendation that summary judgment be granted dismissing plaintiff's claims that false misbehavior reports were issued against him in retaliation for his exercise of his First Amendment right to file grievances, that he was denied access to courts, and that he was denied copies of misbehavior reports.

The Court agrees with Magistrate Judge Treece's discussion and recommendation regarding plaintiff's claims of deliberate indifference to his medical needs, verbal harassment, denial of access to the inmate grievance system, and denial of due process in connection with his prospective disciplinary sentences to SHU under *Sandin v. Conner,* 515 U.S. 472, 484–86, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The Court further adopts the remainder of Magistrate Judge Treece's Report and Recommendation.

### ORDER TO SHOW CAUSE

The Report and Recommendation, filed March 25, 2009, contained an Order to Show Cause as follows:

> [W]ithin thirty (30) days of the filing date of this Report–Recommendation and Order, Plaintiff show cause why Defendants D. Lawrence, F. Kaufman, and John Does 1–3 should not be dismissed from this action due to Plaintiff's failure

to effectuate service of process pursuant to Fed.R.Civ.P. 4(m). Plaintiff is warned that his failure to respond to this Order to Show Cause within thirty (30) days of the filing date of this Report–Recommendation and Order will result in this Court recommending dismissal of his claims against these Defendants.

On May 1, 2009 (Dkt. No. 176) plaintiff requested an extension of time to respond to the Order to Show Cause until May 20, 2009. Plaintiff also stated that officials refused to furnish writing supplies unless plaintiff provided a letter from the Court confirming plaintiff's court-imposed deadline. [2] The Court extended the due date for the responding declaration until May 20, 2009, and otherwise denied the request (Dkt. No. 177). As of the date of this Memorandum–Decision and Order, plaintiff has not submitted a declaration in response to the Order to Show Cause. Accordingly, the case is dismissed against D. Lawrence, F. Kaufman, and John Does 1–3 for failure to serve them with process.

### CONCLUSION

It is therefore

ORDERED that the Report–Recommendation (Dkt. No. 174) is hereby adopted in part and rejected in part as set forth above; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 144) is granted in part and denied in part as follows: summary judgment is granted dismissing the action against the following defendants: N. Smith, L. Wright, P. Sawyer, D. LaClair, C. Richards, R. Wright, G. LaFrance, E. Liberty, B. Kourofsky, D. King, T. Zerniak, G. Canning, R. Keith, J. Martin, A. Boucaud, S. Salls, D. Uhler, R. Bishop, D. Clancy, L. Peary, W. Crozier, K. Bellamy, T. Eagen, G. Bedard, C. Rowe, M. Lambert, K. Caron, J. Boulrice, J. Oropallo, M. McDonald, B. Meacham, W. Trombley, D. Riley, R. Legacy, G. Soucia, J. Anctil, D. Selsky, J. Bennett, and J. Botta, and otherwise denied; and it is further

2009 WL 1953752

**\*4** ORDERED that the action is dismissed without prejudice against D. Lawrence, F. Kaufman, and John Does 1–3 for failure to serve them with process; and it is further

ORDERED that the Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1953752

Footnotes

1   Plaintiff's complaint specifies three consecutive days during which this condition lasted, but the complaint is not sufficiently clear to warrant a definite finding that the situation lasted no longer than that three-day period. The Court notes that, although not in evidentiary form, plaintiff states in his Objection to the Report and Recommendation and his Memorandum of Law in opposition to summary judgment that this unsanitary condition and denial of cleaning supplies persisted for almost three weeks.

2   The "court-imposed" deadline for responding to the Order to Show Cause was set forth in Magistrate Judge Treece's Report and Recommendation, mailed to plaintiff on March 25, 2009. The Court notes that its May 28, 2009 order in *Benitez v. Locastro* (9:04–CV–423, Dkt. No. 131) set forth plaintiff's lawsuits, the matters pending, and the applicable deadlines. Plaintiff's time to respond to the summary judgment motion in *Benitez v. Locastro* was extended from February 17, 2009, to March 2, 2009, to April 20, 2009, to May 1, 2009, to June 8, 2009. In that case, since February 2009, plaintiff has written four letters to the Court requesting extensions of time (9:04–CV–423, Dkt.Nos.122, 125, 127, 133), filed the appeal to this Court (9:04–CV–423, Dkt. No. 123), and submitted opposition (9:04–CV–423, Dkt. No. 126) to defendants' motion to submit an exhibit *in camera.* In *Benitez v. Ham,* 9:04–CV–1159, plaintiff's time to respond to defendants' summary judgment motion has been extended five times, from November 18, 2008, to July 10, 2009; during that time he has made eight submissions to the Court. There is no pending motion in *Benitez v. Perry,* 9:07–CV–1089 (plaintiff responded to defendants' dismissal motion on July 2, 2008 after receiving one extension of time; that motion was granted in part and denied in part, Dkt. No. 85). Plaintiff has already responded to the only pending motion in the remaining case, *Benitez v. Duquette,* 9:03–CV–973 (plaintiff responded to defendants' summary judgment motion on December 4, 2008 after receiving five extensions of time). As is evident from this summary, the Northern District of New York has given plaintiff a great deal of consideration in the lawsuits he currently has pending in this district, and plaintiff has pursued them effectively. The Court notes also that in his most recent adjournment requests, plaintiff no longer claims he lacks sufficient writing materials. *See Benitez v. Locastro,* 9:04–CV–423, Dkt. No. 133, 6/12/09; *Benitez v. Ham,* 9:04–CV–1159, Dkt. No. 108, 6/18/09.

---

**End of Document**                                  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1413387
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Mark BURNS, Plaintiff,

v.

Brian FISCHER, Commissioner of N.Y.S. Dept.
of Corrections; Teresa Knapp–David, Director of
Movement and Control, N.Y.S. DOCCS; Daniel
F. Martuscello, Jr., Superintendent, Coxsackie
Correctional Facility; Captain Shanley, Captain,
Coxsackie Correctional Facility; Sgt. Noeh, Sergeant,
Coxsackie Correctional Facility; Schwebler,
Guidance Counselor, Coxsackie Correctional
Facility; and McGlynn, Guidance Counselor,
Coxsackie Correctional Facility, Defendants. [1]

No. 13–CV–486 (LEK/CFH).
|
Signed Feb. 3, 2014.

**Attorneys and Law Firms**

Mark Burns, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Laura A. Sprague, Esq., Assistant
Attorney General, Albany, NY, for Defendants.

## REPORT–RECOMMENDATION AND ORDER [2]

CHRISTIAN F. HUMMEL, United States Magistrate
Judge.

**\*1** Plaintiff Mark Burns ("Burns"), an inmate currently
in the custody of the New York State Department of
Corrections and Community Supervision ("DOCCS"),
brings this action pursuant to 42 U.S.C. § 1983
alleging that defendants, seven DOCCS employees,
violated his constitutional rights under the First, Eighth,
and Fourteenth Amendments. Compl. (Dkt. No. 1).
Presently pending is defendants' motion to dismiss certain
defendants pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No.
22. Burns does not oppose the motion. [3] Dkt. No. 30. For
the following reasons, it is recommended that defendants'
motion be granted in part and denied in part.

## I. Background

The facts are related herein in the light most favorable to
Burns as the non-moving party. *See* subsection IIA *infra*.
At all relevant times, Burns was an inmate at Coxsackie
Correctional Facility.

While working in the commissary, Burns was struck in the
head by a falling can. Burns Aff. (Dkt. No. 1–1) ¶¶ 16,
30. [4] Burns immediately reported the accident to an officer
in the commissary. *Id.* ¶ 23. The officer had witnessed
the accident and documented the injury as the result of a
"work related" accident. *Id.* ¶¶ 23, 29–30.

On May 20, 2010, Burns met with defendants Shanley
and Noeth. Burns Aff. ¶¶ 20–25. During the meeting,
Shanley said Burns's wife called and told Shanley that
Burns was cut by another inmate. *Id.* ¶ 21. Burns explained
that he had not been attacked but he was injured in an
accident. *Id.* ¶¶ 22, 30. Further, Burns explained that his
wife was attempting to cause him trouble in reaction to
recent marital discord. *Id.* ¶ 22. By all accounts there were
no cuts visible on Burns's body to suggest he had been
attacked. *Id.* ¶¶ 24, 32. Burns informed Shanley as to the
accident that occurred the previous day. *Id.* ¶¶ 22–23.

Also during that meeting, Shanley threatened to transfer
Burns to Involuntary Protective Custody ("IPC") unless
Burns agreed to provide gang and drug information.
Burns Aff. ¶¶ 20–25. In response to Burns's refusal to act
as a "snitch," Shanley told Noeth to write up an IPC
recommendation. *Id.* ¶ 26. The following day, Burns was
served with an IPC order and transferred to a housing unit
that is part of the Special Housing Unit ("SHU"). *Id.* ¶¶
27–28. Burns asserts that the IPC recommendation was
based on fabricated events. *Id.* ¶ 33.

Shanley, Noeth, and the commissary officer testified
during a Tier III hearing addressing Burns's IPC status.
Burns Aff. ¶¶ 29–33. The commissary officer supported
Burns's account of the accident. *Id.* ¶ 30. Noeth testified
that he believed Burns's account of the accident and Burns
had no problems with other inmates. *Id.* ¶ 31. Noeth only
filed the IPC recommendation because he was ordered to
by Shanley. *Id.* Shanley acknowledged that there were no
witnesses or documentation as to an attack on Burns but
gave false statements to justify the IPC recommendation.

*Id.* ¶¶ 32–33. It can be inferred that the hearing resulted in approval of Burns's transfer to IPC. *Id.* ¶¶ 28, 33–34.

**\*2** Since May 21, 2010, Burns has been placed in IPC for twenty-three hours a day on keeplock [5] status. Burns Aff. ¶¶ 27–28, 44–45. Burns is housed in cells neighboring general population inmates against IPC guidelines. *Id.* ¶ 39. Despite Burns's IPC status, Burns is in close proximity with dangerous and troublesome inmates, who frequently create an auditory nuisance through the night. *Id.* ¶¶ 40–41, 63–64. While in IPC, Burns is unable to avail himself of a number of programs and services which were previously accessible in general population and DOCCS has failed to provide services which should be available to IPC inmates pursuant to guidelines and directives. *Id.* ¶¶ 46–64.

Among these lack of services, defendants Guidance Counselors Schwebler and McGlynn failed to make required daily rounds. Burns Aff. ¶¶ 55–58. The librarian and religious supervisors failed to make required weekly rounds. *Id.* ¶¶ 49–52. Grievance Supervisors failed to make required daily rounds. *Id.* ¶¶ 57–58. Burns is denied the use of exercise facilities and participation in family reunion programs and facility festivals. *Id.* ¶¶ 53–54, 61–62. Additionally, Burns is only allotted three hours of programming and out of cell recreation time; inmates in general population are afforded up to thirteen hours. *Id.* ¶¶ 46–47.

While in IPC, Shanley and Martuscello repeatedly prompted Burns to provide them with information. Burns Aff. ¶¶ 34, 36, 42, 65. Upon refusing the requests, Shanley and Martuscello responded that Burns would only be released from IPC if Burns relented. *Id.* ¶¶ 34, 42, 65. Furthermore, Shanley and Martuscello threatened Burns with administrative segregation if Burns did not cease filing grievances about his IPC status. *Id.* ¶ 36.

## II. Discussion

Viewing the allegations in the light most favorable to the plaintiff, Burns contends that his First Amendment rights were violated when defendants Shanley, Martuscello, and Noeth retaliated against Burns for being uncooperative in providing gang and drug information. Burns next contends his Eighth Amendment rights were violated by the cruel and unusual conditions of confinement in relation to his IPC status. Burns further contends that his

Fourteenth Amendment due process rights were violated by the reliance on fabricated events to justify his IPC status and confinement.

Defendants move to dismiss on the grounds that (1) in their official capacities, all defendants are entitled to Eleventh Amendment immunity and (2) Burns has failed to allege the personal involvement of defendants Fischer, Knapp–David, Schwebler and McGlynn.

### A. Legal Standard

Under *Fed.R.Civ.P. 12(b)(6),* a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." *Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir.2009)* (quoting *Holmes v. Grubman, 568 F.3d 329, 335 (2d. Cir2009)*). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills, 572 F.3d 66, 72 (2d Cir.2009)* (quoting *Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009)*) (internal quotation marks and alterations omitted).

**\*3** Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678* (citing *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)* (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct] .")); *see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir.2009)* (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal, 556 U.S. at 679* (citation omitted).

Consideration of a motion to dismiss "is limited to the facts asserted within the four corners of the complaint, the documents attached to the complaint as exhibits,

2014 WL 1413387

and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007) (citations omitted). However, there are instances where the court may consider documents outside those previously referenced, including when the documents are only "partially quoted in [the] complaint ...; integral to [the] complaint ...; [or] relied upon ... in drafting the complaint ...." *Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006) (internal quotation marks and citations omitted). Specifically, the following documents may be considered when construing a complaint's pleading sufficiency:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, ... and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Incorp. Village of Sag Harbor,* 762 F.Supp.2d 560, 567 (E.D.N.Y.2011) (citations omitted).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations or arguments

that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law....

**\*4** *Id.* (internal quotation marks, citations, and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

### B. Eleventh Amendment

Defendants move to dismiss all claims against them in their official capacity. Dkt. No. 22. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (*citing Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159,

166 (1985). Here, Burns seeks monetary damages against defendants for acts occurring within the scope of their duties. Thus, the Eleventh Amendment bar applies and serves to prohibit Burns's claims for monetary damages against all defendants in their official capacity.

Accordingly, defendants' motion on this ground should be granted.

### C. Personal Involvement

Defendants contend that Burns has failed to allege the personal involvement of defendants Fischer, Knapp–David, Schwebler, and McGlynn.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

 **\*5** (1) [T]he defendant participated directly in the alleged constitutional violation;

 (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

 (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

 (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

 (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986))

In this case, Burns does not allege that Commissioner Fischer or Director Knapp–David directly participated in the alleged constitutional violations. Rather, Burns's complaints against these defendants appear to be that they were in positions of power, thus always involved

with anything occurring in conjunction with Burns's confinement. However, attempts to establish personal involvement based upon the supervisory roles these defendants occupied are inappropriate. *Wright,* 21 F.3d at 501 (holding that a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement).

Further, to the extent that Burns contends he notified Fischer and Knapp–David of the alleged constitutional violations through grievances and associated appeals, such claims do not sufficiently state the personal involvement of either defendant. Merely writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] ...."). Similarly, receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."). Burns does not contend that Fischer or Knapp–David acted on his written complaints. Moreover, Burns does not allege that either Fischer or Knapp–David created a policy or custom under which unconstitutional practices occurred, were grossly negligent in supervising subordinates, or were deliberately indifferent to his rights by failing to act on information indicating unconstitutional acts had occurred. Thus, Burns has failed to establish the personal involvement of Fischer and Knapp–David.

 **\*6** As for defendants Schwebler and McGlynn, Burns has sufficiently alleged their personal involvement. Burns alleged that per DOCCS directive, counselors are required to make daily rounds in SHU, where Burns is held in IPC. Burns Aff. ¶¶ 55–58. However, Burns asserts that Schwebler and McGlynn directly participated in the alleged constitutional violations by failing to make the required daily rounds, contributing to Burns's confinement conditions. *See Colon,* 58 F.3d at 873.

Burns v. Fischer, Not Reported in F.Supp.3d (2014)

2014 WL 1413387

Thus, Burns has sufficiently established the personal involvement of Schwebler and McGlynn.

Accordingly, defendants' motion on this ground should be granted as to defendants Fischer and Knapp–David and denied as to defendants Schwebler and McGlynn.

### III. Conclusion

For the reasons stated above, it is hereby:

1. **RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 22) be:

A. **GRANTED** as to the (1) Eleventh Amendment bar to § 1983 claims against all individual defendants in their official capacities; (2) personal involvement defense for defendants Fischer and Knapp–David; AND

B. **DENIED** as to the (1) personal involvement defense for defendants Schwebler and McGlynn.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.3d, 2014 WL 1413387

Footnotes

1   By notice and acknowledgment of receipt of summons and complaint, defendant Noeh indicated that his name is spelled "Noeth ." Dkt. No. 13. The Court considers this as mere error on Burns's part and the latter spelling is used throughout this reportrecommendation.

2   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

3   In Burns's response to defendants' motion to dismiss, Burns limits his opposition of the motion to the dismissal of claims against defendants Shanley, Martuscello, and Noeh. Dkt. No. 30 ¶ 9. Defendants did not move to dismiss claims against these three defendants; therefore, the motion is essentially unopposed.

4   Burns filed a Memorandum of Law (Dkt. No. 1–2) containing much of the same content available in his Affidavit.

5   "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. COMP.CODES R. & REGS. tit. 7, § 301.6.

---

**End of Document**                                                                © 2018 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

Cole v. Artuz, Not Reported in F.Supp.2d (1999)
1999 WL 983876
Case 9:16-cv-01211-GTS-TWD   Document 72   Filed 08/09/18   Page 77 of 338

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*
It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*
For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

1999 WL 983876

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Benitez v. Parmer, N.D.N.Y., July 8, 2013

2011 WL 7479164
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Bartram Yihni DABNEY, [1] Plaintiff,
v.
Dr. Raymond MADDOCK, Physician,
Great Meadow Correctional Facility, and
M. Stormer, Corrections Officer, Great
Meadow Correctional Facility, Defendants.

Civil Action No. 9:10–CV–0519 (GTS/DEP).
|
Nov. 29, 2011.

**Attorneys and Law Firms**

Bartram Yihni Dabney, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Office of the Attorney
General, William J. McCarthy, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** *Pro se* plaintiff Bartram Yihni Dabney, a New
York State prison inmate, has commenced this action
pursuant to 42 U.S.C. § 1983 alleging that he has
suffered several constitutional deprivations arising out of
his incarceration. [2] Plaintiff's complaint names eighteen
separate defendants in varying positions, all employed
at the prison facility at which he was confined at the
relevant times, and asserts an amalgamation of claims
against those defendants ranging from alleged deprivation
of his rights under the First, Eighth, and Fourteenth
Amendments to the United States Constitution to
violation of the Religious Land Use and Institutionalized
Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc–1
et seq.

Plaintiff's claims in this action were significantly narrowed
as a result of a decision rendered by the court upon

initial review of Dabney's *in forma pauperis* application
and accompanying complaint, pursuant to 28 U.S.C. §§
1915(e)(2)(B) and 1915A, prior to service and appearances
on behalf of the defendants. As a result of that review
and the court's initial filing order, the sole surviving claims
include a First Amendment retaliation claim against
Corrections Officer Stormer and a deliberate medical
indifference cause of action against Raymond Maddock,
a physician employed at the prison in which plaintiff was
housed at the relevant times. Those defendants, who have
since been served, now seek dismissal of the remaining
claims for failure to state a cause of action upon which
relief may be granted. For the reasons set forth below, I
am unable to say at this early procedural juncture that
plaintiff has not stated a plausible retaliation claim against
defendant Stormer, but I do find that his claim against
defendant Maddock lacks palpable facial merit.

I. *BACKGROUND* [3], [4]

Plaintiff is a prison inmate entrusted to the custody and
care of the DOCCS (formerly known as the New York
State Department of Correctional Services, or "DOCS");
while he is currently designated elsewhere, plaintiff was
confined in the Great Meadow Correctional Facility
("Great Meadow"), located in Comstock, New York, at
the times relevant to his claims in the action. *See generally*
Complaint (Dkt. No. 1).

In his complaint plaintiff alleges that Corrections Officer
Stormer unlawfully retaliated against him, in violation
of his rights under the First Amendment, in return for
Dabney having filed one or more grievances against that
defendant as well as other prison workers alleged to be
his friends. Complaint (Dkt. No. 1) ¶¶ 6–11. As adverse
retaliatory action, plaintiff alleges that defendant Stormer
verbally harassed him and filed a false misconduct
report resulting in disciplinary proceedings, which he
was precluded from attending in person; denied him
commissary access in order to permit his purchase of such
items as tobacco, stamps, and personal hygiene products;
and severed the electrical supply to his cell, leaving him
without television access, or lights for four days. *Id.*

**\*2** Plaintiff's claims against the other remaining
defendant, Dr. Raymond Maddock, a physician at
Great Meadow, stem from an alleged denial of access
to adequate medical care. Complaint (Dkt. No. 1) ¶¶
40–41. Plaintiff asserts that Dr. Maddock wrongfully

deprived him of a permit for medical boots, necessitated by a bullet lodged in his right femur and the surgical removal of a toenail, and additionally complains of the denial of a permit for back and hand braces, and inadequate treatment of Hepatitis C. *Id.* Plaintiff alleges that in response to his request for treatment of the latter condition Dr. Maddock told him to "drink coffee". *Id.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on May 3, 2010, filing a complaint comprised of ten separate causes of action and naming as defendants. eighteen DOCCS employees assigned to Great Meadow. Dkt. No. 1. Accompanying plaintiff's complaint was an application for leave to proceed *in forma pauperis* ("IFP"). Dkt. No. 2. On January 4, 2011, District Judge Glenn T. Suddaby issued a decision and order in which, *inter alia,* he granted plaintiff's IFP application and dismissed all but two of the claims asserted by the plaintiff in his complaint on the basis that they lacked facial merit, without prejudice and with leave to replead. Dkt. No. 14. As a result of that decision and plaintiff's failure to amend, the sole remaining claims in this action are a First Amendment retaliation claim against Corrections Officer Stormer and an Eighth Amendment deliberate medical indifference cause of action against Dr. Raymond Maddock.

The two remaining defendants, who have now been served, moved on March 17, 2011 seeking dismissal of the remaining two causes of action for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, additionally asserting their entitlement to qualified immunity from suit. Dkt. No. 24. Defendants' motion, which plaintiff has opposed, *see* Dkt. No. 27, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Governing Legal Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands

more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, 167 L.Ed.2d 929). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal,* 129 S.Ct. at 1950.

**\*3** To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper,* 378 U.S. at 546, 84 S.Ct. at 1734; *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Iqbal,* 129 S.Ct. at 1949. In the wake of Twombly and *Iqbal,* the burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) remains substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

### B. *Legal Sufficiency of Plaintiff's Retaliation Claim*

In his first cause of action plaintiff asserts that defendant Stormer engaged in a series of actions toward him, motivated by his filing of grievances against Stormer and his friends. Defendants maintain that this claim, while surviving the court's initial, *sua sponte* review, fails to state a plausible cause of action. Although this is less than clear, it appears the defendant's argument is focued upon the alleged inability of plaintiff to meet the adverse action prong of the governing retaliation test.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

**\*4** In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

As can be seen, analysis of retaliation claims requires thoughtful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are stated in only a conclusory fashion, without any allegations of fact tending to show the requisite elements of protected conduct, adverse action, and a nexus between the two, dismissal is warranted.

Plaintiff alleges that he engaged in protected activity by filing grievances against defendant Stormer and his friends. It is well established that the right to petition the government for the redress of grievances is a fundamental right that derives from the First Amendment, and the filing of grievances thus can constitute protected conduct. *Franco,* 854 F.2d at 590; *see also Alnutt v. Cleary,* 913 F.Supp. 160, 169 (W.D.N.Y.1996). Plaintiff's retaliation claim therefore satisfies the first of the three prongs of the governing retaliation standard.

Plaintiff further asserts that in retaliation for the filing of those grievances defendant Stormer retaliated by harassing him, making religious remarks, issuing a false misbehavior report, and failing to allow him to attend a resulting disciplinary hearing Complaint (Dkt. No. 1) ¶ 6–7, 10–11. In addition, plaintiff alleges that defendant Stormer interfered with his access to the commissary in order to purchase necessary supplies and interrupted the supply of electrical power to his cell for a period of four days. *Id.* at ¶¶ 8–9. Applying a Rule 12(b)(6) standard in order to gauge the sufficiency of these allegations, in his January 4, 2011 decision District Judge Suddaby found that while in isolation potentially none of those allegations rises to a level sufficient to support a finding of adverse action, collectively they could suffice to constitute adverse action. [5] *See* Memorandum Decision and Order (Dkt. No. 14) pp. 16–17. Defendants' motion provides no basis to disturb that finding.

**\*5** Neither Judge Suddaby's decision nor defendants' pending motion addresses the third element of the retaliation claim, requiring a showing of a connection between the protected activity and allegedly resulting adverse action. That required link can be supplied, among other things, by the fact that adverse action closely followed the protected activity, thereby giving rise to an inference of relatedness. *Mateo v. Gundrum,* No. 9:10–CV–1103, 2011 WL 5325790, at \*6 (N.D.N.Y. Aug.30,

2011) (Lowe, M.J.) (citing *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009)), *Report and Recommendation Adopted,* 2011 WL 5325794 (N.D.N.Y. Nov.3, 2011) (Sharpe, J.). [6]

In this instance, plaintiff alleges that he filed a grievance against defendant Stormer on November 13, 2008 and that several of the adverse actions now claimed to have been retaliatory closely followed, including the denial of commissary slips on that same day, the loss of power to his cell thirteen days later, and the denial of the right to be present at his misconduct hearing on November 29, 2008. [7] These allegations are sufficient to plausibly support a finding of a connection between plaintiff's protected activity and the adverse actions alleged. Accordingly, since the plaintiff has made a plausible showing at this early procedural juncture sufficient to meet the three essential elements of a cognizable retaliation claim, I recommend that the portion of defendants' motion seeking dismissal of that cause of action be denied.

### C. Medical Indifference Cause of Action

The other surviving claim in this action is set forth in plaintiff's tenth cause of action, which succinctly alleges that defendant Maddock has denied him a permit for medical boots, a back brace and a hand brace, and additionally has provided inadequate treatment for his Hepatitis C condition. In their motion defendants assert that these allegations fail to support a plausible claim of violation of plaintiff's rights under the Eighth Amendment.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976). The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)) (internal quotations omitted).

**\*6** A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009); *Price v. Reilly,* No. 07–CV–2634 (JFB/ARL), 2010 WL 889787, at \*7–8 (E.D.N.Y. Mar.8, 2010). Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm. *See Salahuddin v. Goord,* 467 F.3d 263, 279–81 (2d Cir.2006).

### 1. Objective Requirement

Analysis of the objective, "sufficiently serious," requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care ...", and centers upon whether prison officials acted reasonably in treating the plaintiff. *Salahuddin,* 467 F.3d at 279. A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. *Id.* at 280. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment

and the offending conduct is an unreasonable delay or
interruption in treatment ... [the focus of] the inquiry
is on the challenged delay or interruption, rather that
the prisoner's underlying medical condition alone." *Id.*
(quoting *Smith,* 316 F.3d at 185) (internal quotations
omitted). In other words, at the heart of the relevant
inquiry is the seriousness of the medical need, and whether
from an objective viewpoint the temporary deprivation
was sufficiently harmful to establish a constitutional
violation. *Smith,* 316 F.3d at 186. Of course, "when
medical treatment is denied for a prolonged period of time,
or when a degenerative medical condition is neglected
over sufficient time, the alleged deprivation of care can
no longer be characterized as 'delayed treatment', but
may properly be viewed as a 'refusal' to provide medical
treatment." *Id.* at 186, n. 10 (quoting *Harrison v. Barkley,*
219 F.3d 132, 137 (2d Cir.2000)).

**\*7** Since medical conditions vary in severity, a decision
to leave a condition untreated may or may not raise
constitutional concerns, depending on the circumstances.
*Harrison,* 219 F.3d at 136–37 (quoting, *inter alia, Chance
v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). Relevant
factors informing this determination include whether the
plaintiff suffers from an injury or condition that a " 
'reasonable doctor or patient would find important and
worthy of comment or treatment' ", a condition that "
'significantly affects' " a prisoner's daily activities, or "
'the existence of chronic and substantial pain.' " *Chance,*
143 F.3d at 702 (citation omitted); *Lafave v. Clinton
County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3
(N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.) (citation omitted).

The allegations supporting plaintiff's deliberate
indifference claim are inadequate to plausibly satisfy
the objective prong of the deliberate indifference
test. Plaintiff's complaint fails to provide elaboration
concerning the condition requiring that he be provided
with a back brace and hand brace. While plaintiff does
provide some information regarding the need for medical
boots for recreation, indicating that he has a bullet
lodged in his right femur and has had a toenail surgically
removed, these allegations fall far short of establishing the
existence of a condition of urgency, capable of producing
death, degeneration or extreme pain. [8] *See, e.g., Harris v.
Morton,* No. 9:05–CV–1049, at *3, n.2 (N.D.N.Y. Feb.
29, 2008) (Kahn, J. and Treece, M.J.) ("We note that
although Plaintiff states he suffered from a 'snapped'
neck, he does not indicate he suffered from anything

other than a generic neck injury."); *Bennett v. Hunter,* No.
9:02–CV–1365, 2006 WL 1174309, *3 (N.D.N.Y. May
1, 2006) (Scullin, S.J. and Lowe, M.J.) (pinched nerve
not a serious medical need)); *Jones v. Furman,* No. 02–
CV–939F, 2007 WL 894218, at *10 (W.D.N.Y. Mar.21,
2007) (soreness, pain in a lump behind his right
ear, lump on the back of his head, small abrasions on
his nose and knuckle, and bruising to his back, ribs
do not constitute the requisite serious medical need)
(citing *Hemmings v. Gorczyk,* 134 F.3d 104, 109 (2d
Cir.1998)); *Tapp v. Tougas,* No. 9:05–CV–0149, 2008
WL 4371766, at * 9 (N.D.N.Y. Aug.11, 2008) (Peebles,
M.J.) (citing *Peterson v. Miller,* No. 9:04–CV–797, 2007
WL 2071743, at *7 (N.D.N.Y. July 13, 2007) (noting
that a "dull pain" in plaintiff's back and persistent rash
on plaintiff's foot did not raise a constitutional issue)
(citation omitted), *Report and Recommendation Adopted
in Part and Rejected in Part,* 2008 WL 4371762 (N.D.N.Y.
Sep 18, 2008) (Mordue, C.J.); *Salaam v. Adams,* No.
03–CV–0517, 2006 WL 2827687, *10 (N.D.N.Y. Sept.
29, 2006) (intermittent back pain requiring pain relievers
and physical therapy, a gastrointestinal problem with
stomach pains, and a psychological problem requiring
Wellbutrin and/or Neurontin did not constitute serious
medical conditions) (Kahn, J. and Lowe, M.J.); *see also
Ford v. Phillips,* No. 05 Civ. 6646, 2007 WL 946703,
at *12 & n. 70 (S.D.N.Y. Mar. 27, 2007) (finding that
plaintiff's allegations of bruises, abrasions, and blood in
his urine for a few weeks did not constitute a sufficiently
serious condition giving rise to a medical indifference
claim); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,*
151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (cut finger with
"skin ripped off" is insufficiently serious); *Bonner v. N.Y.
City Police Dep't,* No. 99 Civ. 3207, 2000 WL 1171150,
at *4 (S.D .N.Y. Aug. 17, 2000) (inability to close hand
due to swelling insufficiently serious to constitute Eighth
Amendment violation); *Gomez v. Zwillinger,* 1998 U.S.
Dist. LEXIS 17713, at *16 (S.D.N.Y. November 6, 1998)
(back pain and discomfort not sufficiently serious).

**\*8** To be sure, as Judge Suddaby has held, the other
condition implicated in plaintiff's medical indifference
claim, Hepatitis C, potentially constitutes a serious
medical condition. *See, e.g., Motta v. Wright,* 9:06–CV–
1047, 2009 WL 1437589, at *15 (N.D.N.Y. May 20, 2009)
("No one disputes that [Hepatitis C] is a 'serious medical
condition.' ") (Mordue, C.J. and DiBianco, M.J.); *Muniz
v. Goord,* 9:04–CV–0479, 2007 WL 2027912, at *8, n. 38
(N.D.N.Y. July 11, 2007) (McAvoy, J. and Lowe, M.J.)

("the bulk of district court decisions addressing the issue finds that Hepatitis C is a serious medical need.") (citing cases). The objective prong of the deliberate indifference standard, however, requires the court to look beyond whether a serious medical condition exists to determine if there has been a complete failure to provide treatment, or instead inadequate or delayed treatment. *Salahuddin,* 467 F.3d at 280. In this case, it is unclear from plaintiff's complaint whether the sole response by Dr. Maddock to his Hepatitis C condition and symptomology was the advice that he "drink coffee", and particularly whether there has been a complete absence of treatment. Under the circumstances, I am unable to conclude that a plausible claim has been stated meeting the objective element of the deliberate indifference test.

### 2. *Subjective Element*

The second, subjective requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants. *Salahuddin,* 467 F.3d at 280 (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 2325, 115 L.Ed.2d 271 (1991)). Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Farmer); Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same). Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law. *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40, 114 S.Ct. 1970, 128 L.Ed.2d 811).

In addition to failing to meet the objective prong of the controlling deliberate indifference test, plaintiff's complaint also fails to include facts which, if proven, would demonstrate defendant Maddock's subjective indifference to plaintiff's serious medical condition.

Because plaintiff's complaint fails to demonstrate the existence of a plausible deliberate indifference claim meeting both the objective and subjective prongs of the governing test, I recommend that his deliberate medical indifference claim be dismissed.

### D. *Qualified Immunity*

**\*9** In their motion defendants assert their entitlement to qualified immunity from suit as an additional basis for dismissal of plaintiff's claims against them.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is an objective inquiry: whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009). In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at 232, 129 S.Ct. at 815–16. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[9] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 430, n. 9 (citing *Saucier* ).[10] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers

"should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." [11] *Pearson, 555 U.S. at 236, 242, 129 S.Ct. at 818, 821.* In other words, as recently emphasized by the Second Circuit, the courts "are no longer required to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey, 567 F.3d at 61* (citing *Pearson, 129 S.Ct. at 821*) (emphasis in original).

**\*10** For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430, n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.' " *Kelsey, 567 F.3d at 61* (quoting *Pearson, 129 S.Ct. at 818).*

In this case, I am unable to conclude that qualified immunity should be invoked in this case. Both of the rights at stake in plaintiff's first and tenth causes of action were established long before the relevant conduct in this case. Since I have already found that plaintiff has failed to state a deliberate medical indifference claim, there is no need under *Saucier* and *Pearson* to address the second prong of the governing test with respect to that claim. Turning to plaintiff's retaliation cause of action, I am unable to conclude at this early procedural juncture that a reasonable person in defendants' circumstances would have believed that his or her conduct did not run afoul of plaintiff's well-established First Amendment right to be free from unlawful retaliation for having engaged in protected conduct. I therefore recommend against a finding of qualified immunity in favor of defendant Stormer in connection with plaintiff's first cause of action.

### E. *Whether to Permit Leave to Replead*

Having determined that plaintiff's deliberate medical indifference cause of action is insufficiently stated, the next question to be addressed is whether he should be afforded leave to amend in an effort to state a cognizable Eighth Amendment claim. Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave

to amend *at least* once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991) (emphasis added); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). In this instance, I discern no basis for finding that the plaintiff is not entitled to the benefit of this general rule, given the procedural history of the case.

In the event that the plaintiff does opt for amendment, he is advised that the law in this circuit clearly provides that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* No. 94–CV–1594, 1995 U.S. Dist. LEXIS 7136, at *24–25 (N.D.N.Y. May 22, 1995) (Pooler, D.J.) (citation omitted). In any amended complaint, plaintiff therefore must clearly set forth the facts, including the wrongful acts that give rise to the claim, the dates, times and places of the alleged acts, and each individual(s) who committed each alleged wrongful act. Such an amended complaint, must replace the existing second amended complaint, must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court, *see Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir.1999) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)); Fed.R.Civ.P. 10(a), and should specifically allege facts indicating the involvement of each of the named defendants in the constitutional deprivations alleged in sufficient detail to establish the they were tangibly connected to those deprivations. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

### F. *Protective Order*

**\*11** In their motion defendants have also moved pursuant to Federal Rule of Civil Procedure Rule 26(c)(1) for a protective order staying discovery pending the resolution of defendants' motion to dismiss. Rule 26(c)(1) of the Federal Rules of Civil Procedure provides, in relevant part, that

Case 9:16-cv-01211-GTS-TWD   Document 72   Filed 08/09/18   Page 86 of 338
Dabney v. Maddock, Not Reported in F.Supp.2d (2011)
2011 WL 7479164

[a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending ... The Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery.

Fed.R.Civ.P. 26(c)(1). This rule is often invoked to avoid potentially expensive and wasteful discovery during the pendency of a determination which could potentially reshape pending claims. *See, e.g., Spencer Trask Software and Information Services, LLC v. RPost Intern. Ltd.,* 206 F.R.D. 367, 368 (S.D.N.Y.2002) (granting stay of discovery pending determination of motion to dismiss where court found defendants presented "substantial arguments" for dismissal of many if not all of the claims in the lawsuit); *United States v. Cnty. of Nassau,* 188 F.R.D. 187, 188–89 (E.D.N.Y.1999) (granting stay of discovery during the pendency of a motion to dismiss where the "interests of fairness, economy and efficiency ... favor[ed] the issuance of a stay of discovery," and where the plaintiff failed to claim prejudice in the event of a stay.).

In this case, until the issues are framed and a standard Rule 16 pretrial scheduling order is issued, no useful purpose would be served in permitting the parties to engage in discovery. Moreover, the court has been presented with no reason to conclude that plaintiff will be prejudiced by a modest delay occasioned by a stay of discovery at this stage. Accordingly, I recommend that defendants' request for a stay of discovery be granted.

IV. *SUMMARY AND RECOMMENDATION*

In their motion defendants challenge the two remaining claims in this action. Addressing first plaintiff's retaliation cause of action against defendant Stormer, I conclude that his complaint plausibly alleges the three necessary elements of a retaliation claim and therefore recommend against dismissal of that cause of action. Plaintiff's medical indifference claim against defendant Maddock, however, does not contain sufficient factual support to permit the court to conclude that a plausible Eighth Amendment violation has been stated. Accordingly, I recommend dismissal of that cause of action, with leave to replead.

Based upon the foregoing it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 24) be GRANTED, in part, and that plaintiff's tenth cause of action, alleging deliberate medical indifference, be DISMISSED, with leave to replead, but that defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

 **\*12** It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 7479164

Footnotes

1    In both the caption and body of his complaint, which was apparently typed with the assistance of fellow inmates working in the prison law library at the Clinton Correctional Facility, plaintiff's name is spelled as "Dadney". *See* Complaint (Dkt. No. 1) pp. 1, 2. From the signature page of that complaint as well as publicly available records from the New York State Department of Corrections and Community Supervision ("DOCCS"), however, it appears that plaintiff's name is correctly spelled as "Dabney".

2    In his complaint, which is sworn to under penalty of perjury, Dabney claims not to have previously brought any other lawsuit in federal court relating to his imprisonment. *See* Complaint (Dkt. No. 1) p. 2. Despite this sworn representation, the court's records reveal that this is the fifth civil rights action filed by Dabney in this court since 1994. *Dabney v. Ricks,*

2011 WL 7479164

*et al.,* No. 94–CV–1058, *Dabney v. Coombe, et al.,* No. 95–CV–1633, *Dabney v. Eagen, et al.,* 03–CV–184, *Dabney v. Goord, et al.,* 04–CV–944, and *Dabney v. Fischer, et al.,* 10–CV–1109.

3    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964). In addition, when evaluating defendants' motion I have also considered the materials submitted by the plaintiff in opposition to the defendants' motion, Dkt. No. 27, to the extent they are consistent with the allegations set forth in his complaint. *See Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.).

4    While plaintiff's complaint, as originally constituted, was wide-ranging and concerned a number of events, both related and unrelated, in the following background section I have included only those salient facts relating to the two claims that survived the court's initial review.

5    In his decision District Judge Suddaby did note that the interference with Dabney's right to be present during a disciplinary hearing could alone suffice to establish an adverse action. *See* Memorandum Decision and Order dated January 4, 2011 (Dkt. No. 14) p. 17.

6    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

7    The chronology concerning the inability of plaintiff to appear at his disciplinary hearing is unclear. At one point in his complaint plaintiff alleges that defendant Stormer and another co-defendant conspired on November 29, 2008 to deny him the right to be present at a misconduct hearing. Complaint (Dkt. No. 1) ¶ 10. At another point he references the denial of his right to be present at a disciplinary hearing on April 5, 2009. *Id.* at ¶ 11. It appears from the complaint, and the court assumes, that plaintiff is alleging the denial of his right to be present at two separate disciplinary hearings, one held in November 2008 and the other in April 2009.

8    Although this information is not included in plaintiff's complaint, in his papers in opposition to defendants' motion plaintiff identifies a condition resulting in his need for a neck and back brace as chronic arthritis, Plaintiff's Memorandum (Dkt. No. 27) at p. 5. *Hale v. Rao,* No. 9:08–CV–1612, 2009 WL 3698420, at *3, n. 8 (N.D.N.Y. Nov.3, 2009) (Hurd, D.J. and Lowe, M.J.) ("[I]n cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint.). Nonetheless, he has failed to allege enough to establish the existence of a serious medical condition. *Veloz v. New York,* 35 F.Supp.2d 305, 309, 312 (S.D.N.Y.1999) (prisoner's foot problem, which involved arthritis and pain, did not constitute a serious medical need); *Veloz v. New York,* 339 F.Supp.2d 505, 522–26 (S.D.N.Y.2004) (plaintiff's chronic back pain and mild to moderate degenerative arthritis of spinal vertebrae did not establish a serious medical need); *but see Sereika v. Patel,* 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) (allegations of "severe pain ... [and] reduced mobility ..." in the shoulder are sufficient to raise a material issue of fact as to a serious medical need).

9    In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

10    In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

11    Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* 555 U.S. at 231, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524, 116 L.Ed.2d 589, —— (1991) (per curiam)).

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-01211-GTS-TWD    Document 72    Filed 08/09/18    Page 88 of 338
Decayette v. Goord, Not Reported in F.Supp.2d (2009)
2009 WL 1606753

2009 WL 1606753
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David DECAYETTE, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.

No. 9:06–CV–783.
|
June 8, 2009.

West KeySummary

1    **Federal Civil Procedure**
    👉 Civil Rights Cases in General
    Genuine issue of material fact as to whether
    prison official had a reasonable opportunity
    to intervene in an incident precluded summary
    judgment in favor of inmate who brought a
    § 1983 action against a prison official who
    allegedly failed to intervene while other prison
    officials where beating inmate in violation
    of his Eighth amendment right. There were
    multiple issues of fact, including whether the
    other prison officials actually beat inmate,
    and if so whether prison official observed
    the beating, and if she observed the beating,
    whether she was capable of preventing or
    mitigating it. U.S.C.A. Const.Amend 8 42
    U.S.C.A. § 1983.

    Cases that cite this headnote

**Attorneys and Law Firms**

David Decayette, Romulus, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the
State of New York, Christina L. Roberts–Ryba, Esq., of
Counsel, New York, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This matter brought pursuant to 42 U.S.C. § 1983
was referred to the Hon. George H. Lowe, United
States Magistrate Judge, for a Report–Recommendation
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report–Recommendation dated March 31, 2009
recommended that Defendants' motion be granted in part
and denied in part. On April 21, 2009, Plaintiff filed
an objection to the Report–Recommendation. Plaintiff's
objection focused primarily on the dismissal of the
Complaint against Defendant Commissioner Goord for
lack of sufficient personal involvement. On May 19,
2009, Defendant Volpe filed an objection to the Report–
Recommendation on the grounds that the action against
her should be dismissed in its entirety.

When objections to a magistrate judge's Report–
Recommendation are lodged, the Court makes a *"de
novo"* determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." *See* 28 U.S.C. § 636(b)(1). After such a
review, the Court may "accept, reject, or modify, in whole
or in part, the findings or recommendations made by
the magistrate judge. The judge may also receive further
evidence or recommit the matter to the magistrate judge
with instructions." *Id.*

Having reviewed the record *de novo* and having
considered the issues raised in Plaintiff's and Defendant's
objections respectively, with the exception of the Eighth
Amendment claim of inadequate medical care against
Defendant Volpe, this Court has determined to accept
the recommendations of Magistrate Judge Lowe for the
reasons stated in the Report–Recommendation.

For a plaintiff to succeed on a claim of inadequate
medical care in violation of the Eighth Amendment, two
factors must be shown: (1) that the plaintiff's medical
need was sufficiently serious; and (2) that the defendant
was deliberately indifferent to that serious medical need.
*Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50
L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d
698, 702 (2d Cir.1998). A plaintiff's medical need is
deemed sufficiently serious under an Eighth Amendment
claim if, looked at objectively, it is "a condition of
urgency, one that may produce death, degeneration, or
extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66

Decayette v. Goord, Not Reported in F.Supp.2d (2009)
2009 WL 1606753

(2d Cir.1996) (citations omitted). A defendant acts with deliberate indifference when she "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Id.*

Plaintiff has failed to show that the alleged injuries present at the time of his interactions with Defendant Volpe were sufficiently serious to satisfy the first prong. While it is unclear from Plaintiff's testimony whether Defendant Volpe was present at the time that the alleged injuries were suffered (Dkt. No. 36–4, at 43, lines 7–23), or whether she was brought into the room shortly thereafter, this distinction is immaterial to this claim. Plaintiff admits that his visible injuries were limited to cuts, bruises and swelling. Dkt. No. 36–4, at 49, lines 12–18. Injuries of this nature are not conditions of urgency that threaten death, degeneration or extreme pain. *Hickey v. City of New York,* No. 01–Civ. 6506(GEL), 2004 WL 2724079, *16 (S.D.N.Y. Nov. 29, 2004) (holding that cuts and bruises do not constitute sufficiently serious medical needs). Moreover, during a meeting with medical personnel on August 5, 2004, which was seven days after the alleged assault, the only injury complained of by Plaintiff was back pain (Dkt. No. 36–4, at 48, 49). Plaintiff admits that his back pain was caused by a 2002 bus accident, and does not allege that it was exacerbated by the incident in question. Dkt. No. 36–4, at 15–16. Accordingly, Plaintiff has failed to demonstrate that he had a sufficiently serious medical need.

**\*2** Assuming, *arguendo,* that Plaintiff's alleged injuries were sufficiently serious, Plaintiff has provided insufficient evidence that Defendant Volpe both knew of and disregarded any such injuries. Plaintiff alleges that he currently suffers nerve damage in his groin area as a result of the alleged assault. Dkt. No. 36–4, at 9. However, the evidence provided by Plaintiff is insufficient to show that Defendant Volpe either knew of or disregarded such injury during her encounters with Plaintiff on or about July 29, 2004 and July 31, 2004.

The first interaction between Defendant Volpe and Plaintiff occurred on July 29, 2004. Dkt. No. 36–12, at 7. According to Plaintiff, Defendant Volpe was either in the room during the alleged assault, or she was brought

into the room immediately thereafter. Dkt. No. 36–4, at 43, lines 7–23. However, Plaintiff does not allege that he notified Defendant Volpe of any specific injuries, including to his groin, during this interaction. Further, the fact that Plaintiff was wearing undershorts during this interaction suggests that, even upon visual inspection, Defendant Volpe would likely have been unable to observe an injury to Plaintiff's groin. While Plaintiff does allege to have had blood visible in his underwear, he did not notice this blood until July 31, 2004 (Dkt. No. 1, at 6), approximately two days after his initial interaction with Defendant Volpe. Accordingly, there is an insufficient basis upon which to conclude that Defendant Volpe was aware of Plaintiff's alleged groin injury at the time of their initial interaction.

The second interaction between Defendant Volpe and Plaintiff occurred on or about July 31, 2004. Dkt. No. 36–4, at 43. On this date, Plaintiff alleges that he noticed blood in his underwear and notified Capt. Felix. Dkt. No. 1, at 5–6. Plaintiff was subsequently removed from his cell to be photographed and inspected. *Id.* Shortly thereafter, Defendant Volpe attended to Plaintiff and attempted to retrieve a urine sample from him. Dkt. No. 36–4, at 43. Plaintiff states that he was unable to provide a urine sample at that time, and that another nurse obtained a urine sample from him the following day. Dkt. No. 36–4, at 46, lines 5–13. Plaintiff admits that he saw medical staff on the day that he was removed from his cell to be inspected and photographed, which was the same day that Defendant Volpe attempted to retrieve his urine sample. Dkt. No. 36–4 at 46–47. Further, Plaintiff admits that he has received consistent medical care from a urologist from the time of the alleged assault to the present date. Dkt. No. 36–4, at 10. As such, there is insufficient evidence to suggest that Defendant Volpe disregarded Plaintiff's injuries once she became aware of the possibility that they may exist.

For the foregoing reasons, Plaintiff has not provided sufficient evidence upon which a fair minded trier of fact could reasonably conclude that he sustained sufficiently serious injuries, or that Defendant Volpe acted with deliberate indifference to a serious injury of which she was aware.

**\*3** It is therefore

Decayette v. Goord, Not Reported in F.Supp.2d (2009)

2009 WL 1606753

**ORDERED** that summary judgment be granted dismissing all claims against Defendants Goord, Allard, Berry, Meeks, Martin, and Sugg; and it is further

**ORDERED** that summary judgment be granted dismissing the Eighth Amendment claim of inadequate medical care against Defendant Volpe; and it is further

**ORDERED** that Defendant Volpe's motion for summary judgment be denied as to the Eighth Amendment claim of failure to intervene.

The case shall proceed to trial against Defendant Volpe on Plaintiff's Eighth Amendment claim of failure to intervene, against Defendants Schewnki and Roberts on Plaintiff's Eighth Amendment claims of excessive force, and against Defendants Schewnki and Roberts on Plaintiff's First Amendment retaliation claims.

**IT IS SO ORDERED.**

### *REPORT–RECOMMENDATION AND ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, David Decayette ("Plaintiff") alleges that in July and August of 2004, while he was incarcerated at the Franklin Correctional Facility ("Franklin C.F."), ten employees of the New York State Department of Correctional Services ("DOCS") violated certain of his constitutional rights. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Currently pending before the Court is Defendants' motion for partial summary judgment [1] pursuant to Fed.R.Civ.P. 56. (Dkt. No. 36.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

### I. BACKGROUND

#### A. Summary of Plaintiff's Complaint

Liberally construed, Plaintiff's Complaint alleges as follows. (Dkt. No. 1.) Plaintiff and another inmate (identified in subsequent pleadings as inmate Rashad) were transferred to Franklin C.F. on or about the same

day. Certain of Rashad's personal property was missing. On or about July 13, 2004, Defendants Sgt. Berry and Corrections Officer Sugg confiscated certain of Plaintiff's personal property. These Defendants permitted Rashad, who was gang affiliated, to view Plaintiff's personal property, including personal photographs.

In his Memorandum of Law submitted in opposition to Defendants' summary judgment motion, Plaintiff alleges that although Rashad's property was not found among Plaintiff's property, Rashad nevertheless believed that Plaintiff possessed it. Rashad threatened Plaintiff, claiming that while viewing Plaintiff's personal property he had obtained information concerning Plaintiff's family and their address. Rashad warned of "serious problems" if he did not get his property back. Dkt. No. 39, at 8–9. [2]

In his Complaint Plaintiff alleges that he subsequently filed a grievance concerning this matter. It appears that the grievance was in the form of a letter to Defendant Goord, then the Commissioner of DOCS. Upon the recommendation of Defendant Goord, Plaintiff was interviewed by Defendant Lt. Meeks. Defendant Berry gave Plaintiff "an ultimatum [to] re-write and sign a statement informing Comm. Goord that there was a misunderstanding." Dkt. No. 1, at 2. Plaintiff declined to do so, and he was issued a false misbehavior report.

**\*4** Without being given a formal hearing on the report Plaintiff was taken to the Special Housing Unit ("SHU"). Upon his arrival at SHU he was confronted by Defendants Sgt. Schewnki, Corrections Officer Roberts, and an unidentified Corrections Officer. They "started reminding the plaintiff about the incident with the statement that he refused to write," (Dkt. No. 1, at 4), and then they beat him. He suffered significant injuries and endured severe pain, but he was denied medical treatment.

### II. APPLICABLE LEGAL STANDARDS

#### A. Legal Standard Governing Motions for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining

2009 WL 1606753

whether a genuine issue of material [3] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [4]

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [5] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [6] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [7]

Where a plaintiff has failed to respond to a defendant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the plaintiff is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court. [8] Stated another way, where a defendant has properly filed a memorandum of law (in support of a properly filed motion for summary judgment), and the plaintiff has failed to respond to that memorandum of law, the only remaining issue is whether the legal arguments advanced in the defendant's memorandum of law are *facially meritorious.* [9] A defendant's burden in making legal arguments that are facially meritorious has appropriately been characterized as "modest." [10]

Finally, in construing Plaintiff's claims, the Court has afforded Plaintiff's Complaint the liberal construction that all pleadings must be afforded, under Fed.R.Civ.P. 8. *See* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). Furthermore, the pleadings of *pro se* litigants are construed with even more liberality than is required under Fed.R.Civ.P. 8, [11] and the Court has done so here. The rationale for extending this special liberality to the pleadings of *pro se* litigants is that, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process.

## III. ANALYSIS

### POINT I

**The claims against Defendants Goord and Allard should be dismissed because of a lack of personal involvement.** [12]

**\*5** " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ). [13] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. [14] If the defendant is a supervisory official, such as a DOCS Commissioner or a correctional facility superintendent, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. [15] In other words, supervisory officials may not be held liable merely because they held a position of authority. [16] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [17]

With respect to Defendant Goord, in 2004 he was the Commissioner of DOCS. Dkt. No. 1 at 1. Defendant Allard was the Superintendent of Franklin C.F. *Id.* In his Complaint Plaintiff alleges that he "wrote a letter" to them, [18] advising them as to what had occurred and his concerns. *Id.,* at 2–3. In his "Statement Pursuant to Rule 7.1(a)(3)," Plaintiff alleges that Goord "ordered an investigation into the incident." Dkt. No. 39, at 3. The investigation was conducted by Defendant Meeks. Dkt. No. 1, at 2; Dkt. No. 39, at 4; Dkt. No. 36–7, at 2–3.

The foregoing does not constitute personal involvement in the alleged constitutional violations. "Defendant Goord was, during the time in question, entitled to (1) refer letters

of complaint to subordinates ..., and (2) rely on those subordinates to conduct an appropriate investigation and response." *Fletcher v. Goord,* 07–CV–0707, 2008 WL 4426763, at * 17 (N.D.N.Y. Sept.25, 2008) (Sharpe, J., adopting Report–Recommendation by Lowe, M.J., on *de novo* review); *see also Cabassa v. Gummerson,* 01–CV–1039, 2008 WL 4416411, at *7 (N.D.N.Y. Sept.24, 2008) (Hurd, J., adopting Report–Recommendation by Lowe, M.J. on *de novo* review) ("[A]s the superintendent of Auburn C.F., Defendant Walker was entitled to rely on his subordinate correctional officers (including the three members of the Periodic Review Committee) to conduct an appropriate investigation of an issue at the facility, without personally involving Defendant Walker in that issue."); *Garvin v. Goord,* 212 F.Supp.2d 123, 126 (W.D.N.Y.2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action."); *cf. Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter).

**\*6** Accordingly, it is recommended that summary judgment be granted in favor of Defendants Goord and Allard, dismissing the Complaint as against them.

### POINT II

#### The conduct of Defendants Berry and Sugg in the examination of Plaintiff's personal property did not amount to a constitutional violation. [19]

As indicated above, Plaintiff and another inmate ("Rashad") were transferred to Franklin C.F. on the same day. Certain of Rashad's personal property was missing. Plaintiff alleges that "Defendants Berry and Sugg elected to allow inmate Rashad to go through Plaintiff's property to look for his missing items." Dkt. No. 39, at 2. Plaintiff's objection appears to be that Berry and Sugg alone should have examined his property and taken an inventory to ascertain whether Rashad's missing property was included with his. *Id.,* at 2–3. Berry and Sugg have declared under oath that at no time did they "allow the plaintiff's property

to be viewed by inmate Rashad or any other inmate." Dkt. No. 36–8, at 2; *see also* Dkt. No. 36–11, at 2–3. In addition, Plaintiff has no non-hearsay evidence to support his claim that Rashad examined his property. Dkt. No. 39, at 3. Finally, Plaintiff has not even alleged, not to mention proffered admissible evidence, that Berry and Sugg knew or should have known that Rashad subsequently would threaten Plaintiff.

In any event, even assuming *arguendo* that Plaintiff's version of the events is correct, there were no constitutional violations. With respect to the Fourth Amendment, it provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches ... shall not be violated." U.S. Const. amend IV. "What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (internal quotation marks and citation omitted). "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner,* 489 U.S. at 619 (internal quotation marks and citations omitted). In so doing, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (citations omitted), *accord, Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). The Fourth Amendment's proscription against unreasonable searches does not apply *at all* within the confines of a prison cell. *Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Therefore, Plaintiff has not stated a Fourth Amendment claim.

With respect to the Eighth Amendment, generally, to prevail on a claim of inadequate prison conditions, a plaintiff must show two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious;* and (2) that the defendant acted with *deliberate indifference* to the plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005). "[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence." *Farmer,* 511 U.S. at 835. Here, again assuming *arguendo* that Plaintiff's

Decayette v. Goord, Not Reported in F.Supp.2d (2009)

2009 WL 1606753

version of the events is correct, for Defendants Berry and Sugg to have allowed Rashad to go through Plaintiff's property to look for his missing items, at a point in time when they had no reason to anticipate the alleged subsequent events, clearly was not a serious deprivation. Similarly, their conduct, at the most, was negligent, and not deliberately indifferent.

**\*7** Accordingly, it is recommended that summary judgment be granted in favor of Defendants Berry and Sugg, dismissing Plaintiff's claims based upon the examination of his personal property.

### POINT III

### Plaintiff's excessive force claims against Defendants Allard, Meeks, Berry, Sugg, and Martin should be dismissed.

In his Complaint Plaintiff alleges that the aforementioned Defendants, along with Defendants Schewnki and Roberts (and John Doe), "wantonly and with malice assaulted and battered him." Dkt. No. 1, at 7. However, in his "Statement Pursuant to Rule 7.1(a) (3)," Plaintiff stated that Defendants Roberts and Schewnki (and John Doe) "beat him"; "those were the only Defendants that beat Plaintiff." Dkt. No. 39, at 5. His deposition testimony was consistent with these statements. Dkt. No. 36–4, at 26–33.

Defendants Schewnki and Roberts have not moved for summary judgment on Plaintiff's excessive force claims. Dkt. No. 36–13, at ii (ftn.1). Given Plaintiff's concession that only Defendants Schewnki and Roberts allegedly beat him, it is recommended that summary judgment be granted in favor of all other Defendants, dismissing as against them Plaintiff's Eighth Amendment excessive force claims.

### POINT IV

### Triable issues of fact exist as to whether Defendant Volpe was deliberately indifferent to a serious medical need.

To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that

the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (citations omitted); *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance,* 143 F.3d at 702. With respect to the second prong, "deliberate indifference describes a state of mind more blameworthy than negligence;" it is a state of mind akin to criminal recklessness. *Farmer,* 511 U.S. at 827, 835.

The argument of Defendant Volpe (a Registered Nurse) that Plaintiff's Eighth Amendment claim of insufficient medical care should be dismissed as against her opens with the contention that she "was brought into the room after [Plaintiff] was allegedly assaulted by Defendants Roberts and Schewnki." Dkt. No. 36–13, at 10. In support of this contention, Volpe cites to page 39 of the transcript of Plaintiff's deposition, at lines 22–25. It is dismaying to this Court that Volpe failed to cite to the following questions and answers that appear on the same page of the transcript:

Q: Why is [Volpe] a defendant? Why do you have her listed here as a defendant?

**\*8** A: Because she was—she was—she was in the room at the time during the incident happened and she never entered into the record that she noted that—she noticed that I was bleeding.

Q: She was in the room when you're claiming that the three officers—

A: Right.

Q:—beat you?

A: Right.

Dkt. No. 36–4, at 39, lines 5–15. In his Memorandum of Law [20] Plaintiff states:

Upon Plaintiff's arrival at the S.H.U. Defendant Roberts began to physically assault Plaintiff, and Sgt. Schewnski eventually joined in the assault as Defendant Volpe watched from the doorway.

Dkt. No. 39, at 10. In his "Statement Pursuant to Rule 7.1(a) (3)" Plaintiff states: "during and after he was being beat, he saw Defendant Volpe." Dkt. No. 39, at 5. In short, there clearly is an issue of fact as to whether Defendant Volpe observed the alleged beating. If the trier of fact concludes that she did, and accepts Plaintiff's version of the alleged beating (punching and slapping both sides of his face, punching him in the ribs, kicking him in the groin area; *see* Dkt. No. 36–4 at 32–37) and further accepts Plaintiff's version of his condition following the alleged beating ("multiple bruises, cut above my eye, and as well as blood that was shown to my underwear and stuff like that"; Dkt. No. 36–4, at 47; *see also* Dkt. No. 1, at 3–5), a finding of an Eighth Amendment violation would not be unreasonable.

Accordingly, it is recommended that Defendant Volpe's motion for summary judgment dismissing Plaintiff's Eighth Amendment claim as against her be denied.

### POINT V

#### Triable issues of fact exist as to whether Defendant Volpe is liable for failing to intervene during the alleged beating of Plaintiff.

Liberally construed, based upon the allegations referenced above in Point IV, Plaintiff has asserted a failure to intervene cause of action against Defendant Volpe.

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.; see also Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can

be grounds for § 1983 liability.") Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1992) ( "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

**\*9** Here there are multiple issues of fact, including whether Defendants Schewnki and Roberts beat the Plaintiff, if so whether Defendant Volpe observed the beating, and if so whether she was capable of preventing or mitigating it. Accordingly, it is recommended that dismissal of Plaintiff's Eighth Amendment failure to intervene claim as against Defendant Volpe be denied.

### POINT VI

#### Plaintiff's retaliation claims based upon allegedly false misbehavior reports should be dismissed. [21]

In order to state a cause of action for retaliation, a plaintiff must plead facts plausibly suggesting that (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

In his Complaint Plaintiff alleges that "on or about July 26, 2004, after filing a grievance the plaintiff was interviewed by Lt. Meeks, per recommendation by Comm. Glenn Goord." Dkt. No. 1, at 2. This "grievance" presumably was the letter that he wrote to Defendant Goord. *Id.* at 2–3. In his Memorandum of Law Plaintiff alleges that he "was subjected to retaliation by receiving false misbehavior reports, for exercising his first amendment right to file grievances pertaining to the search for his personal property." Dkt. No. 39, at 8. Again, the only "grievance[ ] pertaining to the search for his personal property" that is reflected in the record is the letter to Defendant Goord.

The Court acknowledges that Plaintiff's right to send a letter of complaint to Defendant Goord was a constitutionally protected activity. *Davis,* 320 F.3d at 352–53. However, first, the only "inmate misbehavior reports" that are reflected in the record were issued by *non-parties. See* Dkt. No. 36, Exhibits B and C. In addition, Plaintiff has proffered no evidence whatsoever that these non-parties were even aware of the existence of his letter to Defendant Goord. Accordingly, there is no party defendant in this action against whom Plaintiff has made a retaliation claim based upon an allegedly false inmate misbehavior report. Furthermore, there is no evidence of a causal connection between the protected conduct, *i.e.,* the letter to Defendant Goord, and the "adverse actions," *i.e.,* the issuance of the inmate misbehavior reports. Therefore it is recommended that summary judgment be granted dismissing Plaintiff's retaliation claims based upon allegedly false misbehavior reports.

### POINT VII

### Triable issues of fact exist with respect to Plaintiff's retaliation claims against Defendants Schewnki and Roberts. [22]

As noted above, Plaintiff's right to send letters of complaint to Defendant Goord was a constitutionally protected activity. *Davis,* 320 F.3d at 352–53. Also as noted above, Defendants Schewnki and Roberts are not seeking summary judgment on Plaintiff's excessive force claims. Questions of fact clearly exist as to whether they took "adverse action" against him.

**\*10** Finally, on the "causal connection" prong of the retaliation cause of action, in his Complaint Plaintiff alleges, in paragraph "14", that prior to the commencement of the alleged beating, Defendants Schewnki and Roberts "started reminding the plaintiff about the incident with the statement that he refused to write." Dkt. No. 1, at 4. This "incident with the statement that he refused to write" presumably is the one described in paragraph "4" of the Complaint, when Defendant Berry allegedly gave Plaintiff "an ultimatum [to] re-write and sign a statement informing Comm. Goord that there was a misunderstanding." *Id.,* at 2. In short, there clearly are triable questions of fact as to whether there was a causal connection between Plaintiff's letter to Defendant Goord

and the alleged beatings by Defendants Schewnki and Roberts. Accordingly, it is recommended that Plaintiff's First Amendment retaliation claims against Defendants Schewnki and Roberts proceed to trial.

### POINT VIII

### Plaintiff's Fourteenth Amendment Due Process claims should be dismissed. [23]

In his Complaint Plaintiff alleges that he was not "afforded substantive Due Process" and that his Fourteenth Amendment right "against arbitrary and capricious conduct" [24] was violated. Dkt. No. 1, at 6 and 7. However, as the Supreme Court has repeatedly held, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth ... Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the [more generalized notion] of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272, n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (citing *Graham v. Connor,* 490 U.S. 386, 392–94 [1989] ). Because the Court has already analyzed Plaintiff's claims under the appropriate specific legal standards, an analysis is not required under the Fourteenth Amendment substantive due process standard.

However, in addition to substantive due process, the Due Process Clause of the Fourteenth Amendment has a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. In his Memorandum of Law Petitioner argues that "Defendants Sugg and Berry violated his Procedural Due Process Rights ... against unreasonable searches." Dkt. No. 39, at 8.

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S.

454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). Here the Court already has conducted the first step analysis of the conduct of Defendants Berry and Sugg and found no deprivation of a property interest. *See* Point II above. Therefore an analysis is not required under the Fourteenth Amendment procedural due process standard.

**\*11**  Accordingly, it is recommended that the Defendants' motion for summary judgment dismissing Plaintiff's Fourteenth Amendment due process claim be granted.

### POINT IX

### Qualified Immunity [25]

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* —— U.S. ——, ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 812, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). A determination of this issue involves deciding whether the facts that a plaintiff has alleged, or shown, make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson,* 129 S.Ct. at 815–16 (citing *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

A right is sufficiently clearly established if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007). The following three factors are considered when determining whether a particular right was clearly established at the time a defendant acted:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would

have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). [26] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy,* 505 F.3d at 169–70 (citations omitted). [27] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). As the Supreme Court has explained,

> [T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.

However, when "there are facts in dispute that are material to a determination of reasonableness," dismissal on the basis of a qualified immunity defense is inappropriate. *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999); *Ali v. Szabo,* 81 F.Supp.2d 447, 461 (S.D.N.Y.2000) ("The Court cannot conclude as a matter of law that [the officers'] conduct was objectively reasonable since there are material issues of fact as to whether [plaintiff] was obeying the officers' order and who started the physical confrontation.").

**\*12**  The Court has recommended that Defendant Volpe should not be entitled to summary judgment because triable issues of fact exist as to whether she was deliberately indifferent to a serious medical need of Plaintiff's and as to whether she is liable for failing to intervene during the alleged beating of Plaintiff. Therefore, Defendant Volpe should not be entitled to summary judgment on the defense of qualified immunity. *See Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998) ("[S]ummary judgment based either on the merits or

on qualified immunity requires that no disputes about material facts remain.") (citations omitted); *Deal v. Yurack,* No. 9:04–CV–0072, 2007 WL 2789615, at *14 (N.D.N.Y. Sept.24, 2007) (Kahn, J.) (adopting Report–Recommendation of Magistrate Judge David E. Peebles, finding that whether "the defendants maintained a good faith belief that their actions did not violate clearly established rights depends on the resolution of fact issues similar to those identified as precluding entry of summary judgment on the merits of plaintiff's retaliation and excessive force claims. As such ... the court is not currently positioned to determine defendant's entitlement to qualified immunity.").[28] Accordingly, I recommend denying summary judgment in this regard.

**ACCORDINGLY,** it is

**RECOMMENDED** that summary judgment be granted dismissing all claims against Defendants Goord, Allard, Berry, Meeks, Martin, and Sugg; and it is further

**RECOMMENDED** that Defendant Volpe's motion for summary judgment be denied; and it is further

**RECOMMENDED** that the case proceed to trial against Defendants Volpe, Schewnki and Roberts on Plaintiff's Eighth Amendment claims of excessive force and failure to intervene, against Defendants Schewnki and Roberts on Plaintiff's First Amendment retaliation claims, and against Defendant Volpe on Plaintiff's Eighth Amendment claim of inadequate medical care; and it is further

**ORDERED** that the Clerk serve copies of the electronically-available-only opinions cited on pages 4, 5, 7, and 20 of this Report–Recommendation on Plaintiff.

**ANY OBJECTIONS to this Report–Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report–Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/ or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.**[29]

**BE ALSO ADVISED that the failure to file timely objections to this Report–Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1606753

Footnotes

1    The motion is made on behalf of all Defendants except Roberts and Schewnki.

2    The page numbers referred to in this Report–Recommendation are those assigned by the ECF system.

3    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

4    *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

5    Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

6    *Matsushita,* 475 U.S. at 585–86; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ....").

7    *Ross v. McGinnis,* 00–CV–0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added]. The undersigned will provide a copy of all electronically-available-only opinions in this Report–

Recommendation to Plaintiff in light of the Second Circuit's recent decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

8    N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown ."); N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response* ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added]; *see, e.g., Beers v. GMC,* 97—CV–0482, 1999 U.S. Dist. LEXIS 12285, at \*27–31, 1999 WL 325378 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

9    *Hernandez v. Nash,* 00—CV–1564, 2003 U.S. Dist. LEXIS 16258, at \*7–8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted] ).

10   *See Ciaprazi v. Goord,* 02—CV0915, 2005 WL 3531464, at \*8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

11   *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citation omitted].

12   Plaintiff failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

13   *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

14   *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

15   *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

16   *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

17   *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

18   Beyond Plaintiff's allegation the record reflects only a letter to Defendant Goord, which was forwarded to Defendant Allard. Dkt. No. 36–7, at 5.

19   Plaintiff failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

20   In an Affidavit Plaintiff swears that "[a]ll statements made by me in my Complaint and associated documents are true." Dkt. No. 39, at 1. Fed.R.Civ.P. 56(e) provides: "When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Here the Court is mindful of the special leniency to be afforded to a *pro se* litigant alleging a civil rights violation.

21   Plaintiff failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

22   Plaintiff has failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

23   Plaintiff has failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

24   "Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrence v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91—CV–1196, Memorandum–Decision and Order (N.D.N.Y. Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

25    Plaintiff has failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

26    *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

27    *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") [citation omitted]; *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

28    *See also Jeanty v. County of Orange,* 379 F.Supp.2d 533, 542 (S.D.N.Y.2005) ("[T]he same genuine issues of material fact that preclude summary judgment on plaintiff's excessive force claim, also preclude application of the defense of qualified immunity at the summary judgment stage."); *Dellamore v. Stenros,* 886 F.Supp. 349, 352 (S.D.N.Y.1995) (finding that material factual disputes exist on the issue of qualified immunity for the same reasons that the court denied the motion for summary judgment on the plaintiff's Eighth Amendment excessive force claim).

29    *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection[ ].") [citations omitted]; *Greenhow v. Sec 'y of Health & Human Servs.,* 863 F.2d 633, 638–39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson–Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990–91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

---

**End of Document**                          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Diaz v. Fischer, Not Reported in F.Supp.2d (2010)
Case 9:16-cv-01211-GTS-TWD    Document 72    Filed 08/09/18    Page 100 of 338
2010 WL 1132772

2010 WL 1132772
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Frederick DIAZ, Plaintiff,

v.

Brian FISCHER, Commissioner, Department of
Corrections; Harold D. Graham, Superintendent,
Auburn Correctional Facility; Steven Byrne,
Lieutenant; Timothy Quinn, Lieutenant; Gregory
Redmond, Lieutenant, Auburn Correctional
Facility; James Cady, Correctional Officer,
Auburn Correctional Facility; Robert Burdick,
Correctional Officer, Auburn Correctional
Facility; and Joseph Merville, Correctional
Officer, Auburn Correctional Facility, Defendants.

No. 08–CV–1208 (LEK/DRH).
|
Feb. 23, 2010.

Attorneys and Law Firms

Frederick Diaz, Comstock, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Roger W. Kinsey, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

REPORT–RECOMMENDATION AND ORDER [1]

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se Frederick Diaz ("Diaz"), an inmate
in the custody of the New York State Department
of Correctional Services ("DOCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that defendants,
the DOCS Commissioner and seven DOCS employees,
violated his constitutional rights under the First, Eighth,
and Fourteenth Amendments. Compl. (Dkt. No. 1).
Presently pending is defendants' motion to dismiss
pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 25. [2] Diaz
opposes the motion. Dkt. No. 27. For the following
reasons, it is recommended that defendants' motion be
granted.

## I. Background

The facts are related herein in the light most favorable to
Diaz as the non-moving party. *See* subsection II(A) *infra.*

### A. Work Placement

On April 3, 2006, Diaz was transferred to Auburn
Correctional Facility ("Auburn"). Compl. ¶ 14. Upon
arrival at Auburn, Diaz was immediately verbally
harassed by defendant Redmond, a Lieutenant. *Id.* ¶ 15. [3]
Shortly after his arrival, Diaz sought an employment
placement. *Id.* ¶ 16. Diaz claims that he was not offered
an appointment "commensurate with his education and
skills, despite the fact that all the other inmates were
being given programs of [their] choosing." *Id.* When Diaz
protested, his privileges were limited. *Id.*

While on limited privileges, Diaz was repeatedly denied
access to recreation, showers, and the law library, ordered
to double bunk with another inmate, and placed in
keeplock [4] when he refused the double bunking order.
Compl. ¶ 17. During this time, Diaz continued to attempt
to secure an employment position in the Shop Gate. *Id.* ¶
21. Diaz was told that he was not permitted to join such a
program, which he later learned was untrue, so he wrote
multiple letters and grievances to defendant Graham, the
Auburn Superintendent. *Id.* Graham responded that Diaz
would still not be assigned to the Shop Gate program,
regardless of whether it was permitted pursuant to internal
policies and regulations. *Id.* As Diaz was continually
offered nothing other than a porter position, he decided
to run for a membership spot in the Inmate Grievance
Resolution Committee (IGRC). [5] *Id.* ¶ 20.

The day after Diaz won the IGRC election, Graham
approached him and offered a deal. Compl. ¶ 22. If Diaz
resigned from his position on the IGRC, he would be given
an employment placement in the law library and could join
the Inmate Liason Committee. *Id.* Diaz accepted the offer
and resigned. *Id.* [6]

Diaz commenced working in the law library under the
supervision of defendants Burdick and Merville, both
corrections officers. Compl. ¶ 23. Burdick and Merville
attempted to incite the other inmate library clerks into

2010 WL 1132772

an altercation with Diaz, telling the other inmates that Diaz was a "snitch," and promoting Diaz to a coveted position over other inmate clerks who had been employed longer. *Id.* Shortly after Diaz refused the promotion, on December 27, 2006, Burdick issued a retaliatory misbehavior report against Diaz for his failure to report to work. *Id.* ¶ 24. According to Diaz, the schedule was changed without his knowledge and he was not scheduled to work that shift. *Id.*

**\*2** At the subsequent disciplinary hearing, Diaz was found guilty for failing to attend work, sentenced to ten days keeplock [7], and referred back to the Program Committee for a new job assignment. Compl. ¶ 25. Diaz claims that Burdick and Merville tolerated known homosexual activity and drug use among the other inmate clerks, allowing them to retain their employment in the law library despite being adjudged guilty of more serious disciplinary infractions which led to longer disciplinary sentence dispositions. *Id.* ¶ 28. However, due to Diaz's propensity to file grievances, he was terminated from his position in the law library despite his minor disciplinary infraction. *Id.* ¶¶ 28, 30. Diaz was again offered the porter position by the Program Committee, which he accepted, despite the fact that it was given to him with "absolutely no consideration of [his] education and skills ...." *Id.* ¶ 30.

### B. Misbehavior Report for May 21, 2007 and Subsequent Disciplinary Hearing

On May 21, 2007, defendant Quinn, a Lieutenant, was sent to interview Diaz and investigate the claims alleged in Diaz's grievance against Sgt. Cox, a non-party here. [8] Compl. ¶ 37. Quinn called Diaz into an interview room, but was not concerned with investigating Diaz's concerns, as instead he "began to berate [Diaz] about his grievances." *Id.* ¶ 38. During the interview, Quinn asked to see Diaz's identification ("ID") card. *Id.* ¶ 39. Diaz produced the ID card, which did not have a program sticker on it. *Id.* Quinn threatened to place Diaz in keeplock for having improper documentation, but Diaz stated that his card had recently been lost during transport and the replacement did not have a sticker. *Id.* Quinn then asked Diaz why he had not reported to his assigned work program as a porter, and Diaz responded that he was not called out to work that day. *Id.* ¶ 40. At this point, Quinn exited the interview room and ordered Diaz to report to work. *Id.* Upon exiting the room, Diaz

told Quinn not to contact him again. *Id.* ¶ 41. Quinn ordered Diaz onto the wall, Diaz was "roughly" pat frisked, and threatened again by Quinn who stated that the policies and procedures of Auburn did not apply to the corrections officers there. *Id.* Before being returned to his cell, Diaz was informed that he was being sent to the Special Housing Unit ("SHU") [9] for not reporting to work that day. *Id.* ¶ 43.

Quinn charged Diaz with "refusing a direct order and refusing to accept a program assignment by the Program Committee." Compl. ¶ 45. On May 26, 2007, defendant Redmond. a Lieutenant, presided over the disciplinary hearing for the aforementioned misbehavior report. *Id.* ¶ 46. Diaz contends that the misbehavior report was false because (1) he never told Quinn he removed his program sticker, (2) Diaz did accept the porter assignment from the Program Committee or else he would have been on limited privileges, and (3) he did not fail to refuse a direct order as he had never been called for his employment on May 21. *Id.* Diaz could not develop his defense during the hearing because Redmond failed to let him ask Quinn any questions. *Id.* While Diaz was waiting for the verdict of the hearing, he was placed in a holding room. Compl. ¶ 47. While in that room, Diaz observed Quinn and Redmond conversing. *Id.* Then, Quinn came over to the door of the holding room and began to curse at and berate Diaz. *Id.* Ultimately Redmond found Diaz guilty and sentenced him to 120 days in SHU. *Id.* ¶ 47.

**\*3** Diaz wrote letters of complaint and grievances about Quinn and Redmond during the disciplinary hearing. Compl. ¶¶ 47, 49. Diaz also requested to see the videotape of the hearing, [10] as well as asking Graham and Fischer to view the tape. *Id.* ¶¶ 48–49, 51–52. On June 1, 2007, Graham modified Diaz's disciplinary disposition to fourteen days in SHU and forty-six days in keeplock, as well as 120 days loss of privileges. *Id.* ¶ 48. Graham's modification was affirmed on administrative appeal on July 18, 2007, and the grievances Diaz lodged in connection with this misbehavior report and disciplinary hearing were denied. *Id.* ¶ 51.

### C. Conditions of Confinement

For the forty-six days in which Diaz was housed in keeplock, he was deliberately placed in a filthy cell in retaliation for the grievances which he had previously filed

2010 WL 1132772

against defendants. Compl. ¶ 56. Diaz's cell (1) contained a urine-stained mattress; (2) had filthy walls and a dirty sink; (3) had a sink in need of repair; (4) required a new mattress and light bulbs; and (5) lacked a desk and foot locker. *Id.* ¶¶ 56–57. Additionally, while in keeplock, guards placed a note on Diaz's cell labeling him "total whiner," until it was subsequently removed by "a decent guard." *Id.* ¶ 57. Diaz was also denied showers for two days. *Id.* ¶ 58. In response, Diaz submitted a grievance against the staff. *Id.*

### D. Disciplinary Hearing on June 26, 2007 and Subsequent Misbehavior Report and Disciplinary Hearing

On June 26, 2007, Byrne presided over one of Diaz's disciplinary hearings. Compl. ¶ 60. [11] During the hearing, Diaz interrupted Byrne when he began to read the misbehavior report out of context. *Id.* ¶ 62. Byrne strenuously advised Diaz not to interrupt him further. *Id.* This escalated into a verbal altercation, whereupon Diaz got up to leave the hearing and Byrne ordered him to stop. *Id.* ¶¶ 62–63. Defendant Cady, a corrections officer who was also present at the disciplinary hearing, prevented Diaz from leaving the room. *Id.* ¶ 63. Diaz was then assaulted by both Byrne and Cady. *Id.* ¶¶ 63–64. Additional officers responded to the altercation and also began to batter Diaz alongside Byrne and Cady. *Id.* ¶ 64. Throughout the entire assault, an audiotape was running, which was supposed to be recording the disciplinary hearing. *Id.* ¶¶ 62–64. Byrne ultimately found Diaz guilty of the disciplinary infraction, sentenced him to thirty days keeplock, and also issued Diaz a misbehavior report for assaulting an officer. *Id.* ¶¶ 69–70. Diaz's disciplinary disposition was upheld by Graham, despite the fact that he listened to the audiotape of the disciplinary hearing. *Id.* ¶ 68. However, on August 1, 2007, the misbehavior report was "expunged from [Diaz's] record per Supt. Graham," overturning the thirty day disciplinary disposition. *Id.* ¶ 69.

**\*4** On July 2, 2007, a disciplinary hearing was held for the misbehavior report for the altercation on June 26. Compl. ¶ 71. During the hearing, the audiotape from June 26 was played, which was allegedly altered. *Id.* ¶ 72. When Byrne was questioned about the tape's authenticity, he explained he paused the tape player during the hearing in order to converse privately with Diaz. *Id.* ¶ 73. On July 9, 2007, Diaz was found guilty of assaulting Byrne and Cady and sentenced to eight months in SHU. *Id* .

¶ 74. Graham affirmed the disciplinary disposition. *Id.* On September 13, 2007, the conviction and sentence were report was reversed on administrative appeal due to the altered audiotape. *Id.* ¶ 75.

### E. Destroyed Property

Diaz also claims that when he was sent to SHU or keeplock, the retaliation against him was exacerbated and perpetuated by defendants throwing away and damaging his personal property. Compl. ¶¶ 53, 77. Diaz wrote letters to Graham complaining about the destruction of his property, but no investigation was ever commenced. *Id.* ¶ 53.

## II. Discussion

In his complaint, Diaz alleges that his First Amendment rights were violated when defendants continually authored false misbehavior reports against him for filing grievances. Additionally, liberally reading the complaint, Diaz contends that his Eighth Amendment rights were violated when he was subjected to (1) unconstitutional conditions of confinement during his forty-six days in keeplock and (2) excessive force by defendants Byrne and Cady during his disciplinary hearing. Lastly, Diaz asserts that his Fourteenth Amendment rights were violated when he was subjected to (1) multiple false misbehavior reports, (2) faulty procedural due process during disciplinary hearings, (3) damaged personal property, [12] and (4) an Equal Protection violation as Diaz was terminated from his job position in the library when other similarly situated inmates were allowed to continue with their employment placement. Defendants assert that (1) Diaz has failed to demonstrate the personal involvement of defendants Fischer, Quinn, and Graham; (2) there is no merit to Diaz's due process, retaliation, or equal protection claims; (3) the Eleventh Amendment bars suit of defendants in their official capacities; [13] and (4) defendants are entitled to qualified immunity.

### A. Legal Standard

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to

2010 WL 1132772

dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* ─── U.S. ───, ───, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

**\*5** Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950–51.

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest .... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations,.. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a

party from compliance with relevant rules of procedural and substantive law ...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

### B. Conditions of Confinement

To the extent that, liberally reading Diaz's complaint, such a claim is raised, it is without merit. First, Diaz fails to identify the individuals responsible for his placement and care in keeplock." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Second, "[t]he Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1970). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations omitted). Thus, "[c]onditions of confinement only constitute an Eighth Amendment violation if they involve the deprivation of a single identifiable human need or denial of the minimum civilized measure of life's necessities, and the defendants' state of mind was one of deliberate indifference to that deprivation." *Johnson v. Smith,* No. 9:03CV1050 (FJS/ DEP), 2006 WL 1843292, at \*9 (N.D.N.Y. June 29, 2006) (Scullin, J.) (citations omitted).

**\*6** The objective prong can be satisfied by

> conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.

*Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (*citing Wilson v. Seiter,* 501 U.S. 294, 304–05, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety" *Farmer,* 511 U.S. at 834 (citations omitted).

Diaz claims that while in keeplock, he had a stained mattress, dirty walls and sink, and lacked a desk and foot locker. However, Diaz has failed to show how these conditions rose to the level of substantial risk of serious harm or denial of an identifiable human need. *See Davidson,* 371 F.Supp.2d at 370. Diaz makes no contention of how a dirty wall and sink and stained mattress inhibited his ability to eat, sleep, or remain at an adequate temperature. Additionally, there are no claims for illness or injury. At best, these are conclusory allegations that are wholly insufficient to state an Eighth Amendment violation. Moreover, Diaz's claims that he was not offered a shower for two days are also insufficient to state an Eighth Amendment violation. *See Beckford v. Portuondo,* 151 F.Supp.2d 204, 211 (N.D.N.Y.2001) (citations omitted) ("Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers."); *see also Cosby v. Purkett,* 782 F.Supp. 1324, 1329 (E.D.Mo.1992) (holding that access to showers every seventy-two hours is not a violation under the Eighth Amendment). Accordingly, Diaz has failed to establish the objective element of the analysis.

Lastly, as discussed *supra,* verbal harassment alone is insufficient to allege a constitutional violation. Accordingly, defendants' motion as to any such claim should be granted.

## C. Personal Involvement

Defendants contend that Diaz has failed to allege the personal involvement of Fisher, Quinn, and Graham. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950

F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

*7  (1)[T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

### 1. Fischer

A position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *Wright,* 21 F.3d at 501. Thus, Fisher cannot be held liable solely because he, as Commissioner, held a supervisory position. The gravamen of Diaz's Complaints against Fischer is that he was continually written to, and failed to respond. Compl. ¶¶ 29, 3, 52, 76. However, failure to respond to a grievance is insufficient to allege personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ( "Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] ...."). Additionally, there were no allegations, nor does the record support any contentions, that Fischer was directly involved in any of the alleged violations, that Fischer failed to remedy a wrong of which he was informed, that he was grossly negligent in supervising subordinates, or that he was deliberately indifferent to the health and safety of Diaz.

Accordingly, defendants' motion should be granted and Fischer should be dismissed from the present action.

Diaz v. Fischer, Not Reported in F.Supp.2d (2010)

2010 WL 1132772

## 2. Quinn

Diaz has unequivocally alleged that Quinn was directly responsible for writing a false misbehavior report on May 21, 2007, and also influenced Redmond's decision at his subsequent disciplinary hearing on May 26, 2007. Compl. ¶¶ 45, 47. As such, Diaz has plausibly contended that Quinn was responsible for his alleged constitutional violations. Whether there is any substantive merit to said violations is a separate issue and discussed *infra*. Accordingly, defendants' motion on this ground as to Quinn should be denied.

## 3. Graham

As previously discussed, holding a supervisory position, without more, is insufficient to allege personal involvement. *Wright,* 21 F.3d at 501. Additionally, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."). Defendants argue that Diaz's contentions center around Graham's lack of response to his complaints. However, Diaz alleges that Graham personally investigated and acted on Diaz's complaints. For example, Graham allegedly listened to the audiotape of the June 26, 2007 disciplinary hearing before affirming both disciplinary dispositions. Compl. ¶ 74.

**\*8** Additionally, Diaz contends that after the May 26, 2007 disciplinary hearing, he asked Graham to review the videotape of the hearing, thus providing Graham with notice of a constitutional violation which was allegedly ongoing with his continued segregation. Graham refused to review the tape prior to affirming the disciplinary disposition.

> It has been held that "an appropriate guiding principle" for determining personal responsibility is where a grievance alleges an "ongoing" constitutional violation, the supervisory official who reviews the grievance is "personally involved" if he is confronted with a situation that he can remedy directly. If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to "remedy" a violation.

*Harnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008) (internal citations omitted). Thus, Graham's knowledge was not that of a "violation ... that has already occurred and is not ongoing," it was continuous and his failure to remedy the situation is sufficient to allege personal involvement. *Id.*

Accordingly, defendants' motion on this ground as to Graham should be denied.

## D. Retaliation

To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). "Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008) (*citing Graham,* 89 F.3d at 79). Additionally, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.* Conclusory allegations alone are insufficient. *Id.* (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).)).

First, as discussed *infra* section II(E)(2), Diaz's misbehavior reports were written for a proper purpose. Additionally, Diaz has failed to allege or prove facts to support a retaliation claim against Merville and Burdick. The misbehavior report which Burdick authored, and Merville endorsed, occurred shortly after Diaz refused to accept a promotion. Compl. ¶¶ 23–24. Diaz's

employment status does not represent a constitutionally protected activity. *See supra* note 4. Thus, this cannot provide a basis by which to assert a retaliation claim. Instead, Diaz appears to rely upon his grievances as his constitutionally protected conduct. Compl. ¶¶ 28, 30. While filing grievances is an activity protected by the First Amendment, Diaz fails to identify a time when he filed grievances against Merville and Burdick prior to the issuance of the allegedly false misbehavior report. Thus, defendants' adverse actions of filing the misbehavior report could not be a substantial factor in the alleged retaliation because the grievances against them were filed *after* the misbehavior report, not before. Furthermore, conclusory and general allegations that Diaz was retaliated against because of his reputation for filing grievances in the past is insufficient to maintain the present claim. *Jackson,* 549 F.Supp.2d at 215.

**\*9** Similarly, Diaz has failed to allege or prove facts to support a retaliation claim against Quinn. Quinn investigated a grievance which Diaz filed against an unnamed corrections officer. Throughout the interview, Diaz and Quinn exchanged words, Quinn ordered Diaz to report to work, Diaz left the interview and failed to report to work, and was given a misbehavior report for failing to follow a direct order and participate in his programming. Compl. ¶¶ 38–45. Diaz filed a grievance against Quinn after the disciplinary hearing took place. *Id.* ¶¶ 47, 49. As previously discussed, this constitutionally protected activity occurred *after* the adverse action of the misbehavior report, and not before. Thus, the grievances could not serve as a substantial cause for the report. Furthermore, conclusory and general allegations that Diaz was retaliated against because of his reputation for filing grievances in the past is insufficient to maintain the present claim. *Jackson,* 549 F.Supp.2d at 215.

The same is true, with regard to the misbehavior reports and disciplinary hearing occurring prior to June 2007, for Graham. Graham's actions in affirming the hearing decisions were allegedly in retaliation for Diaz's filing of grievances against the other defendants. These conclusory allegations are insufficient to plausibly state a retaliation claim.

Accordingly, defendants' motion on this ground should be granted.

## E. Due Process

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a SHU confinement alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in SHU as well as "the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

### 1. Preclusion

Diaz alleges due process violations occurring during his disciplinary hearing in connection with the December 27 misbehavior report and the hearing on May 26, 2007 in connection with the May 21 disciplinary report. However, such claims run afoul of the "favorable termination" rule of *Heck v. Humphrey,* 512 U.S. 477, 487–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). That rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been reversed on direct appeal or declared invalid in order to recover damages under § 1983. This rule apples to challenges to procedures used in prison disciplinary proceedings. *Edwards. v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997).

**\*10** There is no evidence that Diaz's disciplinary determinations were ever vacated with regard to these two proceedings. [14] While Diaz's sentence was modified with respect to the May 26 hearing, it was never overturned or expunged. Thus, the *Heck* rule still applies and any

procedural challenges are barred. Therefore, because Diaz's recovery of damages here for a false misbehavior report would necessarily imply the invalidity of his conviction, the based on that hearing is barred.

Accordingly, defendants' motion should be granted as to these claims.

### 2. False Misbehavior Reports

An inmate has a right not to be deprived of a liberty interest without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988)).

As discussed *supra,* Diaz has failed to establish facts sufficient to allege a retaliation claim. Thus, the present claim must also fail. Moreover, as discussed *supra,* such a finding of a false misbehavior report runs afoul of *Heck* and its progeny. Finally, as established by the record, Diaz's misbehavior reports were supported by sufficient evidence.

In the first case, Diaz does not dispute that the schedule indicated that he needed to be at work and he was not there. Compl. ¶ 24. The factual issues of when the schedule was changed and what it actually indicated were determined at the hearing, which concluded with a finding of guilt and has not been overturned. Similarly, the second misbehavior report cited Diaz's failure to follow a direct order and participate in his employment. Quinn's order to Diaz to report to work, whether or not he was previously called out, was a direct order with which Diaz failed to comply. *Id.* ¶¶ 40, 43, 45. Any other factual issues were necessarily addressed during the disciplinary hearing which resulted in a finding of guilt which was never expunged or overturned. Accordingly, in both cases, Diaz was found guilty of the offense charged. Such findings were also consistent with the allegations in the complaint. While there are some disputed facts as to why the schedule was incorrect or whether Diaz was actually called for

work, those facts were determined in the disciplinary hearings.

Accordingly, defendants' motion should be granted as to these claims.

### 3. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) ("To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

> **\*11** [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Vegas v. Artus,* 610 F.Supp.2d 185, 209 (N.D.N.Y.2009) (internal quotation marks and citations omitted). In the prison setting, inmate treatment is evaluated pursuant to a rational basis standard. *Phillips,* 408 F.3d at 129 (citing *Shaw v. Murphy,* 532 U.S. 223, 229–230, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001)). Thus, in order to establish an equal protection violation, the plaintiff must show that "the disparity in treatment cannot survive the appropriate level of scrutiny which ... means that he must demonstrate that his treatment was not reasonably related to any legitimate penological interests." *Id.*

If an inmate cannot "allege membership in [a protected] class, he or she can still prevail in ... a class of one equal protection claim." *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005) (internal quotations and citations omitted). Similarly, to succeed, plaintiffs must show "that they were intentionally treated differently from other similarly-

Diaz v. Fischer, Not Reported in F.Supp.2d (2010)

2010 WL 1132772

situated individuals without any rational basis." *Clubside, Inc. v. Valentin,* 468 F.3d 144, 158–59 (2d Cir.2006). Additionally, to be successful, plaintiff must establish an extremely high "level of similarity between plaintiffs and the persons with whom they compare themselves ...." *Neilson,* 409 F.3d at 104.

Here, Diaz contends first that he was not given the preferential employment treatment he deserved when he made a deal with Graham. Compl. ¶ 22. As the Equal Protection Clause bars deprivations and unequal treatment, such claims for preferential treatment are not within its bounds. Moreover, Diaz fails to allege facts sufficient to conclude that others who made similar deals with Graham were treated differently.

Additionally, Diaz claims that the sanction of losing his employment was more severe than that received by other inmates who had been adjudged guilty of more serious disciplinary infractions and sentenced to more severe dispositions. Such general claims fail to identify which individuals intentionally treated him differently. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) ( "To prove an equal protection violation, claimants must prove purposeful discrimination, directed at an identifiable ... class."). The named defendants did not appear to have any involvement in Diaz's employment placement. At Diaz's hearing, he was referred back to the Inmate Program Committee for assignment. Compl. ¶ 25. This committee, the members of which are not named in the present action, appears to have the authority to place inmates in a job assignment. The moving defendants are neither on the Program Committee nor vested with the authority to provide Diaz with employment options. Reliance on Fischer or Graham for such power is neither alleged nor inferable from the record. Additionally, none of the other moving defendants acted as hearing officers or imposed Diaz's sentences. Thus, no evidence has been proffered that any moving defendant purposefully discriminated against Diaz.

**\*12** Accordingly, defendants' motion should be granted as to the equal protection claim.

### F. Qualified Immunity

Defendants claim that they are entitled to qualified immunity. Qualified immunity generally protects

governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov.10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany,* No. 03–CV–1157, 2006 WL 839525 \*16 (N.D.N.Y. Mar. 27, 2006) (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached concerning Diaz's claims because, as discussed *supra,* accepting all of Diaz's allegations as true, he has not shown that defendants violated his constitutional rights.

Accordingly, in the alternative, defendants' motion should be granted on this ground.

### III. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 25) be **GRANTED** in all respects and that the complaint be **DISMISSED** as to defendants Fischer, Graham, Quinn, Redmond, Burdick, and Merville as to all claims against them.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS**

**WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1132772

Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    The motion is filed on behalf of all defendants except Byrne and Cady. Dkt. No. 25 at 2. Byrne and Cady have both filed answers. Dkt. Nos. 26, 39.

3    Allegations of verbal harassment alone are not actionable under § 1983. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1996) ( "The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly d ism issed.").Therefore, even when the allegations of the complaint are liberally construed, the allegations here afford no basis for a claim under § 1983 and will not be further addressed.

4    "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6.

5    "DOCS maintains an Inmate Grievance Program (IGP)at all facilities. The first step requires an inmate to file a grievance with the IGRC. If such informal resolution fails, the inmate may then appeal to the facility superintendent and thereafter to the Central Office Review Committee. *See Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004).

6    To the extent that, liberally reading the complaint, Diaz contends that he should have received, or continued to occupy, a specific employment placement, such contentions are without merit. Prisoners do not have a constitutionally protected property interest in a certain employment or in continued employment. *See Johnson v. Rowley,* 569 F.3d 40, 43–44 (2d Cir.2009); *see also Bulger v. United States Bureau of Prisons,* 65 F.3d 48, 50 (5th Cir.1995) (finding that termination and reassignment to a different job within the prison setting is neither atypical nor significant in relation to ordinary prison life); *Newsom v. Norris,* 888 F.2d 371, 374 (6th Cir.1989) (holding that "the Constitution does not create a property or liberty interest in prison employment and that any such interest must be created by state law by language of an unmistakably mandatory character.") (citations and quotation marks omitted); *Karacsonyi v. Radloff,* 885 F.Supp. 368, 370 (N.D.N.Y.1995) ("Prison officials, however, have broad discretion in denying federal inmates the opportunity to [work].") (citations omitted). Additionally, the Second Circuit has held that a "New York [state] ... prisoner has no protected liberty interest in a particular job assignment." *Frazier v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996); *Hodges v. Jones,* 873 F.Supp. 737, 745 (N.D.N.Y.1995) (citations omitted) (holding that inmates "ha[ve] no constitutional right to any particular position of employment."). Accordingly, as a matter of law, Diaz has no liberty interest in his initial, or continued, employment, or any choice in which employment he should be assigned.

7    "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (2007).

8    On May 15, 2007, Sgt. Cox presided over one of Diaz's disciplinary hearings. Compl. ¶ 35. During the hearing, Cox threatened Diaz, insisting that unless Diaz stopped filing grievances he would be subjected to "man law" by having fabricated charges brought against him, being assaulted by staff, and being sent to solitary confinement. *Id.*

9    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

10    Diaz viewed the tape on June 27 It allegedly showed Diaz in the holding room, Quinn entering the room and conversing with Redmond, Quinn moving to the door of Diaz's room and exchanging words, and then Quinn returning to speak with Redmond. Compl. ¶ 50.

11    It is unclear what the disciplinary infraction was for which Diaz was being tried. However, Diaz and Byrne had previously met as Byrne interviewed Diaz about previous grievances he had submitted. Compl. ¶ 61. Prior to the hearing, Diaz inquired about the status of his grievance investigation and Byrne was very agitated by Diaz's questions. *Id.*

12    An inmate has a right not to be deprived of property without due process. However, federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue. *Hudson v. Palmer,*

468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). "New York courts provide such a remedy ... [through the] initiat[ion of] an Article 78 proceeding in New York Supreme Court ...." *Gabis v. New York City Taxi & Limousine Comm'n,* No. 05–CV–8083 (HB), 2005 WL 2560384, at *3 (S.D.N.Y. Oct.12, 2005); *see also* N.Y. C.P.L.R. §§ 7803, 7804; *Locurto v. Safir,* 264 F.3d 154, 174 (2d Cir.2001) ("An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims.") (citations omitted); *Campo v. New York City Employees' Ret. Sys.,* 843 F.2d 96, 101 (2d Cir.1988) ("Article 78 ... provides a summary proceeding which can be used to review administrative decisions."). State law also provides that "[a]ny claim for damages arising out of any act done ... within the scope of ... employment and in the discharge of the duties of any officer or employee of the department [of corrections] shall be brought and maintained in the court of claims as a claim against the state." N.Y. Corr. Law § 24(2). In this case, Diaz contends that there were unconstitutional deprivations when his property was destroyed by corrections officers. Compl. ¶¶ 53, 77. First, the Article 78 procedure exists. Second, because Diaz is suing for damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24. Thus, the correct venue to litigate these claims is in state court. Accordingly, defendants' motion should be granted as to this claim.

13    Diaz has clarified, in his opposition papers, that he "is suing the defendants in their individual capacities [and] ... refer[ed] to the official title .. for reference purposes only ...." Dkt. No. 27. Accordingly, since Diaz clearly sues the defendants only in their individual capacities, the Eleventh Amendment bar to suits against state officials in their official capacities is inapplicable.

14    Diaz's claims concerning the June 26, and July 2, 2007 disciplinary hearings are not raised in the present motion.

---

End of Document                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3195095
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bruce FLYNN, Plaintiff,
v.
Joe WARD and Lief Wellenstein, Defendants.

No. 15-CV-1028 (TJM/CFH)
|
Signed 06/06/2018
|
Filed 06/07/2018

**Attorneys and Law Firms**

Bruce Flynn, 10-A-1558, Elmira Correctional Facility, P.O. Box 500, Elmira, NY 14902, pro se.

Attorney General for the State of New York, OF COUNSEL: BRIAN W. MATULA, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224-0341, Attorney for Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

**\*1** Plaintiff pro se Bruce Flynn ("Flynn" or "Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 against Defendants Acting Superintendent Joe Ward ("Defendant" or "Ward") and C.O. Lief Wellenstein ("Defendant" or "Wellenstein") for violations of his rights under the First Amendment. Dkt. No. 20 ("Am. Compl."). Additional defendants were named, but the claims against them have since been dismissed. Dkt. No. 22. Presently before the undersigned is Defendants' motion for summary judgment and dismissal of the Amended Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 64. Flynn did not oppose the motion. For the following reasons, it is recommended that Defendants' motion be granted in part and denied in part.

**I. Failure to Respond**

Flynn failed to submit any opposition papers to Defendants' motion for summary judgment. Flynn was notified of the consequences of failing to respond to a summary judgment motion by Defendants and the Court. Dkt. Nos. 64-1 and 65. However, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996). Even in the absence of a response, Defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. Id.; FED. R. CIV. P. 56(c). While "[a] verified complaint is to be treated as an affidavit ... and [may] be considered in determining whether material issues of fact exist[,]" see Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted), Flynn's Amended Complaint is not verified. [2] Thus, the Amended Complaint does not have the "force and effect of an affidavit." See Tafari v. Brown, No. 9:10-CV-1065 (GTS/DRH), 2012 WL 1098447, at *7, n. 8 (N.D.N.Y. Mar. 30, 2012) (collecting cases). Despite this fact, the Court may consider the exhibits attached to the Amended Complaint. See Dawkins v. Williams, 511 F. Supp. 2d 248, 255 (N.D.N.Y. 2007) (considering the exhibits annexed to the pro se plaintiff's amended complaint when deciding the defendant's motion for summary judgment even though that pleading was not verified). Defendants do not dispute the authenticity of the exhibits and, in fact, utilized the exhibits during Flynn's deposition and cite to the exhibits in support of the motion. Dkt. No. 64-2 ¶¶ 46-48; Dkt. No. 64-4; Dkt. No. 64-7 at 1-2. [3] Additionally, a copy of Flynn's deposition transcript is annexed as an exhibit to Defendants' motion. Dkt. No. 64-4. Consequently, the facts set forth in Defendants' Rule 7.1 Statement of Material Facts [4] are accepted as true, but only as to those facts that are not disputed by Flynn's sworn testimony or the exhibits annexed to the Amended Complaint. See N.D.N.Y. L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.") (emphasis omitted).

**II. Background**

### A. Facts

**\*2** The facts are related herein in the light most favorable to Flynn as the nonmoving party. <u>See</u> subsection III(A) <u>infra</u>. The facts recited are for the relevant time period as referenced in the Amended Complaint.

At the time of the incidents described in the Amended Complaint, Flynn was confined in the Long Term Protective Custody Unit ("LTPC") at Mid-State Correctional Facility ("Mid-State C.F."). <u>See</u> generally Am. Compl. Wellenstein was a law library officer at Mid-State C.F. Dkt. No. 64-4 at 35-36. Ward was the Superintendent at Mid-State C.F. <u>Id.</u> at 10. From December 2014 through June 2015, Flynn filed numerous requests for legal materials/legal assistance. Dkt. No. 20-2.

From October 2011 until March 5, 2015, inmates in the LTPC had physical access to the law library from 4:30 p.m. until 5:45 p.m. Dkt. No. 20-1 at 2; Dkt. No. 64-4 at 35-36. On March 5, 2015, Captain Goppert issued a memorandum advising the LTPC Population that their law library services would be "modified." Dkt. No. 20-1 at 1. In accordance with Facility Operations Manual 21.04 [5] and Directive #4833, [6] LTPC inmate requests for legal assistance from the law library must be made in writing and forwarded to the law library officer through the facility mail. Dkt. No. 20-1 at 3. Inmates were permitted two requests each day. Dkt. No. 64-4 at 36; Dkt. No. 64-2 ¶ 34.

### 1. Grievances

On January 6, 2015; February 14, 2015; and February 17, 2015, Flynn filed grievances claiming that Wellenstein refused to make copies of his legal work or perform "word" and "key number searches" on the computer. Dkt. No. 64-5 at 4-7. The grievances were consolidated (MS-28194-15) and on March 11, 2015, the Superintendent responded that Flynn was being properly assisted. [7] <u>Id.</u> at 8. Flynn appealed the decision to the Central Office Review Committee ("CORC"), and, on January 20, 2016, CORC upheld the Superintendent's determination. <u>Id.</u> at 3.

On March 10, 2015, Flynn filed a grievance claiming that Wellenstein refused to accept his March 8, 2015 request and overcharged him for copies. Dkt. No. 20-3 at 12.

**\*3** On April 5, 2015, Flynn filed a grievance alleging that Wellenstein (1) denied him access to the courts; (2) fraud; (3) destruction of property; (4) refused to provide legal materials or assistance; and (5) refused to respond to weekend requests (MS-21943-15). Dkt. No. 64-5 at 10-16. On May 6, 2015, the Superintendent responded that Flynn's concerns were being properly addressed. [8] <u>Id.</u> at 17. Flynn appealed the decision to CORC and on October 21, 2015, CORC upheld the Superintendent's determination. <u>Id.</u> at 9.

On April 17, 2015, Flynn filed a grievance claiming that Wellenstein unlawfully ordered him to remain out of his cell while he made rounds. Dkt. No. 20-3 at 33.

On April 28, 2015, Flynn filed a grievance claiming that Wellenstein was deliberately harassing him and destroying his documents. Dkt. No. 20-3 at 34.

On April 30, 2015, Flynn filed a grievance charging Wellenstein with repeated verbal harassment. Dkt. No. 20-3 at 42. Flynn claimed that Wellenstein came to his cell, accused Flynn of smoking, entered the cell, and pushed Flynn aside. <u>Id.</u> Flynn alleged that Wellenstein made "a couple of smart remarks" and was "angry" over the numerous grievances Flynn filed. <u>Id.</u>

On May 6, 2015; May 8, 2015; and May 11, 2015, Flynn filed grievances accusing Wellenstein of destroying copies, harassment, and threatening behavior. Dkt. No. 64-5 at 19-21. The grievances were consolidated (MS-21970-15), and, on July 14, 2015, after an investigation, the Superintendent issued a decision denying the grievances. [9] <u>Id.</u> at 22-23. Flynn appealed the decision to CORC and on September 21, 2015, the Superintendent's decision was affirmed. <u>Id.</u> at 18.

On May 14, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide books. Dkt. No. 20-3 at 46.

On July 21, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide envelopes and deliberately amended his documents. Dkt. No. 20-6 at 2.

On August 1, 2015, August 7, 2015, and August 10, 2015, Flynn filed grievances against Wellenstein claiming that he refused to make copies of documents "in retaliation for the 2 most recent grievances against him." Dkt. No. 64-5 at 26-28. The grievances were consolidated (MS-22079-15) and on August 27, 2015, after an investigation, the Superintendent denied the grievances. [10] Id. at 29. Flynn appealed the decision to CORC and on October 21, 2015, CORC affirmed the Superintendent's decision. Id. at 24.

On August 20, 2015, Flynn filed a grievance (MS-22105-15) claiming that Wellenstein threatened him and told him, "if I did not stop with my grievances that he, C.O.'s Jordan and Miller were going to set me up again like they have done numerous times in the past." Dkt. No. 20-6 at 10.

On October 23, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide copies and purposefully delayed his access to the courts (MS-22183-15). Dkt. No. 64-5 at 31. On November 10, 2015, after an investigation, the Superintendent determined that Flynn was being provided with Law Library services pursuant to Directive #4483. [11] Id. at 33. Flynn appealed to CORC, and on February 17, 2016, CORC upheld the determination. Id. at 30.

On November 6, 2015, Flynn filed a grievance (MS-22200-15) claiming that Wellenstein's behavior prohibited him from conducting meaningful research. Dkt. No. 64-5 at 37. On December 15, 2015, after an investigation, the Superintendent denied the grievance. [12] Id. at 38. Flynn appealed the decision to CORC, and on March 23, 2016, CORC affirmed the determination. Id. at 36.

**\*4** On January 14, 2016, Flynn filed a grievance claiming that the photocopier was not functioning properly because Wellenstein manipulated the memory function. Dkt. No. 20-6 at 61.

### 2. Misbehavior Reports

On April 30, 2015, Wellenstein issued a misbehavior report charging Flynn with smoking. [13] Dkt. No. 20-6 at 70. After a Tier II disciplinary hearing, Flynn was sentenced to eighteen days in keeplock confinement. Id.

Flynn served his sentence from April 30, 2015 until May 18, 2015. Id.

On August 1, 2015, Officer Koscielniak issued Flynn a misbehavior report charging him with violating facility rules related to smoking. Dkt. No. 20-6 at 6. After a Tier II disciplinary hearing, the hearing officer sentenced Flynn to a thirty day loss of recreation, commissary, and phone/package privileges. Id. at 70. On August 1, 2015, Wellenstein issued a second misbehavior report charging Flynn with disobeying a direct order. Dkt. No. 20-6 at 5. After a Tier II disciplinary hearing, the hearing officer sentenced Flynn to a thirty day loss of recreation, commissary, and phone/package privileges for thirty days, but the sentence was suspended until November 16, 2015. Id. at 70.

On August 17, 2015, Officer Alsante issued Flynn a misbehavior report charging him with placing a three-way call in violation of facility rules. Dkt. No. 20-6 at 8. Alsante noted that, on August 17, 2015, "[a]t approx. 9:05 p.m., at the request of C.O. J. Jordan, I began monitoring 10-2 SHU phone[.]" Id. As a result of the report, Flynn was placed in keeplock for eighteen days from August 17, 2015 until September 4, 2015. Id. at 8, 70. Flynn appealed the decision to Ward claiming that Jordan asked Alsante to monitor his telephone call "as part of a campaign of harassment that CO Wellenstein has launched against those inmates in 10-2 who are trying to access the law library and [c]ourts." Id. at 9. Flynn further noted:

> CO W has written 4 misbehavior reports against me & encourages other CO's to do the same, as well as monitor our alleged activities, and in this incident no 3-way call was made & this is retaliation for my litigation.

Dkt. No. 20-6 at 9.

On August 24, 2015, Wellenstein issued a misbehavior report charging Flynn with threats and harassment. Dkt. No. 20-6 at 12. Wellenstein reported that Flynn told him, "[o]ne day when I get out, I am going to see you selling flowers on the corner and then I will take care of you the way I want to." Id. After a Tier II disciplinary hearing, Flynn was sentenced to thirty days in keeplock confinement. Id. at 70. The sentence was suspended until December 8, 2015. Id.

On November 12, 2015, Officer U. Upshaw issued Flynn a misbehavior report charging him with smoking, arson, false statements, and possessing flammable material. Dkt. No. 20-6 at 24. After a disciplinary hearing, the charges were dismissed. Id. at 25.

On November 18, 2015, Wellenstein issued a misbehavior report charging Flynn with harassment. Dkt. No. 20-6 at 16. The misbehavior report was dismissed by the hearing officer. Am. Compl. ¶ 125.

On December 11, 2015, Wellenstein issued a misbehavior report charging Flynn disobeying a direct order and harassment. Dkt. No. 20-6 at 26. The ticket was dismissed by the hearing officer. Am. Compl. at ¶ 130.

### 3. Legal Work

 *5  In 2013, Flynn filed a Habeas Corpus petition in this Court. See Flynn v. J. Colvin, No. 9:13-CV-1247 (JKS) (N.D.N.Y. 2013). On October 19, 2015, Flynn filed an action in the Court of Claims against Wellenstein charging him with deliberately destroying legal documents. Dkt. No. 20-6 at 27-28. In 2014 and 2015, Flynn was researching and gathering exhibits in support of a writ of error coram nobis to vacate his conviction. Dkt. No. 64-4 at 17. In 2014 and 2015, Flynn was also working on a petition for the Department of Veterans' Affairs to increase his disability benefits, Article 78 petitions, a foreclosure action, and commenced litigation in the Court of Claims. Dkt. No. 64-4 at 18, 21, 25, 29. On August 24, 2015, Flynn commenced the within action. Dkt. No. 1.

During his deposition, Flynn testified that did not know the procedural posture of any of his actions or petitions, could not recall whether deadlines were in place in any litigation, and could not remember the details of each petition and action. Dkt. No. 64-4 at 17-31. Flynn testified that his legal work was lost and therefore, without being able to refer to his legal records, he could not state whether he suffered any negative consequences in any legal matter. Id. at 31-32, 44, 107.

In June 2016, Flynn was transferred out of Mid-State C.F. Dkt. No. 25.

### B. Procedural History

On August 24, 2015, Flynn filed the Complaint in this action. Dkt. No. 1. In a Decision and Order filed December 4, 2015 ("December Order"), the Court reviewed the Complaint in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A, and determined that the Complaint failed to state a claim upon which relief could be granted and, therefore, was subject to dismissal. Dkt. No. 11. In light of his pro se status, Flynn was afforded an opportunity to submit an amended complaint. Dkt. No. 11 at 18. On February 25, 2016, Flynn filed an Amended Complaint. Dkt. No. 20. Upon review of the Amended Complaint, the Court directed Wellenstein and Ward to respond to the First Amendment claims related to access to the courts and retaliation. Dkt. No. 22 at 14, 26, 29.

### III. Discussion [14]

In the Amended Complaint, Flynn alleges that his First Amendment right to access the courts was violated and further, that Wellenstein retaliated against him for filing grievances. See generally Am. Compl. Defendants move for summary judgment arguing that (1) Flynn failed to allege any "actual injury" to sustain a First Amendment claim; (2) Flynn cannot establish a retaliation claim against Wellenstein; (3) Flynn's supervisory claims against Ward must be dismissed; and (4) Flynn failed to exhaust his administrative remedies with respect to retaliatory conduct. See generally Dkt. No. 64.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. See FED R. CIV. P. 56(a). The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. See FED R. CIV. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. See Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. See Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

**\*6** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. See Gallo v. Prudential Residential Servs., Ltd. P'ship., 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1998).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," ... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law,"...

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191–92 (2d Cir. 2008).

### B. First Amendment

#### 1. Access to Courts

Flynn claims that Wellenstein deliberately "mixed up" and destroyed legal exhibits, refused to accept legal requests, and failed to provide legal materials, assistance, and

copies. See generally, Am. Compl. As a result, Flynn claims that he was prevented from filing a writ of coram nobis, a petition for habeas relief, a petition with the Department of Veterans' Affairs, an Article 78 petition, and an appeal with the New York State Retirement System and missed deadlines in pending litigation. See id. Defendants argue, even assuming that Flynn had demonstrated a material issue of fact as to whether Defendants acted deliberately and maliciously in failing to provide him with legal assistance and materials, the record does not support Flynn's conclusory claim that he suffered an actual injury caused by the Defendants. Dkt. No. 64-6 at 4.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. See Bounds v. Smith, 430 U.S. 817, 824 (1977); Lewis v. Casey, 518 U.S. 343, 350 (1996) ("The right that Bounds acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them[.]" Lewis, 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. See Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003). Second, the plaintiff must demonstrate that he suffered an actual injury, "i.e., [the defendant] took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (internal citations, quotation marks, and alterations omitted) (quoting Lewis, 518 U.S. at 329); Davis, 320 F.3d at 351 (internal quotation marks omitted). "[A] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." Benjamin v. Kerik, 102 F. Supp. 2d 157, 164 (S.D.N.Y. 2000) (citation omitted), aff'd sub nom. Benjamin v. Fraser, 264 F.3d 175 (2d Cir. 2001).

**\*7** Here, while Flynn made several claims in his Amended Complaint related to pending legal matters, Flynn testified at his deposition that he could not recall what litigation he was working on in 2015, the procedural posture of any pending litigation, or whether he was subject to any Court imposed deadlines. Dkt. No. 64-4 at 12-31. Flynn testified that he filed actions in the Court of Claims against Wellenstein related to the destruction of his legal work, and that the actions were dismissed, but he

could not attribute that dismissal to Wellenstein's actions or inactions. Id. at 25-26, 29, 30. Flynn explained that he could not provide any specific information related to Court deadlines or legal matters because he was compelled to send his legal work home and it was lost. Dkt. No. 64-4 at 18-19, 25, 31, 45. Flynn testified:

> ... Most of my legal work was shipped—sent home. They forced me to send most of my legal work home, so—and I haven't been able to get my legal work sent to me. Then they lost a box of legal work, so.

Dkt. No. 64-4 at 18.

The record however, lacks any facts related to who directed Flynn to send his legal work home, when or what portion of his work was misplaced or lost, and who was responsible for his missing legal work.

Even if the undersigned accepts Flynn's explanation, the docket reports for cases pending in this Court, as well as Flynn's litigation history, belie his First Amendment claims. In October 2013, Flynn filed a Petition for Habeas Corpus relief. See Flynn v. Colvin, No. 9:13-CV-1247 (JKS), Dkt. No. 1 (N.D.N.Y. Oct. 7, 2013). From February 2014 until June 2016, Flynn filed several submissions in that case including various motions, an application for counsel, a reply to his petition, and objections to Court Orders. Id.; Dkt. Nos. 20, 22, 24, 26, 27, 29, 31, 33, 34, 35, 36, 38. In December 2016, the Petition was denied and Judgment was entered. Id.; Dkt. Nos. 47, 48. Nothing in the record suggests that the Petition was denied for failure to comply with deadlines, prosecute, or purse the action.

In August 2015, Flynn commenced the within action by filing an eighteen page complaint with over two hundred pages of exhibits, together with a motion to proceed IFP, an inmate authorization form, a motion to appoint counsel, and a motion for preliminary injunctive relief. Dkt. Nos. 1, 2, 3, 4, 5. From August 2015 until June 2016, Flynn filed letters, motions, and a fifty-four page Amended Complaint. Dkt. No. 6, 8, 10, 12, 16, 18, 20, 23. Flynn has clearly been able to proceed in his litigation of this case, despite his claims otherwise.

In December 2017 and March 2018, the Appellate Division issued Orders dismissing two such petitions.

See Flynn v. Annucci, 156 A.D.3d 1105 (3d Dep't 2017); Flynn v. Annucci, 159 A.D.3d 1181, 1182 (3d Dep't 2018). In the 2018 Order, the Court affirmed the disciplinary determination after considering the documentary evidence, hearing testimony, and misbehavior report. Flynn, 159 A.D.3d at 1182. The record lacks facts establishing that these cases were dismissed due to Flynn's inability to prosecute or purse the matters or Defendants' behavior. See Davis, 320 F.3d at 352 (holding that a plaintiff must show that there is "a causal connection between the protected speech and the adverse action.") (citation omitted).

To summarize, Flynn has failed to show that Defendants' actions hindered his efforts to pursue a legal claim. Flynn was able to file several submissions in this Court, demonstrating that Defendants' alleged conduct did not prevent him from litigating actions. Flynn has failed to provide evidence of any type of actual injury which occurred as a result of Defendants' actions. Flynn has failed to identify which legal claims were frustrated, if they were meritorious, and how his access to legal materials, supplies, or the law library would have supported the viability of such claims. In the absence of any evidence that Flynn suffered any actual injury precluding him from pursuing any judicial action, it is recommended that Defendants' motion for summary judgment on this ground should be granted.

### 2. Retaliation

**\*8** To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. See Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation omitted); Tafari v. McCarthy, 714 F.Supp.2d 317, 347 (N.D.N.Y. 2010). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. See Jackson v. Onondaga Cnty., 549 F. Supp. 2d 204, 214-15 (N.D.N.Y. 2008). Therefore, conclusory allegations alone are insufficient. See id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations ...

2018 WL 3195095

ought usually be pursued with full discovery.") ). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his engaging in the protected conduct. See Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009). In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003). "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." Jackson, 549 F. Supp. 2d at 215.

The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle, 313 F.3d at 682. A plaintiff "may do so with circumstantial evidence if it is 'sufficiently compelling[.]' " Kotler v. Donelli, 382 Fed.Appx. 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) ). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good disciplinary record, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." Barclay v. New York, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations omitted). Temporal proximity between the protected activity and the adverse action "must be very close." Meyer v. Shulkin, —— Fed.Appx. ——, 2018 WL 480478, at *2 (2d Cir. Jan. 19, 2018) (citation omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other

circumstances three months was considered too long.

Burton v. Lynch, 664 F.Supp.2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

Flynn claims that Wellenstein assaulted him, threatened him, denied him access to the court, and filed misbehavior reports in retaliation for Flynn's grievances against Wellenstein. See generally Am. Compl. It is well-settled that the filing of a grievance constitutes protected speech under the First Amendment. See Graham, 89 F.3d at 80; Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alteration and internal quotation marks omitted); see also Roseboro, 791 F. Supp. 2d at 367 (finding that the filing of a grievance is a protected activity); Mateo v. Fischer, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010) (same). Thus, for each allegation, Flynn has satisfied the first prong of First Amendment retaliation analysis. Thus, the Court turns to whether Flynn has established that he suffered an adverse action and a causal connection between the protected conduct and the adverse action.

### a. Assault

*9 Flynn alleges that Wellenstein assaulted him on April 30, 2015 in retaliation for filing grievances. See Am. Compl. ¶ 54. With respect to the second prong of the analysis, Defendants claim that the alleged action, i.e., pushing, was de minimis and thus, not an adverse action. The undersigned agrees. Although an alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis, Flynn's allegations that Wellenstein "push[ed] him around," see Am. Compl. ¶ 54, are de minimis. See Rivera v. Goord, 119 F. Supp. 2d 327, 340 (S.D.N.Y. 2000) ("[E]ven though [the plaintiff] has alleged that the actions of [the defendants] were motivated by [the plaintiff's] filing of grievances, the alleged acts of retaliation, even if assumed to be true, are de minimis; [the plaintiff] states only that [the defendants] 'shoved' him while taking him to the 'box' (i.e., Green Haven's Special Housing Unit, or "SHU"). Such actions, even if proven at trial, would not chill a person of ordinary

firmness from continuing to engage in First Amendment activity."); Sloane v. Mazzuca, No. 04 CV 8266(KMK), 2006 WL 3096031, at *13-14 (S.D.N.Y. Oct. 31, 2006) (concluding that the defendant's conduct of throwing a food tray at plaintiff did not amount to adverse action); cf. Williams v. Hesse, No. 9:16-CV-01343 (GTS/TWD), 2018 WL 1363759, at *7-8 (N.D.N.Y. Feb. 2, 2018) (concluding that the defendants' threats coupled with spitting chewing tobacco in the plaintiff's face that resulted in "severe burning, pain, and a temporary loss of vision in his right eye for nearly six hours, and a severe headache for days" constituted adverse action) Moreover, there is no indication that plaintiff sought medical treatment or experienced severe pain or suffering as a consequence of the alleged assault. See Williams, 2018 WL 1363759, at *7-8. Therefore, because the undersigned finds that Wellenstein's alleged assault does not amount to adverse action, it is recommended that Defendants' motion on this ground be granted.

### b. Access to Courts

Flynn alleges that Wellenstein denied him access to the law library and to the courts in retaliation for filing grievances. Dkt. No. 20 ¶¶ 57, 59, 118, 119, 120, 122. Although a defendant's underlying action may not amount to a violation of a constitutionally protected right, this does not preclude such action from consideration as an adverse action. See Shariff v. Poole, 689 F. Supp. 2d 470, 478-79 (W.D.N.Y. 2010). " 'An act in retaliation for the exercise of a constitutional right is actionable under § 1983 even if the act when taken for different reasons would have been proper.' " Id. (quoting Franco, 854 F.2d at 588); see Nei v. Dooley, 372 F.3d 1003, 1007 (8th Cir. 2004) (rejecting the defendants' argument that "[a]s for the inmates' claim that they were retaliated against for filing their lawsuit by being denied access to the prison law library, the officials contend the district court should have construed the claim as one of denied access to the courts, requiring proof of actual injury, rather than one of retaliation) (citation omitted)." Thus, even though the undersigned has recommended dismissal of plaintiff's access to the courts claim, Wellenstein's underlying conduct may still be assessed as adverse action.

It is well-settled that the denying an inmate access to the law library or destroying legal material constitutes adverse action. See Guillory v. Haywood, No. 9:13-CV-01564

(MAD), 2015 WL 268933, at *17 (N.D.N.Y. Jan. 21, 2015) ("Furthermore, refusing to allow Plaintiff to go to the law library knowing that it would prevent an inmate from filing papers in a pending lawsuit in a timely manner would arguably deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.") (internal quotation marks and citation omitted); see also Jean-Laurent v. Lane, No. 9:11-CV-186 (NAM/TWD), 2013 WL 600213, at *10 (N.D.N.Y. Jan. 24, 2013), report and recommendation adopted, 2013 WL 599893 (N.D.N.Y. Feb. 15, 2013) ("Destruction of Plaintiff's legal material and documents for his Second Circuit appeal constitutes an adverse action for purposes of the retaliation analysis."). Thus, Flynn has established the second prong of the retaliation analysis.

With respect to the third prong, Flynn must establish a causal connection "sufficient to support the inference 'that the speech played a substantial part' in the [ ] adverse [ ] action." Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir. 2000) (quoting Ezekwo v. NYC Health & Hosps. Corp., 940 F.2d 775, 780-81 (2d Cir. 1991) ). As to temporal proximity, the record indicates that on March 10, 2015; April 5, 2015; April 30, 2015; May 6, 2015; May 8, 2015; May 11, 2015; May 14, 2015; July 21, 2015; August 7, 2015; October 23, 2015; and November 6, 2015, Flynn filed grievances against Wellenstein. See Dkt. N. 64-7. Although there is no "bright line" establishing the time frame appropriate for establishing temporal proximity, the short gap between the protected conduct and adverse action appears sufficiently close to support an indication of a causal connection. See Espinal, 558 F.3d at 129 (holding that passage of six months between protected conduct and adverse action sufficiently supported an inference of a causal connection); see, e.g., Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002) (concluding that the short time frame between grievance and retaliatory action, along with allegation of the defendant's involvement, sufficed to support an inference of a retaliatory motive), abrogated on other grounds, Porter v. Nussle, 534 U.S. 516 (2002).

**\*10** However, "temporal proximity alone cannot create a genuine issue of material as to whether the motivation behind [the defendant's] actions was retaliation." Parks v. Blanchette, 144 F.Supp.3d 282, 336-37 (D. Conn. 2015). Additional circumstantial evidence supports the conclusion that Wellenstein's conduct may have been motivated by Flynn's complaints. On May 8, 2015,

Flynn contends that Wellenstein stated, "don't you dare file any more grievances or I will slap you silly and write misbehavior reports to stop you from requesting anything." Am. Compl. ¶ 56. On May 11, 2015, Wellenstein stated "don't [you] dare request anything or I will write you up. I will set you up for grieving me all the time." Id. ¶ 58. Assessing these statements in the light most favorable to Flynn as the non-moving party, the statements are sufficient to support "an inference of a causal connection between" plaintiff's grievances and Wellenstein's alleged denial of legal materials and/or the law library. Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). Moreover, Wellenstein has not provided an affidavit or other evidence to refute Flynn's testimony. Therefore, there is a genuine triable issue of fact for a jury to consider. See Ramos v. O'Connell, 28 F. Supp. 2d 796, 803 (W.D.N.Y. 1998) (denying summary judgment where the defendants failed to submit affidavits or documents to contradict the plaintiff's account). Therefore, affording plaintiff special solicitude, it is recommended that Defendants' motion on this ground be denied.

### c. Threats

Verbal harassment and threats are generally not considered conduct "that would deter a similarly situation individual of ordinary firmness of exercising constitutional rights." Cabassa v. Smith, No. 9:08-CV-0480 (LEK/DEP), 2009 WL 1212495, at *7 (N.D.N.Y. Apr. 30, 2009) (citing Gill, 389 F.3d at 380) (additional citation omitted). Verbal threats however, may constitute adverse action for purpose of a First Amendment retaliation if the threat is sufficiently specific. Barrington v. New York, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011); see also Ford v. Palmer, 539 Fed.Appx. 5, 6 (2d Cir. 2013) (summary order) (finding that a verbal threat constituted adverse action where corrections officer threatened to poison the plaintiff in retaliation for filing his grievances).

Here, Flynn testified that Wellenstein threatened him and told him not to go to the law library. Dkt. No. 64-4 at 93-94. Upon further questioning, Flynn testified:

Q. Okay. When did he make threats about not going to the law library?

A. I don't recall.

Q. What about threats in writing you up, when did he say that?

A. I don't recall.

Q. Do you recall the sum and substance of any of the conversations about not going to the law library or about writing you up?

A. I don't recall right now.

Dkt. No. 64-4 at 94.

Flynn did not document or report the threats. Dkt. No. 64-4 at 96. Based upon the record, the Court concludes that Wellenstein's alleged threats are not sufficiently specific to constitute adverse action. See Bartley v. Collins, No. 95 Civ. 10161, 2006 WL 1289256, at *2-4 (S.D.N.Y. May 10, 2006) (finding no adverse action where a corrections officer tells a plaintiff that he is going to "get [him]" for filing a lawsuit); Alicea v. Howell, 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) (finding no adverse action where a prison official told an inmate that he would "have to pay the consequences" for filing a grievance against her).

Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims on this ground be granted. [15]

### d. Misbehavior Reports

Flynn alleges that Wellenstein filed misbehavior reports, and directed other officers to file misbehavior reports, in retaliation for grievances. Am. Compl. ¶¶ 55, 70, 71, 73, 79. A defendant's retaliatory filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action. See Gill, 389 F.3d at 384 (finding that a false misbehavior report that resulted in the plaintiff's placement in keeplock constituted adverse action). Courts in this Circuit have held that a temporary loss of privileges does not constitute adverse action. See Smith v. City of New York, No. 14 CIV. 5927, 2017 WL 2172318, at *6 (S.D.N.Y. May 16, 2017); see also Monko v. Cusack, No. 9:11-CV-1218 (GTS/TWD), 2013 WL 5441724, at *11 (N.D.N.Y. Sept. 27, 2013) ("... the temporary loss of privileges such as the post-adjustment privileges lost by Plaintiff for thirty-six days are de

minimis and do not constitute adverse action for purposes of a retaliation claim.") (citation omitted); Bartley, 2006 WL 1289256 at *7 (holding that a misbehavior report which resulted in the temporary loss of commissary privileges does not constitute adverse action because the penalty was de minimis).

**\*11** As a result of the misbehavior reports issued by Koscielniak and Wellenstein on August 1, 2015, Flynn suffered a temporary loss of privileges. Dkt. No. 20-6 at 70. Flynn was not sentenced to any disciplinary confinement or penalized as a result of the November 12, 2015, November 18, 2015 and December 11, 2015 misbehavior reports. Dkt. No. 20-6 at 25; Am. Compl. ¶¶ 125, 130. Therefore, because Flynn has failed to show that he suffered an adverse action as a result of the aforementioned tickets, the undersigned need not determine whether there is a causal connection between Flynn's protected conduct and these misbehavior reports. Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims based upon the August 1, 2015; November 12, 2015; November 18, 2015; and December 11, 2015 reports be granted. [16]

The Court reaches a different conclusion however, with respect to the remaining misbehavior reports. As a result of the April 30, 2015 and August 18, 2015 tickets, Flynn was sentenced to eighteen days in keeplock. Dkt. No 20-6 at 70. As a result of the August 24, 2015 misbehavior report, Flynn received a thirty day keeplock sentence. [17] Id. Accordingly, Flynn has established the second prong of the retaliation analysis with respect to these misbehavior reports. Having found that Flynn satisfied the first and second prong of the retaliation analysis with respect to these tickets, the Court turns to whether the record establishes a causal connection between the protected conduct and the adverse action.

### i. April 30, 2015

On April 30, 2015, Wellenstein issued Flynn a misbehavior report for smoking. Am. Compl. ¶ 55; Dkt. No. 64-6 at 14. Flynn contends that this misbehavior was in retaliation for his April 16, 2015 and April 28, 2015 grievances. Am. Compl. ¶ 55. First, the undersigned notes that the April 16, 2015 grieves conduct by the "law library relief officer" and makes no mention of Wellenstein. See Dkt. No. 20-3

at 31. Absent evidence by plaintiff that Wellenstein either was the library relief officer or knew of the contents of said grievance, the April 16, 2015 grievance cannot be the basis for his retaliation claim. See Tafari, 714 F. Supp. 2d at 374 (concluding that the plaintiff failed to establish a causal connection where the defendant was not named in the original grievance). Second, as to the April 28, 2015 grievance, although the temporal proximity of two days sufficiently supports an inference of causal connection, temporal proximity "without more, is insufficient to survive summary judgment." Roseboro v. Gillespie, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (citing inter alia Ayers v. Stewart, 101 F.3d 687, 1996 WL 346049 (Table), at *1 (2d Cir. 1996) ("[The plaintiff's] reliance on circumstantial evidence of retaliation-namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him-does not suffice to defeat summary judgment.") ). As to statements regarding Wellenstein's motivations, the record indicates that on May 8, 2015, Wellenstein stated, "don't you dare file any more grievances or I will slap you silly and write misbehavior reports to stop you from requesting anything." Am. Compl. ¶ 56. Assessing this statement in the light most favorable to Flynn as the non-moving party, the undersigned finds it sufficient to support "an inference of a causal connection between" plaintiff's grievances and Wellenstein's alleged filing of misbehavior reports. Baskerville, 224 F. Supp. 2d at 732.

**\*12** Wellenstein argues that even assuming the evidence creates a material question of fact as to whether he had retaliatory intent, he would have issued the misbehavior report even in the absence of the protected conduct. "[T]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998). "Defendants [may meet] their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct if 'it was undisputed that [the inmate plaintiff] had in fact committed the prohibited conduct' for which he had been cited in a misbehavior report." Id. (citing Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994) ).

In September 2013 and March 2015, Flynn was charged with smoking at Mid-State C.F. Dkt. No. 20-6 at 70.

2018 WL 3195095

Flynn was found guilty of those charges. Id. During his deposition, Flynn admitted that he smoked in his cell in the past and conceded that he "had several disciplinary issues with smoking[.]" Dkt. No. 64-4 at 95-96. However, Flynn maintains that on April 30, 2015, he was not smoking in his cell. Id. As discussed supra, Wellenstein has not provided any sworn testimony in support of the motion, and, thus, has not met his burden of establishing that he would have filed the misbehavior report even in the absence of the protected conduct. Accordingly, there is an genuine dispute as to whether Flynn committed the charged conduct. See Gayle, 313 F.3d at 684 (denying summary judgment where it is disputed whether the plaintiff committed the prohibited conduct). Therefore, the undersigned recommends that Defendants' motion for summary judgment, on this basis, be denied. [18]

### ii. August 17, 2015

The August 17, 2015 misbehavior report was written by Officer Alsante. Dkt. No. 20-6 at 8. To establish a retaliation claim, a plaintiff must show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline." Graham, 89 F.3d at 81. "[I]t is difficult to establish one defendant's retaliation for complaints against another defendant." Hare v. Hayden, No. 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (citing Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009)).

Here, Flynn did not file any grievances or complaints against Alsante. The record lacks any evidence establishing why Alsante would file a false misbehavior report against Flynn, on Wellenstein's behalf, beyond Flynn's conclusory allegations. Without more, the evidence does not present a genuine issue of material fact for a jury to resolve. See Ciaprazi v. Goord, No. 9:02-CV-915 (GLS/DEP), 2005 WL 3531464, at *9 (N.D.N.Y. Dec. 22, 2005) (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against corrections officers other than the officer who disciplined the plaintiff); see also Alicea v. Maly, No. 9:12-CV-203 (MAD/TWD), 2015 WL 4326114, at *14 (N.D.N.Y. July 14, 2015); Guillory v. Ellis, No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at *18 (N.D.N.Y. Aug. 29, 2014). Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims based upon this misbehavior report be granted. [19]

### iii. August 24, 2015

On August 24, 2015, Wellenstein issued plaintiff a misbehavior report alleging that Flynn threatened and verbally harassed him. Dkt. No. 20-6 at 12. Plaintiff contends that this misbehavior report was in retaliation for his August 20, 2015 and August 22, 2015 grievances. Am. Compl. ¶ 79. However, as Defendants note, during his deposition, plaintiff admitted that he "made a smart remark about [Wellenstein] selling flowers for a living," but that Wellenstein "took that to a whole different level." Dkt. No. 64-4 at 91, 93, 95. Thus, as plaintiff admitted to making the statement that is the basis for the August 24, 2015 misbehavior report, the evidence suggests that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." Gayle, 313 F.3d at 682. Therefore, Defendants have established a non-retaliatory reason for the filing of the August 24, 2015 misbehavior report. See Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998) (concluding that plaintiff's admission of the underlying conduct established a "proper, non-retaliatory reason[ ] for filing the misbehavior report."). Accordingly, it is recommended that Defendants' motion on this ground be granted.

### C. Supervisory Liability

*13 Defendants argue that Flynn's claims against Ward must be dismissed because Ward was not personally involved in any constitutional violations. Dkt. No. 64-6 at 20-23. Flynn does not allege, nor does the record support the conclusion that Ward directly participated in any alleged constitutional violations. Construing the Amended Complaint liberally, Flynn contends that Ward was personally involved in the alleged constitutional violations by denying his grievances.

Supervisory officials may not be held liable merely because they held a position of authority. See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

Case 9:16-cv-01211-GTS-TWD   Document 72   Filed 08/09/18   Page 122 of 338

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323–24 (2d Cir. 1986) ).

Writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. Smart v. Goord, 441 F.Supp.2d 631, 643 (S.D.N.Y. 2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff]...."). Also, it is within the purview of a superior officer to delegate responsibility to others. See Vega v. Artus, 610 F.Supp.2d 185, 198 (N.D.N.Y. 2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation") (citing Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F.Supp.2d 342, 347 (W.D.N.Y. 2007) ).

"[I]t is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement." Perilla v. Fischer, No. 13-CV-398M, 2013 WL 5798557, at *7 (W.D.N.Y. Oct. 28, 2013) (citing inter alia Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (citation omitted) ). "[W]hile personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." Molano v. Bezio, No. 10-CV-6481, 2012 WL 1252630, at *5 (W.D.N.Y. Apr. 13, 2012) (citing Collins v. Ferguson, 804 F.Supp.2d 134, 140 (W.D.N.Y. 2011), Black v. Coughlin, 76 F.3d 72, 74–75 (2d Cir. 1996) ).

The record before the Court contains Superintendent responses related to six grievances. Dkt. No. 64-5 at 8, 17, 22-23, 29, 33, 38. As noted supra, the signature of the Superintendent who executed the response, in each instance, is illegible. See Part II(A)(1). In response to the May 6, 2015 grievance (MS-21970-15), the Superintendent concluded that, "[i]n this investigation, the grievant alleges that he is not being provided assistance with law library requests, his copies are purposely damaged and he is being retaliated against for filing complaints." Dkt. No. 64-5 at 22. Defendants argue that Ward was not involved in that grievance and attribute only two grievances to Ward: MS-22079-15 and MS 22200-15. Dkt. No. 64-6 at 22-23. While Defendants concede that additional grievances were appealed to the Superintendent, Defendants claim that the remaining grievance responses were not issued by Ward and thus, Ward was not involved in the decision-making process or investigation regarding these grievances. These arguments are asserted by counsel in the Memorandum of Law, but notably absent from the record is any affidavit or declaration from Ward. Without such evidence, a factual dispute exists as to whether Ward proactively participated in the decision-making process related to Flynn's grievances. As such, there is triable issue of material fact for a jury to resolve with respect to Ward's personal involvement in Wellenstein's alleged retaliatory conduct. See Celotex Corp., 477 U.S. at 323. Accordingly, Defendants' motion against Ward on this ground should be denied.

*14 A different conclusion is reached however, with respect to Flynn's First Amendment claims based upon access to the courts. Absent an underlying constitutional violation by a subordinate, there can be no supervisory liability. Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see Elek v. Inc. Vill. of Monroe, 815 F.Supp.2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because plaintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability"). As discussed supra, Flynn failed to raise an issue of material fact with respect to his First Amendment claim based upon access to courts. Accordingly, the undersigned recommends that Defendants' motion for summary judgment and dismissal of Flynn's First Amendment claims against Ward based upon access to the courts be granted.

## D. Exhaustion

As an alternative ground for dismissal of the retaliation claims, Defendants contend that the motion for summary judgment must be granted because Flynn failed to exhaust his administrative remedies through available grievance procedures. See Dkt. No. 64-2 at 23-26. The PLRA requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006). "The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004) (citing Porter, 534 U.S. at 524-25). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " Mauldin v. Kiff, No. 11-CV-107-A, 2014 W L 2708434, at *4 (W.D.N.Y. June 16, 2014) (quoting Porter, 534 U.S. at 532). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as money damages. Porter, 534 U.S. at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

"The mere fact that an inmate plaintiff filed some grievance prior to filing suit is not enough. The grievance must also have related to the subject matter of the federal lawsuit." Allah v. Poole, 506 F. Supp. 2d 174, 180 (W.D.N.Y. 2007) (citation omitted). The scope of a plaintiff's federal claim may not exceed that of the grievance. Donahue v. Bennett, No. 02-CV-6430, 2004 WL 1875019, at *8 (W.D.N.Y. Aug. 17, 2004).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this district followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if the plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, the Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, 136 S. Ct. 1850, 1862 (2016). As such, the special circumstances exception previously promulgated by the Second Circuit in Hemphill, is no longer consistent with the statutory requirements of the PLRA. See Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

*15 Although the Supreme Court's decision in Ross eliminates the "special circumstances" exception promulgated by Hemphill, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

Here, there is no dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5 (2015). First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged action. Id. § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the full IGP committee must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent

within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

Flynn testified that he was familiar with the grievance process and filed "numerous" grievances in 2015. Dkt. No. 64-4 at 41-44. As discussed supra, the record contains copies of six (6) grievances that Flynn appealed to CORC and thus, Defendants concede, exhausted. [20] The record contains a certification attesting to the veracity of the grievance records. Dkt. No. 64-5 at 2.

With respect to the exhausted grievances, Defendants argue that Flynn's retaliation claims were not properly exhausted because these grievances did not contain allegations that Wellenstein retaliated against Flynn when he assaulted him and issued misbehavior reports. Dkt. No. 64-6 at 25-26. Defendants have not provided an affidavit from any DOCCS' employee with personal knowledge to support Defendants' contention that there is no connection between Flynn's grievances and the matters raised in the federal court complaint. Once again, Defendants rely upon the unsupported statements by counsel without evidentiary support. Upon review of the record, the undersigned finds that has exhausted his remaining retaliation claims. In the May 6, 2015 grievance, Flynn claimed that Wellenstein provided distorted copies of court forms and asserted, "[t]his is the 3rd time he has deliberately ruined copies to the point they are unusable. This is deliberate harassment and the denial of legal copies." Dkt. No. 64-5 at 21. In the May 8, 2015 grievance, Flynn claimed:

> **\*16** On 5/8/15 at 5:05 p.m. C.O. Wellenstein came to my cell and started kicking the cell door and slaming [sic] feed up door, verbally harassing me and making numerous threats. For months C.O. Wellenstein has been harassing me. As a result of his harassment I am

afraid to use the law library services and request legal material.

Dkt. No. 64-5 at 19.

On July 14, 2015, the Superintendent responded and categorized these claims as "retaliation" claims in response to filing prior complaints. Dkt. No. 64-5 at 22. The Superintendent conducted an investigation and interviewed Wellenstein. Id.

In the August 7, 2015 grievance, Flynn reiterated his harassment complaints claiming that, "Wellenstein has refused to make copies in retaliation for the 2 most recent grievances against him. His refusal to make copies is harassment[.]" Dkt. No. 64-5 at 26-28. On August 27, 2015, the Superintendent issued a response finding that the grievant "has not substantiated his claim that he has been the victim of harassment by staff[.]" Id. at 29. The Superintendent noted that Wellenstein denied the allegations. Dkt. No. 64-5 at 29. In his Appeal Statement, Flynn argued that Wellenstein continues to deter him from using the law library "in retaliation for filing grievances[.]" Id. On October 21, 2015, CORC issued a decision quoting Directive #4040, Section 701.6(b) related to prohibited "reprisals" against an inmate who utilizes the grievance process. [21] Id. at 24.

Drawing all inferences in Flynn's favor, the Court finds that the facts alleged in Flynn's grievances encompass the facts set forth in the Amended Complaint. See Curry v. Fischer, No. 02 Civ.4477, 2004 WL 766433, at \*8 (S.D.N.Y. Apr. 12, 2004). Accordingly, it is recommended that Defendants' Motion for Summary Judgment, insofar as it raises the affirmative defense of nonexhaustion, be denied.

### IV. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt. No. 64) be **GRANTED IN PART**:

(1) Insofar as it seeks dismissal of Flynn's First Amendment access to the courts claims against Wellenstein and Ward;

(2) Insofar as it seeks dismissal of Flynn's retaliation claims against Wellenstein and Ward related to misbehavior reports issued on August 1, 2015, August 17, 2015, August, 24, 2015, November 12, 2015, November 18, 2015, and December 11, 2015;

(3) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward for the April 30, 2015 assault; and

(4) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward for threats,

the motion be **GRANTED**; and it is further

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 64) be **DENIED IN PART**:

(1) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward based on access to courts and the misbehavior report issued on April 30, 2015; and

**\*17** (2) Insofar as it seeks dismissal of plaintiffs retaliation claims for access to the courts and the April 30, 2015 misbehavior report due to nonexhaustion, the motion be **DENIED**; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72. [22]

**All Citations**

Slip Copy, 2018 WL 3195095

Footnotes

1   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).
2   The Amended Complaint is not notarized and does not contain any statement from Flynn certifying the veracity of the document under the penalty of perjury.
3   Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.
4   Local Rule 7.1(a)(3) states:
    Summary Judgment Motions
    Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established.
    The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.
    Local Rule 7.1(a)(3).
5   Mid-State C.F. Facility Operations Manual No. 21.04 provided, in relevant part:
    3. Inmates in SHU areas may request, in writing, legal assistance from the Law Library.
    a. All requests for assistance must be sent to the Law Library Officer vi a facility mail and each request should document what kind of service is needed.

c. SHU inmates will only be allowed to have two (2) legal research resources in their possession at a time. Pick-up and delivery of legal materials will be made on a daily basis, Monday through Sunday.

Dkt. No. 20-1 at 17.

6 DOCCS Directive #4833 provided, in pertinent part:

Cell Study Services: Inmates prohibited by their confinement status from visiting the Law Library shall be allowed to study Law Library materials in their cells and obtain legal services normally available to general population inmates. Such inmates may request, in writing, a maximum of two items per day and these will be delivered, if available, within 24 hours of receipt of the request. Inmates may retain said legal materials for a period of not less than 16 hours nor more than 24 hours.

Dkt. No. 20-1 at 5.

7 The signature of the Superintendent is illegible.

8 See Footnote 8, supra.

9 See Footnote 7, supra.

10 See Footnote 7, supra.

11 See Footnote 7, supra.

12 See Footnote 7, supra.

13 The misbehavior report is not part of the record.

14 All unpublished opinions cited to by the undersigned in this Report-Recommendation are, unless otherwise noted, attached to this Report-Recommendation.

15 In light of my recommendation that Flynn's retaliation claim based upon threats be dismissed in its entirety based on the merits, I find it unnecessary to address the alternative failure to exhaust arguments related to this claim.

16 See Footnote 17, supra.

17 Defendants argue that a suspended sentence does not constitute an adverse action. Dkt. No. 64-6 at 18. Defendants claim, without evidentiary support, that Flynn did not serve keeplock or lose any privileges as a result of this misbehavior report. Id. The record before the Court establishes that the thirty day sentence was suspended until December 8, 2105. Dkt. No. 20-6 at 70. There is however, a genuine issue of fact regarding whether Flynn served the keeplock sentence. Construing the facts in a light most favorable to the pro se, non-moving party, the Court finds that Defendants have failed to meet their burden of proof with regard to this issue.

18 See Footnote 15, supra.

19 See Footnote 17, supra.

20 Flynn filed additional grievances, but the record does not contain proof that these grievances were exhausted. To wit, Flynn testified that "at least two or three" of his grievances "made it to Albany." Dkt. No. 64-4 at 46. Flynn could not recall which grievances were appealed and testified that while nothing prevented him from exhausting of all his grievances, he did not appeal certain grievances because they were "repetitive." Id.

21 Section 701.6(b) provides:

Reprisals prohibited. No reprisals of any kind shall be taken against an inmate or employee for good faith utilization of this grievance procedure. An inmate may pursue a complaint that a reprisal occurred through the grievance mechanism. A grievant shall not receive a misbehavior report based solely upon an allegedly false statement made by the inmate to the grievance committee.

N.Y. COMP. CODES R. & REGS. tit. 7, § 701.6.

22 If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2779751
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Jerry GRAYS, Plaintiff,

v.

ELMIRA CORRECTIONAL
FACILITY, et al., Defendant.

1:13-CV-00532 EAW
|
Signed June 26, 2017
|
Filed 06/27/2017

**Attorneys and Law Firms**

Jerry D. Grays, Coxsackie, NY, pro se.

George Michael Zimmermann, Office of the New York
State Attorney General, Buffalo, NY, for Defendant.

### DECISION AND ORDER

ELIZABETH A. WOLFORD, United States District
Judge

### INTRODUCTION

**\*1**  Plaintiff Jerry Grays ("Plaintiff") filed this action
on May 17, 2013. (Dkt. 1). Plaintiff filed an amended
complaint on November 10, 2015, alleging that his First,
Eighth, and Fourteenth Amendment rights were violated
after he was assaulted by various correctional officers and
denied medical treatment while incarcerated at the Elmira
Correctional Facility. (Dkt. 33). The case was referred to
United States Magistrate Judge Kenneth Schroeder, Jr.,
for disposition of all non-dispositive motions, and to hear
and report on dispositive motions for the consideration of
this Court pursuant to 28 U.S.C. § 636(b)(1). (*See* Dkt. 67).
On March 8, 2016, Defendants Amy Sechrist ("Sechrist")
and Brenda Zelko ("Zelko") filed a motion to dismiss.
(Dkt. 41). Zelko has since been terminated from this
action, (Dkt. 47), leaving Sechrist ("Defendant") as the
sole movant before the Court on this motion. Magistrate
Judge Schroeder filed a report and recommendation
("R&R") on April 3, 2017, recommending that this Court

grant the motion to dismiss. (Dkt. 68). Plaintiff filed timely
objections to the R&R, (Dkt. 73), and Defendant filed a
response (Dkt. 75).

For the reasons set forth below, this Court agrees with
the R&R's recommendation. Therefore, this Court hereby
adopts the R&R and the motion to dismiss is granted.
However, the Court clarifies that the First Amendment
retaliation claim is dismissed without prejudice, and
Plaintiff will be granted leave to amend his complaint to
further specify his claim for retaliation in accordance with
this Decision and Order.

### BACKGROUND

The factual background of this case is set forth in detail in
the R&R. (*See* Dkt. 68 at 2-4). Familiarity with the R&R
is assumed for purposes of this Decision and Order.

### DISCUSSION

**I. Standard of Review**
A district court reviews any specific objections to a report
and recommendation under a *de novo* standard. Fed. R.
Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C) ("A
judge of the court shall make a de novo determination of
those portions of the report or specified proposed findings
or recommendations to which objection is made."). To
trigger the *de novo* review standard, objections must
"specifically identify the portions of the proposed findings
and recommendations to which objection is made and the
basis for each objection." L.R. Civ. P. 72(b); *see, e.g.,
Molefe v. KLM Royal Dutch Airlines,* 602 F. Supp. 2d
485, 487 (S.D.N.Y. 2009). In the absence of a specific
objection, the district court reviews for clear error or
manifest injustice. *Singh v. N. Y. State Dep't of Taxation
& Fin.,* 865 F. Supp. 2d 344, 348 (W.D.N.Y. 2011).
Following review of the report and recommendation, the
district judge "may accept, reject, or modify, in whole or
in part, the findings or recommendations made by the
magistrate judge." 28 U.S.C. § 636(b)(1).

"To survive a motion to dismiss, a complaint must contain
sufficient factual matter, accepted as true, to 'state a
claim to relief that is plausible on its face.' " *Ashcroft v.
Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.
Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Rochester Drug Co-op., Inc. v. Biogen Idec U.S.,* 130 F. Supp. 3d 764, 769 (W.D.N.Y. 2015). "In defending against a motion to dismiss, 'a plaintiffs obligation ... requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.' " *Oldfield v. Vill. of Dansville,* 583 F. Supp. 2d 440, 442 (W.D.N.Y. 2008) (quoting *Twombly,* 550 U.S. at 555).

**\*2** In evaluating the complaint, a court must accept as true all of the plaintiff's factual allegations, and must draw all inferences in the plaintiff's favor. *Larkin v. Savage,* 318 F.3d 138, 139 (2d Cir. 2003). "Further, when the plaintiff proceeds *pro se,* as in this case, a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations." *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir. 2004). In addition, "[i]t is well-settled that *pro se* litigants generally are entitled to a liberal construction of their pleadings, which should be read to raise the strongest arguments that they suggest." *Green v. United States,* 260 F.3d 78, 83 (2d Cir. 2001) (internal quotations and citation omitted). Moreover, "a *pro se* litigant should be afforded every reasonable opportunity to demonstrate that he has a valid claim." *Satchell v. Dilworth,* 745 F.2d 781, 785 (2d Cir. 1984).

## II. First Amendment Retaliation Claims

Title 42 of the United States Code Section 1983 "imposes civil liability upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws." *Johnson-Schmitt v. Robinson,* 990 F. Supp. 2d 331, 339-40 (W.D.N.Y. 2013). "Section 1983 'is not itself a source of substantive rights.' It merely provides 'a method for vindicating federal rights elsewhere conferred ...' " *Patterson v. Cty. of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir. 2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 145 (1979)).

### A. Verbal Threats

Plaintiff does not explicitly allege a First Amendment cause of action for retaliation in his complaint. (*See* Dkt. 33 at ¶ 86 ("The [c]onstitutional basis for this claim under 42 U.S.C. [§] 1983 is: The Defendants' action of

cruel and unusual punishment, and that of deliberate indifference, violate Plaintiff's 8th and 14th Amendment's [sic] [c]onstitutional rights.")). Nonetheless, reading the complaint liberally, and affording Plaintiff the benefit of all reasonable inferences therein, it appears Plaintiff has attempted to raise a retaliation claim relating to Defendant's alleged verbal threats. (*See id.* at ¶¶ 43, 53). Specifically, Plaintiff alleges that Defendant overheard Plaintiff inform an inmate that he had been assaulted by several correctional officers, and in response, Defendant said: "Comments like that can get you hurt or killed around here." (*Id.* at ¶ 43). Subsequently, Defendant told another correctional officer that Plaintiff had mentioned the alleged assault to the other inmate, and Defendant stated: "You must not want to get out of here alive, keep your mouth shut." (*Id.* at ¶ 53).

Magistrate Judge Schroeder, reading Plaintiff's complaint to raise a First Amendment retaliation claim, recommends that this Court dismiss Plaintiff's First Amendment claim for retaliation. (*See* Dkt. 68 at 5-8). Plaintiff objects to this recommendation. (Dkt. 73 at 1-2). Plaintiff argues that: (1) filing a grievance is constitutionally protected conduct (*id.* at 1); (2) Defendant's allegedly retaliatory remarks were sufficiently threatening (*see id.* at 2); and (3) Defendant's statements caused Plaintiff to "be fearful of retaliation," (*id.*).

Due to the ease with which the facts underlying a retaliation claim may be fabricated or mischaracterized, "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). "Accordingly, plaintiffs in retaliatory motive cases must plead 'specific and detailed factual allegations which amount to a persuasive case' or 'facts giving rise to a colorable suspicion of retaliation.' " *Moore v. Peters,* 92 F. Supp. 3d 109, 120 (W.D.N.Y. 2015) (quoting *Johnson v. Eggersdorf,* 8 Fed.Appx. 140, 144 (2d Cir. 2001)). "[T]o sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir. 2004) (quoting *Dawes,* 239 F.3d at 492).

**\*3**  " 'Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation.' " *Moore,* 92 F. Supp. 3d at 120-21 (quoting *Amaker v. Fischer,* No. 10 Civ 0977A (SR), 2014 WL 8663246, at \*7 (W.D.N.Y. Aug. 27, 2014), *report and recommendation adopted,* No. 10 Civ 0977 (RJA), 2015 WL 1822541 (W.D.N.Y. Apr. 22, 2015)). Although "[u]nder some circumstances, verbal threats may constitute adverse action, depending on their degree of specificity and the context in which they are uttered," *Bumpus v. Canfield,* 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007), "verbal harassment, or even threats, are generally held not to rise to the level of adverse action that will support a First Amendment retaliation claim." *Rosales v. Kikendall,* 677 F. Supp. 2d 643, 648 (W.D.N.Y. 2010).

The Court agrees with the R&R that Defendant's alleged threats do not constitute a sufficient "adverse action" to state a claim for retaliation. (Dkt. 68 at 8). Here, the threats allegedly made by Defendant were broad allusions to possible future physical injury, which are insufficient to state a First Amendment claim for retaliation. *See, e.g., Kemp v. LeClaire,* No. 03 Civ 844S, 2007 WL 776416, at \*15 (W.D.N.Y. Mar. 12, 2007) (finding that threats of " 'your day is coming,' 'you'll be sent to your mother in a black box,' and 'you'll get your black ass kicked' " were "insufficient to establish a constitutional violation"); *Bartley v. Collins,* No. 95 Civ 10161 (RJH), 2006 WL 1289256, at \*6 (S.D.N.Y. May 10, 2006) ("Even if [the] plaintiff's deposition testimony were deemed sufficiently specific, verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action." (footnote omitted)); *Alicea v. Howell,* 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) (finding that the defendant's "alleged statements to [the] plaintiff about there being 'no secrets in prison' and that [the] plaintiff would 'have to pay the consequences' for filing a grievance against [the defendant] do not give rise to a First Amendment retaliation claim"). The instant allegations are nothing more than general and undefined threats of future harm. *See, e.g., Bumpus v. Canfield,* 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007) ("[V]ague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim."). The alleged threats here—"Comments like that can get you hurt or killed around here," and "You must not want to get out of here

alive, keep your mouth shut" (Dkt. 33 at ¶¶ 43, 53)—were sufficiently opaque that any First Amendment deterrent effect was considerably softened. *See* Dkt. 68 at 8; *see, e.g., Mateo v. Fischer,* 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010). As such, Plaintiff's alleged verbal threats fail to state a First Amendment claim for retaliation.

### B. Grievance Petition

Plaintiff also alleges that he requested a grievance form from Defendant, who denied this request. (Dkt. 33 at ¶ 63). Subsequently, Plaintiff handed Defendant a hand-written grievance petition, (*id.*), but when it was returned to Plaintiff, Defendant stated: "Your complaint was unfounded on the grounds there is no proof," (*id.* at ¶ 67). Plaintiff then signed the petition and indicated to Defendant that he did not accept her response and wished to appeal. (*Id.*). Plaintiff has not received a response to his grievance since then. (*Id.*). The R&R does not address Defendant's alleged failure to properly file the grievance under a First Amendment retaliation analysis, but giving the complaint a liberal construction, and affording Plaintiff the benefit of all reasonable inferences therein, this Court finds that Plaintiff has attempted to raise such a claim here. (*See id.* at ¶¶ 63, 67; *see also* Dkt. 52 at 4).

**\*4**  Plaintiff cites to *Colon v. Coughlin,* 58 F.3d 865 (2d Cir. 1995) for the proposition that the filing of a grievance petition is constitutionally protected conduct. (Dkt. 73 at 1). Viewed in isolation, Plaintiff is correct in reciting this statement of law. *See, e.g., Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003); *Colon,* 58 F.3d at 872. Nevertheless, Plaintiff's amended complaint fails to allege a retaliatory reason for the denial or otherwise unresponsive action to his grievance petition. *See, e.g., Bennett,* 343 F.3d at 137 ("In order to prevail on his retaliation claims, [the plaintiff] bears the burden of showing that ... the conduct was a substantial or motivating factor for the adverse actions taken by prison officials."). Indeed, it was only in his response to Defendant's motion that Plaintiff alleges that Defendant "denied [him] a grievance form as retaliation for expressing his desire to file criminal charges and a claim against [the correctional officers]" involved in the alleged assault. (Dkt. 52 at 4). The amended complaint includes no allegation of causation that would connect Plaintiff's statement—that he wished to file a complaint and criminal charges—(Dkt. 33 at ¶¶ 50-51), with Defendant's refusal to allow Plaintiff access to the grievance process. *See generally Moore,* 92 F.

Supp. 3d at 120; *Anderson v. Lapolt*, No. 07 Civ 1184 (DNH), 2009 WL 3232418, at *5 (N.D.N.Y. Oct. 1, 2009) ("A plaintiff cannot state a retaliation claim in wholly conclusory terms, but rather, must provide a pleading that is 'supported by specific and detailed factual allegations.' " (quoting *Friedl v. N.Y.C.,* 210 F.3d 79, 85-86 (2d Cir. 2000))).

A plaintiff has "no constitutionally protected right to file a criminal complaint," *Lane v. Carpinello,* No. 07 Civ 751 (GLS)(DEP), 2009 WL 3074344, at *27 (N.D.N.Y. Sept. 24, 2009); *see Hayes v. Cty. of Sullivan,* 853 F. Supp. 2d 400, 433 (S.D.N.Y. 2012) ("[C]ourts in the Second Circuit have long held that an individual has no constitutionally protected right to an investigation by government officials of alleged wrongdoing by other government officials."); *Lewis v. Gallivan,* 315 F. Supp. 2d 313, 316 (W.D.N.Y. 2004) ("There is ... no constitutional right to an investigation by government officials, and no instance where the courts have recognized inadequate investigation as sufficient to state a civil rights claim unless there was another recognized constitutional right involved." (quotations and citations omitted)).

However, "[w]ithin the prison context, a common form of constitutionally protected speech is the filing of a lawsuit or inmate grievance." *Muhammad v. Reeves,* No. 08 Civ 182 (JTC), 2012 WL 5617113, at *7 (W.D.N.Y. Nov. 15, 2012) (citing *Bennett,* 343 F.3d at 137). Nonetheless, a "[p]laintiff [ ] cannot amend [his] complaint by asserting new facts or theories for the first time in opposition to [the d]efendants' motion to dismiss." *K.D. ex rel. Duncan v. White Plains Sch. Dist.,* 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y. 2013); *see, e.g., Uddoh v. United Healthcare,* No. 16 Civ 1002 (BMC)(LB), 2017 WL 2242870, at *4 (E.D.N.Y. May 22, 2017).

In its present state, Plaintiff's amended complaint does not state claim for retaliation in anything other than conclusory terms, and any specific allegation of retaliation was raised for the first time in his opposition to Defendant's motion to dismiss. Even still, "a *pro se* litigant should be afforded every reasonable opportunity to demonstrate that he has a valid claim," *Satchell v. Dilworth,* 745 F.2d 781, 785 (2d Cir. 1984), and "[w]here a *pro se* complaint fails to state a cause of action, the court generally 'should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a

valid claim might be stated.' " *Salgado v. NYS Dep't of Corr. & Cmty. Supervision,* No. 13 Civ 1108 (RJA) (MJR), 2016 WL 6311296, at *12 (W.D.N.Y. Sept. 15, 2016) (quoting *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000)), *report and recommendation adopted Antonio Salgado, Jr., No. 09 A-1863 v. N.Y. State Dep't of Corr. & Cmty. Supervision,* No. 13 Civ 1108A, 2016 WL 6298517 (W.D.N.Y. Oct. 27, 2016). Thus, this Court dismisses Plaintiff's First Amendment claim for retaliation as it relates to Defendant's alleged interference with proper grievance procedures without prejudice. Plaintiff will be granted leave to amend his complaint to provide more specific allegations in an attempt to adequately state such a claim.

### III. Eighth Amendment Claim

**\*5** Magistrate Judge Schroeder recommends that this Court dismiss Plaintiff's Eighth Amendment claim as against Defendant because Plaintiff did not allege any physical harm arising from Defendant's conduct. (*See* Dkt. 68 at 9). Plaintiff did not specifically object to this aspect of the R&R, and as a result, he has waived his right to *de novo* review pursuant to 28 U.S.C. § 636(b)(1). *See United States v. Male Juvenile,* 121 F.3d 34, 38-39 (2d Cir. 1997). The Court has reviewed the initial motion papers and fully agrees with the R&R's conclusion that Defendant's alleged verbal threat with no resulting physical injury is insufficient to state an Eighth Amendment claim and, therefore, for the reasons set forth more fully in the R&R, Plaintiff's Eighth Amendment claim against Defendant is dismissed with prejudice.

### IV. Fourteenth Amendment Due Process Claim

Magistrate Judge Schroeder also recommends that this Court dismiss Plaintiff's Fourteenth Amendment Due Process claim as against Defendant because Plaintiff does not allege a violation of a constitutional right. (*See* Dkt. 68 at 9-10). Plaintiff objects to this ruling, and argues that he has a due process right to the proper filing of his grievance because it was required in order to exhaust his administrative remedies. (*See* Dkt. 73 at 2). This Court agrees with the R&R.

Although Plaintiff may be required to exhaust the administrative remedies available to him, *see Ross v. Blake,* 136 S. Ct. 1850, 1855 (2016), not all administrative remedies enshrine constitutional requirements. "It is well established ... that inmate grievances procedures are

2017 WL 2779751

undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim." *Swift v. Tweddell,* 582 F. Supp. 2d 437, 445-46 (W.D.N.Y. 2008); *see, e.g., Dolberry v. Levine,* 567 F. Supp. 2d 413, 416 (W.D.N.Y. 2008). Plaintiff's allegations imply that Defendant discarded his grievance and interfered with his attempt to seek relief through that administrative process. This does not raise a claim of due process, but instead, it might have bearing on whether the filing of a grievance complaint was an administrative remedy actually available to him. *See Ross,* 136 S. Ct. at 1859-60 (outlining that grievance procedures are unavailable when, inter alia, officers are "unable or consistently unwilling to provide any relief to aggrieved inmates" or "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation").

As discussed above in relation to Plaintiff's Eighth Amendment claim, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir. 1993); *see, e.g., Ladeairous v. Attorney Gen. of the State of N. Y.,* No. 14 Civ 0250 (GTS)(CFH), 2014 WL 12649838, at *7 (N.D.N.Y. June 4, 2014) ("[A]n opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile."). Since the denial of grievance procedures fails to establish a constitutional violation, the Court concludes that Plaintiff is unable to further amend the amended complaint to state a valid cause of action. *See, e.g., Cuoco,* 222 F.3d at 112; *Richard,* 126 F. Supp. 3d at 339-40; *McCree,* No. 14 Civ 5201

(JPO), 2015 WL 4299546, at *6. Accordingly, Plaintiff's Fourteenth Amendment Due Process claim as against Defendant will be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the Court adopts the R&R and Defendant's motion to dismiss is granted. Plaintiff's Eighth and Fourteenth Amendment claims are dismissed with prejudice. Plaintiff's First Amendment retaliation claim is dismissed without prejudice, and Plaintiff is granted leave to file an amended complaint only as directed above **within thirty (30) days** of the filing of this Decision and Order. If Plaintiff does not file an amended complaint as directed above, his First Amendment claim for retaliation is dismissed with prejudice. Plaintiff is advised that an amended complaint is intended to <u>completely replace</u> the prior complaint in the action, and thus it "renders [any prior complaint] of no legal effect." *Int'l Controls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir. 1977); *see, e.g., Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994). Therefore, Plaintiff's amended complaint must include all necessary allegations so that it may stand alone as the sole complaint in this action. Moreover, Plaintiff is reminded that leave to amend is only granted with respect to a First Amendment claim for retaliation pertaining to the grievance petition, consistent with this Decision and Order.

**\*6** SO ORDERED.

## All Citations

Slip Copy, 2017 WL 2779751

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

***MEMORANDUM DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"),
against numerous employees of New York State or the
Central New York Psychiatric Center ("Defendants"),
are Plaintiff's motion to proceed *in forma pauperis,* his
motion for a temporary restraining order and preliminary
injunction, and his motion for appointment of counsel.
(Dkt.Nos.2, 3, 4.) [1] For the reasons set forth below,
Plaintiff's motion to proceed *in forma pauperis* is granted;
his motion for a preliminary injunction is denied; his
motion for appointment of counsel is denied; Plaintiff's
claims of deliberate indifference to his mental health
needs against Defendants Bill, Carver and DeBroize are
*sua sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged
personal involvement in the August 8, 2011 assault are

*sua sponte* dismissed without prejudice and with leave to
amend in this action in accordance with Fed.R.Civ.P.
15; Sgt. Sweet is *sua sponte* dismissed without prejudice
as a Defendant in this action; the Clerk is directed to
issue summonses, and the U.S. Marshal is directed to
effect service of process on Defendants Davis, Sill, and
Nicolette.

## I. RELEVANT BACKGROUND

On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with
a motion to proceed *in forma pauperis.* (Dkt. Nos.1,
2.) [2] Liberally construed, Plaintiff's Complaint alleges
that the following constitutional violations against him
occurred during his confinement at Central New York
Psychiatric Center ("CNYPC"): (1) Defendants Davis and
Sill used excessive force against him under the Eighth
and/or Fourteenth Amendments; (2) Defendant Nicolette
knew of and failed to take action to protect Plaintiff
from the assault under the Eighth and/or Fourteenth
Amendments; (3) Defendants Bill, Carver, and DeBroize
were deliberately indifferent to his mental health needs
under the Eighth and/or Fourteenth Amendments;
and (4) Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, Bosco, and Hogan failed to "adequately
train the staff under their supervision" and to take
appropriate action in response to the incident. (*See
generally* Dkt. No. 1.) For a more detailed description of
Plaintiff's claims, and the factual allegations giving rise to
those claims, the reader is referred to Part III.B of this
Decision and Order.

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the
Court finds that Plaintiff may properly commence this
action *in forma pauperis.* (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

In light of the foregoing, the Court must now review the
sufficiency of the allegations that Plaintiff has set forth in
his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is
because Section 1915(e)(2)(B) directs that, when a plaintiff
seeks to proceed *in forma pauperis,* "(2) ... the court shall
dismiss the case at any time if the court determines that
—... (B) the action ... (i) is frivolous or malicious; (ii) fails
to state a claim on which relief may be granted; or (iii)

2012 WL 651919

seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

**A. Governing Legal Standard**

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–

61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[6]

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at \*7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the

Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at \*15–16 (N.D.N.Y. filed Nov. 18, 2009).[7]

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that

Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

*5 To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily

2012 WL 651919

committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

 **\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading. [10] Rather, this claim is hereby dismissed with prejudice.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible

connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at \*9 (N.D.N.Y. Feb.4, 2011). [13]

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court— to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that*

Groves v. Davis, Not Reported in F.Supp.2d (2012)

2012 WL 651919

may not incorporate by reference any portion of the original Complaint. *See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at \*3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at \*2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at \*2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at \*2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future

2012 WL 651919

wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

 **\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case,

> the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case.[14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10  ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is ***GRANTED;*** [15] and it is further

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is ***DENIED;*** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is ***DENIED* without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte **DISMISSED*** **with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte **DISMISSED* without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte **DISMISSED*** **without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis,

Sill and Nicolette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

Footnotes

1    This is the fourth civil rights action filed by Plaintiff in this District. Generally, two of these actions arose out of Plaintiff's refusal to consent to a strip search and the subsequent actions taken against Plaintiff as a result of his refusal. *See Groves v. New York,* 09–CV–0406, Decision and Order (N.D.N.Y. filed May 11, 2009) (Hurd, J.) (*sua sponte* dismissing complaint pursuant to 28 U.S.C. § 1915[e][2][B] ); *Groves v. The State of New York,* 9:09–CV–0412, Decision and Order (N.D.N.Y. filed Mar. 26, 2010) (Sharpe, J.) (granting defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12[b][6] ).

The third action alleged numerous violations of Plaintiff's constitutional rights during the period July 23, 2009, and August 26, 2009, and was dismissed without prejudice upon Plaintiff's request in October, 2010. *See Groves v. Maxymillian,* 9:09–CV–1002, Decision and Order (N.D.N.Y. filed Oct. 8, 2010) (Suddaby, J.). As a result, it does not appear that the current action is barred because of res judicata, collateral estoppel, and/or the rule against duplicative litigation.

2      At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

3      The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

4      *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

5      *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

6      It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

7      *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

8      Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

9      Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

10     The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not

2012 WL 651919

an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

11    *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

12    *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

13    *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

14    For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

15    Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

---

**End of Document**                                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 2844408
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

William HEPWORTH, Plaintiff,

v.

SUFFOLK COUNTY, Suffolk County Correction
Officers Steven Campitello and George Campatella,
Sergeant Allen, Suffolk County Correction Officers
who worked yards 4 and 5 on the 7am to 3pm tour
and yard 1-2-3 on August 5, 2002, Defendants.

No. 2:02-CV-6473 ENV/ETB.
|
Sept. 29, 2006.

**Attorneys and Law Firms**

William Hepworth, Fishkill, NY, pro se.

John Wyman Cobb, Cobb & Cobb, Esqs., Tuxedo, NY,
for Plaintiff.

Robert A. Caccese, Suffolk County Attorney's Office,
Hauppauge, NY, for Defendants.

ORDER

VITALIANO, D.J.

**\*1** On May 5, 2005, defendants moved for summary
judgment on two grounds: (i) plaintiff's failure to exhaust
administrative remedies; and (ii) plaintiff's failure to state
a claim cognizable under 42 U.S.C. § 1983. By order
dated April 6, 2006, District Judge Dora Irizarry referred
the motion to Magistrate Judge E. Thomas Boyle. On
August 1, 2006, Magistrate Judge Boyle issued a report
and recommendation recommending that the Court deny
defendants' motion for summary judgment. Defendants'
have not subsequently filed objections.

When reviewing a magistrate's report and
recommendation, this Court "may accept, reject, or
modify, in whole or in part, the findings and
recommendations...." 28 U.S.C. § 636(b)(1)(C). When,
as here, no timely objection has been made to the
report and recommendation, this Court "need only satisfy

itself that there is no clear error on the face of the
record." Urena v. New York, 160 F.Supp.2d 606, 609-10
(S.D.N.Y.2001) (quoting Nelson v. Smith, 618 F.Supp.
1186, 1189 (S.D.N.Y.1985)).

After careful review of all the evidence in the
record, this Court finds Magistrate Boyle's report and
recommendation to be correct, comprehensive, well-
reasoned, and free of any clear error. The Court, therefore,
adopts the report and recommendation in its entirety as
the opinion of the Court. Accordingly, for the reasons
stated therein, defendants' motion for summary judgment
is denied.

Counsel are directed to submit a joint pre-trial order, in
accordance with this Court's individual motion practices
and rules, by October 29, 2006. A final pre-trial conference
will be held on November 3, 2006 at 11 a.m. in Courtroom
# 6 of the United States Federal Courthouse, located at
225 Cadman Plaza East, Brooklyn, New York 11201.

SO ORDERED.

*REPORT AND RECOMMENDATION*

E. THOMAS BOYLE, Magistrate J.

Plaintiff William Hepworth ("Hepworth") brings this civil
rights action under 42 U.S.C. § 1983 ("Section 1983")
alleging that Corrections Officer Steven Campitello and
others used unreasonable and excessive force against him
at Riverhead Correctional Facility. Defendants now move
for summary judgment pursuant to Federal Rules of Civil
Procedure 56(c) seeking to dismiss the complaint on two
grounds: (1) failure to exhaust administrative remedies;
and (2) failure to state an actionable claim under Section
1983.

I. *BACKGROUND*

A. *The Alleged Assaults*
Hepworth was an inmate at the Suffolk County
Correctional Facility in Riverhead from May 25, 2002
through April 16, 2003. (Pl.'s Rule 56.1 Statement ¶ 1;
Defs.' Rule 56.1 Statement ¶¶ 1, 5.) Hepworth alleges that
on or about August 5, 2002, while he was in custody,
a fight broke out among inmates in one of the exercise
yards. (Pl.'s Am. Compl. ¶ 8.) Plaintiff alleges that he

was not involved in the altercation, but was nevertheless subject to disciplinary actions. (*Id.*) Plaintiff alleges that at the time of the fight, he was seized and handcuffed by the correction officer defendants. (*Id.*) According to Hepworth, defendant Steven Campitello ("Campitello"), a corrections officer, grabbed him around the throat and said "this is what happens to people who testify against corrections officers," in apparent reference to events that occurred in 1991, when plaintiff testified in federal court as a witness against other corrections officers employed by Suffolk County. (*Id.* ¶¶ 9-10.) Plaintiff alleges that he was then beaten by defendant Campitello and other officers, and as a result, suffered severe bodily injuries including bruising and contusions to the face, head, body, legs, ribs and shoulders, a wound to the right wrist, two black eyes, two broken teeth, and nerve damage to the right hand. (*Id.* ¶¶ 10-14.) Plaintiff further alleges that following the August 5, 2002 incident, he was "subject to a campaign of harassment and assault," including physical assaults by defendant Campitello on or about September 28, 2002 and October 22, 2002; verbal threats to plaintiff and his wife at the visitor's room at the Riverhead Correctional Facility on or about September 7, 2002; and threats to plaintiff that if defendant Campitello was disciplined, plaintiff would be beaten or killed. (*Id.* ¶ 14.)

**\*2** Plaintiff states that on August 6, 2002, he filled out a grievance form concerning the August 5, 2002 incident. (Pl.'s Aff. ¶ 5.) However, according to plaintiff, when he gave the form to an officer to be submitted, the officer ripped it into pieces and threw it in the trash can, telling plaintiff that he could not file a complaint, and that if plaintiff tried to do it again, he would get another beating. (*Id.*) Plaintiff states that he was frightened by the threat so he did not attempt to file another in-house grievance, but he wrote letters of complaint to the United States Attorney General, the New York State Attorney General, the New York State Police Headquarters, the Inspector General of the New York State Department of Correctional Services, the Special Counsel of the State of Correction Executive Department, and the New York State Grievance Committee for the Tenth Judicial District. (*Id.* ¶¶ 6-7; Pl.'s Am. Compl. ¶ 16.) Plaintiff states that he also contacted the Suffolk County Correctional Facility's Internal Affairs Bureau ("SCCF Internal Affairs Bureau") to file a complaint, and that he was interviewed and photographed by the SCCF Internal Affairs Bureau. (Pl.'s Aff. ¶ 4.)

## B. *New York Department of Correctional Services Grievance Procedures*

In their motion for summary judgment, defendants contend that Hepworth failed to exhaust his administrative remedies. (Defs.' Mem. of Law in Supp. of Mot. for Summary Judgment ("Defs.' Mem. in Supp.") at 1.) In support of their motion, defendants submitted an affidavit from Donna Ketonen ("Ketonen"), Executive Officer of the Grievance Evaluation Unit at the Suffolk County Correctional Facility, explaining the correctional facility's grievance procedures. (Affidavit of Donna Ketonen, dated March 21, 2005 ("Ketonen Aff.").) Ketonen states that prisoners who seek administrative review of a grievance are directed to follow the procedures set forth in the Suffolk County Correctional Facility Rules & Regulations book (the "Rules book"), which prisoners receive upon entering the jail. (*Id.* ¶ 3. *See also* Booking Sheet Receipt, annexed as Exh. A. to Affirmation of Arlene S. Zwilling, dated March 23, 2005 ("Zwilling Aff.").) The Rules book directs inmates with a complaint or problem to first attempt to get it resolved with the officer assigned to the inmate's housing unit. (Suffolk County Correctional Facility Rules & Regulations, annexed as Exh. B to Zwilling Aff., at 15-16.) If that effort is unsuccessful, the inmate may request and will receive a grievance form to fill out. (*Id.*) The Rules book states that the grievance will be investigated and the inmate will receive a written determination from the grievance coordinator within 5 business days. (*Id.*) If the inmate is not satisfied with the grievance coordinator's decision, the inmate may appeal to the Chief Administrative Officer, and, if still unsatisfied, to the State Commission of Correction. (*Id.*) Ketonen stated in her affidavit that Hepworth filed no grievances pursuant to the Inmate Grievance Program in the period May 25, 2002 through April 16, 2003. Defendants argue that because plaintiff submitted no evidence that he prepared the grievance, plaintiff has failed to raise a factual issue regarding his attempt to file a grievance. (Defs.' Mem. at 4.) However, plaintiff alleges that a corrections officer ripped up the grievance and threw it away. The destruction of the grievance by a corrections officer is a plausible explanation for plaintiff's failure to submit the grievance as evidence.[1] Defendants submitted no affidavits from corrections officers disavowing plaintiff's version of events.

**\*3** Regardless, plaintiff does not dispute that he did not file any grievances with the correction facility-the essence of plaintiff's claim is that when he attempted to file a grievance about the August 5, 2002 incident, he was prevented from doing so and threatened not to make another attempt to file a grievance. Plaintiff states that he heeded the threat, and instead wrote letters of complaint to government officials removed from the internal grievance process. In opposition to defendant's motion, plaintiff submitted a copy of a letter dated August 23, 2002, addressed to "To Whom it May Concern," detailing the August 5, 2002 incident. (Declaration of John Cobb, dated April 12, 2005 ("Cobb Decl."), Exh. 8.) Plaintiff states that this is a copy of the letter of complaint he sent to the aforementioned governmental officials. (Pl.'s Aff. ¶ 7.) Plaintiff also submitted a letter dated October 1, 2002 to Sheriff Tisch of the Suffolk County Sheriff's Office from Alan J. Croce, Chairman/ Commissioner of the State Commission of Correction, directing the sheriff's office to investigate Hepworth's complaint of assaults by officers on several occasions. (Cobb Decl., Exh. 9.) Plaintiff states that apart from his interview with the Suffolk County Correctional Facility's Internal Affairs Bureau, nothing resulted from his letters of complaint. (Pl.'s Aff. ¶¶ 4, 8.)

## II. DISCUSSION

### A. *Legal Standard for Summary Judgment*

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden is on the moving party to establish the lack of any factual issues. *See id.* Summary judgment is not appropriate where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The inferences to be drawn from the underlying facts are to be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When the moving party has carried its burden, the party

opposing the summary judgment motion must do more than simply show that "there is some metaphysical doubt as to the material facts." *Id.* at 586. Under Rule 56(e), the party opposing the motion "may not rest upon the mere allegations or denials of his pleadings, but ... must set forth specific facts showing there is a genuine issue for trial." *Anderson,* 477 U.S. at 248.

By its terms, Rule 56 does not require the district court judge to make any findings of fact. *See Anderson,* 477 U.S. at 250. The only inquiry to be performed is the determination of whether there is a need for trial. *See id.* The court's principal analysis on a motion for summary judgment is to ascertain whether there are any "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.*

### B. *Availability of Administrative Remedies under the PLRA*

**\*4** The Prison Litigation Reform Act ("PLRA") states that "no action shall be brought with respect to prison conditions under Section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement "applies to all inmate suits about prison life whether they involve general circumstances or particular episodes and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). *See also Woodford v. Ngo,* --- U.S. ----, ----, 126 S.Ct. 2378, 2383, 165 L.Ed.2d 368 (2006). Accordingly, a defendant may raise "failure to exhaust" as an affirmative defense, as defendants here did. (Defs.' Answer to Am. Compl. ¶ 15.)

In 2004, the Second Circuit Court of Appeals issued a series of opinions addressing the PLRA's exhaustion requirement. *See Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004); *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004); *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (collectively, the "2004 Second Circuit exhaustion cases"). In *Hemphill v. New York* 380 F.3d 680, the Second Circuit held that in some circumstances, despite the exhaustion requirement under the PLRA, "the behavior of the defendants may render administrative remedies unavailable." *Hemphill,* 380 F.3d 680, 686 (2d Cir.2004).

The court set forth a three-part inquiry to be applied in cases where a prisoner plausibly seeks to counter defendants' contention that the prisoner failed to exhaust administrative remedies under the PLRA. *Id.* When faced with such circumstances, a district court should examine: (1) whether administrative remedies were in fact "available" to the prisoner; (2) whether the defendants may have forfeited the affirmative defense of non exhaustion by failing to raise or preserve it; or (3) whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop the defendants from raising the plaintiff's failure to exhaust as a defense. *Id.* (citations omitted). Furthermore, the Second Circuit held that "[i]f the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements." ' *Hemphill,* 380 F.3d at 686 (citing *Giano v. Goord,* 380 F.3d 670). *See also Brownell v. Krom,* 446 F.3d 305, 312 (2d Cir.2006) (finding that special circumstances, specifically, prison officials' erroneous interpretation of administrative regulations, justified prisoner's failure to exhaust administrative remedies).

 **\*5** Here, the defendants failed to address *Hemphill* in their memorandum of law in support of their motion for summary judgment, instead arguing simply that Ketonen's affidavit demonstrates that Hepworth never filed any grievances during the period of his incarceration, and therefore, Hepworth's failure to exhaust his administrative remedies bars his claim. (Defs.' Mem. of Law in Supp. of Mot. for Summary Judgment ("Def.'s Mem. in Supp."), at 2-3.)

In opposition to defendants' motion, plaintiff argues that he attempted to follow the established grievance procedures but was prevented from doing so by prison correction officers. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summary Judgment ("Pl.'s Mem. in Opp'n"), at 4-5.) Plaintiff also argues that defendants should be estopped from raising failure to exhaust as an affirmative defense (*id.* at 8), and that special circumstances justified plaintiff's failure to comply with administrative procedures (*id.* at 7-8). The standard (and consequences) of plaintiff's claims of unavailability, estoppel, and justification differ. *Hemphill,* 380 F.3d

at 688. Accordingly, each argument must be analyzed separately, with the recognition that the same facts may fit into more than one of these categories. *See Giano v. Goord,* 380 F.3d at 677 n. 6 (observing that the case law on the PLRA's exhaustion requirement does not always distinguish clearly between the three categories, i.e., unavailability, estoppel, and justification, because the facts may sometimes fit into more than one category).

1. *Whether Administrative Remedies Were In Fact Available to the Plaintiff*

Where a prison nominally provides grievance procedures that may be utilized by inmates claiming excessive force, and the inmate plaintiff argues that the procedures were effectively unavailable to him because of threats of retaliation, the court must determine whether the ordinary grievance procedures were in fact rendered unavailable. "The test for determining whether ordinary grievance procedures were available to an inmate is an objective test and asks whether a 'similarly situated individual of ordinary firmness' [would] have deemed them available." *Dukes v. S.H.U. C.O. John Doe # 1,* No. 03 Civ. 4639, 2006 WL 1628487, at \*4 (S.D.N.Y. June 12, 2006) (quoting *Hemphill,* 380 F.3d at 688) (brackets in original). To the extent that the court finds that a plaintiff lacked "available" administrative remedies, "the PLRA's exhaustion requirement is inapplicable." *Hemphill,* 380 F.3d at 686. *See also Arnold v. C.O. A. Goetz,* 245 F.Supp.2d 527, 537 (S.D.N.Y.2003) (stating the general principle that "an inmate's technical failure to exhaust administrative remedies before commencing a § 1983 action may be excused where officials prevented him from utilizing a grievance procedure").

Here, defendants argue that the traditional grievance procedures were not rendered unavailable because plaintiff was able to file a complaint with Suffolk County Correctional Facility Internal Affairs Bureau, in addition to writing letters to state and federal government officials. (Defs.' Reply Mem. of Law at 5.) The Second Circuit explicitly rejected this line of reasoning in *Hemphill.* In *Hemphill,* a case which presented facts similar to those herein, the plaintiff, Hemphill, alleged that while he was incarcerated at a correctional facility in New York, he was assaulted and beaten by corrections officers. *Hemphill,* 380 F.3d 680 at 683-84. Hemphill alleged that he was threatened with further assaults if he reported the beating so he did not file a grievance through the facility's formal grievance program. *Id.* Instead, he wrote a letter to

the facility superintendent, and subsequently brought a Section 1983 suit against the correction officers and other defendants. *Id.* The defendants argued since Hemphill sent a letter to the superintendent and subsequently filed suit, he was not sufficiently frightened so as to render normal grievance procedures unavailable. *Id.* at 688. The court rejected this argument, holding:

> **\*6** Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts. This may be so, if for no other reason, because seeking a criminal investigation or filing a civil rights complaint may enable an inmate to draw outside attention to his complaints, thereby neutralizing threatened retaliatory conduct from prison employees.

*Id.*

Here plaintiff alleges that he was physically assaulted in retaliation for previously testifying against corrections officers, and that he was threatened with further violence if he reported anything about the assault. Assuming all inferences in a light most favorable to the plaintiff, it may be that corrections officers impeded plaintiff's attempt to use the grievance process, and that the officers' actions were such that a person of ordinary firmness would be deterred from using the facility's internal grievance process. Therefore, there exists as material issue of fact as to whether the normal grievance procedures were "available" to Hepworth. *Larry v. P. Byno,* No. 01 CV 1574, 2006 WL 1313344, at \*4 (N.D.N.Y. May 11, 2006) (finding that if the allegation of physical assault and threats of violence are true, it is plausible that a person of ordinary firmness would be deterred from using the grievance process); *McCullough v. T. Burroughs,* No. 04-CV-3216, 2005 WL 3164248, at \*4 (E.D.N.Y. Nov.29, 2005) (denying summary judgment where issue of fact existed as to whether threats rendered a prison's normal grievance process unavailable to plaintiff); *Martinez v. Richard Augustine,* No. 02-CV-0579, 2004 U.S. Dist.

LEXIS 17972, at \*10-11 (W.D.N.Y. Sept.2, 2004) (same); *Palmer v. Goss,* No. 02 Civ. 5804, 2003 U.S. Dist. LEXIS 18103, at \*16-17 (S.D.N.Y.2003) (denying summary judgment where plaintiff took reasonable steps to vindicate his claim through formal grievance procedures, and only "desist [ed] when it appeared to him that [a corrections officer] had intentionally destroyed evidence that supported his version of the incident and significantly deprived him of any possibility of relief through the grievance procedure").

### 2. *Whether The Alleged Threats Should Estop the Defendants From Raising the Affirmative Defense of Non-Exhaustion*

In *Ziemba v. Wezner,* 366 F.3d 161, the Second Circuit held that in cases under the PLRA, "the affirmative defense of exhaustion is subject to estoppel." *Ziemba,* 366 F.3d 161, 163-64 (2d Cir.2004) (adopting holding of *Wright v. Hollingsworth,* 260 F.3d 357, 358 n. 2 (5th Cir.2001)). To establish equitable estoppel, the party claiming estoppel must demonstrate: "(1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment." *McCullough v. T. Burroughs,* No. 04-CV-3216, 2005 WL 3164248, at \*4 (E.D.N.Y. Nov.29, 2005). In addition, when asserting equitable estoppel against the government, "one must also prove affirmative misconduct." *Id.*

**\*7** Plaintiff alleges that the officer who ripped up the grievance plaintiff filed concerning the August 5, 2002 incident told plaintiff that he could not file a grievance, and that if he attempted to do so again, plaintiff would receive another beating. This officer is unnamed in plaintiff's affidavit, and it is unclear if this officer is one of the "John Doe" defendants in plaintiff's complaint (listed in the caption as "Suffolk County Correction Officers who worked yards 4 and 5 on the 7am to 3pm tour and yard 1-2-3 on August 5, 2002"). Plaintiff also alleges that defendant Campitello and other officers told him on numerous occasions that if Campitello was disciplined, plaintiff would be beaten or killed. (Pl.'s Am. Compl. ¶ 14(c).) Based on these allegations, a factfinder might conclude that it was reasonable for Hepworth to rely on these threats by Campitello and other officers and refrain from any further attempt to file a grievance concerning Campitello's conduct. If so, Campitello and the other officers would be estopped from raising the defense of non-exhaustion. *McCullough v. T. Burroughs,* No. 04-CV-3216, 2005 WL 3164248, at \*4 (E.D.N.Y.

Case 9:16-cv-01211-GTS-TWD    Document 72    Filed 08/09/18    Page 147 of 338
Hepworth v. Suffolk County, Not Reported in F.Supp.2d (2006)
2006 WL 2844408

Nov.29, 2005) (denying summary judgment and finding that defendant may be estopped from raising exhaustion as an affirmative defense where defendant officer allegedly threatened plaintiff with assault if plaintiff filed another grievance against officer); *Martinez v. Richard Augustine,* No. 02-CV-0579, 2004 U.S. Dist. LEXIS 17972, at *10-11 (W.D.N.Y. Sept.2, 2004) (denying summary judgment and finding that defendants may be estopped from raising exhaustion as an affirmative defense where plaintiff alleged that defendant correction officers failed to properly file his grievance appeal). Thus, an issue of material fact exists as to whether defendants are estopped from raising the defense of non-exhaustion, and defendants' motion for summary judgment should be denied.

### 3. *Whether "Special Circumstances" Apply Justifying Failure to Exhaust*

Finally, the Second Circuit has held that "there are certain 'special circumstances' in which, though administrative remedies may have been available and though the government may not have been estopped from asserting the affirmative defense of non-exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." *Hemphill,* 380 F.3d at 689 (citations omitted). The effect of such justification is that "though the administrative remedies are no longer available for reasons of timing or other procedural restrictions, such restrictions cannot serve to keep the plaintiff's suit from proceeding." *Giano v. Goord,* 380 F.3d 670, 675-76 (2d Cir.2004). If a court finds that a plaintiff's failure to exhaust his remedies was justified, the court must determine whether administrative remedies are still available to the plaintiff. *Id.* at 690. If the court finds that the remedies are available, for instance, and that the plaintiff may file an untimely grievance, then the court must dismiss the complaint without prejudice, subject to reinstatement if the remedies prove to be unavailable. *Id.* If instead the court finds administrative remedies no longer available, then the suit may proceed without recourse to administrative remedies. *Id.*

**\*8** In *Hemphill,* the court recognized that threats of retaliation for using the grievance process might qualify as "special circumstances" that justify an inmate's failure to file a grievance in the manner prescribed, even where the threats did not suffice to render the grievance process actually unavailable, and even if the defendants are not estopped from asserting the defense of non-exhaustion. *Hemphill,* 380 F.3d at 690. The Second Circuit remanded *Hemphill* to the district court for consideration of this issue, directing that "the appropriate standard for determining whether [plaintiff's] fear of retaliation justified his sending a letter to [the superintendent] rather than filing [an internal] grievance is the same as is applicable in cases of retaliation; that is, whether a 'similarly situated individual of ordinary firmness would have been deterred from following regular procedures.' " *Id.* (internal citations omitted). The Court of Appeals directed the district court to consider the interplay between alleged threats and an inmate's decision to write directly to a higher authority rather than filing an internal grievance. *Id.* As the court noted, "[g]iven [the officer's] alleged warning of retaliation, it is arguable that Hemphill may have reasonably concluded that writing directly to the Superintendent involved an acceptable level of risk, whereas filing [an internal grievance] or notifying the immediate supervisors of his purported attackers was too fraught with danger." *Id.*

The circumstances in this case are similar to those present in *Hemphill.* Here, plaintiff alleges that he was under threats that, like those in *Hemphill,* may have justified writing a letter of complaint directly to an external prison authority rather than filing an internal grievance. Upon consideration of the interplay between the alleged threats and the plaintiff's decision to write letters to the Internal Affairs Bureau and other agencies, a factfinder might conclude that a similarly situated individual of ordinary firmness would have been deterred from following regular procedures. *Larry v. P. Byno,* No. 01 CV 1574, 2006 WL 1313344, at *4 (N.D.N.Y. May 11, 2006) (finding under similar circumstances that "it cannot be said as a matter of law that special circumstances did not exist"). Accordingly, defendants' motion for summary judgment should be denied.

### C. *First Amendment Retaliation Claim*

Plaintiff also pleads a First Amendment retaliation claim, based on his allegations that defendant Campitello and other corrections officers retaliated against plaintiff for plaintiff's attempt to file a grievance against Campitello, threatening to beat and kill plaintiff if Campitello was disciplined. Plaintiff claims that the adverse actions were the continued verbal threats by Campitello and other officers that if plaintiff filed a grievance and/or Campitello was disciplined, plaintiff would receive another beating

2006 WL 2844408

or be killed. Defendants argue that the alleged threats, if made, do not rise to the level of retaliatory conduct. (Defs.' Reply Mem. at 6-7.)

**\*9** "[A] plaintiff asserting First Amendment retaliation claims must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue is protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), overruled on other grounds by *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). *See also Graham v. R.J. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (stating that a prisoner's retaliation claim will not survive summary judgment if he does not meet the burden of demonstrating that the conduct was constitutionally protected and that the prison officials' actions were substantially improper retaliation). Only retaliatory conduct that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Id.* at 493. In conducting this inquiry, the Second Circuit has advised that courts must approach prisoner claims of retaliation with skepticism and care because they are easily fabricated, and also because of the ease with which virtually any adverse action taken against a prisoner by a prisoner official can be characterized as a constitutionally proscribed retaliatory act, "even those otherwise not rising to the level of a constitutional violation." *Id.*

The first prong of *Dawes* requires a finding that the speech or conduct at issue was protected. *Dawes,* 239 F.3d at 492. An inmate's filing of a grievance is constitutionally protected, and retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments. *Graham,* 89 F.3d at 80. The third prong of *Dawes* requires that a causal connection exist between the speech and the adverse action. Drawing all inferences in favor of the non-movant, there are sufficient allegations here to permit him to show a causal connection between plaintiff's attempt to file a grievance and the subsequent alleged threats. The real question of fact concerns the second prong of *Dawes,* which requires that the defendant took adverse action against the plaintiff, and that the action was such that it would deter a similarly situated individual of ordinary

firmness from exercising his rights. *Dawes v. Walker,* 239 F.3d at 492. While Hepworth argues that the verbal threats deterred him from any further attempts to file grievances, not every unnecessary statement by a prison guard regarding an inmate's exercise of free speech rises to the level of a constitutional violation. *Id.* at 493. Assuming all inferences in favor of Hepworth, however, plaintiff raises a material issue of fact as to whether, under the circumstances plaintiff alleges, a reasonable prisoner would have been deterred from the exercise of his constitutional rights. *See Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002) (holding that temporal proximity of an allegedly retaliatory act to a prisoner's filing of a grievance may serve as circumstantial evidence of retaliation). If so, the evidence is such that a reasonable jury could find that the officers unconstitutionally retaliated against Hepworth for exercising his First Amendment. Accordingly, defendants' motion for summary judgment on plaintiff's retaliation claim should be denied since there are disputed issues of material facts.

*CONCLUSION*

**\*10** Based on the foregoing, I recommend that defendants' motion for summary judgment be denied.

*OBJECTIONS TO THIS REPORT
AND RECOMMENDATION*

Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a copy to the undersigned within ten (10) days of the date of this report. Failure to file objections within ten (10) days will preclude further appellate review of the District Court's order. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), and 72(b); *IUE AFF-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), cert. denied, 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Frank v. Johnson,* 968 F.2d 298 (2d Cir.1992), cert. denied, 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (per curium).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2844408

2006 WL 2844408

Footnotes

1    Defendants also note, in their effort to argue that plaintiff failed to submit evidence as to the existence of the grievance,
     that the statement in plaintiff's counsel's affidavit "is not evidence that there was a grievance, since his attorney has no
     personal knowledge of the grievance." (Defs.' Mem. at 4.) While this may be so, defendants have apparently overlooked
     plaintiff's own affidavit, which clearly sets forth the circumstances surrounding plaintiff's attempt to file a grievance about
     the August 5, 2002 incident. (Pl.'s Aff. ¶ 5.)

**End of Document**                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1459740
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jason HOFELICH, Plaintiff,
v.
Superintendent Robert ERCOLE, Deputy
Superintendent R. Cunningham, Sgt. Strasser,
Sgt. Lonczak, Sgt. Centanni, C.O. Gadaway,
C.O. Flora, Grievance Civilian Supervisor
Mike Henn, C.O. B. Wilson, Defendants.

No. 06 Civ. 13697(PKC).
|
April 8, 2010.

West KeySummary

1    **Constitutional Law**
      🔑 Prisoners

     **Prisons**
      🔑 Threats, Intimidation, and Harassment;
     Abusive Language

     Alleged threat by inmate grievance supervisor
     to inmate that inmate would "end up with
     trauma that [was] irreversible" if he continued
     to file grievances against prison staff did
     not constitute adverse action against inmate
     because no facts established that a single
     threat from supervisor would have been
     enough to deter an inmate of ordinary
     firmness from exercising his constitutional
     rights. Inmate, who filed 190 grievances
     during a single year of incarceration, did
     not provide information regarding the date,
     time, or place of the alleged threat, nor any
     information about the supervisor's authority
     that would have deterred an ordinary inmate
     from continuing to file grievances after a
     single threat, despite ample opportunity for
     discovery.

     Cases that cite this headnote

*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, District Judge.

 **\*1** Plaintiff Jason Hofelich brings this civil rights action
pursuant to 42 U.S.C. § 1983, claiming that defendants
violated his constitutional rights. On January 11, 2010,
by Memorandum and Order (the "Memo & Order") I
granted summary judgment in favor of all but two of
the moving defendants, Robert Ercole and Patrick Henn.
See *Hofelich v. Ercole,* 06 Civ. 13697(PKC), 2010 WL
184453 (S.D .N.Y. Jan. 11, 2010). On January 25, 2010,
defendants Ercole and Henn moved for reconsideration of
this decision. (Docket No. 47.) Plaintiff, proceeding *pro se,*
has not filed any opposition. For the reasons stated below,
I have reconsidered my prior ruling and grant summary
judgment in favor of defendants Ercole and Henn. In
addition, plaintiff's claims against defendant Corrections
Officer Wilson, who has not been served with process, are
dismissed without prejudice.

DISCUSSION

  I. *Defendants Ercole and Henn*
The standards for relief under Local Civil Rule 6.3
and Rule 59(e), Fed.R.Civ.P. are "identical." *Griffin
Indus., Inc. v. Petrojam, Ltd.,* 72 F.Supp.2d 365, 368
(S.D.N.Y.1999). "Local Civil Rule 6.3 elaborates on
Fed.R.Civ.P. 59(e) and provides a vehicle for a party to
call the court's attention to facts or controlling decisions
it believes the court overlooked in reaching its prior
decision." *Truong v. Charles Schwab & Co., Inc.,* 07 Civ.
8085(SHS), 2009 WL 464452, at \*1 (S.D.N.Y. Feb. 24,
2009) (quotation marks and footnote omitted).

"In moving for summary judgment against a party who
will bear the ultimate burden of proof at trial, the
movant's burden will be satisfied if he can point to
an absence of evidence to support an essential element
of the nonmoving party's claim." *Goenaga v. March of
Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995).
Conclusory assertions contained in an affidavit or verified
pleading, are not sufficient to create a genuine issue of
fact. *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d
Cir.2004).

2010 WL 1459740

Because I assume the parties' familiarity with the facts as set forth in the Memo & Order, I will discuss only those facts that are necessary to decide the defendants' motion. Plaintiff alleges that defendant Ercole told him that "if [plaintiff] continued to write and report complaints, [he would] never go home but receive a new sentence on a set-up." (Amended Petition, attached to an incorporated into the Amended Complaint, at 5.) Plaintiff's complaint does not provide any details regarding the date, time or place when this threat was allegedly made, and plaintiff did not come forward with evidence to supplement this allegation in response to the defendants' summary judgment motion. Plaintiff also alleges that defendant Henn "told [plaintiff] himself that if [he] continue[d] to write the Warden, Deputy Warden and security supervisors up [plaintiff will] end up with trauma that is irreversible." (*Id.* at 2.) As with the other alleged threat, after full and fair discovery plaintiff has been unable to provide information regarding the date, time or place of the alleged threat.

**\*2** It is undisputed that during the time period relevant to plaintiff's action, beginning in or about March 2006 and ending in or about March 2007 (Am.Compl.II. C.), plaintiff filed approximately 190 grievances. (Declaration of Rebecca Loren ("Loren Decl.") ¶ 5.) It is also undisputed that during approximately the same time, plaintiff filed 95 appeals to the Central Office Review Committee, which renders final administrative decisions under the New York State Department of Correctional Services Inmate Grievance Program. (Declaration of Karen Bellamy ¶¶ 1, 5.)

a. *Plaintiff Did Not Suffer Any Adverse Action*
To state a First Amendment retaliation claim, a plaintiff must show, "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N .A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Whether something is an adverse action is an objective inquiry. *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Id.* (quotation marks omitted).

In the Memo & Order, I concluded that an alleged threat "from the superintendent of the correctional facility in which a prisoner is incarcerated that the prisoner would be set up and receive a new sentence," and a threat from an individual who worked at the corrections facility in an inmate grievance capacity "that plaintiff would receive irreversible trauma if he continued to file grievances about specific corrections personnel," were sufficient to deter an inmate of ordinary firmness from exercising his or her First Amendment rights. In reaching that conclusion, I recognized that "[c]ase law reflects that verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered." *Lunney v. Brureton,* No. 04 Civ. 2438(LAK)(GWG), 2007 WL 1544629, at \*23 (S.D.N.Y. May 29, 2007)) (Report and Recommendation). However, in addressing the issue of whether a similarly situated individual of ordinary firmness would be deterred from exercising his constitutional rights, I failed to give any consideration whatsoever to the plaintiff's non-stop filing of 190 grievances. Plaintiff's own actions are not controlling on the "ordinary firmness" standard, but they are not irrelevant. Also, I did not focus plaintiff's failure to come forward with evidence as to the time, place, circumstances or context for the two alleged threats after he had a full and fair opportunity to conduct discovery.

Plaintiff alleges that defendant Henn was an "Inmate Grievance Supervisor" at Green Haven Correctional Facility ("Green Haven"). But plaintiff has not come forward with evidence regarding the scope of Henn's authority at Green Haven or other information about Henn's status that bears on whether a single harsh threat from him would have deterred an inmate of ordinary firmness from exercising his or her constitutional rights. Had the single threat been of such significance that it would deter an inmate of ordinary firmness, one would expect that plaintiff would, at the least, be able to set forth—after a full opportunity to conduct discovery— the approximate date, month or season of the year when it was made. In response to the defendants' motion, plaintiff has come forward with nothing other than the original allegation of the verified Amended Complaint. Nothing in his deposition fills in the missing gaps. (Partial Transcript of the Deposition of Jason Hofelich, taken on December 22, 2006, ("Tr.") at 128:3–4, 130:11–20, 180:2– 10, 183:12–19, 185:12–186:22, attached as Exhibit D to

the Declaration of Assistant Attorney General Julinda Dawkins, dated May 15, 2009.)

**\*3** Plaintiff alleges that defendant Ercole threatened him with "a new sentence on a set-up." As with the alleged threat from defendant Henn, plaintiff has not provided any details regarding the alleged threat from Ercole. [1] In addition, drawing all reasonable inferences in plaintiff's favor, plaintiff has alleged that Ercole threatened to have him accused, tried, convicted and sentenced on a false charge. Malicious prosecutions occur in society and it is plausible that corrections personnel could make a false accusation of a crime that led to a prosecution, conviction and a new sentence. While prison disciplinary proceedings are commonplace, there is no evidence proffered by plaintiff that any prisoner was prosecuted for any crime committed while imprisoned based on the complaint of corrections personnel. There is no basis to conclude that they are common. Nor is there a single example provided of such a prosecution arising out of Green Haven that was falsely and maliciously instituted by corrections personnel. In the absence of such evidence and without even a recollection of the approximate date, a prisoner of "ordinary firmness" would not be deterred by such an empty threat and, as noted, the plaintiff in this case was not.

I also note that during the relevant time period, the plaintiff filed multiple grievances in each and every month, from March 2006 to March 2007, totaling approximately 190 separate grievances. (Loren Decl. Ehx. A.) Although this shows that subjectively, plaintiff was not deterred from filing grievances, it also bears on whether a reasonable jury could find that a "similarly situated individual of ordinary firmness" would have been deterred from exercising his or her constitutional rights. Because the "ordinary firmness" standard is an objective test, the fact that plaintiff was not deterred from exercising his constitutional rights is not dispositive. *Gil v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). However, the fact that plaintiff was not deterred from filing grievances is some evidence that a similarly situated prisoner of ordinary firmness would not have been deterred. *Smith v. Yarrow,* 78 Fed. App'x 529, 541 n. 8 (6th Cir.2003) (unpublished) ("The [ordinary firmness] inquiry is more objective than subjective. However, it does seem that the fact that Plaintiff proceeded with the lawsuit offers some probative evidence that the conduct was not a sufficient deterrent under the objective standard."). In response to

the defendants' motion, plaintiff has not come forward with any evidence that he is a person of unusual firmness. *Keenan v. Daniel,* 63 Fed. App'x 180, 182 (6th Cir.2003) (unpublished order) ("Though the test for the deterrent effect of any retaliation is objective, not subjective, we note that the revised evaluation did not prevent [plaintiff] from filing another grievance contesting the revised evaluation, and there is no indication that [plaintiff] is a person of unusual firmness.") (internal citation omitted).

**\*4** Finally, the threats occurred, if at all, in a prison, and not, for example, in an office. The Second Circuit has recognized that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes,* 239 F.3d at 493 (quotation marks omitted) (alteration in original).

Therefore, in the face of the defendants' summary judgment motion, the plaintiff was obliged to come forward with evidence that would allow a reasonable jury to conclude that Ercole's and Henn's threats were adverse actions. This he failed to do. Viewing the evidence most favorably to plaintiff, no reasonable fact finder could find in his favor on this claim.

## II. *Corrections Officer Wilson*

Corrections Officer Wilson is not represented by the Attorney General, and did not move for summary judgment along with the other defendants. In the Memo & Order I noted that it was unclear whether defendant Wilson had been served with a summons and the Amended Complaint, and I directed the Attorney General to clarify Wilson's status by February 1, 2010. (Memo & Order at 2, n. 1.) By letter dated January 28, 2010, the Attorney General confirmed that defendant Wilson has never been served. (Docket No. 49.) On January 29, 2010, I issued an order by memo endorsement stating: "Unless plaintiff shows good cause otherwise by February 26, 2010, the claim against Officer Wilson will be dismissed without prejudice for failure to serve under Rule 4(m) within 120 days." (*Id.*) Plaintiff has not responded to that order.

*Rule 4(m), Fed.R.Civ.P.,* states that if "a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice

against that defendant or order that service be made within a specified time." Plaintiff filed his Amended Complaint on or around March 21, 2007, and has not served Wilson. Therefore, pursuant to Rule 4(m), plaintiff's claims against Corrections Officer Wilson are dismissed without prejudice. CONCLUSION

For the reasons stated above, defendants Ercole and Henn's motion for reconsideration (Docket No. 47) of my prior order in *Hofelich v. Ercole,* 06 Civ. 13697(PKC), 2010 WL 184453 (S.D.N.Y. Jan. 11, 2010) is GRANTED. I grant summary judgment in favor of defendants Ercole and Henn on plaintiff's First Amendment retaliation claim.

Plaintiff's claims against Corrections Officer Wilson are DISMISSED WITHOUT PREJUDICE.

Defendants are directed to serve plaintiff with copies of all unreported decisions cited in this Memorandum and Order, and in *Hofelich v. Ercole,* 06 Civ. 13697(PKC), 2010 WL 184453 (S.D.N.Y. Jan. 11, 2010).

The Clerk is directed to enter judgment in favor of all defendants.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1459740

Footnotes

1    At his deposition, plaintiff testified about an incident which he believed occurred in April 2006. According to plaintiff: "[Ercole] mentioned that my parole, he's going to make sure I max out." (Tr. at 96:7–100:12.) Ensuring a prisoner serves the full term of his lawfully imposed sentence, however, is not the same as threatening to "set-up" a prisoner for a new, unlawful prison sentence, and does not add context to the threat that plaintiff actually alleged in his Amended Complaint.

2009 WL 890658
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Tyrone HOUSTON, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.

No. 9:03-CV-1412 (GTS/DEP).
|
March 31, 2009.

**Attorneys and Law Firms**

Tyrone Houston, Brooklyn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the
State of New York, Stephen M. Kerwin, Esq., Assistant
Attorney General, of Counsel, for Defendants.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this *pro se* prisoner
civil rights action are Defendants' motion for summary
judgment (Dkt. No. 80), and United States Magistrate
Judge David E. Peebles's Report-Recommendation
recommending that Defendants' motion be granted and
Plaintiff's Complaint be dismissed in its entirety (Dkt. No.
85). Plaintiff has timely filed Objections to the Report-
Recommendation. (Dkt. No. 86.) For the reasons set
forth below, the Report-Recommendation is accepted and
adopted in its entirety, Defendants' motion is granted and
Plaintiff's Complaint is dismissed.

**I. RELEVANT BACKGROUND**

On November 21, 2003, Plaintiff filed this action against
twenty-two (22) individuals currently and/or formerly
employed by the New York State Department of
Correctional Services, at various correctional facilities.
Generally, in his Complaint, Plaintiff alleges that his
rights under the First and Eighth Amendments were
violated when (1) certain Defendants had him transferred
in retaliation for grievances that he had filed, (2) certain
Defendants issued false misbehavior reports against him
in retaliation for grievances that he had filed, and (3)

certain Defendants deprived him of the opportunity to
engage in outdoor exercise on two separate occasions. (*See
generally* Dkt. No. 1.) [1]

On September 29, 2006, District Judge Lawrence E. Kahn
issued a Memorandum Decision and Order dismissing
(1) Plaintiff's claims for equitable relief due to Plaintiff's
release from incarceration, which mooted this claim,
and (2) Plaintiff's claims against the CORC and all of
the individual defendants in their official capacities on
Eleventh Amendment grounds. (Dkt. No. 69.)

On January 4, 2008, Defendants filed a motion
for summary judgment seeking dismissal of all of
Plaintiff's claims against them. (Dkt. No. 80.) Generally,
Defendants' motion is premised on the following three
grounds: (1) certain of Plaintiff's claims are procedurally
barred based upon his failure to exhaust available
administrative remedies with regard to those claims (2) no
reasonable factfinder could conclude that the issuance of
misbehavior reports or the transfer to different facilities
were *caused* by Plaintiff's filing of grievances; and (3)
no reasonable factfinder could conclude that Plaintiff
was subjected to cruel and unusual punishment based
on being denied certain exercise opportunities. (*Id.*) On
February 1, 2008, Plaintiff filed a response in opposition
to Defendants' motion. (Dkt. No. 82.).

On March 11, 2009, Magistrate Judge Peebles
issued a Report-Recommendation recommending that
Defendants' motion be granted, because (1) certain of
Plaintiff's claims were not properly exhausted, and (2)
no reasonable factfinder could rule in Plaintiff's favor on
any of his claims. (Dkt. No. 85.) Familiarity with the
grounds of the Report-Recommendation is assumed in
this Decision and Order. On March 20, 2009, Plaintiff filed
his Objections to the Report-Recommendation. (Dkt. No.
86.)

**II. APPLICABLE LEGAL STANDARDS**

**A. Standard of Review on Objection from Report-
Recommendation**

**\*2** When specific objections are made to a magistrate
judge's report-recommendation, the Court makes a "de
novo determination of those portions of the report
or specified proposed findings or recommendations to
which objection is made." *See* 28 U.S.C. § 636(b)(1)

(C). [2] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y.Sept.22, 1997) (Pooler, J.) [collecting cases], aff'd without opinion, 175 F.3d 1007 (2d Cir.1999). [3] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at *1 (S.D.N .Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

### B. Standard Governing Motion for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323-24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with "specific facts showing a genuine issue [of material fact] for trial." Fed.R.Civ.P. 56(e)(2).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]; *see also* Fed.R.Civ.P. 56(e)(2). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts" [citations

omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986).

**\*3** As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding *pro se.* [4] (This is because the Court extends special solicitude to the *pro se* litigant, in part by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.) [5] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules. [6] For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement [7]- even where the nonmoving party was proceeding *pro se* in a civil rights case. [8]

## III. ANALYSIS

After carefully reviewing all of the papers in this action, including Magistrate Judge Peebles's Report-Recommendation and Plaintiff's Objections thereto, the Court rejects each of Plaintiff's Objections, and agrees with each of the conclusions stated in the Report-Recommendation. (*See* Dkt. Nos 85, 86.) Magistrate Judge Peebles employed the proper legal standards, accurately recited the facts, and reasonably applied the law to those facts. (*See* Dkt. No. 86.)

In particular, Magistrate Judge Peebles correctly determined that Plaintiff failed to exhaust some of his claims, as required by the Prison Litigation Reform Act, in that he failed to file grievances, and/or pursue these claims to completion, before bringing the claims to federal court. [9] Magistrate Judge Peebles also correctly determined that the only evidence that the misbehavior reports filed against Plaintiff were retaliatory is the fact

that they were filed in close proximity to Plaintiff's grievances. However, this inference alone is not enough for Plaintiff to defeat summary judgment, in light of the fact that (1) he was found guilty of at least some of the charges lodged in seven of the nine misbehavior reports with which he takes issue, (2) these reports were issued by nine different corrections officers in four different prisons, and (3) all but one of the officers submitted an affidavit expressly denying retaliatory motivation. [10] In addition, regarding Plaintiff's claim that his numerous transfers to various prison facilities was done in retaliation for filing grievances, as Magistrate Judge Peebles explained, (1) Plaintiff has offered no evidence that he was transferred in retaliation for filing grievances, and (2) Plaintiff has a history of claiming retaliation for numerous adverse actions taken against him. As a result, these retaliation claims are dismissed.

*4 Furthermore, as explained in Magistrate Judge Peebles' Report-Recommendation, Plaintiff's Eighth Amendment claims are without merit because (1) the harm that he allegedly suffered as a result of being denied the opportunity to exercise outdoors for less than two weeks is *de minimis,* and (2) being forced to exercise in an area that is eight-feet-five inches by six-feet-nine inches in size, while confined in a SHU facility, is not a constitutional violation. *See, e.g., Cody v. Jones,* 895 F.Supp. 431, 441 (N.D . N.Y.1995) (McCurn, J.) (applying *Sandin* and concluding that no liberty interest was triggered through the failure of the prison to regularly accord plaintiff one hour of daily outdoor exercise for a period of several months); *Anderson v. Coughlin,* 757 F.2d 33, 34-35 (2d Cir.1985) ("[T]hough courts have played a helpful role in assisting prisoners and prison officials to negotiate mutually acceptable terms for the provision of exercise opportunities, as has occurred in this case, they have not found in the Eighth Amendment a broad license to require prison officials to meet all of the recreational standards that have been recommended by penologists.") . [11]

In his Objections to the Report-Recommendation, Plaintiff argues, *inter alia,* that his failures to fully exhaust his available administrative remedies with regard to certain of his claims was due to his being transferred to different facilities shortly after filing grievances, and that his efforts to inform Defendant Goord and Wardens of this issue "are sufficient to invoke the limited exceptions to the grievance requirement." (Dkt. No. 86.) In addition, Plaintiff appears to argue that the Report-

Recommendation should not be adopted because of its failure to appreciate that the "personal involvement on [the] part of all Defendants [regarding his retaliation claims]" constitutes sufficient evidence of a conflict, thereby warranting denial of summary judgment. (Dkt. No. 86.) [12]

With regard to Plaintiff's exhaustion claim, as an initial matter, the Court is not persuaded by Plaintiff's argument that his letters to Defendants Goord and Wardens created an exception to the exhaustion requirement. [13] This is because (1) administrative remedies were available to Plaintiff, who is extremely experienced in the inmate litigation process, [14] (2) Defendants have not waived the exhaustion defense, and (3) special circumstances do not exist which would excuse Plaintiff from complying with the procedural requirements. [15] However, even if the Court were persuaded that Plaintiff's letters created an exception to the exhaustion requirement, such a finding would not help Plaintiff withstand summary judgment on the claims at issue. This is because, while Magistrate Judge Peebles found that some of Plaintiff's retaliatory transfer claims were unexhausted, Magistrate Judge Peebles also found that all of Plaintiff's retaliatory transfer claims were unsupported by sufficient record evidence from which a reasonable factfinder could conclude that the transfers were caused by Plaintiff's filing of grievances (as opposed to being caused by legitimate, penological considerations).

*5 Finally, with regard to Plaintiff's claim that a "conflict" existed (or exists) in this case, the Court rejects that argument. Plaintiff has not offered any evidence of such a conflict. The fact that District Judge Gary L. Sharpe issued a ruling in *Houston v. Leclaire,* 01-CV-0067, Decision and Order (N.D.N.Y. filed July 22, 2004) (Sharpe, J.) (denying, in part, defendants' motion for summary judgment requesting dismissal of Plaintiff's retaliation claim arising from the filing of false misbehavior reports against him, and the destruction of his legal materials, in 1999) in no way collaterally estops or otherwise precludes the Court from dismissing Plaintiff's claims in this current action due to a lack of supporting record evidence. [16] As a result, and for the reasons stated by Magistrate Judge Peebles in his Report-Recommendation, Plaintiff's retaliation claims with regard to the misbehavior reports are dismissed.

For all of these reasons, the Court grants Defendants' motion for summary judgment.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Peebles's Report-Recommendation (Dkt. No. 85) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 80) is **GRANTED;** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED** in its entirety.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Tyrone Houston, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, *inter alia,* alleging violation of his civil rights. In his complaint, plaintiff maintains that as a result of having been engaged in activity protected under the First Amendment to the United States Constitution, including filing grievances and commencement and pursuit of prior lawsuits, he was subjected by prison officials to a series of inter-prison transfers, the filing of false misbehavior reports, the imposition of unwarranted disciplinary confinement, and unfavorable program assignments. Plaintiff also complains of the deprivation of outdoor exercise, contending that the denial represented cruel and unusual punishment, in violation of his rights under the Eighth Amendment. Plaintiff's complaint seeks both equitable relief and the recovery of compensatory and punitive damages.

Currently pending before the court is a motion filed on behalf of the defendants seeking the entry of summary judgment dismissing each of plaintiff's claims. In support of their motion, defendants assert that certain of plaintiff's causes of action are procedurally barred, based upon his failure to exhaust available administrative remedies before filing suit, and that all of his claims are subject to dismissal on the merits, arguing that no reasonable factfinder could conclude that he was subjected to unlawful retaliation or

cruel and unusual punishment. For the reasons set forth below, I recommend that defendants' motion be granted.

I. *BACKGROUND* [1]

**\*6** At the times relevant to his claims plaintiff Tyrone Houston, apparently also known as Tyrone Black, was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"). Plaintiff's claims, which are expansive in terms of both their substantive breadth and the time period involved, arise from incidents occurring while he was confined in various facilities operated by the DOCS including, the Mid-State Correctional Facility, the Mohawk Correctional Facility, the Marcy Correctional Facility, the Great Meadow Correctional Facility, the Downstate Correctional Facility, the Auburn Correctional Facility, the Five Points Correctional Facility, the Cayuga Correctional Facility, the Elmira Correctional Facility, and the Ogdensburg Correctional Facility.

During the period of his incarceration, plaintiff filed a series of grievances and commenced suits against various prison workers. Plaintiff claims that as a direct result of that activity he experienced recrimination, in the form of issuance of several false misbehavior reports, leading to procedurally flawed disciplinary hearings and ensuing unlawful disciplinary confinement in various facility special housing units ("SHUs"). Plaintiff also attributes the various inter-prison transfers which he experienced, including in October of 2000 to the Mohawk Correctional Facility in lieu of a facility closer to his place of residence, to retaliatory animus, in further response to his grievances and lawsuits. Plaintiff additionally asserts that while in disciplinary confinement, he was subject to a DOCS policy under which SHU inmates are ineligible for participation in outdoor exercise. As a result, plaintiff was unable to participate in such outdoor activities for an aggregate period of 222 days, extending intermittently from September of 2001 until mid-2003. [2]

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on November 21, 2003. Dkt. No. 1. As defendants, plaintiff's complaint names twenty-two present or past employees of the DOCS including the agency's commissioner, Glenn S. Goord, as well as the Central Office Review Committee (the

"CORC"), which was sued as an entity, and asserts claims against the defendants in both their individual and official capacities. [3] *Id.* Issue was joined by the filing of answers on behalf of the majority of the defendants on September 30, 2005, and by defendant Dana C. Smith on November 28, 2005, generally denying the material allegations of plaintiff's complaint and interposing various affirmative defenses. Dkt. Nos. 58, 60.

On January 4, 2008, following the completion of pretrial discovery, defendants moved for summary judgment dismissing plaintiff's complaint in its entirety. Dkt. No. 80. In their motion, defendants argue that portions of plaintiff's claims are procedurally barred, based upon his failure to exhaust available administrative remedies before commencing suit. Addressing the merits, defendants assert that plaintiff's claims lack factual support and that the record fails to contain evidence from which a reasonable factfinder could conclude that the adverse actions attributed by the plaintiff to retaliatory animus were in fact motivated by his protected activity. Defendants also contend that as a matter of law plaintiff's complaints regarding the denial of exercise do not implicate constitutional considerations. Plaintiff has since responded in opposition to defendants' motion in papers filed with the court on February 1, 2008. Dkt. No. 83.

**\*7** Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation to the assigned district judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). [4] *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,*

391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law ...." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also* Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see* Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process). When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is appropriately granted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See* Building Trades Employers' Educ. Ass'n v. McGowan, 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also* Anderson, 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

#### B. *Failure to Exhaust Remedies*

**\*8** In their motion defendants assert that, as a threshold matter, certain of plaintiff's claims are procedurally barred based upon his failure to exhaust available administrative remedies with regard to those claims.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 914-15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91-92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit.[5] *Jones,* 127 S.Ct. at 918. In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).

"Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F .3d at 43 (quoting *Johnson,* 380 F.3d at 697-98) (emphasis omitted).

**\*9** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[6] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to CORC, which makes the final administrative decision. *Id .* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Without question the plaintiff, who by all accounts has frequently availed himself of New York's IGP while in DOCS custody, has filed grievances raising many of the issues forming the basis for his complaint in this action. The record now before the court, however, contains no indication that this is true with regard to all of Houston's claims. The only grievance which plaintiff claims to have lodged addressing the question of his many, allegedly retaliatory inter-prison transfers, for example, was filed on March 17, 2003. *See* Complaint (Dkt. No. 1) ¶ 46

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

and pp. 109-111.[7] Accordingly, it does not appear that plaintiff has exhausted available administrative remedies with respect to inter-prison transfers effectuated after the filing of that grievance, including his transfers 1) on June 13, 2003, into the Riverview Correctional Facility; 2) on June 16, 2003, into the Gouverneur Correctional Facility; and 3) on August 15, 2003, into the Elmira Correctional Facility. Similarly, there is no indication in the record now before the court that plaintiff's alleged denial of outdoor exercise covering the period from September 15, 2001 through November 21, 2001, forming the basis for a portion of plaintiff's cruel and unusual punishment claim, *see* Complaint (Dkt. No. 1) ¶ 47, was grieved. While plaintiff did apparently file a grievance on July 29, 2003 regarding his confinement in the Gouverneur SHU beginning on June 17, 2003, *see* Complaint (Dkt. No. 1) at p. 120, there is no evidence of pursuit of that grievance through to completion.

**\*10** In light of these failures and the fact that plaintiff has not offered any evidence which would indicate that the grievance procedure was not available to him or otherwise form a proper basis for excusing the grievance requirement, I recommend that the portions of plaintiff's claims for which there was no grievance filed and pursued to completion be dismissed on this procedural basis.[8]

### C. *Retaliation*

Plaintiff's complaint centers principally upon his claim of retaliation, which is comprised of two discrete components. First, plaintiff maintains that the issuance of various misbehavior reports, alleged by him to have contained false accusations, and resulting findings of guilt following disciplinary hearings, were prompted by his having engaged in protected activity, including the filing of grievances and lawsuits. Additionally, plaintiff asserts that for the same retaliatory reasons he was excessively transferred among various prison facilities, including into some at remote locations from his place of residence. In their motion, defendants contend that the record fails to disclose the basis upon which a reasonable factfinder could conclude that the adverse actions upon which plaintiff's retaliation claims hinge were in fact prompted by retaliatory animus.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free

speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F .3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that: 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff successfully shoulders this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*11** Analysis of retaliation claims thus requires thoughtful consideration of the evidence presented concerning the protected activity in which the inmate plaintiff has engaged and the adverse action taken against him or her, as well as evidence tending to link the two. When such claims, which ordinarily are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, the entry of summary judgment dismissing plaintiff's retaliation claims is warranted. *Flaherty,* 713 F.2d at 13.

It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). As is true of other types of claims, this principle applies to causes of action claiming unlawful retaliation. *See Abascal v. Hilton,* No. 04-CV-1401, 2008 WL 268366, at *10 (N.D.N.Y. Jan. 30, 2008) (Kahn, D.J. and Lowe, M.J.).

### 1. *False Misbehavior Report Claim*

In cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he

difficulty lies in establishing a retaliatory motive." *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007). Mere conclusory allegations of such retaliatory motivation will not suffice to survive a summary judgment motion; to establish retaliatory animus, which ordinarily must be shown circumstantially since direct evidence of such motivation is typically lacking, a plaintiff may cite such factors as "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

Plaintiff's complaint alleges the issuance of nine allegedly false misbehavior reports, each authored by a different corrections officer, between April 8, 2001 and June 9, 2003. Complaint (Dkt. No. 1) ¶¶ 13-29. In each instance plaintiff attributes the issuance to retaliatory motives, citing different protected activity, as follows:

| Date of Issuance | Author | Alleged Protected Activity Precipitating Issuance | Disposition |
| --- | --- | --- | --- |
| 4/8/01 | Van Slyke | Submission of grievance dated 4/12/01 against Van Slyke's girlfriend, identified only as "SHU Counselor". [9] | Dismissed (no hearing held) |

**\*12** *Id.*

The only evidence offered by the plaintiff which could potentially support the finding of a nexus between an instance of protected activity alleged in his complaint and a corresponding misbehavior report is the inference to be drawn from the relevant chronology. It is true such an inference, flowing from a closeness in proximity between protected activity and the issuance of a misbehavior report can in certain instances suffice to avoid summary judgment dismissal of a retaliation claim. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) citing *Flaherty v. Coughlin,* 713. F.2d 10, 14 (2d Cir.1983). As defendants note, however, in many circumstances this alone is insufficient to avoid summary judgment. *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000); citing *Ayers v. Stewart,* 1996 WL 346049, at *1 (2d Cir.1999); *see*

*also Ethier v. City of Cohoes,* No. 1:02 Civ. 1584, 2006 WL 1007780, *7 (N.D.N.Y. April 18, 2006).

In this instance there are misbehavior reports issued which, taken in isolation, could give rise to a determination by a reasonable factfinder that the misbehavior report was issued in retaliation for protected activity. Taken together and considered in the light of all relevant facts, however, the record in this instance simply does not support the inference of such a connection. Prior to April of 2001, plaintiff had amassed a disciplinary record which included twelve separate findings of guilt in connection with alleged violations between October, 1993 and July, 27, 1999. *See* Kerwin Decl. (Dkt. No. 80-8) Exh. B. The allegedly retaliatory misbehavior reports now in dispute were issued over a two-year period by nine different corrections workers, while

Houston v. Goord, Not Reported in F.Supp.2d (2009)

2009 WL 890658

plaintiff was incarcerated at four different prison facilities. With the exception of defendant Hammill, each of the individuals authoring the subject misbehavior reports has submitted an affidavit expressly denying having done so prompted by retaliatory motivation.[12] In seven of the nine instances, plaintiff was found guilty of at least some of the charges lodged, with an acquittal in one additional instance and one other misbehavior report having been dismissed for failure to conduct a timely disciplinary hearing. Given the totality of these circumstances, no reasonable factfinder could conclude that the issuance of the various misbehavior reports and resulting findings of guilty was prompted by retaliatory animus. I therefore recommend dismissal of this portion of plaintiff's retaliation claim.

### 2. *Prison Transfer Claim*

The second aspect of plaintiff's retaliation claim concerns his frequent transfer among prisons.[13] The record supports plaintiff's claim regarding the frequency of his prison transfers. Plaintiff was transferred among various New York prisons thirteen times between May 7, 2001 and August 15, 2003, as set forth below:

**\*13** Complaint (Dkt. No. 1) ¶¶ 7-10, 32-46; Knapp-David Aff. (Dkt. No. 80-22) Exh. B. Citing some specific instances of protected activity, plaintiff alleges that all of these transfers were prompted by retaliatory motives on the part of prison officials. *See* Complaint (Dkt. No. 1), *id.* Without question, prison officials retain significant flexibility and wide discretion in managing the corrections system and placing inmates appropriately. *See* N.Y. Correction Law §§ 23, 72 and 112(1); *see also Prins v. Coughlin,* 76 F.3d 504, 507 (2d Cir.1996) *citing Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538 (1976) (prisoner generally has no due process right to challenge a transfer from one facility to another). As the Supreme Court has noted, New York's statute governing prison transfers "imposes no conditions on the discretionary power to transfer, and we are advised by the State that no such requirements have been promulgated." *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543 (1976).

While the discretion of prison officials to place and transfer prisoners is broad, it is not unfettered; when such a transfer is made out of purely retaliatory motivation, in response to constitutionally protected activity, a claim

of unlawful retaliation under the First Amendment is established. *Meriwhether v. Coughlin,* 879 F.2d 1037, 1046 (2d Cir.1989); *Hohman v. Hogan,* 597 F.2d 490, 492-93 (2d Cir.1979).

In this instance plaintiff's allegations of retaliatory transfers appear to center upon defendants Knapp-David, LeClaire and Goord. *See* Complaint (Dkt. No. 1) ¶¶ 32, 35-42, 45 and pp. 18-19, 79-81, 88-89, 91-92, 94-95. Plaintiff apparently theorizes that these high ranking DOCS officials undertook a campaign of retaliatory transfers in order to punish him for his filing of grievances and lawsuits against various corrections workers assigned to the prison to which plaintiff was assigned.

In an affidavit given in support of defendants' motion, defendant Knapp-David, formerly the Director of Classification and Movement for the DOCS, explains the hub system implemented by the agency to designate the 63,500 inmates in the system and the process utilized to effectuate inmate transfers. Knapp-David Decl. (Dkt. No. 80-22) ¶¶ 2-7. That affidavit reflects that "transfers of inmates between hubs or transfer of maximum security inmates were approved and made by classification analysts on [Knapp-David's] staff when [she] was the Director of Classification and Movement .... As a routine matter [she] was not personally involved in inmate transfer decisions."[14] *Id.* ¶ 3. In that declaration defendant Knapp-David denies both having any retaliatory motivation, and participating in the decisions to make the disputed transfers. *Id* . Since personal involvement is a constitutional violation is a pre-requisite to establishing liability, defendant Knapp-David is entitled to dismissal on this basis. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977).

**\*14** Aside from his sheer conjecture, plaintiff has offered no evidence from which a reasonable factfinder could determine that any of the cited prison transfers were ordered out of retaliation for plaintiff's filing of grievances and commencement of lawsuits, rather than resulting from legitimate, penological considerations. Given this and plaintiff's well documented history of claiming retaliation in connection with many adverse actions taken against him overtime by prison officials, I conclude that the entry of summary judgment dismissing this portion of plaintiff's retaliation claim is also warranted.[15]

Case 9:16-cv-01211-GTS-TWD   Document 72   Filed 08/09/18   Page 163 of 338
Houston v. Goord, Not Reported in F.Supp.2d (2009)
2009 WL 890658

### D. *Cruel and Unusual Punishment*

The last element of plaintiff's complaint is focused upon the alleged denial of the opportunity to engage in outdoor exercise while confined to S-Blocks and at Ogdensburg. Complaint (Dkt. No. 1) ¶¶ 47-48. Defendants maintain that they are entitled to the entry of summary judgment dismissing this claim as well.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 297-98, 111 S.Ct. 2321, 2323-2324 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

Without question, prison inmates must be afforded a reasonable opportunity for exercise. *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985); *see also Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996) and *Sostre v. McGinnis,* 442 F.2d 178, 193 & n .25 (2d Cir.1971)

(en banc), *rev'd on other grounds, cert. denied Sostre v. Oswald,* 404 U.S. 1049, 92 S.Ct. 11190 (1972). Not every deprivation of this opportunity, however, rises to a level of constitutional significance; instead, to sustain an Eighth Amendment claim a plaintiff must show that he or she was denied of all meaningful exercise for a substantial period of time. *See Davidson v. Coughlin,* 968 F.Supp. 121, 129 (S.D.N.Y.1997). When determining whether this showing has been made, a court may consider such relevant factors as 1) the duration of the deprivation; 2) its extent; 3) the availability of other out-of-cell activities; 4) the opportunity for in-cell exercise; and 5) the justification offered for the deprivation. *See Williams v. Goord,* 111 F.Supp.2d 280, 291 (S.D.N.Y.2000).

**\*15** Plaintiff's exercise claim is comprised of two components. First, he contends that when confined to an "S" block for disciplinary purposes he was not permitted to engage in outdoor exercise, but instead only permitted to exercise utilizing an outdoor recreation pen attached to his cell. *See* Complaint (Dkt. No. 1) ¶¶ 48 and p. 113. Secondly, plaintiff asserts that he was confined to his cell for twenty-four hours each day between March 22, 2003 and April 4, 2003, pending a hearing at the Ogdensburg Correctional Facility, and thus denied any meaningful opportunity to exercise during that period. (Dkt. No. 1) ¶ 49 and p. 116.

### 1. *"S" Block Confinement*

While confined in facility SHU's, plaintiff was restricted to an exercise area measuring eight feet five inches in width, six feet nine inches in depth, and with the ceiling height of twelve feet seven inches. Complaint (Dkt. No. 1) ¶¶ 47-48; Prack Aff. (Dkt. No. 80-30) ¶ 5. SHU exercise areas have three solid walls, with a fourth side made of woven rod security screen through which inmates can view the open surroundings. Prack Aff. (Dkt. No. 80-30) ¶ 5.

The relevant portions of plaintiff's complaint and exhibits describe standard SHU conditions of confinement, which have been found to pass constitutional muster. *See, e.g., Sostre v. McGinnis,* 442 F.2d at (outdoor exercise for one hour in small enclosed yard open to the sky consistent with Eighth Amendment); *Anderson,* 757 F.2d at 35) (holding that Eighth Amendment not violated when inmates confined to special housing unit were allowed one hour per day of outdoor exercise-with no access to indoor exercise area); *Young v. Scully,* Nos. 91 Civ. 4332, 91 Civ. 4801, 91 Civ. 6769, 1993 WL 88144, at *5 (S.D.N.Y. March 22,

1993) (holding that Eighth Amendment was not violated when inmate was deprived of exercise for periods lasting several days); and *Jordan v. Arnold,* 408 F. Supp 869, 876-877 (M.D.Pa.1976) (holding that Eighth Amendment not violated when inmates confined to special housing unit were allowed two hours of exercise per week). In this instance the court declines plaintiff's invitation to enter the arena of prison management, and instead recommends a finding that this portion of plaintiff's complaint fails to allege a cognizable constitutional deprivation.

### 2. *Denial of Exercise While at Ogdensburg*

The second element of plaintiff's cruel and unusual punishment claim relates to the denial of exercise for a period of thirteen days while awaiting a disciplinary hearing. *See* Complaint (Dkt. No. 1) ¶ 49 and p. 116. In order to sustain a constitutional claim this cause of action must assert an "unquestioned and serious deprivation of basic human needs" or "depri[vation] of the minimal civilized measure of life's necessities. *Anderson,* 757 F.2d at 35. The denial of exercise for a period of thirteen days is, relatively speaking, *de minimis* and does not rise to a level sufficient to support a constitutional deprivation. *See Young v. Scully,* 91 Civ. 4332, 91 Civ. 4801, 91 Civ. 6768 and 91 Civ. 6769, 1993 WL 88144, at *5 (deprivation of exercise over several days found to be *de minimis* ); *Davidson v. Coughlin,* 968 F.Supp. 121, 128-131 (S.D.N.Y.1997) (holding that "temporary and sporadic deprivations of outdoor activity [for no longer than fourteen days in a row] do not fall below the minimum standards of the Eighth Amendment"); *see also Trammell v. Keane,* 338 F.3d 155 (2d Cir.2003); *Branham v. Meachum,* 77 F.3d 626, 630-31(2d Cir.1996) (finding that keeping inmate on lockdown and "full restraint" status without outdoor exercise for a period of approximately twenty-two days does not violate the Eighth Amendment).

**\*16** There appears to be another basis on which dismissal of this portion of plaintiff's complaint would be warranted. The deprivation of exercise while in Ogdensburg does not appear to be attributed to subjective indifference on the part of any of the named defendants to plaintiff's well being, but instead was the result of a facility procedure at Ogdensburg which was later amended following plaintiff's successful grievance regarding the matter. *See* Kurz Decl. (Dkt. No. 80-26) ¶ 9. Under these circumstances plaintiff has failed to establish the subject deliberate indifference on the part of any of the defendants

toward his safety and well being. *Hathaway v. Coughlin,* 99 F.3d 550, 554 (2d Cir.1996) (charged official must act with sufficiently culpable state of mind that is equivalent to criminal recklessness); *see also Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994).

### IV. *SUMMARY AND RECOMMENDATION*

The plaintiff, a frequent litigator and an inmate who over the period of his confinement with the DOCS accumulated an extremely poor disciplinary record, now complains alleging that nine misbehavior reports authored by nine separate corrections officers at four corrections facilities over a two year period, seven of which resulted of findings of guilt following disciplinary hearings, were issued out retaliatory motivation. Having carefully considered the record now before the court, I conclude no reasonable factfinder could agree that those misbehavior reports were issued for retaliatory purposes. Plaintiff further claims that various inter-prison transfers which he experienced over time were retaliatory, in response to his having filed grievances and lawsuits. Once again, the record fails to contain evidence from which a reasonable factfinder could draw this conclusion. Finally plaintiff contends that he was subjected to cruel and unusual punishment by the denial of adequate opportunities for exercise. Having carefully reviewed the record, I conclude that no reasonable factfinder could determine that he was in fact subjected to cruel and unusual punishment.

For these reasons, and additionally because certain of his claims are procedurally barred based upon his failure to exhaust available administrative remedies, I recommend dismissal of plaintiff's complaint in its entirety. It is therefore respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 80) be GRANTED, and that all plaintiff's claims in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 890658

Footnotes

1   On September 30, 2005, all of the Defendants except one filed their Answer to Plaintiff's Complaint. (Dkt. No. 58.) On November 28, 2005, Defendant Smith filed her answer to the Complaint. (Dkt. No. 59.)

2   On de novo review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

3   *See also Vargas v. Keane,* 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

4   *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

5   *Krug v. County of Rennselaer,* 04-CV-0640, 2006 WL 2669122, at *3 (N.D.N.Y. Sept. 18, 2006) (McAvoy, J.) ("When dealing with a *pro se* party, certain procedural rules apply so as to insure that the *pro se* litigant in not disadvantaged by the lack of legal training. In this regard, the Local Rules require that [a *pro se* party be informed of the consequences of failing to respond to a motion for summary judgment, before those consequences may be imposed]."); *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("This Court has also held that summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default.") [citations omitted]; *see also* Jessica Case, *"Pro Se* Litigants at the Summary Judgment Stage: Is Ignorance of the Law an Excuse?" 90 Ky. L.J. 701, 704, n. 24 (Spring 2001) ("The Second, Fourth, Seventh, Tenth, Eleventh, and D.C. Circuit Courts of Appeals mandate that notice of summary judgment requirements be given to *pro se* litigants.... The Ninth Circuit requires notice of summary judgment requirements for *pro se* prisoner litigants only.") [citations omitted].

6   *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *McKaskle v. Wiggins,* 465 U.S. 168, 184 (1984) ("Nor does the Constitution require judges to take over chores for a *pro se* [litigant] that would normally be attended to by trained counsel as a matter of course."); *Mohasco Corp. v. Silver,* 447 U.S. 807, 826 (1980) ("[I]in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law [even when that strict adherence inures to the detriment of a *pro se* litigant]."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) ("*[P]ro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law.") [citation omitted]; *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995) ("Although *pro se* litigants should be afforded latitude, ... they generally are required to inform themselves regarding procedural rules and to comply with them .... This is especially true in civil litigation.") [internal quotation marks and citations omitted]; *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them .") [citations omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[T]he right [to benefit from reasonable allowances as a *pro se* litigant]

does not exempt [the *pro se* ] party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted].

7    Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

8    *See, e.g., Hassig v. N.Y.S. Dep't of Environmental Conservation,* 01-CV-0284, Decision and Order, at 7 (N.D.N.Y. filed March 4, 2004) (McAvoy, J.), *aff'd,* No. 04-1773, 2005 WL 290210 (2d Cir. Feb. 2, 2005); *Lee,* 2004 U.S. Dist. LEXIS 20746, at *12-13, 15, *aff'd,* No. 04-1921, 2004 U.S.App. LEXIS 21432; *Harvey v. Morabito,* 99-CV-1913, 2003 WL 21402561, at *1, 3-4 (N.D.N.Y. June 17, 2003) (Sharpe, M.J.), *adopted by* 99-CV-1913, Order, at 2-3 (N.D.N.Y. filed Jan. 15, 2004) (Munson, J.), *aff'd,* No. 04-1008, 115 F. App'x 521 (2d Cir. Dec. 23, 2004); *Krug,* 2006 WL 2669122, at *2-3; *Fox,* 2006 U.S. Dist. LEXIS 9147, at *2-3; *Singleton v. Caron,* 03-CV-0455, 2005 WL 2179402, at *3-4 (N.D.N.Y. Sept. 5, 2005) (Peebles, M.J.), *adopted by* 03-CV-0455, 2006 WL 2023000, at *3 (N.D.N.Y. July 18, 2006) (Sharpe, J.); *Govan,* 289 F.Supp.2d at 295; *Butler v. Weissman,* 00-CV-1240, 2002 WL 31309347, at *3 (N.D.N.Y. June 20, 2002) (Sharpe, M.J.), *adopted by* 00-CV-1240, Decision and Order, at 1-2 (N.D.N.Y. filed July 22, 2002) (Kahn, J.); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 & n. 1 (N.D.N.Y.1999) (McAvoy, C.J.); *Costello v. Norton,* 96-CV-1634, 1998 WL 743710, at *1, n. 2 (N.D.N.Y. Oct. 21, 1998) (McAvoy, C.J.); *Squair v. O'Brien & Gere Eng'rs, Inc.,* 96-CV-1812, 1998 WL 566773, at *1, n. 2 (N.D.N.Y. Aug. 21, 1998) (Scullin, J.); *see also Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing, in *pro se* civil rights case, district courts' discretion to adopt local rules like 7.1[a][3] "to carry out the conduct of its business").

9    The Court notes that a detailed recitation of the claims and Plaintiff's procedural errors are provided in Magistrate Judge Peebles's Report-Recommendation. (Dkt. No. 85, at 8-14.) Accordingly, the Court will not repeat this thorough analysis.

10   *See Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) ("Although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment.") (citing *Ayers v. Stewart,* No. 96-2013, 1996 WL 346049, at *1 [2d Cir.1999] ).

11   *See also Sostre v. McGinnis,* 442 F.2d 178, 187-92 (2d Cir.1971), *rev'd on other grounds, Sostre v. Oswald,* 404 U.S. 1049 (1972).

12   In addition, in his Objections to the Report-Recommendation, Plaintiff appears to argue, for the first time, that the Court lacks jurisdiction over his claims. The Court rejects this argument for a number of reasons, including the fact that (1) such a jurisdictional challenge is not timely, and (2) such a jurisdictional challenge flies in the face of Plaintiff's Complaint, which alleged that the Court had "jurisdiction over each of Plaintiff's claims."

13   "Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases." *Chaney v. Koupash,* 04-CV-0136, 2008 WL 5423419, at *7 (N.D.N.Y. Dec. 30, 2008) (citing *Porter v. Nussle,* 534 U.S. 516, 524 (2002) [other citation omitted].). "While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that 'certain caveats apply.' " *Chaney,* 2008 WL 5423419, at *7 (citations omitted). "Exhaustion is generally achieved through the [Inmate Grievance Program]." *Id.* (citation omitted). "However, when inmates fail to follow the IGP, a court must conduct a three-part inquiry to determine if such failure is fatal to their claims." *Id.* "A court must consider whether (1) administrative remedies are not available to the prisoner; (2) defendants have waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Id.* (citations omitted).

14   "Administrative remedies are unavailable when there is no possibility of relief for the action complained of." *Chaney,* 2008 WL 5423419, at *7 (citations and internal quotations omitted). "The test to determine the availability of an administrative remedy is an objective one asking whether 'a similarly situated individual of ordinary firmness' would have deemed it accessible." *Id.* (citation omitted). "Courts have found unavailability where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Id.* (citations and internal quotations omitted).

15   *See, e.g., Carini v. Austin,* 06-CV-5652, 2008 WL 151555, at *4 (S.D.N.Y. Jan. 14, 2008) (noting that an inmate must point to "an affirmative act by prison officials that would have prevented him from pursuing administrative remedies, ... [because] his transfer to another facility is not a 'special circumstance' that excuses his failure to exhaust").

16   To the extent that Plaintiff argues that there existed a conflict of interest resulting from his disciplinary hearing officers knowing each other, or knowing the correctional officers having charged Plaintiff with disciplinary charges, it is true that "[p]risoners have a constitutional right to have a fair and impartial hearing officer preside over their disciplinary hearings."

2009 WL 890658

*Chaney,* 2008 WL 5423419 at *7 (citing *Sira v. Morton,* 380 F.3d 57, 69 [2d Cir.2004] ). "However, the degree of impartiality required of prison officials does not rise to the level of that required of judges as it is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citations and internal quotations omitted). "While the Supreme Court held 'that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] ...,' the Second Circuit has held that the test is whether there was 'reliable evidence' of the inmate's guilt." *Id.* (citations omitted).

1   In light of the procedural posture of the case the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted).

2   Each of these claims and their factual underpinnings will be discussed in more detail further on in this report.

3   Plaintiff's claim against the CORC, as well as those asserted against the remaining defendants in their official capacities, were dismissed by order issued by Senior District Judge Lawrence E. Kahn, on September 29, 2006 (Dkt. No. 69), acting on a report and recommendation issued by me on August 28, 2006. Dkt. No. 67.

4   This matter was transferred from Judge Kahn to District Judge Glenn T. Suddaby on October 2, 2008. *See* Dkt. No. 84.

5   In their answers, defendants have included an affirmative defense alleging plaintiff's failure to satisfy his exhaustion obligation. *See* Dkt. Nos. 58, ¶ 16 and 60, ¶ 16.

6   The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

7   In support of their motion, defendants have offered a version of plaintiff's complaint, which is exceedingly comprehensive, together with the extensive exhibits attached, all paginated for ease of reference. *See* Kerwin Decl. (Dkt. No. 80-8) Exh. A. In this report and recommendation I will adopt defendants' pagination when citing to those materials.

8   In his memorandum in opposition to defendants' motion, plaintiff alleges, for the first time, that certain prison officials, identified as defendants DeBejian and G. Molnar, interfered with his grievances out of retaliatory animus. *See* Plaintiff's Memorandum (Dkt. No. 82) at pp. 11-12. This conclusory statement draws no evidentiary support from the record, and is not viewed by the court as sufficient to invoke the limited exceptions by the Second Circuit in its group of decisions issued in 2004. *See, Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004); *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004); *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004); and *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004). I note, moreover, that whether the *Hemphill* test survives intact following the Supreme Court's decision in *Woodford v. Ngo,* 524 U.S. 81, 126 S.Ct. 2378 (2006), has been a matter of some speculation. In one relatively recent decision a judge of another district within this Circuit concluded that at least the first two prongs of the *Hemphill* three part inquiry, requiring the court to assess whether administrative remedies were in fact "available" to prisoners and whether defendants should be estopped from raising the affirmative defense of non-exhaustion, retain continued vitality. *Amador v. Superintendent of Dep't of Correctional Services,* No. 03 Civ. 0650(KTD)(GWG), 2007 WL 4326747, at *6-7 (S.D.N.Y. Dec. 4, 2007). I note that another judge of this court has similarly concluded that

it appears that these decisions have **not** been overruled ... In [his] concurring opinion, Justice Breyer specifically noted that two circuits, the **Second** Circuit and Third Circuit, have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts(,) ...,"

further buttressing the conclusion that the Second Circuit's *Hemphill* test retains vitality. *Miller v. Covey,* No. 9:05-CV 649, 2007 WL 952054, at *3 (N.D.N.Y. Mar. 29, 2007) (*Emphasis in original* ).

9   While the grievance for which plaintiff claims he was retaliated against in this count was filed on April 12, 2001, according to the exhibit attached to plaintiff's complaint, Houston contends that it was filed earlier and that there was a delay on the part of the IGRC in passing the complaint through for filing. *See* Houston Aff. (Dkt. No. 82) ¶ 4. While plaintiff's actual grievance complaints are annexed as exhibits in connection with other claims of retaliation, plaintiff did not include a copy of his handwritten grievance in this instance. It should be noted, however, that the handwritten complaints filed in other instances and the resulting formal IGRC sheet all bear the same filing dates. *See, e.g.,* Complaint (Dkt. No. 1) at pp. 19-21, 24-25, 59-61 and 116-18.

| 8/15/01 | Elliott | Grievances filed on 8/9/01 and and 8/12/01 [10] | Guilty (all counts) |
|---|---|---|---|

10   While plaintiff alleges having filed grievances on August 9, 2001 and August 12, 2001 against defendants Elliott and DeBejain, the record contains only the August 12, 2001 grievance. *See* Complaint (Dkt. No. 1) at ¶ 15 and pp. 20-21. Additionally, although plaintiff claims that the resulting false misbehavior report was issued on August 15, 2001 by both defendants Elliot and DeBejain, the report contains only Elliot's signature. *Id.* at p. 21.

Houston v. Goord, Not Reported in F.Supp.2d (2009)

2009 WL 890658

| | | | |
|---|---|---|---|
| 8/20/01 | Kelley | Filing of grievances (dates and content unspecified) | Guilty (two counts)/Not Guilty (one count) |
| 8/23/01 | Wurst | Filing of grievances and lawsuits against defendant Wurst's "buddies at Mohawk" (dates and specifics not specified) | Guilty of all charges |
| 11/26/02 | Morse | Plaintiff "verbally complaining to [Morse's] supervisor about his racist behavior" (neither dates nor specifics provided) | Acquitted on all counts |
| 3/3/03 | Touron | "[Plaintiff's] exercise of freedom of information" (neither dates nor specifics provided) | Guilty on all counts |
| 3/22/03 | Shaver | Grievance filed on 3/12/03 | Guilty (two counts), Not Guilty (one count). |
| 5/29/03 [11] | Hammill | Written complaint dated 5/29/03 to defendant Smith re: defendant Hammill [submitted by plaintiff] | Guilty (all counts) |

11    Plaintiff contends that this misbehavior report was issued on May 30, 2003, but backdated by one day. *See* Complaint (Dkt. No. 1) ¶ 26.

| | | | |
|---|---|---|---|
| 6/9/03 | Pirie | Pursuit of grievance appeal resulting in CORC decision dated 6/4/03 | Guilty (all counts); hearing result subsequently reversed on appeal to defendant Donald Selsky, Director of SHU/ Inmate Disciplinary Program |

12    No explanation is offered for the failure to include an affidavit for that defendant.

13    It should be noted that this is not the first time the plaintiff has had occasion to raise the claim of retaliation associated with this inter-prison transfers. In another action also filed in 2003, in the Western District of New York, plaintiff's complaint included claims of retaliation based upon prison transfers; plaintiff's claims in that case were dismissed, on motion for summary judgment, by order issued by District Judge David G. Larimer. *Houston v. ZenZen*, No. 03-CV-6118 L, (N.D.N.Y. September 26, 2005). *See* Kerwin Decl. (Dkt. No. 80-8) Exh. M (Decision and Order). Significantly, among the defendants named in that action was defendant Knapp-David. *Id.* It therefore could well be that plaintiff's claims in this action alleging retaliatory inter-prison transfer are barred by claim preclusion, or at the very least issue preclusion, based upon Judge Larimer's determination and the resulting judgment. *See Hill v. Coca Cola Bottling Co.*, 786 F.2d 550, 552-53 (2d Cir.1986) and *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455, 482 N.E.2d 63, 67 (1985).

| *Date of Transfer* | *Transferee Facility* |
|---|---|
| 5/7/01 | Mohawk Correctional Facility |
| 9/15/01 | Marcy Correctional Facility SHU |
| 11/21/01 | Downstate Correctional Facility SHU |
| 11/23/01 | Great Meadow Correctional Facility SHU |
| 11/27/01 | Downstate Correctional Facility SHU |
| 12/2/01 | Auburn Correctional Facility SHU |
| 12/5/01 | Five Points Correctional Facility |
| 7/11/02 | Cayuga Correctional Facility |
| 8/16/02 | Auburn Correctional Facility |
| 2/3/03 | Ogdensburg Correctional Facility |
| 6/13/03 | Riverview Correctional Facility |
| 6/17/03 | Gouverneur Correctional Facility |
| 8/15/03 | Elmira Correctional Facility |

14    In her declaration, Knapp-David also explained that inmate transfers can be prompted by a number of factors, including required court appearances or the need for specialized medical treatment, additionally pointing out that on occasion when an inmate is moved between hubs, a transfer may include short term stays at various facilities along the way. Knapp-David Decl. (Dkt. No. 80-22) ¶ 9. Knapp-David further explained that this is the likely reason for certain transfers in rapid succession not necessarily reflected on plaintiff's inmate transfer history including, for example, the September 2001 transfer from Marcy to Great Meadow, with an intermediate stop at Downstate, and a return trip through Downstate with

2009 WL 890658

a final destination of Five Points, with only the Marcy to Five Points transfer having been noted on the plaintiff's transfer history. *See* Knapp-David Decl. (Dkt. No. 80-22) ¶ 9 and Exh. B.

15    In a declaration given in support of defendants' motion, Attorney Stephen M. Kerwin, Esq. recounts his search for actions commenced by the plaintiff, revealing eleven civil cases commenced by Houston against DOCS employees, several of which include allegations of retaliation. *See* Kerwin Decl. (Dkt. No. 80-8) ¶¶ 5, 9-11.

---

**End of Document**                                   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 776416

KeyCite Yellow Flag - Negative Treatment
Distinguished by Jackson v. Monin, W.D.N.Y., March 11, 2016
2007 WL 776416
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Delroy KEMP, Plaintiff,
v.
Lucien J. LeCLAIRE, Theresa Knapp-David, Donald
Selsky, Randy James, C.O. Bea, Darryl Borawski, A.
Welsh, Officer A. Brigzna, D. Morris, A. Mezydlo,
James Conway and Ms. Arnone, Defendants.

No. 03-CV-844S.
|
March 12, 2007.

**Attorneys and Law Firms**

Delroy Kemp, Elmira, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo,
NY, for Defendants.

**DECISION AND ORDER**

WILLIAM M. SKRETNY, United States District Judge.

**I. INTRODUCTION**

*1   In this action, pro se Plaintiff Delroy Kemp
alleges pursuant to 42 U.S.C. § 1983 that Defendants
violated several of his constitutional rights by, *inter alia,*
repeatedly retaliating against him for filing grievances
against prison officials. Presently before this Court is
Defendants' Motion for Summary Judgment.[1] This
Court has reviewed and considered the motion papers and
finds that oral argument is unnecessary. For the following
reasons, Defendants' motion is granted in its entirety.

**II. BACKGROUND**

**A. Procedural History**

Plaintiff's Complaint was entered on the docket on
November 10, 2003. Because Plaintiff was granted

*in forma pauperis* status, his Complaint was screened
pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and
1915A(a). As
a result of this screening process, this Court dismissed
several defendants, primarily because Plaintiff failed to
assert adequate claims against them. (*See* Docket No.
5.) On May 12, 2006, the remaining defendants filed
the instant Motion for Summary Judgment. The parties
fully briefed the motion, and as of November 28, 2006,
this Court took the matter under advisement without
oral argument. The facts underlying Plaintiff's claims are
discussed below.

**B. Facts**

Plaintiff is an inmate in the custody of the New York
State Department of Correctional Services ("DOCS").
(Defendants' Rule 56 Statement of Undisputed Facts
("Defendants' Statement"), ¶ 1.) At one time, Plaintiff
resided in the Great Meadow Correctional Facility.
(Defendants' Statement, ¶¶ 3, 4.) DOCS transferred
Plaintiff from Great Meadow to the Attica Correctional
Facility on February 20, 2003. (Defendants' Statement,
¶ 3.) This transfer was effectuated because mental health
professionals determined that Plaintiff would benefit from
treatment through the Specialized Treatment Program
("STP") available at Attica. (James Decl., ¶ 13.) However,
Plaintiff stopped attending STP shortly after arriving
at Attica, despite being encouraged to continue. (James
Decl., ¶ 14.) Plaintiff alleges that he stopped attending
because officers and inmates were verbally harassing him.
(Complaint, p. 9.)

The staff at Attica placed Plaintiff in the Special Housing
Unit ("SHU") upon his arrival, which is a unit designated
for inmates with disciplinary violations. (Defendants'
Statement, ¶ 3; James Decl., ¶ 6.) Plaintiff's history
includes 44 Misbehavior Reports related to threats and
violence against staff. (James Decl., ¶ 9.)

Plaintiff maintains that from the outset, Defendants
undertook a campaign of retaliation against him because
he filed numerous grievances. This retaliation included
verbal and physical threats, punitive restraint and cell
shield orders, an assaultive pat frisk, the denial of medical
care and the opening of his legal mail. These incidents are
set forth below.

**1. Verbal and Physical Threats**

Plaintiff alleges that he was verbally abused and physically threatened by Defendants Arnone, Borawski, Bea, Brigzna and James for filing grievances. He alleges that he was told at various times that he would be hanged in his cell, that all of the bones in his body would be broken, that he would be sent to his mother in a black box, and that he would have his "black ass kicked," all because he repeatedly filed grievances against prison staff. Plaintiff further maintains that he was called a "black nigger bitch," a rat, and a "pain in the ass." He also maintains that Defendants Morris and Mezydlo told other inmates that they would not receive any favors because of Plaintiff's complaints about prison staff.

**2. The Restraining Order**

**\*2**  On February 16, 2003, while Plaintiff was at Great Meadow, he was under a restraining order because of his continued threats and assaults against staff members. (James Decl., ¶ 7.) Defendant James, Deputy Superintendent of Security at Attica, continued this order when Plaintiff was transferred to Attica. (Defendants' Statement, ¶¶ 4, 5.) Defendant James is authorized to impose such an order under 7 NYCRR § 305.4, which provides as follows:

Section 305.4 Restraint orders.

(a) Any inmate assigned to an SHU who has history of assaultive behavior and/or who presents a threat to the safety or security of himself/herself, other persons, or State property may be placed under a restraint order by the deputy superintendent for security or, in his/her absence, the O.D. or higher ranking authority.

(b) A restraint order will be valid for no more than seven days and may be renewed by the deputy superintendent for security or, in his/her absence, the O.D. or higher ranking authority.

(c) A copy of the restraint order and any renewal thereafter must be forwarded to the superintendent and the inmate within 24 hours. The order and any renewal thereafter must briefly state the reason(s) for the order or renewal and contain the following notice to the inmate: "You may write to the deputy superintendent for security or his/her designee to make a statement as to the need for continuing the restraint order."

(d) A restraint order will describe the types of restraints to be used and the manner in which they are to be

applied (e.g., handcuffed in front or in back, with or without waist chain, with or without leg irons).

(e) If an inmate is under a restraint order directing that he/she be mechanically restrained whenever he/she leaves the SHU cell for any reason, the inmate will remain mechanically restrained during the entire period of time he/she is out of the SHU cell, except:

(1) upon request of a physician, nurse practitioner, or a physician's assistant (P.A.) when removal is necessary to permit medical treatment;

(2) upon request of the Parole Board at a parole hearing;

(3) upon the request of a judge or magistrate;

(4) when the inmate can be secured in a shower room during the scheduled shower period;

(5) when the inmate has been secured in the exercise area, unless the restraint order (or renewal) includes a written determination stating the reason(s) why the removal of restraints in the exercise area would, in the light of the particular circumstances relative to the affected inmate, present a treat to the safety or security of the inmate, other persons or State property. Such a determination, in any restraint order or renewal, shall only remain in effect for three days unless approved in writing by the superintendent or acting superintendent, based upon his or her review of the relevant facts. Note: This paragraph does not apply to Southport Correctional Facility;

(6) upon order of the deputy superintendent for security services or higher ranking authority; or

**\*3**  (7) when in a general population visiting room and not in a noncontact area.

(f) When mechanical restraints are removed pursuant to subdivision (e) of this section, they will be reapplied as specified in the restraint order prior to return to the SHU cell.

7 NYCRR § 305.4

Defendant James reviewed this order each week, and continued to renew the order through September 12, 2003, at which time the DOCS stopped using this type of restraining order. (Defendants' Statement, ¶¶ 6, 7, 9.)

Case 9:16-cv-01211-GTS-TWD    Document 72    Filed 08/09/18    Page 172 of 338
Kemp v. LeClaire, Not Reported in F.Supp.2d (2007)
2007 WL 776416

Defendant James continuously renewed his restraining order because he believed it was necessary to prevent Plaintiff from committing further acts of violence against staff and other inmates. (Defendants' Statement, ¶ 8.)

Plaintiff maintains that there was no cause for the restraining order and that Defendant James kept it in place as a punitive measure for Plaintiff's filing of grievances. (Complaint, p. 10.) He further alleges that Defendant James repeatedly renewed the restraint order because Plaintiff refused to participate in the STP, despite Defendant James' encouragement of him to do so. (Complaint, pp. 10-11, 12.)

### 3. The Cell Shield Order

Along with the restraining order, Defendant James found cause to issue a cell shield order against Plaintiff based on his continued threats against staff and his unhygienic acts. (Defendants' Statement, ¶¶ 11, 13.) Defendant James is authorized to impose such an order under 7 NYCRR § 305.6, which provides as follows:

Section 305.6 Use of cell shields.

(a) A cell shield is a transparent cell front covering, equipped to provide adequate ventilation.

(b) Cell shields may be ordered for good cause, including but not limited to the reasons listed below:

(1) Spitting through the cell door, or the throwing of feces, urine, food, or other objects through the cell door.

(2) The inmate refuses to keep his/her hands within the cell and/or otherwise attempts to assault or harass staff.

(3) The inmate is so disruptive as to adversely affect the proper operation of the unit.

(c) Use of the cell shield shall be ordered by the deputy superintendent for security or, in his/ her absence, the O.D. or higher ranking authority. The cell shield order shall be valid for no more than seven days and may be renewed by the deputy superintendent for security or, in his/her absence, the O.D. or higher ranking authority.

(d) A copy of the cell shield order and any renewal thereafter shall be forwarded to the superintendent and the inmate within 24 hours. The order and any renewal

thereafter shall briefly state the reason for the order or renewal and contain the following notice to the inmate: "You may write to the deputy superintendent for security or his/her designee to make a statement as to the need for continuing the cell shield order."

7 NYCRR § 305.6

Defendant James renewed this order on a weekly basis from February 28, 2003, through April 25, 2003, at which point he discontinued it because Plaintiff was housed on the third floor of the SHU, which had permanent plexiglass shields on the cells. (Defendants' Statement, ¶¶ 13, 14, 16; James Decl., ¶ 25.)

**\*4** Again, Plaintiff maintains that there were no grounds for this order and that Defendant James kept the order in place to retaliate against him for filing grievances against prison staff.

### 4. The Opening of Legal Mail

On August 22, 2003, Defendant Welsh received a letter from Prisoners Legal Services that was addressed to Plaintiff, but contained the identification number of another inmate. (Defendants' Statement, ¶ 17; Welsh Decl., ¶ 6.) Because of this discrepancy, Defendant Welsh advised Plaintiff that the letter would be opened in his presence to determine whether it was in fact intended for him, and to inspect it for contraband. (Defendants' Statement, ¶ 18.) Defendant Welsh opened the letter in Plaintiff's presence in an interview room, examined it briefly, and determined that it was intended for Plaintiff. (Defendants' Statement, ¶ 19; Welsh Decl., ¶¶ 6-8.) Defendant Welsh did not read the letter, nor did he question Plaintiff regarding the nature of the letter. (Defendants' Statement, ¶ 20.)

Plaintiff alleges that Defendant Welsh opened and read his legal mail and then asked him whether he filed another complaint against the prison. (Complaint, p. 16.) Plaintiff allegedly responded that he was not required to discuss his legal proceedings. (Complaint, p. 16.)

### 5. Pat-Frisk

On September 17, 2003, Defendant Brigzna conducted a pat-frisk on Plaintiff before Plaintiff went to the shower. (Defendants' Statement, ¶ 21.) A pat-frisk search requires searching the buttocks and groin areas, which are favored

areas for concealing contraband. (Defendants' Statement, ¶ 23.) This type of search is required for every inmate who enters or leaves the SHU, and is authorized by 7 NYCRR § 305.1 as follows:

> Section § 305.1 Frisks.
>
> In accordance with the provisions of directives concerning "Control of and Search for Contraband," the following procedures will be followed in such designated special housing units.
>
> ...
>
> (b) *Pat frisk.* An inmate will be pat-frisked whenever he goes out of or returns to the SHU; and/or prior to and upon returning from any exercise periods, hearings, interviews, etc.

7 NYCRR § 305.1.

Plaintiff did not seek medical attention after the pat-frisk, despite the availability of medical staff through regular rounds in the SHU. (Defendants' Statement, ¶ 25.) However, Plaintiff sought medical attention three days later, on September 20, 2003, complaining of mild pain in his testicle. (Defendants' Statement, ¶¶ 26, 27.) Dr. Stephan Lakowski examined Plaintiff and found no evidence of swelling. (Defendants' Statement, ¶ 27.)

Plaintiff maintains that Defendant Brigzna slapped his right testicle "very hard" during the pat-frisk, and then "felt [his] left side ass." (Complaint, p. 18.) Plaintiff asserts that he asked to see medical personnel immediately after the pat-frisk because his testicle hurt, but that his request was denied and he was told that he would be cited for assault if he persisted in his bid for medical assistance. (Complaint, p. 18.)

## III. DISCUSSION

**\*5** Cognizant of the distinct disadvantage that pro se litigants face, federal courts routinely read their submissions liberally, and interpret them to raise the strongest arguments that they suggest. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Since Plaintiff is proceeding pro se, this

Court has considered his submissions and arguments accordingly.

Plaintiff argues that Defendants took the measures discussed above in retaliation for his numerous grievances and in violation of his constitutional rights under the First, Eighth and Fourteenth Amendments. Defendants do not deny that these events took place (other than the verbal threats and denial of medical care), but rather, maintain that there is a legitimate reason for each action taken, and that none of Plaintiff's constitutional rights were violated. Moreover, they maintain that even if a constitutional violation occurred, they are entitled to the protections of qualified immunity. The parties' respective positions are discussed below.

### A. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L .Ed.2d 202 (1986); *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson,* 477 U.S. at 248. In a case where the non-moving party bears the ultimate burden of proof at trial, the movant may satisfy its burden by pointing to the absence of evidence supporting an essential element of the non-moving party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

At this stage, the function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. Thus, summary judgment is not appropriate if "there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Ford,* 316 F.3d at 354.

When deciding a motion for summary judgment, a court must view the evidence and the inferences drawn from the evidence "in the light most favorable to the party

2007 WL 776416

opposing the motion." *Addickes v. S.H. Kress and Co.,* 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970). However, the party against whom summary judgment is sought "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991).

## B. 42 U.S.C. § 1983

**\*6** Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. *See* 42 U.S.C. § 1983. On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. *See Graham v. Connor,* 490 U.S. 386, 393-94,109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (quoting *Baker v. McCollan,* 443 U.S. 137, 145 n.3, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979)). Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations alleged. *See Baker,* 443 U.S. at 140. Here, Plaintiff's various § 1983 claims are grounded in the First, Eighth and Fourteenth Amendments.

## C. Personal Involvement

Personal involvement in the deprivation of a federal constitutional right is the *sine qua non* of liability under § 1983. *See Haygood v. City of New York,* 64 F.Supp.2d 275, 280 (S .D.N.Y.1999). Moreover, it is well settled in this Circuit that personal involvement by defendants in cases alleging constitutional deprivations is a prerequisite to an award of damages under § 1983. *See McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977); *Richardson v. Coughlin,* 101 F.Supp.2d 127, 129 (W.D.N.Y.2000); *Pritchett v. Artuz,* No. 99 Civ. 3957(SAS), 2000 WL 4157, at \*5 (S.D.N.Y. Jan. 3, 2000). The Second Circuit construes personal involvement in this context to mean "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Black v. Coughlin,*

76 F.3d 72, 74 (2d Cir.1996); *see also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

Defendants LeClaire, Knapp-David and Selsky argue that they must be dismissed because Plaintiff's Complaint does not contain any allegations against them. Plaintiff contends that these defendants were personally involved because they failed to act on letters that he sent them complaining about threats and other mistreatment, and requesting a transfer out of Attica. (Plaintiff's June 19, 2006 Decl ., p. 5.)

The fact that Plaintiff sent letters of complaint to Defendants LeClaire, Knapp-David and Selsky is insufficient to maintain a § 1983 claim against them. Courts have consistently held that the mere receipt of a letter does not render a supervisor personally liable. *See Hyman v. Holder,* No. 96 Civ. 7748(RCC), 2001 WL 262665, \*6 (S.D.N.Y.2001) (no personal involvement where inmate wrote letter to supervisor, who then forwarded it to deputy); *see also Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Richardson,* 101 F.Supp.2d at 131; *Thomas v. Coombe,* 95 Civ. 10342, 1998 WL 391143, at \*6 (S.D.N.Y. July 13, 1998); *Gayle v. Lucas,* 97 Civ. 883, 1998 WL 148416, at \*4 (S.D.N.Y. Mar. 30, 1998).

**\*7** It appears that Plaintiff is suing each of these defendants simply because they held supervisory positions. Such allegations are insufficient to establish the required level of personal involvement. *See Black,* 76 F.3d at 74 ("a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority"). There is no evidence (or allegation) that Defendants LeClaire, Knapp-David or Selsky were personally involved in the alleged constitutional deprivations or had direct knowledge thereof. As such, these defendants are entitled to summary judgment and will be dismissed.

## D. Verbal and Physical Threats

As indicated, Plaintiff alleges that he was verbally abused and physically threatened by Defendants Arnone, Borawski, Brigzna, Bea and James. Defendants vigorously deny these allegations. (Brigzna Decl., ¶¶ 12, 15; James Decl., ¶¶ 5, 16, 17.) Nonetheless, even assuming that these defendants insulted and threatened Plaintiff in the manner that he alleges, this Court finds that no constitutional violation occurred.

Kemp v. LeClaire, Not Reported in F.Supp.2d (2007)
Case 9:16-cv-01211-GTS-TWD   Document 72   Filed 08/09/18   Page 175 of 338
2007 WL 776416

Verbal harassment and name calling, absent physical injury, are not constitutional violations cognizable under § 1983. *See Martin v. Sargent,* 780 F.2d 1334, 1338 (8th Cir.1985); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986)(per curiam)(finding that a claim that a prison guard called an inmate a name does not allege any appreciable injury); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 342 (S.D.N.Y.2000) (collecting cases). Moreover, the use of racial epithets, racially prejudicial insults and name-calling, without more, does not violate the Constitution. *See Cuoco v. U.S. Bureau of Prisons,* No. 98 Civ. 9009, 2001 WL 167694, at *3 (S.D.N .Y. Feb. 16, 2001) (finding that although abhorrent, verbal harassment and profanity do not violate an inmate's constitutional rights); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997) (racial slurs and epithets not actionable); *Jeromosen v. Coughlin,* 878 F.Supp. 444, 449 (N.D.N.Y.1995) (same).

There is no evidence in the record to support a finding that Plaintiff was injured by or as a result of the verbal abuse and physical threats that he alleges Defendants' directed at him. Indeed, Plaintiff does not assert that he suffered any physical injury. As such, he does not state a constitutional claim under § 1983, and Defendants Arnone, Borawski, Brigzna, Bea and James are entitled to summary judgment.

### E. The Restraining and Cell Shield Orders

Plaintiff contends that Defendant James' imposition of the restraining and cell shield orders violated his Eighth Amendment rights. Prison officials have wide latitude to place restraints on inmates and only violate the Eighth Amendment if the imposed restraint is "totally without penological justification, grossly disproportionate, or involves the unnecessary and wanton infliction of pain." *Horne v. Coughlin,* 155 F.3d 26, 31 (2d Cir.1998) (citations omitted).

**\*8** There are no disputed issues of fact on this claim. Plaintiff concedes that Defendant James imposed the restraint and cell shield orders pursuant to 7 NYCRR §§ 305.4 and 305.6 because of his disciplinary history, including 44 previous Misbehavior Reports. (Plaintiff's June 19, 2006 Decl., pp. 13, 14.) Plaintiff simply contends that, in his judgment, he was not a threat to security. (*Id.*) While Plaintiff may hold this belief, the fact remains that Defendant James was authorized to impose the restraining and cell shield orders under the regulations, and he

did so for a legitimate, penological purpose. Defendant James reviewed the propriety of the orders on a weekly basis as required and determined that continuation was warranted. (James Decl., ¶¶ 9, 21.) As such, there is no violation of the Eighth Amendment. *See Dabney v. McGinnis,* 97 CV 489, 2006 WL 1285625, at *5 (W.D.N.Y. May 9, 2006) (upholding use of restraint order to shackle inmate for exercise); *DeMaio v. Mann,* 877 F.Supp. 89, 93 (N.D.N.Y.1995) (use of plexiglass shield on cell that does not interfere with air flow does not violate the Eighth or Fourteenth Amendment).

To the extent Plaintiff claims a Fourteenth Amendment violation based on a denial of Due Process, "it has been held that the daily review of deprivation orders, the availability of the inmate grievance program, and the fact that the inmate has a judicial remedy to challenge deprivation orders, and restraining orders, under CPLR article 78 clearly provide due process of law." *Dawes v. Coughlin,* 964 F.Supp. 652, 658 (N.D.N.Y.1997). Moreover, "courts in this Circuit have found that a prison inmate in New York has no protected liberty interest in confinement in an unshielded cell." *Breazil v. Bartlett,* 998 F.Supp. 236, 243 (W.D.N.Y.1997) (citing *DeMaio,* 877 F.Supp. at 93 and *Young v. Scully,* 91 Civ. 4332, 1993 WL 88144, at *3 (S.D.N.Y. Mar. 22, 1993)). As such, no violation of the Fourteenth Amendment occurred.

Accordingly, this Court finds that Defendant James is entitled to summary judgment on this claim.

### F. The Opening of Legal Mail

Plaintiff argues that Defendant Welsh's opening and examination of his legal mail violated his constitutional rights. Inmates retain a recognized right under the First Amendment to the free flow of their incoming and outgoing mail subject to reasonable restrictions related to legitimate penological interests. *See Thornburgh v. Abbott,* 490 U.S. 401, 413-415, 109 S.Ct. 1874, 104 L . Ed.2d 459 (1999); *Heimerle v. Attorney Gen.,* 753 F.2d 10, 12-13 (2d Cir.1985). To maintain a claim, however, an inmate must demonstrate more than a single instance of interference with his mail. *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) ("an isolated incident of mail tampering is usually insufficient to establish a constitutional violation"); *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986) (isolated incident of interference with inmate's mail insufficient to state a claim under § 1983); *Morgan v. Montayne,* 516 F.2d 1367, 1372 (2d

Cir.1975) (same). Rather, to establish a violation, an inmate must demonstrate that prison officials "regularly and unjustifiably interfered with the incoming legal mail." *Davis,* 320 F.3d at 351 (citations omitted).

**\*9** Here, Plaintiff alleges only a single incident of mail interference that did not result in any identifiable harm. Even assuming that Defendant Welsh read Plaintiff's letter, which he denies doing, Plaintiff fails to state a constitutional claim. In addition, it is undisputed that the piece of legal mail in question was addressed to Plaintiff but contained a different inmate's identification number. (Welsh Decl., ¶ 6.) Thus, Defendant Welsh properly opened the letter, in Plaintiff's presence, to determine its rightful owner and whether it contained contraband. *See Word v. Croce,* 169 F.Supp.2d 219, 228 (S.D.N.Y.2001) ("prison officials may open incoming mail to ensure that no contraband is contained in the correspondence") (quoting *Webster v. Mann,* 917 F.Supp. 185, 187 (W.D.N.Y.1996). Accordingly, Defendant Welsh is entitled to summary judgment on Plaintiff's claim that he violated his First Amendment rights.

### G. Pat-Frisk and Request for Medical Care

#### 1. The Pat-Frisk
Plaintiff alleges that Defendant Brigzna violated his Eighth Amendment rights by using excessive force against him when he allegedly slapped him in his right testicle during the pat-frisk. Moreover, Plaintiff maintains that Defendant Brigzna sexually assaulted him during the pat-frisk by fondling his buttocks.

Defendant Brigzna denies that he assaulted Plaintiff and notes that Plaintiff's grievance of this incident was denied because the investigation revealed that Plaintiff's allegations were without merit. (Brigzna Decl., ¶¶ 5-8.) Moreover, Defendant Brigzna contends that the investigator noted in his report that the video surveillance tape revealed that Defendant Brigzna did not strike Plaintiff in the groin or fondle his buttocks during the pat-frisk. (Brigzna Decl., ¶ 8.)

The Eighth Amendment "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." *Wilson v. Seiter,* 501 U.S. 294, 297, 11 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991). "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty

to assume some responsibility for his safety and general well being." *Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (quotation and citation omitted). Part of the state's duty is to protect inmates from punishments that are "totally without penological justification." *See Williams v. Fitzpatrick,* No. 03 CV 11, 2006 WL 1889964, at \*2 (D.Vt. July 10, 2006) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

Plaintiff's Eighth Amendment excessive force claim is evaluated under the familiar two-prong inquiry. *See Warren v. Chakravorty,* No. 03 Civ. 8736, 2006 WL 2067736, at \*7 (S.D.N.Y. July 25, 2006). That is, both an objective and subjective prong must be satisfied. To meet the objective prong, the alleged violation must be "sufficiently serious" by objective standards. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). To meet the subjective prong, the inmate must show that the prison officials involved had a wanton state of mind when they engaged in the misconduct. *See Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (quoting *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994)).

**\*10** As noted, Plaintiff alleges that Defendant Brigzna used excessive force when he allegedly slapped him in his right testicle during the pat-frisk. This Court finds that Defendant Brigzna is entitled to summary judgment on this claim for several reasons.

First, Plaintiff has not presented any evidence that this incident actually took place. He rests only on his bare accusations. *See* FED.R.CIV.P. 56(e) ( "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"); *see Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994) ("mere allegations or denials" not enough to defeat summary judgment); *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (conclusory allegations and unsubstantiated speculation cannot defeat summary judgment). Defendants, on the other hand, have presented evidence that an internal investigation revealed that Plaintiff's present allegations have no merit. (Brigzna Decl., ¶¶ 5-8.) This determination was also upheld on internal appeal. (Brigzna Decl., ¶ 9.)

Second, even assuming that Defendant Brizna's hand came into contact with Plaintiff's testicle, there is no evidence whatsoever that Defendant Brigzna took such action as a punitive measure against Plaintiff. Plaintiff does not dispute that 7 NYCRR 305.1 requires that inmates entering or leaving the SHU be pat-frisked by officers. He may disagree with the regulation, but Plaintiff does not dispute that Defendant Brigzna conducted the pat-frisk because Plaintiff was leaving the SHU to go to the showers. Thus, Defendant Brigzna acted with a legitimate penological purpose pursuant to the regulation.

Third, even assuming that Defendant Brigzna slapped Plaintiff's testicle as alleged, Plaintiff's claim fails. There is no medical evidence establishing that Plaintiff suffered a serious injury, and even if there was, there is no evidence from which a reasonable trier of fact could conclude that Defendant Brigzna acted maliciously. *See Green v. Morse,* No. 00-CV-6533, 2005 WL 1490301, at *3 (W.D.N.Y. June 23, 2005) ("even if the harm inflicted is not significant, if plaintiff can show malicious intent then the objective prong will [ ] almost always be satisfied"); *Griffin,* 193 F.3d at 91 (malicious use of force to cause harm constitutes an Eighth Amendment violation per se whether or not significant injury is evident).

The subjective inquiry requires this Court to determine whether there is evidence from which it could be concluded that the prison officials involved had a wanton state of mind when they engaged in the misconduct. *See Davidson,* 32 F.3d at 30. Put another way, the "core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Warren,* 2006 WL 2067736, at *7 (quoting *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). In light of the complete absence of any evidence that Defendant Brigzna acted with a wanton state of mind and the existence of evidence that he in fact acted with a legitimate penological purpose, this Court finds that no reasonable jury could find that Defendant Brigzna violated Plaintiff's Eighth Amendment rights.

**\*11** Finally, to the extent Plaintiff asserts that Defendant Brigzna sexually abused or assaulted him, Defendant Brigzna denies committing such an act (Brigzna Decl., ¶ 7) and, in any event, the Second Circuit has determined that an isolated act of alleged sexual touching is insufficient to state an Eighth Amendment claim. *Boddie v. Schnieder,* 105 F.3d 857, 860-61 (2d Cir.1997); *Young v. Poff,* No. 04 CV 320, 2006 WL 1455482, at *3 (W.D.N.Y. May 22, 2006) (discussing *Boddie).*

Accordingly, this Court finds that Defendant Brigzna is entitled to summary judgment on Plaintiff's claim that he used excessive force and sexually assaulted him in violation of his Eighth Amendment rights. [2]

### 2. Request for Medical Care

Plaintiff also maintains that Defendants Brigzna, Welsh and Morris ignored his requests to see medical personnel following the pat-frisk and refused to provide him medical care in violation of the Eighth Amendment.

The Eighth Amendment to the United States Constitution applies to the States through the Fourteenth Amendment, and "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." *Wilson,* 501 U.S. at 297; U.S. Const. amend. VIII. As such, prison conditions and the treatment prisoners receive while incarcerated are subject to scrutiny under the Eighth Amendment. *See DeShaney v. Winnebago County Dept. of Social Svcs.,* 489 U.S. 189, 199-200, 109 S.Ct. 998, 1005-1006, 103 L.Ed.2d 249 (1989). In addition, the Supreme Court has recognized that a prisoner's claim that he was intentionally denied medical treatment is cognizable under the Eighth Amendment and § 1983:

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.
>
> ...
>
> In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend evolving standards of decency in violation of the Eighth Amendment.

2007 WL 776416

*Estelle v. Gamble,* 429 U.S. 97, 104, 106, 97 S.Ct. 285, 291, 292, 50 L.Ed.2d 25 (1976)(quotations and citations omitted).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000) (citing *Hudson v. McMillian,* 503 U.S. 1, 7-8, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). With respect to a claim of deliberate indifference to a serious medical need, a prisoner must show that he suffered from a "sufficiently serious" medical condition, *see Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998), and that the defendants acted with a "sufficiently culpable state of mind," *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994).

**\*12** The subjective component "requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." *Sims,* 230 F .3d at 21 (citations omitted). The objective component is "contextual and responsive to contemporary standards of decency." *Id.* (quoting *Hudson,* 503 U.S. at 8).

> "An official acts with the requisite deliberate indifference when he 'knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' "

*Brown v. Picarelli,* No. 96 Civ. 1222, 2003 WL 1906180, at *6 (S.D.N.Y. Apr. 15, 2003)(quoting *Farmer,* 511 U.S. at 837).

This Court finds that Plaintiff has failed to demonstrate the existence of any genuine issue of material fact regarding his Eighth Amendment denial of medical treatment claim. Defendants Brigzna and Welsh deny that Plaintiff ever requested medical attention after the pat-frisk (Brigzna Decl., ¶ 10; Welsh Decl., ¶ 12), but even assuming that he did, this Court finds that Plaintiff's claim fails.

First, Plaintiff has failed to present competent evidence demonstrating that he suffered a sufficiently serious injury to his right testicle as a result of the pat-frisk. More than minor discomfort or injury is required to demonstrate a serious medical condition implicating the Eighth Amendment. *See Evering v. Rielly,* No. 98 CIV. 6718, 2001 WL 1150318, *9 (S.D.N.Y. Sept. 28, 2001). At most, Plaintiff received some pain medication, but there is no evidence that he suffered a lasting injury. In fact, Defendants presented evidence that Dr. Stephan Lakowski found no sign of swelling and that Plaintiff reported only mild pain. (Murphy May 12, 2006 Decl., ¶ 3 and Exhibit A.)

The Second Circuit has set forth a number of factors to be considered when determining whether a serious medical condition exists. *See Chance,* 143 F.3d at 702. These factors include, but are not limited to, "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic or substantial pain." *Chance,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir.1992) (citations omitted)).

There are numerous examples of injuries that courts have found to be too lacking in seriousness to raise Eighth Amendment concerns. *See, e.g., Rivera v. Johnson,* No. 95 CIV. 0845E(H), 1996 WL 549336 at *2 (W.D.N.Y. Sept. 20, 1996) (broken finger); *Glasper v. Wilson,* 559 F.Supp. 13 (W.D.N.Y.1982) (lack of immediate medical attention for bowel problems); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303 (S.D.N.Y.2001) (cut finger); *Henderson v. Doe,* No. 98 CIV. 5011, 1999 WL 378333 (S.D.N.Y. June 10, 1999) (broken finger); *Gibson v. McEvers,* 631 F.2d 95, 98 (7th Cir.1980) (cold symptoms); *Dickson v. Colman,* 569 F.2d 1310 (5th Cir.1978) (per curiam) (headaches); *Tyler v. Rapone,* 603 F.Supp. 268 (E.D.Pa.1984) (toothache and cut).

**\*13** There are also numerous examples of injuries found to be sufficiently serious to satisfy the Eighth Amendment standard. *See Neitzke v. Williams,* 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed .2d 338 (1989) (brain tumor); *Hathaway,* 37 F.3d at 66 (two year delay in arranging hip surgery); *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974) (loss of an ear); *Corby v. Convoy,* 457 F.2d 251 (2d Cir.1972) (serious nasal problem); *Monmouth County Corr. Inst.*

*Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir.1987) (abortion); *Griffin v. DeRobertis,* 557 F.Supp 302, 306 (N.D.Ill.1983) (spitting up blood).

The minor pain and discomfort Plaintiff reported in his testicle clearly falls into the former category of injuries that are not sufficiently serious to raise an Eighth Amendment claim. There is simply no suggestion in the record, let alone any evidence, that Plaintiff suffered from an untreated medical condition that was "sufficiently serious, in the sense that [it was] a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998).

Second, even assuming that Plaintiff could establish that he suffered a sufficiently serious injury such that he is able to meet the objective component of an Eighth Amendment claim, this Court finds that he cannot meet the subjective component because there is no evidence that Defendants Brigzna and Welsh acted wantonly. In fact, Plaintiff admits that he received medical attention for his alleged injury, although not immediately when he requested it. It is therefore undisputed that Defendants provided medical care. (Murphy May 12, 2006 Decl., Exhibit A.) To the extent Plaintiff argues that his rights were violated because he did not receive medical attention immediately upon his request, this Court notes that Plaintiff is not entitled to choose his own course of treatment. *See Armstrong,* 143 F.3d at 703 ("it is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."). Plaintiff simply cannot demonstrate that Defendants Brigzna and Welsh acted with a sufficiently culpable state of mind to meet the deliberate indifference standard. *See Hathaway,* 37 F.3d at 66.

Accordingly, for the reasons stated above, this Court finds that Defendants Brigzna, Welsh and Morris are entitled to summary judgment on Plaintiff's claim that they denied him adequate medical care in violation of his Eighth Amendment rights.

## H. Retaliation

Plaintiff claims that Defendants Arnone, James, Borawski, Bea, Welsh, Brigzna, Mezydlo, Morris and Conway retaliated against him in various ways because he repeatedly filed grievances against Attica staff members.

Plaintiff argues that Defendants took all of the actions discussed above-the verbal and physical threats, the restraining and cell shield orders, the opening of his legal mail, the pat-frisk, and the denial of medical treatment-in retaliation for his filing of grievances.

**\*14** It is well established that prison officials cannot retaliate against inmates for exercising their constitutional rights. *See Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). The Second Circuit has cautioned that courts "must approach prisoner claims of retaliation with skepticism and particular care" because such claims are "prone to abuse" and can be easily fabricated. *See Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Colon,* 58 F.3d at 872; *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

To prove a retaliation claim under the First Amendment, an inmate must establish the following:

(1) that the speech or conduct at issue was protected;

(2) that the defendant took adverse action against the plaintiff, and

(3) that there was a causal connection between the protected speech and the adverse action.

*Gill v. Pidlypchack,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes,* 239 F.3d at 492).

For purposes of the second requirement, adverse action is defined as one "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 380 (citing *Davis,* 320 F.3d at 353). "If the action would not deter an individual of ordinary firmness the retaliatory act 'is simply de minimis and therefore outside the ambit of constitutional protection." *Islam v. Goord,* No. 05 Civ. 7502, 2006 WL 2819651, at *4 (S.D.N.Y. Sept. 29, 2006) (citing *Davis,* 320 F.3d at 353).

Here, it is undisputed that Plaintiff repeatedly filed grievances against prison staff members, which undoubtedly constitutes a constitutionally protected activity. *See Gayle,* 313 F.3d at 682. However, Plaintiff has failed to demonstrate that Defendants' actions, even assuming that they would deter an individual of ordinary

firmness from filing grievances, were causally connected to his protected speech or would not have been imposed otherwise for penological reasons.

As discussed at length above, there exist legitimate, penological reasons for the restraining and cell shield orders, the opening of Plaintiff's mail, and the pat-frisk. Moreover, Plaintiff has not come forward with any evidence that he was denied medical treatment, and in fact, the evidence of record demonstrates that Plaintiff received treatment for the pain and discomfort he felt in his testicle. In any event, these are not the types of harms that courts in this circuit typically consider significant enough to constitute adverse actions. *See Islam,* 2006 WL 2819651, at *6 (collecting cases including *Morales v. Mackalm,* 278 F.3d 126, 131-32 (2d Cir.2002) (transfer to psychiatric facility); *Graham v. Henderson,* 89 F.3d 75, 80-81 (2d Cir.1996) (false misbehavior reports); *Colon,* 58 F.3d at 872-73 (planted contraband in plaintiff's cell); *Gill v. Hoadley,* 261 F.Supp.2d 113, 124 (N.D.N.Y.2003) (false misbehavior report resulting in keeplock confinement for almost fifty days)).

 *15 That leaves only the alleged verbal and physical threats. Even assuming that Defendants insulted and threatened Plaintiff as he alleges, "threats made to an inmate, without more, do not rise to the level of a constitutional violation." *Pledger v. Hudson,* No. 99 Civ. 2167, 2005 WL 736228, at *5 (S.D.N.Y. Mar. 31, 2005). The threats at issue here, such as "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your black ass kicked" and the alleged statement to other prisoners that no favors would be granted because of Plaintiff's grievances, are indistinguishable from those that have been found insufficient to establish a constitutional violation. *See, e.g., Bartley v. Collins,* 95 Civ. 10161, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) ("verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action"); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) ("alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance ... do not rise to a First Amendment retaliation claim"); *Williams v. Muller,* 98 Civ. 5204, 2001 WL 936297, at *4 (S.D.N.Y. Aug. 17, 2001) (defendant's "alleged spreading of rumors [that] plaintiff's claims ... were intended to incite the inmates to harm plaintiff ... do not rise to a retaliation claim").

Here, Plaintiff has not presented any evidence that the threats he alleges were leveled at him resulted in any further action or injury. Indeed, they are exactly the types of threats that have been found to be insufficient to sustain a First Amendment claim. Accordingly, this Court finds that Defendants Arnone, James, Borawski, Bea, Welsh, Brigzna, Mezydlo, Morris and Conway are entitled to summary judgment on Plaintiff's retaliation claim.

### I. Qualified Immunity

"[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate a clearly established statutory or constitutional right of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 1696, 143 L.Ed.2d 818 (1999) (internal quotations and citation omitted). In light of the fact that this Court finds that Defendants did not infringe Plaintiff's constitutional rights, it is unnecessary to reach the merits of Defendants' alternate qualified immunity argument.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted.

### V. ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 34) is GRANTED.

FURTHER, that Plaintiff's Motion to Compel Discovery (Docket No. 33) is DENIED as moot.[3]

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 776416

Kemp v. LeClaire, Not Reported in F.Supp.2d (2007)

2007 WL 776416

Footnotes

1   In support of their Motion for Summary Judgment, Defendants filed the following documents: a memorandum of law, a Rule 56 Statement of Undisputed Facts, the Declaration of Aivars Brigzna, the Declaration of Randy James, the Declaration of Allan Welsh, the May 12, 2006 Declaration of Kim Murphy, Esq., and two Reply Declarations of Kim Murphy, Esq. filed June 30 and November 6, 2006. In opposition to Defendants' motion, Plaintiff filed three of his own Declarations dated June 19, July 10, and November 28, 2006.

2   To the extent that Plaintiff argues that the mere fact that he was subjected to a pat-frisk violated his Eighth Amendment rights, that claim also fails. Conditions of confinement violate the Eighth Amendment only when "they result 'in unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measure of life's necessities.' " *Anderson v. Coughlin,* 757 F.2d 33, 34-35 (2d Cir.1985)(quoting *Rhodes,* 452 U.S. at 347). There is simply no evidence that Plaintiff suffered a serious deprivation of his basic human needs as a result of being pat-frisked.

3   Plaintiff filed a Motion to Compel Discovery that he alleges Defendants failed to provide. Defendants' counsel indicates in opposition that the relevant requested discovery was provided, and that Plaintiff's other discovery demands fall outside the relevant time period. (Murphy May 12, 2006 Decl.,¶¶ 5-11.) This Court has reviewed Plaintiff's motion and concludes that Defendants' discovery production is proper, and that the requested discovery, even if it was not already provided, would not alter this Court's determination that Defendants are entitled to summary judgment in this case.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 1544629

KeyCite Yellow Flag - Negative Treatment

Distinguished by Tolliver v. Skinner, S.D.N.Y., August 10, 2017

2007 WL 1544629
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

George LUNNEY, Plaintiff,

v.

Lieutenant BRURETON, et al., Defendants.

No. 04 Civ. 2438(LAK)(GWG).
|
May 29, 2007.

**Attorneys and Law Firms**

George Lunney, Elmira, NY, pro se.

Benjamin Lee, Assistant Attorney General, New York, NY, for Defendants.

## *REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, United States Magistrate Judge.

## *TABLE OF CONTENTS*

| | | | |
|---|---|---|---|
| I. | BACKGROUND ................... | | 2 |
| | A. | Facts ..................... | 2 |
| | B. | Procedural History .............. | 5 |
| II. | APPLICABLE LAW ............... | | 8 |
| | A. | Standard of Review on Summary Judgment Motions ............... | 8 |
| | B. | Exhaustion ................ | 10 |
| | | 1. PLRA .............. | 10 |
| | | 2. New York's Inmate Grievance Program% i ......... | 11 |
| III. | DISCUSSION ................... | | 12 |
| | A. | Eighth Amendment Claim Relating to Food in the SHU .............. | 12 |
| | B. | Eighth Amendment Claim of Excessive Force ........ | 16 |
| | | 1. Exhaustion ................ | 16 |
| | | 2. Merits ................... | 21 |
| | C. | Eighth Amendment Claims Based on Lack of Laundry Services and Personal Hygiene Items ..................... | 26 |
| | | 1. Laundry Services .............. | 2 7 |
| | | 2. Plumbing Problems and Failure to Provide Personal Hygiene Items ..... | 28 |
| | | 3. Personal Involvement ................. | 30 |
| | D. | First Amendment Retaliation Claims .............. | 30 |

1.   *Law Governing First Amendment Retaliation* ...........   31

2.   *Claims against Fischer* ...............   32

3.   *Claims against Blot* ..............   34

       a.   Exhaustion of Claims Against Blot% i .........   ........... 34

       b.   *The Merits of Lunney's Allegation that Blot Denied Him Showers, Meals,* ........... 37
            *and Recreation* ...........

              i.   Adverse Action.......................................................   38

              ii.  Causal Connection................................................   40

       c.   *The Merits of Lunney's Allegation that Blot Filed a False Misbehavior* ........... 41
            *Report* ...............

       d.   *The Merits of Lunney's Allegation that Blot Threatened Physical* ........... 43
            *Violence* ..............

       e.   *The Merits of Lunney's Allegation of Retaliatory Assault* .....   ........... 45

4.   *First Amendment Claim Against Frazier* .........   47

5.   *First Amendment Claim Against Brereton* ........   47

E.   *Unfiled Grievances* ...............   4 8

F.   *Fourteenth Amendment Due Process Claims* ..........   50

1.   *Law Governing Disciplinary Proceedings* ..........   50

2.   *Written Disposition of Disciplinary Hearing* ..........   51

Conclusion ........................   55

**\*1** George Lunney, currently an inmate at the Elmira Correctional Facility, has brought this suit *pro se* under 42 U.S.C. § 1983 against employees of the Sing Sing Correctional Facility ("Sing Sing"), where Lunney was previously housed. Lunney alleges that certain defendants violated his due process rights by improperly conducting a disciplinary hearing that resulted in his confinement in the Special Housing Unit ("SHU") of Sing Sing. He further alleges that various defendants were deliberately indifferent to inhumane conditions of confinement in the SHU in violation of his Eighth Amendment rights, that he was the victim of an assault, and that he was retaliated against for filing grievances with respect to conditions in the SHU in violation of his rights under the First Amendment.

Defendants now move for summary judgment. As described below, the defendants' motion should be granted, with the exception of the portion of their motion concerning Lunney's claim of (1) excessive force against Correction Officers Blot and Frazier and (2) his First Amendment retaliation claims (a) against defendant Officer Blot based on the allegedly retaliatory assault, threats, and deprivation of recreation and showers and (b) against Officer Frazier for his participation in the retaliatory assault.

## I. *BACKGROUND*
The facts described below and later in this Report are drawn largely from Lunney's affidavit. *See* Plaintiff's Affidavit, filed June 13, 2006 (Docket # 88) ("Lunney Aff."). In many places, Lunney's affidavit cites to

allegations contained in his amended complaint. *See* Amended Complaint, filed Mar. 24, 2005 (Docket # 34) ("Am.Compl."). That is, the affidavit cites the allegations of the amended complaint without repeating the substance of the incorporated matters under oath or penalty of perjury. Because defendants have not objected to this approach, we proceed as if any such incorporated matters in the Amended Complaint were admissible under Fed.R.Civ.P. 56(e).

A. *Facts*

On May 21, 2002, Lunney returned to his cell following a "medical shower" to find Correction Officer Hadzovic leaving the cell. *See* Lunney Aff. ¶ 1 (incorporating Am. Compl. at 3 ¶ 1). Hadzovic informed Lunney that he had just searched his cell. *Id.* After conducting a pat frisk on Lunney, Hadzovic reentered the cell and came out with a box of spaghetti. *Id.* Hadzovic announced that he would confiscate the box, which appeared to be altered, and locked Lunney in his cell. *Id.*

Approximately 45 minutes after Hadzovic left, Correction Sergeant Guadagno came to Lunney's cell with two other correction officers. *Id.* (incorporating Am. Compl. ¶ 2). Guadagno informed Lunney that a "shank type weapon" was discovered in the confiscated spaghetti box. *Id.* Lunney asserted that the weapon was not his and that he had merely purchased the spaghetti from the commissary. *Id.* Nonetheless, he was escorted to the SHU to await disciplinary action. *Id.*

 **\*2** Lunney received a "Tier III" misbehavior report on May 22, 2002. *Id.* (incorporating Am. Compl. ¶ 3); Inmate Misbehavior Report (reproduced as Ex. A to Notice of Motion to Dismiss, filed June 10, 2004 (Docket # 15) ("Motion to Dismiss")). Following a disciplinary hearing on June 13, 2002, Lunney was found guilty of possession of a weapon and sentenced to nine months' confinement in the SHU. Lunney Aff. ¶ 2 (incorporating Am. Compl. ¶ 4). Lunney filed an administrative appeal with Donald Selsky, the Director of Special Housing/ Inmate Disciplinary Program for the New York State Department of Correctional Services, who affirmed the disposition on August 22, 2002. Lunney Aff. ¶ 2; Am. Compl. at 2.

Lunney then filed a petition pursuant to Article 78 of the New York Civil Practice Law and Rules in the New York State Supreme Court, Albany County. Lunney Aff. ¶ 2.

On September 16, 2002, Justice Thomas J. McNamara issued an order to show cause directing Selsky to respond to the petition. *Id.* ¶ 4. On October 3, 2002, Selsky rescinded the disciplinary determination and ordered a rehearing on the ground that Lunney had not been given adequate assistance in preparing his defense. *Id.* ¶ 5. Lunney subsequently withdrew his Article 78 petition. *Id.* ¶ 9.

The rehearing commenced on October 15, 2002. *Id.* ¶ 11; Disciplinary Hearing Transcript (reproduced as Ex. B to Motion to Dismiss) ("Transcript"). During the hearing, a dispute arose between the hearing officer, Lieutenant Brereton, [1] and Lunney. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 29-37. Lunney requested permission to leave the hearing, Brereton granted him permission to do so, and Lunney was escorted out. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 34-37. Lunney was again found guilty of possessing a weapon and sentenced to nine months in the SHU with a corresponding loss of all privileges. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 59.

Lunney subsequently filed a request for discretionary review with Brian Fischer, at that time the Superintendent of Sing Sing. Lunney Aff. ¶ 13; Am. Compl. at 2. The disciplinary disposition was affirmed by First Deputy Superintendent Paul Kikendall. Lunney Aff. ¶ 13; Am. Compl. at 2. In an appeal to the Commissioner of the New York State Department of Correctional Services, Lunney argued that he had not been provided with a copy of the hearing disposition and that Selsky had no authority to order a new disciplinary hearing once the action in state court had been filed. Lunney Aff. ¶ 14 (incorporating Am. Compl. ¶ 10). The Acting Director of Special Housing rejected the appeal on November 7, 2002, although he reduced Lunney's sentence from nine to six months in the SHU. *Id.;* Review of Superintendent's Hearing (reproduced as Ex. D to Motion to Dismiss) ("Hearing Review").

Lunney filed a second Article 78 petition on November 19, 2002, with respect to the rehearing. *See* Article 78 Petition (reproduced as Ex. E to Motion to Dismiss); Lunney Aff. ¶ 15. On August 13, 2003, Justice Edward Sheridan of the Albany County Supreme Court dismissed the misbehavior report and ordered the Department of Correctional Services ("DOCS") to expunge all references to the incident from Lunney's institutional record. *See*

Decision, Order and Judgment, dated Aug. 13, 2003 (reproduced as Ex. D to Combined Affirmation and Memorandum of Law in Opposition to Defendants' Motion for Dismissal, filed July 6, 2004 (Docket # 18) ("Pl. Opp. to Mot. to Dismiss")). Justice Sheridan concluded that the failure to provide Lunney with a copy of the hearing disposition was a violation of due process and that Selsky had no authority to order the rehearing once Lunney filed an Article 78 petition in state court. *Id.* at 3.

**\*3** Lunney was confined to the SHU for 180 days, Lunney Aff. ¶ 17, from May 21, 2002, to November 21, 2002. As is described in greater detail below, during this period Lunney asserts that he was served with cold, spoiled, or poorly prepared food, given inadequate laundry services, and denied hygiene items, showers, meals, and recreation by SHU staff. *Id.* ¶¶ 18, 21-23, 29 (incorporating Am. Compl. ¶ 15(a)-(d), (g)). Lunney also asserts that he was criticized and threatened by SHU staff for filing grievances related to prison conditions, and threatened with transfer by Superintendent Fischer. *Id.* ¶¶ 28, 30, 31 (incorporating Am. Compl. ¶ 15(f)-(h)). Lunney asserts that, on one occasion, he was physically assaulted by prison guards in retaliation for complaining about conditions in his cell. Lunney Aff. ¶¶ 24-25 (incorporating Am. Compl. ¶ 15(e)(1)-(2)).

### B. *Procedural History*

The original complaint in this action was filed on March 29, 2004. *See* Complaint (Docket # 2) ("Compl."). It alleged the following claims: (1) violation of due process when Selsky convened a new disciplinary hearing while the Article 78 review of the first hearing was pending, Compl. at 7 (¶ 1); (2) violation of due process based on the failure to provide Lunney with a timely written disposition of the second hearing, Compl. ¶ 8; (3) that in violation of the Eighth Amendment, Lunney was subject to "overall poor" conditions of confinement in the Sing Sing SHU, *see id.* at 7 (¶ 3), including the service of cold, spoiled, and improperly prepared food; inadequate laundry services; inadequate law library services; and inadequate reading material, Compl. ¶ 16; and (4) that he was retaliated against for filing grievances with respect to conditions in the SHU, *id.* ¶¶ 17, 19; *id.* at 7 (¶ 2), in violation of his rights under the First Amendment. Lunney sought $10 million in punitive and/or compensatory damages. *Id.* at 8.

Defendants filed a motion to dismiss. *See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss, filed June 10, 2004 (Docket # 16). On February 23, 2005, this Court dismissed all of Lunney's claims except for: (1) his Eighth Amendment claim against Fischer with regard to improperly prepared food; (2) his First Amendment claim against Fischer alleging that he was threatened with physical retaliation for filing grievances; and (3) his due process claim against Brereton regarding the failure to receive a written disposition of his disciplinary hearing. *See Lunney v. Brureton,* 2005 WL 121720, at *16 (S.D.N.Y. Jan.21, 2005) ("*Lunney I*"), *adopted by,* 2005 WL 433285, at *1 (S.D.N.Y. Feb.23, 2005).* Lunney was given the opportunity to replead his claims. *Lunney I,* 2005 WL 121720, at *16.

Lunney then filed an amended complaint, which restated most of the allegations included in his original complaint. *See Id.* ¶¶ 15. It also contained new claims. Significantly, Lunney amended his original complaint to include as defendants Officers Michael Blot and Parrish Frazier. *See* Am. Compl. ¶ 16(h), (i). The claims in the amended complaint are as follows: (1) Selsky deprived Lunney of his First and Fourteenth Amendment rights by ordering a new disciplinary hearing and "depriving [him] of his right to challenge the original hearing in a court of law," *see id.* ¶ 16(a); (2) Brereton violated Lunney's due process rights by failing to provide him with a written copy of the disposition for the hearing on October 17, 2002, *id.* ¶ 16(f); (3) Robert Murphy, Fischer, and Kikendall violated Lunney's due process rights by failing to remedy Lieutenant Brereton's failure to provide a copy of the disposition, *id.* ¶¶ 16(b)-(d); (4) Fischer violated Lunney's First Amendment rights by threatening to transfer him in retaliation for filing grievances, *id.* ¶ 16(c); (5) Fischer failed to remedy the "numerous sub-standard conditions of confinement in the S.H.U.," and subjected him to "forced labor without pay," *id.;* (6) Sean Kober violated Lunney's First and Eighth Amendment rights by failing "to operate the Sing Sing I.G.R.C. in accordance with D.O.C.S. policy and thus[ ] deprived plaintiff of his means to petition the government for the redress of grievances," *id.* ¶ 16(e); (7) Anthony Chu violated Lunney's Eighth Amendment rights by failing to remedy "the many problems that existed with the S.H.U. food service program and for failing to provide plaintiff with wholesome, nutritious and properly prepared meals," *id.* ¶ 16(g); (8) Blot violated Lunney's First, Eighth, and Fourteenth Amendment rights by (a) assaulting

him, threatening and harassing him, and depriving him of showers, meals and recreation, all in retaliation for Lunney's filing of grievances; (b) by co-signing a misbehavior report against Lunney for an incident in which Blot was not involved; (c) by threatening Lunney for making complaints against other staff members; (d) by depriving Lunney of access to clean clothing and/or failing to ensure that the clothing was laundered; (e) by failing to provide Lunney with basic hygiene items; and (f) by failing to remedy the plumbing problems in Lunney's SHU cell, *id.* ¶ 16(h); and (9) Frazier violated Lunney's First and Eighth Amendment rights by assisting Blot in the aforementioned violations. *Id.* ¶ 16(i).

**\*4** On April 24, 2006, defendants moved for summary judgment on all claims.[2] On June 13, 2006, Lunney filed opposition papers. *See* Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Docket # 87) ("Pl.Mem."); Lunney Aff. Lunney's papers did not include a statement made in response to the Defendants' 56.1 Statement as required by Local Civil Rule 56.1. Defendants subsequently filed reply papers. *See* Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment, filed July 28, 2006 (Docket # 91) ("Def. Reply Mem."); Lee Reply Declaration, filed July 28, 2006 (Docket # 92) ("Lee Reply Decl."). Lunney then submitted a sur-reply memorandum with an additional affidavit. Plaintiff's Sur-Reply Memorandum, filed Sept. 12, 2006 (Docket # 96) ("Pl.Sur-Reply"); Affidavit, dated Sept. 7, 2006 (Docket # 97) ("Sur-Reply Aff.").

## II. *APPLICABLE LAW*

A. *Standard of Review on Summary Judgment Motions*
Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the nonmovant "is to be believed" and the court must draw "all justifiable inferences" in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial,*' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (quoting *Celotex,* 477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo,* 100 F.3d 253, 258 (2d Cir.1996) (citing *Anderson,* 477 U.S. at 247-48).

### B. *Exhaustion*

#### 1. *PLRA*

**\*5** The Prison Litigation Reform Act ("PLRA") provides in relevant part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Accordingly, "[c]omplete exhaustion of ... administrative remedies through the highest level

for each claim is required." *Veloz v. New York,* 339 F.Supp.2d 505, 514 (S.D.N.Y.), *aff'd,* 178 Fed. Appx. 39 (2d Cir.2004); *see also Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) ("All 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.' ") (citations omitted). In addition, the exhaustion must be "proper"-that is, "compl[y] with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo,* --- U.S. ----, ---- - ----, 126 S.Ct. 2378, 2386-87, 165 L.Ed.2d 368 (2006) (internal citation and quotation omitted). Further, "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532. The exhaustion requirement applies even when a plaintiff seeks relief not available in prison administrative proceedings, such as monetary damages. *See Booth v. Churner,* 532 U.S. 731, 740-41, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). Nonetheless, an inmate is not required to use this process where it "was reasonable for the inmate to conclude that his administrative remedies had been exhausted by [a] positive disposition" of some informal complaint. *Braham v. Clancy,* 425 F.3d 177, 183 (2d Cir.2005); *accord Dixon v. Goord,* 224 F.Supp.2d 739, 749 (S.D.N.Y.2002) ("The exhaustion requirement is satisfied by resolution of the matter, i.e., an inmate is not required to continue to complain after his grievances have been addressed."); *Perez v. Blot,* 195 F.Supp.2d 539, 546 (S.D.N.Y.2002).

In this Circuit, when a plaintiff advances a plausible explanation for his failure to exhaust, a court engages in a three-part analysis:

> First, the court must ask: whether administrative remedies were in fact "available" to the prisoner. [Second], [t]he court should also inquire ... whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. [Third], [i]f the court finds that administrative remedies were available to the plaintiff, and that the defendants are

not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether *special circumstances* have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements.

**\*6** *Brownell v. Krom,* 446 F.3d 305, 311-12 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)) (emphasis and alterations in original); *accord Curry v. Mazzuca,* 2006 WL 250487, at \*6 (S.D.N.Y. Feb.2, 2006).

Finally, in *Jones v. Bock,* --- U.S. ----, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), the Supreme Court held that courts must consider claims in a § 1983 complaint that have been exhausted despite the presence of unexhausted claims. 127 S.Ct. at 923-26.

### 2. *New York's Inmate Grievance Program*

In New York, formal exhaustion for state prisoners generally requires complying with the three-step grievance and appeal procedure outlined in the Inmate Grievance Program. *See* N.Y. Comp.Codes R. & Regs. tit. 7 ("7 N.Y.C.R.R."), § 701.5. In brief, an inmate must first file a complaint with the Inmate Grievance Resolution Committee ("IGRC"). 7 N.Y.C.R.R. § 701.5(a). Next, after receiving a response from the IGRC, the inmate may appeal to the superintendent of the facility. *Id.* § 701.5(b). Finally, after receiving a response from the superintendent, the prisoner may seek any review of the superintendent's decision with the Central Office Review Committee ("CORC"). *Id.* § 701.5(c). *See Hemphill,* 380 F.3d at 682. Generally, "[a] prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." *Hairston v. LaMarche,* 2006 WL 2309592, at \*7 (S.D.N.Y. Aug.10, 2006) (citing cases).

### III. *DISCUSSION*

In his opposition papers, Lunney did not submit a statement in response to the defendants' statement under Local Civil Rule 56.1. In light of Lunney's *pro se* status, and in light of the fact that he submitted an affidavit

setting forth his disagreements with the defendants' version of the facts, *see* Lunney Aff., the Court will exercise its discretion not to penalize Lunney for this failure. *See, e.g., Phoenix Global Ventures, LLC v. Phoenix Hotel Assocs., Ltd.,* 422 F.3d 72, 75 (2d Cir.2005) ("district court has inherent authority to determine when to overlook or excuse a departure from its own local rules").

We now address the claims made in Lunney's amended complaint.

### A. *Eighth Amendment Claim Relating to Food in the SHU*

Lunney maintains his Eighth Amendment rights were compromised when he was served food that was "cold, spoiled and poorly prepared" on "a near daily basis" during his detention in the SHU. *See* Lunney Aff. ¶ 18; Affirmation of A. Franco, DIN # 01-A-5104, undated (reproduced in Ex. E to Lunney Aff.), ¶ 3(a) (milk often spoiled, fruits and vegetables rotten, appearance and quality of meals poor and unpalatable, inmates forced to refuse meals on numerous occasions); Affirmation of Johnny Casaigne, DIN # 04-A-2867, undated (reproduced in Ex. E to Lunney Aff.), ¶ 3(a) (same); Deposition of Johnny E. Casaigne, dated June 24, 2005 (reproduced as Ex. F to Lunney Aff.), at 27 ("I rarely ate the food because when it did come it was ... either spoiled, ice cold or wasn't even cooked right."); Deposition of Alisjandro Franco, dated June 24, 2005 (reproduced as Ex. G to Lunney Aff.), at 19 (refused meals "a few times"). Lunney states that he and other inmates "were often forced to refuse meals due to the poor quality of the food." *See* Lunney Aff. ¶ 18. Lunney also states that complaints and grievances about these problems were ignored, and that inmates "had to resort to refusing entire meals so as to get the attention of" defendants. *See id.* ¶ 19 (incorporating Am. Compl. ¶ 15(a)(1)). Finally, Lunney alleges that he suffered "[w]eight loss and muscle atrophy as a result of not receiving adequate meals." *See Id.* ¶ 18 (incorporating Am. Compl. at 18 (¶ 2)), and that on one occasion he and other inmates "became ill after eating," *see Id.* ¶ 18. He states that the illness consisted of "stomach cramping, nausea, slight fever, chills and diarrhea," and that the inmates received antacid tablets for their discomfort. *See id.* (incorporating Am. Compl. at 18 (¶ 2)); Ambulatory Health Record, dated Aug. 20, 2002 (reproduced as Ex. H to Lunney Aff.) (medical records reflecting a doctor's assessment of "upset stomach," for

which Lunney was given antacid tablets). Defendants note that Lunney "acknowledged that other than one alleged incident involving a dinner of rice and beans, [he] was never treated for food poisoning or spoiled food and that he did not know other inmates in the S.H.U. who were treated for food poisoning or spoiled food." *See* Def. 56.1 ¶ 20 (citing Deposition of George Lunney, dated June 23, 2005 (reproduced as Ex. A to Lee Decl.) ("Lunney Dep."), at 123).

**\*7** Defendants argue that Lunney has failed to exhaust his claim that the food in the SHU posed a threat to him and the other SHU inmates. *See* Def. Mem. at 11. With respect to this claim, Lunney does not argue that the grievance process was unavailable to him, that there is a basis for estopping defendants from relying on the exhaustion doctrine, or that there are other special circumstances excusing his failure to exhaust, *see* Pl. Mem. at 9-10-though, as described further below, he does make such an argument with respect to the excessive force and other retaliation claims. *See id.* at 6-7, 12-13. Rather, to support his contention that the food claim is exhausted, Lunney cites to grievances SS-35888-02 and SS-36314-02, as well as to "a grievance dated Sept. 29, 2002 and the letters sent to D.O.C.S. officials." *See id.* at 9 (citing Ex. K to Lunney Aff.). Grievance SS-35888-02, however, complains only that SHU inmates "received only one cup of milk" and that the inmates "do not get what we're supposed to" in terms of "healthy food items." *See* Grievance SS-35888-02, dated July 20, 2002 (reproduced in Ex. K to Lunney Aff.). It mentions nothing about spoiled food or food that posed an immediate health risk to the inmates. Grievance SS-36314-02 mainly states that Lunney received Rice Krispies for breakfast even though the menu called for Bran Flakes, and thus that he was not receiving the proper amount of fiber in his diet. *See* Grievance SS-36314-02, dated Sept. 24, 2002 (reproduced in Ex. K to Lunney Aff.). It then also makes a brief reference to his food being "ice cold." *Id.* Thus, neither of these grievances support the broad claims now being made in the complaint.

Lunney also provides a copy of a purported grievance dated September 29, 2002. *See* Grievance (reproduced in Ex. K to Lunney Aff.). This grievance-which defendants contend was considered as part of SS-36314-02, *see* Def. Reply Mem. at 8 n. 2-contains a fleeting reference to "spoiled or rotten food" but gives no specifics on when the serving of such food occurred. This generic

and unexplained reference to "spoiled or rotten food"-included at the end of a grievance that focuses largely on whether the fiber content of the food met dietary guidelines-was not sufficient to alert the prison officials as to the claims now being made in this complaint. While inmates are held only to a standard of "notice pleading" in grievances, *see Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004), Lunney's grievance statement was far too vague to provide the defendants with notice of when such spoiled food was served, in what manner, and with what frequency. It is thus insufficient to have exhausted this claim.

In any event, Lunney has not met his burden of showing he made the required appeals of even this grievance or that he should be excused from having done so. Although he asserts that this grievance was denied and appealed to the Superintendent, he concedes that he did not appeal it to the CORC, stating only that, based on the Superintendent's reply, "an appeal to the C.O.R.C. was unnecessary." Pl. Sur-Reply at 14. Lunney's general allegations that his grievances "proved ineffective in correcting the problems with the food" and that he made additional verbal complaints, *see* Lunney Aff. ¶ 19, do not excuse his failure to exhaust. *See, e.g., Curry v. Fischer,* 2004 WL 766433, at *6 (S.D.N.Y. Apr.12, 2004) ("Since informal channels did not lead to the resolution of his complaints, Curry cannot be deemed to have informally exhausted his remedies.") (citing *Hernandez v. Coffey,* 2003 WL 22241431, at *3 n. 4 (S.D.N.Y. Sept.29, 2003) (informal exhaustion cannot be found where no resolution is reached)); *see also Williams v. City of New York,* 2005 WL 2862007, at *10 (S.D.N.Y. Nov.1, 2005) ("It is well settled that complaint letters to DOCS or prison officials do not satisfy the PLRA's exhaustion requirements.").

 **\*8** Lunney makes general claims about the alleged mismanagement of the grievance process, *see* Pl. Mem. at 71-75, which are discussed further in section III.E below. However, there is no reason why these alleged failures should have excused his obligation to exhaust his claims regarding food. Nor has he shown that he was otherwise prevented from filing grievances on food-a fact most obviously demonstrated by the fact that he filed various food-related grievances as has just been noted. Notably, Lunney asserts that between February 2002 and March 2004 he filed "more than 100 grievances and more than a dozen complaints with outside agencies and

D.O.C.S. officials regarding nearly every aspect of his confinement." Pl. Sur-Reply at 19.

In sum, Lunney's claim that his Eighth Amendment rights were violated by the failure of the prison system to provide him with safe food, *see* Am. Compl. ¶ 16(g), is unexhausted and must be dismissed.

*B. Eighth Amendment Claim of Excessive Force*
Lunney claims that he was assaulted by Officers Blot and Frazier "[d]uring his first week in the S.H.U." after he attempted to notify another officer that his sink and toilet were broken and he was missing certain personal hygiene items. *See* Lunney Aff. ¶ 24. He states that as a result of this assault, he suffered a "[s]mall cut to lip and another to left side of jaw with bruises and contusions to face and body." *See id.* ¶ 25 (incorporating Am. Compl. at 18 (¶ 1)). The defendants argue that this claim is unexhausted and that it fails on the merits. *See* Def. Mem. at 10-11, 30-32. [3]

1. *Exhaustion*
Lunney states that he did not file a grievance against Blot and Frazier for this assault until after he was transferred to Cayuga Correctional Facility nearly two years later, because Blot threatened him with retaliation if he did so, stating that "he would receive a misbehavior report for assault on staff if he ... filed a complaint and claimed any injuries." *See* Lunney Aff. ¶ 25 (incorporating Am. Compl. ¶ 15(e)(2)). Blot also told him that if he did file a grievance, "his time in S.H.U. would be longer and harsher." *See id.* Lunney argues that under cases such as *Ziemba v. Wezner,* 366 F.3d 161 (2d Cir.2004), his failure to file a timely grievance was "justifiable." *See* Pl. Mem. at 5-7.

Defendants argue that Lunney's failure to exhaust the excessive force complaint in a timely fashion should not be excused for several reasons: (1) the grievances and appeals Lunney filed in 2004 at Cayuga were untimely, and regardless, made no reference to any instance of excessive force by Officers Blot and Frazier, but only to the Tier III hearing and "conditions of confinement" in the SHU, *see* Def. Reply Mem. at 6; (2) Lunney never mentioned any excessive force by Officers Blot and Frazier until he filed his amended complaint, *id.* at 7; and (3) the Second Circuit excuses failures to exhaust based on threats or retaliation only where "the record contain[s] documented proof of an inmate's prior complaints about

the misconduct in a form other than a grievance along with allegations that an inmate was prevented from making these same complaints in the form of a grievance." *See id.* at 6 (citing *Ziemba* and *Hemphill* ).

 **\*9**  The first question is whether administrative remedies were in fact "available" to Lunney. *Brownell,* 446 F.3d at 311 (citing *Hemphill,* 380 F.3d at 686). To be available, an administrative remedy must "afford the possibility of some relief for the action complained of." *Booth,* 532 U.S. at 738; *accord Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004). There is no dispute that the prison "provided grievance procedures that inmates claiming excessive force could utilize," *see Hemphill,* 380 F.3d at 686-specifically, the three-step process outlined in 7 N.Y.C.R.R. § 701.5. Nor is there any dispute that Lunney used these procedures frequently both before and after the alleged incident with Blot and Frazier. *See* Eagen Decl., Exs. A & B. Indeed, Lunney concedes that he "has an extensive history of prosecuting grievances." *See* Pl. Sur-Reply at 4.

The availability inquiry does not end here, however. In *Hemphill,* the Second Circuit held that the test for deciding whether ordinary grievance procedures were "available" is an "objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." 380 F.3d at 688 (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). The court went on to note that "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *See Hemphill,* 380 F.3d at 688.

Lunney's affidavit suggests that he failed to file a grievance regarding the assault by Officers Blot and Frazier until 2004 because Blot threatened him with retaliation if he did so. *See* Lunney Aff. ¶ 25 (incorporating Am. Compl. ¶ 15(e)(2)). Specifically, Lunney has asserted that Blot told him if he filed a grievance about the assault, "he would receive a misbehavior report for assault on staff" and that "his time in S.H.U. would be longer and harsher." *See id.* Lunney states that this threat led him to avoid seeking medical attention or filing a complaint regarding the assault by Blot and Frazier until nearly two years later, when he was transferred to Cayuga Correctional Facility. *See id.* Because on this motion for summary judgment, we

accept as true the admissible evidence of Lunney, we must assume that Blot did in fact threaten Lunney in the manner Lunney has claimed.

Applying the "ordinary firmness" standard, it is certainly plausible that a reasonable factfinder could conclude that a prisoner in Lunney's situation would be deterred from complaining about an assault that had just occurred. Here, Lunney alleged that he was beaten and that the beating was followed immediately by specific threats, some impliedly physical, if he filed a grievance. *See Hemphill, e.g.,* 380 F.3d at 688-89 (remanding for determination of availability of remedies where officer told plaintiff he had "better drop" his complaint regarding injuries sustained in a beating and not seek any medical attention or the officer would "make your life a living hell"); *McCullough v. Burroughs,* 2005 WL 3164248, at \*4 (E.D.N.Y. Nov.29, 2005) (plaintiff excused from failing to exhaust remedies after he was assaulted by officers in retaliation for prior grievances and during the assault, officer expressly threatened that he would "get [him]") (alteration in original); *accord Hepworth v. Suffolk,* 2006 WL 2844408, at \*4-7 (E.D.N.Y. Sept.29, 2006) (exhaustion excused where inmate was threatened for filing a grievance); *Larry v. Byno,* 2006 WL 1313344, at \*4 (N.D.N.Y. May 11, 2006) (inmate subject to physical assault and threats of violence excused from filing grievance); *cf. Benjamin v. Comm'r New York State Dep't of Corr. Servs.,* 2006 WL 783380, at \*4 (S.D.N.Y. Mar.28, 2006) (suggesting in dictum that administrative remedies would be rendered unavailable where "the complaint specifically recounted threatening statements made by correctional officers and plaintiff's 'acquiescence' to those threats") (citing *Hemphill,* 380 F.3d at 683-84, 687). Thus, Lunney has established a genuine issue of material fact with regard to the availability of administrative remedies for his claim of excessive force.

 **\*10**  Defendants contend that because Lunney "has no corroborated documentation of previously complaining about unconstitutional conduct in some form," this Court should not excuse his failure to exhaust this claim. *See* Def. Reply Mem. at 7. They argue that *Hemphill* and *Ziemba* "require[ ]" this result. *See id.* at 6-7. However, neither *Hemphill* nor *Ziemba* held that a plaintiff alleging threats or retaliation in relation to an excessive-force claim is required to have "corroborated documentation of previously complaining" about such force. Each merely noted that there had been some such documentation.

Lunney v. Brureton, Not Reported in F.Supp.2d (2007)
Case 9:16-cv-01211-GTS-TWD    Document 72    Filed 08/09/18    Page 191 of 338
2007 WL 1544629

For example, in *Hemphill,* the plaintiff alleged that he failed to exhaust his administrative remedies with regard to an excessive-force claim because an officer had told him, "I'll make your life a living hell throughout this penal system because I have friends all over." *See* 380 F.3d at 684. The Second Circuit held that the district court was required to consider whether "some seemingly available remedies were rendered unavailable by the threats Hemphill received" or alternatively, whether the defendants' exhaustion defense was estopped by the threats the officer had allegedly made to the plaintiff. *See id.* at 688-89. While the court noted that the plaintiff had written a letter to the superintendent of the prison, *see id.* at 688, the court's holding with respect to these questions did not rely on this fact, *see id.* at 688-89, and specifically noted that his letter to the superintendent did not necessarily mean that administrative remedies were "available" to him. *Id.*

Nor does it help defendants' argument that Lunney waited until his transfer to another facility, nearly two years later, to submit a grievance of any kind. First, such a delay is consistent with the actions of someone in fear of retaliation by Blot. Second, if Lunney was justified in not filing a grievance at all, he should not be penalized for filing an untimely one.

In sum, construing the record in the light most favorable to Lunney, a factfinder could conclude that administrative remedies were not "available" to Lunney with respect to his claim of excessive force. Accordingly, summary judgment cannot be granted on this question.[4]

### 2. Merits

Lunney asserts that after he attempted to notify another officer about his plumbing problems and lack of personal hygiene items, Officer Blot approached his cell and told him to "shut the fuck up or we are coming in there and you will not like the results." Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶ 15(e)(1)). After further discussion between Lunney and Officers Blot and Frazier, Blot called for Lunney's cell door to be opened, and then "rushed into [his] cell and began punching [him] in the head and body." *Id.* Frazier then entered the cell "and placed [Lunney] in a choke hold for several minutes." *See id.* Lunney adds that he sustained "some bruises" from the attack, specifically that his "throat was bruised" where Frazier had grabbed" him and that he had a "couple [of] black and blues on my

side," and that "about a week later bruises, you know, swelling went down." *See id.* ¶¶ 24-25 (citing Lunney Dep. at 171-74); *see also id.* (citing Lunney Dep. at 180-81 ("I could have used [medical attention], yeah. I had some bruises. I was pretty banged up.")).

**\*11** Defendants argue that any injuries Lunney sustained were *de minimis* and thus not actionable under the Eighth Amendment. *See* Def. Mem. at 30-32; Def. Reply Mem. at 26-27.

To establish an Eighth Amendment violation based on a claim of excessive force, "an inmate must meet both an objective and a subjective requirement." *See Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). To meet the objective requirement, "the alleged violation must be 'sufficiently serious' by objective standards." *See id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The objective component is "context specific, turning upon 'contemporary standards of decency.' " *See Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999) (quoting *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). To meet the subjective requirement, the inmate must show that the prison officials involved "had a 'wanton' state of mind when they were engaging in the alleged misconduct." *See Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994). "[T]he 'wantonness' inquiry turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *See Blyden,* 186 F.3d at 262 (quoting *Hudson,* 503 U.S. at 7). "Thus, [t]he key inquiry under *Hudson* and its precedents is whether the alleged conduct involved unnecessary and wanton infliction of pain." *Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir.2000) (citing *Davidson,* 32 F.3d at 30) (internal quotation marks omitted).

"However, the malicious use of force to cause harm constitutes an 'Eighth Amendment violation[ ] per se ... whether or not significant injury is evident.' " *Griffin,* 193 F.3d at 91 (quoting *Blyden,* 186 F.3d at 263). This result follows because " '[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.' " *Blyden,* 186 F.3d at 263 (quoting *Hudson,* 503 U.S. at 9). Nevertheless, "a *de minimis* use of force will rarely suffice to state a constitutional claim." *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's

chambers, violates a prisoner's constitutional rights.' " *Id.* (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)).

Furthermore, courts in this circuit have held that "although the subjective component is 'inherently an inquiry into [the] defendant's state of mind, plaintiff need not offer particular evidence of defendant's mental state. For purposes of opposing defendants' summary judgment motion, plaintiff has satisfied his burden on this element by merely pleading a scenario in which the use of force could not have been in good faith.' " *See Watson v. Delgado,* 2006 WL 1716869, at *5 (S.D.N.Y. June 20, 2006)* (quoting *Santiago v. Campisi,* 91 F.Supp.2d 665, 673 (S.D.N.Y.2000)); *see also Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997) ("Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind.").

 *12 In this case, Lunney states that Blot and Frazier first threatened him and then entered his cell and attacked him without provocation. *See* Lunney Aff. ¶¶ 24-25 (incorporating Am. Compl. ¶ 15(e)(1)). Because under Lunney's version of the facts, the officers' alleged use of force could not have been in good faith, he has provided sufficient evidence of the subjective component of an Eighth Amendment violation. *See, e.g., United States v. Walsh,* 194 F.3d 37, 50 (2d Cir.1999) ("the subjective element is satisfied in this case as there was absolutely no reasonably perceived need for the application of force"); *Santiago,* 91 F.Supp.2d at 673 ("Assuming plaintiff's story to be true, defendant's alleged conduct is clearly unrelated to any 'good-faith effort to maintain or restore discipline.' ") (citation omitted).

With regard to the objective component, Lunney has alleged that as a result of the assault by Blot and Frazier, he sustained "some bruises," specifically, his "throat was bruised where Frazier had grabbed" him and he had a "couple black and blues on my side," and that "about a week later bruises, you know, swelling went down." *See* Lunney Aff. ¶¶ 24-25 (citing Lunney Dep. at 171-74); *see also id.* (citing Lunney Dep. at 180-81 ("I could have used [medical attention], yeah. I had some bruises. I was pretty banged up.")). While defendants argue that any injuries Lunney suffered were *de minimis* and not documented by medical records, *see* Def. Mem. at 30-32, they point to no

case where alleged injuries of this kind were considered outside the protection or the Eighth Amendment. Indeed, *Griffin* held that an inmate's Eighth Amendment claim survived summary judgment where "the only injuries he suffered were a bruised shin and swelling over his left knee," and "the only evidence he intended to offer in support of his claims was his own testimony." *See Griffin,* 193 F.3d at 91. The court explained that although the inmate's claim of excessive force was "weak and his evidence extremely thin, dismissal of the excessive-force claim was inappropriate because there are genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him." *See id.* Thus, one court has concluded that "bruising or equivalent injuries may be found by a reasonable fact-finder to constitute minor rather than de minimis harm." *See Watson,* 2006 WL 1716869, at *7 (citing *McCrory v. Belden,* 2003 WL 22271192, at *6 (S.D.N.Y. Mar.22, 2004)) (internal quotation omitted).

Lunney's alleged injuries-involving bruising and contusions-are quite different from the claim of the prisoner in *Boddie,* who had alleged only that he had been "bumped, grabbed, elbowed, and pushed." *See Boddie,* 105 F.3d at 862. In dismissing the claim, *Boddie* noted that the plaintiff "does not maintain that he experienced any pain or injury as a result of the physical contact," and that he did not "allege facts that show that the defendants used force 'maliciously and sadistically to cause harm,' rather than 'in a good-faith effort to maintain or restore discipline.' " *See id.* Both these circumstances are present in Lunney's case, however.

 *13 In *Espinal v. Goord,* 2001 WL 476070 (S.D.N.Y. May 7, 2001), the court found the plaintiff's injuries to be *de minimis* where he was hit in the face two or three times, making his face turn red. 2001 WL 476070, at *13. However, the plaintiff in that case described these injuries as "really nothing." *Id.* In *Perkins v. Brown,* 285 F.Supp.2d 279 (E.D.N.Y.2003), a prisoner was not permitted to base an excessive force claim on allegations of a "broken lip," swollen nose, eye, fingers, and wrists, jaw pain, chest bruising, and "stress disorder" resulting from being struck, where the only evidence was the plaintiff's testimony and it was contradicted by prior statements of the plaintiff and medical evidence *Id.* at 284. The district court also pointed to a number of factors reflecting that such injuries were in fact *de minimis,* including the plaintiff's assertion that his pain was "nothing major" or

"nothing serious." *Id.* In contrast, Lunney has stated that his throat was bruised from being put in choke hold, that he had bruises on his side as well, and that the swelling from these injuries did not subside for about a week.

To the extent the defendants argue that the lack of medical records showing treatment is grounds for dismissing Lunney's claim, the Court rejects this argument inasmuch as there is no requirement that the claim of injury be substantiated in contemporaneous medical records. *See Griffin,* 193 F.3d at 91 (Eighth Amendment claim permitted to proceed to trial even though only evidence supporting it was plaintiff's testimony). Thus, cases have frequently denied summary judgment for excessive-force violations while noting the absence of corroborating medical records. *See, e.g., Atkins v. County of Orange,* 372 F.Supp.2d 377, 399 (S.D.N.Y.2005); *Davis v. Patrick,* 2000 WL 1154065, at *1 (S.D.N.Y. Aug.14, 2000); *Baskerville v. Goord,* 2000 WL 897153, at *1-2 (S.D.N.Y. July 6, 2000).

Finally, Blot and Frazier are not protected by qualified immunity on this claim. Qualified immunity attaches where (1) a constitutional right would have been violated on the facts alleged; but (2) it would have been objectively reasonable for the defendant to have believed that his actions did not violate clearly established law. *See Saucier v. Katz,* 533 U.S. 194, 200-201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Lunney has a constitutional right to be free from a correction officer's use of excessive force, and it could not be objectively reasonable for Officer Blot or Officer Frazier to have believed that the use of excessive force is allowed under the law. *See Calamia v. City of New York,* 879 F.2d 1025, 1036 (2d Cir.1989) ("The right of an individual not to be subjected to excessive force has long been clearly established."); *Johnson v. City of New York,* 2006 WL 2354815, at *5 (S.D.N.Y. Aug.14, 2006) (citing cases).

C. *Eighth Amendment Claims Based on Lack of Laundry Services and Personal Hygiene Items*

**\*14** Lunney claims that prison officials violated his Eighth Amendment rights based on the existence of inadequate laundry services, plumbing problems, and the deprivation of personal hygiene items. *See* Lunney Aff. ¶¶ 20-23. While the defendants argue that these claims are unexhausted, *see* Def. Mem. at 11, it is unnecessary to reach this question because the claims fail on the merits.

The Supreme Court has held that "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). The Eighth Amendment imposes an obligation on prison officials to provide "humane conditions of confinement" including "adequate food, clothing, shelter, and medical care." *Id.* To establish a violation of the Eighth Amendment on the basis of inhumane prison conditions, a plaintiff must show that the deprivation is sufficiently serious as to result in a denial of " 'the minimal civilized measure of life's necessities,' " *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (quoting *Rhodes,* 452 U.S. at 347), and that the prison officials acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted). In the context of conditions of confinement, the requisite mental state for the prison officials is "deliberate indifference." *Wilson,* 501 U.S. at 302-03.

1. *Laundry Services*

Lunney re-alleges the claim from his original complaint that the laundry services in the SHU were inadequate. *See* Lunney Aff. ¶¶ 20-21. In rejecting this claim on the motion to dismiss, this Court held that there "is no Eighth Amendment violation ... in instances where inmates are provided the opportunity and the supplies to wash their own clothes." *See Lunney I,* 2005 WL 121720, at *8 (citing *Green v. Ferrell,* 801 F.2d 765, 771 (5th Cir.1986) (no constitutional violation where inmates were permitted to wash their clothes in sinks and were provided with laundry detergent)); *Benjamin v. Fraser,* 161 F.Supp.2d 151, 178-79 (S.D.N.Y.2001) (availability of sinks and laundry detergent or bar soap sufficient under the Eighth Amendment), *aff'd in relevant part and vacated in part,* 343 F.3d 35 (2d Cir.2003). The Court thus concluded that "Lunney's mere allegation that his clothes were returned to him without being cleaned on various occasions does not state an Eighth Amendment claim as to inadequate laundry services." *See Lunney I,* 2005 WL 121720, at *8. Lunney asserts that his sink was small and that he was not given soap specifically for laundry purposes. Lunney Dep. at 167. But he has not submitted evidence that would allow a reasonable to jury to conclude that he could not achieve some level of cleanliness with the materials he had. *See generally Benjamin,* 161 F.Supp.2d at 178-79. That Lunney asserts he was without soap for eight days and had

2007 WL 1544629

a clogged sink for five, as described in the next section, shows at most that he lacked the means to clean his own clothing for a relatively brief period. As such, there was no Eighth Amendment violation.

### 2. *Plumbing Problems and Failure to Provide Personal Hygiene Items*

**\*15** Lunney alleges that he "was placed in a cell where the sink was clogged and there was no running water." *See* Lunney Aff. ¶ 22. He states that he made "verbal complaints" and that the sink was repaired "on about plaintiff's fifth day in S.H.U." *See id.* (incorporating Am. Compl. ¶ 15(c)). He also states that he did not receive "soap, toothpaste, a toothbrush, and other hygiene items." *See Id.* ¶ 23. While he states that his verbal complaints were ignored, he adds that the problem "was informally resolved on May 29, 2002 when C.O. Lebron of the I.G.R.C. corrected the problem." *See id.*

With regard to toiletries and hygiene items, Lunney fails to show that such a denial rose to the level of deliberate indifference to his health or safety. Courts have typically held that temporary deprivations of toiletries do not violate the Eighth Amendment. *See Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir.2003) (deprivation of "toiletries for approximately two weeks-while perhaps uncomfortable-does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference' ") (quoting *Farmer,* 511 U.S. at 837) (alterations in original); *Fernandez v. Armstrong,* 2005 WL 733664, at \*5-6 (D.Conn. Mar.30, 2005) (up to 16-day deprivation of toothbrush, toothpaste, soap, and shampoo did not violate the Constitution).

With regard to Lunney's claim of no running water, defendants have pointed to evidence that Lunney filed a grievance on May 23, 2002, regarding the plumbing problems in his cell, Grievance SS-35563-02, dated May 23, 2002 (reproduced as Ex. J to Lunney Aff.), and that it was repaired the next day. *See* SHU Activity Log, dated May 24, 2002 (reproduced as Ex. D to Lee Reply Decl.). Even if Lunney's cell sink lacked running water for five days, as he claims, he does not show an Eighth Amendment violation given that there is no evidence that he was deprived of water entirely during this period. The "[l]ack of access to running

water, by itself, does not constitute the denial of the minimal civilized measure of life's necessities." *James v. Monroe County Jail,* 2005 WL 2030730, at \*3 (W.D.N.Y. Aug.23, 2005) (no constitutional violation where inmates claimed they lacked running water from cell sinks for several hours every night for over four months); *see also Johnson v. Comm'r of Corr. Servs.,* 699 F.Supp. 1071, 1074 (S.D.N.Y.1988) (plaintiff confined for one week in a cell with an inoperable sink did not suffer a constitutional violation because he was provided drinks with meals); *Castro v. Chesney,* 1998 WL 767467, at \*4 (E.D.Pa. Nov.3, 1996) (no constitutional violation where plaintiff placed in a "dry cell" without running water for several days, given water "sometimes" when he asked for it and water was turned on every other day so he could wash his face and brush his teeth).

### 3. *Personal Involvement*

**\*16** In any event, even if some constitutional deprivation had been shown, Lunney's submission does not provide facts that would show that any particular defendant sued here was personally involved in committing the violation. As the Second Circuit has noted, "[a]n individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority.' " *Back v. Hastings On Hudson Union Free Sch. Dist.,* 365 F.3d 107, 127 (2d Cir.2004) (quoting *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996)). He can only be held liable if he was "personally involved in the alleged deprivation." *Id.* While there are number of ways in which such involvement can be shown, *see, e.g., Back,* 365 F.3d at 127 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)), Lunney has not provided evidence (as opposed to speculation) as to any of them.

In sum, defendants are entitled to summary judgment on Lunney's claims of a temporary lack of running water, plumbing problems, and denial of personal hygiene items.

### D. *First Amendment Retaliation Claims*

Lunney asserts that he was assaulted by Blot and Frazier because he made verbal complaints about SHU conditions, *see* Lunney Aff. ¶ 24; that Blot threatened him with physical violence on several occasions for his writing of grievances, *see id.* ¶¶ 30-31; that Blot denied him recreation, meals, and showers because of his complaints, *see id.* ¶ 29; and that Fischer threatened to transfer him to Attica for writing grievances, *see id.* ¶ 28 (incorporating Am. Compl. ¶ 15(f)). He also asserts in his amended

Lunney v. Brureton, Not Reported in F.Supp.2d (2007)
Case 9:16-cv-01211-GTS-TWD    Document 72    Filed 08/09/18    Page 195 of 338
2007 WL 1544629

complaint that Brereton fired him from his position as a porter "as a means of retaliation." Am. Compl. at ¶ 15(g)(2). The defendants argue that these claims are unexhausted and fail on the merits. *See* Def. Mem at 9-12, 12-17; Def. Reply Mem. at 9-10, 11-15.

In its prior ruling, the Court dismissed Lunney's general allegations of threats and harassment because "comments that are merely 'insulting' or 'disrespectful' do not give rise to a constitutional violation." *See Lunney I,* 2005 WL 121720, at \*11 (citations omitted). The Court also dismissed Lunney's claim that Fischer threatened to transfer him to another facility for writing grievances because, *inter alia,* Lunney did not allege that he was transferred because he filed grievances against prison officials. *See id.* However, the Court did not dismiss Lunney's claim that he was threatened with physical violence for filing grievances. *See id.* (citing *Hernandez v. Goord,* 312 F.Supp.2d 537, 545 (S.D.N.Y.2004) (threatened bodily injury and threats to inmate's life sufficient to state a claim)). Lunney's retaliation claims re-appeared in somewhat different form in his amended complaint, *see* Am. Compl. ¶ 16(c), which also contains new retaliation claims against Blot, Frazier and Brereton. *See id.* ¶¶ 15(g)(2), 16(h), (i).

### 1. *Law Governing First Amendment Retaliation*

**\*17** The First Amendment protects prisoners from retaliation for engaging in protected speech, including submitting grievances regarding prison conditions. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.") (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)). "[I]ntentional obstruction of a prisoner's right to seek redress of grievances 'is precisely the sort of oppression that ... section 1983[is] intended to remedy.' " *Id.,* 89 F.3d at 80 (quoting *Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987)) (alterations in original). A prisoner asserting a retaliation claim must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

Moreover, in the prison context, the Second Circuit has recognized "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated." *Colon,* 58 F.3d at 872 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)). Thus, courts "examine prisoners' claims of retaliation with skepticism and particular care." *Colon,* 58 F.3d at 872.

### 2. *Claims against Fischer*

In his affidavit, Lunney alleges that Fischer "repeatedly threatened" him "in retaliation for his filing of grievances and complaints regarding S.H.U. conditions." *See* Lunney Aff. ¶ 28 (incorporating Am. Compl. ¶ 15(f)) (Lunney "subjected to threats of being transferred to Attica" by Fischer, who "made it quite clear to plaintiff that he did not like the fact that plaintiff was writing grievances and complaints to outside agencies."). He further states that his prison records reflect that Fischer attempted to transfer him "under the reason that plaintiff's behavior in Sing Sing was unsuitable." *See* Lunney Aff. ¶ 28 (incorporating Am. Compl. ¶ 15(f)). While defendants argue that Lunney's claim should be dismissed because he did not properly exhaust the claim in accordance with the PLRA, it is not necessary to reach this question because the claim fails on the merits.

Lunney's First Amendment claim against Fischer is based on his claim that Fischer "threaten[ed]" him in response to his grievance writing. Am. Compl. ¶ 16(c); Lunney Aff. ¶ 28. But Lunney's only specific allegation on this point is that Fischer "did ... *try* to transfer plaintiff but D.O.C.S. officials in Albany, New York cancelled the transfer." Lunney Aff. ¶ 28 (emphasis added); *see also* Pl. Mem. at 14-17.

This allegation cannot meet the requirement that the plaintiff experience an "adverse action." *Pidlypchak,* 389 F.3d at 380. While "the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes v. Walker,* 239 F.3d 489, 492-93 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Only retaliatory conduct which would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" may support such a claim. *Id.* at 493. The Second Circuit has "made

clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Pidlypchak,* 389 F.3d at 381 (citing *Davis v. Goord,* 320 F.3d 346 (2d Cir.2003)).

**\*18** The allegation in the complaint regarding the threats of transfer cannot be objectively viewed as deterring a person of ordinary firmness from exercising First Amendment rights. This is particularly true where Lunney's allegations are devoid of any dates or descriptions of the manner in which Fischer made the alleged threats. Moreover, the lack of dates also makes it impossible to determine whether there was a causal connection between the filing of grievances and the adverse action. Accordingly, summary judgment on this claim should be granted. It is, therefore, unnecessary to reach the question of qualified immunity. *See* Def. Mem. at 34; Def. Reply Mem. at 25. [5]

### 3. *Claims against Blot*

Lunney asserts that (1) Officer Blot denied him showers, meals, and recreation in retaliation for his grievances, *see* Lunney Aff. ¶ 29; (2) that Blot co-signed a misbehavior report against him stemming from an incident to which Blot was not a party; and that Blot subsequently told Lunney, "If I ever hear about you complaining about another officer you'll be sorry. You won't be so lucky next time," *see id.* ¶ 31 (incorporating Am. Compl. ¶ 15(h)); (3) that Blot threatened to harm Lunney physically if Lunney refused Blot's offer of a bribe to stop writing grievances, *see id.* ¶ 30; and (4) Blot assaulted him in retaliation for verbal complaints about the conditions in the SHU. *See id.* ¶¶ 24-25.

Defendants contend that each of these claims should be dismissed because Lunney failed to exhaust them and also dismissed on the merits. *See* Def. Reply Mem. at 5-7, 10. Defendants further contend that Blot is entitled to qualified immunity "from plaintiff's retaliation claim involving an alleged false misbehavior report ...." Def. Mem. at 34; Def. Reply Mem. at 29-30.

### a. *Exhaustion of Claims Against Blot*

As to the four claims with respect to which the exhaustion defense has been raised, we have already discussed why Lunney should be excused from having failed to grieve the assault claim, *see* section III.B.1, and the same reasons that excuse the failure to grieve the assault apply equally to the claim that the motive for the assault was to retaliate for protected activity. Accordingly, there is no need to discuss exhaustion with respect to this aspect of the retaliation claim against Blot.

In addition, we conclude, for the reasons discussed in section III.D.3.c below, that Lunney's claim with respect to the false misbehavior report would fail on the merits. Accordingly, our discussion of exhaustion relates only to claims (1) and (3): that is, the claim regarding the denial of showers, meals, and recreation and the claim regarding the threat of physical violence.

Lunney alleges that Blot said: "If I ever hear about you complaining about another officer you'll be sorry. You won't be so lucky next time." Am. Compl. ¶ 15(h). He also states that "[Blot] would come in and threaten guys and tell guys 'listen, I'm going to write you up and you will get a new charge,' " Lunney Aff. ¶ 30 (citing Lunney Dep. at 190); and generally, that Blot "threaten[ed] [Lunney] with misbehavior reports, physical beatings and deprivations of privileges if he ... continued to write grievances." Am. Compl. ¶ 15(g). More specifically, in his deposition, Lunney states that Blot became "offended and upset about my writing grievances and he said he didn't like people that wrote grievances"; that he "would complain that he didn't like people writing grievances" and would "criticiz[e]" him for it. Lunney Dep. at 187. Lunney recounts one conversation as follows:

**\*19** [H]e came to me one day and said "listen, I want you to stop writing grievances." And I said "listen, you guys are doing a lot of things wrong down here." He said "listen, if you don't stop writing grievances I'm going to break your fuckin' neck." He said "you're going to have a hard time in the SHU."

*Id.*

As already discussed in the context of Lunney's excessive-force claim, *see* section III.B the Second Circuit has held that "seemingly available remedies [may be] rendered unavailable by threats," *Hemphill,* 380 F.3d at 688, if a "similarly situated individual of ordinary firmness" would not have "deemed them available." *Id.* (citations and quotations omitted). Likewise, the Second Circuit has held that threats by prison authorities may provide grounds for estoppel if defendants "took affirmative action to prevent [the prisoner] from availing himself of grievance

procedures." *Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (citing cases). [6]

Liberally construed, Lunney's argument can be read as asserting both that (1) his failure to follow the formal exhaustion process should be excused because Blot's threats rendered the formal grievance process effectively unavailable to him and (2) that Blot's exhaustion defense was estopped by Blot's alleged threats.

Lunney's general assertions regarding threats-without the specific of dates or content of threats-might not be sufficient permit a finding on these points. But his assertion that Blot stated "if you don't stop writing grievances I'm going to break your fuckin' neck," Lunney Dep. at 187, coupled with the allegation that Blot had actually assaulted him previously, would be sufficient to allow a factfinder to conclude that a "similarly situated individual of ordinary firmness" would not have deemed the inmate grievance process available with respect to grievances that involve conduct by Blot. *See, e.g., Hepworth v. Suffolk County,* 2006 WL 2844408, at *4-7 (E.D.N.Y. Sept.29, 2006) (inmate beaten and threatened with further violence after testifying against correction officers); *Larry v. Byno,* 2006 WL 1313344, at *4 (N.D.N.Y. May 11, 2006) (physical assault coupled with threat to kill inmate after inmate mailed a complaint); *McCullough,* 2005 WL 3164248, at *3-4 (assault with threat to "get [him]" if he filed another grievance). It also raises questions regarding estoppel as to any claim against Blot. Thus, a genuine issue of material fact exists as to (1) whether administrative remedies, though nominally "available," were functionally available to Lunney to grieve these claims-the deprivation of meals, showers and recreation and the threat of physical violence by Blot-against Blot and/or (2) whether Blot's alleged threats estop defendants from raising exhaustion as an affirmative defense.

We now address the merits of the four claims against Blot.

### b. *The Merits of Lunney's Allegation that Blot Denied Him Showers, Meals, and Recreation*

**\*20** Lunney states that he was deprived of showers "at least twice a week." Lunney Dep. at 182. He asserts that this occurred "[b]ecause of problems I was having with Blot and my being vocal about the problems, the conditions of SHU." *Id.* at 183. He asserts that he was

supposed to get three showers a week. *See* Pl. Mem. at 22. As to recreation, Lunney states that at least "three or four times a week [ ] Blot would come ... by with the list. He'd ask guys if they want recreation. We'd be brought down for breakfast. He'd tell me 'you're staying here.' " *Id.* (citing Lunney Dep. at 185-86). Lunney makes no specific statements as to Blot's depriving him of meals. While Blot denies ever depriving Lunney of meals, showers or recreation, *see* Blot Decl. ¶ 4, we accept Lunney's assertions as true for purposes of this motion.

Defendants challenge whether Lunney has established the second and third prongs of a prima facie case of retaliation: namely, whether (1) the deprivations constitute "adverse action," and (2) there is a causal connection between these deprivations and his grievance writing. Def. Mem. at 15.

*i. Adverse Action.* As an initial matter, defendants argue that Lunney's claim lacks sufficient specificity. Def. Reply Mem. at 13. As is true in response to any motion for summary judgment, Lunney was required to provide evidence sufficient to allow a jury to find in his favor. Thus, "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998). Lunney's allegations regarding denial of meals are completely lacking in any such specifics. His allegations regarding the denials of showers and recreation, however, are sufficiently detailed to allow a trier of fact to conclude that such denials occurred. Accordingly, we limit our discussion to the issue of whether the denial of showers and recreation constitute "adverse action."

As noted, the Second Circuit has held that while "the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes,* 239 F.3d at 492-93. Only retaliatory conduct which would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" may support such a claim. *Id.* at 493. Thus, the conduct must be "specifically directed at plaintiff[ ] and substantial enough to deter legitimate grievances against prison officers." *Salahuddin v. Mead,* 2002 WL 1968329, at *5 (S.D.N.Y. Aug.26, 2002). Conduct that is *de minimis* does not provide this deterrent effect and does not give rise to

2007 WL 1544629

actionable retaliation. *Dawes,* 239 F.3d at 493; *see also Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999) (citing *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982) ("[S]ince there is no justification for harassing people for exercising their constitutional rights [, harassment] need not be great in order to be actionable. Yet, ... [i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise ....")) (alterations in original). What is *de minimis* varies according to context. *See Dawes,* 239 F.3d at 493 ("[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a[ retaliatory] action taken against them is considered adverse") (alteration in original) (citing *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999)). Thus, in the prison context, not all harms constitute legally sufficient grounds for retaliation claims. *See Salahuddin,* 2002 WL 1968329, at *4-5 (citing cases).

**\*21** Case law suggests that the isolated or sporadic denial of privileges do not suffice to state a claim of actionable retaliation. *Chestnut,* 193 F.3d at 150 (remanding to district court on interlocutory appeal where "there [was] a serious question as to whether ... [plaintiff's] asserted one-day denial of an opportunity to exercise, w[as] more than *de minimis"* ); *Snyder v. McGinnis,* 2004 WL 1949472, at *11 (W.D.N.Y. Sept.2, 2004) (deprivation of meal on two occasions is *de minimis* and does not state a claim for retaliation); *Lyons v. Wall,* 2006 WL 2945256, at *5 (D.R.I. Oct.13, 2006) (sporadic cold showers are *de minimis* ). Here, however, Lunney alleges a routine denial of showers and recreation such that he regularly had one shower a week instead of two, and three to four hours of recreation a week instead of the normal seven. Pl. Mem. at 22 (citing Lee Decl. Ex. J §§ 304.2, 304.3, 304.5; Lunney Aff. Ex. M at 140-142); *see also Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004) (discussing normal conditions of the SHU as two showers a week and one hour of recreation a day). Defendants have pointed to no case where a constant denial of showers and recreation, in the proportions alleged here, was deemed to be *de minimis* as a matter of law. [7]

In sum, defendants are not entitled to summary judgment on this point.

*ii. Causal Connection.* Lunney must also show that there was "a causal connection between the protected speech and the adverse action." *Pidlypchak,* 389 F.3d at 380. *Colon* discusses a number of factors relevant to whether a causal connection exists, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation. 58 F.3d at 872-73; *accord Sloane v. Mazzuca,* 2006 WL 3096031, at *14 (S.D.N.Y. Oct.31, 2006); *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002).

Here, a reasonable factfinder might view Blot's decision to deny Lunney recreation and shower privileges as being prompted by Lunney's grievance writing. Lunney states that upon arrival to the SHU, he immediately complained about the conditions of his cell, both verbally and through the filing of written grievances. Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶ 15(c)-(e)). On his third day in the SHU, Officers Blot and Frazier assaulted him, and Blot warned him that he would suffer consequences if he filed a grievance. *Id.* (incorporating Am. Compl. ¶ 15(e)(1)-(2)). Nonetheless, Lunney continued to file grievances in the SHU. *See, e.g.,* Ex. K to Lunney Aff. Blot stated to him that he "didn't like people that wrote grievances" and told him "listen, I want you to stop writing grievances" and that "if you don't stop writing grievances I'm going to break your fuckin' neck" and that "you're going to have a hard time in SHU." Lunney Dep. at 187. At the same time, Lunney states that he was routinely denied showers and recreation. Lunney Aff. ¶ 29. Thus, the evidence for causation centers on (1) the fact that there is no explanation provided for the denial of showers and recreation and (2) the evidence that Blot complained to Lunney about his writing grievances and specifically threatened Lunney about them during the same time period that the denial of showers and recreation was taking place. Lunney Dep. at 186-87. While it may also be reasonable to infer, as defendants argue, that the deprivations, if they did occur, were a result Lunney's "extensive disciplinary history," Def. Mem. at 15, on a motion for summary judgment, the Court must draw "all justifiable inferences" in favor of the non-moving party. *Anderson,* 477 U.S. at 255. Thus, Lunney has raised a genuine issue of material fact as to whether Blot denied showers and recreation in retaliation for Lunney's grievances. [8]

c. *The Merits of Lunney's Allegation that Blot Filed a False Misbehavior Report*

**\*22** The filing of a false misbehavior report in response to constitutionally protected activity can constitute actionable retaliation. *See Graham,* 89 F.3d. at 79-81 (allegation that defendants filed false misbehavior reports against plaintiff in retaliation for his leadership in filing a grievance to protest the removal of workshop showers); *Jones v. Coughlin,* 45 F.3d 677-78, 680 (2d Cir.1995) (per curiam) (allegation that defendants, in retaliation for plaintiff's filing administrative complaint, filed a false misbehavior report that led to 120 days of punitive segregation).

Lunney asserts that a misbehavior report dated June 22, 2003-approximately six months after he left the SHU-"stemmed from plaintiff having sent letters to several facility staff members"-not including Blot-"complaining about being harassed by another staff member, C.O. Davis." *See* Am. Compl. ¶ 15(h); *see also* Misbehavior Report (reproduced in Ex. G. of Lee Decl.). Officer Gary, one of the officers to whom Lunney had sent the letter, wrote the misbehavior report because Lunney's letters violated facility correspondence rules that prohibit "correspond[ence] with dep[artment] employees [without] the express permission of the superintendent." *See* Lee Decl. Ex. G (citing DOCS Directive 4422). Blot "endorsed" the misbehavior report. *See* Def. 56.1 ¶ 22. Lunney was subsequently found guilty of this charge based on "[his] admissions that [he] willfully wrote to a total of 15 officers including officer Gary," *see* Lee Decl. Ex. G, and sentenced to 30 days' keeplock, loss of packages, loss of commissary, and loss of phone privileges. [9] *See id.* Defendants argue that Lunney has not met the elements of a retaliation claim. Def. Mem. at 16-17; Def. Reply Mem. at 14.

Lunney's claim is simply disposed of based on the evidence that the misbehavior report had a legitimate justification. The Second Circuit has held that, "[r]egardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.,* that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287-88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Thus, where a plaintiff has met his "initial

burden of showing that an improper motive played a substantial part in defendant's action," the defendant may still obtain summary judgment if the defendant can "show it would have taken exactly the same action absent the improper motive." *Id.; see also Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (affirming dismissal on summary judgment because correction officer's actions were of mixed motives and "would have been issued on proper grounds alone."); *see also Sher v. Coughlin,* 739 F.2d 77, 81-82 (2d Cir.1984) (affirming summary judgment dismissal of prisoner's retaliation claim where dual motivation existed for prisoner's transfer to another facility).

**\*23** Assuming without deciding that Lunney had met his initial burden of showing that an improper motive played a substantial part in the decision to discipline him, Lunney concedes that the misbehavior report "stemmed from" a letter he wrote to Officer Gary. Am. Compl. ¶ 15(h). It is undisputed that writing letters to prison guards violates DOCS's policy. *See* DOCS Directive 4422. Lunney has provided no evidence of instances in which prisoners wrote letters to prison guards without receiving disciplinary action. Based on the evidence in the record, it would be purely speculative for a factfinder to conclude that the prison would not have taken the same action against Lunney regardless of any motive it had to punish him for writing grievances. Accordingly, defendants are entitled to summary judgment on this claim.

d. *The Merits of Lunney's Allegation that Blot Threatened Physical Violence*

Lunney states that Blot threatened him physically, both generally in response to his continued filing of grievances, *see* Lunney Aff. ¶¶ 29-30, and specifically in response to his complaint about another officer. *See id.* ¶ 31. Lunney's most specific allegations consist of two statements: (1) "If I ever hear about you complaining about another officer you'll be sorry. You won't be so lucky next time," Am. Compl. ¶ 15(h), and (2) "[I]f you don't stop writing grievances I'm going to break your fuckin' neck." Lunney Aff. ¶ 30 (citing Lunney Dep. at 186-87). He also states more generally that Blot "threaten[ed] [Lunney] with misbehavior reports, physical beatings and deprivations of privileges if he [ ] continued to write grievances." Am. Compl. ¶ 15(g). Defendants do not address this claim in their papers, although they argue that Blot is entitled to qualified immunity on it. *See* Def. Reply Mem. at 30.

Case law reflects that verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered. *Compare Hepworth,* 2006 WL 2844408, at *8-9 (denying summary judgment where "continued verbal threats" that inmate "would receive another beating or be killed" was sufficient "evidence ... such that a reasonable jury could find that the officers unconstitutionally retaliated against [inmate] ... for exercising his First Amendment"); *Brown v. Coughlin,* 965 F.Supp. 401 (W.D.N.Y.1997) (threat to inmate that when officers were "done with him" he would not want to "file any more complaints" sufficient for First Amendment retaliation claim); *Thaddeus-X,* 175 F.3d at 396, 398 ("In the prison context ... [h]arassment, physical threats" would "certainly be adverse" action), *with Bartley v. Collins,* 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (threats such as "we going to get you, you better drop the suit," do not rise to the level of adverse action); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) ("[Defendant's] alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] do not give rise to a First Amendment retaliation claim," especially considering the fact that the threat was never carried out); *Cruz v. Hillman,* 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (allegation that correction counselor expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said "Green Haven is an open battlefield, so be careful," insufficient to state a retaliation claim). Given the directness and specificity of the alleged threats here, a factfinder could permissibly decide that the threats were such that it would deter an inmate of "ordinary firmness" from engaging in protected activity.

**\*24** Nor should Blot be entitled to qualified immunity. It would not have been "objectively reasonable" for Blot to have believed that it did not violate "clearly established" law regarding retaliation to tell Lunney that he would "break [his] fuckin' neck" if Lunney continued to write grievances. In other words, the contours of the right to be free from First Amendment retaliation were "sufficiently clear that [Blot] would [have] underst[ood] that what he [was] doing violate[d] that right." *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

e. *The Merits of Lunney's Allegation of Retaliatory Assault*

We have already discussed Lunney's claim that the assault by Blot and Frazier constituted an Eighth Amendment violation. *See* section III.B above. In addition, Lunney asserts that this same assault occurred "because of a verbal complaint he made to another officer regarding his not having hygiene items and the problems with his sink and toilet." Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶¶ 15(e)(1)-(2)). In his amended complaint, Lunney specifically pleads this as a First Amendment claim as well. *See* Am. Compl. at ¶ 16(h).

Defendants do not make any arguments regarding this claim specifically. Nonetheless, because they moved for summary judgment as to "plaintiff's First Amendment retaliation claim" generally on the ground that there is no "causal relationship between protected activity and adverse action," Def. Mem. at 2, Lunney was obligated to "come forward with admissible evidence supporting [his] claim" on this point. *Feurtado v. City of New York,* 337 F.Supp.2d 593, 599 (S.D.N.Y.2004) (citing cases) (internal quotation marks omitted). [10]

Lunney details that after "attempting to inform another officer, who was confined to a control room at least 45 feet away from plaintiff's cell," *see* Am. Compl. ¶ 15(e), that he lacked certain hygiene items,

> [d]efendants Blot and Frazier approached plaintiff's cell and began to state that plaintiff had better "shut the fuck up or we are coming in there and you will not like the results." After attempting to explain his problems to [them] Officer Frazier appeared to become calm and attempted to resolve plaintiff's complaints. However, defendant Blot stated "I don't give a shit about your fucking problems. File a fucking grievance." Defendant Blot then proceeded to yell to the officer in the control booth to have plaintiff's cell opened.

Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶¶ 15(e)(1)-(2)). According to Lunney, Blot then entered Lunney's cell and assaulted him, *id.,* though Blot denies that this assault ever took place. Blot Decl. ¶ 3.

Here, the sequence of events-a complaint followed by an immediate assault, accompanied by remarks referring to his complaint-would be sufficient for a jury to find that there was a causal connection between Lunney's

complaints and the assault. Accordingly, summary judgment cannot be granted to defendants on this claim. [11]

### 4. *First Amendment Claim Against Frazier*

**\*25** Lunney alleges that Frazier assisted Blot "in assaulting plaintiff in retaliation for plaintiff making complaints." Am. Compl. ¶ 16(i). Once again, defendants argue only generally that plaintiff's First Amendment retaliation claim should be dismissed for failure to establish a causal relationship. Def. Mem. at 2. As to Frazier's particular actions, Lunney claims that he "entered the cell and placed [Lunney] in a choke hold for several minutes." Am. Compl. ¶ 15(e)(1). Frazier, like Blot, denies Lunney's allegations of unnecessary physical force. Frazier Decl. ¶ 3. For the same reasons just stated, Lunney's allegations are sufficient to allege a causal connection between his complaints and the assault. Thus, defendants must be denied summary judgment as to the claim against Frazier.

### 5. *First Amendment Claim Against Brereton*

Lunney's amended complaint states that he "filed a formal grievance complaint with the I.G.R.C. arguing that he had been fired [from his job as a porter] as a means of retaliation by defendant Brureton." Am. Compl. ¶ 15(g)(2). No further information is provided on this issue. While Lunney makes reference to it in his memorandum of law, Pl. Mem. at 30, he does not address it in his affidavit. Given the conclusory reference in the amended complaint, there is no admissible evidence before the Court that would allow a jury to conclude that Lunney had made out each of the elements of a retaliation claim.

Accordingly, this claim must be dismissed.

### E. *Unfiled Grievances*

Lunney claims that defendant Kober violated his First and Eighth Amendment rights by denying him "access to an effective Inmate Grievance Program," *see* Lunney Aff. ¶ 32, and thus that Kober "deprived plaintiff of his means to petition the government for the redress of grievances." *See* Am. Compl. ¶ 16(e). Specifically, he alleges that "[g]rievances were not timely filed or they were completely ignored," and that Kober stated they "were never received by his office." *See* Lunney Aff. ¶ 32 (incorporating Am. Compl. ¶ 15(i)). He adds that the Sing Sing IGRC "was

not operating in accordance with policy," that grievances "were not being timely filed and responded to," that "investigations were biased and or incomplete," and that "appeals were not timely filed." *See* Am. Compl. ¶ 15(i). While defendants argue that this claim is unexhausted, *see* Def. Reply Mem. at 10, it is unnecessary to reach that issue because the claim fails on the merits.

It is well established that a claim of violation of a state grievance procedure is not cognizable in an action under 42 U.S.C. § 1983. *See Cancel,* 2001 WL 303713, at *3 ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983"); *accord Davis v. Castleberry,* 364 F.Supp.2d 319, 323 (W.D.N.Y.2005); *Fernandez,* 2005 WL 733664, at *9; *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 n. 3 (W.D.N.Y.1998) (citing *Buckley v. Barlow,* 997 F.2d 494, 495 (8th Cir.1993)).

**\*26** It does not help Lunney's claim if it is construed as one for denial of access to the courts. To state a claim for denial of access to the courts under § 1983, Lunney must demonstrate that defendants "took or [were] responsible for actions that hindered [plaintiff's] efforts to pursue a legal claim." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (internal quotation marks omitted). Only those actions which rise to the level of " 'deliberate and malicious interference' " and which " 'actually impeded his access to the court or prejudiced an existing action' " are sufficient to present a claim. *Green v. Phillips,* 2006 WL 846272, at *11-12 (S.D.N.Y. Mar.31, 2006) (quoting *Cancel v. Goord,* 2001 WL 303713, at *4 (S.D.N.Y. Mar.29, 2001)); *accord Rivera v. Pataki,* 2005 WL 407710, at *17-18 (S.D.N.Y. Feb.7, 2005). The evidence presented by Lunney, however, does not satisfy this standard. The operation of the grievance process is relevant to any access-to-the-courts claim only insofar as the procedure is a prerequisite for the filing of a civil suit under the PLRA. Lunney has not shown how the operation of the grievance procedure denied him such access. Moreover, in light of the fact that prisoners are excused from filing grievances where prison officials prevent them from doing so or make the grievance process not "available," *see, e.g., Brownell,* 446 F.3d at 311-12, any such actions-even if they had been demonstrated-could not be shown to have deprived Lunney of his ability to bring any lawsuit. Thus, this claim too must be dismissed.

### F. *Fourteenth Amendment Due Process Claims*

As in his original complaint, Lunney asserts that his right to due process was violated by two separate actions. First, Lunney claims that Selsky improperly ordered a second disciplinary hearing after the Article 78 proceeding had been filed with respect to the first hearing. *See* Lunney Aff. ¶ 14 (incorporating Am. Compl. ¶ 10). Second, he argues that defendants' failure to provide him with a timely written disposition of his disciplinary hearing was a violation of his due process rights. *See* Am. Compl. ¶¶ 10, 12. This first claim is identical to one the Court dismissed on the merits in its original ruling, *see* Lunney I, 2005 WL 121720, at *14, and thus the Court will not reconsider it here. Accordingly, we address only the second claim. [12]

### 1. *Law Governing Disciplinary Proceedings*

A party asserting a due process claim "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Ortiz, 380 F.3d at 654 (quoting Giano v. Selsky, 238 F.3d 223, 225 (2d Cir.2001)). Prisoners subject to disciplinary proceedings can show a liberty interest only if "disciplinary punishment 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *See* Hanrahan v. Doling, 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (quoting Sandin v. Conner, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " Palmer v. Richards, 364 F.3d 60, 64 (2d Cir.2004) (quoting Wright v. Coughlin, 132 F.3d 133, 136 (2d Cir.1998)).

**\*27** There is no bright-line rule in determining whether a particular period of confinement in a SHU meets the *Sandin* standard of an "atypical and significant" hardship thereby implicating due process protection. *See id.* (citations omitted). However, as in the original motion, defendants do not argue that Lunney's liberty interests were not implicated by his nine-month sentence of confinement to the SHU-which was later reduced to six months-under the standard established in *Sandin.* It is assumed, therefore, that Lunney's sentence of confinement did implicate a liberty interest for purposes of this motion. Consequently, we consider whether Lunney

was denied due process when he was not provided with a written disposition of his disciplinary hearing and when the second hearing was scheduled.

### 2. *Written Disposition of Disciplinary Hearing*

As noted above, *see* section I.A, Lunney's first disciplinary hearing, in June 2002, resulted in a finding of guilt for which he was sentenced to nine months in the SHU. Lunney appealed this ruling, which was affirmed in August 2002. Lunney then filed an Article 78 petition in the state Supreme Court, which led to an order to show cause directing Selsky to respond to the petition. In October 2002, Selsky rescinded the disciplinary determination and ordered a rehearing on the ground that Lunney had not been given adequate assistance in preparing his defense. The rehearing was held in October 2002, and Lunney was again found guilty and sentenced to nine months in the SHU. He again appealed, arguing this time that he had not received a copy of the hearing disposition. His appeal was denied, although his sentence was reduced to six months because the original sentence had exceeded the guidelines "without further justification." *See* Memorandum, dated Nov. 7, 2002 (reproduced in Ex. J to Selsky Decl., filed July 12, 2005 (Docket # 84) ("Selsky Decl.")). Lunney filed a second Article 78 petition with respect to the rehearing, and in August 2003, a judge of the State Supreme Court dismissed the original misbehavior report and concluded that the failure to provide Lunney with a copy of the hearing disposition was a violation of due process.

With regard to the timing and manner of notifying Lunney about the hearing disposition, Lunney acknowledges that he received oral notification of the result on October 17, 2002. *See* Def. 56.1 ¶ 12; Lunney Aff. ¶ 12. It is undisputed that he also received a tape recording of the hearing on this date, and that the tape "contained all [of] the information contained in the written decision including the evidence relied upon and reasons for the penalty imposed." *See* Def. Reply Mem. at 23. [13]

The written disposition stated that it was based on "the written report by Officer Hadzovic and because it was recovered in the locker which was lock [sic]. Also from the testimony of Sgt. Guadagno who stated that the showers are normally completed by 7:15-7:30 PM." *See* Superintendent Hearing Disposition Rendered, dated Oct. 17, 2002 (reproduced in Ex. H to Selsky Decl.). It

noted the reasons for the disposition as: "to impress upon this person the seriousness of this act and to act a[s] a deterrent to other[s]. Also that the possession of illegal weapons in a correctional facility is very detrimental to the safety and security of all those that work and live [h]ere, and this will not be tolerated." *See id.* Lunney makes no allegations regarding what was or was not on the tape. Nor does he allege that the written decision contained any information that was not on the tape.

**\*28**  In its original ruling on this claim, this Court allowed Lunney's claim regarding his failure to receive a written disposition of his disciplinary hearing to proceed because "the right to receive a 'written statement of the disposition' [is] a requirement that has been in place since the Supreme Court's decision in *Wolff v. McDonnell* [418 U.S. 539, 563 (1974) ]." *See Lunney I,* 2005 WL 121720, at \*13 (citing *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004)); *see also Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999); *McCann v. Coughlin,* 698 F.2d 112, 121-22 (2d Cir.1983); *Higgins v. Coombe,* 2002 WL 362776, at \*2 (S.D.N.Y. Mar.6, 2002); *Silva v. Sanford,* 1998 WL 205326, at \*6 (S.D.N.Y. Apr.24, 1998). The Court noted at that time that the defendants might be able to defeat the due process claim based upon additional facts (not contained in the complaint) showing, for example, that Lunney was informed of the disposition or was otherwise given the opportunity to obtain it. *Lunney I,* 2005 WL 121720, at \*13. In addition, the Court left open the possibility that the defendants could show entitlement to qualified immunity. *Id.*

Prison disciplinary hearings are subject to a harmless error analysis. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("If a person may be convicted and obliged to serve a substantial prison sentence notwithstanding a constitutional error determined to be harmless, surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for a prison rules infraction despite a harmless error in adjudicating the violation.") (internal citations omitted); *Louis v. Ricks,* 2002 WL 31051633, at \*11 (S.D.N.Y. Sept.13, 2002) (citing *Powell,* 953 F.2d at 750). Defendants now argue that any failure to provide Lunney with a written disposition of the result of his disciplinary hearing in a timely fashion was harmless, because: (1) "there was no information contained in the written hearing decision not provided to plaintiff before his final challenge to the hearing decision and penalty," *see* Def. Reply Mem. at

23; (2) after receiving a tape recording of the hearing which contained the rationale, "he did not add any new substantive arguments related to the rationale ... because he had already made the best arguments possible," *see* Def. Mem. at 26; and (3) his sentence was reduced for exceeding the guidelines, despite his failure to raise the issue on appeal. *See* Def. Reply Mem. at 23. Thus, defendants argue, the claim must fail. *See* Def. 56.1 ¶¶ 12, 35; Def. Mem. at 22-23; Def. Reply Mem. at 25-27.

Lunney does not contradict any of the relevant facts asserted by defendants on this point. Rather, he states that although his punishment at the second disciplinary hearing was in the end reduced for exceeding the guidelines, he never made this challenge on appeal. *See* Pl. Mem. at 57. He uses this fact to argue that "[p]erhaps if plaintiff had received a copy of the disposition paperwork, he could have argued on appeal that the penalty ... exceeded the guidelines." *See id.* This is the only harm Lunney points to based on his not having received the written disposition.

**\*29**  Lunney's argument fails for two reasons. First, he was aware of his nine-month sentence following the disciplinary hearing. *See* Def. 56.1 ¶ 12 (citing Lunney Dep. at 93, 100-101). Thus, nothing prevented Lunney from raising the alleged illegality of the nine-month sentence even without a copy of the actual written disposition. Second, Lunney has not shown that there was any potential for any other outcome had he been provided with a copy of the written disposition. For example, he makes no argument that he could have received an even greater sentence reduction had he had access to the written hearing disposition. Given that the error in the sentence was remedied in November 2002 prior to his serving six months in confinement, any failure on his part to raise the argument that his sentence was incorrect was necessarily harmless.

*Conclusion*

For the foregoing reasons, defendants' motion should be granted, with the exception of the portion of their motion concerning Lunney's claim of (1) excessive force against Blot and Frazier and (2) his First Amendment retaliation claims (a) against defendant Blot based on the allegedly retaliatory assault, threats, and deprivation of

2007 WL 1544629

recreation and showers (b) against defendant Frazier for his participation in the retaliatory assault. [14]

### *PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the

Hon. Lewis A. Kaplan, 500 Pearl Street, New York, New York 10007, and to the undersigned at the same address. Any request for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See* Thomas v. Arn, 474 U.S. 140, 144-45, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

### All Citations

Not Reported in F.Supp.2d, 2007 WL 1544629

### Footnotes

1    This officer is identified as Lieutenant "Brureton" in the complaint.

2    *See* Notice of Motion for Summary Judgment, filed Apr. 24, 2006 (Docket # 72); Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, filed Apr. 24, 2006 (Docket # 73) ("Def.Mem."); Defendants' Rule 56.2 Statement, filed Apr. 24, 2006 (Docket # 74); Declaration of Brian Fischer, filed Apr. 24, 2006 (Docket # 75) ("Fischer Decl."); Declaration of Paul Kikendall, filed Apr. 24, 2006 (Docket # 76); Declaration of Robert Murphy, filed Apr. 24, 2006 (Docket # 77); Declaration of Michael Blot, filed Apr. 24, 2006 (Docket # 78) ("Blot Decl."); Declaration of Parrish Frazier, filed Apr. 24, 2006 (Docket # 79) ("Frazier Decl."); Declaration of Sean Kober, filed Apr. 24, 2006 (Docket # 80); Rule 56.1 Statement, filed Apr. 24, 2006 (Docket # 81) ("Def.56.1"); Chu Declaration in Support of Defendants' Motion for Summary Judgment, filed Apr. 24, 2006 (Docket # 82); Declaration of Thomas G. Eagen, filed Apr. 24, 2006 (Docket # 83) ("Eagen Decl."); Declaration of Donald Selsky, filed Apr. 24, 2005 (Docket # 84) ("Selsky Decl."); Declaration of Benjamin Lee, filed Apr. 24, 2006 (Docket # 85) ("Lee Decl.").

3    Lunney has also asserted that the assault occurred in retaliation for complaints he has made. The retaliation claim with respect to the assault is discussed separately below in sections III.D.3.e (with respect to Blot) and III.D.4 (with respect to Frazier).

4    Defendants assert that "in the event that the Court finds that there is a genuine dispute of material fact concerning exhaustion, and that plaintiff's claims cannot otherwise be dismissed, the proper procedure would be to hold an evidentiary hearing," Def. Reply Mem. at 10, rather than "proceed directly to trial." *Id.* There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. *See, e.g.,* Wyatt v. Terhune, 315 F.3d 1108, 1119-20 (9th Cir.) (in motion to dismiss for failure to exhaust administrative remedies under PLRA, court may "decide disputed issues of fact"), *cert. denied,* 540 U.S. 810 (2003); Priester v. Rich, 457 F.Supp.2d 1369, 1377 (S.D.Ga.2006) (same); *see also* Dukes v. Doe, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering without discussion an "evidentiary hearing" on the question of exhaustion under the PLRA); *cf.* Pauling v. Sec'y of Dep't of Interior, 71 F.Supp.2d 231, 232-33 (S.D.N.Y.1999) (issues of fact with respect to equitable tolling of statute of limitations to be decided by the court). As the Supreme Court has recently affirmed, however, exhaustion is an "affirmative defense," much like a statute of limitations defense. *See* Jones v. Bock, --- U.S. ----, ---- - ----, 127 S.Ct. 910, 919-921, 166 L.Ed.2d 798 (2007). Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that "issues of fact as to the application of that defense must be submitted to a jury." Katz v. Goodyear Tire & Rubber Co., 737 F.2d 238, 243 n. 2 (2d Cir.1984). Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court.

5    Lunney was transferred some time later, in 2004, to Cayuga Correctional Facility, long after the grievances and alleged threats by Fischer were made. *See* Lunney Aff. ¶ 26. Lunney has not alleged any facts regarding this transfer and also has not provided evidence that Fischer caused this transfer. Notably, there is an affidavit from Fischer stating that he was not involved in Lunney's transfer. *See* Fischer Decl. ¶¶ 5-7; *see generally* Davidson v. Donnelly, 2004 WL 1941349, at *3 (W.D.N.Y. Aug.29, 2004) (no claim for retaliatory transfer where plaintiff provided no evidence on reason for transfer and prison officials gave reasons).

2007 WL 1544629

6    The Second Circuit has recognized that "the case law on the PLRA's exhaustion requirement does not always distinguish clearly between (a) cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense, (b) situations in which administrative remedies are not 'available' to the plaintiff ...." *Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

7    While defendants argue that "the alleged denial of meals, recreation and showers did not deter the exercise of plaintiff's rights as evidenced by his many grievances," Def. Mem. at 15, as noted, the test for adverse action is an "objective test [which] applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Pidlypchak,* 389 F.3d at 381 (citing *Davis,* 320 F.3d at 353).

8    Defendants have made only a conclusory argument as to qualified immunity on this point, *see* Def. Mem. at 33-34, and thus we do not consider it here.

9    This finding of guilt was "apparently overturned," or at least "modified" on appeal, though to what extent and the reason for such action is not clear from the record. *See* Def. Mem. at 16 (citing Lee Decl. Ex. I).

10   Because defendants' motion does not contend that verbal complaints cannot constitute constitutionally protected activity, it is unnecessary to reach this question. The Court notes that some case law indicates that a prisoner's oral complaints to prison guards may provide the basis for a retaliation claim under § 1983. *See Smith v. Woods,* 2006 WL 11312347, at *10 (N.D.N.Y. Apr. 24, 2006), *aff'd,* 2007 WL 756410, at *1 (2d Cir. Mar.12, 2007); *Gill v. Riddick,* 2005 WL 755745, at *10 (N.D.N.Y. Mar.31, 2005) (citing cases); *Gaston v. Coughlin,* 81 F.Supp.2d 381, 386 (N.D.N.Y.1999); *Malik'El v. New York State Dept. of Corr. Servs.,* 1998 WL 187459, at *4 (N.D.N.Y. Apr.8, 1998); *but see Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) ("verbal confrontation" not protected activity).

11   Defendants make no arguments with respect to qualified immunity on this claim or with respect to the First Amendment claim against Frazier (discussed in the next section), and thus we do not consider the doctrine's applicability with respect to these claims.

12   The defendants and Lunney discuss the matter of "hearing officer bias" in their summary judgment papers. *See* Def. Mem. at 23-24; Pl. Mem. at 50-52; Def. Reply Mem. at 21-22. However, Lunney did not raise this claim in his amended complaint or in his affidavit and thus we do not consider it.

13   Lunney wrote a letter to Donald Selsky, *see* Letter, dated Nov. 14, 2002 (reproduced in Ex. K to Selsky Decl.), stating that the original tape he received was defective, and requesting a new one. Defendants state, and Lunney does not dispute, that he received a new tape around that time. *See* Def. Mem. at 24.

14   Lunney asserts in his amended complaint that Fischer subjected him to "forced labor without pay" while he was in the SHU, *see* Am. Compl. ¶ 16(c). However, this claim is not explained in his affidavit. Nor is any evidence supplied to support it. Accordingly, it is too vague to constitute the basis for a claim and it has not been discussed herein.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   24

2013 WL 5441724
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Daniel K. MONKO, Plaintiff,

v.

Robert CUSACK, Corrections Officer,
Shawangunk Correctional Facility; and
Gerald Gardner, Corrections Lieutenant,
Shawangunk Correctional Facility, Defendants.

No. 9:11–CV–1218 GTS/TWD.
|
Sept. 27, 2013.

**Attorneys and Law Firms**

Daniel K. Monko, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Kevin P. Hickey, Esq., Assistant
Attorney General, Albany, NY, for Defendant.

### DECISION and ORDER

GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court in this *pro se*
prisoner civil rights action, filed by Daniel K. Monko
("Plaintiff") against the two above-captioned New
York State correctional employees ("Defendants"),
are (1) Defendants' motion for summary judgment,
(2) United States Magistrate Judge Therese Wiley
Dancks' Report–Recommendation recommending that
Defendants' motion be granted, (3) Plaintiff's Objection
to the Report–Recommendation, and (4) Defendants'
Objection to the Report–Recommendation (requesting
that the Report–Recommendation be adopted based,
in the alternative, on Defendants' causation argument).
(Dkt.Nos.28, 36, 38, 39.) For the reasons set forth below,
Plaintiff's Objection is rejected; Defendants' Objection
is accepted; the Report–Recommendation is accepted
and adopted; Defendants' motion is granted for the
reasons stated in the Report–Recommendation as well
as in Defendants' Objection; and Plaintiff's Complaint is
dismissed in its entirety.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Amended Complaint
Generally, in his Amended Complaint, Plaintiff asserts
the following claims: (1) a claim that Defendant Cusack
retaliated against Plaintiff in violation of the First
Amendment by filing two false misbehavior reports
against him in response to his complaints to Defendant
Cusack's supervisor (Corrections Sergeant Lutz) that he
(Plaintiff) was not provided with contraband receipts
when Defendant Cusack confiscated food items from
his cell; (2) a claim that Defendant Gardner similarly
retaliated against Plaintiff in violation of the First
Amendment by failing to take steps (as a supervisor and
hearing officer) to rectify Defendant Cusask's issuance
of false misbehavior reports and by finding him guilty at
the disciplinary hearings despite the clear and convincing
evidence of his innocence; and (3) and a claim that
Defendant Gardner denied Plaintiff due process under
the Fourteenth Amendment by finding him guilty of
both misbehavior charges despite the clear and convincing
evidence of his innocence and the misbehavior reports'
retaliatory nature. (Dkt. No. 12.) Familiarity with
the factual allegations supporting these claims in the
Amended Complaint is assumed in this Decision and
Order, which is intended primarily for the review of the
parties. (*Id.*)

### B. Parties' Briefing of Defendants' Motion for
### Summary Judgment
Because the parties have demonstrated an accurate
understanding of their arguments on Defendants' motion
for summary judgment, the Court will not repeat those
arguments in this Decision and Order, which (again) is
intended primarily for the review of the parties.

### C. Magistrate Judge Dancks' Report–Recommendation
Generally, in her Report–Recommendation, Magistrate
Judge Dancks recommends that Defendants' motion be
granted and Plaintiff's Complaint be dismissed for the
following reasons: (1) Plaintiff has failed to adduce
admissible record evidence from which a rational fact
finder could conclude that he experienced a sufficiently
serious adverse action to support a retaliation claim
against either Defendant, because the loss of privileges for
thirty-six days is *de minimus;* and (2) Plaintiff has failed to
adduce admissible record evidence from which a rational

fact finder could conclude that he possessed a protected liberty or property interest to support a procedural due process claim against Defendant Gardner, because the loss of privileges for thirty-six days is not an atypical and significant hardship in relation to the ordinary incidents of prison life. (Dkt. No. 36.) Familiarity with the particular findings and conclusions supporting these recommendations is assumed in this Decision and Order, which (again) is intended primarily for the review of the parties. (*Id.*)

### D. Parties' Objections to the Report–Recommendation

**\*2** Generally, in his Objection to the Report–Recommendation, Plaintiff asserts the following two arguments: (1) Plaintiff has established a retaliation claim under the First Amendment, because a similarly situated individual of ordinary firmness would be deterred from exercising his constitutional rights by (a) the mere *threat* of receiving a false misbehavior report and/of (b) a resulting loss of privileges for thirty-six days (as evidenced by the affidavit of Plaintiff's fellow inmate in the Special Housing Unit, Timothy Vail); and (2) contrary to Magistrate Judge Danck's characterization of Plaintiff's due process claim as being procedural in nature, it is actually substantive in nature, as evidenced by the word "substantive" in his Amended Complaint. (Dkt. No. 38.)

Generally, in their Objection to the Report–Recommendation, Defendants argue that, while the Report–Recommendation properly recommends that Defendants' motion be granted (for the reasons stated therein), the Report–Recommendation neglects to address, and endorse, Defendants' alternative argument for dismissal of Plaintiff's retaliation claim: that Plaintiff has failed to adduce admissible record evidence from which a rational fact finder could conclude that there was a causal connection between the protected speech and the adverse action. (Dkt. No. 39.) Defendants argue that Plaintiff's conduct would have resulted in the issuance of a misbehavior report regardless of whether Plaintiff complained to the area supervisor. (*Id.*)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard Governing Review of a Report–Recommendation

When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court

subjects that portion of the report-recommendation to a *de novo* review. Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. [3]

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b)(2),(3); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. [4] Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. [5] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.* [6]

**\*3** After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

### B. Standard Governing a Motion for Summary Judgment

Magistrate Judge Dancks correctly recited the legal standard governing a motion for summary judgment. (Dkt. No. 36, at Part III.A.) As a result, this standard is incorporated by reference in this Decision and Order.

Case 9:16-cv-01211-GTS-TWD    Document 72    Filed 08/09/18    Page 208 of 338

## III. ANALYSIS

After carefully reviewing all of the papers in this action (including Magistrate Judge Dancks' Report–Recommendation, and Plaintiff's objection thereto), the Court concludes that the Report–Recommendation is free of error: Magistrate Judge Dancks employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (Dkt. No. 36.) As a result, the Court accepts and adopts the Report–Recommendation for the reasons stated therein. (*Id.*) The Court would only add the following two points.

First, regarding the causation argument asserted by Defendants in their Objection, the Court agrees with Defendants that, based on the current record evidence, there is no genuine dispute that Plaintiff's continuation and escalation of his conduct would have resulted in the issuance of misbehavior reports regardless of whether Plaintiff complained to the area supervisor. (Dkt. No. 39, at 2.) Indeed, Plaintiff expressly invited the misbehavior reports as a way of forcing Defendant Cusack to identify the disciplinary rule(s) that he believed Plaintiff was violating by keeping food items in his cell. (Dkt. No. 35, at ¶ 24.)

Second, regarding the substantive due process argument asserted by Plaintiff in his Objection, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver,* 510 U.S. 266, 272–73, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Here, because Plaintiff's substantive due process claim overlaps both his procedural due process claim and his retaliation claim, it must be dismissed. *See Rother v. NYS Dept. of Corr. and Cmty. Supervision,* 12–CV–0397, 2013 WL 4774484, at \* 14 (N.D.N.Y. Sept.4, 2013) (Kahn, J.) ("Plaintiff's substantive-due-process claim overlaps entirely with her procedural-due-process claim-they both seek to remedy the same harm and challenge the same conduct.... Moreover, the harm and conduct challenged by the substantive-due-process, First Amendment, and equal-protection claims significantly overlap. Because the claim for substantive due process is subsumed by Plaintiff's other constitutional claims, it must be dismissed."); *Velez v. Levy,* 274 F.Supp.2d 444, 454 (S.D.N.Y.2003) ("[T]o the extent that the plaintiff's substantive due process claim is based

on the same allegations that give rise to the plaintiff's Fourteenth Amendment procedural due process claims, the underlying allegations must be analyzed under the relevant standards for a procedural due process claim, ... rather than standards that govern a claim for substantive due process."), *aff'd in part,* 401 F.3d 75 (2d Cir.2005). [7]

**\*4  ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Dancks' Report–Recommendation (Dkt. No. 36) is **ACCEPTED** and **ADOPTED;** and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 28) is **GRANTED;** and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 12) is **DISMISSED** in its entirety. The Clerk is directed to enter judgment in favor of the defendants and close this case.

## *REPORT–RECOMMENDATION AND ORDER*

THÉRSE WILEY DANCKS, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c). [1] Plaintiff alleges in his Amended Complaint that Defendant Robert Cusack ("Cusack"), a Corrections Officer at Shawangunk Correctional Facility ("Shawangunk"), violated his First and Fourteenth Amendment rights by filing two false misbehavior reports against him in retaliation for Plaintiff's verbal complaint to regular area supervisor, Corrections Sergeant Lutz ("Lutz"), that he was not being given contraband receipts when food items were removed from his cell. (Dkt. No. 28–3 at 41–43 .) Defendant Gerald Gardner ("Gardner"), a Corrections Lieutenant at Shawangunk and hearing officer at the disciplinary proceedings on the two misbehavior reports, is alleged to have found Plaintiff guilty despite the clear and compelling nature of Plaintiff's defense, and to have imposed sanctions against him. (Dkt. Nos. 12 at ¶¶ 57–62; 12–2 at 21–22, 33–34.) Plaintiff has asserted claims against Gardner for both retaliation and for violation of his Fourteenth Amendment right to due process in

2013 WL 5441724

finding Plaintiff guilty of the charges in the allegedly false misbehavior reports. (Dkt. No. 12 at ¶¶ 83–84, 87–88.)

Currently pending before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 28.) Plaintiff has opposed the motion. (Dkt. No. 35.) For the reasons that follow, I recommend that Defendants' motion be granted.

## I. BACKGROUND

### A. Daily Cell Searches and Confiscation of Food Without Issuing Contraband Receipts

Plaintiff has been incarcerated within the Department of Corrections and Community Supervision ("DOCCS") system since September of 1985. (Dkt. No. 28–3 at 13.) During the late summer and early fall of 2010, the time period relevant to Plaintiff's claims, he was confined at Shawangunk. *Id.* at 14, 16. Plaintiff had been at Shawangunk since 2001. *Id.* at 14.

Plaintiff was placed in the Special Housing Unit ("SHU") at Shawangunk in early August of 2010 for a contraband-related infraction. *Id.* at 26; Dkt. No. 28–4 at ¶ 7. He was housed with twelve or so other inmates when corrections officer David Degraff ("Degraff") moved from the night shift to the day shift. (Dkt. No. 28–3 at 16.) During the months of July and August of 2010, every time one particular inmate left his cell for a shower or his hour of recreation, Degraff went into his cell and took out food items. *Id.;* Dkt. No. 12 at ¶ 22. When that inmate began writing grievances complaining that Degraff was singling him out, Degraff started going into all of the inmate's cells and removing, among other things, food items that inmates had saved from breakfast to consume later in the day. (Dkt. No. 12 at ¶ 23.) Degraff told inmates who complained that they could blame the inmate who had filed the grievances. (Dkt. No. 28–3 at 18–19.) On September 10, 2010, when it became clear to Plaintiff that Degraff was trying to pit one inmate against another, Plaintiff complained verbally to Lutz about Degraff's conduct and also wrote to the DOCCS Inspector Generals Office. (Dkt. No. 12 at ¶ 22.) Plaintiff told both Lutz and the Inspector Generals Office that Degraff was the only corrections officer performing the daily searches and removing food items. *Id.* at ¶ 29.

**\*5** Plaintiff initially believed that Lutz would instruct Degraff to stop the searches. (Dkt. No 12 at ¶ 31.)

Instead, beginning in September of 2010, all of the corrections officers, including Defendant Cusack, began going into the SHU inmates' cells and removing the inmates' things, including food items, on a daily basis, without leaving contraband receipts. (Dkt. No. 28–3 at 21–23, 28.) According to Plaintiff, because contraband receipts were not being issued, there was no record of the cell searches and inspections. (Dkt. No. 12 at ¶ 32.)

Plaintiff filed a grievance on October 10, 2010, complaining that contraband receipts were not being left when food items were removed from his cell. (Dkt. Nos. 12 at ¶ 33;12–2 at 13–14.) Lutz submitted an October 16, 2010, memorandum to the Inmate Grievance Program Supervisor responsive to the grievance. (Dkt. No. 12–2 at 15.) The memorandum stated that on or about September 10, 2010, Lutz had instructed the floor officers that he expected them to conduct daily cell inspections in addition to daily cell searches and, as had been the practice, to confiscate contraband, including but not limited to "food, food containers, and drag lines," in plain view. [2] *Id.;* Dkt. No. 28–4 at ¶ 12. Lutz explained in the memorandum that visual inspections "are a good security practice to minimize the introduction of contraband in the Special Housing Unit." (Dkt. No. 12–2 at 15.) Lutz also disclosed in the memorandum that he had instructed the officers to give inmates contraband receipts for any items taken from their cells. *Id.* On October 20, 2010, the Inmate Grievance Review Committee concluded that contraband receipts should be given for items taken out of inmates' cells. *Id.* at 16.

Prior to the determination of Plaintiff's grievance, on October 12, 2010, Cusack performed a regular scheduled search of Plaintiff's cell. [3] (Dkt. No. 28–3 at 28, 30–31.) During the search, Cusack confiscated state food, an extra state towel, and a fishing pole from Plaintiff's cell and left a contraband receipt. [4] (Dkt. No. 28–7 at 1.) According to Cusack, contraband receipts are required whenever a cell search is conducted whether or not contraband is found. (Dkt. No. 28–4 at ¶ 16.) Plaintiff had no complaint with the regular cell search, except for his belief that there was no rule in effect prohibiting inmates from keeping food in their cells at the time. (Dkt. No. 28–3 at 30–31.) Cusack, on the other hand, believed that all of the items confiscated from Plaintiff's cell were contraband and violated SITU policy. (Dkt. No. 28–4 at ¶ 17.) While Cusack believed that the items warranted confiscation, he did not issue a

misbehavior report because it appeared to be an isolated incident. *Id.* In addition, it was Cusack's understanding from his training and experience that misbehavior reports are issued at the discretion of the corrections officer depending on the circumstances, and at that time Cusack believed discarding the items would resolve the issue. *Id.* at ¶ 18.

**\*6** The following day, October 13, 2010, while Plaintiff was in the yard, Cusack conducted a visual inspection of Plaintiff's cell and confiscated a container of milk and four slices of bread that were in a paper bag in his cell. [5] (Dkt. No. 28–3 at 31–33.) Cusack, believing that contraband receipts were not required for items found in a visual cell inspection, did not give Plaintiff a contraband receipt. (Dkt. Nos. 12 at ¶ 37; 28–4 at ¶ 22.) Cusack claims to have warned Plaintiff that he was not allowed to keep food items in his cell. (Dkt. No. 28–4 at ¶ 21.) Plaintiff contends that Cusack never gave him a direct order or any sort of direction on whether he could have food in his cell. (Dkt. No. 35 at p. 10, ¶ 23.)

The morning of October 14, 2010, Plaintiff made a verbal complaint to Lutz regarding Cusack's failure to give Plaintiff a contraband receipt for the food items he had confiscated the day before. (Dkt. Nos. 28–3 at 33–34;12 at ¶ 38.) Fifteen or twenty minutes later, Cusack and another corrections officer escorted Plaintiff to the yard for his recreation period. *Id.* at ¶ 40. According to Plaintiff, as they were walking towards the yard, Cusack said "So you want me to give you a contraband receipt for the food items I removed from your cell yesterday?" [6] Plaintiff replied, "If you are saying that the food items are contraband, then yes I want a contraband receipt." Cusack then asked Plaintiff, "Do you want the misbehavior report that's gonna come with it?" [7] Plaintiff replied "If you are saying I broke a rule, then yes, I'll take that as well." Plaintiff then said "There is no rule saying we can't keep food in our cells." Cusack responded "we'll see." (Dkt. No. 35 at ¶ 24.) When Plaintiff returned to his cell after recreation, he noticed that Cusack had removed an apple, a banana, and half of a cucumber and had left contraband receipts for the food taken on October 13th and 14th. (Dkt. Nos. 12 at ¶ 41; 35 at ¶ 25.)

**B. Misbehavior Reports and Plaintiff's Disciplinary Hearings**

The following day, Plaintiff was given two Tier II misbehavior reports written by Cusack. (Dkt. No. 12 at ¶ 42.) The first misbehavior report involved Cusack's October 13, 2010 visual inspection of Plaintiff's cell and confiscation of Plaintiff's milk and bread. (Dkt. No. 12– 2 at 20.) Cusack indicated in the misbehavior report that Plaintiff "has been previously told that he can not keep food items in his cell." *Id.* Plaintiff was charged with possession of contraband, having an untidy cell or person, refusing a direct order, and property damage or loss. (Dkt. No. 28–15 at 1.) The second misbehavior report, which involved the confiscation of the banana, apple, and half a cucumber from Plaintiff's cell on October 14, 2010, included the same charges as the first. (Dkt. No. 12–2 at 32.) The misbehavior reports were endorsed by Lutz. (Dkt. Nos. 28–11 at 9; 28–13; 28–14.)

Defendant Gardner, as hearing officer, made a determination to hold a separate disciplinary hearing for each of the misbehavior reports. (Dkt. Nos. 28–11 at 1, 3; 28–12 at 1.) The disciplinary hearings were held on October 19th and 20th of 2010. [8] (Dkt. No. 28–11 at 1.) Plaintiff pleaded not guilty to the charges at both hearings. (Dkt. Nos. 28–11 at 2; 28–12 at 3.) Plaintiff argued that there was no rule prohibiting him from saving food given to him at meals, and that neither Cusack nor any other corrections officer or sergeant had given him a direct order that he could not keep food in his cell. (Dkt. Nos. 28– 11 at 5–6; 28–12 at 4.) Cusack testified that he had told Plaintiff he could not keep food in his cell prior to writing the misbehavior reports. (Dkt. No. 28–11 at 15–17.) When asked if he had given Plaintiff a "direct order" to that effect, Cusack testified that while he had not used the words "direct order," when he makes a statement to an inmate, the statement constitutes a direct order whether he uses the word "direct order" or not. [9] *Id.* at 16–17.

**\*7** In their testimony at the hearings, Lutz and Cusack both identified Section 2.401, subsection 5, of the SHU rulebook as the source of the rule prohibiting inmates from keeping food in their cells. [10] (Dkt. Nos. 28–11 at 14; 28–12 at 8, 13.) The rule provides:

> Inmates will receive their meals in a food tray (unless on a restricted diet) and are expected to return both parts of that tray, utensils, and all other foods/liquid containers at the completion of each meal. Failure to do so will be considered a violation of Standards of

2013 WL 5441724

III misbehavior report and pre-hearing restricted diet. Damage to the trays will be considered a violation of Standards of Inmate Behavior Rule 116.10 and may result in the requirement that monetary restitution be made.

(Dkt. No. 28–8 at 1.) Plaintiff argued that the provision applied only to containers, not food. (Dkt. No. 28–12 at 4.) Cusack testified that he considered food in inmates cells to be contraband according to the Rulebook provision. *Id.* at 12–13; *see also* Dkt. No. 28–4 at ¶¶ 19–20.

Lutz acknowledged telling Plaintiff on October 14, 2010, that he was supposed to have been given a contraband receipt for the food taken from his cell on October 13, 2010. *Id.* at 9. Lutz also testified that he had told Cusack to give Plaintiff a receipt. *Id .* Gardner, over Plaintiff's objection and without explanation, refused to ask Lutz whether he had instructed Cusack to write the misbehavior report or Cusack had done it on his own. *Id.* at 10–11. However, Cusack testified that Lutz did not direct him to write the misbehavior reports. (Dkt. No. 28–11 at 13.)

Cusack testified at the hearings that if Plaintiff had not asked for contraband receipts, he would not have written the two misbehavior reports. (Dkt. Nos. 28–11 at 14; 28–12 at 11–13.) When asked why he had written the misbehavior reports, Cusack testified that because once Plaintiff asked for the contraband receipts, Cusack wanted to make it official—have everything on record. (Dkt. No. 28–12 at 15.)

Gardner found Plaintiff guilty of having contraband in his cell and refusing a direct order at the end of the disciplinary hearings on the two misbehavior reports and not guilty of untidy cell or person and property damage or loss. (Dkt. Nos. 28–15 at 1; 28–16 at 1.) The only penalty imposed on Plaintiff in connection with the guilty finding on the misbehavior report dealing with the October 13, 2010 contraband incident was counseling and reprimand. (Dkt. No. 28–15 at 1.) The penalty imposed in connection with the guilty finding on the misbehavior report for the October 14, 2010 contraband incident was thirty days keeplock and thirty days loss of packages, commissary, and phone. (Dkt. No. 28–16 at 1.) According to Plaintiff, he lost his postadjustment privileges—extra benefits such as headphones, extra clothing and personal property—

for approximately a month as a result of the misbehavior reports. (Dkt. No. 28–3 at 45–46.)

## C. Reversal of the Guilty Findings and Revision of the SHU Rulebook

**\*8** Plaintiff appealed the two determinations of guilt to Shawangunk Superintendent Joseph T. Smith, who designated Deputy Superintendent John Maly ("Maly") to handle the appeals. (Dkt. Nos. 12 at ¶¶ 63–65; 12–2 at 24–29, 36–39.) On February 9, 2011, Maly reversed both of the disciplinary hearing determinations and directed that all records of the hearings be expunged. (Dkt. No. 12–2 at 29–30, 39–40.) As a result of the expungement, the thirty days of keeplock was never imposed on Plaintiff. (Dkt. No. 28–3 at 46.) The same day the determinations were reversed, Maly issued a memorandum effective immediately prohibiting inmates in SHU from possessing unconsumed food and requiring unconsumed food to be returned with the feeding utensils at the end of each meal.[11] (Dkt. No. 28–19 .) The memorandum stated that unconsumed food items retained by inmates after the meal period is over would be considered contraband. *Id.* The SHU rulebook section relied upon by Lutz and Cusack at Plaintiff's disciplinary hearings was revised on February 14, 2011, to add subsection 7, which provides that "Inmates must consume all meals at the time served. Inmates are not allowed to store food in their cell." (Dkt. No. 28–20.)

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on October 11, 2011. (Dkt. No. 1 .) His application to proceed *in forma pauperis* was granted on November 11, 2011. (Dkt.Nos.2, 4.) On December 12, 2011, Plaintiff filed an Amended Complaint, which was accepted as the operative pleading in this lawsuit by Order dated December 14, 2011. (Dkt.Nos .12, 13.)

Defendants filed their Answer to Plaintiff's Amended Complaint on January 19, 2011 (Dkt. No. 14), and a day later, Plaintiff filed a motion for partial summary judgment on liability and for an order directing Defendants to produce certified copies of the transcripts from the two disciplinary hearings at issue in the lawsuit. (Dkt. No. 16.) Defendants moved for denial of Plaintiff's motion for partial summary judgment without prejudice on the grounds that it was premature. (Dkt. No. 17.) In response, Plaintiff requested that he be allowed to

Monko v. Cusack, Not Reported in F.Supp.2d (2013)

2013 WL 5441724

withdraw the motion as premature. (Dkt. No. 18.) Plaintiff's request was granted by Text Order dated January 1, 2012.

Following discovery, Defendants filed the motion for summary judgment now before me for report and recommendation. (Dkt. No. 28.) Plaintiff thereafter filed papers in opposition to the motion. (Dkt. No. 35.)

## III. APPLICABLE LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*9** Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.[12] *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact. *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence,

is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP)(JCF), 1999 WL 983876 at \*3, 1999 U.S. Dist. LEXIS 16767 at \*8 (S.D.N.Y. Oct. 28, 1999)[13] (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

## IV. ANALYSIS

### A. Retaliation Claim Against Cusack

Plaintiff claims that Defendant Cusack filed two false misbehavior reports against him in retaliation for Plaintiff going over his head and complaining to Lutz that corrections officers, including Cusack, were confiscating food from inmates' cells without giving the inmates a contraband receipt. (Dkt. No. 28–3 at 41–43.) "[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). False accusations contained in a misbehavior report can, however, rise to the level of a constitutional violation when there has been more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862.

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak,* 389 F.3d at 381–83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> **\*10** [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner

by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a retaliation claim under § 1983, a plaintiff must prove that: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Pidlypchak, 389 F.3d at 380 (citing Dawes, 239 F.3d at 492).

Adverse action, used in the prison context, is defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 381, 383 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). In evaluating what constitutes adverse action for purposes of a retaliation claim, a court should be mindful that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes,* 239 F.3d at 493.

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon,* 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

The protected First Amendment conduct on which Plaintiff relies in his retaliation claim is his complaint to Lutz that corrections officers were confiscating food from inmates' cells without giving the inmates contraband receipts. (Dkt. No. 28–3 at 41–43.) An inmate's verbal complaint to a corrections officer might serve as the basis for a § 1983 retaliation claim. *Smith v. Woods,* No. 9:03–CV–480, 2006 WL 1133247, at *10, 2006 U.S. Dist. LEXIS 29745 at *46 (N.D.N.Y. April 24, 2006) (finding that oral complaints made to corrections officers may have First Amendment protection for purposes of a retaliation claim), *aff'd,* 219 F. App'x 110 (2d Cir.2007); *Brewer v. Kamas,* 533 F.Supp.2d 318, 328 (W.D.N.Y.2008) (same). Therefore, the evidence may support a finding that Plaintiff was engaging in protected conduct when he complained to Lutz.

**\*11** However, the evidence does not support a finding of adverse action. Defendant Gardner imposed a penalty of only counseling and reprimand upon finding Plaintiff guilty after the hearing on the first misbehavior report. (Dkt. No. 28–15 at 1.) Gardner imposed a penalty of thirty days in keeplock, and thirty days loss of packages, commissary, and phones on the second. (Dkt. No. 28–16.) However, Plaintiff, by his own admission, did not spend any time in keeplock and testified at his deposition that his damages as a result of the finding of guilt were limited to a thirty-six day loss of post-adjustment privileges, including things like radio, headphones, and personal photographs. (Dkt. No. 28–3 at 46–48.) "The filing of misbehavior reports that result in a temporary loss of various privileges such as permission to visit the commissary [does] not constitute adverse action because they are *de minimis.*" *Gantt v. Lape,* No. 9:10–CV–0083 (GTS/GHL), 2012 WL 4033729, at *8, 2012 U.S. Dist. LEXIS 130052, at *24–25 (N.D.N.Y. July 31, 2012); *see also Bartley v. Collins,* No. 95–CV–10161(RJH), 2006 WL 1289256, *7, 2006 U.S. Dist. LEXIS 28285, at *21 (S.D.N.Y. May 10, 2006) ("Bates' misbehavior report against plaintiff and Collin's first report, which both resulted in plaintiff's temporary loss of various privileges such as permission to visit the commissary ... do not constitute adverse action because they were too *de minimis;* they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights."); *Shaheen v. McIntyre,* No, 9:05–CV–0173 (TJM/GHL), 2007 WL 3274835, at *9, 2007 U.S. Dist. LEXIS 81895 (N.D.N.Y. Nov. 5, 2007) ("allegations of lost

2013 WL 5441724

privileges, standing alone, would be too *de minimis* to constitute 'adverse action' ").

Even giving due consideration to Plaintiff's argument that because SHU inmates have so few privileges, losing what they do have is a significant loss (Dkt. No. 35 at 31), I find that Plaintiff's temporary loss of post-adjustment privileges in this case is too *de minimis* to constitute adverse action for purposes of his retaliation claim against Cusack. [14] Therefore, I recommend that the Court grant Defendant Cusack's motion for summary judgment.

### B. Retaliation and Due Process Claims Against Gardner

#### 1. *Retaliation*

Plaintiff claims that Gardner retaliated against him by failing to take steps in his supervisory capacity to rectify Cusack's issuance of false misbehavior reports and by finding him guilty at the disciplinary hearings despite the clear and convincing evidence of his innocence. (Dkt. Nos. 12 at ¶¶ 83–84, 28–3 at 70–72.) As discussed above with regard to Plaintiff's retaliation claim against Cusack, the temporary loss of privileges such as the post-adjustment privileges lost by Plaintiff for thirty-six days are *de minimis* and do not constitute adverse action for purposes of a retaliation claim. *See Bartley v. Collins,* 2006 WL 1289256, at *7. Therefore, I recommend that Gardner be granted summary judgment dismissing Plaintiff's retaliation claim against him.

#### 2. *Due Process*

 *12 Plaintiff claims that Gardner denied his Fourteenth Amendment right to due process by finding him guilty of the charges of possessing contraband and refusing a direct order in each of the two misbehavior reports filed by Cusack, despite clear and compelling evidence at the hearings that the charges were false and without merit, and the misbehavior reports had been written in direct retaliation for Plaintiff's verbal grievance to Lutz. (Dkt. Nos. 12 at ¶¶ 84, 88; 28–15 at 1; 28–16 at 1.)

To prevail on a § 1983 claim for denial of Fourteenth Amendment procedural due process rights, a plaintiff must demonstrate that he possessed a protected property or liberty interest, and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000). Due

process generally requires that "some kind of hearing" be provided to an individual by the state prior to depriving them of a property or liberty interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003).

An inmate can show deprivation of a liberty interest under the due process clause when a prison condition imposes an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (same). There is no evidence that counseling and reprimand constitutes an atypical and significant hardship. (Dkt. No. 28–15 at 1.) Furthermore, Plaintiff did not serve any of the thirty days in keeplock, and it appears that the penalty of thirty day loss of packages, commissary, and phone may not have been carried out either. (Dkt. No. 28–16 at 1.) At most, the evidence shows that Plaintiff lost his post-adjustment privileges—extra benefits such as headphones, extra clothing and personal property—for thirty-six days. *Id.* at 45–46.

"[T]he loss of phones, packages, and commissary privileges does not give rise to a protected liberty interest under New York law." *Smart v. Goord,* 441 F.Supp.2d 631, 640 (S.D.N.Y.2006); *see also Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998) (holding temporary loss of various privileges—telephone, package, commissary and recreation—did "not represent the type of deprivation which could reasonably be viewed as imposing an atypical and significant hardship on an inmate"); *Johnson v. Enu,* No. 08–CV–158 (FJS/DRH), 2011 WL 3439179, at *12, 2011 U.S. Dist. LEXIS 86831, at *34–35 (N.D.N.Y. July 13, 2011) (suspension of recreation, commissary, and phone privileges did not give rise to a protected liberty interest); *Edelkind v. Killian,* No. 09 Civ. 5835(SHS) (MHD), 2011 WL 10599973, at *16, 2011 U.S. Dist. LEXIS 157207, at *46 (S.D.N.Y. Aug. 31, 2011) ("loss of telephone privileges is plainly a common incident of prison life and hence does not itself reflect a circumstance that implicates the loss of a liberty interest.").

 *13 I find that Plaintiff's thirty-six day loss of post-adjustment privileges, and a thirty day loss of telephone, commissary, and recreation, if those losses in fact occurred, do not give rise to a protected liberty interest. Therefore, I recommend that Defendant Gardner also be granted summary judgment dismissing Plaintiff's

Monko v. Cusack, Not Reported in F.Supp.2d (2013)

2013 WL 5441724

claim against him for denial of Plaintiff's Fourteenth Amendment due process rights in connection with the hearings on the misbehavior reports written by Defendant Cusack.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 28) be **GRANTED** and that the Court enter judgment in Defendants' favor; and it is

**ORDERED** that the Clerk provide Plaintiff with copies of all of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.* Roldan v. Racette, 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec 'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5441724

---

**Footnotes**

1    *See also* Mario v. P & C Food Markets, Inc., 313 F.3d 758, 766 (2d Cir.2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

2    *See* Paddington Partners v. Bouchard, 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters, 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf.* U.S. v. Raddatz, 447 U.S. 667, 676, n. 3, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

3    *See* Zhao v. State Univ. of N.Y., 04—CV—0210, 2011 WL 3610717, at * 1 (E.D.N.Y. Aug.15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); Hubbard v. Kelley, 752 F.Supp.2d 311, 312–13 (W.D.N.Y.2009) ( "In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted).

4    *See also* Brown v. Peters, 95—CV—1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).

5    *See* Mario, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed.R.Civ.P. 72(b) or Local Civil Rule 72.3(a)(3)."); Camardo v. Gen. Motors Hourly– Rate Emp. Pension Plan, 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord,* Praileau v. Cnty. of Schenectady, 09—CV—0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept.20, 2010) (McAvoy, J.); Hickman ex rel. M.A.H. v. Astrue, 07—CV—1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); Almonte v. N.Y.S. Div. of Parole, 04—CV—0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan.18, 2006) (Sharpe, J.).

6    *See also* Batista v. Walker, 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

7    The Court notes that, even if it were to assume that Plaintiff had asserted an independent substantive due process claim, the Court is unable to find admissible record evidence establishing that the state action was arbitrary in the constitutional sense.

1    *See* Text Entry of October 29, 2012.

2    Cusack explained in his Affidavit that "[a]lthough food is generally harmless in its original form, it can be altered or changed into may improper forms [e.g., fruit can be fermented into prison wine] if not properly controlled." (Dkt. No. 28–4 at ¶ 6.)

3    Plaintiff described the scheduled cell search as one done when an inmate's name comes up on the computer, and a thorough search of the inmate's property is conducted. (Dkt. No. 28–3 at 28.)

4    A fishing pole is a drag line crafted by prisoners and used as a tool to pass and retrieve items between inmates. (Dkt. Nos. 28–3 at 23; 28–4 at ¶ 15.) It is considered contraband. *Id.*

5    Plaintiff, who converted to Judaism in 2005, received the Kosher cold alternative diet, which contained substantially more unprepared foods, including fruits and vegetables, than the regular meals served to the majority of inmates. (Dkt. No. 12 at ¶¶ 21–22, 34.) Because it was difficult to consume an entire meal in the short time allotted, Plaintiff was in the habit of saving his fresh fruits and vegetables to be consumed during the day. *Id.* at ¶ 34. Plaintiff had also been given authorization to keep the containers of milk given to him with breakfast when the milk was frozen. (Dkt. No. 28–3 at 32–33.)

6    Cusack claims to have asked Plaintiff "in words or substance, whether he truly wanted to received contraband receipts for food items [Cusack] felt constituted illegal contraband." (Dkt. No. 28–4 at ¶ 2 1.)

7    According to Cusack, he asked Plaintiff "in words or substance, whether he also wanted the misbehavior report that would result from his disregard for SHU rules." (Dkt. No. 28–4 at ¶ 28 .)

8    The transcripts from the hearings, submitted by Defendants in support of their motion for summary judgment, contain a substantial number of gaps in the testimony. (Dkt. Nos. 28–11 and 28–12.)

9    Lutz testified that when Cusack told Plaintiff he could not keep food in his cell, it constituted a "direct order." (Dkt. No. 28–12 at 10.)

10    The referenced SHU rulebook is SHU/PC/IPC Guidelines & Regulations No. 2.401. (Dkt. No. 28–8.) The provision at issue is subsection 6 of part V. Disciplinary Special Housing Rules (Directive 4933), not subsection 5. (Dkt. No. 28–8.)

11    Cusack understands that the guilty findings were expunged because the rule on which he and Lutz had relied in deciding that inmates were not allowed to keep food in their cells was deemed ambiguous. (Dkt. No. 28–4 at ¶ 53.)

12    Only admissible evidence need be considered by a court in ruling on a motion for summary judgment, and the court has "broad discretion in choosing whether to admit evidence." Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir.2009). Because Plaintiff's Amended Complaint (Dkt. No. 12) is verified, it will be treated as an affidavit in opposition to Defendants' summary judgment motion. *See* Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1995). The Affirmation submitted by Plaintiff in opposition to Defendants' motion (Dkt. No. 35 at 5–14) is unsworn and was not signed under penalty of perjury. *See* 28 U.S.C. § 1746 (authorizing the use of declarations made under penalty of perjury when an affidavit is required or permitted to be used); *see also* 1 0B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 362–63 (Civil 3d ed.1998) (affidavits submitted for or in opposition to a motion for summary judgment need not be notarized when they are made under penalty of perjury, but unsworn statements will be rejected). However, on summary judgment motions involving *pro se* plaintiffs, courts have been known to consider papers that did not constitute affidavits or declarations. *See, e.g.,* Robles v. Khahaifa, No. 09CV718, 2012 WL 2401574, at *7, 2012 U.S. Dist. LEXIS 87834, at *20–22 (W.D.N.Y. June 25, 2012). In light of Plaintiff's *pro se* status, and because: (1) Plaintiff explained in his Affirmation that he was unable to submit a sworn affidavit because notary service was unavailable (although he presumably could have signed the Affirmation under penalty of perjury); (2) Defendants have not objected to consideration of the Affirmation; and (3) the Affirmation is generally consistent with the allegations in Plaintiff's Amended Complaint and his deposition testimony submitted as an Exhibit by Defendants, I have considered the Affirmation in opposition to Defendants' motion.

13    Copies of unpublished decisions cited herein will be provided to Plaintiff by the Clerk.

14    While it is not entirely clear from the summary judgment record whether the thirty day loss of privileges imposed on Plaintiff by Gardner on the second misbehavior report was also carried out, even if it were, the penalty would be too *de minimis* to constitute adverse action.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 9511158
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Derrick MORGAN, Plaintiff,

v.

LUFT, Correctional Officer, Greene Correctional
Facility and Sergeant Farrell, Correctional
Officer, Greene Correctional Facility, Defendants.

Civ. No. 9:15-CV-0024 (GTS/DJS)
|
Signed 06/22/2017

**Attorneys and Law Firms**

DERRICK    MORGAN,    13-R-3119,    Franklin
Correctional Facility, P.O. Box 10, Malone, New York
12953, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General
of the State of New York, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., Assistant
Attorney General, The Capitol, Albany, New York 12224,
Attorney for Defendants.

**REPORT-RECOMMENDATION and ORDER**

DANIEL J. STEWART, United States Magistrate Judge

**\*1** On January 9, 2015, *pro se* Plaintiff Derrick Morgan
commenced this civil rights action, pursuant to 42 U.S.C.
§ 1983, asserting claims arising from when he was
incarcerated at Greene Correctional Facility ("Greene")
while in the custody of the Department of Corrections
and Community Supervision ("DOCCS"). Dkt. No. 1,
Compl. Plaintiff's remaining claims are: (1) a First
Amendment retaliation claim and an Eighth Amendment
excessive force claim against Defendant Luft; and (2) First
Amendment retaliation claims against Defendant Farrell.
*See* Dkt. No. 5. Presently before the Court is Defendants'
Motion for Summary Judgment pursuant to FED. R.
CIV. P. 56. Plaintiff has filed a Response, Dkt. Nos. 68,
Pl.'s Resp. & 70, Pl.'s Suppl. Resp., and Defendants have
filed a Reply, Dkt. No. 69, Defs.' Reply. In his Response,
Plaintiff requests that the Court reopen discovery under
FED. R. CIV. P. 56(d). *See* Dkt. No. 68-1. For the reasons

that follow, it is recommended that Defendants' Motion
be **granted in part** and **denied in part**. [1]

**I. BACKGROUND**

Plaintiff arrived at Greene sometime in the Fall or Winter
of 2013. Dkt. No. 64-2, Affirm. of Christopher Hummel,
dated Oct. 14, 2016, Ex. A, Dep. of Derrick Morgan, dated
Nov. 13, 2015 ("Pl.'s Nov. Dep.") at p. 9. Plaintiff was
housed in the E-1 dormitory, which is on the medical floor,
because he has a heart condition. *Id.* Plaintiff states that he
has had multiple heart attacks and has seven stents in his
heart. Hummel Affirm., Ex. B, Dep. of Derrick Morgan,
dated Aug. 11, 2016 ("Pl.'s Aug. Dep.") at p. 7.

Plaintiff was a representative on the Inmate Grievance
Resolution Committee. Pl.'s Nov. Dep. at pp. 11-12. On
June 14, 2014, Plaintiff filed a grievance against Defendant
Correction Officer Luft. *Id.*, Ex. A. In the grievance,
Plaintiff asserted that certain inmates had complained to
him of statements made by Luft that he was planning
to set an inmate up either by planting a weapon in
someone's cube or by punching himself in the face. *Id.*
Plaintiff states that certain inmates felt threatened by these
statements and asked that he file a grievance as the dorm
representative. Pl.'s Nov. Dep. at pp. 11-12.

On June 28, 2014, at approximately 8:40 a.m., Luft
informed Plaintiff that he was being moved to another
dormitory and told him to pack up his possessions. *Id.* at
p. 21; Dkt. No. 64-4, Decl. of Ryan Luft, dated Oct. 11,
2016, at ¶ 6. According to Luft, Plaintiff became very upset
when he learned that he was being moved and demanded
to know the reason why. Luft Decl. at ¶ 7. While Plaintiff
admits that he did not want to move, he also states that he
had no problem moving. Pl.'s Nov. Dep. at p. 22. Plaintiff
informed Luft that he had no draft bags for moving his
possessions, and Luft ordered Plaintiff to go to Draft
Process to obtain bags. Luft Decl. at ¶ 8.

**\*2** The parties' accounts diverge at this point. Defendant
Luft states that he let Plaintiff out of the dormitory, and
that while Plaintiff was in the porch area of the dormitory,
he observed Plaintiff bend over, grab his chest, and fall to
the ground. Luft Decl. at ¶ 10. Plaintiff, on the other hand,
claims that, as he was exiting his cube, Luft ordered him
to stand against the wall and spread his legs in order that
he could search him. Pl.'s Nov. Dep. at p. 24; Compl. at p.

7. Plaintiff complied, but Luft ordered Plaintiff to spread his legs further out, although Plaintiff had spread his legs as far as he could. Compl. at p. 7. Luft began searching Plaintiff's pockets and removed Plaintiff's asthma pump and nitroglycerine, which he threw onto the floor. Pl.'s Nov. Dep. at p. 24. Luft then kicked Plaintiff's legs out from under him, and Plaintiff fell to the ground. *Id.* At the same time that he kicked Plaintiff's legs, Plaintiff also claims that Luft pushed him up against the wall, causing him to scrape his elbow. *Id.* at pp. 29-30. Plaintiff was on floor, and Luft ordered him to get up, which Plaintiff claimed he was unable to do. *Id.* at p. 26. Four other officers, whom Plaintiff was unable to identify, arrived and began joking with Luft. *Id.* at pp. 26-28. As Plaintiff was lying on the floor, he began to experience chest pains. *Id.* at pp. 26-27. Plaintiff claims that Luft then made a crude joke in which he offered to put his penis in Plaintiff's mouth. *Id.* at p. 25. Luft entirely denies Plaintiff's version of the events. Luft Decl. at ¶¶ 14-16.

The parties agree that after Plaintiff complained of chest pains, a nurse was summoned who examined Plaintiff, administered nitroglycerine from Plaintiff's self-carry supply, and transported him to the infirmary. Pl.'s Nov. Dep. at p. 32; Luft Decl. at ¶¶ 10-11. Luft states that he immediately called for a medical response, and that Nurse Aidan O'Connor arrived within minutes, Luft Decl. at ¶¶ 10-11, whereas Plaintiff estimates that Nurse O'Connor arrived approximately ten minutes after he had first fallen to the ground, Pl.'s Nov. Dep. at p. 31.

At the infirmary, Plaintiff reported that his chest pain had lessened, but requested a second dose of nitroglycerine, which Nurse O'Connor administered. Dkt. No. 64-5, Decl. of Aidan O'Connor, dated Sept. 12, 2016, at ¶ 5. After the second dose of nitroglycerine, and within approximately a half-hour of when he first experienced the chest pains, Plaintiff's pain subsided. *Id.*; Pl.'s Nov. Dep. at p. 32. Plaintiff refused to have an EKG or to be transported to the hospital for further evaluation and signed a Refusal of Medical Examination and/or Treatment form. O'Connor Decl. at ¶ 7. Plaintiff explains that he did not want to go to the hospital if the nitroglycerine relieved his pain, Pl.'s Nov. Dep. at pp. 32-33, and asked that he be allowed to return to the dormitory, O'Connor Decl. at ¶ 7.

Aside from his complaints of chest pain, the only other injury Nurse O'Connor noted was a "superficial abrasion to his left elbow which [he] treated by cleaning the area."

O'Connor Decl. at ¶ 5. As far as his physical injuries, Plaintiff claims that in addition to the scrape on his elbow, he had a bruise on his shin. Pl.'s Nov. Dep. at pp. 29-30. He states that both of these injuries healed within a couple days and did not cause any lasting scars or pains. *Id.* at p. 30.

On July 1, 2014, Plaintiff filed a grievance alleging that he had been assaulted by Luft on June 28, 2014. Dkt. No. 64-1, Defs.' Rule 7.1 Statement of Material Facts ("Defs.' SMF") at ¶ 36. [2] On July 22, 2014, Plaintiff advised the Inspector General's Office that he had been assaulted by Luft. *Id.* at ¶ 38. Defendant Sergeant Farrell was assigned to investigate Plaintiff's grievance, and on July 25, 2014, he escorted Plaintiff to the infirmary in order to have pictures taken. Pl.'s Aug. Dep. at pp. 11-12; O'Connor Decl. at ¶ 14. As they were walking to the infirmary, Plaintiff alleges that Farrell stated "you just fucked up. I'm tired of good white people going down by motherfuckers like you. We will get you for this. You nothing but a pussy, you motherfucker." Compl. at p. 9. Plaintiff claimed that he was concerned that Farrell might try to set him up with a fabricated misbehavior report or by planting a weapon in his cell. *Id.* at pp. 9-10. O'Connor examined and took pictures of Plaintiff and noted no evidence of any injuries. O'Connor Decl. at ¶ 14.

**\*3** Plaintiff filed a grievance against Farrell on July 25, 2014, complaining of Farrell's comments. Pl.'s Aug. Dep., Ex. 1. Plaintiff alleges that Farrell continued to harass him. On one occasion when Plaintiff was sent to Albany Medical Center on account of his heart condition, Plaintiff claims that Farrell sarcastically asked him if he was having any chest pain. Compl. at p. 10. On other occasions, Plaintiff alleges that Farrell made comments such as "My day will be better when you are dead." *Id.* On December 7, 2014, Plaintiff alleges that Farrell stated "Your time is coming. If we can kill you'll [sic] on the outside and get away, what makes you think that it can't happen with you." *Id.* at p. 11. Farrell denies having made any threatening or harassing statements to Plaintiff at any time. Dkt. No. 64-3, Decl. of Mark Farrell, dated Oct. 14, 2016, at ¶ 4.

## II. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to

2017 WL 9511158

any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

### A. Claims Against Defendant Farrell

#### 1. Legal Standard

**\*4** "[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). To state a First Amendment claim for retaliation, an inmate must demonstrate that (1) he or she was engaged in constitutionally protected speech or conduct, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citing *Dawes v. Walker*, 239 F.3d at 493). Otherwise, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d at 493.

The plaintiff bears the initial burden in showing that "that the protected conduct was a substantial or motivating factor" for the defendant's actions. *Graham v. Henderson*, 89 F.3d at 79. To satisfy the causal connection prong, a

prisoner must present evidence inferring that a defendant acted with an improper motive. Such evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the prisoner's prior good disciplinary record; (3) the prisoner's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin*, 58 F.3d at 872-73. Direct evidence is not required and a plaintiff may meet this burden by presenting "sufficiently compelling" circumstantial evidence of a retaliatory motive. *Bennett v. Goord*, 343 F.3d 133, 138-39 (2d Cir. 2003). If the plaintiff carries this initial burden, the burden then shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson*, 89 F.3d at 79 (citing, *inter alia, Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) ); *see also Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (stating that a defendant may successfully meet this burden by demonstrating that the "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report").

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d at 872 (citation omitted); *Dawes v. Walker*, 239 F.3d at 491("[V]irtually any adverse action taken against a prisoner by a prison official —even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act."); *see also Graham v. Henderson*, 89 F.3d at 79.

### 2. Analysis

The basis of Plaintiff's claims against Defendant Farrell is the series of verbal threats and harassment that Farrell allegedly made against Plaintiff in retaliation for filing a grievance against Defendant Luft on June 28, 2014. Plaintiff specifically alleges that: (1) on July 25, 2014, Farrell stated "You just fucked up. I'm tired of good white people going down by motherfuckers like you. We will get you for this. You nothing but a pussy, you motherfucker," Compl. at p. 9; (2) on one occasion when Plaintiff was sent to Albany Medical Center for his heart condition, Farrell sarcastically asked, "Any chest pain? Any chest pain?," *id.* at p. 10; (3) in the mess hall, Farrell would make comments such as "My day will be better when you

are dead" or "I was hoping that red dot was you," *id.*; and (4) on December 7, 2014, Farrell stated "Your time is coming. If we can kill you'll [*sic*] on the outside and get away, what makes you think that it can't happen with you," *id.* at p. 11. Although Farrell denies having made any of these statements, Farrell Decl. at ¶ 4, Defendants argue that even if Plaintiff's assertions are accepted as true, he has failed to establish a *prima facie* case of retaliation, on the grounds that (1) Farrell's statements do not constitute adverse action and (2) there is no causal connection between the grievance Plaintiff filed against Luft and Farrell's statements. Dkt. No. 64-6, Defs.' Mem. of Law at pp. 8-12. [3]

**\*5** The Court first considers whether Farrell's statements amount to an adverse action; namely, whether they would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d at 353. As the Second Circuit has noted, "it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes v. Walker*, 239 F.3d at 492-93. "Prisoners may be required ... to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.* at 493 (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) ). Nonetheless, the case law in this Circuit "reflects that verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered." *Lunney v. Brureton*, 2007 WL 1544629, at \*23 (S.D.N.Y. May 29, 2007) (collecting cases). "The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights." *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010); *but see Ford v. Palmer*, 539 Fed.Appx. 5, 7 (2d Cir. 2013) ("[I]n this context, the vague nature of the alleged threat ... could have enhanced its effectiveness as a threat and increased the likelihood that a person of ordinary firmness would be deterred from filing additional grievances.").

Courts are divided over the level of specificity required before a verbal threat is actionable. *Compare Barrington v. New York*, 806 F. Supp. 2d 730 (S.D.N.Y. 2011) (granting summary judgment on retaliation claim based upon threat that "me and my boys [sic] going to get you" made while holding copy of grievance); *Kemp v. LeClaire*, 2007 WL 776416, at \*15 (W.D.N.Y. Mar. 15, 2007) (finding threats that "your day is coming," "you'll be sent to your

mother in a black box," and "you'll get you black ass kicked" insufficient to support retaliation claim); *Bartley v. Collins*, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) ("[V]erbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action."); *Alicea v. Howell*, 387 F. Supp. 2d 227, 237-38 (W.D.N.Y. 2005) (granting summary judgment on retaliation claim based upon statements that there are "no secrets in prison" and that the plaintiff would "have to pay the consequences"), *with Gomez v. Graham*, 2016 WL 8652781, at *13 (N.D.N.Y. June 16, 2016) (finding threat that if the plaintiff proceeded with his grievance, then he "was going to be hurt" sufficient to support retaliation claim); *Quezada v. Roy*, 2015 WL 5970355, at *23 (S.D.N.Y. Oct. 13, 2015) (finding that threat to kill the plaintiff sufficient to support retaliation claim); *Lunney v. Brureton*, 2007 WL 1544629, at *23 (finding threat that "if you don't stop writing grievances I'm going to break your fuckin' neck" sufficient to support retaliation claim).

Given the disparity in the case law, the issue of whether Farrell's alleged verbal harassment of Plaintiff constitutes an adverse action is a close one. Nonetheless, the Court finds that Farrell's statements would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights," *Davis v. Goord*, 320 F.3d at 353, for the following reasons. First, Farrell's alleged statements contain at least two direct threats that are more than mere vulgar or abusive language. On July 25, Farrell stated that they would "get" Plaintiff for filing grievances; on December 7, Farrell stated that Plaintiff's time was "coming" and implied that they could "kill" Plaintiff and "get away" with it. Compl. at pp. 9 & 11. Second, although these threats alone might be insufficient to establish an adverse action, *see Kemp v. LeClaire*, 2007 WL 776416, at *15; *Bartley v. Collins*, 2006 WL 1289256, at *6, the Court must also consider the context in which these threats were made. Particularly significant to the Court's view of these threats is Plaintiff's contention that Farrell conducted an on-going pattern of harassment against him, in which he repeatedly joked about Plaintiff's death. *See* Compl. at p. 10. Although Plaintiff's allegations in this respect are vague and non-specific,—he is unable to recall the specific dates on which Farrell made comments such as "I hope you die," Pl.'s Aug. Dep. at pp. 25-26—and thus are not sufficient to form the basis for a retaliation claim on their own, his allegation that Farrell engaged in a persistent course of harassment, every time he saw him, over approximately six months, *see* Pl.'s Aug. Dep.

at p. 25, certainly makes Farrell's direct threats against him more credible. On this basis, the Court finds that a reasonable factfinder could conclude that Farrell's threats were sufficient to deter a person of ordinary firmness from filing further grievances.

**\*6** The Court next considers whether Plaintiff has sufficiently established a causal connection between the grievance he filed and Farrell's threats. Defendants argue that Plaintiff has not presented any evidence that would explain why Farrell would retaliate against Plaintiff for filing a grievance against Defendant Luft. *See* Defs.' Mem. of Law at p. 10 (citing *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) ). While Defendants are correct that "[a]s a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant," *Hare v. Hayden*, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011), in this case, Plaintiff claims that Farrell explicitly connected his threats to the grievance Plaintiff filed against Luft. According to Plaintiff, Farrell stated that they would "get" Plaintiff for filing a grievance against Luft. Compl. at p. 9. Thus, Plaintiff offers direct evidence that Farrell's threats were retaliatory. *See Colon v. Coughlin*, 58 F.3d at 873 (finding that "alleged admission of the existence of a retaliatory scheme" sufficient to create genuine issue of material fact).

Defendants also argue, in conclusory terms, that Farrell is entitled to qualified immunity because he "properly and professionally investigated plaintiff's allegations that he had been assaulted by Luft." Defs.' Mem. of Law at pp. 21-22. However, as outlined above, there are significant issues of material fact that are not appropriately resolved on a motion for summary judgment. The Court therefore cannot determine whether it would have been "objectively reasonable" for Farrell to believe that it did not violate "clearly established" law to threaten Plaintiff after he filed a grievance against Luft. *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

Accordingly, the Court recommends that Defendants' Motion be **denied** as to Plaintiff's First Amendment retaliation claims against Defendant Farrell.

### B. Claims Against Defendant Luft

*1. Excessive Force*

2017 WL 9511158

a. Legal Standard

The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 666-67 (1962) (cited in *Tramell v. Keane*, 338 F.3d 155, 161 (2d Cir. 2003) ). In *Hudson v. McMillian*, 503 U.S. 1 (1992), the Supreme Court clarified the standards for determining whether an Eighth Amendment violation occurred in the context of excessive force. Specifically, the Court stated that, "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley* [*v. Albers*, 475 U.S. 312 (1986) ]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *503 U.S. at 6-7*. To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must prove two components: (1) objectively, that the defendant's actions violated "contemporary standards of decency," and (2) subjectively, that the defendant acted wantonly and in bad faith. *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999).

The inmate must establish that the conduct alleged is "sufficiently serious" to reach constitutional dimensions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) ). This inquiry is "context specific, turning upon contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d at 263. Regarding the objective element, "a *de minimis* use of force will rarely suffice to state a constitutional claim[.]" *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993). In that respect, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). However, the malicious use of force to cause harm constitutes an Eighth Amendment violation *per se* because in such instances "contemporary standards of decency always are violated" regardless of whether a "significant injury" is apparent. *Blyden v. Mancusi*, 186 F.3d at 263 (citing *Hudson v. McMillian*, 503 U.S. at 9). For example, "when a prison guard applies force against a prisoner that poses no reasonable threat simply because the guard loses his or her temper and wishes to wantonly inflict pain on the prisoner, a *per se* violation of the Eighth Amendment occurs." *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 216 (N.D.N.Y. 2001).

**\*7** With regard to the subjective component, a court should consider whether the defendant had a wanton state of mind when engaging in the alleged misconduct. To determine whether a defendant acted wantonly or maliciously, several factors should be examined, including

> the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by defendants to temper the severity of a forceful response.

*Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003); *see also Hudson v. McMillian*, 503 U.S. at 7. When prison officials are accused of using excessive force, "the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. at 6-7 (citing *Whitley v. Albers*, 475 U.S. at 320-21). Where "no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may ... be sufficient evidence of a culpable state of mind." *Boddie v. Schneider*, 105 F.3d 857, 861 (2d Cir. 1997).

b. Analysis

Here, the parties offer widely differing accounts of the events of June 28, 2014. According to Plaintiff, Defendant Luft ordered him to get against the wall and began searching him; Luft then kicked his legs out, causing him to fall to the ground. Pl.'s Nov. Dep. at p. 23. Plaintiff claims that he suffered a scrape to his right elbow and a bruise to his shin. *Id.* at pp. 30-31. Plaintiff also claims that he began to experience chest pains as he was laying on the ground. *Id.* at p. 26. Luft, on the other hand, asserts that Plaintiff fell to the ground after experiencing chest pains; Luft wholly denies that he performed a pat frisk on Plaintiff or in any other way applied force to him. Luft Decl. at ¶¶ 10 & 14.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

This factual dispute, however, does not preclude the entry of summary judgment in favor of Defendant, because even if Plaintiff's version of the events is credited, Luft applied no more than *de minimis* force that is not sufficiently serious to constitute an Eighth Amendment violation. Accepting Plaintiff's allegations as true, Luft "kicked [Plaintiff's] legs out from under [him]" during a pat frisk, which caused him to fall and suffer a scrape to his right elbow and bruise to his shin, both of which healed within a "couple days." [4] Pl.'s Nov. Dep. at pp. 24 & 30. No reasonable factfinder could find that such an application of force was more than *de minimis.* A number of district courts in this Circuit have held that similar applications of force during a pat frisk are insufficient to state an Eighth Amendment claim. See *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 507 (S.D.N.Y. 2012) (finding plaintiff's allegation that guard "pushed her up against a wall" during a pat frisk insufficient to support Eighth Amendment claim); *Tavares v. City of New York*, 2011 WL 5877550, at *5-7 (S.D.N.Y. Oct. 17, 2011) (granting summary judgment on inmate's claim that he was subjected to excessive force when he was thrown up against the wall and his legs kicked apart during a pat frisk); *Kalwasinski v. Artuz*, 2003 WL 22973420, at *6-7 (S.D.N.Y. Dec. 18, 2003) (finding that "minor amount of force actually used ... was commensurate with the need to conduct a pat frisk"); *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 471 (S.D.N.Y. 1998) ("[A]lthough kicking an inmate's ankles and feet cannot be condoned, this use of force is *de minimis* and insufficient to rise to the level of a constitutional violation.").

**\*8** Accordingly, because Plaintiff is unable to establish that Luft's actions were objectively serious, the Court recommends that summary judgment be **granted** on his excessive force claim.

### 2. Retaliation

Plaintiff also asserts that Defendant Luft's actions against him were in retaliation for the grievance Plaintiff had filed against him. Compl. at p. 12. Defendants argue that for the same reasons Luft's actions were not objectively serious under the Eighth Amendment, they are also insufficient to constitute adverse action under the First Amendment. Defs.' Mem. of Law at pp. 20-21.

The Court first notes that a physical assault may constitute adverse action under First Amendment even without rising to the level of an Eighth Amendment excessive force violation. See *Flemming v. King*, 2016 WL 5219995, at *5 (N.D.N.Y. June 20, 2016) ("[T]he alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis."). Nonetheless, even viewed in the most favorable light, Plaintiff's allegations are insufficient to satisfy this lower standard. At most, Plaintiff claims that he was subjected to a rough pat frisk by Luft. As other courts have noted, "pat frisks are an ordinary part of prison life and would not (and do not) deter the average inmate from continuing to exercise his First Amendment rights." *Henry v. Annetts*, 2010 WL 3220332, at *2 (S.D.N.Y. July 22, 2010); *see also Amaker v. Fischer*, 2014 WL 8663246, at *8 (W.D.N.Y. Aug. 27, 2014) ("[P]at frisks, even if conducted for retaliatory reasons, cannot constitute an adverse action as required to support a First Amendment retaliation claim.").

Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's First Amendment retaliation claim against Defendant Luft.

### C. Plaintiff's Rule 56(d) Request to Re-Open Discovery

Plaintiff opposes Defendants' Motion under FED. R. CIV. P. 56(d), which provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the Court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Dkt. No. 68-1, Aff. of Derrick Morgan, dated Nov. 21, 2016. Plaintiff appears to request that the Court defer ruling on Defendants' Motion in order that he may seek additional discovery, namely, (1) "[a]ny and ALL Institutional Claims Filed by the plaintiff at Greene Correction Facility" and (2) "a copy of A-1 dorm log book for the date of June 28th 2014 for the 7X3 tour." *Id.* at ¶ 17. Plaintiff claims that such discovery would show that he "never returned to dorm E-2 from the infirmary, but went to A." *Id.* at ¶ 22(a).

A party seeking additional discovery pursuant to FED. R. CIV. P. 56(d) must file an affidavit explaining "1) the

nature of the uncompleted discovery, i.e., what facts are sought and how they are to be obtained; and 2) how those facts are reasonably expected to create a genuine issue of material fact; and 3) what efforts the affiant has made to obtain those facts; and 4) why those efforts were unsuccessful." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir. 1985).

**\*9** Although Plaintiff has filed an affidavit attempting to comply with FED. R. CIV. P. 56(d), that affidavit fails to show his entitlement to the requested relief. In the first place, the discovery Plaintiff seeks has no relevance to the matters at issue on this Motion. Plaintiff asserts that the discovery would show that after being discharged from the infirmary he collected his property from the "porch" of the E-dormitory and never reentered that dormitory before moving to the A-dormitory. Morgan Aff. at ¶ 22(a). The fact of whether or not Plaintiff reentered the E-dormitory before moving to the A-dormitory has no relevance to the issues of (1) whether Defendant Luft used excessive force and retaliated against Plaintiff or (2) whether Defendant Farrell retaliated against Plaintiff.

Furthermore, Plaintiff admits that he did not attempt to seek this discovery before the discovery deadline in this action expired. *See* Morgan Aff. at ¶ 24 ("This is the first time that the plaintiff is requesting the above-mention [sic] documents."). "If a party seeks to reopen discovery after discovery has closed, he must show a good cause." *Justice v. Wiggins*, 2014 WL 4966896, at \*7 (N.D.N.Y. Sept. 30, 2014) (citing *Lore v. City of Syracuse*, 232 F.R.D. 155, 159 (N.D.N.Y. 2005) ). Here, Plaintiff cannot show good cause for his failure to seek this discovery before the discovery deadline expired.

Accordingly, Plaintiff's request, under FED. R. CIV. P. 56(d), to reopen discovery is **denied**.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 64) be **GRANTED in part** and **DENIED in part**; and it is further

**RECOMMENDED**, that if the above recommendation is accepted, that Defendant Luft be **DISMISSED** from this action and this case be deemed trial ready on the First Amendment retaliation claim against Defendant Farrell; and it is further

**ORDERED**, that Plaintiff's Letter-Motion (Dkt. No. 61) is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [5] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) ); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Slip Copy, 2017 WL 9511158

Footnotes

1    Also pending is a Letter-Motion filed by Plaintiff on September 11, 2016, in which he requests a twenty-day extension of time to reply to the Defendants' response to his discovery requests; Plaintiff states that he hopes to resolve Defendants' objections to his discovery demands before filing a motion to compel. Dkt. No. 61. Plaintiff's Response papers to Defendants' Motion contain correspondence between Plaintiff and Defendants' counsel regarding Plaintiff's demands, in which Defendants' counsel maintains his objections to the demands. *See* Dkt. No. 68-2, Aff. of Derrick Morgan, dated Nov. 21, 2016, Exs., Exs. C & D. Plaintiff did not file a motion to compel. Plaintiff's Letter-Motion (Dkt. No. 61) is therefore **denied**.

2    Under Local Rule 7.1(a)(3), on a motion for summary judgment a non-movant must respond to the movant's statement of material facts "by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" and

**Morgan v. Luft, Slip Copy (2017)**

2017 WL 9511158

"set forth a specific citation to the record where the factual issue arises." N.D.N.Y.L.R. 7.1(a)(3). While Plaintiff has filed a response to Defendants' Statement of Material Facts, it is not properly supported by citations to the record. *See* Dkt. No. 70, Pl.'s Rule 7.1 Statement of Material Facts ("Pl.'s Counter-SMF"). The Court will cite to the facts as set forth in Defendants' Statement of Material Facts when properly supported by the record. *See GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 329 (N.D.N.Y. 2013) ("Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions.") (citing *Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003)

3    The Court notes that Defendants' Memorandum of Law also addresses certain additional alleged incidents of retaliation by Defendant Farrell that occurred after Plaintiff filed his Complaint. *See* Defs.' Mem. of Law at pp. 12-15. Since Plaintiff has not amended his Complaint to include these additional claims, the Court does not address them here.

4    Plaintiff admits that his chest pains were not caused by Luft's application of force, but rather began as he was lying on the ground. Pl.'s Nov. Dep. at p. 26.

5    If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 2009432
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Kenneth NICHOLSON, Plaintiff,

v.

Brian FISCHER, et al., Defendant.

Case # 13-CV-6072-FPG-MWP
|
Signed 04/27/2018
|
Filed 04/30/2018

**Attorneys and Law Firms**

David M. Knapp, Eric J. Ward, Jessica N. Clemente, Ward Greenberg Heller & Reidy LLP, Rochester, NY, for Plaintiff.

Bernard F. Sheehan, NYS Attorney General's Office Department of Law, Rochester, NY, for Defendant.

DECISION AND ORDER

HON. FRANK P. GERACI, JR., Chief Judge

**INTRODUCTION**

*1 Plaintiff Kenneth Nicholson ("Plaintiff") brings this Eighth Amendment action pursuant to 42 U.S.C. § 1983 ("Section 1983") against three employees of Wende Correctional Facility: Corrections Officer James Johnson ("Johnson"), Corrections Officer Jason Barrett ("Barrett"), and Deputy Superintendent of Security Thomas J. Sticht ("Sticht"). ECF No. 38. [1] On January 5, 2018, Defendants Sticht and Barrett moved for summary judgment. ECF No. 95. For the reasons stated below, Defendants' motion is GRANTED in part and DENIED in part.

**BACKGROUND** [2]

In October 2012, Plaintiff, then an inmate at Sing Sing Correctional Facility, had a physical fight with two inmates belonging to the Bloods gang. The inmates slashed Plaintiff across the face with a sharp object. Plaintiff told prison officials that the men assaulted him because he dropped out of the Bloods. ECF No. 102-1 at 14. To separate him from his attackers, Sing Sing officials placed Plaintiff in involuntary protective custody and decided to transfer him to Wende Correctional Facility in January 2013. The New York State Department of Corrections and Community Supervision's ("DOCCS") Office of Classification and Movement in Albany, New York, which is responsible for transferring and classifying roughly 50,000 inmates among more than 50 different correctional facilities, determined that Plaintiff's transfer to Wende was appropriate and that Plaintiff was eligible to share a cell with another inmate at Wende—a practice DOCCS refers to as "double bunking."

According to Defendant Sticht, who was responsible for overseeing all aspects of security at Wende, once Plaintiff "was transferred, he was no longer in protective custody" and his "involuntary protective custody status ... did not follow him to Wende Correctional Facility." ECF No. 95-1 at 3. Plaintiff, on the other hand, stated that his protective custody status followed him to Wende and that he was supposed to be isolated so that authorities could interview him and determine if he had any enemies before placing him in a double bunk cell with another inmate. ECF No. 102-1 at 25. In any event, no one interviewed Plaintiff immediately upon his arrival at Wende; rather, he was placed into a double-bunk cell with another inmate, Michael Williams. According to Sticht, "[p]lacement of incoming inmates in cells at Wende CF is made by random selection of available cells. Both inmates were deemed eligible for double bunking and randomly selected for the cell." *Id.* at 21.

Williams had a history with the Bloods. Specifically, a form documenting his initial interview at Wende, dated January 7, 2013, states that he had a disciplinary history of gangs and violence, and his security assessment form, dated January 1, 2013, states that he was a member of the Bloods. *See id.* at 8. Furthermore, one month before Williams was placed in a cell with Plaintiff, officials placed him in the Special Housing Unit ("SHU") for four months because of gang activity. *Id.* Plaintiff also had a documented history of gang involvement: paperwork from his guidance file, which was accessible to Wende officials, indicated that Plaintiff was a former Bloods member and had enemies and prior gang-related charges. *Id.* Plaintiff's guidance file also revealed that Plaintiff

previously transferred from Great Meadow Correctional Facility in 2011 because prison staff "believed that a portion of [the] inmate population [knew] that [Plaintiff] had provided confidential information to prison security regarding Bloods activity." *Id.* at 10.

**\*2** On January 16, 2013, Williams returned to his cell after lunch and threatened to "blow [Plaintiff's] face off" unless Plaintiff asked a corrections officer to move him to a different cell. ECF No. 38 at 15. According to Plaintiff, he immediately left the cell and told Defendant Barrett, who was performing rounds in Plaintiff's cellblock, about Williams's threat. According to Barrett, however, Plaintiff told him that he could no longer live in his cell but refused to tell him why. In any case, all parties agree that Barrett then locked Plaintiff in the shower to secure him and notified his supervisor, Defendant Johnson, of the situation with Williams so that Johnson could investigate. Johnson asked Williams what would happen if he did not move Plaintiff to a new cell, to which Williams responded: "it will be what it is going to be" and that he "would handle his business." ECF No. 102-1 at 9. Johnson moved Williams into a different cell, but Plaintiff heard Johnson joke to Barrett that they should have put Plaintiff back in the cell with Williams and let them "beat the shit out of each other and the best man keeps the cell." *Id.* Neither Barrett nor Johnson made any written notation of the incident. Plaintiff did not ask anyone at Wende to place him in protective custody and nobody offered him protective custody.

According to Wende counselor Robert Skubis, new inmates are supposed to be housed separately from other inmates until a sergeant or higher ranked official conducts a security interview to determine if the new inmate is suitable for general population housing. ECF No. 102-13. According to Defendant Johnson,[3] that initial interview should occur within the first three days of an inmate's arrival. ECF No. 102-1 at 10. No one interviewed Plaintiff until January 20, 2013—five days after he arrived at Wende and several days after his altercation with Williams. Plaintiff's paperwork from that interview indicates that he was involved in gang activity but did not identify any known enemies. *Id.* at 6. The next day, Counselor Skubis interviewed Plaintiff, who alleges that he told Skubis "about his prior altercation with Williams in his cell" and that Williams was in the same prison orientation class with him. *Id.* at 11. Skubis's paperwork documenting that interview indicates

that Plaintiff had enemies, but does not mention Williams. ECF No. 95-5 at 4. The form, which Plaintiff signed, reveals that Plaintiff had no concerns for his personal safety. *Id.*

On January 23, 2013, Plaintiff, Williams, and 19 other inmates attended an orientation session in an unsupervised classroom. According to Defendant Sticht, because the orientation program is a "peer run program" that is run by a fellow inmate and not a staff instructor, it "is common to have the inmates in the room without an officer physically present in the room." ECF No. 103-1. During the orientation, Williams and another inmate named Martinez began stabbing Plaintiff with a homemade knife. Williams and Martinez stabbed Plaintiff at least nine times over the course of five to seven minutes, and Plaintiff suffered puncture wounds on both of his hands, his right shoulder, and the back of his head. Plaintiff eventually escaped and alerted a corrections officer, who was posted more than 25 feet away. Officials took Plaintiff to Erie County Medical Center for treatment.

On February 12, 2013, after Plaintiff refused to voluntarily enter protective custody, Wende officials held a hearing to determine if Plaintiff should be placed in involuntary protective custody. During the hearing, Defendant Sticht acknowledged that Plaintiff's "previous record shows prior [involuntary protective custody] placements and gangs," and decided to place Plaintiff in involuntary protective custody.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate if "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Sousa v. Roque*, 578 F.3d 164, 169 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id.* The court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

2018 WL 2009432

*Id.* at 249. The court resolves all ambiguities and draws all factual inferences in the nonmovant's favor, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56).

**\*3** To defeat summary judgment, therefore, nonmoving parties "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and they "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted). At the summary judgment stage, a nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. N.Y.C.*, 132 F.3d 145, 149 (2d Cir. 1998).

## II. Direct Liability Under the Eighth Amendment

Plaintiff argues that Defendants Barrett and Sticht violated the Eighth Amendment by failing to protect him from Williams and Martinez's attack. The Eighth Amendment protects prisoners from cruel and unusual punishment. *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015). It also imposes a duty on prison officials to "take reasonable measures to guarantee the safety of the inmates" and "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 822 (1994). Officials are not liable for "every injury suffered by one prisoner at the hands of another." *Id.* at 834; *see also Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (explaining that Eighth Amendment liability "entails something more than mere negligence").

Instead, to prove that an official violated the Eighth Amendment, the injured inmate must show that 1) "he is incarcerated under conditions posing a substantial risk of serious harm," and 2) the prison official acted with "deliberate indifference" to the inmate's health or safety. *Farmer*, 511 U.S. at 834. An official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The U.S. Supreme Court set forth a subjective, as opposed to objective, standard for deliberate indifference because "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for

commendation, cannot under our cases be condemned as the infliction of [cruel and unusual] punishment" under the Eighth Amendment. *Id.* at 838.

The Court need not determine if Plaintiff satisfied the first part of the Eighth Amendment's two-part test—whether he was incarcerated under conditions posing a substantial risk of serious harm—because he has not adduced any evidence to establish that Defendants Barrett or Sticht were deliberately indifferent to his health or safety.

### i. Defendant Barrett

Barrett denies that he was deliberately indifferent to Plaintiff's safety because Plaintiff never told him about Williams's threat and, "more important[ly]," Barrett's actions on the day of the verbal altercation between Williams and Plaintiff would have been the same regardless of whether he knew that Williams threatened Plaintiff. Plaintiff argues that Barrett knew about Williams's threat, and that Barrett's failure to document the verbal dispute between them or to ensure that Plaintiff received protective custody after the incident amounted to deliberate indifference.

Plaintiff's arguments fail for multiple reasons. First, Barrett did not have "authority to conduct investigations" or to "offer an inmate protective custody." ECF No. 95-2. After locking Plaintiff in the shower when he refused to return to his cell with Williams, Barrett did what he was "supposed to" do by notifying his supervisor, Defendant Johnson, "of the situation so that he could investigate." ECF No. 95-2. Plaintiff emphasizes the fact that Barrett "simply ... called his supervisor and left the scene, rather than logging the incident, as required by DOCCS Directive." ECF No. 102-1 at 5. DOCCS rules, however, did not require Barrett to log the incident. Rather, DOCCS Directive Number 4091 provides that officers should log "fights" or other "unusual incidents." *Id.* at 27. Using his discretion, which DOCCS rules allow corrections officers to do, Barrett decided that a verbal disagreement between inmates was not an "unusual incident" that merited documentation.

**\*4** Secondly, Plaintiff unduly focuses on the fact that Barrett did not record the incident in the logbook. After refraining from documenting the incident between Williams and Plaintiff, Barrett did not simply abandon the scene or otherwise fail to act. Far from disregarding any risk to Plaintiff's safety, Barrett secured Plaintiff in a

location that was outside of Williams's reach and notified Defendant Johnson of the situation. Johnson, unlike Barrett, had authority to investigate the altercation and take corrective action, which he did by moving Williams to a new cell. Whether Johnson's actions were sufficient to protect Plaintiff is not currently before the Court on this motion. The record indicates that Barrett's reliance on his supervisor was fully reasonable, and Plaintiff has not rebutted that conclusion. Plaintiff clearly disagrees with Barrett's decision, but he cannot explain how it was deliberately indifferent or even negligent. Summary Judgment is therefore GRANTED as to Defendant Barrett.

### ii. Defendant Sticht

Plaintiff argues that, because Defendant Sticht was "responsible for overseeing all aspects of security at" Wende and had access to documents establishing Plaintiff's history with the Bloods, even a "cursory review of documents available to Sticht would have revealed that [Plaintiff] had a history of being attacked by members of the Bloods gang and should not have been placed in general population with Williams." *Id.* at 22. But the Eighth Amendment is only concerned with what Sticht actually knew—not what he *should* have known. Sticht repeatedly avers in sworn statements that he did not know anything about Plaintiff, Williams, or their respective histories with the Bloods before the orientation session attack. *See, e.g.*, ECF No. 103-1 at 2. Although Sticht could access documents describing Plaintiff's history with the Bloods, he had no reason to read them because the DOCCS Office of Movement and Classification was responsible for placing inmates and conducting risk assessments. Sticht testified that he did not learn of Plaintiff's background or his January 16, 2013 verbal altercation with Williams until after the January 23, 2013 attack at the orientation session, at which point Sticht decided to place Plaintiff in protective custody. *Id.* at 12. Nothing in the record rebuts or discredits Sticht's averments. Because it would be impossible for Sticht to disregard a risk that he did not know existed, no reasonable jury could conclude that Sticht was directly liable for an Eighth Amendment violation. Summary Judgment is therefore GRANTED as to Defendant Sticht.

### III. Supervisory Liability

Plaintiff argues that, even if Sticht is not directly liable under Section 1983, he is liable under the statute as a supervisor. Section 1983 imposes liability for conduct that subjects a plaintiff or "causes" him "to be subjected to a deprivation of a right secured by the Constitution and laws." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) (citing *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) ). There is no *respondeat superior* liability under Section 1983. *Crawford v. Coughlin*, 43 F. Supp. 2d 319, 324 (W.D.N.Y. 1999). Instead, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages" under Section 1983. *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d. Cir. 1977). A supervisor is "personally involved" in the deprivation of a plaintiff's Eighth Amendment rights and therefore liable under Section 1983 if he or she (1) participated directly in the alleged constitutional violation, (2) after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[4]

**\*5** Fundamentally, for a supervisor to be liable under Section 1983, there must "of course" have "been an underlying constitutional deprivation" by a subordinate, *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999), and a "causal link" between the supervisor's conduct and the violation of the plaintiff's civil rights. *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002). When a Plaintiff raises an allegation under the third *Colon* factor—that the defendant supervisor maintained a custom or policy under which unconstitutional practices occurred—that policy must be the "moving force" behind a constitutional violation. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 831 (1985). Absent an "affirmative link" between the policy and the "particular constitutional violation" alleged, a policy is too "nebulous" and far "removed from the constitutional violation" to establish supervisory liability. *See id.* at 822. Furthermore, a "single incident" of illegality ... especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993).

Plaintiff argues that Sticht is liable under the third *Colon* factor of creating or continuing a policy under which unconstitutional practices occurred. Specifically, Sticht's policy "was to impermissibly defer to the determinations of unidentified people in Albany as to whether an inmate was eligible for double-cell housing, and then randomly assign inmates together." ECF No. 102-1 at 6. According to Plaintiff, state regulations required Sticht himself to determine whether Plaintiff was suitable for double-cell housing, but Sticht instead improperly relied on DOCCS Office of Classification and Movement. *Id.* at 19.

Sticht correctly argues that state regulations expressly allow him or his "designee" to make that determination. *Id.* (citing 7 N.Y.C.R.R. § 1701.5(a) ("The deputy superintendent of security or designee shall conduct a risk assessment ...") ). As there "are thousands of violent gang members who are incarcerated throughout NYS DOCCS" and "literally hundreds, and even thousands, of pages of records related to each inmate in DOCCS," it would be extraordinarily difficult for Sticht himself to determine inmates' suitability for double-cell housing. ECF No. 103-1 at 3. DOCCS's Classification and Movement Office exists so Sticht and deputy superintendents of security at other prisons can "help assess, to the extent possible, the risks associated with moving inmates among the various DOCCS facilities." *Id.* at 4. There is evidence that Classification and Movement could have more thoroughly vetted Plaintiff for double-bunk housing, [5] but that does not mean that Sticht's reliance on the office was misplaced. Plaintiff also argues that Sticht's policy [6] of "randomly select[ing] inmates to bunk together" once they were cleared for double-cell housing violated state regulations requiring him to "assess the suitability of double-cell inmates to be placed together in the same cell." ECF No. 102-1 at 21. Additionally, Plaintiff argues that he did not timely receive an intake interview. *Id.* at 10.

Even assuming that Sticht maintained deficient policies for pairing cellmates together, his policies are too disconnected from the underlying alleged unconstitutional conduct to render him liable as a supervisor under Section 1983. The alleged underlying constitutional violation in this case is Defendant Johnson's failure to document the verbal altercation between Williams and Plaintiff, but the policies leading to Williams and Plaintiff's pairing as cellmates are several "steps removed from" Johnson's own conduct and can hardly be described as the "moving force" behind Johnson's deliberate indifference. *See Tuttle*, 471 U.S. at 819.

**\*6** To illustrate the notable disconnect between Sticht's policies and the alleged Eighth Amendment violation, the Court deduces Plaintiff's line of reasoning as follows: because Sticht had improper policies for matching cellmates, Williams and Plaintiff were unwisely double bunked, which led to their verbal altercation in which Defendant Johnson intervened but failed to document, which resulted in Plaintiff and Williams attending the same orientation session, which resulted in Williams attacking Plaintiff. It is evident from this strained line of reasoning that the relationship between Sticht's cellmate pairing policies and the alleged underlying constitutional violation—Johnson's deliberate indifference to Plaintiff's safety—is attenuated at best, and a far cry from the "affirmative link" that the Supreme Court demanded in *Tuttle*. Johnson's actions are entirely unrelated to any alleged policies that Sticht had for double bunking cellmates. Moreover, a policy cannot "ordinarily be inferred from a single incident of illegality," and a single incident is all that Plaintiff has alleged. *See Dwares*, 985 F.2d at 100. Summary judgement is therefore GRANTED as to Defendant Sticht.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (ECF No. 95) is GRANTED and Defendants Barrett and Sticht are dismissed from this case. The Clerk of Court is directed to update the caption accordingly.

Defendant Johnson is the sole remaining defendant in this case. The parties are directed to appear on May 25, 2018 at 10 AM to set a date for trial.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2018 WL 2009432

Footnotes

1    Plaintiff's Second Amended Complaint ("SAC") is the operative complaint. The SAC listed additional defendants who have since been dismissed from this case. *See* ECF No. 66 at 1.

2    The following facts are undisputed and are taken from each party's Statement of Material Facts. ECF Nos. 95-1, 102-2.

3    Defendant Johnson has not moved for summary judgment.

4    The Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), called the doctrine of supervisory liability into question. The Second Circuit has "not yet determined the contours of the supervisory liability test" in the wake of *Iqbal. See Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014). However, courts within the Second Circuit have reached the consensus that the relevant *Coughlin* category here—whether the supervisor created a policy or custom under which unconstitutional practices occurred—is still sound law. *See, e.g., Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801 (SAS), 2009 WL 1835939, at *6 (S.D.N.Y. Jun. 26, 2009); *Joseph v. Fischer*, No. 08 Civ. 2824 (PKC) (AJP), 2009 WL 3321011, at *14 (S.D.N.Y. Aug. 10, 2010).

5    For instance, DOCCS should not have deemed Plaintiff eligible for double bunking in the first place because regulations prohibit individuals weighing over 299 pounds from double cell assignment, and Plaintiff weighed more than 300 pounds when he transferred to Wende. ECF No. 102-1 at 22. Additionally, it appears that DOCCS did not fill out the requisite information sheet documenting its evaluation of Plaintiff for double bunking. *See id.*

6    It is unclear, but ultimately immaterial, whether DOCCS or Sticht randomly selected inmates to bunk together.

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   6

2008 WL 4517806
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kirk OCHOA, Plaintiff,

v.

Carol DeSIMONE, Inmate Records Coordinator;
D.S.A. Badger; Lt. Santos, Defendants.

Civ. No. 9:06-CV-119 (DNH/RFT).
|
Sept. 30, 2008.

**Attorneys and Law Firms**

Kirk Ochoa, Bronx, NY, pro se.

Andrew M. Cuomo, Attorney General for the State of New York, Senta B. Suida, Esq., Assistant Attorney General, of Counsel, Syracuse, NY, for Defendants.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*6** Plaintiff, Kirk Ochoa, brought this civil rights action pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated September 10, 2008, the Honorable Randolph F. Treece, United States Magistrate Judge, recommended that the defendants' motion for summary judgment (Dkt. No. 32) be granted; that plaintiff's retaliation claim be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii); and that the plaintiff's complaint be dismissed. Objections to the Report-Recommendation have not been filed.

Based upon a careful review of the entire file and the recommendations of Magistrate Judge Treece, the Report-Recommendation is accepted and adopted in all respects. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment (Docket No. 32) is GRANTED;

2. Plaintiff's retaliation claim is DISMISSED; and

3. Plaintiff's complaint is DISMISSED.

The Clerk is directed to enter judgment accordingly and close the file.

IT IS SO ORDERED.

RANDOLPH F. TREECE, United States Magistrate Judge.

### *REPORT-RECOMMENDATION and ORDER*

**\*1** On January 30, 2006, *pro se* Plaintiff Kirk Ochoa filed this civil rights lawsuit, pursuant to 42 U.S.C. § 1983, alleging that (1) Defendant Carol DeSimone retaliated against him for filing lawsuits and grievances; (2) Defendant Badger violated his due process rights by denying him a legal assistant and the right to call witnesses during a disciplinary hearing; and (3) Defendant Santos violated his rights by ruling against him in a separate disciplinary hearing. Dkt. No. 1, Compl. at ¶ 7. Defendants have filed a Motion for Summary Judgment to which Plaintiff has not responded. Dkt. No. 32, Defs.' Mot. for Summ. J. The original deadline for Plaintiff's response to the Defendants' Motion was February 25, 2008. *See id.* After Plaintiff failed to meet that deadline, on April 4, 2008, this Court issued the following Order:

> Plaintiff shall file and serve any opposition to Defendants' Motion for Summary Judgment on or before May 19, 2008; ***Plaintiff is warned that failure to oppose Defendants' Motion will result in this Court accepting the facts set forth by Defendants as true.*** *See* N.D.N.Y.L.R. 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*" (emphasis in original)). ***Plaintiff is further warned that failure to respond may, if appropriate, result in the granting of Defendants' Motion, in which [case] there will be no trial.*** *See* N.D.N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to

Ochoa v. DeSimone, Not Reported in F.Supp.2d (2008)

2008 WL 4517806

the granting or denial of the motion, as the case may be, unless good cause is shown.").

Dkt. No. 33, Order dated Apr. 11, 2008 (emphasis in original).

Because Plaintiff has failed to respond to the Defendants' Motion, we will accept the facts set forth by Defendants as true.

## I. FACTS

At the time of the events alleged in the Complaint, Plaintiff was in the New York State Department of Correctional Services' (DOCS) custody at the Oneida Correctional Facility. Defs.' Mot. for Summ. J., Ex. 3, Statement Pursuant to Rule 7.1 (hereinafter "Defs.' 7.1 Statement"), at ¶ 3. Plaintiff was subsequently released from DOCS custody on September 6, 2007. *Id.* at ¶ 2. The material facts giving rise to Plaintiff's claims are as follows.

On October 26, 2005, Defendant Carol DeSimone filed a Misbehavior Report (hereinafter "October Report") against Plaintiff accusing him of harassment. *Id.,* Ex. B, Misbehavior Rep., dated Oct. 26, 2005. Defendant Deputy Superintendent for Administration John Badger presided as Hearing Officer over the ensuing Disciplinary Hearing, which was held on November 8, 2005. *Id.,* Ex. C, Disciplinary Hr'g Tr., dated Nov. 8, 2005. At the conclusion of the Hearing, Plaintiff was found guilty and sentenced to thirty (30) days in the Special Housing Unit ("SHU") and one month recommended loss of good time. *Id.* at p. 7. Plaintiff appealed Badger's determination and it was reversed on January 13, 2006. *Id.,* Ex. D, Order Reversing Hr'g Decision, dated Jan. 13, 2006.

**\*2** On December 2, 2005, Plaintiff was issued another Misbehavior Report (hereinafter "December Report") for refusal to obey a direct order. *Id.,* Ex. E, Misbehavior Rep., dated Dec. 2, 2005. Defendant Lieutenant Lance Santos presided over Plaintiff's Disciplinary Hearing at the conclusion of which Plaintiff was found guilty and sentenced to thirty (30) days keeplock. *Id.,* Exs. F, Disciplinary Hr'g Tr., dated Dec. 7, 2005 & G, Inmate Disciplinary Hist. Plaintiff did not appeal that decision. *Id.* at ¶ 11.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary

Ochoa v. Desimone, Not Reported in F.Supp.2d (2008)

2008 WL 4517806

judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**B. Due Process Claims**

**\*3** Plaintiff asserts that Defendant Badger violated his due process rights by denying him a legal assistant and the right to call witnesses during a disciplinary hearing related to the October Report, and that Defendant Santos violated his rights by ruling against him in a disciplinary hearing related to the December Report.[1] Badger sentenced Plaintiff to thirty (30) days in SHU with a recommended one month loss of good time and Santos sentenced him to thirty (30) days keeplock. Defs.' 7.1 Statement at ¶¶ 6 & 10.

In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). Such interests are derived from the Fourteenth Amendment Due Process Clause itself or from state statute or regulations. *Id.*

The Supreme Court has narrowly circumscribed the scope of liberty interests emanating from the Due Process Clause to protect "no more than the 'most basic liberty interests in prisoners.' " *Id.* (quoting *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). Furthermore, "changes in the conditions of confinement having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the Due Process Clause '[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within

the sentence imposed upon him.' " *Vitek v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (quoting *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976)).

However, when a prisoner is subjected to conditions that are "unexpected," *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), and "qualitatively different from the punishment characteristically suffered by a person convicted of crime," the Due Process Clause itself confers a liberty interest. *Vitek v. Jones,* 445 U.S. at 493 (holding an involuntary transfer to a state mental hospital implicated a liberty interest protected by the Due Process Clause); *see also Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (finding the Due Process Clause provides a liberty interest in being protected from the involuntary administration of psychotropic drugs).

In the case at bar, Plaintiff's disciplinary confinement in SHU and keeplock does not constitute an "unexpected" change in condition, nor did those conditions exceed the sentence imposed upon him. *See Dawes v. Dibiase,* 1997 WL 376043, at \*4 (N.D.N.Y. July 3, 1997) (citing *Washington v. Harper & Vitek v. Jones* for the proposition that the Due Process Clause will apply by its own force only for deprivations much more severe than solitary confinement for a year). Therefore, Plaintiff does not have a liberty interest in remaining free from SHU confinement emanating from the Due Process Clause itself.

State statutes and regulations may also confer liberty interests to prisoners. *Arce v. Walker,* 139 F.3d at 334 (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. at 460). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. at 484. Thus, a prisoner asserting a denial of due process as a result of segregated confinement or loss of privileges must (1) make a threshold showing that an atypical and significant hardship was imposed upon him, and (2) establish that the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Case 9:16-cv-01211-GTS-TWD Document 72 Filed 08/09/18 Page 236 of 338
Ochoa v. DeSimone, Not Reported in F.Supp.2d (2008)
2008 WL 4517806

**\*4** While the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard, *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections, *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (stating that confinement in SHU exceeding 305 days was atypical); *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (finding 305 days of SHU confinement atypical).

In this case, neither of Plaintiff's thirty (30) day stints in SHU and keeplock, without more,[2] constitute an atypical and significant hardship, and therefore Plaintiff has not asserted that he has a liberty interest at stake. *See Sealey v. Giltner,* 197 F.3d 578, 590 (2d Cir.1999) (101 days in normal SHU conditions did not constitute an atypical and significant hardship); *see also Sandin v. Conner,* 515 U.S. at 486; *Thompson v. LaClair,* 2008 WL 191212, at \*3 (N.D.N.Y. Jan.22, 2008) (30 days in SHU does not constitute an atypical and significant hardship).

Therefore, these claims should be **dismissed** as a matter of law.[3]

### C. Retaliation Claim

Plaintiff asserts that Defendant DeSimone issued the October Misbehavior Report against him in retaliation for his filing "court actions and grievances against [Oneida Correctional Facility] and its staff." Compl. at ¶ 5. The Defendants failed to address this claim in their Motion for Summary Judgment. *See* Dkt. No. 32, Pl.'s Mem. of Law. However, notwithstanding that omission, under 28 U.S.C. § 1915(e)(2)(B)(ii), this Court has the power to review Plaintiff's Complaint for failure to state a claim *at any time. See, e.g., Zimmerman v. Burge,* 2008 WL 850677, at \*7 (N.D.N.Y. Mar.28, 2008) (noting that "even where a defendant has not requested dismissal based on a failure of the plaintiff to state a claim upon which relief may be granted, a district court may, *sua sponte,* address whether a pro se prisoner has failed to state a claim[.]") (citing 28 U.S.C. § 1915(e)(2)(B)(ii)). We find that, even accepting all Plaintiff's factual allegations as true, he has not stated a valid claim § 1983 retaliation claim.

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove, "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted). Thus, there must be a "causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

**\*5** A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d at 138-39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky,* 2005 WL 2128851, at \*5 (N.D.N.Y. Aug.30, 2005) (citing *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995)).

Moreover, "in the prison context [the Second Circuit has] previously defined 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (emphasis in original). This objective test will apply even though a particular plaintiff was not himself deterred. *Id.*

If the plaintiff can carry that burden, the defendants will still be entitled to summary judgment if they can show, by a preponderance of the evidence, that they would have taken the same action in the absence of the prisoner's First Amendment activity. *Davidson v. Chestnut,* 193 F.3d 144, 148-49 (2d Cir.1999); *see Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

In asserting his retaliation claim, Plaintiff generally states that he filed grievances and lawsuits which formed the basis for Defendant DeSimone's retaliatory Misbehavior Report. The Supreme Court has noted that the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *See United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967). The Second Circuit has held that within the prison context, "inmates must be 'permit[ted] free and uninhibited access ... to both *administrative and judicial* forums for the purpose of seeking redress of grievances against state officers.' " *Franco v. Kelly,* 854 F.2d at 589 (quoting *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976)) (emphasis and alterations in original).

Fatal to Plaintiff's retaliation claim, however, is his failure to specify what lawsuits or grievances he filed, against whom, and where such were filed. Plaintiff does not indicate that Defendant DeSimone was even aware of any lawsuit or grievance which he may have filed. Therefore, Plaintiff has failed to allege a causal connection between his filing of grievances and lawsuits and DeSimone's filing of the Misbehavior Report. "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

Therefore, it is recommended that this claim be **dismissed.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 32) be **granted;** and it is further

**RECOMMENDED,** that Plaintiff's retaliation claim be **dismissed** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii); and it is further

**RECOMMENDED;** that in light of the above recommendations, Plaintiff's Complaint (Dkt. No. 1) be **dismissed;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4517806

---

Footnotes

1    The basis for Plaintiff's claim against Defendant Santos is not entirely clear. His Complaint states: "Defendant Lt. Santos Hearing Decision informing Plaintiff that these rules apply while not in DOCS custody is a violation of due process of [law] [.] DOCS own rule book clearly states that rules only apply in DOCS custody not out side [sic] custody." Compl. at ¶ 7. Because Plaintiff's claim is unclear, we liberally construe it as a due process claim.

2    The Second Circuit has held open the possibility that a period of restricted confinement of less than 101 days could create a liberty interest if the record were to reflect atypical and significant conditions of confinement. *See Colon v. Howard,* 215 F.3d at 232 n. 5. In this case, Plaintiff has adduced no allegations regarding the conditions of his confinement beyond the loss of privileges that normally accompany disciplinary confinement.

3    With respect to Plaintiff's due process claim against Santos, Plaintiff failed to appeal Santos's decision and therefore that claim should be dismissed for failure to exhaust administrative remedies as well. *See* Defs.' 7.1 Statement at ¶ 10;

2008 WL 4517806

42 U.S.C. § 1997(e)(a) ("No action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.")

---

**End of Document**                                          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5970355
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jose QUEZADA, Plaintiff,

v.

Richard ROY, et al., Defendants.

No. 14 Civ. 4056(CM).
|
Signed Oct. 13, 2015.

**MEMORANDUM DECISION AND ORDER
GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGEMENT**

McMAHON, District Judge.

**\*1** *Pro se* Plaintiff Jose Quezada brought this
action against 21 corrections officers and administrators
alleging they violated his First, Eighth, and Fourteenth
Amendment rights while he was incarcerated at Green
Haven Correctional Facility ("Green Haven"). His main
allegations revolve around a campaign of harassment
and retaliation that culminated in an assault by several
correctional officers in May 2011 ("the May 2011
assault").

The court previously dismissed the complaint as against
four of the defendants for failure to allege personal
involvement (Docket # 146). The remaining defendants
now move for partial summary judgment on the ground
of qualified immunity. [1]

For the reasons stated below, Defendants' motion for
partial summary judgment on the ground on which the
motion is premised-qualified immunity-is denied. Denial
is without prejudice to the State's bringing a motion
for summary judgment, at the appropriate time, on the
ground that the officers did nothing wrong. In some
instances, that will require further embellishment of the
evidentiary record.

Defendants are nonetheless entitled to dismissal of several
of Plaintiff's claims-not on the ground of qualified

immunity, but because the law bars their pursuit. The
majority of Plaintiff's First Amendment retaliation claims
predicated on verbal harassment must be dismissed
because the verbal harassment he describes is no more
than *de minimis;* and his claims for negligence and
intentional infliction of emotional distress must be
dismissed because those claims are not cognizable under
§ 1983.

**BACKGROUND**

**Parties**

Plaintiff is an inmate who is serving time for
manslaughter. He is currently incarcerated in Auburn
Correctional Facility in the Northern District of New
York; for a period of time between 2006 and 2011 he was
incarcerated at Green Haven Correctional Facility, which
is located in this district.

Defendants are corrections officers, supervisors, and
administrators who worked at Green Haven. In
particular, at the time of the events giving rise to the
complaint:

• William Lee was the Superintendent;

• Thomas Melville was a Lieutenant;

• Tracey Alexander was a Sergeant;

• John Conforti was a Sergeant;

• Kevin O'Connor was a Sergeant;

• Brenda Surber was a Sergeant;

• Stephanie Mryzglod was a nurse; and

• Lori Badger was the head cook.

The other Defendants were correctional officers at Green
Haven:

• Jason C. Brothers;

• Anthony M. Cefaloni;

• Ronald Corbin;

• Matthew Filipponi;

• John Henschel;

Jeffrey Macisaac;

• Michael Mryzglod;

• Sonya Rojas; and

• Jeffrey Tokarx.

### Facts

The facts below are drawn from the complaint, exhibits, and Plaintiff's deposition. For purposes of this motion, the facts are construed in the light most favorable to Plaintiff, as the party opposing summary judgment. *See James v. Orange Cnty. Corr. Facility,* 2011 WL 5834855, at *1 (S.D.N.Y. Nov.18, 2011).

**\*2** Because Plaintiff is proceeding *pro se,* the court has construed the allegations in his complaint broadly. As is my custom when defendants move for summary judgment on the ground of qualified immunity, I have allowed him to amplify and clarify the allegations in his pleading via deposition. The purposes of the deposition is to fix, in testimonial form, the totality of the plaintiff's allegations.

Upon his arrival at Green Haven in or about 2006, Plaintiff experienced harassment, which he believes was in retaliation for a federal lawsuit he had filed based on events at his previous correctional facility (the "First Action"). This led Plaintiff to file a second § 1983 suit in February 2009 (the "Second Action"). Several of the defendants in this case (which is the Third Action)— including Officers Macisaac, Cefaloni, and M. Mryzglod, and nurse S. Mryzglod-were named as defendants in the Second Action. (*See* Quezada 2/12/15 Deposition [hereinafter "Quezada Dep."] at 12–13, Exhibit A to Declaration of Samuel Yaggy in Support of Defendants' Motion for Summary Judgment (Docket # 109).)

The gravamen of the current complaint (this is the Third Lawsuit) is that Plaintiff was harassed and retaliated against for having filed the Second Action and for making complaints and filing grievances against Green Haven personnel. (*Id.*) This behavior essentially went on from 2009, when he filed the Second Action, until 2011, when he left Green Haven. It took a variety of forms, ranging from verbal abuse to assault. Herewith a summary of Plaintiff's contentions, in roughly chronological order:

### Denial of Legal Supplies

From September 2009 until April 2010, Plaintiff was confined in the Special Housing Unit ("SHU"). (Quezada Dep. at 29.) During this time, he informed Defendant Conforti that he lacked legal supplies and resources he needed to work on his cases; he lacked pencils, envelopes, and the ability to make copies of documents. (*Id.* at 27.) Although Conforti was aware of Plaintiff's lack of supplies, he did nothing to remedy it. (*Id.*) Plaintiff also informed Defendant Lee that he lacked supplies, but Lee did not resolve the situation. (Quezada Dep. at 29; Am. Compl., at ¶ 21–22). Defendant Lee also allegedly directed the law library supervisor to refuse to allow Plaintiff to make copies of court documents unless Plaintiff provided a court order specifying the number of copies he was supposed to provide the court and opposing counsel. (*Id.* at ¶ 24.)

Plaintiff contends that the defendants denied him supplies to retaliate against him for having filed the Second Action. (Am. Compl., at ¶ 21–22.) The denial of access to legal supplies meant that Plaintiff missed various court-ordered deadlines, in the Second Action, on his CPL 440.10 motion, in his family court case, and in connection with other unspecified matters. (Quezada Dep. at 27–28.) When asked at his deposition precisely what deadlines he missed, however, Plaintiff could not remember what they were. (*Id.*)

### Dangerous Housing Placement

**\*3** On April 1, 2010, Plaintiff was released from the SHU. (*Id.* at ¶ 30.) Upon release, he was housed in H–Block, although he had asked Defendant Lee and others to assign him to E–Block or G–Block, because he feared for his safety in H–Block. (*Id.* at ¶ 27, 30.) Plaintiff wrote several letters complaining about his placement to Defendant Lee and others, claiming that his life was in danger because Officers Macisaac and Cefaloni, who were defendants in the Second Action, worked in H–Block. He also asked to be transferred out of Green Haven. (*Id.* at ¶¶ 31–43.)

Plaintiff continued to inform various officials about his safety fears and desire to be placed in protective custody or transferred to a cell block away from Officers Macisaac, Cefaloni, and Mryzglod. (*See id.* at ¶ 26–27.) For example, he told Defendant Lee that these officers "already threatened Plaintiff with assaulting him again." (*Id.* at ¶ 27.) He also "made several requests to the

administration requesting to be transferred for security reasons ." (*Id.* at ¶ 28.)

Defendant Lee denied Plaintiff's transfer request on June 16, 2010. Plaintiff was told he could not be transferred due to a "medical hold." Plaintiff testified that he told Lee that no medical condition necessitated keeping him at Green Haven. (*Id.* at ¶ 35.) Plaintiff claims that someone in the medical clinic placed "the medical hold again to make sure the Plaintiff stayed in Greenhaven Correctional Facility and be assaulted or even killed." (*Id.* at ¶ 40.) When asked to specify who had done that, he speculated that Defendant Stephanie Mryzglod was, "perhaps involved with the medical hold." (Quezada Dep. at 57.)

Plaintiff says that Lee denied his request for a transfer out of indifference to Plaintiff's safety at Green Haven. (*Id.* at ¶¶ 44–45.)

**Plaintiff is Called Names**
On June 2, 2010, Plaintiff claims that Officers Macisaac and Cefaloni removed him from the law library and then called him a "faggot" in front of Defendant O'Connor. (*See* Quezada Dep. at 55; Am. Compl., at ¶ 35.)

**The Rumor that Plaintiff Was an Informant**
On July 28, 2010, Plaintiff informed the Deputy Superintendent of Programs (who is not named as a defendant) that some of the defendants from his prior lawsuit were spreading rumors that Plaintiff was a "snitch." (*Id.* at ¶ 48.) Plaintiff also filed a complaint with Defendants Lee and Roy against Officers Macissac, Cefaloni, and others, alleging the same thing. (*Id.* at ¶ 49.) Several inmates questioned Plaintiff about the rumor that he was a "snitch." (*Id.*)

Shortly thereafter, three unidentified inmates assaulted Plaintiff in the prison yard and accused him of being a snitch. (*Id.* at ¶ 50.) According to Plaintiff, certain defendants continued to spread rumors that he was a snitch. (*Id.* at ¶¶ 51–58.)

**Diet Card Harassment/Removal from Special Meal Program**
 **\*4** On October 27, 2010, while Plaintiff was trying to get a therapeutic diet meal, Officer Henschel warned Plaintiff that he would attack Plaintiff if he made any trouble. (*Id.*

at ¶¶ 60–62.) Plaintiff testified that he did not approach Henschel and tried to avoid contact with him. (Quezada Dep. at 17.) Plaintiff filed a complaint against Officer Henschel on November 4, 2010. (Am. Compl., at ¶ 60.) Defendant Melville investigated the claim but was unable to substantiate it. (*Id.* at ¶ 62; Melville Investigation Letter, Am. Compl., Ex. 13.)

On December 7, 2010, Officer Henschel threatened and berated Plaintiff again when he went to check in for his diet meal. (Am.Compl., ¶¶ 63–64.) Plaintiff informed Defendant Badger, the head cook, about this confrontation, but could not remember how she responded. (Quezada Dep. at 18.) Plaintiff complained to Captain Burnett and then filed a grievance against Officer Henschel and Badger. (Am. Compl., at ¶¶ 64–65; Grievance GH–70696–10, Am. Compl., Ex. 15.)

On December 8, 2010, Officer Henschel threatened Plaintiff a third time. (Am. Compl., at ¶ 67.) That afternoon, Plaintiff observed Badger and Officer Henschel talking, after which Badger confiscated Plaintiff's diet card. (*Id.* at ¶ 68.) Badger said she took the card because she observed Plaintiff eating food not on the special diet plan. (Quezada Dep. at 18.) Plaintiff filed a grievance against her on December 23, 2010. (*See* Grievance GH–70764–11, Am. Compl., Ex. 16.)

Plaintiff was on the regular diet plan for some unspecified amount of time after his special diet card was confiscated. (Quezada Dep. at 18.) He testified that his health suffered after he was removed from the special diet plan, having unspecified "problems with my stomach and other medical problems." (*Id.*) Three months after he was removed from the special diet plan, Plaintiff was seen in the infirmary, at which time it was medically determined that a "special diet [was] not medically indicated" for him. (*See* Ambulatory Health Record Progress Note, Am. Compl., Ex. 16.) He testified that he is presently on a special diet plan at his current facility. (Quezada Dep. at 18.)

Defendant Lee denied both grievances arising from the incident, and on appeal the Central Office Review Committee ("CORC") upheld those decisions. (*See* Grievance GH–70696–10, Am. Compl., Ex. 15; Grievance GH–70764–11, Am. Compl., Ex. 16.)

**Plaintiff is Moved Back to H–Block**

On January 6, 2011, Plaintiff was told he would be moving from F–Block back to H–Block, where Officers Macisaac and Cefaloni worked. (Am. Compl., at ¶ 73.) Plaintiff refused to transfer and asked either to see his psychologist or to be placed in protective custody, because he feared the defendants working in H–Block. (*Id*. at ¶ 73.) Defendant O'Connor, the H–Block Supervisor, refused to place Plaintiff in protective custody, allegedly because it was not possible to place someone in protective custody based on his fear of particular officers. (*Id.* at 75–76.) Instead, O'Connor escorted Plaintiff to the Mental Health Unit. (*Id.*)

**\*5** After speaking with his psychologists and Defendant O'Connor, Plaintiff was told he would be moved to H–Block for just two days, and that he would be fed in his cell to avoid any problems with Officers Macisaac, Cefaloni, Henschel, and Michael Mryzglod. (*Id.* at ¶ 77.)

Once Plaintiff was moved to H–Block and locked in his cell, someone turned off the water and electricity to his cell. (Quezada Dep. at 23; Am. Compl., at ¶ 79.) Plaintiff also did not receive a footlocker for his belongings. (*Id.*) No one else had any problems with water or electricity. (Quezada Dep. at 23.) He says he saw Officers Cefaloni, Macisaac, and Henschel "go behind the cell," but he did not remember any specific comments from them about the water or electricity. (*Id* at 23–24.)

Plaintiff complained about the lack of water and power to Officer Macisaac, who did nothing. (Am. Compl., at ¶ 79.) Plaintiff's family called the facility and complained about his condition. (*Id.*)

On January 13, 2011, the water and electricity were restored. Plaintiff never received a footlocker. (*Id.* at ¶ 80.)

**Problems With Plaintiff's ID Card**
On January 25, 2011, Plaintiff went to Building 12 to interview for transitional services. (*Id.* at ¶ 85.) While there, Officer Henschel defaced Plaintiff's ID card by writing racist comments on it with a magic marker and throwing it on the floor to make Plaintiff pick it up. (Quezada Dep. at 25.)

On February 3, 2011, Plaintiff returned to transitional services and Officer Henschel defaced Plaintiff's ID card again–this time in front of Plaintiff–and threatened him with a ticket if he tried to retrieve the card before the end of

his program. (Am. Compl., at ¶ 87.) Plaintiff complained to two of the teachers in the room. (*Id.* at ¶ 88.) As he did so, Officer Henschel tried to intimidate him by raising a clenched fist. (*Id.*)

On February 9, 2011, Plaintiff tried to retrieve his ID card after a class, only to have Officer Henschel say that "he didn't know about the Plaintiff's ID card." (*Id.* at ¶ 89.) While one of the teachers went to get Plaintiff a new card, Officer Henschel told Plaintiff that he would never give the ID card back if Plaintiff kept making complaints. (*Id.*) After Plaintiff returned to his cell, another officer brought Plaintiff an ID card. (*Id.*) Plaintiff was late to a call out while waiting for his new ID card, although he was ultimately able to attend. (Quezada Dep. at 26.) Plaintiff later filed a grievance against Officer Henschel for harassment and retaliation. (*See* Grievance GH71071–11, Am. Compl., Ex. 22.)

**Plaintiff is Told to Quit Filing Complaints**
Sometime in March 2011, Plaintiff was approached by Defendant Brenda Surber, who berated him for filing complaints and lawsuits against officers she supervised. (Quezada Dep. at 35; Am. Compl., at ¶ 90.) Plaintiff tried to leave, but Officers Macisaac and Cefaloni blocked him until Surber told them to let him go. (Am. Compl., at ¶ 91.) Surber told him to stop filing complaints naming her and the officers she supervised; she told him that filing complaints was for women. (Quezada Dep. at 36.) Surber also informed Plaintiff that she was "a martial arts expert." (*Id.*)

**\*6** Defendant Lee also told Plaintiff that he filed too many complaints and was becoming "like the child crying wolf." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment [hereinafter "Opp. Br."] at 25 (Docket # 135).)

Defendant O'Connor also told Plaintiff that other defendants would stop retaliating against him if he stopped filing grievances. (*Id.*)

**Plaintiff's Evidence Bag is Slashed**
On March 22, 2011, Plaintiff was scheduled to go to court. (Quezada Dep. at 31; Am. Compl., at ¶ 94.) Officer Michael Mryzglod came to his cell to pack his papers for transit, which filled two new draft bags. (*Id.*) When Plaintiff arrived at Downstate Correctional Facility

2015 WL 5970355

to await his court appearance, he discovered that the bottom of one of the bags had been slashed open and several documents were missing. (Quezada Dep. at 32.) He testified that Officer Mryzglod had packed the bags before the trip, but did not travel with them to Downstate. (*Id.*)

Plaintiff testified that the documents he was missing when he arrived at Downstate were motions and legal books; he could not be more specific about what was missing. (*Id.*) Plaintiff did not recall whether he submitted a lost property claim for these documents. (*Id.* at 41.) He believed that an order dismissing something was entered in the Second Action as a result of the loss of his papers; he could not remember more details. (*Id.* at 33.)

**Plaintiff Fails to Receive a Razor**
On April 5, 2011, while still out on a court trip, Plaintiff filed a telephone complaint with the Inspector General's office against Surber, Macisaac, Cefaloni, and Michael Mryzglod. (*Id.* at ¶ 96; 4/5/11 Phone Complaint, Am. Compl., Ex. 25.)

Upon his return to Green Haven on April 8, 2011, Plaintiff did not receive a razor along with his property. (Quezada Dep. at 33–34; Am. Compl., at ¶ 97.) He filed a grievance. When he returned from recreation on April 19, he was told that he had not received a razor because he was out of his cell. (Am. Compl., at ¶ 98.) Plaintiff wrote to Defendant Lee to apprise him of the situation so Plaintiff would not "be issued a Misbehavior Report for not having the razor." (*Id.* at ¶ 99.) He received a razor the next day, but complained to Defendant Lee that he had not received a receipt for the razor because the defendants were trying to "get [him] in trouble." (*Id.* at ¶ 100.)

**Threats Because of the April 5 Complaint**
On April 28, 2011, Sergeant Surber harassed Plaintiff about his April 5 complaint to the Inspector General and threatened to transfer him to Attica Correctional Facility. (Quezada Dep. at 37; Am. Compl., at ¶ 103.) Plaintiff immediately filed another complaint against Sergeant Surber. (Am. Compl., at ¶ 104.) When he tried to give a copy of the complaint to Defendant Lee and Hub Superintendent Ada Perez, Sergeant Conforti took it from him and gave it to Surber. (*Id.* at ¶ 105; Quezada Dep. at 42.) Plaintiff testified that the complaint was subsequently investigated by Lieutenant Schmitt on May 16, 2011. (Quezada Dep. at 42.)

**The Assault on Plaintiff**
*7 On May 6, 2011, the block officer told Plaintiff he would be moving to B–Block. (Am. Compl., at ¶ 106.) Another inmate told Plaintiff that Sergeant Surber had arranged for the move so that she could assault or kill Plaintiff. (*Id.*) Plaintiff informed Defendant O'Connor that he would not move, and said he wanted to see his psychologist. (*Id.* at ¶ 107.) Defendant O'Connor told Plaintiff he could either go to B–Block or to the SHU. (*Id.*)

After he moved to B–Block, Plaintiff asked to be put in protective custody or to see his psychologist, a request O'Connor allegedly denied. (*Id.* at if ¶ 108; *Cf.* Quezada Dep. at 54.)

On May 16, 2011, Plaintiff was interviewed by Defendant Schmitt regarding his complaint against Surber, Macissac, and Cefaloni. (Am. Compl., at ¶ 111.) After this interview, Plaintiff had a visit from his attorney. (*Id.* at ¶ 112.) While Plaintiff was waiting to return to his cell, he saw Sergeant Surber enter the building, notice him, and leave. (Quezada Dep. at 37.) Officer Brothers then told Plaintiff, "I'll see you later." (*Id.* at 38; Am. Compl., at ¶ 113.)

When he returned to his cell, Plaintiff was told that he was in transit; he did not know if he was being transferred to another facility or in transit for a court appearance. (*Id.* at ¶ 114.) Shortly thereafter, Officer Macisaac entered Plaintiff's cell. According to Plaintiff, Officer Macisaac screamed, "Drop the weapon!" and then cut himself. (*Id.* at ¶ 116.) Officer Matthew Filipponi then entered Plaintiff's cell and yelled, "Stop resisting!" at ¶ 117.) Officers Macisaac and Filipponi, along with Officers Corbin, Tokarz, and Brothers, allegedly proceeded to assault and beat Plaintiff. (*Id.* at ¶¶ 118–19.) Sergeant Alexander allegedly watched and did nothing, at one point joining in on the assault. (*Id.* at ¶ 119.) Defendants then allegedly took Plaintiff out of his cell and continued to beat him in front of Defendant Melville, who did nothing to stop it. (*Id.* at ¶ 120.) Officer Sonya Rojas allegedly watched as well. (*Id.*)

Sergeant Alexander then told the other defendants to take Plaintiff to the SHU. (*Id.*) On the way, Officers Corbin and Brothers allegedly continued to beat Plaintiff. (*Id.* at ¶ 121 .)

When Plaintiff arrived at the SHU, he was examined by Nurse D. Gusattney, who examined him superficially and wrote a false report of his injuries based on Sergeant Alexander's statements. (*Id* at ¶ 122.) However, when he was examined by Dr. Ventivena, he was transferred to St. Luke's Hospital on the doctor's orders. (*Id.*)

While Plaintiff was awaiting transfer, a detective from the State Police interviewed him and told him that two other detectives had found a razor blade in his cell. (*Id.* at ¶ 123.)

Plaintiff was also interviewed by two investigators from the Inspector General's office as he was traveling through Green Haven in transit to the hospital. (*Id.* at ¶¶ 124–25.)

**\*8** Plaintiff says he suffered "cuts and lacerations on his body, left shoulder, legs and multiple other injuries including a fracture on his back, dislocation in his right shoulder," and other "serious injuries." (*Id.* at ¶ 127.) After being treated at the hospital, he was transferred to Shawangunk Correctional Facility. (*Id.* at ¶ 128.) Ultimately, a disciplinary hearing was held at Shawangunk, at which Plaintiff was accused of having a weapon in his cell and assaulting an officer.

Many other events are alleged in the complaint and amended complaint, but they occurred outside this district and are the subject of a different lawsuit now pending in the Northern District of New York (the "Fourth Action").

## SUMMARY OF CLAIMS

Like most *pro se* complaints, Plaintiff's is not a model of clarity. The separate "causes of action" he lists-nine in total-do not always separate out his various claims, let alone clearly identify the constitutional or statutory authority under which each claim is brought. Many individual causes of action describe multiple claims together, and other causes of action seem needlessly duplicative. Based on a liberal reading of the facts alleged in Plaintiff's Amended Complaint and the causes of action he lists, the court understands Plaintiff to assert the following claims, which I use to organize this opinion:

1. First Amendment access to courts claims based on: (a) denial of legal supplies, and (b) Mryzglod's slashing Plaintiff's bag;

2. Eighth Amendment deliberate indifference claims for: (a) Lee's refusal to transfer Plaintiff or otherwise protect him from harm, (b) O'Connor's refusal to place Plaintiff in protective custody, (c) Henschel's and Badger's removing Plaintiff from the special diet plan, and (d) multiple defendants' failure to prevent or intervene to stop the May 2011 assault;

3. Eighth Amendment excessive force claims for: (a) spreading rumors that Plaintiff was a snitch, and (b) the May 2011 assault;

4. Fourteenth Amendment due process claims for false testimony provided during the disciplinary proceeding arising from the May 2011 assault;

5. First Amendment retaliation claims for: (a) verbal harassment, (b) harassing conduct, and (c) the May 2011 assault and Plaintiff's false punishment for it; and

6. Miscellaneous claims for: (a) negligent hiring, retaining, training, and supervising claims, and (b) intentional infliction of emotional distress for the retaliation, harassment, and assault.

## PROCEDURAL HISTORY

Plaintiff filed his original complaint in this court on May 7, 2013. (Docket # 3.) Because Plaintiff was incarcerated at Auburn and alleged numerous events that took place at that facility, this court transferred the action to the Northern District of New York on July 22, 2013. (Docket # 15.)

On October 7, 2013, Plaintiff filed an Amended Complaint, which he describes as "virtually identical to the original Complaint ... except that the amended complaint identified by name three John Doe defendants included in the complaint." (*See* Plaintiff's Memorandum of Law in Opposition to Defendants' Partial Motion to Dismiss Amended Complaint at 2, Docket # 134.)

**\*9** On March 31, 2014, the Northern District severed the claims arising out of events at Green Haven from the claims arising out of correctional facilities located in the Northern District, and transferred the Green Haven claims back to this court. (Docket # 38.) The case was

2015 WL 5970355

given a new docket number, which is why this case bears a 2014 civil action number, even though it was actually filed in 2013.

Defendants indicated an intent to move for summary judgment on the ground of qualified immunity on December 15, 2014. (Docket # 83.) In accordance with this court's rules, Plaintiff was deposed and the motion was briefed thereafter.

## DISCUSSION

### I. Legal Standard
A motion for summary judgment should be granted when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Cortes v. MTA New York City Transit,* 2015 WL 5166342, at *4 (2d Cir. Sept 4, 2015) (quotation marks and citation omitted). That is no less true of a motion for summary judgment on the ground of qualified immunity than on any other motion. However, there are special considerations when the motion for summary judgment is made on that ground.

Qualified immunity exists to protect government employees from civil liability where performance of their discretionary functions "does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The immunity defense is available so long as reasonably competent officials could disagree about whether the conduct at issue would violate clearly established rights. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Carrier v. Lussier,* 955 F.2d 841, 846 (2d Cir.1992). Thus, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting *Malley,* 475 U.S. at 341).

In *Saucier,* the Supreme Court said that a court confronted with a qualified immunity defense should ask two questions. First, the court should determine whether the plaintiff alleged facts sufficient to demonstrate a violation of a constitutional right. If the answer is yes, the plaintiff has alleged such facts, the court should then decide whether the right was clearly established at the time of the alleged misconduct. *See Saucier,* 533 U.S. at 201, 121 S.Ct. at 2156. Although the *Saucier* court directed that the questions be addressed in that order, the Supreme Court later recognized that district courts should have discretion to decide in what order to address the two questions, because "There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Pearson,* 555 U.S. at 236–37. Thus, this court need not reach the issue of whether the facts before it make out a constitutional question if it finds that defendants could not possibly have violated any clearly established statutory or constitutional right.

**\*10** "Because qualified immunity is an immunity from suit rather than a mere defense to liability," it should be decided at the earliest appropriate stage of litigation, which is usually on a motion for summary judgment. *See Drimal v. Tai,* 786 F.3d 219, 225 (2d Cir.2015) (quoting *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). When deciding a motion for summary judgment on the ground of qualified immunity (like this one), the court asks the two *Saucier* questions while assuming the truth of plaintiff's allegations and without regard to any objection defendants may have to the truth of plaintiff's version of events. *Tellier v. Fields,* 280 F.3d 69, 74 (2d Cir.2000); *Plunkett v. City of New York,* 2011 WL 4000985, at *6 (S.D.N.Y. Sept.2, 2011).

This court finds it frequently the case that the Attorney General will file a notice of motion for summary judgment on the ground of qualified immunity, but then make arguments that have nothing to do with qualified immunity-for example, he will argue that the plaintiff's pleading fails the plausibility test of *Twombly*/*Iqbal,* or that the plaintiff fails to plead facts that, if true, make out a constitutional violation. *E.g., Espinoza v. City of New York,* 2012 WL 4761565, at *1 (S.D.N.Y. Aug.3, 2012). But as the Second Circuit reminded us in *Stephenson v. Doe,* 332 F.3d 68, 78 (2d Cir.2003), the merits of a claim are distinct from the issue of qualified immunity. There are times when a public official is entitled to dismissal or

summary judgment, "not because of qualified immunity, but because he did nothing wrong." *Dolson v. Vill. of Washingtonville,* 382 F.Supp.2d 598, 602 (S.D.N.Y.2005). There are also technical defenses to claims, such as the statute of limitations. When the Attorney General is making such arguments, it is wrong to invoke qualified immunity; rather, the case should be defended on the ground that the Defendants are simply not liable. If that requires further evidence, he should make a motion for summary judgment on the merits at the appropriate time, which is after the plaintiff has had an opportunity to take discovery.

This case is no exception to the usual rule that Section 1983 defendants tend to conflate qualified immunity with other grounds for pre-discovery dismissal. Ironically, the only time Defendants touch on a real qualified immunity argument, they do so in their reply papers, in contravention of the rule that arguments cannot be raised for the first time in reply. *Knipe v. Skinner,* 999 F.2d 708, 710 (2d Cir.1993).

I would ordinarily deny such a motion in its entirety because Defendants did not move on proper grounds; but here Defendants are obviously entitled to partial dismissal-although not because of qualified immunity-because several of Plaintiff's claims manifestly do not rise to the level of a constitutional violation or are simply not actionable under § 1983. I deny the rest of the motion, but denial is without prejudice to the assertion of those arguments on a proper motion addressed to the merits. No such motion will be entertained until discovery has concluded.

**\*11** There is one more preliminary issue to address. Under this court's individual rules, such a motion for summary judgment is decided on the basis of the allegations of plaintiff's complaint, as fleshed out in plaintiff's deposition (which is taken for the purpose of getting his full story). Consideration of the deposition allows plaintiff (who may be an unsophisticated litigant) to fill in the gaps in his pleading. The court does not take testimony from defendants or consider their version of events (which frequently does not correspond to plaintiff's version of events).

Notwithstanding the fact that the deposition is an aid to him, Plaintiff argues that Defendants should not be allowed to rely on his deposition in making this motion,

because he did not receive formal notice of the deposition 30 days in advance. His objection is without merit; Plaintiff had ample notice that he was going to be deposed.

Defendants filed their bare notice of motion invoking qualified immunity on December 15, 2014. Under this court's rules, they had thirty days to depose Plaintiff.

On December 24, 2014, Defendants submitted a letter requesting an extension of time to take Plaintiff's deposition, which I granted. Defendants stated that they were preparing to take the deposition via videoconference at Five Points Correctional Facility, where Plaintiff was incarcerated. Plaintiff was copied on that letter.

On January 28, 2015, Defendants advised the court by letter that when they attempted to depose Plaintiff by videoconference, he objected to going forward, because he did not have his hearing aid and so could not hear the questions well. Defendants adjourned the deposition so that it could be taken in person, where Plaintiff would not have difficulty hearing. I granted them until February 19, 2015 to depose Plaintiff. Plaintiff was also copied on this letter.

Defendants deposed Plaintiff in person on February 12, 2015. Plaintiff again objected to going forward, this time on the ground that he did not prepare adequately because he had not yet received a notice of the deposition. Apparently, the formal notice Defendants sent to Plaintiff reached a correctional facility at which Plaintiff no longer resided, which meant that he did not receive a copy until the day of the deposition. Nonetheless, Plaintiff was questioned and did respond to questions-although he now argues that he would have responded more fulsomely had he realized that he was going to be deposed and prepared accordingly.

Plaintiff's argument is specious. Whether or not he received a piece of paper legended "notice of deposition," he was obviously on notice, because he showed up for his video deposition in January 2015 and was present when Defendants adjourned the deposition due to Plaintiff's claimed inability to hear the questions that were being put to him. Additionally, Plaintiff was sent and does not deny receiving copies of Defendants' various letters to this court seeking adjournments and extensions of time to complete the deposition, as well as the court's memo endorsements setting the deadline for him to be deposed.

**\*12**  In short, Plaintiff could not possibly have been surprised by being questioned under oath about the allegations in his pleading. If Plaintiff did not choose to prepare for a deposition that he knew was going to take place, that is his problem; and if he elected not to respond fully to the questions that were put to him, he is bound by the record he has made. His deposition testimony is part of the record on this motion and will be considered.

## II. Defendants' Motion for Summary Judgment is Granted in Part and Denied in Part

Defendants have not moved for summary judgment on all of Plaintiff s claims. They move for summary judgment-listing qualified immunity as the sole basis for dismissal-on the following claims only:

1. All First Amendment access to court claims;

2. The Eighth Amendment deliberate indifference claim predicated on Plaintiff's removal from the special diet plan;

3. The Fourteenth Amendment due process claim for false testimony offered during Plaintiff's disciplinary proceeding arising from the May 2011 assault;

4. First Amendment retaliation claims for verbal harassment; and

5. Miscellaneous claims relating to negligent hiring, retaining, training, and supervising and intentional infliction of emotional distress.

Defendants have not moved for summary judgment on Plaintiff's Eight Amendment claims for excessive force, failure to intervene, or failure to protect, or his First Amendment retaliation claims based on harassing conduct or related to the May 2011 assault. Those claims are not discussed below.

### A. Defendants are not entitled to dismissal of Plaintiff's First Amendment access to courts claims

"It is well established that all persons enjoy a constitutional right of access to the courts," which "extends beyond mere physical access to a courtroom and a judge." *Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997). For prisoners challenging their sentences or conditions of confinement, "the right of access may

include affording prisoners who are preparing legal papers adequate law libraries or adequate assistance from persons trained in the law." *Id.* (quoting *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

"In order to establish a constitutional violation based on a denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in an actual injury to the plaintiff." *Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008). "To show actual injury, the plaintiff must demonstrate that the defendant's conduct frustrated the plaintiff's efforts to pursue a nonfrivolous claim." *Id.*

Plaintiff alleges two separate violations of his First Amendment right to access the courts. First, he claims that Sergeant Conforti and Superintendent Lee were aware he lacked adequate supplies to work on his ongoing legal cases and did nothing to resolve the situation. Second, he claims that Officer Mryzglod caused the loss of his legal documents while Plaintiff was in transit to Downstate Correctional Facility.

**\*13**  Defendants also characterize another incident as an access to court claim-when Sergeant Conforti took a copy of Plaintiff's complaint against Surber and gave it to Surber instead of Hub Superintendent Ada Perez. Plaintiff, however, does not describe this as an access to court claim. Rather, Plaintiff says that Conforti took the complaint and showed it to Surber so that Surber could retaliate against Plaintiff for naming her in the complaint. In other words, this allegation is simply is part of the evidentiary chain on his retaliation claim against Surber. As Plaintiff is master of his complaint, I accept his characterization of the pleading and will ignore Defendants'.

#### 1. Adequate Legal Supplies

Plaintiff claims that he notified Defendants Conforti and Lee that he lacked the legal supplies needed to work on his cases while he was in the SHU-between September 2009 and April 2010. (Quezada Dep. at 27, 29.) Plaintiff also wrote to Defendant Lee about needing pens, paper, and envelopes to do his legal work, but Plaintiff does not date these complaints. (*See* Quezada Dep. 27–28.)

Plaintiff also claims that Defendant Lee directed the law library supervisor to refuse to allow Plaintiff to make copies (presumably of legal papers for his cases) unless

2015 WL 5970355

Plaintiff provided a court order specifying the number of copies he was supposed to provide the court and opposing counsel. (Am. Compl., at ¶ 24.) But he does not further describe this incident or when it occurred.

Defendants have not established that Lee and Conforti are entitled to qualified immunity on this claim. First, they did not even argue qualified immunity in their moving brief; rather, they argued that this claim should be dismissed because there is no evidence that the lack of proper supplies resulted in any specific adverse action being taken against him in his cases. That argument has nothing whatever to do with qualified immunity. What Defendants actually suggest is that Plaintiff has not offered evidence to prove all the necessary elements of the constitutional tort of denial of access. Put otherwise, they argue that they are entitled to dismissal because Plaintiff cannot prove that they did anything wrong. Their motion is denied to the extent it is so predicated.

In their Reply Brief, Defendants finally make an argument that appears to be addressed to qualified immunity. They argue that, even if Plaintiff were prejudiced in one or more of his cases, the viability of such "backward-looking" access to court claims-claims that point backward to a past deprivation of access to courts-is not clearly viable in this circuit. They cite to *Jean–Laurent v. Lawrence,* 2015 WL 1208318, at *3 (S.D.N.Y. Mar.17, 2015), in which my colleague, Judge Oetken, held that, "The Second Circuit has emphasized, however, that the viability of backwardlooking claims is far from clear, pointing out that the Supreme Court's *Harbury* decision was careful not to endorse their validity."

**\*14** This argument could simply be ignored, since arguments first raised in reply are not ripe for consideration. *Knipe v. Skinner,* 999 F.2d 708, 710 (2d Cir.1993). However, Defendants misconstrue the qualified immunity inquiry, which questions whether the *right* allegedly violated was clearly established at the time of the officer's conduct. It is undisputed that Plaintiff had a right of access to the courts at the time he claims he was denied the supplies he needed to take advantage of that right-the right of access was clearly established. As the Second Circuit said in *Russo v. City of Bridgeport,* 479 F.3d 196 (2d Cir.2007): "Today we have clarified that Russo's claim should be treated under the Fourth Amendment, rather than under substantive due process. But this clarification is of no consequence to the question of whether the

right was clearly established, because the proper inquiry is whether the *right* itself-rather than its *source*-is clearly established." *Id.* at 212 (emphasis in original) (quotation marks and citation omitted). In other words, the question for qualified immunity purposes is whether the right was clearly established at the time of the official's actions, not whether the claim would be viable if brought later in time. In the same way that a time-barred claim does not entitle a defendant to qualified immunity, a backward-looking claim-if one is truly not viable in this circuit-does not entitle a defendant to qualified immunity. Defendants may be able to obtain dismissal of a backwardlooking access to court claim, but they are not entitled to qualified immunity for it.

Finally, I turn to the possibility that the claim must be dismissed as against Conforti and Lee because it is barred by the applicable statute of limitations.

The statute of limitations for § 1983 cases filed in New York is three years. *Dory v. Ryan,* 999 F.2d 679, 681 (2d Cir.1993). Plaintiff's original complaint arrived at the *pro se* office of this court on May 7, 2013. "It is well-settled, however, that the date of filing a federal complaint by a *pro se* prisoner is, for statute of limitations purposes, the date of delivery to prison authorities." *Walker v. Jastremski,* 430 F.3d 560, 562 n. 1 (2d Cir.2005). Although nothing in the record indicates the date on which Plaintiff delivered his complaint to prison authorities, the handwritten date on Plaintiff's complaint is April 25, 2013. It is thus reasonable to conclude that Plaintiff submitted his complaint to prison authorities sometime between April 25 and May 7, 2013. To give Plaintiff the benefit of the doubt, the court will consider timely any allegations concerning events that occurred on or after April 25, 2010.

Even with that concession, it appears that Plaintiff's denial of access claim relating to the period when he was in the SHU must be dismissed as time barred. Plaintiff was released from the SHU on April 1, 2010—more than three years prior to the filing of his complaint, even assuming that the correct filing date for our purposes is April 25, 2013. But the period when he alleges he was denied access to legal supplies is the period when he was in the SHU. As that period ended on April 1, 2010, he sued three and a half weeks too late.

**\*15** Had Defendants moved to dismiss this claim on statute of limitations grounds, Plaintiff would have been

on notice that he had to respond to such a motion-which is not a motion for summary judgment on the ground of qualified immunity (one is not qualifiedly immune from suit because the statute of limitations has run; one is absolutely immune from suit!). Had Plaintiff been on notice, he might have been able to argue that the limitations period should be tolled for some reason or other. Because Plaintiff had no opportunity to make that argument, I decline to enter an order dismissing this claim as time-barred. This issue will undoubtedly be raised on a postdiscovery motion for summary judgment; Plaintiff is now on notice that will have to convince me that there is a reason to toll the statute of limitations. Otherwise, his denial of access claim arising from the lack of supplies while he was in the SHU will have to be dismissed.

### 2. Lost Legal Documents

Plaintiff claims that, when he arrived at Downstate Correctional Facility in March 2011 for a court appearance, he discovered that one of the bags he packed with legal documents was slashed open and the documents were missing. (Quezada Dep. at 31; Am. Compl., at ¶ 94.) Plaintiff blames Defendant Michael Mryzglod for slashing open the bag. (*Id.*)

Once again, Defendants move on grounds that have nothing to do with qualified immunity. On a pre-discovery motion for qualified immunity the court assumes that Mryzglod deliberately slashed Plaintiff's bag open, and asks whether (1) slashing open the bag rises to the level of a constitutional tort; and (2) if it does, was that right clearly established by Supreme Court precedent at the time of the slashing. Defendants never mention those issues. Instead, movants argue that, at his deposition, Plaintiff could provide no hard proof that Mryzglod (or any of the named defendants) was the person who actually slashed his bag. All Plaintiff testified was that he had a basis for believing that Mryzglod slashed his bag:

> Q: So, did you see the bags at any time between when Officer Mryzglod packed them and when you arrived at Downstate?
>
> A: When he finished and he sealed it and I signed my receipt, he took the bag to where he works at, to where he works at [*sic*], that nobody could go there either, no prisoner could go there. He is responsible for that. And he is the one also that would put it inside

the bus. And it is his name that's on the receipt on the bag, that he is the one that package it, prepared it.

(Quezada Dep. at 33.) That testimony, which I assume to be true for purposes of this motion, admits of an inference that Mryzglod was in a position, by virtue of his job responsibilities, to slash the bag. Slashing the bag could have only one intended consequence: allowing the contents (Plaintiff's legal papers) to fall out.

Of course Plaintiff's conjecture does not definitively prove that Mryzglod slashed the bag-for one thing, Plaintiff admitted that Mryzglod did not travel on the bus with the bag. (*Id.* at 32, 34 .). But while the case is circumstantial and the proof weak, the inference is there. The State does not suggest that an inmate's right to have his legal papers interfered with was unsettled, and the Attorney General does not argue that a corrections officer is privileged to slit a bag containing an inmate's legal papers without having a good faith belief that contraband or evidence of a crime might be found inside. It is of course possible that whoever slit the bag can defend his conduct by asserting that there was some reason to believe it contained contraband. But that defense goes to the merits, not qualified immunity; and it can be raised only when the Defendants are allowed to put in their evidence.

**\*16** Defendants again argue that Plaintiff has failed to identify any "actual loss" that he suffered as a result of the loss of the papers that were in the bag, which is a necessary element of a claim for denial of access to the courts. But that argument, like the argument that Plaintiff's evidence about Mryzglod's participation is less than persuasive, is addressed to the sufficiency of Plaintiff's case-not to qualified immunity. Plaintiff was unable to identify what documents he lost as result of the slashed bag; he testified at his deposition, however, that their loss prejudiced his ability to pursue his claims in the Second Action. (*See* Quezada Dep. at 32–33.) To refute that claim, Defendants cite the docket sheet for that case, which reveals that my colleague Judge Cote refused Quezada's request for an extension of time (his fifth) to file an opposition to the defendants' summary judgment motion after Mryzglod allegedly destroyed his papers, but still "construed each of Quezada's statements in the complaint in this action and in his grievances as if they had been reasserted by Quezada in an affidavit in opposition to the summary judgment motion." *Quezada v. Ercole, et al.,* No. 09 Civ. 2832(DLC) (S.D.N.Y), Docket # 83 at 8–9. Furthermore, several of the claims survived summary judgment, and the

2015 WL 5970355

case ultimately settled. *See id.,* Stipulation of Settlement (Docket # 113). But that is an evidentiary argument addressing the merits-it does not assume the truth of Plaintiff's claim, as required on a pre-discovery motion for summary judgment on the ground of qualified immunity.

Plaintiff also argues that he lost his CPL 440.10 motion because he was not able to submit documents that Mryzlod caused him to lose. Opp. Br. at 22. Defendants respond that Plaintiff would have lost the motion anyway because, in denying the motion, the state Supreme Court held, "In previous motions, Defendant has raised or had the opportunity to raise every issue contained in the instant motion. Therefore, CPL § 440.10(2) requires the Court to deny their [*sic* ] motion." Supreme Court Decision, Plaintiff's Appendix, Ex. 88 at pg. 8. But the court also said that it "has no method to determine the veracity of [several miscellaneous] claims because Defendant has not supplemented his motion with any exhibits or affirmations made under oath supporting these assertions." *Id.*

Again, the purported lack of injury to which Defendants point-using evidence, which is absolutely prohibited under my rules on a pre-discovery qualified immunity motion (because I am not interested in Defendants' side of the story)-does not render Mryzglod immune from suit; it means he is not liable on the merits, because Plaintiff has failed to prove an element of his claim. If it be true that Plaintiff suffered no prejudice in the pursuit of any of his claims in the Second Action, then the denial of access claim against Mryzglod must be dismissed, not on qualified immunity grounds, but because Plaintiff has not established all the elements of a constitutional tort. Defendants are free to raise their merits-based arguments on a proper motion for summary judgment-one that gives Plaintiff notice of what their arguments are and that alerts him to the need to respond with evidence raising a genuine issue of material fact.

**\*17**  As Defendants have not suggested any reason why Mryzglod is entitled to qualified immunity (as opposed to why he might not be liable on the merits), the pending motion is denied. Again, denial is without prejudice to the assertion of this argument on a motion for summary judgment on the merits.

## B. Defendants are not entitled to dismissal of Plaintiff's Eighth Amendment deliberate indifference claim for removing Plaintiff from the special diet plan

Defendants move for summary judgment on Plaintiff's Eighth Amendment claim for deliberate indifference to his medical needs when Henschel and Badger removed him from the special diet plan; they have not moved on Plaintiff's other deliberate indifference claims. Although Defendants characterized some incidents of harassing conduct as Eighth Amendment claims, those incidents should be considered instances of purported First Amendment retaliation (see below, page 37), because that is how Plaintiff characterizes them in his complaint and opposition papers. Defendants have not moved for summary judgment dismissing those retaliation claims, and I do not address them here because they are not Eighth Amendment claims.

Plaintiff claims that Defendants Henschel and Badger blocked his access to the therapeutic diet meal on several occasions. He also alleges that he was removed from the therapeutic diet program when Badger confiscated his diet card on December 8, 2010. (Quezada Dep. at 18; Am. Compl., at ¶¶ 67–68.) He testified that he was not on the special diet plan for some indeterminate time thereafter, (Quezada Dep. at 18), but he concedes that, by October 31, 2011, he was again receiving therapeutic diet meals, (Opposition Br. at 15).

Plaintiff testified that he was told that he was removed from the diet plan for exchanging his food for donuts from another inmate, which he claims were not on the menu that day. (*See* Quezada Dep. at 18.)

The Eighth Amendment requires prison officials to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citation and quotation marks omitted). Prison officials are required to provide inmates with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 14 (2d Cir.1983).

2015 WL 5970355

To find an Eight Amendment violation, two requirements must be met:

> First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities....

> The second requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment. To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind. In prison-conditions cases that state of mind is one of "deliberate indifference" to inmate health or safety,

**\*18**  *Id.* at 834 (citations and quotation marks omitted).

"Prison officials violate the Eighth Amendment if they are deliberately indifferent to an inmate's serious medical needs by denying or delaying his access to medical care or by intentionally interfering with his treatment." *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 179 (N.D.N.Y.1996) (citing *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). According to the Second Circuit:

> Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. More specifically, a prison official does not act in a deliberately indifferent manner unless that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quotation marks and citation omitted).

Plaintiff claims that he suffered from serious medical issues necessitating a special therapeutic diet. (Quezada Dep. at 18.) Defendants argue that Plaintiffs testimony about his stomach issues did not indicate the level of serious harm contemplated by the Eighth Amendment, and that the medical records Plaintiff attached to his complaint show only unspecified stomach trouble. (*See*

Ambulatory Health Record Progress Note, Am. Compl., Ex. 16.)

As with Defendants' arguments on the other claims, "that has nothing whatever to do with qualified immunity. Qualified immunity protects a public official *who has committed a constitutional violation* from being held liable for that violation." *Dolson v. Vill. of Washingtonville,* 382 F.Supp.2d 598, 602 (S.D.N.Y.2005) (emphasis in original). Because Defendants present no arguments to support granting summary judgment on qualified immunity grounds, that motion is denied. Of course, it may eventually be possible to grant summary judgment on this claim on the ground that taking removing Plaintiff from the diet plan does not rise to the very high level of an Eight Amendment violation-possible, that is, once the record contains a clearer picture of Plaintiff's medical status and the reason (if there was one) why he was receiving a special diet in the first place. At present, all I know is that Plaintiff is (or claims to be) on a special restricted diet at his new prison facility-which raises the possibility that he might have required the same treatment at Green Haven.

To the extent that Plaintiff also describes his removal from the special diet plan as a form of retaliation, Defendants confirm that they "did not move for qualified immunity on the alleged retaliation claims, only on the deliberate indifference claim." *See* Reply Br. at 4.

## C. No Fourteenth Amendment denial of due process claims are pending before this court

Although Plaintiff's complaint pleads alleged due process violations, he concedes in his opposition papers that all but one of these claims are more properly characterized as retaliation claims, deliberate indifference claims, or failure to protect claims. (*See* Opposition Br. at 36.) The events giving rise to these claims have either already been discussed in this opinion or constitute claims on which the moving defendants have not sought summary judgment at this time.

**\*19**  The one claim that Plaintiff continues to press as a due process violation is the claim that Officers Macisaac and Cefaloni lied at a disciplinary hearing in which Plaintiff was sentenced to five years in the SHU. This disciplinary hearing took place at Shawangunk Correctional Facility. As far as this court knows, any claim arising out of that incident has been severed from

this action and is being handled in the Northern District of New York. *See* Docket # 38. If that is not true, someone needs to advise me immediately.

### D. Defendants are entitled to dismissal of some of Plaintiffs First Amendment retaliation claims predicated on verbal harassment-not because of qualified immunity, but because the verbal harassment is on its face *de minimis*

Plaintiff alleges that all of the remaining defendants retaliated against him in some way for having exercised his First Amendment rights by commencing the Second Action and filing grievances. His claims of First Amendment retaliation can be placed into three groups: verbal threats and warnings; harassing conduct; and actions relating to the 2011 assault, which Plaintiff claims was motivated by a desire to retaliate.

"To prevail on a First Amendment retaliation claim brought under *42 U.S.C. § 1983*, a prisoner must demonstrate (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Ford v. Palmer, 539 F. App'x 5, 6 (2d Cir.2013)* (quoting *Espinal v. Goord, 558 F.3d 119, 128 (2d Cir.2009)*).

Filing lawsuits and prison grievances is protected conduct. *See Graham v. Henderson, 89 F.3d 75, 80 (2d Cir.1996); Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir.2002).*

To constitute adverse action, the prison official's conduct must be such that it "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Dawes v. Walker, 239 F.3d 489, 493 (2d Cir.2001) overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)*. "In making this determination, the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Davis v. Goord, 320 F.3d 346, 353 (2d Cir.2003)* (quotation marks, citations, and alterations omitted).

The inquiry is an objective one, which "applies even where a particular plaintiff was not himself subjectively

deterred; that is, where he continued to file grievances and lawsuits." *Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir.2004)*. Because it is an objective inquiry, sufficiently serious verbal threats can constitute "adverse action." *Ford,* 539 F. App'x at 7. In addition, "An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a prison grievance, states a claim under *§ 1983*." *Gayle,* 313 F.3d at 682.

**\*20** "Several factors come into play in determining whether a causal connection exists: (1) the temporal proximity between the plaintiff's protected activity and the defendant's adverse action, (2) the prior disciplinary record of the inmate, (3) the outcomes of any hearings regarding the allegedly retaliatory charges, and (4) any statements defendant makes concerning his motive." *Davidson v. Bartholome, 460 F.Supp.2d 436, 444 (S.D.N.Y.2006)*. "Temporal proximity between an inmate's lawsuit and disciplinary action may serve as circumstantial evidence of retaliation." *Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1995)*.

Even if the plaintiff makes an initial showing of retaliation, that does not end the inquiry. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)*. "Regardless of the presence of retaliatory motive ... a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred. Plaintiff has the initial burden of showing that an improper motive played a substantial part in defendant's action. The burden then shifts to defendant to show it would have taken exactly the same action absent the improper motive." *Scott v. Coughlin, 344 F.3d 282, 287–88 (2d Cir.2003)*.

The Second Circuit has cautioned that, "Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996)* (quotation marks omitted). "Recognizing the possibilities for abuse with respect to retaliation claims, the Circuit has insisted on a higher level of detail in pleading them." *Shariff v. Poole, 689 F.Supp.2d 470, 478 (W.D.N.Y.2010)* (quoting *Gill v. Mooney, 824 F.2d 192, 194 (2d Cir.1987)*. And of course in this case we have, not just the pleading, but the testimony of Plaintiff as well.

**1. Verbal Threats and Warnings**
Plaintiff claims that Defendants Macisaac, Cefaloni, Henschel, and Surber called him names, threatened him, and verbally harassed him in retaliation for engaging in protected conduct.

These defendants seek summary judgment on the five claims of retaliatory verbal harassment listed below:

• In retaliation for filing a lawsuit against them, Defendants Macisaac and Cefaloni made a false call out to the law library to remove Plaintiff and then called him a "faggot." (*See* Am. Compl. ¶ 35; Quezada dep. at 55.)

• On October 27, December 7, and December 8, 2010, defendant Henschel verbally harassed Plaintiff for prior grievances against Henschel and other defendants. (*See* Harassment & Retaliation Complaint, Am. Compl., Ex. 14; Complaint against Lori Badger, Am. Compl., Ex. 16; Am. Compl., ¶¶ 63–64.)

• On January 25, February 3 and February 9, 2011, Henschel allegedly harassed and threatened Plaintiff in retaliation for his prior grievances against Henschel, and threatened to withhold Plaintiff's ID card. (*See* 2/20/11 Complaint, Am. Compl., Ex. 22; Quezada dep. at 26.)

**\*21**  • On an unidentified day in March 2011, Surber verbally harassed Plaintiff for filing complaints and grievances against officers under her command. (*See* Quezada dep. 35–37.)

• On April 28, 2011, Surber verbally harassed Plaintiff for filing his complaint refarding the missing legal documents.(*Id.*)

(See Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 18 (Docket # 108).)

When asserting a retaliation claim, "An inmate has no right to redress simply because an officer made a hostile or derogatory comment about him." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 373 (S.D.N.Y.2011) (quotation marks, alteration, and citation omitted). "Allegations of threats or verbal harassment, without any injury or

damage, do not state a claim under 42 U.S.C. § 1983." *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996).

For example, I previously dismissed a prisoner's claims *sua sponte* on similar facts in *Davidson v. Bartholome,* 460 F.Supp.2d 436 (S.D.N.Y.2006). The plaintiff in that case:

> testified that after explaining to Sergeant Augustine why plaintiff needed his medication, the sergeant became hostile and began cursing at him. Sergeant Augustine purportedly referred to an earlier lawsuit that plaintiff brought against a Downstate employee and told plaintiff that he was going to issue him a "false" misbehavior ticket. However, plaintiff states that Sergeant Augustine never followed through with any false report.

*Id.* at 446. The plaintiff there argued that the sergeant's verbal harassment was enough to show retaliation, but the court held otherwise. "Plaintiff has no right to redress simply because the sergeant made a hostile or derogatory comment about him." *Id.* The plaintiff received a medication he sought, even after the sergeant's comments, so the verbal harassment could not have constituted adverse action.

Other courts in this circuit have reached similar conclusions about verbal harassment. *See, e.g., Bartley v. Collins,* 95–10161, 2006 WL 1289256, at 6 (S.D.N.Y. May 10, 2006); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005). The line between *de minimis* verbal harassment and retaliatory adverse action seems to hinge on the specificity and seriousness of the words used; "The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights." *Mateo v. Fischer,* 682 F.Supp.2d 423, 434 (S.D.N.Y.2010).

Defendants argue that none of the verbal harassment in the five incidents described above rises to the level of adverse action applying the relevant standard.

That is, of course, a merits defense-or, more properly, a *Twombly/Iqbal* defense. It has absolutely nothing to do with qualified immunity.

2015 WL 5970355

Defendants contend that pretending Plaintiff had a call out from the law library and then calling him a "faggot" is not adverse action. "Non-specific verbal threats, harassing comments and hostile behavior do not constitute adverse actions sufficient to state a retaliation claim." *Ross v. Westchester Cnty. Jail,* 2012 WL 86467, at \*7 (S.D.N.Y. Jan.11, 2012). Confronted with the very same derogatory comment made here, the court in *Edwards v. Horn,* 2012 WL 760172, at \*15 (S.D.N.Y. Mar.8, 2012), found it was insufficient to rise to the level of adverse action. The same court also described the prisoner "being told he had a visitor when he in fact did not" as *de miminis* and not actionable. *See id.* Defendants argue that these are not the sort of actions that deter a person of ordinary firmness.

 **\*22** Defendants also argue that Henschel's verbal harassment in October and December 2010 is insufficient to state a claim.[2] Plaintiff claims that Henschel made several threatening comments during this time period:

• "Get the fuck away from my face. We all know who you are. You don't understand that we know who you are. So either get out of my face, or I'm going to have to break your fucking face before my retirement, you fucking asshole." (Am.Compl., ¶ 60.)

"I am going to fuck you up very bad. You're making me lose my patience. Are you not going to move or am I going to break your fucking face?" (*Id.* at ¶ 61.)

"You get on my nerves and I will do something to put you out of circulation." (*Id.* at ¶ 62.)

"You're going to close your fucking mouth or I'm going to take you outside to the messhall. Then you'll know what's going to happen to you. If you don't want me to do something to you, stay the fuck away from me." (*Id.* at ¶ 63.)

Defendants argue that these are the sort of vague threats that would not deter someone of ordinary fitness from exercising his constitutional rights, noting, "Verbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional violations." *DeJesus v. Tierney,* 2006 WL 839541, at \*11 (N.D.N.Y. Mar.28, 2006.).

Defendants further argue that Henschel's harassment and threats in January and February 2011 are not adverse

actions. Plaintiff claims that Henschel defaced his ID card on several occasions in early 2011. He also says that one time Henschel refused to give Plaintiff his ID card back, and told Plaintiff, "I have the ID card and if you continue snitching, telling people and the Sergeant that I destroyed it, you'll never fucking receive the ID card and you're going to be in your cell for days or weeks." (Am. Compl., at ¶ 89 .) Plaintiff admits that he later received a new ID card that same day. (*Id.*)

Just as the threat to file a misbehavior report without following through is not adverse action, *see Davidson v. Bartholome,* 460 F.Supp.2d 436 (S.D.N.Y.2006), neither is a threat that Plaintiff would lose his ID card for days or weeks when that does not come to fruition.

Finally, Defendants contend that Surber's verbal harassment in March and April 2011 is not adverse action. Plaintiff claims that in March 2011, Surber approached him "in a hostile manner" and said:

> This is the person I want to see. Let me tell you something. Keep me out of your shit. You file too many complaints against my officers and then fucking lawsuits, you fucking bitch. That's for women. You're a fucking bitch. I don't need these fucking officers to kick your ass. I can do it myself. Keep me out of your fucking shit. I don't want to see no more fucking against my officers, you fucking bitch.

(Am. Compl., at ¶ 90.) The next month, Surber again yelled at Plaintiff and berated him for filing complaints against her and the officers she supervised. (*Id.* at ¶ 103.)

 **\*23** Besides the vague reference to kicking Plaintiff's ass, there is no threat in these statements. And it is well established that general threats and foul language do not constitute adverse actions. *See Barrington v. N.Y.,* 806 F.Supp.2d 730, 746 (S.D.N.Y.2011).

All of these contentions must be dismissed-not because the officers who made the offensive statements and uttered the threats are qualifiedly immune from suit, but because their disgusting, offensive and highly unprofessional conduct does not rise to the level of a constitutional tort (which is to say, it is not sufficiently serious to deter a person

2015 WL 5970355

of ordinary firmness from continuing to exercise his First Amendment rights). Therefore, the motion is granted to the extent it seeks dismissal of all the retaliation claims for verbal harassment against Macisaac, Cefaloni, Henshcel, and Surber that do not involve threats of serious violence.

I decline, however, to dismiss the claim against Henschel for allegedly threatening to kill Plaintiff in December 2010. A threat to kill someone for filing a grievance is sufficiently serious that it might well deter a person of ordinary firmness from exercising his First Amendment rights—particularly in view of the numerous reports of corrections officer misconduct that have been made public recently. While I recognize that one of my colleagues in another district recently dismissed a case where a corrections officer allegedly threatened to kill a prisoner, on the ground that the threat was too general, *Barnes v. Cnty. of Monroe,* 2015 WL 602860, at *35 (W.D.N.Y.2015), I do not believe it appropriate to follow that non-binding precedent here-especially in view of what happened to Plaintiff only a few months thereafter. Besides, the Second Circuit has held that threats to seriously harm prisoners can be sufficiently serious in the context of repeated instances of harassment or retaliation. *See Ford v. Palmer,* 539 F. App'x 5, 7 (2d Cir.2013).

### 2. Harassing Conduct
Plaintiff claims that Defendants engaged in a campaign of harassment in retaliation for having filed the Second Action and his continual filing of prison grievances. The episodes of harassing conduct he recounts can be grouped as follows: (a) denial of legal supplies/destruction of legal papers, (b) removal from the special diet plan, (c) defacement and confiscation of Plaintiff's ID card, (d) turning off the lights and water in Plaintiff's cell, and (e) failure to provide Plaintiff a razor.

Defendants have not moved for summary judgment on the retaliation claims predicated on these incidents of harassing conduct. Though Defendants discussed some of these as "Eighth Amendment harassment" claims-whatever that may be-they have not moved for summary judgment on these *as retaliation claims.*

### 3. The May 2011 Assault
Defendants do not move for summary judgment on claims against Defendants Macisaac, Filipponi, Corbin, Tokarz, Brothers, Alexander, Melville, and Rojas arising

from their direct involvement in the May 2011 incident. Defendants fail to acknowledge that Plaintiff also asserts that Surber and the Mryzglods were involved in directing, planning, or covering up the May 2011 assault, and so Defendants have not moved for summary judgment on the claims against these defendants arising from the assault either.

### E. Defendants are entitled to dismissal of Plaintiff's miscellaneous claims
**\*24**  Plaintiff asserts claims for (1) negligent hiring, training, retaining, and supervising, and (2) intentional infliction of emotional distress. These will be discussed below.

In addition to these claims, Defendants also characterize several other claims as "miscellaneous"-such as their biased investigation of Plaintiff's complaints and failure to transfer Plaintiff. The gravamen of Plaintiff's concern about those other incidents is that Defendants made no effort to protect him, despite notice of the harm he faced; he contends that Defendants demonstrated their indifference to his safety by not transferring him out of Green Haven or placing him in protective custody.

I understand these claims to be Eighth Amendment deliberate indifference claims, not "free-floating" miscellaneous claims. Because Defendants mischaracterized these claims as "miscellaneous," it did not discuss them using the rubric of deliberate indifference claims. I do not understand Plaintiff to contend that he had a right to a transfer for personal convenience or for any other reason except his safety; it seems to me that Defendants misunderstand what Plaintiff is charging them with, which is being indifferent to his safety and well-being. That being so, the arguments they make do not clash with the claim as pleaded, and the motion for summary judgment on those claims is denied. Denial is without prejudice to a motion addressing the claims that Plaintiff pleaded.

### 1. Negligent Hiring, Training, Retaining, and Supervising
Defendants argue that they are entitled to summary judgment on Plaintiff's negligence claims because negligence claims are not cognizable under § 1983. That is correct. *See Cruz v. New York,* 24 F.Supp.3d 299, 311 (W.D.N.Y.2014). I therefore cannot understand why

Defendants did not move to dismiss this claim for failure to state a claim-which is what they argue. Instead, they say once again that they are entitled to qualified immunity from suit on such a claim. They are not. A prison official is obviously not entitled to qualified immunity from a claim that does not exist!

However, it makes no sense to proceed on a claim that is dismissible on its face.

Even if I read the complaint to assert these claims under state law rather than § 1983, I would still be constrained to dismiss them. New York Correction Law § 24 shields Defendants from liability. Correction Law § 24 provides in relevant part:

> No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, ... in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

N.Y. Correct. Law § 24. Although § 24 only refers to actions in state court, the Second Circuit has held that it applies to state claims brought in federal court. *Baker v. Coughlin,* 77 F.3d 12, 13–14 (2d Cir.1996).

**\*25** Defendants are thus entitled to dismissal of Plaintiff's negligence claims-though once again dismissal is not on the grounds of qualified immunity.

**2. Intentional Infliction of Emotional Distress**

Plaintiff asserts a claim for intentional infliction of emotional distress under § 1983, based primarily on the May 2011 assault.

The Defendants argue that there are no Second Circuit cases authorizing § 1983 claims for this cause of action, and "federal courts in other districts have dismissed § 1983 claims for intentional infliction of emotional distress because it is not a cognizable constitutional claim." *Anderson v. City of New York,* 2013 WL 6182675, at *3 (S.D.N.Y. Nov.19, 2013).

Once again, Defendants assert that they are qualifiedly immune and then argue a meritsbased defense-again, that the claim is not legally actionable. Once again, they are correct (or would be, if they had not cloaked their motion in the coat of qualified immunity). Because § 1983 is not the proper vehicle to bring an intentional infliction of emotional distress claim, the claim is dismissed.

As before, it would not save Plaintiff's claim if I deemed his complaint to plead a state law claim for intentional infliction of emotional distress. Corrections Law § 24 bars Plaintiff's pursuit of this claim under state law. *Cf. Cruz,* 24 F.Supp.3d at 310.

### CONCLUSION

For the foregoing reasons, the motion for summary judgment is granted in part and denied in part. The Clerk has already been directed to close this motion.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5970355

Footnotes

1    On August 28, 2015, after almost all of the briefing on this motion was completed, Defendant Tracey Alexander, who had not originally moved for summary judgment, joined in the motion. (Docket # 141.) However, there do not appear to be any claims against Defendant Alexander on which Defendants moved for summary judgment. Alexander is alleged to have participated in the May 2011 assault against Plaintiff, but Defendants have not moved for summary judgment on that claim-with good reason, since there is no conceivable way that anyone could be not liable for an assault *under the doctrine of qualified immunity* (as opposed to not liable on the merits, because nothing happened that actually violated Plaintiff's constitutional rights).

2    To be completely frank, the State argues that the officers are "entitled to qualified immunity" because the statements are no more than *de minimis* and do not rise to the level of a constitutional violation. That is not correct. The officers

2015 WL 5970355

are not entitled to qualified immunity from suit if statements are *de minimis.* They are entitled to dismissal on the merits if statements are *de minimis.* One might hope that lawyers in an office that repeatedly litigates the issue of qualified immunity would understand what it is, but this court has long since abandoned hope on that score. It is apparent, from the briefs filed in this case, that the Assistant Attorneys General on this case have no idea of the difference between qualified immunity and dismissal for failure to state a claim, or between qualified immunity and summary judgment on the merits.

---

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    19

2013 WL 5441503
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Benji D. REED, Plaintiff,
v.
John DOE NO. 1; John Doe No.
2; and M. Soto, Defendants.

No. 9:11–CV–0250.
|
Sept. 27, 2013.

**DECISION & ORDER**

**Attorneys and Law Firms**

Benji D. Reed, Pine City, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, James Seaman, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant Soto.

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**
**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred by this Court to the Hon. David E. Peebles, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S .C. § 636(b) and N.D.N.Y. Local Rule 72.3(c).

In his Report and Recommendation [dkt. # 33], Magistrate Judge Peebles:

RECOMMENDED that plaintiff's amended complaint (Dkt. No. 30) be REJECTED as failing to cure the deficiencies detected in the court's earlier order as it relates to all claims asserted against defendant Soto, and that this action be DISMISSED, with prejudice, as it relates to defendant Soto; and it is further

RECOMMENDED that plaintiff's amended complaint be REJECTED as precluded by New York Correction Law § 24 as it relates to all claims asserted against defendant John Doe # 2; and it is further

RECOMMENDED that plaintiff's amended complaint be ACCEPTED as it relates to the claims asserted against defendant John Doe # 1; and it is further

RECOMMENDED that, upon the district judge accepting the recommendations regarding the claims asserted against defendant John Doe # 1, the superintendent of Eastern Correctional Facility be added as a defendant to this action for the sole purpose of permitting service and discovery;

RECOMMENDED that, upon the district judge accepting the recommendation that the superintendent of Eastern Correctional Facility be added as a defendant in this action, the clerk of the court issue a summons and forward it, along with a copy of plaintiff's amended complaint, to the United States Marshal for service upon the superintendent of Eastern Correctional Facility. The clerk shall forward a copy of the summons and complaint by mail to the Office of the New York State Attorney General, together with a copy of this report and recommendation, and any decision and order issued accepting or rejecting it; and it is further

RECOMMENDED that, upon the district judge accepting the recommendation that the superintendent of Eastern Correctional Facility be added as a defendant in this action, a response to the plaintiff's amended complaint be filed by a defendant, or his counsel, as provided for in the Federal Rules of Civil Procedure after service of process on a defendant; and it is further,

RECOMMENDED that, upon the district judge accepting the recommendation that the superintendent of Eastern Correctional Facility be added as a defendant in this action, plaintiff continue to take reasonable steps to ascertain the identity of defendant John Doe # 1, and, if appropriate, file a motion with the court seeking permission to file a second amended complaint so that he may add such individual, by name, as a defendant to this lawsuit; and it is further

RECOMMENDED that, upon the district judge accepting the recommendation that the superintendent of Eastern Correctional Facility be added as a defendant in this action, all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building,

100 S. Clinton St., Syracuse, New York 13261–7367. Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in plaintiff's address; his failure to do so may result in the dismissal of this action. All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

*2 Dkt. # 33 at 18–21.

Plaintiff has filed objections to Magistrate Judge Peebles' report (dkt.# 36).

## II. STANDARD OF REVIEW

When objections to a magistrate judge's report and recommendation are lodged, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C); *see also United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997) (The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings.). "[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument." *Machicote v. Ercole,* 2011 WL 3809920, at * 2 (S.D.N.Y., Aug. 25, 2011) (citations and interior quotation marks omitted); *DiPilato v. 7–Eleven, Inc.,* 662 F.Supp.2d 333, 340 (S.D.N.Y.2009) (same).

General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *Farid v. Bouey,* 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); *see Frankel v. N.Y.C.,* 2009 WL 465645 at *2

(S.D.N.Y. Feb. 25, 2009). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

## III. DISCUSSION

Plaintiff's first objection contends that Judge Peebles' recommendation to dismiss the retaliation claim against Defendant Soto is the result of Plaintiff's Complaint "being inartfully drawn or composed." Dtk. # 36 at 1. Plaintiff correctly articulates the lenient standard that is to be afforded to *pro se* litigants in civil actions. The Supreme Court has stated that "[a] document filed *pro se* is 'to be liberally construed' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)). However, even applying this lenient standard, the Court agrees with Magistrate Judge Peebles that "careful review of plaintiff's proposed amended complaint reveals that it lacks sufficient factual allegations to demonstrate a plausible retaliation claim, including a basis to find a causal connection between a protected activity engaged in by plaintiff, and an adverse action taken by the defendants against him as a result." Dkt. # 33 at 10. This conclusion is reinforced by the fact that the misbehavior report that serves as the basis of Plaintiff's claim against Defendant Soto was dismissed when the hearing officer "learned that [Plaintiff], in fact, had missed the programming for medical reasons." *Id.* at 7. Thus, it is clear that the misbehavior report was filed because of a mistaken belief as to Plaintiff's location, not in retaliation for Plaintiff using medical services at the correctional facility, and that Plaintiff suffered no adverse consequences from the misbehavior report. Because the Court has already given Plaintiff an opportunity to amend his Complaint, dkt. # 28 at 6, it now finds that Plaintiff's failure to make a claim under Section 1983 is not a product of the quality of the pleadings. Rather, the facts of this case are simply insufficient to implicate a retaliation claim. Therefore, the Court finds on *de novo* review that Plaintiff's claim against Soto is properly dismissed.

*3 In all other respects, Plaintiff fails to make specific objections to Magistrate Judge Peebles' report. Instead, he states generally that "the magistrate alleges that my

amended complaint lack [sic] sufficient allegations which could be reasonably concluded that a nexus exist [sic] linking the protected activity and adverse action." Dkt. # 36 at 1. Plaintiff then proceeds by merely rearguing the same claims presented to Magistrate Judge Peebles in an attempt to demonstrate that there is a causal connection between Defendant Soto's actions and Plaintiff's protected behavior. *See generally* dkt. # 36. As a consequence, the Court reviews the Report and Recommendation for clear error and finds none. Moreover, upon *de novo* review, the Court reaches the same conclusion as did Magistrate Judge Peebles. Accordingly, the Court accepts and adopts Magistrate Judge Peebles recommendations for the reasons stated in his report.

### IV. CONCLUSION

For the reasons discussed above, the Court accepts and adopts Magistrate Judge Peebles' recommendations for the reasons stated in his report. Accordingly,

(1) Plaintiff's amended complaint (Dkt. No. 30) is **REJECTED** and this action is **DISMISSED,** with prejudice, as it relates to Defendant Soto; and

(2) Plaintiff's amended complaint is **REJECTED** and this action is **DISMISSED,** with prejudice, as it relates to Defendant John Doe # 2; and

(3) Plaintiff's amended complaint is **ACCEPTED** as it relates to the claims asserted against Defendant John Doe # 1; and

(4) It is **ORDERED** that the Superintendent of Eastern Correctional Facility be added as a defendant to this action for the sole purpose of permitting service and discovery; and

(5) It is **ORDERED** that the Clerk of the Court issue a summons and forward it, along with a copy of Plaintiff's Amended Complaint, to the United States Marshal for service upon the Superintendent of Eastern Correctional Facility. The Clerk shall forward a copy of the summons and complaint by mail to the Office of the New York State Attorney General, together with a copy of the Report and Recommendation, and this Decision and Order; and

(6) It is **ORDERED** that upon the superintendent of Eastern Correctional Facility being added as a defendant in this action and Defendant John Doe # 1 being

identified, a response to the plaintiff's amended complaint be filed by Defendant John Doe # 1, or his counsel, as provided for in the Federal Rules of Civil Procedure after service of process on a defendant; and

(7) It is **ORDERED** that Plaintiff continue to take reasonable steps to ascertain the identity of Defendant John Doe # 1, and, if appropriate, file a motion with the Court seeking permission to file a second amended complaint so that he may add such individual, by name, as a defendant to this lawsuit. Plaintiff's failure to ascertain the identity of Defendant John Doe # 1 will result in the dismissal of this action; and

**\*4** (8) It is **ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so may result in the dismissal of this action. All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**IT IS SO ORDERED.**

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Benji D. Reed, a New York prison inmate, has commenced this suit pursuant to 42 U.S.C. § 1983 against various prison officials alleging deprivation of his civil rights. As a result of prior court determinations, plaintiff's claims against M. Soto, the only defendant named and served in the action, have all been dismissed,

2013 WL 5441503

although plaintiff was granted leave to amend his complaint in order to allege facts demonstrating the existence of a plausible retaliation claim against that defendant.

Currently pending before the court for review is an amended complaint proffered by plaintiff in an attempt to cure the deficiencies discerned by the court in connection with his retaliation claim, as originally stated. Having reviewed that proposed amended complaint, I conclude that, like its predecessor, the new pleading fails to include sufficient factual allegations to support a cognizable retaliation claim, and therefore recommend that it be rejected. In addition, because I find that the negligence claim asserted against one of the unidentified defendants, defendant John Doe # 2, is precluded by New York Correction Law § 24, I recommend that claim be dismissed. Finally, because I conclude that plaintiff's amended complaint sets forth facts plausibly alleging an Eighth Amendment claim against the other unidentified defendant, defendant John Doe # 1, who, to date, has not been identified and therefore cannot be served, I recommend that the superintendent of Eastern Correctional Facility be added to the action for the sole purpose of aiding plaintiff in ascertaining the identity of that defendant.

I. BACKGROUND

Plaintiff commenced this action on March 8, 2011, asserting a variety of claims against two unnamed defendants John Doe # 1 and John Doe # 2, and defendant M. Soto, a corrections counselor at Eastern Correctional Facility ("Eastern"), where plaintiff was housed at the relevant times.[1] On October 17, 2011, defendant M. Soto, the sole remaining named-defendant in the action, moved for dismissal of the balance of plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 11. In a report issued on July 26, 2012, I recommended dismissal of plaintiff's claims against defendant Soto, with leave to amend with respect to plaintiff's cause of action for retaliation arising out of the alleged filing of false misbehavior reports by defendant Soto. See Report and Recommendation Dated July 26, 2012 (Dkt. No. 22). That recommendation was based upon a finding that plaintiff's complaint failed to allege facts sufficient to establish the requisite nexus between his visit to the prison infirmary, which plaintiff alleged constituted protected activity, and

defendant Soto's issuance of misbehavior reports against him, representing an alleged adverse action motivated by retaliatory animus. *Id.* at pp. 15–16.

**\*5** My recommendation was adopted by Senior District Judge McAvoy on September 26, 2012, with leave to the plaintiff to replead within thirty days. Dkt. No. 28. Plaintiff has since availed himself of the opportunity to amend, submitting a proposed amended complaint on October 12, 2012. Dkt. No. 30. That amended complaint has been referred to me for review.

II. DISCUSSION

A. Unlawful Retaliation

It is well-established that the issuance, by correctional officers, of a false misbehavior report to against an inmate, standing alone, is insufficient to support a cognizable claim under the Eighth Amendment or otherwise. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report") (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273 (1988)). In such a case, "[t]he prisoner's due process rights are protected if he is granted a hearing on the charges and given an opportunity to rebut them." *Jones v. Coughlin,* 45 F.3d 677, 679 (2d Cir.1995) (citations omitted).

When an allegedly false misbehavior report is issued, motivated by an inmate's exercise of a protected right under the Constitution, however, a cognizable retaliation claim lies under 42 U.S.C. § 1983. *See Franco v. Kelly,* 854 F.3d 584, 590 (2d Cir.2008) ("An act in retaliation for the exercise of a constitutional right is actionable under section 1983 even if the act, when taken for different reasons, would have been proper.") (alterations and internal quotation marks omitted). In order to state a *prima facie* claim of retaliation under section 1983, a plaintiff must advance non-conclusory allegations establishing that (1) the he engaged in protected conduct; (2) the defendants took adverse action against him; and (3) a causal connection exists between the protected activity and the adverse action. *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Phelps v. Kapnolas,* 308 F.3d 180, 187 n. 6 (2d Cir.2002). In other words, plaintiff must allege facts plausibly suggesting that the protected conduct was a "substantial or motivating

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

factor" in the prison officials' decision to take action against the plaintiff.

In my earlier report, I interpreted plaintiff's complaint as alleging unlawful retaliation, predicated upon his contention that two misbehavior reports issued against him by defendant Soto in September 2010 were motivated by the fact that Reed sought medical treatment for a stomach illness. Assuming that plaintiff's resort to seeking medical treatment within the correctional facility could be regarded as protected activity sufficient to trigger the First Amendment's protection against retaliation, and that the issuance of a false misbehavior report could represent constitutionally significant adverse action, I nonetheless found that plaintiff's complaint lacked sufficient factual allegations from which it could be reasonably concluded that a nexus existed linking the protected activity and adverse action alleged. [2] For reasons similar to those set forth in my original report, I conclude that plaintiff's most recent amended complaint is similarly lacking in the necessary factual allegations to establish the missing link.

 **\*6** The facts alleged in plaintiff's amended complaint show that on September 16, 2010, he visited the medical clinic at Eastern to receive treatment for a food related illness. Amended Complaint. (Dkt. No. 30) at 3. Plaintiff alleges that on that same date, he was issued a misbehavior report by defendant Soto for missing assigned programming, accusing him of being out of place and lying concerning his whereabouts. *Id.* at 4. The misbehavior report was later dismissed when it was learned that he, in fact, had missed the programming for medical reasons. *Id.* at 5. As a result, it appears that the misbehavior report was issued not *because of* plaintiff's trip to the infirmary, but instead out of a mistaken belief that he was elsewhere than in the infirmary at the time of the scheduled programming. *See id.* ("However, after it was ascertained and found by the hearing officer that ... I was infact [sic] at the medical clinic being treated for an illness ... and thereafter confined to my cell ... [,] the misbehavior report ... was dismissed."). In simple terms, plaintiff's own allegations contradict his theory that defendant Soto issued a misbehavior report in retaliation for plaintiff seeking medical care. His complaint therefore lacks facts demonstrating the existence of a plausible retaliation claim, including, significantly, a causal link between the protected activity and first misbehavior report at issue.

Plaintiff's retaliation claim also potentially implicates a second misbehavior report that, according to plaintiff's amended complaint, was issued against him on September 25, 2010, again alleging his refusal to participate in prison programming. Amended Complaint. (Dkt. No. 30) at 6. The charges were ultimately dismissed after plaintiff explained the circumstances surrounding his refusal, which included an allegation by plaintiff that defendant Soto forced him to sign the refusal-to-participate form. *Id.* at 7. Once again, conspicuously lacking in plaintiff's complaint is any allegation linking a protected activity to the issuance of this second misbehavior report.

I note that in his amended complaint, plaintiff also alleges that defendant Soto directed various derogatory statements toward him, alleging "upon information and belief" that they were motivated by favorable disciplinary decisions in connection with the two misbehavior reports previously issued by that defendant. Amended Complaint (Dkt. No. 30) at 8. It is well-established, however, that verbal harassment and derogatory comments by prison workers aimed at an inmate, however unprofessional, do not rise to a level of constitutional significance, and therefore cannot constitute adverse action sufficient to support a retaliation cause of action. *See Alnutt v. Cleary,* 913 F.Supp. 160, 165–66 (W.D.N.Y.1996) ("[M]ere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations."). [3] Section 1983 is not intended to represent a code of professional conduct for federal, state and local prison officials. *Cf. Alnutt,* 913 F.Supp. at 166, *accord, Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (Peebles, M.J.); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) (Sotomayor, J.). Standing alone, allegations of verbal abuse do not rise to the level of a constitutional violation, and are not cognizable under 42 U.S.C. § 1983. *See Moncrieffe v. Witbeck,* No. 97–CV–0253, 2000 WL 949457, at \*3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (finding that allegations that corrections officers laughed at and insulted the plaintiff do not give rise to a claim under section 1983); *Carpio v. Walker,* No. Civ. 95–CV–1502, 1997 WL 642543, at \*6 (N.D.N.Y. Oct. 15, 1997) (Pooler, J., adopting report-recommendation by DiBianco, M.J.) ("[V]erbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation.").

2013 WL 5441503

**\*7** In sum, careful review of plaintiff's proposed amended complaint reveals that it lacks sufficient factual allegations to demonstrate a plausible retaliation claim, including a basis to find a causal connection between a protected activity engaged in by plaintiff, and an adverse action taken by the defendants against him as a result. Plaintiff's claims against defendant Soto should therefore be dismissed, without leave to replead.

### B. John Doe Defendants
In the event that my recommendation is accepted and plaintiff's claims against defendant Soto are dismissed, the question remains as to whether he should be permitted to pursue his claims against the two unnamed, "John Doe," defendants.

#### 1. Merits of Claims Asserted Against John Doe Defendants
In order to decide whether the unnamed John Doe defendants survive plaintiff's amended complaint, as a threshold matter, I must briefly address the merits of the claims asserted against them. As it relates to defendant John Doe # 1, plaintiff's amended complaint alleges that, notwithstanding the fact that defendant John Doe # 1 knew that the "[M]exican corn and rice diablo," which was served to plaintiff and other inmates as the evening meal on September 14, 2010, and which allegedly caused plaintiff to become ill, smelled badly and "could be contaminated," defendant John Doe # 1 nonetheless served it to plaintiff. Amended Complaint (Dkt. No. 30) at 4. These allegations, liberally construed, could support a plausible cruel-and-unusual-punishment claim in violation of the Eighth Amendment. *Id.* at 8. Indeed, the Eighth Amendment protects inmates against being served contaminated food in prison. *See, e.g., Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) ("[T]he Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it."). For this reason, I recommend a finding that, although the identity of defendant John Doe # 1 is unknown at this juncture, plaintiff's amended complaint alleges facts plausibly suggesting that defendant John Doe # 1 violated plaintiff's Eighth Amendment right.

As it relates to defendant John Doe # 2, plaintiff's amended complaint alleges that defendant John Doe # 2, who is allegedly in charge of inspecting "all food products served" in Eastern, failed to identify the Mexican corn and rice diablo as contaminated. Amended Complaint (Dkt. No. 30) at 4. As a result of this allegation, liberally construed, plaintiff's amended complaint asserts a state-law negligence claim against that defendant. *Id.* at 9.

This claim fails, however, because New York Correction Law § 24 precludes civil actions from being filed against "any officer or employee of [the Department of Corrections and Community Supervision] ... in his ... personal capacity for damages arising out of any act done or failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee[,]" except for civil actions brought by the New York State Attorney General. N.Y. Corr. Law § 24(1). Here, although plaintiff has failed to specifically identify defendant John Doe # 2, plaintiff's amended complaint alleges that "Defendant, John Doe # 2[,] is an employee employed at Eastern." Amended Complaint (Dkt. No. 30) at 2. Because defendant John Doe # 2 is an employee of the Department of Corrections and Community Supervision ("DOCCS"), New York Correctional Law § 24 is triggered, precluding plaintiff from maintaining a negligence action against him. *Dallio v. Hebert,* 678 F.Supp.2d 35, 57 (N.D.N.Y.2009) (Suddaby, J., adopting report and recommendation by Lowe, J.) (dismissing the plaintiff's state-law claims of assault, battery, and negligence against a defendant correctional officer because "[a]lthough New York Correction Law section 24 explicitly bars only cases filed in state court, it is equally applicable to state law claims filed in federal court[.]"). For these reasons, I recommend that the negligence claim against defendant John Doe # 2 be dismissed with prejudice.

#### 2. Identification of Defendant John Doe # 1
**\*8** Because I find that plaintiff's amended complaint states a claim against defendant John Doe # 1, the question remains whether plaintiff may pursue his claims against that defendant because that defendant remains unidentified, despite the fact that this case has been pending against him since March of 2011.[4] Complaint (Dkt. No. 1). More specifically, although Senior District Judge McAvoy's Decision and Order dated September 27, 2012, granted defendant Soto's motion to dismiss, the

claim against defendants John Doe # 1 survived because defendant Soto's motion moved to dismiss only the claims against him. Dkt. Nos. 22, 28. For this reason, pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, the court has the authority to *sua sponte* dismiss all claims against defendant John Doe # 1 upon notice to plaintiff. Fed.R.Civ.P. 4(m) ("If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice ... or order that service be made within a specified time."); *see also* N.Y.N.D. L.R. § 4.1(b) (restricting Rule 4(m)'s time period to 60 days). However, as discussed more fully below, despite the fact that the court is unaware of any efforts made by plaintiff to identify defendant John Doe # 1, and mindful of the Second Circuit's instruction that the district courts are to assist *pro se* inmate litigants, I reject this option at this stage.

Generally, when a *pro se* plaintiff includes a "Doe" defendant along with named defendants, the complaint is served upon the named defendants, and the plaintiff pursues discovery to identify the Doe defendant. *Peralta v. Doe,* No. 04–CV–6559–P, 2005 WL 357358, at *2 (W.D.N.Y. Jan. 24, 2005). In this case, however, in the event my recommendation to dismiss defendant Soto is adopted, no nameddefendant will remain in this case. Mindful of plaintiff's status as a *pro se* inmate litigant, and of the court's obligation to assist *pro se* inmate litigants identify unknown defendants, I recommend that the superintendent of Eastern be added as a defendant in this action only so that service and joinder may occur. Once issue is joined, plaintiff may, through discovery, seek the identity of defendant John Doe # 1. *See Peralta,* 2005 WL 357358, at * 2 (permitting the addition of the superintendent of Eastern to facilitate service and discovery to uncover the identities of the unknown defendants) (citing *Valentin v. Dinkins,* 121 F.3d 72, 76 (2d Cir.1997) (holding that the district court should assist *pro se* incarcerated litigants with their inquiry into the identities of unknown defendants and "may pursue any course that it deems appropriate to a further inquiry into the identity" of the unknown defendant); *see also Dorsey v. Fischer,* No. 9:09–CV–1011 (GLS/DEP), Decision and Order (N.D.N.Y. filed Jan. 23, 2012) (*sua sponte* adding the superintendent of the correctional facility where the alleged wrongdoing occurred in order to facilitate the identification of Doe defendants). [5]

**\*9** Accordingly, I recommend that the clerk of the court be directed to add the superintendent of Eastern as a defendant for service and discovery purposes only. By doing so, I do not suggest in any way that the superintendent of Eastern was personally involved in the events allegedly giving rise to the Eighth Amendment claim asserted against defendant John Doe # 1. In addition, because the court finds that the superintendent of Eastern is likely to be represented by the New York State Attorney General, I recommend that the clerk send a copy of the plaintiff's amended complaint, this report and recommendation, and any decision and order adopting or rejecting it, to the Attorney General's Office to facilitate the identification of defendant John Doe # 1.

Plaintiff is advised, however, that the United States Marshals Service cannot effect service on a "John Doe" defendant. Therefore, if plaintiff wishes to pursue his claims against defendant John Doe # 1, he must take reasonable steps to ascertain his identity. Upon learning the identity of defendant John Doe # 1, plaintiff must seek permission from the court to file a second amended complaint to properly name him as a defendant. If plaintiff fails to ascertain the identity of defendant John Doe # 1, so as to permit the timely service of process, this action will be dismissed as against that individual.

### III. SUMMARY AND RECOMMENDATION

Because plaintiff, though granted leave to amend, has failed to cure the deficiencies discussed in my earlier report and recommendation by alleging facts demonstrating the existence of a plausible retaliation claim against defendant Soto, I recommend that that claim be dismissed with prejudice. In addition, I recommend that plaintiff's negligence claim against defendant John Doe # 2 be dismissed because New York Correction Law § 24 precludes plaintiff from suing that defendant, a DOCCS employee, for any state-law claim. Finally, because I recommend a finding that plaintiff's amended complaint sets forth allegations plausibly suggesting a cause of action against defendant John Doe # 1, I recommend that the superintendent of Eastern be added as a defendant to this action for the sole purpose of permitting service and discovery.

Based upon the foregoing it is hereby respectfully,

RECOMMENDED that plaintiff's amended complaint (Dkt. No. 30) be REJECTED as failing to cure the

deficiencies detected in the court's earlier order as it relates to all claims asserted against defendant Soto, and that this action be DISMISSED, with prejudice, as it relates to defendant Soto; and it is further

RECOMMENDED that plaintiff's amended complaint be REJECTED as precluded by New York Correction Law § 24 as it relates to all claims asserted against defendant John Doe # 2; and it is further

RECOMMENDED that plaintiff's amended complaint be ACCEPTED as it relates to the claims asserted against defendant John Doe # 1; and it is further

RECOMMENDED that, upon the district judge accepting the recommendations regarding the claims asserted against defendant John Doe # 1, the superintendent of Eastern Correctional Facility be added as a defendant to this action for the sole purpose of permitting service and discovery;

 *10 RECOMMENDED that, upon the district judge accepting the recommendation that the superintendent of Eastern Correctional Facility be added as a defendant in this action, the clerk of the court issue a summons and forward it, along with a copy of plaintiff's amended complaint, to the United States Marshal for service upon the superintendent of Eastern Correctional Facility. The clerk shall forward a copy of the summons and complaint by mail to the Office of the New York State Attorney General, together with a copy of this report and recommendation, and any decision and order issued accepting or rejecting it; and it is further

RECOMMENDED that, upon the district judge accepting the recommendation that the superintendent of Eastern Correctional Facility be added as a defendant in this action, a response to the plaintiff's amended complaint be filed by a defendant, or his counsel, as provided for in the Federal Rules of Civil Procedure after service of process on a defendant; and it is further,

RECOMMENDED that, upon the district judge accepting the recommendation that the superintendent of Eastern Correctional Facility be added as a defendant in this action, plaintiff continue to take reasonable steps to ascertain the identity of defendant John Doe # 1,

and, if appropriate, file a motion with the court seeking permission to file a second amended complaint so that he may add such individual, by name, as a defendant to this lawsuit; and it is further

RECOMMENDED that, upon the district judge accepting the recommendation that the superintendent of Eastern Correctional Facility be added as a defendant in this action, all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in plaintiff's address; his failure to do so may result in the dismissal of this action. All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court; and it is further

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; Roland v. Racette, 984 F.2d 85 (2d Cir.1993).

 *11 It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5441503

Reed v. Doe No. 1, Not Reported in F.Supp.2d (2013)

2013 WL 5441503

Footnotes

1    Plaintiff's complaint also named seven corrections employees assigned to Southport Correctional Facility ("Southport") as defendants. All claims stemming from events occurring at Southport were severed from those arising out of Eastern, however, and were transferred to the Western District of New York by order issued by Senior District Judge Thomas J. McAvoy on August 2, 2011. *See* Dkt. No. 4.

2    When examining whether such a nexus exists, courts generally look to several factors, including "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007) (Hurd, J.); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

3    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

4    Although the following analysis is applicable to defendant John Doe # 2, as well, in light of the fact that I recommend dismissal of the only claim pending against him due to New York Correction Law § 24, I do not address defendant John Doe # 2 in this section of the report and recommendation.

5    *Cf. Davis v. Kelly,* 160 F.3d 917, 921–22 (2d Cir.1998) (holding that when a prisoner does not know the identities of any of the individuals who allegedly violated his constitutional rights, it is appropriate to maintain "supervisory personnel as defendants ... until the plaintiff has been afforded an opportunity through at least brief discovery to identify the subordinate officials who have personal liability.... After an opportunity for discovery, undisputed allegations that the supervisor lacked personal involvement will ultimately suffice to dismiss that official from the case, but such dismissal is premature where the opportunity to identify those involved has not yet been accorded"); *Murphy v. Goord,* 445 F.Supp.2d 261 (W.D.N.Y.2006) (denying superintendent's motion for judgment on the pleadings on personal involvement grounds and allowing plaintiff to proceed with discovery to identify the Doe defendants; *Brown v. Doe,* No. 96–CV–1222, 1999 WL 893070, at *2 (S.D.N.Y. October 18, 1999) (deferring defendants' motion to dismiss until they have provided the requisite discovery information and materials to the pro se prisoner litigant on the grounds that "[p]laintiffs, especially *pro se* incarcerated plaintiffs should be given an opportunity to identify ... unknown defendants through discovery").

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1743987

2009 WL 1743987
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dawson SHARPE, Plaintiff,

v.

Justin TAYLOR, et al., Defendants.

No. 9:05–CV–1003 (GTS/GHL).
|
March 26, 2009.

West KeySummary

**1**    **Prisons**
👉 Clothing and grooming;bedding and
sleeping conditions

**Sentencing and Punishment**
👉 Sanitation

Prisoner's complaint alleging that correctional
officer violated his constitutional rights by
washing dirty mop heads with his laundry
stated an Eighth Amendment conditions of
confinement claim based on the failure to
provide adequate clothing. Prisoner alleged
that because the dirty mop heads were
washed with his laundry, he suffered a
skin rash. Prisoner's primary care physician
instructed that a memorandum be issued
instructing that dirty mop heads should
not be washed in the same machines as
prisoners' clothes because he was concerned
about the prisoner's "contact with pernicious
chemicals." Correctional officer allowed
porters to wash dirty mop heads in
the prisoner washing machine. U.S.C.A.
Const.Amend. 8; 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

**Attorneys and Law Firms**

Dawson Sharpe, Cape Vincent, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Heather R. Rubinstein, Esq., of Counsel,
Syracuse, NY, for Defendants.

*REPORT–RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

 **\*1**   This *pro se* prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to me for
Report and Recommendation by the Honorable Glenn
T. Suddaby, United States District Judge, pursuant to 28
U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Dawson
Sharpe alleges that employees of the New York State
Department of Correctional Services ("DOCS") violated
his civil rights by repeatedly washing dirty mop heads
with his clothing, physically attacking him, depriving
him of medications, issuing false misbehavior reports,
and threatening to harm him if he filed any grievances.
(Dkt. No. 35.) Currently pending before the Court is
Defendants' motion for summary judgment pursuant to
Federal Rule of Civil Procedure 56. (Dkt. No. 68.) For
the reasons that follow, I recommend that Defendants'
motion be treated solely as a motion for judgment on
the pleadings, granted in part, and denied in part without
prejudice to the later filing of a subsequent motion for
summary judgment supported by a proper Statement of
Material Facts and admissible evidence [1].

**I. BACKGROUND**

**A. Summary of Plaintiff's Complaint**
The operative complaint (Dkt. No. 35) alleges that:

Defendant Coco, a correctional officer at Gouverneur
Correctional Facility, "ordered that dirty mop heads be
washed and dr[ied] in the same washing machine used for
[Plaintiff's] towels, sheets, pillow cases, underwear, and
clothing" from 2002 to 2004. (Dkt. No. 35 at ¶ 9.)

On September 20, 2004, Plaintiff's primary care physician
referred him to a dermatologist for treatment of a severe
rash. (Dkt. No. 35 at ¶ 4.) The complaint refers to this rash
as "htperplastic micropoapular rash of the trunk." *Id.*

On October 7, 2004, Plaintiff saw a dermatologist, who
opined that the rash was caused by cleaning materials and

the fact that Plaintiff's skin had come "in contact with pernicious chemicals." (Dkt. No. 35 at ¶ 5.) After this consultation, Plaintiff's primary care physician referred him for a biopsy on the rash. (Dkt. No. 35 at ¶ 6.)

On October 19, 2004, Defendant Coco "address[ed] [Plaintiff's] grievance/complaint" by transferring Plaintiff to "another dormitory ... without a misbehavior report [2] ." (Dkt. No. 35 at ¶ 10.)

The biopsy on Plaintiff's rash was performed on October 21, 2004. (Dkt. No. 35 at ¶ 7.) As a result of the biopsy, Plaintiff was diagnosed with "ngiotic dermatitis, subacute type." (Dkt. No. 35 at ¶ 8.)

On November 6, 2004, Defendant Plowman physically assaulted Plaintiff "in retaliation for the above grievance." (Dkt. No. 35 at ¶ 14.) Plaintiff alleges that his "serious back problem was further infuriated" by this attack. (Dkt. No. 35 at ¶ 41.)

On November 9, 2004, Defendant Shareldon physically assaulted Plaintiff "in retaliation for the above grievance." (Dkt. No. 35 at ¶ 14.) Plaintiff alleges that his "serious back problem was further infuriated" by this attack. (Dkt. No. 35 at ¶ 41.)

**\*2** On December 20, 2004, Plaintiff's primary care physician, after reviewing the results of Plaintiff's biopsy, directed a nurse to issue memoranda to all of the housing units at Gouverneur Correctional Facility advising that dirty mop heads should not be washed in the same machines as inmates' clothes. (Dkt. No. 35 at ¶ 15.)

Sometime before January 21, 2005, Defendant Justin Taylor, the superintendent of the facility, had the posted memoranda removed. (Dkt. No. 35 at ¶¶ 16–17.)

On February 18, 2005, Defendant Sorell allowed porters to wash dirty mop heads in the inmate washing machine. (Dkt. No. 35 at ¶ 18.)

On April 27, 2005, Defendant Sorell, "in retaliation," ordered Plaintiff to perform a work detail. When Plaintiff told her he was medically excused, Defendant Sorell issued a false misbehavior report that resulted in Plaintiff being confined to the SHU and removed from the "RSAT" program. (Dkt. No. 35 at ¶ 19.) Plaintiff alleges that

he suffered "prolong[ed] pain and suffering" after this incident [3] . (Dkt. No. 35 at ¶ 42.)

On May 3, 2005, Defendant Sorell falsely testified at a disciplinary hearing that she did not know that Plaintiff had a medical excuse. (Dkt. No. 35 at ¶ 20.)

On August 25, 2005, Defendant Hunksy issued a false misbehavior report that resulted in Plaintiff being sent to the SHU. (Dkt. No. 35 at ¶¶ 23–24.) Plaintiff filed a grievance regarding this false misbehavior report. (Dkt. No. 35 at ¶ 23.)

On August 31, 2005, Defendant Theriault told Plaintiff "if you don't stop writing grievances on my officers, I will personally do you bodily harm." (Dkt. No. 35 at ¶ 23.)

On August 31, 2005, Defendant Hunksy issued another false misbehavior report that resulted in Plaintiff being sent to the SHU. (Dkt. No. 35 at ¶¶ 23–24.)

On August 31, 2005, Defendants Theriault and Shareldon physically assaulted Plaintiff while he was handcuffed. (Dkt. No. 35 at ¶ 25 .)

On September 3, 2005, Defendant Plowman removed Plaintiff's prescribed pain medication from Plaintiff's personal property. Plowman claimed that Plaintiff "was on the burn because of the grievances he had written in the facility." Plaintiff did not receive his medication until two weeks later. (Dkt. No. 35 at ¶¶ 26–27.) Plaintiff does not allege that he suffered any injury as a result of not having his medication.

On January 23, 2006, Defendant Theriault told Plaintiff that his "officer will continue to target [Plaintiff] for the grievance [he] wrote because they are human beings." (Dkt. No. 35 at ¶ 29.)

On January 28, 2006, and January 30, 2006, Defendant McDonald issued false misbehavior reports to Plaintiff "in retaliation" for Plaintiff "asserting [his] constitutional rights." (Dkt. No. 35 at ¶ 30.)

On April 25, 2006, Defendant Ball "saw Plaintiff on the walk way ..., called him a trouble maker, verbally harassed him, and threated[ed] to put him in the SHU because of the civil action [Plaintiff] had filed against his colleagues." (Dkt. No. 35 at ¶ 31.) On April 26,

2006, Defendant Ball fabricated a misbehavior report and placed Plaintiff in the SHU. (Dkt. No. 35 at ¶ 32.)

**\*3** On April 26, 2006, while Plaintiff was being processed into the SHU, Defendant Monnely sexually harassed Plaintiff, fondled Plaintiff's anus, and said "if you make any sudden moves I will thr[ow] you to the ground and stomp you out." (Dkt. No. 35 at ¶ 33.)

Plaintiff alleges that all of the events described in the complaint are "retaliatory actions against the plaintiff to dehumanize him and discourage him from exercising his Constitutional Rights." (Dkt. No. 35 at ¶ 35.) Plaintiff alleges he suffered "extreme emotional distress" as a result of "[t]he constant threats" to him [4] . (Dkt. No. 35 at ¶ 22.)

Plaintiff requests an injunction removing him from Gouverneur Correctional Facility. (Dkt. No. 35 at ¶ 36.) In addition, he requests $5 million in compensatory damages and $5 million in punitive damages. (Dkt. No. 35 at ¶ 45.)

### B. Summary of Grounds in Support of Defendants' Motion

Defendants argue that (1) Plaintiff's allegations that Defendants Theriault, Ball, and Monnely threatened or verbally and/or sexually harassed him do not state a claim for retaliation; (2) Plaintiff has not stated an Eighth Amendment conditions of confinement claim against Defendants Coco and Sorell regarding the dirty mop heads or, in the alternative, that there is no triable issue of material fact on this issue; (3) Plaintiff's allegations that Defendants Sorell, Hunsky, McDonald, and Ball issued false misbehavior reports to him do not state a claim for retaliation or, in the alternative, that there is not triable issue of material fact on this issue; (4) Plaintiff's allegations that Defendants Coco and Sorell washed dirty mop heads with his clothing and that Defendant Plowman removed medication from his personal property do not state an Eighth Amendment claim of inadequate medical care; (5) Plaintiff's complaint is too conclusory to state any claim; (6) Plaintiff has failed to allege sufficient personal involvement by Defendant Taylor; (7) Plaintiff's excessive force claims should be dismissed; and (8) they are entitled to qualified immunity. (Dkt. No. 68–5.)

### C. Deficiencies in Defendants' Statement of Material Facts and Evidence

Defendants move for summary judgment. As the moving parties, they bear the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists and they are entitled to judgment as a matter of law. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Only after they have met this burden is Plaintiff required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). Federal Rule of Civil Procedure 56 and Local Rule 7 .1(a)(3) provide the procedural guidelines for meeting this initial burden.

Local Rule 7.1(a)(3) requires parties moving for summary judgment to file and serve a Statement of Material Facts. This statement "shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." Facts that are not in the Statement of Material Facts need not be considered. *Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 292 (2d Cir.2000). The rule thus puts the onus on the parties to marshal the evidence that supports the motion. *Id.* A district court has no duty, on a motion for summary judgment, to perform an independent review of the record to find proof of either a factual dispute or the lack of a factual dispute. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *accord, Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371–72 (N.D.N.Y.2003) (Hurd, J.). "Our District's requirements are not empty formalities. Rules such as L.R. 7.1(a)3 'serve to notify the parties of the factual support for their opponent's arguments, but more importantly inform the court of the evidence and arguments in an organized way-thus facilitating its judgment of the necessity for trial.' " *Jackson v. Broome County Correctional Facility,* 194 F.R.D. 436, 437 (N.D.N.Y.2000) (*citing Little v. Cox's Supermarkets,* 71 F.3d 637, 641 (7th Cir.1995)).

**\*4** Defendants' Statement of Material Facts informs neither Plaintiff nor the Court of the evidence supporting Defendants' arguments. It does not set forth each material fact about which Defendants claim there exists no genuine issue. Rather, it is little more than a list of exhibits. It states, in full:

Case 9:16-cv-01211-GTS-TWD    Document 72    Filed 08/09/18    Page 270 of 338
Sharpe v. Taylor, Not Reported in F.Supp.2d (2009)
2009 WL 1743987

1. During all times relevant, the plaintiff Dawson Sharpe was a New York State inmate being housed at Gouverneur Correctional Facility (hereinafter "Gouverneur"). See Amended Complaint, Docket No. 35.

2. Employees at Gouverneur responded to three (3) separate grievances filed by plaintiff regarding the allegation that mopheads were being improperly washed in the dorm washing machine. See Exhibit A annexed hereto.

3. One (*sic*) June 19, 2007, plaintiff was deposed by Maria Moran, AAG in regard to the allegations in his complaint. Plaintiff's deposition transcript is annexed hereto as Exhibit B.

4. On August 31, 2005, plaintiff was the subject of an inmate misbehavior report drafted by defendant Honsky. See Exhibit C annexed hereto.

5. On January 28, 2006, plaintiff was the subject of an inmate misbehavior report drafted by defendant McDonald. See Exhibit D annexed hereto.

6. On January 30, 2006, plaintiff was the subject of a second inmate misbehavior report drafted by defendant McDonald. See Exhibit E annexed hereto.

(Dkt. No. 68–3.) This Statement of Material Facts does not set forth any facts that are material to the dispute at hand. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). None of the issues in this lawsuit hinge on where Plaintiff is housed, whether employees responded to Plaintiff's complaints, the date of Plaintiff's deposition or the identity of the attorney who conducted it, or the mere fact that Plaintiff was the subject of misbehavior reports. Therefore, Defendants' Statement of Material Facts does not comply with Local Rule 7.1(a)(3).

Local Rule 7.1(a)(3) clearly states that the *"[f]ailure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."* (Emphasis in original.) This Court has denied motions for summary judgment based solely on the deficiency of Statements of Material Facts nearly identical to the Statement filed here. *See e.g. Lynch v. Cook,* No. 02–

CV–1526, 2006 WL 839 543 (N.D.N.Y. Mar.29, 2006) (McAvoy, J.).

As noted above, in the absence of a proper Statement of Material Facts, this Court has no duty to perform an independent review of the record to find proof of either a factual dispute or the lack of a factual dispute. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002). And although Second Circuit precedent clearly states that district court must grant special solicitude to *pro se* civil rights plaintiffs, liberally construing their pleadings and loosely applying procedural rules, I owe no such duty to Defendants, who are represented by counsel.

**\*5** Even if I were inclined to go beyond the bounds of duty and perform an independent review of the record to find proof of the lack of a factual dispute, I would be hampered by the fact that Defendants have not produced an iota of admissible evidence. Motions for summary judgment must be supported by admissible evidence. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). "To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." Charles Alan Wright, et al., 10A Fed. Practice & Procedure 3d § 2722 (2005). Here, none of the exhibits to the Statement of Material Facts is accompanied by *any* affidavit, much less an affidavit by a person through whom the exhibits could be admitted into evidence [5].

In light of Defendants' failure to file a proper Statement of Material Facts or any admissible evidence, I will treat their motion as an attack on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

### D. Summary of Plaintiff's Response to Defendants' Arguments

Plaintiff's response to Defendants' motion essentially reiterates the allegations of the complaint. (Dkt. No. 72.) The only significant difference is that in his opposition to Defendants' motion, Plaintiff argues that Defendant Taylor is liable because of his response or lack of response to Plaintiff's grievances about the mop heads being washed with inmates' clothing. Plaintiff has also provided affidavits from two other inmates who have been housed

at Gouverneur Correctional Facility. (Dkt. Nos. 70 and 71.) These inmates share Plaintiff's concerns about dirty mop heads being washed with inmates' clothing.

## II. APPLICABLE LEGAL STANDARD

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on a plaintiff's complaint, such a motion is functionally the same as a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(c) motion for judgment on the pleadings] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief maybe granted. [6] For these reasons, it is appropriate to briefly summarize the recently clarified legal standard governing Federal Rule of Civil Procedure 12(c) motions for judgment on the pleadings.

**\*6** The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Cleveland v. Caplaw Enter.,* 448 F.3d 518, 521 (2d Cir.2006). Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [7] or (2) a challenge to the legal cognizability of the claim. [8]

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [9] The main

purpose of this rule is to "facilitate a proper decision on the merits." [10] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [11]

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [12] However, it is well established that even this liberal notice pleading standard "has its limits." [13] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard. [14]

Most notably, in *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, 127 S.Ct. 1955, 1968–69, 167 L.Ed.2d 929 [15] (2007). [16] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74.

More specifically, the Court reasoned that, by requiring that a pleading "show [ ] that the pleader is entitled to relief," Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable

2009 WL 1743987

conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id* .

**\*7** As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic* ). [17] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded pro se litigants). [18]

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Bell Atlantic*—that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [19] There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [20] This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* [21] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro*

*se* civil rights pleadings are to be construed with an *extra* degree of liberality.

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [22] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [23] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated. [24] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. [25] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [26]

**\*8** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed), [27] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12. [28] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [29] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [30]

## III. ANALYSIS

### A. Retaliation Claims Based on Comments, Threats, and Harassment

The complaint alleges that several Defendants retaliated against Plaintiff by verbally harassing him, making threats, and sexually harassing him. Defendants argue that these allegations fail to state a claim. (Dkt. No. 68–5 at 2–4.)

2009 WL 1743987

1. *Comments, Threats, and Verbal Harassment*

The complaint describes four occasions on which various Defendants threatened Plaintiff. First, it alleges that on August 31, 2005, Defendant Theriault told Plaintiff "if you don't stop writing grievances on my officers, I will personally do you bodily harm." (Dkt. No. 35 at ¶ 23.) Second, it alleges that on January 23, 2006, Defendant Theriault told Plaintiff that his "officer [s] will continue to target [Plaintiff] for the grievance [he] wrote because they are human beings." (Dkt. No. 35 at ¶ 29.) Third, it alleges that on April 25, 2006, Defendant Ball "saw Plaintiff on the walk way ..., called him a trouble maker, verbally harassed him, and threated[ed] to put him in the SHU because of the civil action [Plaintiff] had filed against his colleagues." (Dkt. No. 35 at ¶ 31.) Fourth, it alleges that on April 26, 2006, Defendant Monnely [31] said "if you make any sudden moves I will thr[ow] you to the ground and stomp you out." (Dkt. No. 35 at ¶ 33.)

I have construed the complaint as asserting retaliation claims against Defendants Theriault, Ball, and Monelly based on these allegations. Defendants argue that these allegations fail to state a claim. Specifically, Defendants argue that "[i]t is clear that claims of verbal harassment alone do not state a cause of action under § 1983." (Dkt. No. 68–5 at 2.)

In order to state a cause of action for retaliation, a plaintiff must plead facts plausibly suggesting that (1) the plaintiff engaged in constitutionally protected speech or conduct; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). Defendants argue, essentially, that Plaintiff has not pleaded facts sufficient to plausibly suggest that Defendants took adverse action.

**\*9** Under some circumstances, verbal threats may constitute adverse action, depending on their degree of specificity and the context in which they are uttered. *See, e.g., Hepworth v. Suffolk County,* No. 2:02–cv–6473, 2006 WL 2844408, at \*8–9 (E.D.N.Y. Sept.29, 2006) (denying summary judgment where "continued verbal threats" that inmate "would receive another beating or be killed" was sufficient "evidence ... such that a reasonable jury could find that the officers unconstitutionally retaliated against [inmate] ... for exercising his First Amendment" rights). Thus, vague

intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim. *See, e.g., Bartley v. Collins,* No. 95 Civ. 10616, 2006 WL 1289256, at \*6 (S.D.N.Y. May 10, 2006) (stating that "verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action") (citing *Dawes,* 239 F.3d at 493, for the proposition that "[n]ot every unnecessary statement of a prison guard regarding an inmate's exercise of free speech violates the First Amendment"); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) (defendant's "alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] d[id] not give rise to a First Amendment retaliation claim"); *Cruz v. Hillman,* No. 01 Civ. 4169, 2002 WL 31045864, at \*7 (S.D.N.Y. May 16, 2002) (allegation that defendant made statement which "expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said 'Green Haven is an open battlefield, so be careful' " was insufficient to state retaliation claim).

*Bumpus v. Canfield,* 495 F.Supp.2d 316, 326 (W.D.N.Y.2007) (allegation that correctional officer "chastised" prisoner and said that he was "getting tired of" prisoner filing grievances insufficient to state a retaliation claim).

Here, viewed in context, Defendant Theriault's alleged threats were sufficiently specific that, if the facts alleged were proved by evidence, a reasonable jury could find that Defendant Theriault retaliated against Plaintiff. The complaint alleges that on August 25, 2005, Plaintiff filed a grievance against Defendant Hunsky. (Dkt. No. 35 at ¶ 23.) Six days later, Defendant Theriault told Plaintiff that if he did not "stop writing grievances, I will personally do you bodily harm." *Id.* Plaintiff alleges that on that same day, Defendant Theriault did, in fact, attack him. (Dkt. No. 35 at ¶ 25.) In light of this history, Defendant Theriault's statement five months later that his "officers will continue to target [Plaintiff] for the grievances [he] wrote because they are human beings" (Dkt. No. 35 at ¶ 29) was neither vague nor unspecified. Therefore, the complaint states a claim that Defendant Theriault's threats constituted retaliation and I recommend that Defendants' motion be denied as to this claim.

**\*10** The complaint also states a cause of action for retaliation against Defendant Ball. Defendant Ball's threat

that he was going to put Plaintiff in the SHU was fairly specific. Moreover, Plaintiff alleges that Defendant Ball did, indeed, put Plaintiff in the SHU the very next day. (Dkt. No. 35 at ¶ 32.) Accordingly, I find that the complaint alleges that Defendant Ball's threat was sufficiently specific in context to state a claim for retaliation and I recommend that Defendants' motion be denied as to this claim.

Defendant Monnely's comment that "if you make any sudden moves I will thr[ow] you to the ground and stomp you out" (Dkt. No. 35 at ¶ 3 3) was made in the context of processing Plaintiff into the SHU. Even liberally construed, the context of Defendant Monnely's comment does not plausibly suggest that it was sufficiently specific or related to constitutionally protected activity to state a claim for retaliation. Therefore, I recommend that Plaintiff's claim regarding this comment be dismissed.

### 2. *Sexual Harassment*

The complaint alleges that on April 26, 2006, while Plaintiff was being processed into the SHU, Defendant Monnely sexually harassed Plaintiff and fondled Plaintiff's anus. (Dkt. No. 35 at ¶ 33.) Defendants argue that Plaintiff has failed to state a claim against Defendant Monnely. (Dkt. No. 68–5 at 2–4.) Defendants are correct.

Sexual abuse of a prisoner by a corrections officer may, in some circumstances, violate the prisoner's Eighth Amendment right to be free from cruel and unusual punishment. For example, "severe or repetitive sexual abuse of an inmate by a prison officer" may be actionable under the Eighth Amendment, as may situations where "no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct." *Boddie v. Schnieder,* 105 F.3d 857, 860–61 (2d Cir.1997) (holding that allegation that correctional officer touched inmate's penis on one occasion and pressed against him sexually on another occasion, while "despicable," was insufficient to state Eighth Amendment claim). *See also Morrison v. Cortright,* 397 F.Supp.2d 424 (W.D.N.Y.2005) (allegation that correctional officer shone light up inmate's anus, ran his middle finger between inmate's buttocks causing inmate to urinate on himself, and rubbed his penis against inmate's buttocks during strip frisk insufficient to give rise to constitutional claim); *Davis v. Castleberry,* 364 F.Supp.2d 319, 321 (W.D.N.Y.2005) (allegation that correctional officer grabbed inmate's penis during pat frisk insufficient to state

constitutional claim); *Montero v. Crusie,* 153 F.Supp.2d 368 (S.D.N.Y.2001) (allegation that, on several occasions, correctional officer squeezed inmate's genitalia while pat-frisking him did not show sufficiently serious deprivation to establish Eighth Amendment violation, particularly when inmate did not allege that he was physically injured by such conduct); *Williams v. Keane,* No. 95 Civ. 0379, 1997 WL 527677, at * 11 (S.D.N.Y. Aug. 25, 1997) (allegation that correctional officer put his hand down inmate's pants and fondled inmates genitals during pat frisk failed to state constitutional claim).

**\*11** The allegations here are virtually indistinguishable from the events described in *Boddie.* Therefore, I recommend that the claim against Defendant Monnely be dismissed.

### B. Conditions of Confinement Claim Regarding Dirty Mop Heads

Plaintiff alleges that Defendants Coco and Sorell violated his constitutional rights by washing dirty mop heads with inmates' laundry, thus causing him to suffer a skin rash. (Dkt. No. 35 at ¶¶ 9, 18.) I have construed the complaint as asserting an Eighth Amendment conditions of confinement claim against Defendants Coco and Sorell. Defendants argue that Plaintiff has failed to state a constitutional claim or, in the alternative, that there is no triable issue of material fact on this issue. (Dkt. No. 68–5 at 4–5.) As discussed above, due to the deficiencies in Defendants' Statement of Material Facts and evidentiary submissions, I will address only Defendants' argument that Plaintiff has failed to state a constitutional claim.

Generally, to state a claim of inadequate prison conditions, a plaintiff must allege facts plausibly suggesting two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious* such that the prisoner was denied the minimal civilized measure of life's necessities; and (2) that the defendant acted with *deliberate indifference* to the plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003); *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005). There is not a static test for Eighth Amendment conditions of confinement claims: the conditions must be evaluated in light of contemporary standards of decency. *Blissett v. Coughlin,* 66 F.3d 531,

537 (2d Cir.1995) (citing *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

Defendants argue, without citation to authority, that Plaintiff's allegations about his skin rash are not "sufficiently serious" to state an Eighth Amendment claim. (Dkt. No. 68–5 at 4–5.)

Prison officials are required to ensure that prisoners receive adequate clothing. *Farmer,* 511 U.S. at 832. The lack of clean clothing raises personal hygiene concerns that may implicate the Eighth Amendment. *See Blissett,* 66 F.3d at 537 (citing *Maxwell v. Mason,* 668 F.2d 361, 363 (8th Cir.1981) (unnecessary deprivation of adequate clothing and bedding violates Eighth Amendment); *Toussaint v. McCarthy,* 597 F.Supp. 1388, 1410–11 (N.D.Cal.1984) (lack of laundry service for months violates Eighth Amendment), *aff 'd in part, rev'd in part on other grounds,* 801 F.2d 1080 (9th Cir.1986), *cert. denied,* 481 U.S. 1069 (1987).

Here, the complaint alleges that Plaintiff's primary care physician was sufficiently concerned about Plaintiff's "contact with pernicious chemicals" that he instructed that a memorandum be issued to all of the housing units at the facility instructing that dirty mop heads should not be washed in the same machines as inmates' clothes. (Dkt. No. 35 at ¶¶ 5, 15.) Rather than heeding this advice, Defendant Sorell allowed porters to wash dirty mop heads in the inmate washing machine. (Dkt. No. 35 at ¶ 18.) Liberally construed, the complaint states an Eighth Amendment conditions of confinement claim based on the failure to provide adequate clothing. As discussed below, however, Defendants Coco and Sorell are entitled to qualified immunity.

### C. Retaliation Claims Based on False Misbehavior Reports

**\*12** Plaintiff alleges that Defendants Sorell, Hunsky, McDonald, and Ball issued false misbehavior reports. (Dkt. No. 35 at ¶¶ 19, 23, 24, 30, 32.) I have construed the complaint as asserting retaliation claims against these Defendants. Defendants argue that Plaintiff has failed to state a claim or, in the alternative, has failed to raise a genuine issue of material fact. (Dkt. No. 68–5 at 5–11.) As discussed above, due to the deficiencies in Defendants' Statement of Material Facts and evidentiary submissions,

I will address only Defendants' argument that Plaintiff has failed to state a claim [32].

"[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986]); *accord, Pittman v. Forte,* 01–CV– 0100, 2002 WL 31309183, \*5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.). In addition, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing." *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862.

To state a claim for retaliation, a plaintiff must plead facts plausibly suggesting that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d. Cir.2001)).

"A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord,* 554 F.3d 216, 227 (2d Cir.2009) (citing *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) and *Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir.2001)).

The complaint states a retaliation claim against Defendant Hunsky regarding the August 31, 2005, misbehavior report. Plaintiff alleges that he filed a grievance against Hunsky "for filing a fa[ls]e misbehavior report, dated 8/25/05 [33]." (Dkt. No. 35 at ¶ 23.) Filing a grievance is a constitutionally protected activity. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Six days later, "[i]n retaliation for asserting my constitutional rights, Officer Hunsky fabricated a second misbehavior report ... resulting in [Plaintiff] being sent to the SHU." (Dkt. No. 35 at ¶ 24.)

Filing a false misbehavior report that results in a SHU sentence is an "adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004). Plaintiff's allegation that the adverse action took place six days after the protected activity plausibly suggests that there was a causal connection between the two events. Thus, the complaint alleges that Defendant Hunksy issued the second false misbehavior report in retaliation for Plaintiff's filing of a grievance regarding the first false misbehavior report. I therefore recommend that Defendants' motion be denied as to the retaliation claim against Defendant Hunsky arising from the August 31, 2005, misbehavior report without prejudice to the filing of a subsequent motion for summary judgment properly supported by a Statement of Material Facts and admissible evidence.

**\*13** Defendants argue that Plaintiff "fails to make a showing in regard to McDonald." (Dkt. No. 68–5 at 5.) Defendants' argument hinges on evidence rather than on Plaintiff's complaint. (Dkt. No. 68–5 at 8–10.) Therefore, as discussed above, I will not address it due to the defects in Defendants' Statement of Material Facts and evidentiary submissions. Very liberally construed, the complaint states a claim against Defendant McDonald for retaliation. The complaint alleges that on January 23, 2006, Defendant Theriault told Plaintiff that his "officer[s] will continue to target [Plaintiff] for the grievance [he] wrote." (Dkt. No. 35 at ¶ 29.) Within the next week, Defendant McDonald issued two misbehavior reports to Plaintiff, which Plaintiff alleges were false. (Dkt. No. 35 at ¶ 30.) These facts plausibly suggest that Defendant McDonald took adverse action against Plaintiff for engaging in constitutionally protected activity. Therefore, I recommend that Defendants' motion be denied without prejudice to the filing of a subsequent motion for summary judgment properly supported by a Statement of Material Facts and admissible evidence.

Defendants argue that the complaint does not allege that Sorell acted in retaliation. (Dkt. No. 68–5 at 5.) The complaint does conclusorily allege that Sorell acted in retaliation. Paragraph 19 states: "Also *in retaliation* on 4/27/05 petitioner was given a Direct Officer to perform a work detail by correction officer Sorell. Upon informing this officer that I have a medical excuse that prohibits me from this task. This officer fabricated a false misbehavior report." (Dkt. No. 35 at ¶ 19, emphasis added.) The complaint further alleges that Defendant Sorell falsely testified at the subsequent disciplinary hearing and that

this act, like all of the other acts alleged in the complaint, was "based on *retaliatory* actions against the plaintiff to dehumanize and discourage him from exercising his Constitutional Rights." (Dkt. No. 35 at ¶¶ 20, 35, emphasis added.) However, this conclusory allegation is not plausibly supported by any facts in the complaint. The complaint alleges that Defendant Sorell washed mop heads with inmates' laundry and that two months later Defendant Sorell ordered Plaintiff to perform a work detail. (Dkt. No. 35 at ¶¶ 18–19.) It does *not* allege that Plaintiff filed any grievances against Defendant Sorell regarding the mop heads or complained about her actions to anyone. Thus, the complaint does not allege that Defendant Sorell took adverse action in response to Plaintiff's exercise of his constitutional rights. Therefore, I recommend that Defendants' motion be granted as to this claim.

Defendants argue that the complaint does not allege that Defendant Ball acted in retaliation. (Dkt. No. 68–5 at 5.) Defendants are correct that the paragraph describing Defendant Ball's behavior merely alleges that Defendant Ball "fabricated a misbehavior report and placed [Plaintiff] in the SHU" without alleging Defendant Ball had a retaliatory motive. (Dkt. No. 35 at ¶ 32.) However, as noted above, Paragraph 35 of the complaint alleges that all of the actions described in the complaint were retaliatory. (Dkt. No. 35 at ¶ 35.) Moreover, as discussed above, the complaint includes facts plausibly suggesting that Defendant Ball retaliated against Plaintiff for constitutionally protected activity. It alleges that Defendant Ball told Plaintiff that he planned to put Plaintiff in the SHU "because of the civil action [Plaintiff] had filed against his colleagues" and that he made good on this threat the very next day. (Dkt. No. 35 at ¶¶ 31– 32.) These facts plausibly suggest that Defendant Ball retaliated against Plaintiff. Therefore, I recommend that Defendants' motion be denied as to this claim.

### D. Eighth Amendment Medical Care Claims
**\*14** Liberally construed, the complaint may be read as alleging that Defendants Coco, Sorell, and Plowman violated Plaintiff's Eighth Amendment right to adequate medical care. To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976);

2009 WL 1743987

*Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Defendants argue that Plaintiff has not alleged that he suffers from a serious medical need and that, even if he had, the complaint does not allege that Defendants were deliberately indifferent to that need.

To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Regarding the claims against Defendants Coco and Sorell arising from the washing of the mop heads with inmates' clothing, although the complaint refers to Plaintiff's rash as "cancer-like" (Dkt. No. 35 at ¶ 10), the complaint is conspicuously devoid of any allegations that Plaintiff actually suffered pain or degeneration due to the rash. Moreover, I have not found any federal cases, published or unpublished, classifying this type of rash as a serious medical condition. As to the claim that Defendant Plowman removed medication from Plaintiff's personal property, the complaint does not specify what the medication was or why Plaintiff needed it. Therefore, I find that Plaintiff has not alleged a condition that is "sufficiently serious" to state an Eighth Amendment claim of inadequate medical care.

Even if Plaintiff had alleged a "sufficiently serious" condition, I would find that he has not alleged that Defendants Coco, Sorell, and Plowman acted with deliberate indifference to that need. For a complaint to adequately allege deliberate indifference, an inmate must plead facts plausibly suggesting that (1) a prison medical care provider was aware of facts from which the inference could be drawn the inmate had a serious medical need; and (2) that the medical-care provider actually drew that inference. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, a complaint that a physician has been negligent

in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").

**\*15** The complaint does not allege that Defendants Coco, Sorell, or Plowman were medical care providers. The complaint does not allege that they witnessed Plaintiff suffering from his rash or any other condition and declined to summon medical personnel. They were under no duty to provide medical care to Plaintiff. As discussed above, Plaintiff's claims against Defendants Coco and Sorell regarding the washing of the mop heads are better stated as conditions of confinement claims. The allegations against Defendant Plowman regarding the removal of Plaintiff's medication do not state any claim [34]. Therefore, I recommend that Defendants' motion be granted as to Plaintiff's Eighth Amendment medical care claims.

### E. Conclusory Allegations

Defendants argue that "the allegations regarding defendants are completely conclusory, and do not give defendants fair notice of plaintiff's claims." (Dkt. No. 68–5 at 13.) Defendants do not specify which allegations they claim are too conclusory.

Defendants correctly note that "[t]he Second Circuit has repeatedly held that complaints based on violations of constitutional rights must contain more than conclusory allegations to avoid dismissal." (Dkt. No. 68–5 at 13) (*citing Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir.1990) and *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987)). Here, Plaintiff's complaint contains more than conclusory allegations, to which Defendants have been able to respond. Therefore, I recommend that Defendants' motion be denied on this ground.

### F. Personal Involvement by Defendant Taylor

Plaintiff alleges that "Superintendent Taylor had a memorandum from the Medical Department that was posted removed ... that would have avoided the

2009 WL 1743987

prolong[ed] practice of washing dirty mop heads in the inmate[ ] washing machines." (Dkt. No. 35 at ¶ 17.) I have construed the complaint as asserting an Eighth Amendment conditions of confinement claim against Defendant Taylor.

Defendants argue that Plaintiff's "only allegation against defendant Taylor involve[s] the assumption that, as the Superintendent, Taylor was somehow liable. Plaintiff does not allege any wrongdoing in connection with this act; nor does he allege this act in any way violated his Constitutional rights [35] ." (Dkt. No. 68–5 at 14.)

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[36] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[37] If the defendant is a supervisory official, such as a DOCS Commissioner or Deputy Commissioner, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[38] In other words, supervisory officials may not be held liable merely because they held a position of authority.[39] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[40]

**\*16** Here, as discussed above, the complaint states an Eighth Amendment conditions of confinement claim based on Plaintiff's allegation that he developed a rash because dirty mop heads were washed with his clothes. Construed liberally, the complaint alleges that Defendant Taylor personally participated in that violation by removing notices posted at the direction of Plaintiff's primary care physician warning about the

dangers of washing dirty mop heads with inmates' clothing. Therefore, I find that the complaint sufficiently alleges personal involvement by Defendant Taylor and I recommend that Defendants' motion be denied without prejudice to the filing of a subsequent motion for summary judgment properly supported by a Statement of Material Facts and admissible evidence [41] .

### G. Eighth Amendment Excessive Force Claims

The complaint alleges that Defendants Plowman, Shareldon, and Theriault physically assaulted Plaintiff. (Dkt. No. 35 at ¶¶ 14, 25.) I have construed the complaint as asserting an Eighth Amendment excessive force claim against these Defendants. Defendants argue that Plaintiff has failed to state an Eighth Amendment excessive force claim against these officers because "taking [P]laintiff's allegations as true for purposes of this motion only, [P]laintiff has failed to allege anything more than a *de minimus* use of force [42] ." (Dkt. No. 68–5 at 17.)

An Eighth Amendment claim of excessive force "has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000) (*citing Hudson v. McMillian,* 503 U.S. 1, 7–8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)).

Defendants argue, essentially, that Plaintiff has not pleaded sufficient facts to plausibly establish the objective element. "[T]here are significant differences between the harm that must be shown to support a claim based on prison conditions and the harm that will suffice to support a claimed use of excessive force. To prevail on a claim based on the conditions of his confinement, a prisoner must show 'extreme deprivations,' ... However, no such showing of extreme injury is required when the claim is that prison officials used excessive force." *Sims,* 230 F.3d 14 at 21.

Here, Plaintiff has pleaded harm arising from the November 6, 2004, attack by Defendant Plowman and the November 9, 2004, attack by Defendant Shareldon. Plaintiff alleges that each of these incidents "further infuriated" his "serious back problem." (Dkt. No. 35 at ¶ 41.) Therefore, Plaintiff has pleaded the objective element as to the November 2004 attacks by Defendants Plowman and Shareldon.

Plaintiff has not pleaded the objective element as to Defendants Theriault and Shareldon regarding the August 31, 2005, attack. Nowhere in the complaint does Plaintiff allege that he was harmed by this incident. Therefore, I recommend that Defendants' motion be granted and that Plaintiff's Eighth Amendment excessive force claims against Defendants Theriault and Shareldon arising from the August 31, 2005, incident be dismissed.

**\*17** Plaintiff has not sufficiently pleaded the subjective element as to any of the defendants. "The subjective component of the claim requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' " in light of the particular circumstances surrounding the challenged conduct." *Sims,* 230 F.3d at 20. "[W]hether conduct was "wanton" turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (*citing Hudson,* 503 U.S. at 7). Plaintiff does not even cursorily allege that Defendants Plowman or Shareldon acted wantonly. Absent from the complaint are any facts plausibly suggesting that Defendants Plowman and Shareldon acted wantonly. Rather, the complaint simply alleges that these Defendants "physically assaulted" Plaintiff. (Dkt. No. 35 at ¶ 14.) Therefore, I recommend that Defendants' motion be granted and that Plaintiff's Eighth Amendment claims against Defendants Plowman and Shareldon arising from the November 2004 incidents be dismissed.

### H. Qualified Immunity

Defendants argue that they are entitled to qualified immunity. Defendants argue that they did not violate any clearly established constitutional rights because "none of [P]laintiff's allegations, even if true, rise to the level of Constitutional violations." (Dkt. No. 68–5 at 20.) Even if there were constitutional violations, Defendants argue, "it would not have been clear to a reasonable person that the actions by defendants as alleged by plaintiff violated plaintiff's Constitutional rights. No reasonable person in defendants' shoes would have thought those actions violated any clearly established right of the plaintiff." (Dkt. No. 68–5 at 20–21.) Defendants do not break down their qualified immunity argument by defendant or cause of action. Other than a statement of law, these quotes comprise the entirety of Defendants' qualified immunity argument.

I will discuss the application of the doctrine of qualified immunity to the following claims, which I have found sufficient to withstand Defendants' arguments on the constitutional merits: (1) the Eighth Amendment conditions of confinement claim against Defendant Coco arising from the washing of inmates' clothing with dirty mop heads; (2) the Eighth Amendment conditions of confinement claim against Defendant Taylor for removing the memoranda from Plaintiff's physician; (3) the Eighth Amendment conditions of confinement claim against Defendant Sorell arising from the washing of inmates' clothing with dirty mop heads; (4) the retaliation claim against Defendant Hunsky arising from the August 31, 2005, misbehavior report; (5) the retaliation claims against Defendant Theriault arising from the August 31, 2005, and January 23, 2006, threats; (6) the retaliation claims against Defendant McDonald arising from the January 2006 misbehavior reports; (7) the retaliation claim against Defendant Ball arising from the April 25, 2006, threat; and (8) the retaliation claim against Defendant Ball arising from the April 26, 2006, misbehavior report.

**\*18** "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a prisoner civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004) [citations omitted], *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007) [citations omitted]. Courts may exercise their sound discretion in deciding which of the two prongs should be addressed first, in light of the circumstances in the particular case at hand. *Pearson v. Callahan,* ——U.S. ——, ——, 129 S.Ct. 808, 817, 172 L.Ed.2d 565 (2009).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

(1) whether the right in question was defined with 'reasonable specificity'; whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) [citations omitted], *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211(1992).[43] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007) [citations omitted].[44] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).[45]

I find that Defendants Coco and Sorell are entitled to qualified immunity against the Eighth Amendment conditions of confinement claims arising from the washing of inmates' clothing with dirty mop heads. As discussed above, the facts, viewed in the light most favorable to Plaintiff, state an Eighth Amendment conditions of confinement claim. However, this right was not defined with sufficient specificity that a reasonable officer, upon washing mop heads with inmate clothing, would have understood that his or her actions violated inmates' constitutional rights. Therefore, I recommend that Defendants' motion be granted as to these claims.

**\*19** As to the remaining claims, I find that Defendants are not entitled to qualified immunity because the facts viewed in the light most favorable to Plaintiff state constitutional claims, the rights in question are defined with 'reasonable specificity', the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question, and under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 68) be **GRANTED IN PART** and **DENIED IN PART.**

**RECOMMENDED** that Defendants' motion be granted as to the following claims: (1) all claims against Defendant Monnely; (2) the retaliation claim against Defendant Hunsky arising from the August 25, 2005, misbehavior report; (3) the retaliation claim against Defendant Sorell arising from the April 2005 misbehavior report and disciplinary hearing testimony; (4) the Eighth Amendment medical care claims against Defendants Coco, Sorell, and Plowman; (5) the Eighth Amendment excessive force claims against Defendants Plowman, Shareldon, and Theriault; and (6) the Eighth Amendment conditions of confinement claims against Defendants Coco and Sorell arising from the washing of dirty mop heads with inmates' clothing.

**RECOMMENDED** that Defendants' motion be **denied** as to the following claims without prejudice to the filing of a subsequent motion for summary judgment properly supported by a Statement of Material Facts and admissible evidence: (1) the retaliation claim against Defendant Theriault arising from the August 31, 2005, threat; (2) the retaliation claim against Defendant Theriault arising from the January 23, 2006, threat; (3) the retaliation claim against Defendant Ball arising from the April 25, 2006, threat; (4) the retaliation claim against Defendant Hunsky arising from the August 31, 2005, misbehavior report; (5) the retaliation claims against Defendant McDonald arising from the January 2006 misbehavior reports; (6) the retaliation claim against Defendant Ball arising from the April 26, 2006, misbehavior report; and (7) the Eighth Amendment conditions of confinement claim against Defendant Taylor.

**RECOMMENDED** that the Court *sua sponte* dismiss: (1) any Fourth Amendment claim against Defendant Plowman arising from his removal of Plaintiff's medication from Plaintiff's personal property; (2) any retaliation claim against Defendant Coco arising from his transfer of Plaintiff to another dormitory; and (3) any Eighth Amendment medical care claim against Defendant Sorell arising from the April 2005 misbehavior report.

**RECOMMENDED** that the Court find that the complaint asserts the following claims, which Defendants have not addressed and which are sufficiently well pleaded to withstand *sua sponte* review: (1) a retaliation claim against Defendant Plowman arising from the November 6, 2004, physical attack; (2) a retaliation claim against Defendant Shareldon arising from the November 9, 2004, physical attack; (3) retaliation claims against Defendants Theriault and Shareldon arising from the August 31, 2005, physical attack; and (4) a retaliation claim against Defendant Plowman arising from the removal of Plaintiff's medication from his personal property on September 3, 2005.

**\*20** **ANY OBJECTIONS to this Report–Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report–Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/ or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.**[46]

**BE ALSO ADVISED that the failure to file timely objections to this Report–Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1743987

Footnotes

1    Because this case has been pending for 3.5 years, I am reluctant to recommend allowing Defendants the opportunity to move again for summary judgment. However, the possibility that some claims could be disposed of without the need for expending the court and community resources required for a trial suggests that denying portions of the motion without prejudice is the most efficient resolution.

2    To the extent that this allegation asserts a retaliation claim against Defendant Coco, I recommend that the Court dismiss the claim *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B). Plaintiff has not pleaded facts plausibly suggesting that this transfer was an "adverse action." *See Coleman v. Sutton,* 530 F.Supp.2d 451, 453 (W.D.N.Y.2008) (prisoner failed to state a retaliation claim where he did not allege that conditions into which he was transferred were more onerous than his original placement). *Compare Shine v. Hofman,* 548 F.Supp.2d 112 (D.Vt.2008) (transfer from general population to "close custody").

3    To the extent that Plaintiff asserts an Eighth Amendment medical care claim arising out of this incident (Dkt. No. 35 at ¶ 42), I recommend that the Court dismiss it *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B). The complaint alleges neither any "serious medical condition" nor facts plausibly suggesting that Defendant Sorell was deliberately indifferent to that condition.

4    Plaintiff's complaint also makes the following allegations about individuals not named as defendants: (1) Officer Devito and a civilian cook fabricated a misbehavior report on November 6, 2004, which resulted in Plaintiff being placed in the SHU (Dkt. No. 35 at ¶ 11); (2) Lt. Don held a biased Tier II hearing on November 9, 2004, which resulted in Plaintiff being placed in the SHU (Dkt. No. 35 at ¶ 12); (3) unnamed people "maliciously destroyed" Plaintiff's typewriter in retaliation for filing a grievance (Dkt. No. 35 at ¶ 13); (4) unnamed sergeants who were supposed to investigate incidents involving Plaintiff "used intimidating tactic[s] to scare some witnesses into not wanting to testify" for Plaintiff (Dkt. No. 35 at ¶ 21); (5) an unnamed sergeant instructed his subordinates to keep Plaintiff locked in a double-bunk cubicle (Dkt. No. 35 at ¶ 28); and (6) unnamed correctional officers called Plaintiff a troublemaker and a nigger. (Dkt. No. 35 at ¶ 41.)

5    Although Plaintiff's deposition includes a statement by the court reporter certifying that the transcript is accurate, the statement is not signed.

6    The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which

Sharpe v. Taylor, Not Reported in F.Supp.2d (2009)

2009 WL 1743987

provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

7    *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

8    *See* Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest .... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02–CV–6205, 2004 U.S. Dist. LEXIS 23314, at *4–5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101–102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01–CV–4430, 2002 U.S. Dist. LEXIS 1658, at *6–7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion—one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

9    *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

10    *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

11    *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) ( McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95–CV–4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98–CV–0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

12    *See, e.g., Swierkiewicz,* 534 U.S. at 513–514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

13    2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003).

14    *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a] [2]'s liberal requirement); *accord, Dura Pharm.,* 125 S.Ct. at 1634–1635, *Christopher v. Harbury,* 536 U.S. 403, 416–422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234–235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208–209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01–7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit

interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

15   All citations to the *Bell Atlantic* decision will be to the S.Ct. cite rather than the U.S. cite because page numbers are not available for the U.S. version.

16   The Court in *Bell Atlantic* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Bell Atlantic,* 127 S.Ct. at 1969.

17   *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07–CV–2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that *"Twombly requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....'"*) [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ( "We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" ) [emphasis in original].

18   *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215–16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

19   For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Bell Atlantic,* all that is required is "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199–2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatitis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01–CV–0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02–CV–1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01–CV–6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99–CV–3208, 2000 WL 760751, at *5 (S.D.N.Y. June 13, 2000).

20   *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

21   *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

2009 WL 1743987

22    "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96–CV–7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading—which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138–39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

23    *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

24    *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

25    *Yang v. New York City Trans. Auth.,* 01–CV–3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

26    *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy,* 05–CV–0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report–Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint—the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07–CV–0166, 2008 WL 3582743, at *2 (D.Vt. Aug.13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint—lack of subject-matter jurisdiction and lack of standing —were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co.,* 05–CV–2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint—which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence—were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00–CV–1309, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint—the fact that the defendants were protected from liability by Eleventh Amendment immunity—was substantive and not formal in nature, rendering repleading futile).

27    *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06–1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

28    *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

29    *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro*

*se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

30  *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

31  Defendants refer to this officer as "Marnell" in their memorandum of law (Dkt. No. 68–5 at 2–4), but refer to her in the answer to the complaint as "Monnely." I have used the spelling listed in the complaint, the answer, and the docket.

32  On the evidence, Defendants argue that they are entitled to summary judgment because it is undisputed that Plaintiff committed the misconduct charged. (Dkt. No. 68–5 at 9–11.) Defendants rely on *Hynes v. Squillace,* 143 F.3d 653 (2d Cir.1998). I note that *Hynes* is distinguishable because in that case the prisoner conceded, both at his disciplinary hearing and in his briefs before the district court, that he was guilty of the disciplinary charges. *Hynes,* 143 F.3d at 657.

33  To the extent that Plaintiff's complaint asserts a retaliation claim against Defendant Hunsky regarding the August 25, 2005, misbehavior report, I recommend that the claim be dismissed because the complaint does not assert facts plausibly suggesting a retaliatory motive.

34  To the extent that Plaintiff asserts a Fourth Amendment claim against Defendant Plowman arising from this incident, I find it to be without merit and recommend dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B). The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches ... shall not be violated." U.S. Const. amend IV. "What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) [internal quotation marks and citation omitted]. "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner,* 489 U.S. at 619 [internal quotation marks and citations omitted]. In so doing, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) [citations omitted], *accord, Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). The Fourth Amendment's proscription against unreasonable searches does not apply *at all* within the confines of a prison cell. *Hudson v. Palmer* 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *see also Tinsley v. Greene,* 95–CV–1765, 1997 WL 160124, at *7 (N.D.N.Y. March 31, 1997) (Pooler, J., adopting Report–Recommendation of Homer, M.J.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights.").

35  To the extent that Defendants' argument relies on Plaintiff's deposition testimony, I decline to consider it due to the deficiencies in Defendants' Statement of Material Facts and evidentiary submissions.

36  *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

37  *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

38  *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

39  *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

40  *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

41  Plaintiff's opposition to Defendants' motion appears to assert that Defendant Taylor was personally involved because he responded to Plaintiff's grievances. Those allegations do not appear in the complaint, and I decline to address them at this time.

42  To the extent that Defendants' argument relies on Plaintiff's deposition testimony, I decline to consider it in light of the deficiencies in Defendants' Statement of Material Facts and evidentiary submissions.

43  *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

44  *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") [citation omitted]; *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under

the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

45    *See also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

46    *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88–CV–5309, 1993 WL 427409, at * 18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec 'y of Health & Human Servs.,* 863 F.2d 633, 638–39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson–Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990–91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1133247
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeff SMITH, Plaintiff,
v.
Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480.
|
April 24, 2006.

### Attorneys and Law Firms

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of
New York, Kelly L. Munkwitz, Esq., Asst. Attorney
General, of Counsel, Department of Law, Albany, NY,
for Defendants.

### DECISION and ORDER

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Jeff Smith, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By Report-
Recommendation dated March 17, 2006, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted, and that plaintiff's motion for
partial summary judgment be denied. (Docket No.
51). The plaintiff has filed objections to the Report-
Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of
the report and recommendations to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted in whole. See 28 U .S.C. 636(b)(1). Accordingly,
it is ORDERED that
1. Defendants' motion for summary judgment is
GRANTED;

Plaintiff's motion for partial summary judgment is
DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

### REPORT-RECOMMENDATION

This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(c) of the Rules of Practice
for this Court. In this *pro se* civil rights action brought
under 42 U.S.C. § 1983, Jeff Smith ("Plaintiff") alleges
that five employees of Upstate Correctional Facility-
Deputy Superintendent Robert K. Woods, Captain
Joseph R. Belarge, Sergeant G.J. O'Donnel, Food Service
Administrator Richard Antonelli, and Correction Officer
Wayne Holt ("Defendants")-violated his rights under the
First, Fourth, Eighth, and Fourteenth Amendments by
(1) retaliating against him for having previously filed a
complaint, (2) subjecting him to an unreasonable search
and seizure, (3) subjecting him to a damaged bunk bed
while he was housed in the Upstate Correctional Facility
Special Housing Unit, and (4) taking away his "good
time" credits without affording him due process. (Dkt.
No. 5 [Plf.'s Am. Compl.].) [1]

Currently before the Court is Defendants' motion for
summary judgment (Dkt. No. 37), and Plaintiff's motion
for partial summary judgment (Dkt. No. 38), both
brought pursuant to Rule 56 of the Federal Rules of Civil
Procedure. Because both motions were filed on the same
day (February 11, 2005), and neither was filed in response
to the other, I construe each motion as a "motion"
and neither motion as a "cross-motion." Both Plaintiff
and Defendants have responded to each other's motion
(Dkt.Nos.42, 45), and replied to the other's response
(Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1)
whether Plaintiff has failed to establish (or even state) a

2006 WL 1133247

First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff has failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

**\*2**  Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

## I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110

(2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings. "[I]n actions in which one of the parties appears *pro se,* this Court is faced with the ... responsibility of granting significant liberality in how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) *(per curiam) (pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3**  However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding

pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A., 02-CV-10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004)* (citations omitted), *accord, Durran v. Selsky, 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003)* (citations omitted).

## II. STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [5]

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [7] An affidavit or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [8]

Similarly, such an affidavit or verified complaint must not be conclusory. [9] Of course, an affidavit may be conclusory because its assertions are too general. [10] However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [11] Indeed, it has long been the rule in the Second Circuit that

"issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc., 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978),* aff'd without opinion, 603 F.2d 214 (2d Cir.1979).

**\*4** Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No. 42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a][2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]." [12] However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. [13]

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube"

Case 9:16-cv-01211-GTS-TWD    Document 72    Filed 08/09/18    Page 290 of 338
Smith v. Woods, Not Reported in F.Supp.2d (2006)
2006 WL 1133247

on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail." [14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters. [15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail. [16]

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

### Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F."). [17]

**\*5** At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F. [18]

### Plaintiff's Legal Assistance to Inmate Peter Alcivar and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198). [19]

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit. [20] At the time, Plaintiff was not an inmate law clerk. [21]

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer. [22]

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action. [23] In pertinent part, the letter stated,

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already told both of you that I am helping him with the filing of his motions, etc....
Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research that I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him. [24]

2006 WL 1133247

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center. [25]

**\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters. [26] In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on." [27] In addition, the last page of the letter states:

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original*.
It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession. [28]

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters. [29] In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

Plaintiff's Communications with Defendant Woods and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods. [30] The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request." [31]

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods. [32] The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention." [33]

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic." [34]

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods. [35] The note stated, in pertinent part:

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a *<DEAD>* man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration cannot take any action against the inmate's family nor myself. [36]

**\*7** 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff. [37] That memorandum stated, in pertinent part:

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately. [38]

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum. [39]

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents. [40] Plaintiff denied having such documents. [41]

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note. [42]

Case 9:16-cv-01211-GTS-TWD    Document 72    Filed 08/09/18    Page 292 of 338
Smith v. Woods, Not Reported in F.Supp.2d (2006)
2006 WL 1133247

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers). [43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters). [44]

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods. [45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F. [46]

Plaintiff's Misbehavior Report,
Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002. [47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3) soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20. [48]

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee; [49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization; [50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate

family member without the consent or approval of the Superintendent or his designee. [51]

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits . [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence. [57] Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days. [58] However, Plaintiff's good time loss was unaffected by the discretionary review. [59]

Meetings Between Defendants
Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff. [60] Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff. [61]

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F. [62] Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules. [63]

Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002. [64]

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU. [65]

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned. [66] Those photographs are made part of the record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood. [67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; and between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned in SHU. [68]

III. ANALYSIS

A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

**\*9** In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he

fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty right to make an oral and written complaint about Defendant Antontelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

2006 WL 1133247

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

 *10 Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers. [69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks before the disciplinary hearing. [70] Plaintiff's letter did not mention Defendant Antonelli. [71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing. [72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met"

with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing. [73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

### B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. [75]

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint. [76] Specifically, the allegations contained in Paragraph 15 of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim. [77] In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...." [78]

2006 WL 1133247

**\*11** The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube"). "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). [79] Nor does the Fourth Amendment proscription apply within the confines of a prison "cube." [80] Indeed, Plaintiff appears to recognize this point of law. [81]

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and seizure by Defendant Woods of Plaintiff's mail is vague and conclusory. [82] Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar). [83] I fail to see how any search and confiscation of such contraband would have violated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program). [84]

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

### C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not established that Defendants were *deliberately* indifferent to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU

as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

**\*12** With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

### 1. Sufficiently Serious Deprivation

Plaintiff alleges that he was diagnosed with "spondylolisthesis" [85] in September of 2002 as a result of sleeping on a defective bed. [86] As far as I can tell from available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a

2006 WL 1133247

prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need.[87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint,[88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need.[89]

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective.[90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question.[91]

**\*13** More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed,[92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002.[93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002.[94]

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds.[95] For these reasons, I find that Plaintiff has

failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

2. Deliberate Indifference

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3 5, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it.[96] More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times.[97] Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antontelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints.[98] Any assertion by Plaintiff that Defendants Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk.[99]

**\*14** In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October 24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace. [100]

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days). [101] Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various

other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn, 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); Reyes v. Punzal, 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).*

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York, 380 F.3d 680, 686, 691 (2d Cir.2004).* First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill, 380*

F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

### 1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed. [102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions, testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question. [103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the

PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16** Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question. [104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable. [105]

### 2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

### 3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school. [106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F. [107] Indeed, he had filed grievances immediately before and during this very time period. [108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

### E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

**\*17** In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S. 477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997) ].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their modest threshold burden with regard to this issue. [109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to

(1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated. [110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated. [111]

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

### F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, *see, e.g.,* Dkt. No. 5, ¶¶ 21-22 (Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

**\*18** I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. *See Webb v. Goord,* 340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights"

2006 WL 1133247

as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb,* 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. *Id.* (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); *Boddie v. Schneider,* 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. *( See, supra,* Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no *evidence* to the contrary. Plaintiff merely argues that DOCS' policies and procedures would *never* involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no

evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result, I recommend that the Court dismiss Plaintiff's conspiracy claim.

G. Whether Defendants Are Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992).[112] Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness"[113] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,*

475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter" regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20** As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it

appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or Antonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment
Based on the above reasons, I find that Plaintiff's motion for partial summary judgment-which (at best) contains arguments regarding the issues discussed above-is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt. No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."*) [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y*

2006 WL 1133247

*of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

Footnotes

1    Given my duty to liberally construe a *pro se* plaintiff's civil rights complaint, I construe Plaintiff's Amended Complaint as including a claim that various Defendants violated Plaintiff's rights under the Fourth Amendment to be free from unreasonable searches and seizures. *See Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, [the plaintiff] has raised. In so doing, the court's imagination should be limited only by [the plaintiff's] factual allegations, not by the legal claims set out in his pleadings.") [citations omitted]. *(See also* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment[ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

2    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

3    *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

4    *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

5    Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a)(3) statement does not comply with the local rules, it has been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

6    *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

7    Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

8    *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting

affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

9    *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

10   *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e]), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

11   *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

12   (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

13   *(See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff ***"stuck with them*** as well as the other two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers ***I have here"];*** Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to ***hold a copy of the complaint"*** in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents ***being in my possession ...*** you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

14   (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

15   (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube"].)

16   (Dkt. No. 5, ¶ 12 [Am. Compl.].)

2006 WL 1133247

17   (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl].)

18   (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ ¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

19   (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37 [Antonelli Aff., attaching pleading and motion from lawsuit].)

20   (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

21   (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

22   (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

23   (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

24   (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

25   (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

26   (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

27   (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

28   (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

29   (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

30   (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

31   (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

32   (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

33   (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

34   (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "crypic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

35   (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

36   (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

37   (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

38   (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

39   (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

2006 WL 1133247

40  (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

41  (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

42  (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

43  (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

44  (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; see also Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told Holden that he was helping an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

45  (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

46  (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

47  (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

48  (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

49  (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) See also 7 N.Y.C.R.R. § 270.2[B][26][vii].

2006 WL 1133247

50    (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) *See also* 7 N.Y.C.R.R. § 270.02[B][14] [v].

51    (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or services" from Inmate Alcivar's daughters].) *See also* 7 N.Y.C.R.R. § 270.02[B][4][ii].

52    (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

53    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

54    (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11 [Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

55    (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

56    (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

57    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 1 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

58    (Id.)

59    (Id.)

60    (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

61    (Dkt. No. 37, Part 2, ¶ 3 8 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 8 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

62    (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

63    (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

64    (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

65    (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

66    (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

67    (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

68    (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

69    See Malik'El v. N.Y. State DOCS, 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at *7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), adopted by 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); but see Rodriguez v. Phillips, 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); Garrido v. Coughlin, 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct under the First Amendment).

70    (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

71    (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

72    (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week prior to holding said hearing," without providing any specifics about the alleged "encounter," without providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73    (Dkt. No. 42, Part 1¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

74    (See, supra, Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

75    (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].) See Clissuras v. CUNY, 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

76    (See Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment [ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom

was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

77    (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though the cause of action cites the Fourth Amendment], 28 [in which defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am"].)

78    (Dkt. No. 5, ¶ 14 [Am. Compl.].)

79    See also *Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at *7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

80    See *Freeman v. Goord,* 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at *5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

81    (Dkt. No. 37, Part 22, Ex. A at 26 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

82    (Dkt. No. 5, ¶ 12 [Am. Compl.].)

83    I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

84    See, e.g., DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

85    "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at *35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456 [25th ed.1990] ).

86    (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].)

87    See *Villante v. N.Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at *4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at *11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at *13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at *4-6, 8-10 (E.D.Pa. Nov. 28, 1989).

88    (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard conditions there, which included his allegedly defective bunk].)

89    (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].)

90    (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

91    (See, supra, Statement of Fact No. 29.)

92    (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

93    (Compare Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on **9/23/02,** after having been assigned to two different SHU

cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] *with* Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02**, and that the date of diagnosis was **9/20/02]** *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02]** *and* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on **9/9/02**, or three days after his admission to SHU].)

94    (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past**. I request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

95    *See Faunce v. Gomez,* No. 97-16943, 1998 U.S.App. LEXIS. 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

96    (Dkt. No. 5, ¶ 38 [Am. Compl.].)

97    *(See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

98    (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question on 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

99    *(Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

100    (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

101    *(See, supra,* Statement of Fact No. 24.)

102    (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

103    *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

104    *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

105    (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

106    (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

107    (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

108    (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

109    See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ... upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

110    See *Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at *7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at *7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

111    (See, e.g., Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'...."].)

112    See also *Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

113    See *Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

**End of Document**                                             © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 3913018
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

William D. THOMAS, Plaintiff,
v.
L. PINGOTTI; et al., Defendants.

William D. Thomas, Plaintiff,
v.
Polizzi; et al., Defendants.

9:17-CV-0300 (GTS/DEP)
|
9:17-CV-0377 (GTS/ATB)
|
Signed 09/06/2017

**Attorneys and Law Firms**

WILLIAM D. THOMAS, Plaintiff, pro se, 13-A-2123, Downstate Correctional Facility, Box F, Fishkill, NY 12524.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**I. INTRODUCTION**

 **\*1**  The Clerk of the Court has sent to the Court for review two complaints filed pro se by plaintiff William D. Thomas in the above-captioned actions. [1] Plaintiff, who is confined at Downstate Correctional Facility, asserts claims arising out of his confinement at Shawangunk Correctional Facility ("Shawangunk C.F.") in 2016. Plaintiff has not paid the filing fee in either action, and seeks leave to proceed in forma pauperis ("IFP").

**II. Duplicative Actions**

A court reviewing a complaint pursuant to 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A may properly consider whether the claims asserted by the plaintiff are duplicative of claims asserted in another action. [2] As the Second Circuit has recognized, "plaintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time." Curtis v. Citibank, N.A., 226 F.3d 133, 138-39 (2d

Cir. 2000). The principles which guide courts addressing duplicative and repetitive claims rest on considerations of "(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180, 183 (1952). The doctrine is also meant to protect parties from "the vexation of concurrent litigation over the same subject matter." Adam v. Jacob, 950 F.2d 89, 93 (2d Cir. 1991). Thus, "[c]ourts generally look to the identity of the parties, legal claims, factual allegations including temporal circumstances, and the relief sought to determine if the complaint is repetitive or malicious." Hahn v. Tarnow, No. 06-CV-12814, 2006 WL 2160934, at *3 (E.D. Mich. July 31, 2006).

In managing the litigation in its court, there are several approaches to the proper disposition of duplicative actions, including dismissal without prejudice, and consolidation. Curtis, 226 F.3d at 138. The district court has broad discretion in making this determination, and the exercise of its power is reviewed by the Court of Appeals for abuse of discretion. Id.; see also Lopez v. Ferguson, 361 Fed.Appx. 225, 226 (2d Cir. 2010) ("We review a district court's dismissal of claims as duplicative for abuse of discretion."); Johnson v. Celotex Corp., 899 F.2d 1281, 1284-85 (2d Cir. 1990) ("The trial court has broad discretion to determine whether consolidation is appropriate.").

 **\*2**  The pleading submitted by plaintiff in Thomas I is styled as a "Complaint under [New York] Civil Service Law Section 75." See Dkt. No. 1 at 5. [3] While nominally directed towards Shawangunk C.F. Acting Supt. Pingotti, the pleading identifies sixteen additional corrections and medical staff as "respondents" and alleges numerous claims of misconduct by those individuals during plaintiff's confinement at Shawangunk C.F. in 2016. Id. at 5-9. Liberally construed, plaintiff claims that he has been subjected to adverse actions in retaliation for his having filed grievances and complaints (related primarily to his participation in the Sex Offender Treatment Program ("SOTP")), disciplined without due process, denied proper and adequate mental health care, and denied proper investigation of and redress for the misconduct complained of his grievances.

In Thomas II, plaintiff submitted a twenty-five page complaint utilizing the form civil rights complaint available to litigants in the Northern District of New

2017 WL 3913018

York. *See* Dkt. No. 1 ("Compl."). All seventeen of the defendants named in *Thomas* I are defendants in this complaint. *Id.* at 1-7. The complaint in *Thomas* II sets forth, with some additional factual support, the instances of misconduct complained of in *Thomas* I, as well as additional claims and three additional defendants. *Id.* at 9-23. [4] Plaintiff seeks an award of compensatory and punitive damages as well as declaratory and injunctive relief. *Id.* at 24-25.

Upon review of the two pleadings, the Court finds that there is considerable duplication and repetition of claims and defendants in these two actions, as to which common questions of law and fact exist. To the extent that these actions differ in any significant way, the differences arise only from the additional claims and defendants in *Thomas* II. The Court also finds that the pleading in *Thomas* II sets forth plaintiff's claims in a more comprehensive and well-organized manner than does the pleading in *Thomas* I which, as noted, purports to be a state court petition under Civil Service Law Section 75.

Based upon the foregoing, and in order to conserve judicial resources and avoid duplicative litigation, the Court hereby dismisses *Thomas* I without prejudice in favor of *Thomas* II. [5]

## III. IFP STATUS

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010). [6] "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Id.* (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

**\*3** Upon review, the Court finds that plaintiff has submitted a completed IFP application which has been certified by an appropriate official at his facility, *see* Dkt. No. 10, and which demonstrates economic need. *See* 28 U.S.C. § 1915(a)(2). Plaintiff has also filed the inmate authorization required in the Northern District. Dkt. No. 3.

Accordingly, plaintiff's application to proceed with this action IFP is granted.

## IV. SUFFICIENCY OF THE COMPLAINT

Having found that plaintiff meets the financial criteria for commencing this action in forma pauperis, and because plaintiff seeks relief from officers and employees of a governmental entity, the Court must consider the sufficiency of the allegations set forth in his complaint in light of 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A. Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed in forma pauperis, "(2) ... the court shall dismiss the case at any time if the court determines that —... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [7] Similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both Sections 1915 and 1915A are available to evaluate prisoner pro se complaints).

In reviewing a complaint, the Court has a duty to show liberality toward pro se litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution ... in ordering *sua sponte* dismissal of a *pro se* complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond," *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that

a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to 'infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

**\*4** Plaintiff seeks relief in this action pursuant to Section 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983); *see also Myers v. Wollowitz*, No. 95-CV-0272, 1995 WL 236245, at \*2 (N.D.N.Y. Apr. 10, 1995) (McAvoy, C.J.) (finding that Section 1983 "is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights"). To be held liable for damages in a Section 1983 action, a defendant must have been personally involved in the alleged violation. *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). Thus, to set forth a cognizable claim under Section 1983, a "plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)).

Plaintiff asserts numerous claims for the violation of his rights protected under the First, Eighth, and Fourteenth Amendments to the U.S. Constitution. The sufficiency of those claims, as set forth in the complaint in seven causes of action, is addressed below.

### A. First Cause of Action—Retaliation

To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff.

*Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d. Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

The Second Circuit has long instructed that because virtually any adverse action taken against a prisoner by a prison official can be characterized as a constitutionally proscribed retaliatory act, courts must examine claims of retaliation with "skepticism and particular care." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes*, 239 F.3d at 491). Analysis of retaliation claims thus requires thoughtful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the factual allegations tending to link the two. "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

Here, plaintiff alleges that he was retaliated against "for filing grievances and voicing opinion. And filing the 42 U.S.C. 1983 lawsuit." Compl. at 10. [8] Plaintiff identifies the following instances in which defendants took allegedly adverse action against him: C.O. Bertone threatened plaintiff with physical harm if he "continue[d] to make complaints;" C.O. Cutler and C.O. Stefanik wrote false reports against plaintiff "due to plaintiff voicing his opinion, and views;" and C.O. Clayburn issued a false misbehavior report to plaintiff after learning that plaintiff had written several inmate grievances against "fellow employees." *Id.* at 12.

It is well-settled that "verbal harassment, or even threats, are generally held not to rise to the level of adverse action that will support a First Amendment retaliation claim." *Rosales v. Kikendall*, 677 F. Supp.2d 643, 648 (W.D.N.Y. 2010) (citing *Cabassa v. Smith*, No. 08 Civ. 480 (LEK/DEP), 2009 WL 1212495, at \*7 (N.D.N.Y. Apr. 30, 2009)); *see Bartley v. Collins*, No. 95 Civ. 10161, 2006 WL 1289256, at \*6 (S.D.N.Y. May 10, 2006) ("[V]erbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action."); *Kemp v. LeClaire*, No. 03 Civ. 844, 2007 WL 776416, at \*15 (W.D.N.Y. Mar. 12, 2007) (threats such as "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your black ass kicked" are indistinguishable from those that have been found insufficient to establish a constitutional violation).

 **\*5** Upon review, the Court finds that C.O. Bertone's statement that he would "make something happen" to plaintiff if he continued to make complaints, without more, does not suffice to state a cognizable First Amendment retaliation claim against this defendant.

Plaintiff does not enjoy a protected constitutional right "to be free from false and inaccurate information" in his prison records. The creation of a false report in a prisoner's file is not, on its own, a due process violation. *See Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) ("a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report"); *Hollman v. Bartlett*, No. 08-CV-1417, 2011 WL 4382191, at \*12 (E.D.N.Y. Aug. 26, 2011) (the placement of a false report in an inmate's file, without more, is not a due process violation). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more such as "retaliation against the prisoner for exercising a constitutional right." *Boddie*, 105 F.3d at 862.

Here, while plaintiff alleges that C.O. Cutler and C.O. Stefanik created false reports about plaintiff which were retaliatory in nature, plaintiff has not provided any facts regarding the type of records or reports that were created, the manner in which these records were falsified, or how such falsity harmed plaintiff. Upon review, the Court finds that plaintiff has not alleged facts sufficient to plausibly suggest that these defendants took actions against him which were sufficiently "adverse" for purposes of the First Amendment. As a result, plaintiff's claims against C.O. Cutler and C.O. Stefanik do not survive initial review and are dismissed without prejudice. *Sheehy v. Brown*, 335 Fed.Appx. 102, 104 (2d Cir. 2009) (summary order) (allegations that "are so vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal.).

The Court also considered the sufficiency of plaintiff's claim that C.O. Clayburn issued a false misbehavior report in retaliation for grievances plaintiff had filed against other corrections officers. *See* Compl. at 12.[9] "Generally, alleged retaliation motivated by an action the prisoner took which did not personally involve the prison officials is insufficient for a retaliation claim." *Ortiz v. Russo*, No. 13 CIV. 5317, 2015 WL 1427247, at \*11 (S.D.N.Y. Mar. 27, 2015) (citing *Wright v. Goord*, 554

F.3d 255, 274 (2d Cir. 2009) (dismissing a pro se prisoner's claim that he was assaulted by the defendant in retaliation for an earlier letter he wrote which did not name or address defendant)); *see also Guillory v. Ellis*, No. 9:11-CV-0600 (MAD/ATB), 2014 WL 4365274, at \*18 (N.D.N.Y. Aug. 28, 2014) ("it is difficult to establish one defendant's retaliation for complaints against another defendant"); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (plaintiff "failed to provide any basis to believe that [defendant] retaliated for a grievance that she was not personally named in"). Here, because plaintiff has not alleged facts sufficient to plausibly suggest that grievances he wrote against other officers were a "substantial or motivating factor" in C.O. Clayburn's decision to issue the challenged misbehavior report, this claim does not survive initial review.

 **\*6** Based upon the foregoing, plaintiff's retaliation claims against C.O. Bertone, C.O. Cutler, C.O. Stefanik, and C.O. Clayburn set forth in the First Cause of Action are dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 19215A(b)(1).

### B. Second Cause of Action—Equal Protection

The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). To state a viable Equal Protection claim, a plaintiff generally must allege "purposeful discrimination ... directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995). In the alternative, under a "class of one" theory, plaintiff must allege that he has been intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *DeMuria v. Hawkes*, 328 F.3d 704, 706 (2d Cir. 2003).

Thomas v. Pingotti, Slip Copy (2017)

2017 WL 3913018

Here, plaintiff states that he is an "African American Muslim," and claims that defendants treat him differently from the Caucasian inmates in the SOTP "without a [reason] of doing so." Compl. at 13. More specifically, plaintiff alleges that defendants Piliero-Kinderman, Bode-Cutler, and Snyder (identified as Caucasian female employees assigned to the SOTP) spoke disparagingly to him in an attempt to "dehumanize" him and "strip [him] of his self-esteem;" plaintiff contends that these remarks were racially motivated. Id. Plaintiff further claims that he was improperly disciplined by defendant Scaringi (identified as a "Caucasian female American"), who ignored substantial evidence of plaintiff's innocence and found him guilty due to her discriminatory motive. Id. at 13, 15 (Scaringi went "against her better judgment, due to the fact that plaintiff is a African American male in a sex-offender program. And Defendant is a Caucasian woman."). With respect to a disciplinary hearing conducted by defendant Polizzi (identified as a Caucasian American male), plaintiff claims that he was improperly found guilty without regard to the evidence "because [he] is an African-American Muslim." Id. at 15. [10] As against defendant Acting Supt. Pingotti, plaintiff complains that he improperly reviewed and approved misbehavior reports written against plaintiff by C.O. Cutler, C.O. Clayburn, and C.O. Figuero (not a defendant) and designated Polizzi to conduct the hearings, actions that Acting Supt. Pingotti would not have taken in the case of a "Caucasian prisoner who had a false misbehavior report written against him." Id. at 18. Plaintiff further alleges that Acting Supt. Pingotti improperly affirmed the disciplinary findings by defendant Polizzi. Id.

**\*7** Plaintiff's complaint does not include any facts plausibly suggesting that similarly situated prisoners were treated differently than he was. Rather, plaintiff merely makes the conclusory assertion that inmates of other races, religions, and gender were treated differently by defendants (or would be treated differently if they found themselves in similar circumstances). Conclusory allegations of disparate treatment or a plaintiff's personal belief of discriminatory intent are patently insufficient to plead a valid claim under the Equal Protection clause. Nash v. McGinnis, 585 F. Supp. 2d 455, 462 (W.D.N.Y. 2008); see also Coleman v. Rice, No. 8:14-CV-1469 (MAD/CFH), 2015 WL 401194, at \*7 (N.D.N.Y. Jan. 28, 2015); Hughes v. Butt, No. 9:06-CV-1462 (TJM/GHL), 2009 WL 3122952, at \*12 (N.D.N.Y. Sept. 28, 2009).

As a result, plaintiff's Equal Protection claims set forth in the Second Cause of Action are dismissed without prejudice for failure to state a claim upon which relief may be granted. See 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

### C. Third Cause of Action—Free Exercise

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003). This includes the "right to participate in congregate religious services ... Confinement in keeplock does not deprive prisoners of this right." Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir. 1993) (internal citations omitted); see also Ford, 352 F.3d at 597 ("[A] prisoner's free exercise right to participate in religious services is not extinguished by his or her confinement in special housing or keeplock."). [11] However, an inmate's freedom of religion is not absolute, and must be balanced against "the interests of prison officials charged with complex duties arising from administration of the penal system." Ford, 352 F.3d at 588 (citation omitted). The analysis of a free exercise claim is governed by the framework set forth in O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987) and Turner v. Safley, 482 U.S. 78, 84 (1987). [12]

As alleged in the complaint, defendants Piliero-Kinderman, Bode-Cutler, and Snyder deliberately undertook to deny plaintiff the ability to practice his religion "when they went out of their way to discretely get plaintiff remove[d] from sex-offender treatment program by having false misbehavior reports written on plaintiff." Compl. at 19. [13] Plaintiff also contends that defendant Lt. Gardner made disparaging remarks about plaintiff's religion during the disciplinary hearing he conducted to address these reports. Id. At the conclusion of the hearing, Lt. Gardner found plaintiff guilty of misbehavior and sanctioned him with thirty (30) days of keeplock confinement. Id. During plaintiff's period of "restrictive confinement," Acting Deputy Supt. of Security ("Acting DSS") Bertone ignored plaintiff's written requests to attend Jum'mah services, and "to attend to break of Ramadan prayer and festival" with his "fellow Muslim[s]." Id. at 20-21. [14] Plaintiff identifies these observances as "religious tenets" of his faith. Id. at 20.

Thomas v. Pingotti, Slip Copy (2017)

2017 WL 3913018

**\*8** Upon review, and with due regard for plaintiff's status as a pro se litigant, the Court finds that a response to plaintiff's claim that he was denied free exercise of his religion is required from Acting DSS Bertone. This is not a ruling on the merits and the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

The Court reaches a different conclusion, however, with respect to the sufficiency of plaintiff's claims against defendants Piliero-Kinderman, Bode-Cutler, Snyder, and Gardner. As to these defendants, because plaintiff has not alleged facts which plausibly suggest that they were personally involved in the determinations made regarding plaintiff's ability to participate in congregate religious services during his period of keeplock confinement, his First Amendment free exercise claims against them set forth in the Third Cause of Action do not survive the Court's initial review and are dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

**D. Fourth Cause of Action—Privacy and Failure to Address Grievances**

The Supreme Court has recognized that the right to privacy protects against disclosure of personal matters, such as one's medical conditions. *Whalen v. Roe*, 429 U.S. 589, 598-600 (1977); *Doe v. City of N.Y.*, 15 F.3d 264, 267 (2d Cir. 1994). "The privacy interest is at its zenith when the prisoner suffers from an 'unusual' condition, such as HIV or transsexualism, that is 'likely to provoke an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others.' " *Shuler v. Brown*, No. 07-CV-0937 (TJM/GHL), 2009 WL 790973, at \* 5 (N.D.N.Y. Mar. 23, 2009) (quoting *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999)). However, courts have held that the right of confidentiality does not prohibit the disclosure of an individual's criminal history, including arrest records. *See Paul v. Davis*, 424 U.S. 693, 713 (1976) (finding no constitutional right of confidentiality affected by the publication of the fact that an individual was arrested of shoplifting); *Doe v. Cuomo*, 755 F.3d 105, 114 (2d Cir. 2014) (rejecting claim that reporting and notification requirements of New York's Sex Offender Reporting Act violate plaintiff's right to privacy of personal information); *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996) (holding that "there is no constitutional right to privacy in one's criminal record"

because "arrest and conviction information are matters of public record").

Here, plaintiff alleges that defendant C.O. Cunningham improperly told other inmates in the SHU that plaintiff "is a rapist in the sex-offender program." Compl. at 21. According to plaintiff, C.O. Cunningham intended to "encourage" other inmates to antagonize plaintiff "to see if they could get him to hang himself." *Id.*

Because the constitutional right to privacy does not protect the type of information allegedly disclosed by C.O. Cunningham, this claim does not survive initial review. [15]

**\*9** The Fourth Cause of Action also includes claims against Deputy Supt. Taylor-Stewart and Supt. Lamanna which arise, if at all, from their alleged failure to properly investigate and address plaintiff's complaints and grievances. Compl. at 22. As alleged, Deputy Supt. Taylor-Stewart ignored plaintiff's constant complaints about defendants Piliero-Kinderman, Bode-Cutler, and Snyder. *Id.* Plaintiff also alleges that Supt. Lamanna ignored plaintiff's complaints and improperly denied his grievance. *Id.*

Despite the fact that New York prison inmates are required to exhaust administrative remedies prior to commencing an action complaining of prison conditions, and resort to that grievance process is regarded as protected activity under the First Amendment which insulates inmates against retaliation for engaging in such activity, *see Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996), there is no constitutional right of access to the established inmate grievance program. *Pine v. Seally*, No. 9:09-CV-1198 (DNH/ATB), 2011 WL 856426, at \*9 (N.D.N.Y. Feb. 4, 2011) ("the law is ... clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials") (citing *Bernstein v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008) (collecting cases)); *see also Shell v. Brzezniak*, 365 F. Supp. 2d362, 369-70 (W.D.N.Y. 2005) ("[i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim").

Based upon the foregoing, plaintiff's allegations that his complaints and grievances were not properly processed, investigated, and responded to does not give rise to

cognizable claims for the violation of his Fourteenth Amendment due process rights. As a result, these claims against Deputy Supt. Taylor-Stewart and Supt. Lamanna set forth in the Fourth Cause of Action are dismissed without prejudice for failure to state a claim upon which relief may be granted. See 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 19215A(b)(1).

**E. Fifth Cause of Action—Unlawful SHU Confinement**
Although it is clear that the Constitution "does not mandate comfortable prisons," it does not permit inhumane treatment of those in custody. *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) and *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). "To demonstrate that the conditions of his confinement constitute cruel and unusual punishment a plaintiff must show that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. See *Farmer*, 511 U.S. at 834; *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)." "Only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991).

In his Fifth Cause of Action, plaintiff claims that he was "unlawfully confined in the SHU" due to the actions of defendants Piliero-Kinderman, Bode-Cutler, Snyder, Cutler, Stefanik, Clayburn, Cunningham, Gardner, Taylor-Stewart, Pingotti, Scaringi, Polizzi, Denniston, North, and Koba. Compl. at 22. No other facts are alleged.

Generally speaking, the "normal" or "ordinary" restraints imposed on inmates confined in SHU are not unconstitutional. See *Sostre v. McGinnis*, 442 F.2d 178, 192 (2d Cir. 1971) (en banc) ("It is undisputed on this appeal that segregated confinement does not itself violate the Constitution."). [16] Moreover, such confinement is not "abnormal" unless it is "totally without penological justification, grossly disproportionate, or involve[s] the unnecessary and wanton infliction of pain." *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir. 1984) (internal quotation marks and citations omitted). In limited circumstances, the length of the disciplinary detention may itself constitute disproportionate punishment in light of the gravity of the offense. See *Sostre v. McGinnis*,

442 F.2d 178, 190–94 & n.28 (2d Cir. 1971) (length of disciplinary detention [12 months] did not constitute disproportionate punishment considering the gravity of the offense; *Peoples v. Fischer*, No. 11-2694, 2012 WL 1575302, at *9 (S.D.N.Y. May 3, 2012) (denying motion to dismiss claim that disciplinary sentence of thirty-six months SHU confinement for a non-violent rule infraction constituted cruel and unusual punishment), *motion for reconsideration granted in part and denied in part on other grounds*, 898 F. Supp.2d 618, 626 (S.D.N.Y. 2012).

**\*10**  Significantly, plaintiff does not allege that the conditions of his SHU confinement were unduly harsh or in any way "abnormal" or "unusual." Plaintiff has also not disclosed the duration of his confinement. Moreover, plaintiff has failed to allege facts in support of his claim that these fifteen defendants were personally involved in creating the conditions of his SHU confinement that he seeks to complain of.

As a result, the unlawful confinement claim set forth in the Fifth Cause of Action is dismissed without prejudice for failure to state a claim upon which relief may be granted. See 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

**F. Sixth Cause of Action—Due Process**
In the Sixth Cause of Action, plaintiff sets forth claims against defendants North, Hines, Pearson, and Koba which, liberally construed, assert violations of plaintiff's due process rights. See Compl. at 22-23.

As against defendant C.O. North, plaintiff alleges that he tampered with hearing tapes that plaintiff requested, and improperly "coached" Scaringi to find plaintiff guilty at a Tier III hearing held in November 2015. Compl. at 22.

To successfully state a claim under Section 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. See *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation

to the ordinary incidents of prison life.' " *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). While not the only factor to be considered, the duration of a disciplinary confinement remains significant under *Sandin*. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000). [17] Thus, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see Colon*, 215 F.3d at 232 n.5), the Second Circuit generally takes the position that confinement in a SHU, without unusual conditions, for a period of up to 101 days will generally not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal conditions." *Ortiz*, 380 F.3d at 654; *Colon*, 215 F.3d at 231.

Here, insofar as plaintiff alleges that C.O. North engaged in conduct which resulted in his being denied due process at his disciplinary hearing, this claim does not survive initial review. Even assuming that plaintiff enjoyed a protected liberty interest in the disciplinary hearing conducted by Scaringi (and the Court makes no such finding), there is no basis in the complaint upon which the Court could conclude that C.O. North was personally involved in that wrongdoing for purposes of personal liability under Section 1983.

**\*11** Plaintiff alleges that defendant Hines improperly denied plaintiff's request for documents under the New York Freedom of Information Law ("FOIL"). Compl. at 23. [18] While the exact contours of plaintiff's claim are far from clear, to the extent that he claims that the denial of his FOIL request violated his constitutional rights, that claim is not cognizable in this Section 1983 action. *See Ladeairous v. Attorney Gen. of N.Y.*, 592 Fed.Appx. 47, 48 (2d Cir.), cert. denied sub nom. *Ladeairous v. Schneiderman*, 136 S. Ct. 220 (2015), reh'g denied, 136 S. Ct. 579 (2015) (" '[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control.' ") (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978)).

As alleged in the complaint, defendant C.O. Pearson confiscated legal materials and grievance records from plaintiff's cell. Compl. at 23. Following this incident, plaintiff "started to have problems obtaining legal research and materials." *Id.*

The Supreme Court has held that even "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). The Second Circuit has recognized that New York provides, "an adequate post deprivation remedy in the form of, inter alia, a Court of Claims action." *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001) (citing *Love v. Coughlin*, 714 F.2d 207, 208-09 (2d Cir. 1983)). [19] As a result, plaintiff's claims against C.O. Pearson arising from the confiscation of his legal papers are not cognizable in this action.

In his complaint, plaintiff alleges that defendant Koba, identified as the Grievance Supervisor, falsely reported that plaintiff never filed any grievances, and "prevented plaintiff from exhausting his grievances against fellow employees." Compl. at 23. In addition, plaintiff alleges that Koba provided false testimony at plaintiff's disciplinary hearing "to make plaintiff look like a gang member." *Id.*

Upon review, the Court finds that plaintiff's claims against defendant Koba do not survive initial review. As discussed above in Part III(D), an inmate does not enjoy a protected due process interest in accessing the inmate grievance system. As a result, plaintiff's claim that defendant Koba did not properly perform his duties as "Grievance Supervisor" at Shawangunk C.F. is not cognizable in this Section 1983 action. In addition, it is well-settled that "provision of false testimony against an inmate by corrections officers is insufficient on its own to establish a denial of due process." *Mitchell v. Senkowski*, 158 Fed.Appx. 346, 349 (2d Cir. 2005) (summary order) (citing *Boddie*, 105 F.3d at 862). Thus, the mere allegation that a defendant has given false testimony at a disciplinary hearing fails to support a section 1983 claim for damages against the witness providing such testimony. *Green v. Greene*, No. 9:07–CV–0351 (GTS/DEP), 2009 WL 5874308, at \*23 (N.D.N.Y. Mar. 30, 2009); *see also Cole v. Fischer*, No. 07 Civ. 11096, 2009 WL 130186, at \*3 (S.D.N.Y. Jan. 15, 2009).

**\*12** Based upon the foregoing, plaintiff's claims against defendants North, Hines, Pearson, and Koba set forth in the Sixth Cause of Action are dismissed without prejudice for failure to state a claim upon which relief may be

Thomas v. Pingotti, Slip Copy (2017)

2017 WL 3913018

granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

**G. Seventh Cause of Action—Inadequate Medical Care**
There are two elements to a claim that officials violated a plaintiff's Eighth Amendment right to receive adequate medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).[20]

In his complaint, plaintiff claims that Dr. Parks acted with deliberate indifference to plaintiff's "health and safety when he deny plaintiff proper and helpful medications." Compl. at 23. Plaintiff does not set forth any facts regarding the nature and extent of his medical and/or mental conditions, his efforts to obtain evaluation and treatment, or the basis for his belief that the treatment provided was not "proper and helpful."

Upon review, the Court concludes that the facts alleged in the complaint do not plausibly suggest that Dr. Parks acted with deliberate indifference, was reckless in his treatment of plaintiff, or provided him with treatment that was "inadequate" in a constitutional sense. It is well-settled that an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corrections*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008). "[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

As a result, plaintiff's medical indifference claim set forth in the Seventh Cause of Action does not survive initial review and is dismissed without prejudice for failure to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

**V. CONCLUSION**
**\*13 WHEREFORE**, it is hereby

**ORDERED** that upon review of the pleadings filed in *Thomas* I and *Thomas* II, the Court finds that there is considerable duplication and repetition of claims and defendants in these two actions, as to which common questions of law and fact exist; because the pleading in *Thomas* II is more complete and because plaintiff has asserted additional claims and named additional defendants in that action, *Thomas* I is hereby **DISMISSED without prejudice** in favor of *Thomas* II; and it is further

**ORDERED** that plaintiff's IFP application in *Thomas* I (Dkt. No. 11) is **DENIED as moot**; and it is further

**ORDERED** that plaintiff's IFP application in *Thomas* II (Dkt. No. 10) is **GRANTED**;[21] and it is further

**ORDERED** that the Clerk provide the superintendent of the facility, designated by plaintiff as his current location, with a copy of plaintiff's inmate authorization (Dkt. No. 3), and notify the official that this action has been filed and that plaintiff is required to pay to the Northern District of New York the entire statutory filing fee of $350 in installments, over time, pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED** that the Clerk provide a copy of plaintiff's inmate authorization (Dkt. No. 3) to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that plaintiff's claim that he was denied free exercise of his religion by Acting DSS Bertone set forth in the Third Cause of Action survives initial review and requires a response from this defendant; and it is further

**ORDERED** that plaintiff's remaining claims are **DISMISSED without prejudice** in accordance with 28 U.S.C. § 1915(e)(2)(ii) and 28 U.S.C. § 1915A(b)(1);[22] and it is further

**ORDERED** that the Clerk shall terminate Polizzi, Pingotti, Lamanna, Taylor-Stewart, Parks, Piliero-Kinderman, Denniston, Koba, Bode-Cutler, Snyder, Pearson, Gardner, Hines, Cunningham, Clayburn, Scaringi, Cutler, Stefanik, and North as defendants in this action; and it is further

**ORDERED** that upon receipt from plaintiff of the documents required for service of process, the Clerk shall issue a summons and forward it, along with a copy of the complaint, to the United States Marshal for service on defendant Bertone. The Clerk shall forward a copy of the summons and complaint to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

*14  **ORDERED** that a response to plaintiff's complaint be filed by defendant Bertone or his counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action must bear the case number (No. 9:17-CV-0377), and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so will result in the dismissal of this action**; and it is further

**ORDERED** that the Clerk of the Court serve a copy of this Decision and Order on plaintiff.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 3913018

---

Footnotes

1    Since March 2017, plaintiff has filed five civil rights actions in this District.

2    The dismissal of an action as duplicative has been found on several occasions to fall within the ambit of the court's power to dismiss a complaint which is frivolous or malicious pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). *See, e.g., Abreu v. Travers,* No. 9:15-CV-0540 (MAD/ATB), 2015 WL 10741194, at *4 (N.D.N.Y. Sept. 14, 2015) (citing cases), reconsideration denied, No. 9:15-CV-0540 (MAD/ATB), 2016 WL 1717204 (N.D.N.Y. Apr. 28, 2016); *see also Denton v. Hernandez,* 504 U.S. 25, 30 (1992) (recognizing Congress's concern that "a litigant whose filing fees and court costs are assumed by the public, unlike a paying litigant, lacks an economic incentive to refrain from filing frivolous, malicious, or repetitive lawsuits") (citation omitted).

3    Section 75 provides for the availability of a hearing upon stated charges prior to dismissal of certain government employees in New York. *See Russell v. Hodges,* 470 F.2d 212, 215 (2d Cir. 1972). Civil Service Law Section 75 does not afford plaintiff any basis for relief in this action; in light of plaintiff's pro se status the Court has liberally construed the pleading as seeking redress pursuant to 42 U.S.C. § 1983 ("Section 1983").

4    The additional defendants are Shawangunk C.F. Supt. Lamanna, Shawangunk C.F. C.O. Cunningham, and Shawangunk C.F. C.O. North. *Thomas* II, Compl. at 2, 6-7.

5    In light of the dismissal of *Thomas* I, plaintiff's IFP application in that case, *see* Dkt. No. 11, is denied as moot. Except as specifically noted, all further references in this Decision and Order to the docket shall be to *Thomas* II.

6    Section 1915(g) prohibits a prisoner from proceeding in forma pauperis where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions or appeals that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). The Court has reviewed plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service. *See* http://pacer.uspci.uscourts.gov. Based upon that review, it does not appear that plaintiff has accumulated three "strikes" for purposes of 28 U.S.C. § 1915(g).

7    To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989).

8    No other facts are alleged regarding the timing or subject matter of plaintiff's complaints and grievances.

9    Plaintiff's claim is asserted in wholly conclusory terms; no facts are provided regarding the date(s) of these grievances, the officers against whom the grievances were filed, or the nature of plaintiff's complaints.

10   The hearing was convened to consider an inmate misbehavior report written by C.O. Clayburn. Compl. at 16.

11   As the Second Circuit noted in *Ford*, DOCCS Directive 4202 "sets out prison officials' obligations in accommodating prisoners' religious practices." *Ford*, 352 F.3d at 586. Part X of Directive 4202 provides that "[u]pon commencement of keeplock or confinement status, an inmate may submit a written request to attend regularly scheduled congregate religious services;" such requests are to be directed to (and decided by) the Deputy Superintendent for Security.

12   This framework is one of reasonableness and is "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone*, 482 U.S. at 349. "It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.' " *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006)). At this early stage of the action, this Court applies the traditional formulation that, to prevail on a First Amendment claim, an inmate must show that he has a sincerely held religious belief, that it was substantially burdened, and that defendants' conduct was not reasonably related to some legitimate penological interest. *See Holland*, 758 F.3d at 221; *Salahuddin*, 467 F.3d at 274-75.

13   As noted, plaintiff states that he is an "African American Muslim." Compl. at 13.

14   Plaintiff does not contend that he was prohibited or prevented from praying or otherwise practicing his religion in his cell during the period of keeplock confinement.

15   In light of plaintiff's pro se status, the Court also considered whether plaintiff has plausibly alleged that C.O. Cunningham intentionally exposed plaintiff to "a substantial risk to his safety" in violation of his Eighth Amendment rights when he made comments to other inmates about plaintiff's criminal history, and concludes that he has not. Plaintiff may pursue such a claim in a properly filed amended complaint.

16   "Under the 'normal conditions of SHU confinement in New York [state prison],' the prisoner is: placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors [are] permitted, but the frequency and duration [is] less than in general population. The number of books allowed in the cell [is] also limited." *Palmer v. Richards*, 364 F.3d 60, 66 n.3 (2d Cir. 2004) (citation omitted).

17   For example, segregation for a period of thirty days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate. *Sandin*, 515 U.S. at 485-86. In explaining its reasoning, the Court found that the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's normal sentence. *Id.*

18   As alleged, plaintiff's request was denied on the ground that it was not timely. Compl. at 23.

19   The confiscation of an inmate's legal papers related to a legitimate, non-frivolous legal proceeding can give rise to a claim under the First Amendment for interference with access to the courts, provided that the inmate can establish that he or she has suffered prejudice as a result of the actions of corrections officials in the pursuit of his or her legal claims. *See Pacheco v. Pataki*, No. 9:07-CV-850 (FJS/GHL), 2010 WL 3635673, at *3 (N.D.N.Y. Sept. 9, 2010) ("A prisoner has a constitutional right of access to the courts, which is infringed when prison officials actively interfere with a prisoner's preparation of legal documents.... [f]or the claim of denial of access to the courts to be successful, a plaintiff must allege an actual injury."). Here, because plaintiff does not claim and there are no facts alleged in the complaint which even suggest, that the problems he experienced with the law library resulted in "actual injury," the complaint does not state a cognizable access to the courts claim.

20   "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1970)).

21   Although his in forma pauperis application has been granted, plaintiff will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

22   Should plaintiff seek to pursue any of the claims dismissed without prejudice, he must file an amended complaint. Any amended complaint, which shall supersede and replace the original complaint in its entirety, must be a complete pleading and must allege claims of misconduct or wrongdoing against each named defendant which plaintiff has a legal right to pursue, and over which this Court may properly exercise jurisdiction. Any amended complaint filed by plaintiff must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.

**End of Document**                                           © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 774982
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Miguel TIRADO, Plaintiff,

v.

Sergeant Brian SHUTT; Correction Officer
Steven Holliday; Correction Officer Rodney
Lassiter; Correction Officer Kyle Jackson;
and Lieutenant Stacy Dominic, Defendants.

No. 13 Civ. 2848(LTS)(AJP).
|
Signed Feb. 23, 2015.

### REPORT AND RECOMMENDATION

ANDREW J. PECK, United States Magistrate Judge.

**\*1 To the Honorable Laura T. Swain, United States District Judge:**

Plaintiff Miguel Tirado, an inmate currently incarcerated by the the New York State Department of Corrections and Community Supervision ("DOCCS") at Sing Sing Correctional Facility, brings this action (represented by pro bono counsel) against DOCCS Sergeant Brian Shutt, Correction Officers Steven Holliday, Rodney Lassiter and Kyle Jackson, and Lieutenant Stacy Dominic. (Dkt. No. 80: Am. Compl.) Tirado alleges, *inter alia,* that defendants retaliated against him for exercising his constitutional rights by assaulting him on April 19, 2012, filing false misbehavior reports against him, transferring him to other prison facilities against his will and threatening him and his family. (*See generally* Am. Compl.)

Presently before the Court is defendants' motion for partial summary judgment. (Dkt. No. 100.) For the reasons set for below, defendants' motion should be *DENIED* with respect to Tirado's claim that defendants retaliated against him for requesting to speak to a sergeant on April 19, 2012 by assaulting him and issuing a false misbehavior report, and his claim that they planted contraband in his cell as further retaliation, but *GRANTED* in all other respects. As a result, Lieutenant Dominic and C.O. Jackson should be *DISMISSED* as

defendants in this case. The Pretrial Order is due March 20, 2015.

### FACTS

#### Tirado's January 2012 Grievance

In January 2012, two correctional officers conducted a search of Tirado's cell in Sing Sing. (Dkt. No. 101: Defs. 56.1 Stmt. ¶ 7; Dkt. No. 105: Tirado 56.1 Stmt. ¶ 7.) During the search, Tirado became sick and had to lie down on the floor. (Defs. & Tirado 56.1 Stmts. ¶ 7.) Tirado claims that he was dragged out of his cell and down two flights of stairs to the infirmary. (*Id.*) The prison nurse found nothing wrong with Tirado, and the officers escorted him back to his cell. (*Id.*) Neither the officers nor the nurse involved in this incident are defendants in this case. (*Id.*) Tirado filed an inmate grievance, alleging staff misconduct and harassment. (*Id.*) Tirado also filed a complaint with the Westchester County District Attorney's Office. (Dkt. No. 106: Kremer Aff. ¶ 3 & Ex. B: 1/26/12 DA Letter.) After an investigation, on February 3, 2012 Sing Sing's superintendent denied Tirado's grievance. (Defs. & Tirado 56.1 Stmts. ¶¶ 8–9.) Tirado appealed to the Central Officer Review Committee, which upheld the denial. (*Id.*)

All of the defendants deny that they were aware of Tirado's January 2012 grievance or his complaint to the Westchester County District Attorney's office when the incidents that give rise to this case occurred. (Dkt. No.102: Shutt Aff. ¶ 11; Dkt. No.102: Jackson Aff. ¶ 7; Dkt. No.102: Holliday Aff. ¶ 6; Dkt. No.102: Lassiter Aff. ¶ 6; Dkt. No.102: Dominic Aff. ¶ 5.)

#### The April 19, 2012 Use of Force Incident And Resulting Inmate Misbehavior Report

**\*2** Tirado alleges that on April 19, 2012 at about 1:50 p.m., Correction Officers Steven Holliday and Rodney Lassiter assaulted him by pinning him to a wall, punching him in the face, throwing him to the ground, kneeling on his back, and kicking him while Sergeant Brian Shutt failed to intervene. (Dkt. No. 101: Defs. 56.1 Stmt. ¶ 10; Dkt. No. 105: Tirado 56.1 Stmt. ¶ 10.) Specifically, Tirado claims that Officer Holliday, who was on duty on Tirado's cell block along with Officer Lassiter, unfairly denied Tirado access to the recreation yard. (Dkt. No. 104: Tirado Br. at 3–4; Dkt. No. 106: Kremer Aff. Ex. C:

Tirado Dep. at 40.) Tirado, who was locked in his cell at this point, asked to speak to a seargeant. (Tirado. Br. at 3–4; Tirado Dep. at 40; *see also* Kremer Aff. Ex. D: Holliday Dep. at 108 (Tirado was "screaming 'I want to speak to a sergeant.' ").)

Tirado claims that after he requested to speak with a sergeant, Officer Holliday approached his cell and told Officer Lassiter to unlock it. (Tirado Br. at 4; Tirado Dep. at 40; Kremer Aff. Ex. E: Cassidy Dep. at 18.) Three other inmates—Anthony Cassidy, Elias Otero and Kelvin Vazquez—testified that they saw Officer Holliday approach Tirado while Tirado was locked in his cell, asking to speak with a sergeant. (Cassidy Dep. at 4, 17–18; Kremer Aff. Ex. I: Vazquez Dep. at 10; Kremer Aff. Ex. J: Otero Dep. at 15, 25.)

Officer Holliday allegedly directed Tirado to walk down to the center gate area of the gallery where Tirado would be able to speak to a sergeant. (Tirado Dep. at 40; Cassidy Dep. at 7, 18, 20; Vazquez Dep. at 6–7.) Officer Holliday admits that he had no idea whether the sergeant was near the gate but believed that no cameras or inmates could see what went on in that area. (Holliday Dep. at 110–11, 144–45.)

According to inmates Vazquez and Cassidy, Officer Holliday assaulted Tirado without provocation by pushing him and striking him. (Cassidy Dep. at 7, 20–21; Vazquez Dep. at 6–7, 12–13.) According to Tirado, Officer Holliday pinned him to the wall, and Officer Lassiter repeatedly punched him in the face. (Tirado Dep. at 40, 43–45, 87.) Tirado claims that he heard Sergeant Shutt approaching to ask what was happening, and Officer Lassiter replied that Tirado had been "disrespecting Holliday" by demanding to speak to a sergeant. (Tirado Dep. at 44, 46–47, 87.) Inmate Otero testified that prior to removing Tirado from his cell, Officer Holliday told inmates who were calling for a sergeant to "be quiet." (Otero Dep. at 33–34.) Inmate Otero further testified that Officer Holliday stated " 'I don't give a fuck about Lieutenants or Deps. I run shit here and if you don't do what I say I'll write you up every day I work.' " (Otero Dep. at 32–33.)

Defendants concede that Officers Holliday and Lassiter subjected Tirado to the use of force (*see* Defs. 56.1 Statement ¶ 12), but present a very different account of the incident. Officer Holliday claims that on April 19, 2012,

he saw "Tirado ... standing in the open doorway of his cell, yelling that he wanted to see a sergeant" (Dkt. No. 102: Holliday Aff. ¶ 3). According to Officer Holliday, Tirado walked out of his cell, became agitated, ignored a direct order to get against the wall for a pat frisk, and punched Officer Holliday in the face, leading Officer Holliday to push Tirado back against the wall and strike him two or three times before placing him in a bear hug. (Holliday Aff. ¶ 4.) Officer Holliday testified that he "was scared for [his] life" during the fight. (Holliday Dep. at 127.) Officer Lassiter arrived at the scene, saw the struggle and handcuffed Tirado. (Holliday Aff. ¶ 4; Dkt. No. 102: Lassiter Aff. ¶ 3.)

**\*3** Following the officers' use of force, Sergeant Shutt sent Tirado and the officers to different parts of the medical department to be assessed for injuries. (Defs. & Tirado 56.1 Stmts. 12.) After speaking with Tirado about his version of events, Sergeant Shutt had him escorted to the secure housing unit ("SHU"). (*Id.*) By the time Tirado was sent to the SHU, it was approximately 3:00 p.m., and the 3:00 p.m. to 11 p.m. shift had begun. (Defs. & Tirado 56.1 Stmts. 13.)

Tirado initially claimed that Lieutenant Dominic "confronted" him in the medical facility and threatened him with further assault. (Dkt. No. 80: Am. Comp. ¶ 35.) Tirado's deposition clarified that Lieutenant Dominic did no more than make a vague threat and that a different correction officer said "hold it down," which Tirado understood to mean that he should not tell anyone that he had been assaulted. (Tirado Dep. at 51.) According to Tirado, that threat deterred him from making any oral complaints about the assault while he was receiving medical treatment. (Tirado Dep. at 55–56.) Tirado admits that none of the defendants were present in the infirmary when this threat allegedly occurred. (Tirado Dep. at 56.)

Later that same day, Officer Holliday filed an inmate misbehavior report charging Tirado with assault on a correction officer, violent conduct, refusing direct orders and refusing a search or frisk. (Kremer Aff. Ex. M: 4/19/12 Officer Holliday Inmate Misbehavior Report.)

### The Search of Tirado's Cell And Resulting Inmate Misbehavior Report

After Tirado was sent to the SHU, Sergeant Shutt directed Officer Jackson to search Tirado's cell and pack his property for transfer to the SHU. (Dkt. No. 101: Defs.

56.1 Stmt. ¶ 14; Dkt. No. 105: Tirado 56.1 Stmt. ¶ 14.) [1] Around 5:30 p.m. on April 19, 2012, Officer Jackson searched Tirado's cell and found a metal ice pick-like weapon made from a tweezer broken in two and taped together and two other altered items—a toothbrush and a pen each with a metal tip added. (Defs. & Tirado 56.1 Stmt. ¶ 16.) After completing the cell search, Officer Jackson issued Tirado an inmate misbehavior report for possessing one weapon and two altered items. (Defs. & Tirado 56.1 Stmt. ¶ 17; Shevlin Aff. Ex. B: 4/19/12 Officer Jackson Inmate Misbehavior Report.)

Tirado denies that the contraband found in his cell belonged to him or that he left the items in his cell, instead maintaining that they were planted by defendants as retaliation. (Tirado 56.1 Stmt. ¶ 16; Dkt. No. 102: Shevlin Aff. Ex. E: Disciplinary Hearing Tr. at 6–8; Kremer Aff. Ex. C: Tirado Dep. at 61–62.) Tirado points to testimony by Lieutenant Dominic that officers frequently confiscate similar items (Kremer Aff. Ex. T: Dominic Dep. at 188), as well as testimony by inmate Vazquez that he feared that if he spoke up about the assault on Tirado, officers would put a knife in his cell and "justify a search" in order to have him sent to SHU (Kremer Aff. Ex. I: Vazquez Dep. at 26–27). Logs from the months prior to April 2012 show three separate searches of Tirado's cell which did not result in officers finding weapons or similar modified items (*see* Kremer Aff. Ex. U: Cell Search Logs), although Tirado admitted to possessing such contraband items in the past to use to clean his typewriter and radio (Shevlin Aff. Ex. E: Disciplinary Hearing Transcript at 31).

**\*4** Officer Holliday testified that Tirado's cell was open during and after the altercation and he does not know when it was locked. (Kremer Aff. Ex. D: Holliday Dep. at 181.) Both Officers Holliday and Lassiter possessed keys that could open Tirado's cell. (Holliday Dep. at 176.) Officer Holliday returned to Tirado's gallery after his shift ended, although he maintains that he simply retrieved his bag and left without passing Tirado's cell. (Holliday Dep. at 180.) Sergeant Shutt and Officer Lassiter both also remained in Sing Sing after their shifts ended at 3:00 p.m. (Kremer Aff. Ex. F: Shutt Dep. at 189; Lassiter Dep. at 163.)

### Tirado's Disciplinary Hearing Results

At his disciplinary hearing on April 30, 2012, Tirado initially pled "[g]uilty with an explanation" to the charges

in Officer Jackson's misbehavior report and only changed his plea to "not guilty" after the hearing officer informed him that DOCCS does not recognize a plea of "guilty with an explanation." (Dkt. No. 102: Shevlin Aff. Ex. E: Disciplinary Hearing Tr. at 5–6.) At the hearing, and again in his deposition, Tirado testified that the three contraband items found in his cell were not his. (Disciplinary Hearing Tr. at 8; Shevlin Aff. Ex. F: 5/3/12 Disciplinary Hearing Disposition; Dkt. No. 106: Kremer Aff. Ex. C: Tirado Dep. at 61–62; Dkt. No. 105: Tirado 56.1 Stmt. ¶ 16.) Tirado also testified that although he believed the contraband had been placed as retaliation by Officer Holliday, he did not believe Officer Jackson had any part in the alleged retaliation. (Discplinary Hearing Tr. at 7–8, 14, 19, 26–27.) Tirado was found guilty of the weapon and altered item charges alleged in Officer Jackson's Inmate Misbehavior Report. (Dkt. No. 101: Defs. 56.1 Statement ¶ 18; Tirado 56.1 Stmt. ¶ 18; 5/3/12 Disciplinary Hearing Disposition.)

Tirado was found not guilty of all four counts contained in Officer Holliday's inmate misbehavior report. (Defs. & Tirado 56.1 Stmts. ¶ 18; Kremer Aff. Ex. M: 5/8/12 Disciplinary Hearing Disposition.) The hearing officer found that "[t]estimony from witnesses did not support the charges in the misbehavior report." (5/8/12 Disciplinary Hearing Disposition.) The hearing officer reported his findings to the DOCCS Office of the Inspector General, stating that "[a]ny reasonable person who understands how this process works can see the officers are lying." (Kremer Aff. Ex. N: 6/15/12 Keyser Email.) [2]

### Tirado's Subsequent Facility Transfers and Further Misbehavior Reports

Because Tirado received a sentence of ninety days in SHU as a result of being found guilty of Officer Jackson's inmate misbehavior report, Tirado was transferred out of Sing Sing to Mid-State Correctional Facility on May 4, 2012. (Dkt. No. 101: Defs. 56.1 Stmt. ¶ 24; Dkt. No. 105: Tirado 56.1 Stmt. ¶ 24.) After completing his SHU term at Mid-State, Tirado was transferred to Auburn Correctional Facility on August 1, 2012 and back to Sing Sing on February 10, 2014. (Defs. & Tirado 56.1 Stmts. ¶¶ 25, 26.)

**\*5** In April 2013, Tirado filed a pro se complaint in this Court alleging deprivations of his constitutional rights

by Sergeant Shutt, Officer Holliday and Officer Lassiter. (Dkt. No. 2: Comp.) On June 12, 2013 Auburn Correction Officer Steven Slivinski, who is not a defendant in this case, filed a misbehavior report against Tirado, which Tirado alleges was in retaliation for his suing defendants. (Dkt. No. 80: Am. Comp. ¶¶ 69–70; Dkt. No. 103: Defs. Br. at 19.) Tirado was found guilty of several of the charges in Officer Slivinski's misbehavior report, and those determinations were upheld on appeal. (Am. Comp. ¶¶ 71–72; Defs. Br. at 19.)

On March 17, 2014, after Tirado returned to Sing Sing, Officer Holliday issued him another inmate misbehavior report alleging harassment and violent conduct in a facility emergency room on March 16. (Dkt. No. 106: Kremer Aff. Ex. V: 3/17/14 Inmate Misbehavior Report.) Tirado testified that on March 16, Officer Holliday harassed him in relation to this lawsuit. (Kremer Aff. Ex. C: Tirado Dep. at 110 ("He's in front of me and he's talking to me about this case and why I'm doing it and all this other stuff and I'm not basically paying him no mind.").) Tirado was found guilty of all charges in this misbehavior report. (Kremer Aff. Ex. V: 4/11/14 Disciplinary Hearing Disposition.) Tirado further alleges that on March 23, 2014, Officer Holliday intimidated and menaced Tirado and his parents in Sing Sing's visiting room by pacing behind Tirado's father and glaring at Tirado. (Am. Compl. ¶ 81; Tirado Dep. at 91.)

Finally, in August 2014, Officer Holliday issued Tirado another inmate misbehavior report charging him with making threats, harassing a correction officer, and violating visiting procedures. (Kremer Aff. Ex. W: 8/2/14 Inmate Misbehavior Report.) Following a hearing, Tirado was found guilty of the visiting violation. (Kremer Aff. Ex. W: 8/8/14 Disciplinary Hearing Disposition.) The hearing officer found that Officer Holliday's testimony "failed to corroborate" the other charges. (8/8/14 Disciplinary Hearing Disposition.) At deposition, Officer Holliday admitted that he issued Tirado the August 2014 misbehavior report because of this lawsuit. (Kremer Aff. Ex. D: Holliday Dep. at 201 ("Oh, I had to protect my interests, my job.").) Tirado has not filed a grievance in connection with this misbehavior report. (Dkt. No. 113: Shevlin Aff Ex.: Quick Aff. ¶ 3.)

*Defendants' Motion for Partial Summary Judgment*
In August 2014, represented by pro bono counsel, Tirado filed an amended complaint. (Dkt. No. 80: Am. Comp.)

On December 29, 2014, defendants moved for partial summary judgment on Tirado's claims that: (a) any of the events of April 19, 2012 were in retaliation for his January 2012 grievance, (b) Officer Slivinski, who was not named as a defendant, issued a false misbehavior report to Tirado on June 12, 2013 in retaliation for his January 2012 grievance and the filing of this lawsuit, (c) Lieutenant Dominic threatened Tirado while he was in the medical facility, and (d) Tirado's transfers between correctional facilities were intended to impair his ability to prosecute his grievances and lawsuit. (Dkt. No. 100: Defs. Summary Judgment Motion; Dkt. No 103: Defs. Br. at 2.) Defendants did not move for summary judgment with respect to Tirado's claim that he was subjected to excessive force on April 19, 2012 or his claim that Officer Holliday's March 16, 2014 inmate misbehavior report was retaliatory. (Defs. Br. at 2 n. 1.) In response to Tirado's opposition brief, which argued that defendants retaliated against Tirado by causing another correction officer to threaten Tirado with further assaults and emphasized Tirado's allegations that the April 19, 2012 incident was in retaliation for Tirado's request to speak with Officer Holliday's sergeant (Dkt. No. 104: Tirado Br. at 3), defendants also seek summary judgment on those claims (Dkt. No. 112: Defs. Reply Br. at 2, 7–8.)

*ANALYSIS*

**I. SUMMARY JUDGMENT STANDARD**

**\*6** Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U .S .242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Humphreys v. Cablevision Sys. Corp.,* 533 F. App'x 13, 14 (2d Cir.2014); *Connolly v. Calvanese,* 515 F. App'x 62, 62 (2d Cir.2013); *Lang v. Ret. Living Publ'g Co.,* 949 F.2d 576, 580 (2d Cir.1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See, e.g., Adickes v.. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970); *Alzawahra v. Albany Med. Ctr.,* 546 F. App'x 53, 54 (2d Cir.2013); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F .3d

1219, 1223 (2d Cir.1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552–53; *Dolan v. Cassella,* 543 F. App'x 90, 90 (2d Cir.2013).

To defeat a summary judgment motion, the non-moving party " 'must do more than simply show that there is some metaphysical doubt as to the material facts.' " *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986)). Instead, the non-moving party must "cit[e] to particular parts of materials in the record" to show that "a fact ... is genuinely disputed." Fed.R.Civ.P. 56(c)(1); *see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356; *Alzawahra v. Albany Med. Ctr.,* 2013 WL 6284286 at *1; *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (at summary judgment, "[t]he time has come ... 'to put up or shut up' "), *cert. denied,* 540 U.S. 811, 124 S.Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513.[3] The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 37.

*7 In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight v. U.S. Fire Ins. Co.,* 804 F.2d at 11–12.

## II. *CLAIMS TIRADO CONCEDES*

Tirado's response to defendants' motion for summary judgment concedes that several of his claims should be dismissed.

### A. *Claims Against Lieutenant Dominic*

Following his altercation with Officers Holliday and Lassiter, Tirado was taken to the prison infirmary. (*See* page 4 above.) Tirado's amended complaint alleged that Lieutenant Dominic "confronted" him in the infirmary and threatened him with further assault. (*See* pages 4–5 above.) Tirado now concedes that he has not raised any genuine issues of material fact with respect to Lieutenant Dominic. (Dkt. No. 104: Tirado Br. at 3 ("Tirado does not contend that there is a genuine issue of material fact regarding Defendant Dominic's liability in this case").) Defendants therefore should be granted summary judgment on this claim. Because no claims against Lt. Dominic remain, he should be dismissed as a defendant in this case.

### B. *Claims Involving Officer Slivinksi*

Similarly, Tirado's amended complaint alleged that Officer Slivinski's June 12, 2013 Inmate Misbehavior Report was retaliatory. (*See* page 8 above.) Officers Slivinski is not a defendant in this case, and Tirado now acknowledges that he "does not contend that there is a genuine issue of material fact regarding Defendants' responsibility for the misbehavior report filed by non-party Steven Slivinski." (Dkt. No. 104: Tirado Br. at 3.) Defendants therefore should be granted summary judgment on this claim.

### C. *Claims Relating To Tirado's Transfers Between Correctional Facilities*

Finally, DOCCS transferred Tirado from Sing Sing to Mid–State to Auburn and back to Sing Sing. (*See* page 8 above.) Although Tirado initially alleged that defendants

transferred him in order to impair his ability to pursue his grievance and this lawsuit (Am.Compl.¶¶ 58, 65), he now "does not contend that there is a genuine issue of material fact regarding Defendants' liability for Mr. Tirado's transfers between correctional facilities" (Dkt. No. 104: Tirado Br. at 3). Accordingly, defendants should be granted summary judgment with respect to Tirado's claims arising from his transfers.

## III. *TIRADO'S REMAINING FIRST AMENDMENT RETALIATION CLAIMS*

### A. *First Amendment Retaliation Standard*

**\*8** To prove a First Amendment retaliation claim, "a prisoner must show ... '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009). [4]

For the second prong, adverse action, the plaintiff must show that the defendant's "retaliatory conduct ... would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.... Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker,* 239 F.3d 489, 49293 (2d Cir.2001) (citations omitted), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002). [5]

For the third prong, causal connection between the protected speech and the adverse action, a court may consider a number of factors, including "any statements made by the defendant concerning his motivation" and "the temporal proximity between the protected activity and the defendant's adverse action." *Williams v. Muller,* 98 Civ. 5204, 2001 WL 936297 at \*3 (S.D.N.Y. Aug. 17, 2001); *see, e.g., Espinal v. Goord,* 558 F.3d at 129; *Turner v. Sidorowicz,* 2014 WL 641454 at \*10; *Moore v. Cajigas,* 12 Civ. 4120, 2013 WL 4734829 at \*6 (S.D.N.Y. Aug. 20, 2013). [6] In the context of retaliatory false misbehavior reports, a court may also consider the plaintiff's prior good disciplinary record and whether he was vindicated at the subsequent disciplinary hearing. *See, e.g., Turner v. Sidorowicz,* 2014 WL 641454 at \*10–12; *Jones v. Marshall,* 08 Civ. 0562, 2010 WL 234990 at

\*4 (S.D.N.Y. Jan. 19, 2010); *Brown v. Brown,* No. 08–CV–0209, 2010 WL 1186569 at \*6 (N.D.N.Y. Jan. 19, 2010), *report & rec. adopted,* 2010 WL 1186566 (N.D.N.Y. Mar. 24, 2010); *Burton v. Lynch,* 664 F.Supp.2d 349, 367 (S.D.N.Y.2009); *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002).

If the plaintiff satisfies his burden,

> the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff "even in the absence of the protected conduct." Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.

*Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted). [7]

Prisoners' claims of retaliation, of course, must be examined with skepticism and particular care because they are " 'prone to abuse' since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson,* 89 F.3d at 79 (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)); *accord, e.g., Dorsey v. Fisher,* 468 F. App'x at 27; *Gill v. Pidlypchak,* 389 F.3d 379, 385 (2d Cir.2004); *Bennett v. Goord,* 343 F.3d at 137; *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003); *Dawes v. Walker,* 239 F.3d at 491. [8]

### B. *Tirado Engaged In Protected Speech*

**\*9** Tirado alleges that defendants retaliated against him for three different instances of protected speech: First, Tirado alleges that defendants retaliated against him for filing his January 2012 grievance and the related complaint to the Westchester County District Attorney's Office. (Dkt. No. 104: Tirado Br. at 10.) Second, Tirado alleges that defendants retaliated against him for his request on April 19, 2012 to be let out of his cell to speak to a sergeant regarding the loss of his recreation time. (Tirado Br. at 10–12.) Third, Tirado alleges that defendants retaliated against him for filing this lawsuit. (Tirado Br. at 12.)

In alleging that defendants retaliated against him for filing a prison grievance, Tirado has met the first prong of the First Amendment retaliation analysis requiring that the speech or conduct at issue was protected. "It is well settled that the filing of a prison grievance is a protected activity." *Mateo v. Fischer,* 682 F.Supp.2d 423,

433 (S.D.N.Y.2010). [9] Similarly, the filing of a lawsuit is a protected activity. *See, e.g., Espinal v. Goord* 558 F.3d 119, 128–29 (2d Cir.2009) ("There is no dispute that [plaintiff's] earlier federal lawsuit ... was a protected activity."); *Liner v. Fischer,* 11 Civ. 6711, 2013 WL 4405539 at *23 (S.D.N.Y. Aug. 7, 2013) ("[F]iling prison grievances and lawsuits are constitutionally protected activities."); *Jean–Laurent v. Lane,* No. 11–CV–186, 2013 WL 600213 at *8 (N.D.N .Y. Jan. 24, 2013) ("The filing of lawsuits ... is constitutionally protected activity for retaliation purposes."), *report & rec. adopted,* 2013 WL 599893 (N.D.N.Y. Feb. 15, 2013); *Spavone v. Fischer,* 10 Civ. 9427, 2012 WL 360289 at *4 (S.D.N.Y. Feb. 2012) ("There is no dispute that plaintiff's earlier lawsuit against defendants ... was protected conduct....").

Defendants do not appear to dispute whether Tirado's verbal complaints to Officer Holliday on April 19, 2012 were protected speech. (*See* Dkt. No. 112: Defs. Reply Br. at 4.) In any event, case law in this Circuit indicates that a prisoner's oral complaints to a correction officer may serve as the basis for a First Amendment retaliation claim. *See, e.g., Lunney v. Brureton,* 04 Civ. 2438, 2007 WL 1544629 at *24 & n. 10 (S.D.N.Y. May 29, 2007) (defendant correction officers not entitled to summary judgment where inmate alleged they assaulted him after he made an oral complaint), *report & rec. adopted* 2007 WL 2050301 at *1 (S.D.N.Y. July 17, 2007); *Smith v. Woods,* 2006 WL 1133247 at *10 & n. 69 (inmate's verbal complaint to a correction officer may serve as the basis for a First Amendment retaliation claim), *aff'd* 219 F. App'x 110 (2d Cir.2007); *Gill v. Riddick,* No. 03–CV–1456, 2005 WL 755745 at *10 (N.D.N.Y.2005) (inmate's oral complaints "clearly protected").

### C. *Claims Where Defendants Are Entitled To Summary Judgment*

#### 1. *Tirado Has Failed To Show A Causal Connection Between His January 2012 Grievance And Defendants' Alleged Retaliatory Conduct*

**\*10** Defendants argue that Tirado has presented no evidence that his January 2012 grievance has any causal connection to the events of April 2012 because "[t]hese complaints were made three months earlier, the grievance submitted by [Tirado] was ultimately denied, the grievance/complaints did not name any of the defendants, and these defendants have affirmatively stated that they

were unaware of these complaints prior to April 19, 2012." (Dkt. No. 103: Defs. Br. at 12–13.)

Defendants uniformly have denied that they were aware of Tirado's January 2012 Tirado has presented no countervailing evidence. Absent evidence that any defendant knew about his January 2012 grievance, Tirado has failed to provide any basis to believe that they retaliated against him for a grievance in which they were not named. *See, e.g., Faulk v. Fisher,* 545 F. App'x 56, 59 (2d Cir.2013) (summary judgment in favor of correction officers proper where inmate plaintiff failed to provide evidence that officers who wrote the allegedly retaliatory misbehavior reports were motivated by, named in, or even aware of the earlier grievance); *Toliver v. Fischer,* No. 12–CV–77, 2015 WL 403133 at *19 (N.D.N.Y. Jan. 29, 2015) ("[A] summary judgment motion might clarify who was named in plaintiff's first grievances and persuade the court that no rational fact finder would conclude that correction officers not implicated in the grievances had any cause to retaliate against plaintiff."); *Jones v. Fischer,* No. 10–cv–1331, 2013 WL 5441353 at *21 (N.D.N.Y. Sept. 27, 2013) ("Retaliation claims have been dismissed when they are supported only by conclusory allegations that the retaliation was based upon complaints against another officer."); *Perez v. Keysor,* No. 10–CV–518, 2013 WL 5493932 at *15 (N.D.N.Y. Sept. 30, 2013) (inmate claims alleging retaliation " 'against other prison employees elsewhere in the New York penal system,' without providing additional factual allegations establishing knowledge and involvement are insufficient to state a claim"); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (Peck, M.J.) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance in which the counselor was not named and of which he was unaware). [10]

Direct evidence is not required where "circumstantial evidence." of a retaliatory motive is sufficiently compelling." *Bennett v. Goord,* 343 F.3d 133, 138–39 (2d Cir.2003). Here, the only circumstantial evidence of retaliation based on Tirado's January 2012 grievance is that the April 19, 2012 use of force occurred within three months. (*See* pages 2–3 above.) To be sure, a "plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord,* 558 at 129. Such circumstantial evidence of retaliation, however, without more, is insufficient to survive summary judgment-

especially here where defendants were unaware of Tirado's grievance. *See, e.g., Faulk v. Fisher,* 545 F. App'x at 58–59 (temporal proximity of the allegedly retaliatory misbehavior reports to plaintiff's filing of grievances and plaintiff's excellent prior disciplinary history were insufficient to avoid summary judgment where there was no additional evidence, and neither officer was involved in plaintiff's successful grievance); *Ayers v. Stewart,* No. 96–2013, 101 F.3d 687 (table), 1996 WL 346049 at *1 (2d Cir. June 25, 1996) (Plaintiff's "reliance on circumstantial evidence of retaliation-namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him-does not suffice to defeat summary judgment."); *Guillory v. Ellis,* No. 11–CV–600, 2014 WL 4365274 at *14 (N.D.N.Y. Aug. 29, 2014) (quoting *Roseboro v. Gillespie,* 791 F.Supp.2d at 370); *Brown v. Graham,* No. 07–CV–1353, 2010 WL 6428251 at *19 (N.D.N.Y. Mar. 30, 2010) ("[T]emporal proximity is the only fact that might give rise to a determination by a reasonable factfinder that the misbehavior report was issued in retaliation for plaintiff's grievance activity. However, that link is insufficient when considered in light of the present record. There is no evidence that [defendant] was aware of plaintiff's grievance activity ...."), *report & rec. adopted,* 2011 WL 1213482 (N.D.N.Y. Mar. 31, 2011); *Williams v. Goord,* 111 F.Supp.2d at 290 ("Although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment."); *Gill v. DeFrank,* 98 Civ. 7851, 2000 WL 270854 at *16 (S.D.N.Y. Mar. 9, 2000) (Peck, M.J.) ("While the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment."), *report & rec. adopted as modified,* 2000 WL 897152 (S.D.N.Y. July 6, 2000); *cf. Blue v. Koren,* 72 F.3d 1075, 1085 (2d Cir.1995) ("a temporal sequence may fuel ... suspicions, [but] it does not suffice to satisfy the heightened evidentiary standard"). [11]

**\*11** Viewing Tirado's retaliation claims with the appropriate skepticism (*see* cases cited on page 16 above), Tirado has failed to provide sufficient evidence to establish a causal connection between his January 2012 grievance and any defendant in this case. Defendants should be granted summary judgment on this claim.

### 2. Alleged April 19, 2012 Threats By An Unidentified Officer

Tirado previously claimed that Lieutenant Dominic threatened further retaliation if Tirado spoke about the alleged assault. (*See* pages 4–5 above.) Having since conceded that there is no genuine issue regarding Lieutenant Dominic's liability (*see* pages 12–13 above), Tirado now argues that "there is at least a genuine issue of material fact as to whether Defendants retaliated against [him] by causing another correction officer to threaten [him] with additional assaults and to order him to 'hold it down.' " (Dkt. No. 104: Tirado Br. at 3.) Tirado testified that while he was in Sing Sing's medical facility following the alleged assault, a non-defendant correction officer told him to "hold it down," which Tirado understood to mean that he should not tell anyone that he had been assaulted or why. (*See* page 5 above.)

Vague threats like "hold it down," however, do not constitute an adverse action for purposes of a First Amendment retaliation claim because they are insufficiently specific to deter an inmate from exercising his First Amendment rights. *See, e.g., Figueroa v.. Holmes,* No. 13–CV–48, 2013 WL 5702269 at *6 (N.D.N.Y. Oct. 18, 2013) (verbal threat did not rise to the level of an adverse action); *Phelan v. Zenzen,* No. 10–CV–6704, 2012 WL 5420423 at *7 (W.D.N.Y. Nov. 6, 2012) ("[V]ague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim."); *Barrington v. N.Y.,* 806 F.Supp.2d 730, 746 (S.D.N.Y.2011) ("[C]ourts in this district have dismissed and/or granted summary judgment with respect to retaliation claims based on general threats."); *Royster v. Spitzer,* 05 Civ. 6635, 2011 WL 2020442 at *4 (S.D.N.Y. Mar. 28, 2011) ("[T]hreats, without any subsequent injury, do not constitute an adverse action."), *report & rec. adopted,* 2011 WL 2020267 (S . D.N.Y. May 23, 2011); *Mateo v. Fischer,* 682 F.Supp.2d 423, 434 (S.D.N.Y.2010) ("The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights."); *Bartley v. Collins,* 95 Civ. 10161, 2006 WL 1289256 at *6 (S.D.N.Y. May 10, 2006) ("verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action" (fn.omitted)).

In addition, despite discovery taken by Tirado's counsel, there is no evidence to connect the unidentified officer's alleged statement to any defendant. *See, e.g., Rosales v.*

*Fischer,* 07 Civ. 10554, 2011 WL 253392 at *10 (S.D.N.Y. Jan. 24, 2011)* (inmate failed to establish defendant's role in any alleged retaliation where defendant denied any involvement and plaintiff "pointed to no record evidence to the contrary"). [12]

 **\*12** Defendants should be granted summary judgment on this claim.

### 3. *Menacing And Intimidation By Officer Holliday In Response To The Filing Of This Lawsuit*

Tirado claims that he "has raised a triable issue of fact as to whether Defendant Holliday has retaliated against [him] for filing this case" based on Holliday's "intimidation and menacing of Mr. Tirado and his parents since 2012." (Dkt. No. 104: Tirado Br. at 12, 15–16.) To establish that a defendant took an adverse action, a plaintiff must show that the defendant's "retaliatory conduct ... would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.... Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001)* (citations omitted), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U . S. 506, 122 S.Ct. 992 (2002); *see also* cases cited at page 14 above.

Tirado does not allege that Officer Holliday actually made any threats to him or his family, but merely alleges that Officer Holliday paced behind them in Sing Sing's visiting room and glared. (*See* page 9 above.) Although a pattern of harassment and vague threats potentially could constitute adverse action, *see, e.g., Ford v. Palmer,* 539 F. App'x 5, 7 & n. 2 (2d Cir.2013)* (considered in context of multiple instances of correction officer denying plaintiff hot water for retaliatory reasons, correction officer's vague threat to poison plaintiff by putting an unidentified substance into plaintiff's water constituted adverse action); *Dabney v. Maddock,* No. 10–CV–519, 2011 WL 7479164 at *4 (N.D.N.Y. Nov. 29, 2011)* (isolated actions that do not rise to the level of adverse actions on their own may "collectively ... suffice to constitute adverse action"), *report & rec. adopted,* 2012 WL 760748 (N.D.N.Y. Mar. 7, 2012); *Shariff v. Poole,* 689 F.Supp.2d 470, 47879 (W.D.N.Y.2010)* (plaintiff satisfied adverse action requirement by showing "an excessive number of cell searches, false misbehavior reports, confiscation of legal documents, and verbal

threats followed by excessive pat frisking and searching"), Tirado's allegation of a single instance of vague conduct does not meet that standard.

Defendants should be granted summary judgment on this claim.

### D. *Claims Where Defendants Are Not Entitled To Summary Judgment*

Tirado has met his burden to survive summary judgment with respect to several of his claims. If "there is *any* evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994); *see* cases cited at pages 11–12 above. Here, Tirado has produced evidence from which a reasonable inference could be drawn that Officer Holliday assaulted him on April 19, 2012 and filed a false misbehavior report against him in retaliation for Tirado's requesting to speak to a sergeant. The record also contains evidence, including testimony from Tirado, another inmate and defendants, from which a reasonable inference could be drawn that defendants retaliated by planting contraband in Tirado's cell prior to Officer Jackson searching it.

### 1. *The April 19, 2012 Assault and Officer Holliday's Subsequent False Misbehavior Report*

 **\*13** Defendants argue that "[i]n an effort to bypass the lack of evidence for the allegedly retaliatory nature of the April 2012 use of force, [Tirado] now argues, for the first time, that the alleged assault was also in retaliation for his having asked Officer Holliday to speak with a Sergeant and for 'disrespecting' that Officer" and that Tirado never asserted this claim prior to filing his opposition brief. (Dkt. No. 112: Defs. Reply Br. at 4.) Defendants view this as an impermissible attempt to amend the complaint through opposition papers. (Defs. Reply Br. at 4.)

Tirado's amended complaint *does* assert that his retaliation claims are based in part on his conversation with Officer Holliday immediately prior to defendants' use of force. Tirado's third cause of action, for retaliation, incorporates by reference all of Tirado's prior factual allegations and specifically alleges that defendants retaliated against Tirado on the basis of the conduct described in *all* of them. (Dkt. No. 80: Am. Comp. ¶¶ 103–04 .) This includes Tirado's allegations about

requesting to speak to a sergeant and Officer Lassiter telling Tirado that he was " 'disrespecting' " Holliday. (Am.Comp.¶¶ 18–19, 22–24, 30.) Defendants' argument that it is "inapposite" for Tirado to "cite[ ] to the Third cause of action in the Complaint for [this] claim" because "that cause of action focuses exclusively on the January 2012 complaints" (Defs. Reply Br. at 4) therefore is incorrect.

In support of his claim that the officers' use of force and Officer Holliday's subsequent false misbehavior report were retaliatory, Tirado has produced sufficient evidence, both direct and circumstantial, to allow a jury to find causal connections between his request to speak to a sergeant and those events.

The officers' use of force against Tirado and Officer Holliday's subsequent false misbehavior report occurred immediately after Tirado complained to Officer Holliday that he wanted to speak to a sergeant. (*See* pages 3, 5 above.) Tirado's subsequent vindication at his disciplinary hearing supports Tirado's account of the incident, as do the results of the investigation into the incident by the DOCCS Inspector General. (*See* pages 7–8 above.) In addition, other inmates who witnessed the altercation testified that, contrary to defendants' account, Officer Holliday approached Tirado in his cell, directed Tirado to leave the cell and walk toward the center gate area of the galley, and together with Officer Lassiter attacked Tirado without provocation. (*See* page 3 above .) Officer Holliday admitted that he believed the center gate area was outside the view of inmates and the cameras. (*See* page 3 above.)

Tirado also has presented direct evidence of defendants' retaliatory motive. Officer Lassiter told Sergeant Shutt, with Tirado present, that Tirado was "disrespecting Holliday" by demanding to speak to a sergeant. (*See* pages 3–4 above.) Tirado's testimony is corroborated by another inmate who testified that Officer Holliday was telling inmates who were calling for a sergeant to "be quiet" and "assertively" claimed that "I don't give a fuck about Lieutenants or Deps. I run shit here and if you don't do what I say I'll write you up every day I work." (*See* page 4 above.)

**\*14** Finally, Officer Holliday's subsequent testimony that in issuing Tirado a disciplinary report in August 2014 he had to protect his interests and job (*see* page 9 above) provides further circumstantial evidence of a retaliatory

motive. Defendants are correct that Tirado cannot advance a retaliation claim based on the August 2014 report because he has not exhausted his administrative remedies with respect to any such claim. (Dkt. No. 112: Defs. Reply Br. at 8, citing *Jones v. Brock,* 549 US. 199, 218, 127 S.Ct. 910, 922–23 (2000); *see* page 9 above.) Tirado, however, argues that the August 2014 misbehavior report is one component of a disciplinary record that, as a whole, "reflects Defendants' persistent retaliatory motive." (Dkt. No. 104: Tirado Br. at 18). Other parts of that disciplinary record support Tirado's argument. Tirado was found not guilty of assaulting Officer Holliday during the April 2012 incident (*see* page 7 above), and a superintendent's investigation of Officer Holliday's August 2014 report reached a similar conclusion; although Officer Holliday alleged that Tirado assaulted him, Tirado again was vindicated on that charge (*see* page 9 above). Officer Holliday twice filed false misbehavior reports alleging that Tirado assaulted him; a jury reasonably could infer from his statement admitting a retaliatory motive for the latter report that he had a similar motive for the prior one. (*See* pages 7, 9 above.)

Defendants should be denied summary judgment with respect to whether their use of force against Tirado on April 19, 2012, and Officer Holliday's subsequent false misbehavior report, were in retaliation for Tirado's verbal complaints to Officer Holliday immediately prior to the incident.

### 2. *Tirado's Claim That Defendants Planted Contraband Found During Officer Jackson's April 19, 2012 Cell Search*

Defendants argue that, as a matter of law, Tirado cannot establish a retaliation claim based on Officer Jackson's cell search. (*See* Dkt. Not. 103: Defs. Br. at 13–14.) "[W]hile the Second Circuit has not addressed whether a cell search can constitute an adverse action for purposes of a First Amendment retaliation claim, many district courts in this circuit have concluded that a cell search cannot support such a claim." *Shannon v. Venettozzi,* 13 Civ. 4530, 2015 WL 114179 at *7 n. 4 (S.D.N.Y. Jan. 8, 2015); *accord, e.g., Mateo v. Alexander* 10 Civ. 8427, 2012 WL 864805 at *4 (S.D.N.Y. Mar. 14, 2012) ("The Second Circuit has not addressed whether a cell search can constitute an adverse action for purposes of a First Amendment retaliation claim. Nevertheless, many district courts in this circuit have concluded that a cell search is insufficient to support such a claim. These courts have reasoned ... that a search

2015 WL 774982

of an inmate's cell, even for retaliatory reasons, does not implicate a constitutional right, because a prisoner has no reasonable expectation of privacy in his or her prison cell." (fn. & citations omitted)); *Salahuddin v. Mead,* 95 Civ. 8581, 2002 WL 1968329 at *5 (S.D.N.Y. Aug. 26, 2002) ("Many courts in this district have concluded that a retaliatory cell search is insufficient to support a First Amendment retaliation claim."). Defendants also argue that "a prison inmate has no general Constitutional right to be free from being falsely accused in a misbehavior report. There must be more, such as retaliation against the prisoner for exercising a constitutional right." (Defs. Br. at 15, citing *Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997); *see also* Dkt. No. 112: Defs. Reply Br. at 5 n. 2.)

 **\*15** Retaliation for exercising a constitutional right is, however, the basis for Tirado's claim that "[t]here is at least a genuine issue of material fact as to whether the misbehavior report issued as a result of the cell search was retaliatory because it was based on planted evidence" (Dkt. No. 104: Tirado Br. at 2), not the simple fact that the Officer Jackson searched Tirado's cell or that the resulting misbehavior report allegedly was false. Tirado supports his claim that the contraband was planted with his own testimony, evidence from prior searches of his cell, testimony from another inmate that retaliation by weapon-planting was a concern for inmates at Sing Sing, and evidence that a jury could find shows that defendants had the motive and means to plant the contraband in Tirado's cell. (*See* Tirado Br. at 2; *see* pages 4–8 above.)

Defendants do not dispute that the planting of weapons or other contraband in an inmate's cell can support a First Amendment retaliation claim. (*See* Dkt. No. 112: Defs. Reply Br. at 5–7.) Instead, defendants argue that Tirado "has not 'adduced' any 'evidence' that any of the defendants retaliated against him by planting contraband in his cell," that his claims are merely "conjecture and supposition," and that Tirado's argument that his evidence shows defendants had the motive, means, and opportunity to plant the contraband is "irrelevant ... as that does not constitute evidence that any of them actually did plant contraband." (Defs. Reply Br. at 5–6.)

Taken as a whole, Tirado's evidence is the sort of circumstantial evidence from which a jury reasonably could infer that the contraband was planted. *See, e.g., Kotler v. Donelli,* 382 F. App'x 56, 58 (2d Cir.2010) ("Viewing the evidence in the light most favorable to

[plaintiff], as we must, a reasonable jury could return a verdict for [plaintiff]. [Plaintiff] disavows ownership of the weapon, defendants' testimony is inconsistent on how and where the prison officials found the weapon, and there is evidence that at least one defendant wished to remove [plaintiff] from the grievance committee. This combined with the rest of the circumstantial evidence [plaintiff] alleges is sufficient to raise a genuine issue of fact as to whether one or more of the defendants retaliated against [plaintiff] for his protected activities."); *Bennett v. Goord,* 343 F.3d 133, 136–39 (2d Cir.2003) (inmate's circumstantial evidence of retaliation "sufficiently compelling" to survive summary judgment; defendants filed disciplinary charge involving allegedly planted weapon mere days after inmate filed grievance and inmate was subsequently vindicated on administrative appeal); *Jackson v. Goord,* No. 06–CV–6172, 2013 WL 1560204 at *1–2 (W.D.N.Y. Apr. 10, 2013); *Higgins v. Artuz,* 94 Civ. 4810, 1997 WL 466505 at *5 (S.D.N.Y. Aug. 14, 1997) (Sotomayor, D.J.) (defendants not entitled to summary judgment on inmate's claim of retaliatory false misbehavior reports alleging possession of contraband; temporal proximity to inmate's grievances and activist role on grievance committee combined with inmate's vindication in resulting disciplinary hearings and status as honor block inmate created factual dispute).

 **\*16** First, Tirado consistently testified at his disciplinary hearing and at deposition that the three contraband items recovered from his cell were not his. (*See* page 6 above.) Search logs for Tirado's cell show that three searches of his cell in the prior three months found no contraband similar to that recovered on April 19, 2012. (*See* page 6 above.)

Tirado argues that planting weapons in his cell would undermine his credibility and substantiate Officer Holliday's claim to have been fearful when he used force on Tirado (Tirado Br. at 14), and he has introduced evidence from which a jury could infer that this gave at least Officer Holliday motive to plant the contraband. Officer Holliday testified that he was scared for his life when, according to his version of events, Tirado assaulted him (*see* page 4 above), and the subsequent disposition of his disciplinary report against Tirado, which included a finding that Tirado was not guilty, that Officer Holliday was not credible, and that resulted in now-rescinded disciplinary actions against both Officers Holliday and Lassiter by the Officer of the Inspector General, demonstrate why a jury could find that Officer

Holliday would want to bolster his credibility (*see* pages 7–8 above). Furthermore, inmate Kelvin Vazquez testified that he feared that if he spoke up about the April 19, 2012 assault on Tirado, officers would put a knife in his cell and "justify a search" in order to have him sent to SHU. (*See* page 6 above.)

Tirado's evidence supports his argument that defendants had the means of acquiring, and therefore the means to plant, the contraband found in his cell because "altered items are rife at Sing Sing and correction officers confiscate them easily and regularly." (Tirado Br. at 14.) Defendants claim that this is "mere speculation as [Tirado] presents no evidence that any of these defendants possessed such items." (Defs. Reply Br. at 6.) Lieutenant Dominic's and inmate Vazquez' testimony confirmed that contraband such as altered tweezers is common at Sing Sing and found by guards on a regular basis. (*See* page 6 above.)

Tirado notes that defendants had the opportunity to plant the contraband since Officer Jackson did not perform the search until 5:30 p.m., two and a half hours after Tirado was taken to the medical facility and SHU. (Tirado Br. at 14–15; *see* pages 4–6 above.) Tirado's cell may have been open for some of that time, and both Officers Holliday and Lassiter had keys to open it. (*See* page 6 above.) In addition, Officer Holliday testified that he returned to Tirado's gallery after Tirado was taken to the medical facility. (*See* page 7 above.) Similarly, both Sergeant Shutt and Officer Lassiter testified that they stayed at work on April 19, 2012 after their shifts' scheduled end at 3:00 p.m. (*See* page 7 above.) Thus, Tirado has presented evidence that "[d]efendants had a clear opportunity to engage in this misconduct while [he] was locked away in SHU following the assault." (Tirado Br. at 14.)

 **\*17** Finally, defendants' argument that "even if the Court were to determine that plaintiff has satisfied his burden of demonstrating that the defendants retaliated against him by conducting a cell search and issuing a misbehavior report to him, such claims should still be dismissed because such actions were motivated by legitimate penological interests" (Defs. Br. at 17) is without merit insofar as Tirado's claim is that the misbehavior report is based on defendants having planted contraband in his cell. Retaliatory contraband planting clearly serves no legitimate penological interest.

Drawing all reasonable inferences in Tirado's favor, there is sufficient evidence to raise a genuine factual dispute about whether Officer Holliday (and/or Officer Lassiter or Sergeant Shutt) planted contraband in Tirado's cell prior to Officer Jackson searching it on the evening of April 19, 2012. [13]

Defendants should be denied summary judgment on this claim.

### IV. *DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY*

Defendants also argue that they are entitled to summary judgment on qualified immunity grounds. (*See* Dkt. No. 103: Defs. Br. at 24–25; Dkt. No. 112: Defs. Reply Br. at 9–10.) "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982)). When a government official charged with violating federal constitutional rights invokes qualified immunity to support a summary judgment motion, the Court considers, as a threshold matter, whether the facts when viewed in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156 (2001); *accord, e .g., Tolan v. Cotton,* 134 S.Ct. 1861, 1865 (2014) (per curiam). If the answer to this question is no, "there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz,* 533 U.S. at 201, 121 S.Ct. at 2156; *see also, e.g., X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 66 (2d Cir.1999) (observing that resolution of this first question favorable to defendant "moots" further inquiry into qualified immunity). "The reason for this rule is that, where there is no viable constitutional claim, defendants have no need of an immunity shield." *Walczyk v.. Rio,* 496 F.3d 139, 154 (2d Cir.2007). [14]

If, however, the answer to the first question is yes, the Court must decide whether "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan,* 555 U.S. at 232, 129 S.Ct. at 816 (citing *Saucier v. Katz,* 533 U.S. at 201, 121 S.Ct. at 2156). "The relevant, dispositive inquiry

Case 9:16-cv-01211-GTS-TWD Document 72 Filed 08/09/18 Page 335 of 338
Tirado v. Shutt, Not Reported in F.Supp.3d (2015)
2015 WL 774982

in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. at 202, 121 S.Ct. at 2156; *accord, e.g., Tolan v. Cotton,* 134 S.Ct. at 1866. "[T]his question is not answered by reference to how courts or lawyers might have understood the state of the law." *Walczyk v. Rio,* 496 F.3d at 154. When the right at issue is not clearly established by then existing precedent, qualified immunity shields the defendant. *Pearson v. Callahan,* 555 U.S. at 243–45, 129 S.Ct. at 822–23; *accord, e.g., Tolan v. Cotton,* 134 S.Ct. at 1866 (" '[T]he salient question ... is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.' " (quoting *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 2511 (2002))). "Even if the right at issue was clearly established in certain respects, however, an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Walczyk v. Rio,* 496 F.3d at 154 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096 (1986)).[15] "In this respect, the Supreme Court has observed that qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Walczyk v. Rio,* 496 F.3d at 154 (quoting *Malley v. Briggs,* 475 U.S. at 341, 106 S.Ct. at 1096.)

**\*18** The Supreme Court clarified in *Pearson* that the rigid application of *Saucier's* two-step protocol is not appropriate in every qualified immunity case, but recognized that it:

> "is often beneficial," such as where the analysis of the facts under clearly established law "make[s] it apparent that ... the relevant facts do not make out a constitutional violation at all" and where the question presented does "not frequently arise in cases in which a qualified immunity defense is unavailable."

*Dean v. Blumenthal,* 577 F.3d 60, 67 (2d Cir.2009) (discussing *Pearson*' s holding that Saucier's two-step framework is no longer mandatory), *cert. denied,* 559 U.S. 1058, 130 S.Ct. 2347 (2010); *see also, e.g., Tolan v. Cotton,* 134 S.Ct. at 1866 ("Courts have discretion to decide the order in which to engage these two prongs."); *Pearson v. Callahan,* 555 U.S. at 236, 129 S.Ct. at 818 (the "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis

should be addressed first in light of the circumstances in the particular case at hand").

Defendants are not entitled to summary judgment on qualified immunity grounds. The constitutional right that Tirado alleges they violated—the right to be free from retaliation for the exercise of his First Amendment rights —has long been clearly established. *See, e.g., Faulk v. Fisher,* 545February 23, 2015 F. App'x 56, 58 (2d Cir.2013) ("The [defendants] concede that filing an inmate grievance constitutes protected conduct...."); *Johnson v. Burge,* 506 F. App'x 10, 12 (2d Cir.2012) ("Undoubtedly, 'filing a grievance is protected activity.' "); *Bilal v. White,* 494 F. App'x 143, 146–47 (2d Cir.2012) ( "[T]he State of New York does not dispute that [plaintiff's] filing of an inmate grievance qualifies as protected activity for First Amendment purposes."); *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("This court has held that retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983."); *Edwards v. Horn,* 10 Civ. 6194, 2012 WL 760172 at \*14 (S.D.N.Y. Mar. 8, 2012). The very same factual disputes that make summary judgment on the merits improper in this case preclude summary judgment on qualified immunity grounds. *See, e.g., Lore v. City of Syracuse,* 670 F.3d 127, 162 (2d Cir.2012); *Bonilla v. U.S.,* 357 F. App'x 334, 335 (2d Cir.2009) ("Although qualified immunity is a question of law for the Court, if there are factual disputes that bear directly upon whether it was objectively reasonable for an official to believe that he was acting lawfully, these disputes must be resolved by a jury before the legal question can be addressed."); *Mills v. Fenger,* 216 F. App'x 7, 9 (2d Cir.2006) ("Because the parties' accounts differ on the important questions of whether [the plaintiff] resisted arrest and whether his actions threatened the officer or required the force used, summary judgment on qualified immunity is inappropriate."); *Kerman v. City of New York,* 261 F.3d 229, 240 (2d Cir.2001) ("[T]he parties' versions of the facts differ markedly and '[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonabless.' " (quoting *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999)).[16]

***CONCLUSION***

**\*19**  For the reasons set forth above, defendants' motion for partial summary judgment (Dkt. No. 100) should be *DENIED* with respect to (i) Tirado's claim that defendants retaliated against him on April 19, 2012 for requesting to speak to a sergeant by assaulting him and issuing a false misbehavior report based on the assault, and (ii) his claim that they planted contraband in his cell as a further instance of retaliation, but *GRANTED* in all other respects. Lieutenant Dominic and Officer Jackson should be *DISMISSED* as defendants in this case.

The Pretrial Order is due March 20, 2015 (even if objections are filed to this Report and Recommendation).

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain, 500 Pearl Street, Room 1320, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Swain (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *Ingram v. Herrick,* 475 F. App'x 793, 793 (2d Cir.2012); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

### All Citations

Not Reported in F.Supp.3d, 2015 WL 774982

### Footnotes

1    Defendants maintain that "[w]hen an inmate is sent to SHU, his property is packed as soon as possible" and sent to SHU to be inventoried in front of the inmate. (Defs. 56.1 Statement ¶ 14; Dkt. No. 102: Shutt Aff. ¶ 8.) Tirado disputes this on the ground that DOCCS Directive 4910 requires " '[a]n unscheduled search of the living quarters of an inmate shall be conducted only when there is a reasonable suspicion that contraband is contained in the housing unit.' " (Tirado 56.1 Stmt. ¶ 14; Dkt. No. 102: Shevlin Aff. Ex. G: DOCCS Directive 4910.) According to Tirado, "[n]either DOCCS Directive 4910 nor DOCCS Directive 4944 (Use of Physical Force) specifies that an inmate's cell is to be searched for contraband following a use of force incident." (Tirado 56.1 Stmt. ¶ 14; *see generally* DOCCS Directive 4910; Dkt. No. 106: Kremer Aff. Ex. Z: DOCCS Directive 4944.)

     Defendants further claim that under DOCCS protocol, Tirado was not permitted to return from SHU to witness the search of his cell because he had been deemed a security risk as a result of being accused of assaulting staff. (Defs. 56.1 Statement ¶ 15.) Tirado disputes whether the DOCCS directive which states that an inmate shall be present when his cell is searched unless security staff believes he presents a danger to the safety and security of the facility was applicable to him because Officer Lassiter testified that once handcuffed, Tirado was "compliant" and "not combative in any way." (Tirado 56.1 Stmt. ¶ 15; Kremer Aff. Ex. G: Lassiter Dep. at 140–41.)

2    The Office of the Inspector General conducted an investigation of the April 19, 2012 incident based on the hearing officer's conclusions and a grievance filed by Tirado. (Kremer Aff. Ex. O: 8/21/12 Inspector General Report.) On August 21, 2012, the Office of the Inspector General issued a report substantiating Tirado's account and recommending that the case be forwarded to the Bureau of Labor Relations. (*See generally* 8/21/12 Inspector General Report.) On August 31, 2012, the Bureau of Labor relations issued Notices of Discipline to Officers Holliday and Lassiter. (Kremer Aff. Ex. P: Notices of Discipline.) On October 29, 2013, however, the Notices of Discipline were withdrawn. (Kremer Aff. Ex. Q: Hopkins Memo that staff misconduct claim was "weak"; Kremer Aff. Ex. R: Withdrawal of Notice of Discipline.)

3    *See also, e.g., Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y.,* 552 F. App'x 47, 49 (2d Cir.2014); *Alzawahra v. Albany Med. Ctr.,* 2013 WL 6284286 at *1; *Feingold v. New York,* 366 F.3d 138, 148 (2d Cir.2004); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 36; *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d at 1223.

4    *Accord, e.g., Holland v. Goord,* 758 F.3d 215, 225 (2d Cir.2014); *Kotler v. Donelli,* 382 F. App'x 56, 57 (2d Cir.2010); *Allah–Kasiem v. Sidorowicz,* 09 Civ. 9665, 2012 WL 2912930 at *8 (S.D.N.Y. July 15, 2012); *Spavone v. Fischer,* 10

Civ. 9427, 2012 WL 360289 at *3 (S.D.N.Y. Feb. 3, 2012); *Henderson v. Sommer,* 08 Civ. 3440, 09 Civ. 611, 2011 WL 1346818 at *5 (S.D.N.Y. Apr. 1, 2011); *Bilal v. N.Y.S. Dep't of Corr.,* 09 Civ. 8433, 2010 WL 2506988 at *14 (S.D.N.Y. June 21, 2010) (Peck, M.J.), *aff'd,* 494 F. App'x 143 (2d Cir.2012); *Garcia v. Watts,* 08 Civ. 7778, 2009 WL 2777085 at *9 (S.D.N.Y. Sept. 1, 2009).

5   *Accord, e.g., Dorsey v. Fisher,* 468 F. App'x 25, 27 (2d Cir.2012); *Zherka v. Amicone,* 634 F.3d 642, 644–45 (2d Cir.2011); *Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999); *Thaddeus–X v. Blatter,* 175 F.3d 378, 396–98 (6th Cir.1999) (to be actionable, retaliation against a prisoner must be likely to "chill a person of ordinary firmness from continuing to engage" in activity protected by the First Amendment); *Williams v. King,* 11 Civ. 1863, 2014 WL 3925230 at *6 (S.D.N.Y. Aug. 11, 2014); *Turner v. Sidorowicz,* 12 Civ. 7048, 2014 WL 641454 at *10 (S.D.N.Y. Feb. 18, 2014); *Liner v. Fischer,* 11 Civ. 6711, 2013 WL 4405539 at *23 (S.D.N.Y. Aug. 7, 2013); *Henderson v. Sommer,* 2011 WL 1346818 at *5; *Bilal v. N.Y.S. Dep't of Corr.,* 2010 WL 2506988 at *14; *Mateo v. Fischer,* 682 F.Supp.2d 423, 433 (S.D.N.Y.2010); *Walker v. Keyser,* 98 Civ. 5217, 2001 WL 1160588 at *6 (S.D.N.Y. Oct. 2, 2001), aff'd, 131 F. App'x 775 (2d Cir.2005); *Wagnoon v. Gatson,* 00 Civ. 3722, 99 Civ. 5872, 2001 WL 709276 at *6 (S.D.N.Y. June 25, 2001); *Rivera v. Goord,* 119 F.Supp.2d 327, 340 (S.D.N.Y.2000).

6   *See, e.g., Inesti v. Hicks,* 11 Civ. 2596, 2012 WL 2362626 at *15 (S.D.N.Y. June 22, 2012) (Peck, M.J.), *report & rec. adopted,* 2012 WL 3822224 (S.D.N.Y. Sept. 4, 2012); *Gill v. Jones,* 95 Civ. 9031, 2001 WL 1346012 at *6 (S.D.N.Y. Nov. 1, 2001); *Walker v. Keyser,* 2001 WL 1160588 at *6; *Rivera v. Goord,* 119 F.Supp.2d at 339.

7   *See, e.g., Murray v. Hulihan,* 436 F. App'x 22, 23 (2d Cir.2011); *Bilal v. White,* 494 F. App'x 143, 146 (2d Cir.2010); *Gill v. Tuttle,* 93 F. App'x 301, 303 (2d Cir.2004); *Bennett v.. Goord,* 343 F.3d 133, 137 (2d. Cir.2003); *Ebron v. CTO Huria,* No. 99–0087, 205 F.3d 1322 (table), 2000 WL 241576 at *1 (2d Cir. Feb. 1, 2000); *Davidson v. Chestnut,* 193 F.3d at 148–49; *Duamutef v. Hollins,* No. 97–2692, 159 F.3d 1346 (table), 1998 WL 537838 at *1 (2d Cir. July 7, 1998); *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998); *Davidson v. Kelly,* No. 96–2066, 131 F.3d 130 (table), 1997 WL 738109 at *3 (2d Cir. Nov. 24, 1997); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Sher v. Coughlin,* 739 F.2d 77, 82 (2d Cir.1984); *see also, e.g., Allah–Kasiem v. Sidorowicz,* 2012 WL 2912930 at *9; *Spavone v. Fischer,* 2012 WL 360289 at *3; *Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789 at *4 (S.D.N.Y. Apr. 14, 2011); *Walker v. Keyser,* 2001 WL 1160588 at *6; *Williams v. Muller,* 98 Civ. 5204, 2001 WL 936297 at *3 (S .D.N.Y. Aug. 17, 2001); *Jackson v. Johnson,* 15 F.Supp.2d 341, 363–64 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.); *Campbell v. Kuhlmann,* 91 Civ. 6766, 1998 WL 249196 at *4 (S.D.N.Y. May 15,1998).

8   *See also, e.g., Williams v. King,* 2014 WL 3925230 at *6; *Liner v. Fischer,* 2013 WL 4405539 at *22; *Jackson v. Johnson,* 15 F.Supp.2d at 364 ( & cases cited therein).

9   *See, e.g., Faulk v. Fisher,* 545 F. App'x 56, 58 (2d Cir.2013) ("The [defendants] concede that filing an inmate grievance constitutes protected conduct...."); *Johnson v. Burge,* 506 F. App'x 10, 12 (2d Cir.2012) ("Undoubtedly, 'filing a grievance is protected activity.' "); *Bilal v. White,* 494 F. App'x 143, 146–47 (2d Cir.2012) ( "[T]he State of New York does not dispute that [plaintiff's] filing of an inmate grievance qualifies as protected activity for First Amendment purposes."); *Kotler v. Donelli,* 382 F. App'x 56, 57 (2d Cir.2010) ( "There is no dispute that [plaintiff's] activities on the grievance committee were protected."); *Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004) (Plaintiff "has sufficiently alleged ... participation in protected activity: the use of the prison grievance system."); *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001) (filing of internal prison complaint against a correction officer is protected by the First Amendment), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002); *Ricket v. Orsino,* 10 Civ. 5152, 2013 WL 1176059 at *18 (S.D.N.Y. Feb. 20, 2013) ("protected activity includes the filing of grievances"), *report & rec. adopted,* 2013 WL 1155354 (S.D.N.Y. Mar. 21, 2013); *Inesti v. Hicks,* 11 Civ. 2596, 2012 WL 2362626 at *16 (S.D.N.Y. June 22, 2012) (Peck, M.J.), *report & rec. adopted,* 2012 WL 3822224 (S.D.N.Y. Sept. 4, 2012); *Edwards v. Horn,* 10 Civ. 6194, 2012 WL 760172 at *14 (S.D.N.Y. Mar. 8, 2012) ("It is well-established that 'retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances'...."); *Ayers v. Roberts,* No. 05–CV–889, 2008 WL 2079921 at *6 (W.D.N.Y. May 15, 2008) ("The filing of formal prisoner grievances is among the conduct protected by the First Amendment and thus actionable under § 1983."); *Smith v. Woods,* No. 03–CV–480, 2006 WL 1133247 at *10 (N.D.N.Y. Apr. 24, 2006) (extending First Amendment protection to prisoner plaintiff's oral complaints to correction officers), *aff'd,* 219 F. App'x 110 (2d Cir.2007), *cert. denied,* 522 U.S. 1248, 128 S.Ct. 1485 (2008).

10   *See also, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789 at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant."); *Bryant v. Goord,* 99 Civ. 9442, 2002 WL 553556 at *2 (S.D.N.Y. Apr. 12, 2002) ("The grievances that Plaintiff filed prior to the disciplinary proceedings at issue here did not involve any of these Defendants, therefore, there is no basis to assume that these Defendants instituted disciplinary proceedings against Plaintiff to retaliate for his filing grievances against other corrections officers.");

Tirado v. Shutt, Not Reported in F.Supp.3d (2015)
2015 WL 774982

*Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) ("[P]laintiff has not sufficiently alleged that the conduct of [the defendants] was motivated by plaintiff's activities. Plaintiff fails to plead specific facts or to assert any causal connection between his filing of grievances against [one defendant] and his alleged denial of exercise by" the other defendants.).

In *Espinal v. Goord,* however, the Second Circuit found summary judgment inappropriate after finding a "legitimate inference" that a defendant correction officer participated in a retaliatory beating of an inmate because of the inmate's prior lawsuit against other correction officers, even though the defendant was not named in the suit. *Espinal v. Goord,* 558 F.3d 119, 129–30 (2d Cir.2009). *Espinal* is distinguishable because, unlike the current case, the officers involved in the beating told the plaintiff that " 'this is what happens to [i]nmates when they submit law suits against us.' " *Espinal v. Goord,* 558 F.3d at 122. Without such a statement evincing retaliatory intent, there is no "legitimate inference" here that defendants retaliated for a grievance in which they were not named and were unaware of.

11    *Compare, e.g., Bennett v. Goord,* 343 F.3d at 138 (summary judgment precluded where plaintiff's allegations were supported by the temporal proximity of settling of his lawsuit and the alleged retaliation and where "all relevant adverse actions by DOCS officials were subsequently found to have been unjustified."); *Jones v. Coughlin,* 45 F.3d 677, 680 (2d Cir.1995) (plaintiff's testimony that retaliatory threats had been made, together with sequence of events, made summary judgment inappropriate); *Smith v. City of N.Y.,* 03 Civ. 7576, 2005 WL 1026551 at *4 (S.D.N.Y. May 3, 2005) ("However, when this alleged statement [*i.e.,* " 'I don't like you, I'm pretty sure you know why' "] is combined with circumstantial evidence regarding the timing of the incident, plaintiff has established genuine issues of material fact regarding the reason for the destruction of his property.").

12    *See also, e.g., Ayers v. Stewart,* No. 96–2013, 101 F.3d 687 (table), 1996 WL 346049 at *1 (2d Cir. June 25, 1996) (following extensive discovery, plaintiff's "allegation that a meeting had transpired among the defendants, during which they allegedly agreed to confine [plaintiff], is conclusory and is totally unsupported by the record. As such, it cannot defeat summary judgment."); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 368–69 (S.D.N.Y.2011) (Peck, M.J.) (summary judgment for defendant correction officer; while plaintiff claimed that defendant retaliated against him by discussing his grievance with other defendants, plaintiff has "not provided any evidence that such a discussion ever took place").

13    Tirado, however, has presented no evidence that Officer Jackson knew about the alleged planting of the contraband, played any role in it, or otherwise engaged in any retaliatory conduct whatsoever and even testified that he does not believe Officer Jackson had any part in the alleged retaliation. (*See* pages 4–7 above.) Accordingly, Officer Jackson should be dismissed as a defendant in this case.

14    *See also, e.g., Farrell v. Burke,* 449 F.3d 470, 499 n. 14 (2d Cir.2006) (Sotomayor, C.J.) ("Because we have found no cognizable violation of [plaintiff's] rights in this case, we need not reach the question of qualified immunity."); *Holcomb v. Lykens,* 337 F.3d 217, 223–25 (2d Cir.2003) (declining to decide qualified immunity question and affirming summary judgment on ground that, as a matter of law, defendants did not violate plaintiff's due process rights); *Muhammad v. Jenkins,* 12 Civ. 8525, 2013 WL 5225573 at *8 (S.D.N.Y. Sept. 13, 2013) ("If the answer to [the first prong of *Saucier* ] is no, the case is over-not because the defendant is entitled to qualified immunity, but because the defendant did nothing wrong.").

15    *See also, e.g., Betts v. Shearman,* 751 F.3d 78, 82–83 (2d Cir.2014); *Iqbal v. Hasty,* 490 F.3d 143, 167 (2d Cir.2007), *rev'd on other grounds,* 556 U.S. 662, 129 S.Ct. 1937 (2009); *Cerrone v. Brown,* 246 F.3d 194, 202 (2d Cir.2001); *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995).

16    *See also, e.g., Patterson v. Labella,* No. 12–cv–1572, 2014 WL 4892895 at *11 (N.D.N.Y. Sept. 30, 2014) ("If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. Any unresolved factual issues, however, must be resolved by the jury." (citations omitted)); *Tompkins v. City of N.Y.,* 12 Civ. 7771, 2014 WL 4467814 at *6 (S.D.N.Y. Sept. 10, 2014); *Okoroafor v. City of N.Y.,* 07 Civ. 9387, 2013 WL 5462284 at *4–5 (S.D.N.Y. Sept. 25, 2013); *Searles v. Pompilio,* 652 F.Supp.2d 432, 446 (S.D.N.Y.2009); *Rivera v. Leto,* No. 04 Civ. 7072, 2008 WL 5062103 at *7 (S.D.N.Y. Nov. 25, 2008).

---

**End of Document**                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.